UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER 07-61162-CIV-MORENO

STATE NATIONAL INSURANCE
COMPANY,

             Plaintiff,

vs.

ANZHELA EXPLORER LLC,
JEFF DORSEY, MARK ROSANDICH,

             Defendants.

_____/

### DEFENDANT ANZHELA EXPLORER'S TRIAL BRIEF

Plaintiff State National ("Plaintiff") is entitled to no relief.  Plaintiff prefers premiums over promises.  Anzhela Explorer's owner deserves to benefit from promises and protections for which it incurred an obligation to pay a $48,000 premium.  Plaintiff's excuses for nonpayment were all advanced long after this loss.  In any event, not one of these post-hoc rationalizations is sufficient to deny Anzhela her benefits.

This Court has previously declared: "The record as it stands now supports an inference that the language of navigational warranty included in the written documents was overbroad as it did not reflect true intentions of the parties." *Report & Recommendation On Plaintiff's Motion For Summary Judgment*, p. 7 (FLSD Docket: Document 155) (Nov. 28, 2008) ("*SJ Ruling*").  Plaintiff has not and cannot overcome this inference.  Plaintiff cannot discharge its multiple burdens -- as Plaintiff, as insurer, and as the sole drafter of each and every single policy provision at issue herein.  The

TRIAL BRIEF of Anzhela Explorer, LLC   1

evidence supporting coverage herein preponderates too strongly for this Plaintiff to deny. Anzhela was covered for her loss to a stormy sea.

Indeed, Plaintiff long ago admitted coverage: "WFT's representative and State National's agent Karyn Price acknowledged in her deposition that Anzhela Explorer was insured under the terms of the policy while it was in Florida and on its voyage to Louisiana. *See* Deposition of Karyn Price at 100-101." *SJ Ruling,* p. 6. Plaintiff also implicitly admitted coverage by paying for vessel removal. "Why did State National pay for the vessel removal if it was clear from the beginning that Anzhela Explorer sank outside of the navigational limits?" *Id.*, p. 7. Karyn Price's anger -- she was "very angry" upon hearing of this loss -- is a further admission of coverage. Docket #93; LeBeouf Dep., pp. 111-113.

The negligent actions of Anzhela's crew provide Plaintiff no defense, due to the negligence of crew, barratry, Inchmaree, and machinery failure clauses of Plaintiff's named peril policy. Docket #1, Exhibit C to State National's Complaint, Hull and Machinery Policy, page 49, l. 70-86. Finally, the venerable "Extended Adventures & Perils" clause similarly provides a safety net of coverage for which Plaintiff charged, and Anzhela paid. Docket #1, Exhibit C, page 76. Sinking in a stormy sea, on a much-discussed voyage to Louisiana, is exactly the risk which Plaintiff underwrote and priced for, and for which Anzhela paid (now dearly).

The breathtakingly broad "held covered" clause -- which Plaintiff chose to put in this policy -- alone justifies coverage herein. Docket #1, Exhibit C, Page 49, Lines 67-69. Anzhela never acted willfully or deliberately regarding her obligations under the policy. Under well-settled law in this Circuit (which Plaintiff chooses to ignore), this

TRIAL BRIEF of Anzhela Explorer, LLC    2

sinking should be "held covered" -- even if Anzhela had been unseaworthy (which she was not).

In sum, the evidence at trial will confirm that Plaintiff knew exactly the risks presented by this vessel and voyage -- and Plaintiff chose to price and provide coverage in light of and in spite of the risks. Plaintiff simply prefers not to pay. Anzhela is entitled to, and prays for, judgment in full, including reasonable attorneys' fees, all costs and recoverable litigation expenses, and both pre and post judgment interest.

## **Factual Background**

### A.      THE VESSEL.

Jeff and Anzhela Dorsey bought the vessel Bottom Time II, located in Dania, Florida. On March 20, 2007, the Dorseys transferred ownership of the vessel to Anzhela Explorer, LLC ("Anzhela LLC"), a company Jeff Dorsey owns and controls. He renamed the vessel after Anzhela, his wife. Docket # 92; Dorsey Dep. pp. 34, 53-54. Docket # 85, Rosandich Dep. pp. 14-20. Anzhela then spent seven months in intensive refurbishment, getting ready to operate in the Louisiana oil industry. Docket # 92; Dorsey Dep. p. 63.

### B.      THE SINKING.

In the early morning of March 26, 2007, while on a trip from Florida to Louisiana, the Anzhela sank in the Atlantic Ocean just south of Fort Lauderdale, suffering a total loss. Docket # 85; Rosandich Dep., pp. 77-96. Docket # 94; Eymard Dep., pp. 17-18, 91-92,103-104,162-164. Docket # 93; LeBeouf Deposition, pages 107-108. LeBeouf Deposition Exhibit 15 USI-Placement Number # 099-102. LeBeouf Deposition Exhibit 16, USI-Placement Number # 0912-0913. No one in this action disputes that the wrecked Anzhela constitutes a total loss under this policy.

TRIAL BRIEF of Anzhela Explorer, LLC   3

No locally knowledgeable persons were aboard the vessel when the Captain and crew took the vessel through the Jupiter Inlet contrary to the instructions from the owner's representative Mark Rosandich. *Id.*  As the Court will hear from defendant's marine expert Malcolm Elliot, the Jupiter Inlet Commission's website report of March 25, when Anzhela went to sea: "Jupiter Inlet is considered unnavigable by the Coast Guard.  It should be avoided by all boaters except experienced locals with an up-to-date shoaling report. … Jupiter Inlet is The Meanest Inlet in South Florida.  Sand is constantly shifting, especially on the northern side.  Shoaling and fast currents make this an especially dangerous place to boat.  Do not attempt to use this inlet without local knowledge."

The same day Anzhela sank, USI notified underwriters of its sinking and also notified underwriters that it had gone down in the Atlantic Ocean.  Knowing the vessel had sunk in the Atlantic Ocean, Karyn Price was very angry about the loss. Docket # 93; LeBeouf Deposition, pages 111-113.

## C.    THE POLICY.

Price likely was angry because she had agreed as managing general agent for the plaintiff  to cover Anzhela.  This coverage resulted from oral discussions (a binder), and a written policy.

***Oral Discussions.***  In February 2007, as intense refurbishment was ending, Anzhela LLC began seeking insurance to cover the vessel's voyage from Ft. Lauderdale, Florida area to Louisiana. Docket # 92; Dorsey Deposition page 39-40, 52.  Docket #93; LeBeouf Deposition pages 23-28.  LeBeouf Deposition Exhibit 1 USI-Placement Number # 458-461.

TRIAL BRIEF of Anzhela Explorer, LLC    4

On or about February 14, 2007, Anzhela LLC consultant Mark Rosandich called USI Southwest, an insurance brokerage with offices in both Louisiana and Texas.  Rosandich spoke with Shawn LeBeouf and Jamie Robichaux about insuring Anzhela.  Docket # 93; LeBeouf Dep. pp. 30-31.  Docket # 90; Robichaux Dep. p. 26.  Rosandich confirmed this conversation with an email to Lebeouf, attaching an August 2006 survey of the vessel.  Docket # 93; LeBeouf Deposition pages 30-31.   LeBeouf Deposition Exhibit 2 USI-Placement Number # 001-016.

Rosandich explained that the vessel did not have a current Certificate of Inspection (C.O.I.) from the U.S. Coast Guard, that it would be traveling to Louisiana in the next few weeks, and that it would need insurance.  Docket # 85 Rosandich Deposition p.44.  LeBeouf Deposition Exhibit 2 USI-Placement Number # 001.  The survey Rosandich attached to his email to Plaintiff identified the vessel as being in Ft. Lauderdale, Florida and also made clear that although the vessel was seaworthy, it did not have a current C.O.I.   Docket # 93; LeBeouf Deposition pages 31-37.  LeBeouf Deposition Exhibit 2 USI-Placement Number # 001-016.

On February 15, 2007, USI employee Jamie Robichaux forwarded the Rosandich email with the survey to Ms. Price, an underwriter at WFT, Inc., Plaintiff's managing general agent, and the same entity that ultimately underwrote the policy on the vessel.

In the email to Ms. Price, Ms. Robichaux, requested that WFT, Inc. start the review process and that additional information would follow.  Docket # 90; Robichaux Deposition, page 32-34.  Robichaux Deposition Exhibit 1 USI-Placement Number # 034-052.  Docket # 87; Price Deposition, page 30, 44.  Docket # 93; LeBeouf Deposition pages 44.  Anzhela LLC representative Shawn LeBeouf then had multiple conversations

with Ms. Price about: Anzhela's location being in the area of Ft. Lauderdale; Anzhela's condition being such as to require more work to secure Coast Guard approval; when Anzhela was set to leave Florida; and the need for Anzhela to have coverage for her trip from Florida to Louisiana.  Docket # 93; LeBeouf Deposition pages 44-49, 90-91. Docket # 87; Karyn Price Deposition, pages 64-66.

On February 16, 2007 -- after getting the email from Mark Rosandich, reviewing the survey and discussing the matter with Shawn LeBeouf and Jamie Robichaux at USI -- Ms. Price, on Plaintiff's behalf, agreed to underwrite a hull and machinery and P&I policy for Anzhela; and she quoted a premium to USI. Docket # 93; LeBeouf Deposition, pages 50-51; LeBeouf Deposition Exhibit 4 USI-Placement Number # 061-066;  Docket # 87; Karyn Price Deposition, pages 90-94, Price Deposition Exhibit 6 and 7, USI-Placement Number # 053-060.

On March 19, 2007, Mark Rosandich emailed Shawn Lebeouf that Anzhela needed to leave Florida for Louisiana and it would need insurance for that trip. Docket # 93; LeBeouf Deposition, pages 82. LeBeouf Deposition Exhibit 11 USI-Placement Number # 086-087.  On or about that same day, LeBeouf contacted Ms. Price via cell phone and again discussed obtaining insurance for the vessel's trip from South Florida to Louisiana on the Atlantic.  Docket # 93; LeBeouf Deposition, pages 96-100. USI-Placement Document 396-399.  LeBeouf wrote a memo to his file detailing what was agreed in his conversations with Ms. Price.  Docket # 90; Robichaux Deposition, page 82-84.

On or about this same day, Price and LeBeouf verbally agreed on the premium price, the nature of the risk, the amount of coverage, and what was to be covered.  The agreement included coverage for the vessel's trip from Florida to Louisiana.  Docket # 93;

TRIAL BRIEF of Anzhela Explorer, LLC    6

LeBeouf Deposition, pages 96-100.   Docket # 87; Karyn Price Deposition, pages 100-101.  Docket # 90; Robichaux Deposition, page 85-86.  Docket # 86; Didier Deposition, page 107.  Docket #115; Affidavit of Donald P. Roinestad, ¶ 19.

Finally, on March 19, LeBeouf emailed Anzhela LLC employee Rosandich to tell him the vessel's trip was covered.  Docket # 93; LeBeouf Deposition, pages 82-83. LeBeouf Deposition Exhibit 11 USI-Placement Number # 086-087.

***The Written Policy.***   On March 23, 2007, USI faxed a written Confirmation of Coverage to Anzhela for hull insurance coverage for $1,000,000.00 and P&I coverage for $10,000,000.00, commencing that same day:  March 23, 2007.  Docket # 93; LeBeouf Deposition, pages 87-90. LeBeouf Deposition Exhibit 12 USI-Placement Number # 0798-0799.

Though the Confirmation of Coverage contained a Navigational Warranty for the Gulf of Mexico, the trip from Dania, Florida to Louisiana was included in coverage because of all parties' verbal agreement that had been made to cover the trip.  Docket # 93; LeBeouf Deposition, pages 90. LeBeouf Deposition Exhibit 12 USI-Placement Number # 0798-0799.

This Court already denied Plaintiff's motion for summary judgment, holding that there is a fact question as to the existence of a valid oral contract providing coverage for the trip.  At trial, Defendants will present evidence that Plaintiff, through its agents, verbally agreed to bind coverage for the trip.

### D.    AFTERMATH.

During the first few days after Anzhela's sinking, Plaintiff acted as though it would pay on the claim for salvage and damage to the vessel. Docket # 88; Morgan Deposition,

TRIAL BRIEF of Anzhela Explorer, LLC    7

pages 77-80.  During this time, Plaintiff's claims agent, Optimum Claims Service, Inc.

("OCS") and its underwriter, WFT Inc., even explored filing a subrogation action against

the welding company that had performed work on the vessel's exhaust system.  *See* WFT,

Inc. March 27, 2006 email (Exhibit 11 to Docket # 116; Anzhela's Notice of Filing

Discovery Documents in Support of Opposition to Summary Judgment).  Through its

agent, OCS, Plaintiff even retained salvors to salvage the remains of the vessel.  Docket #

88; Morgan Deposition, pages 77-80.

   After this loss, Anzhela LLC received this policy in Florida: USI-Claims-0319.

(Exhibit 13 to Docket # 116; Defendant's Notice of Filing Discovery Documents in

Support of Opposition to Summary Judgment).  The policy is signed by WFT, Inc.'s

chief underwriter, Wanda Didier.  Docket # 86; Didier Deposition, pages, 90-92.  As

issued, the policy had numerous mistakes that needed fixing -- including the policy's

omission of the trip coverage previously agreed to between USI and WFT, Inc.  Docket #

90; Robichaux Deposition, page 38-45.  Robichaux Deposition Exhibit 3, 4 USI-

Placement #0995-1029, # 498-500.  On June 27, 2007, USI contacted WFT, Inc. about

the changes that needed to be made to the policy. Docket # 90; Robichaux Deposition,

page 38-45.   Robichaux Deposition Exhibit 3, 4 USI-Placement #0995-1029, # 498-500.

WFT, Inc. agreed to make some of the changes to the policy -- but refused, without

explanation, to change the policy to allow for coverage of the trip, even though it had

previously agreed to underwrite such coverage.

      As required under the policy and the agreement between the parties, Anzhela LLC

began paying the premiums, and continued to do so for several months, until it became

clear Plaintiff was not going to pay for this loss.  Plaintiff refuses to pay on the policy, and to return the premiums.  Docket # 86; Didier Deposition, pages, 90-92.

On August 15, 2007, Plaintiff filed a Complaint For Declaratory Relief and Damages, declaring the policy *void ab initio.*  Complaint, page 9, ¶ 37.  In its declaratory action, Plaintiff brought personal claims against Jeff Dorsey and Mark Rosandich for fraud and misrepresentation, which claims this Court dismissed.  Docket #s 32, 35, and 46.

Plaintiff also alleged in its Complaint (p. 5, ¶ 17) that it never received a copy of the August 2006 survey – a principal basis for Plaintiff's continuing, false claim that it knew nothing of Anzhela's seaworthiness.  Plaintiff also alleged in its Complaint (p.6, ¶ 20) that the Defendant "never mentioned in the application or otherwise to STATE that the vessel was outside of the requested navigational limits and would need to be transported to the Gulf of Mexico to be compliance with the navigational limits requested."  This was not true for *on April 29, 2007*, pursuant to a subpoena from Anzhela, USI produced *documents that Plaintiff should already have produced to Anzhela defendants*, but had not.  Included among these documents was the email from USI to Karyn Price containing Mark Rosandich's February 14, 2007 email -- **with the vessel survey attached**.  Docket #35, Exhibit B, USI Placement File 034-052.  The email sent, by Mark Rosandich from Florida, stated that the vessel was going to be taken to Louisiana.  The email also stated that the vessel did not have a current COI.  The survey stated that the vessel did not have a current COI and the vessel was located on the east coast of Florida.   When confronted with Plaintiff's failure to produce these critical

responsive documents, Plaintiff's then attorneys withdrew, hinting they were doing so for ethical reasons. Docket #34.

On June 9, 2008, Karyn Price finally admitted, under oath, to having received the survey, but she maintained her claim of ignorance of the Mark Rosandich email. Docket # 87 Price Deposition, page 72-76; Price Deposition Exhibit 5, USI-Placement #034-052. On June 30, Anzhela subpoenaed WFT demanding all pertinent documents.  On July 22, WFT produced an email from Karyn Price to Wanda Didier (WFT's Chief Underwriter and Karyn Price's boss), dated May 6, 2008, showing that Price had not only received a copy of the Rosandich email -- she had forwarded it on to her boss!  Docket # 115; Exhibit # 17.  At her deposition 30 days later, Price claimed to have never seen the Rosandich email she had forwarded to her boss. Docket # 87 Price Deposition, page 72-76; Price Deposition Exhibit 5, USI-Placement #034-052.

<u>**Analysis**</u>

### A.  THIS MARINE POLICY PRESUMPTIVELY PROVIDES COVERAGE.

The ancient oath of marine insurance defines all "the Adventures and Perils which the Underwriters are contented to bear and take upon themselves" breathtakingly broadly:

> they ["Adventures and Perils"] are of the Seas, Men-of-War, Fire … Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage to the Vessel … excepting … such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by endorsement thereon.  Policy; Exhibit C to the Complaint filed as Docket #1, page 49, l. 70-74.

Moreover, "it is the general rule that any ambiguity must be construed against the underwriter; that is to say, most favorably to the assured."  L. Buglass, *Marine Insurance & General Average in The United States*, p. 98 (Cornell: 3d ed. 1991) (citations omitted).

Therefore, the overarching principle for resolving this dispute is straightforward: "Under a policy of marine insurance, the risk undertaken by an underwriter is that if the subject-matter insured is lost or damaged as a result of the operation of an insured peril, he will be responsible. …. It is only necessary to see whether the loss comes within the terms of the contract and is caused by the perils of the sea." *Id.*, p. 80 (citation omitted).

Not even Plaintiff disputes that the loss of Anzhela seems to fall within the terms of this policy, or that she sank because of flooding caused by perils of a stormy sea. Insuring against the marine perils of a trip from Florida to Louisiana was the prime and plain "intent and reasonable expectation of the parties in entering into the agreement." American Strategic Insurance Co. v. Lucas-Solomon, 927. So.2d 184 (Fla. App. 2006). This core intent should be central in determining the appropriate resolution of this case.

Plaintiff simply wants to avoid payment.  Indeed, despite claiming coverage never existed, Plaintiff is too indecent even to return the premiums.  Most stridently, Plaintiff asserts that Anzhela was unseaworthy due to a few "fixes" listed on a USCG Certificate.

Of course, the mere listing of a "fix" – even if listed by a good sailor of our Coast Guard – cannot, *ipso facto*, transform any item(s) into a material deficiency, rendering the vessel unseaworthy.  Every vessel has deficiencies, many of them.  Indeed, even Plaintiff admits in its Complaint the settled legal rule: "A vessel must be fit for the use anticipated to be considered seaworthy."  Docket #1; Complaint, Page 12, ¶ 47.  *See also* Lloyd's U.S. Corp. v. Robert D. Smallwood, 719 F. Supp. 1540, 1549;1995 AMC 1201, (M.D. Fla. 1989); *affirmed w/out opinion* 903 F.2d 828 (11th Cir. 1990).  After the policy has been issued, the vessel owner does not have an absolute duty to keep the vessel seaworthy.  *Id.* at 1549.   The vessel owner only warrants that it will not knowingly, from

bad faith or neglect, permit the vessel to continue to operate in an unseaworthy condition. *Id.*

Plaintiff has not and will not – because it cannot – prove that Anzhela was not fit to sail from Florida to Louisiana.  Anzhela was seaworthy.  Plaintiff has not, and will not, prove otherwise.  Even if Plaintiff were to prove everything alleged in its Complaint, this proof would be inadequate, for lack of proximate cause.  The law, facts and expert testimony herein will demonstrate that none of Plaintiff's complaints actually affected Anzhela's performance.  None of Anzhela's defects proximately caused her loss.  Plaintiff's case is hindsight.  If every defect could defeat coverage, no insurer would pay.  The law of materiality requires far more: "Plaintiff/insurer had the dual burdens of proving that the vessel was unseaworthy and that the cause of the unseaworthiness was the proximate cause of the loss."  Lloyd's v. Smallwood, 719 F. Supp. at 1549.  *See also* Saskatchewan Government Ins. Office v. Spot Pack, Inc., 1957 AMC 655, 662-63; 242 F. 2d 385, 389 (5th Cir. 1957).  A contention quite similar to Plaintiff's herein – "that the results of an inspection by the National Cargo Bureau … should have been disclosed" – was rejected: "the survey was not material to the barge's seaworthiness."  Steelmet, Inc. v. Caribe Towing Corp., 842 F.2d 1237, 1240 n.2 (11th Cir. 1988).  Plaintiff must *prove* causation -- and cannot.

Plaintiff similarly misrepresents the law of misrepresentation.  "Plaintiff avers, as a basis for the determination of no coverage, that … applicant must voluntarily and accurately disclose to the insurance company all facts which might have a bearing on the insurer's decision to accept or reject the risk … [even if] not directly inquired into by the insurer . . . [and] even if innocently made."  Docket #1, Complaint, page 9, ¶ 36-37.

TRIAL BRIEF of Anzhela Explorer, LLC   12

This is not, and cannot be, the law.  How could it be?  Plaintiff creates all its own application forms and procedures, and controls its agents and underwriters.  Yet Plaintiff tries to deny coverage based solely on its *post hoc*, self-serving allegations of materiality?  Once it undertook to underwrite Anzhela, Plaintiff had a duty to exercise care, including sufficient levels of underwriter curiosity to uncover risks it now "avers" were so material:

> *[U]berrimae fidei* does not require the voiding of the contract unless the undisclosed facts were material and relied upon. . . . . Further "[a] minute disclosure of every material circumstance is not required.  The assured complies with the rule if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it."

Puritan Ins. Co. v. Eagle Steamship, 779 F.2d 866, 871 (2d Cir. 1985) (citations omitted).

## B.  PLAINTIFF'S AGENT EXTENDED COVERAGE TO THE ATLANTIC.

The validity of an oral insurance binder is an issue of fact.  Nu-Air Mfg.Co. v.  Frank B. Hall & Co. of New York, 822 F. 2d 987, 990-991 (11th Cir. 1987) (Florida law).  As detailed below, the parties herein plainly and repeatedly covered Anzhela's sailing plans.

In a remarkably similar decision, a policy had been limited to "in inland waters only," until the owner obtained an oral agreement binding and extending coverage to the Gulf of Mexico, where the vessel's loss occurred.  Great American v. Maxey, 193 F.2d 151, 1952 AMC 36 (5th Cir. 1951).  The Fifth Circuit affirmed the District Court's holding that an oral agreement had been formed and sanctioned the insurer's refusal to pay.  Id., AMC at 37; see also McBride v. Home Ins. Co., 1952 AMC 938 (E.D.La.1952) (oral agreement to extend navigational limits of marine insurance policy enforced over insurer's objections).

This Court will hear repeated testimony confirming that the navigational limits of this policy were extended.  See Docket # 86, Didier Dep., p. 107. Docket # 93 LeBeouf Dep.,

pp. 96-100. Docket # 87 Price Dep., pp. 100-101. Docket # 90, Robichaux Dep., pp. 85-

86.  Docket # 115 Affidavit of Donald P. Roinestad ¶ 11, 19 (expert).

Karyn Price, Plaintiff's Executive Vice President, under oath, confirmed this binder:

> Q. (Moure) **And you bound coverage on the vessel while it was in Florida, correct?**
> **A. (Karyn Price) Correct**.
>
> Q. (Moure) And so when you bound coverage on the vessel in Florida, it was insured while it was in Florida, is that that not correct?
>     Mr. Cochran: Object to form.
>     Ms. Lidondici: Objection to form.
> A.  (Karyn Price) Yes.
>
> \* \* \*
>
> Q. (Moure) . . . the vessel also had insurance while it was on the voyage, is that not correct?
>     Mr. Cochran: Object to form.
>     Ms. Lidondici: Objection to form.
> A.  **(Karyn Price) It had insurance on its way down to Louisiana, yes.**
>
> Q.  (Moure) Do you recall how many times you talked to Mr. LeBeouf regarding underwriting this policy?
>     Mr. Cochran: Form.
> A. (Karyn Price) **Four to five times. We talked quite often**.

Docket # 87; Karyn Price Dep., pp. 100-101 (emphasis supplied).

Anzhela employee Shawn M. LeBeouf confirmed Price's testimony to this oral binder:

> Q. (Moure) Okay. Do you recall what was said during that phone call?
> A. (Shawn M. LeBeouf) Just clarifying that she [Price] knew the vessel was at XYZ dock.  Again, I remember this conversation.  I was pulled over on the road on Highway 90, and I had the name of the dock. **I said they are going to have to do this. They are going to try to go through the Intercoastal.**
>
> Q. (Moure) Where was the dock? What state was it in?
> A. (Shawn L. LeBeouf) In Florida, South Florida.
>
> Q. **(Moure) The vessel was going where?**
> **A. (Shawn L. LeBeouf) To Gold Meadow, Louisiana.**
>     \* \* \* \*

**I asked to make sure we are okay we are coming from XYZ dock and also the city, and I don't recall.  We are going to be coming to Golden Meadows, make sure everything is good.**

Q. (Moure) So the conversation would have taken place on March 19, 2007?
A. (Shawn L. LeBeouf) There about, yes sir.  If I am not mistaken coverage was bound on 3:23.

Docket # 93; Shawn M. LeBeouf Dep. pp. 83-84 (emphasis supplied).

Q. (Lidondici) So if the Confirmation of Coverage indicates navigational limits, those would be the navigational limits, those would be the navigation that upon review of your placement file were bound in this policy?
A. (Shawn L. LeBeouf) No, with exception, no, because **the underwriters had agreed to give us coverage to bring it from Florida to Golden Meadow to get outfitted**.

Docket # 93; Shawn M. LeBeouf Dep., pp. 192 (emphasis supplied).

With this repeated testimony, Plaintiff's refusing coverage is exceptionally offensive.

For the longstanding law controlling this issue – under almost identical circumstances -- is venerable indeed.  As long ago as 1887, the U.S. Supreme Court held that the parties' knowledge of the purpose of a voyage is dispositive, superseding a navigational warranty: "all parties knew that the business in which she was engaged took her in and out of the last-named port. . . . . To get to and from it ships must navigate the Gulf of Mexico." Merchants' Mutual Ins. Co. v. Allen, 121 U.S. 67, 69, 7 S. Ct. 821, 30 L. Ed. 858 (1887).

Instead of respecting such precedent, Plaintiff prefers intimidation by litigation.

This Court should refuse to dignify Plaintiff's notorious refusal to pay claims.

### C.  PAYMENT IS DUE FOR THE "NAMED PERILS" THAT OCCCURRED: (1) BARRATRY, (2) CREW NEGLIGENCE, (3) MACHINERY FAILURE.

TRIAL BRIEF of Anzhela Explorer, LLC   15

The marine policy herein includes an Inchamaree clause, thus extending coverage to any harm caused by "Negligence of Masters, Officers, Crew or Pilots" (both negligence, and deliberate acts of "barratry"); and for any "Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull" (hereinafter: "machinery failure(s)").

### 1.    Barratry.

A captain's "deliberately and willfully disobeying" the ship owner's "instructions regarding the territorial limits of the insurance policy" was held barratrous so as to trigger marine coverage.  U.S. Fire Ins. Co. v. Cavanaugh, 1983 AMC 1261 (S.D. Fla.), aff'd, 732 F.2d 832, 1985 AMC 1001, 1004 (11th Cir. 1984) ("gross and culpable negligence" or "deliberate and willful disobedience" of "oral or written instructions" equal barratry). The Court should find barratry, as Anzhela owner, through its agent Captain Rosandich, told Captain Eymard to stay in inland waters until further instructions.  Docket # 85; Rosandich Deposition, page 86-87.  Captain Eymard made a decision, against stated instructions from the vessel owner, to take the vessel offshore to make better time.  *Id.*

### 2.    Crew Negligence.

This rule is longstanding: "Negligence of the assured or his agent is no defense to a marine policy." Tropical Marine Products v. Birmingham Fire Ins. Co. of Pa., 247 F.2d 116, 122, 1957 AMC 1946 (5th Cir.) (citations omitted).  "[T]he Inchmaree clause is an expansion of coverage of considerable magnitude. . . . . [and] does in fact underwrite unseaworthiness of many types." 247 F.2d at 122-23.  This presumption of coverage has special force if a "vessel did not sink in a calm sea," but instead sank due to "the cruel sea working on a troubled hull."  247 F.2d at 122.  Cf. Underwriters at Lloyd's v. LaBarca, 260 F.3d 3, 8 (1st Cir. 2001).  The crew members in this case were negligent.  Despite the

bad weather, and reportedly having no steerage, Captain Eymard has admitted that he

went to his bunk and left the engineer on watch who then fell asleep allowing the vessel

to flood.  Docket # 94; Eymard Deposition Pages 103-105;137-142; 155; 185-191.

Docket # 88 Morgan Deposition, Page 32-33. Docket # 85, Rosandich Deposition,

Page85-89.  Handling precisely such emergent situations in a professional way is exactly

what competent crew must do.  The Court will also hear testimony about this crew's

negligent failures to (e.g.):

> A.  Recognize the overheated condition of the starboard main engine;
> B.  Determine the source(s) of flooding, and employ damage control;
> C.  Employ other dewater capabilities reasonably available to them;
> D.  Notify the USCG or other response entities, timely and properly;
> E.  Maintain a proper watch (vs. sleeping), esp. while sinking; and/or
> F.  Secure watertight integrity throughout the remainder of Anzhela.

The policy clearly provided coverage for crew negligence.


### 3.  Machinery Failures.

The Anzhela Explorer operated perfectly for over 48 hours prior to foundering off the

beach just south of Ft. Lauderdale off of Golden Beach. Docket # 94; Eymard Deposition

Page 33-42; 61-103.  She did not begin to encounter any problems until she began

operating offshore when, according to the Captain, she suffered a loss of steerage.

Docket # 94; Eymard Deposition, Page 103-104.  Brad Schoenwald observed significant

signs of overheating on the vessel's starboard engine which then caused a rupture in the

starboard exhaust hose causing the vessel to sink.  Docket # 99; Schoenwald Deposition,

page 31, 36-37, 54-67.  Malcolm Elliot, all well respected marine surveyor, and Samuel

Windsor, an licensed engineer, will also testify regarding how mechanical failure lead to

the sinking of the vessel.  In sum, strong evidence at trial will show that Anzhela had

critical machinery fail, and it cannot be disputed that the policy covered that.

### D.  IN ANY EVENT, THE HELD COVERED CLAUSE COVERS THIS LOSS.

Plaintiff included the following "held covered" clause into Anzhela's policy here:

> The Vessel is held covered in case of any breach of conditions as to cargo,
> **trade, locality**, towage, or salvage activities, or date of sailing, or loading
> or discharging of cargo at sea, provided (a) notice is given to the
> Underwriters immediately following receipt of knowledge thereof by the
> Assured, and (b) any amended terms of cover and any amended term of
> cover and any additional premium required by the Underwriter are agreed
> to by the Assured.

*Hull and Machinery Policy* (Exhibit C to Plaintiff's Complaint for Declaratory Judgment),
p. 49, lines 67-69 (emphasis supplied).

"The effect of the held covered clause is that the vessel remains covered even if

the insured breaches one of the warranties specified in the clause."  Int'l Ship Repair &

Marine Serv., Inc. v. St. Paul Fire & Marine Ins. Co., 944 F.Supp. 886, 894, 1997 AMC

1419 (M.D. Fla. 1996) (citations omitted).  This clause is not "applied only to minor

deviations"; instead, it "is all inclusive" and "provide[s] the broadest available type of

coverage." Kalmbach, Inc. v. Ins. Co. of State of Pa., Inc., 529 F.2d 552, 555-56 (9th Cir.

1976).

The Kalmbach court held the "held covered" clause to cover the owners' "loss of

their ships," despite an agreed breach of warranty; and noted UK authority (from a multi-

century line of English cases) holding squarely that "even though the breach of warranty

was not discovered until after the loss had occurred," the held covered clause "protected

the ship against loss on a breach of the fundamental warranty of seaworthiness." 529 F.2d

at 557.  The broad held covered clause herein thus provides a basis to "cure" Anzhela's

alleged lack of seaworthiness and all else.

Further, one of the key impacts of the held covered clause is that the insured vessel remains covered even if the insured breaches one or more of the warranties specified in the clause.  See Hilton Oil Transp. v. T.E. Jonas, 75 F.3d 627, 629 (11th Cir. 1996 (("By including the [held covered] clause, the insurer accepts the greater risk occasioned by a possible failure to comply with those warranties, on condition that the breach is not willful, the assured gives prompt notice in the event a breach occurs and agrees to pay an additional premium") (quoting Judge, now Mr. Justice Kennedy in Campbell v. Hartfort Fire Ins. Co., 1976 AMC at 799, 533 F.2d 496, 496 (9th Cir. 1976); see also Int'l Ship Repair, 944 F. Supp. at 895-96, 1997 A.M.C. at 1430.

Hence, a held covered clause imposes a condition that; the breach of warranty which is covered must not be "willful. "  *Campbell,* 533 F.2d at 497-498, 1976 AMC at 801; Int'l Ship Repair, 944 F.Supp., at 896.

Plaintiff's agents had full and timely knowledge of -- and thus accepted under this clause -- Anzhela's condition, nature, and path to Louisiana.   Docket # 87; Price Dep., p. 65. Docket # 93; LeBeouf Dep., pp. 83-84.  Once Anzhela had sunk, Plaintiff's underwriters were notified immediately of the loss and of the exact place where she sank. Docket # 93;LeBeouf Dep., pp. 96-100 & 107-117.  LeBeouf Dep., Exh. 15 (USI-Placement # 099-102). Docket # 87; Price Dep, pp. 100-101.

Plaintiff cannot prove that Anzhela LLC breached any covered warranty *willfully*. This lack of proof is decisive, as the Eleventh Circuit has squarely and explicitly relied upon the held covered clause to find coverage despite a mistaken belief that the vessel's course "was within the trading limits specified …." Hilton Oil, 75 F.3d at 630.  Similarly, Anzhela LLC is entitled to full relief herein due to operation of the held covered clause.

Another clause in this policy confirms its extremely broad coverage: the Extended Adventures and Perils ("EAP") provision.  <u>See</u> Docket #1, Exhibit C, Policy, p.76, ¶ 15:

> It is especially understood and agreed that the Perils Clause in this Policy shall be interpreted to include the following perils, which shall in no event be construed to limit the basic coverage provided thereunder: ***Loss or damage howsoever caused by*** theft, **flood, cloudburst, tidal action, rising water**, ice, **or other storm, tempest**, tornado, **windstorm**, landslide, falling object, **upset, capsizing, overturn**, pillage and/or looting. (emphases supplied)

Anzhela LLC has discovered no decision nor authority interpreting this explicitly and breathtakingly broad coverage clause.  The context for its proper construction is clear: Plaintiff writes these policies and charges *very* large premiums for them.  Plaintiff should now be asked simply to honor the promises and protection for which Anzhela LLC paid.

<u>**Conclusion**</u>

Plaintiff's desire to avoid payment is clear.  So are the broad terms of the policy it drafted, for which Anzhela LLC paid.  The weather that caused Anzhela to sink was violent; the captain, barratrous, and the crew, negligent.  The machinery broke down and Plaintiff knew, at each and every time pertinent, the magnitude of the place and type of navigational risks it undertook.

Anzhela LLC is entited to reimbursement for the sinking of its vessel.

DATED this 20th day of January, 2009.

Charles P. Moure
Harris & Moure P L L C
600 Stewart, Ste 1200
Seattle, Washington 98101-1878
Phone: 206-224-5657
Fax:    206-224-5659
email: charles@harrismoure.com
Attorney for Defendant Anzhela Explorer, LLC
BY:  /s/ Charles P. Moure
CHARLES P. MOURE
Fla. Bar No. 955817

TRIAL BRIEF of Anzhela Explorer, LLC   20

Donald W. Strader
Law Office of Donald W. Strader
8522 SW 82 Terrace
Miami, FL 33143-6663
Tel: 305-274-6881
Fax: 305-274-8786
email: dstrader@bellsouth.net
Attorney for Defendant Anzhela Explorer LLC
BY:  /s/ Donald W. Strader
     DONALD W. STRADER
     Fla. Bar No. 287342