<pre>
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2                      MIAMI DIVISION
                CASE NUMBER 07-CIV-61162-TORRES
 3
     STATE NATIONAL INSURANCE COMPANY,
 4
                                         4TH FLOOR TOWER
 5              Plaintiff,                MIAMI, FLORIDA

 6        vs.

 7   ANZHELA EXPLORER LLC,               JANUARY 30, 2009
                                         8:48 a.m.
 8              Defendant.               (Pages 1 -175)
     ------------------------------------------------------------
 9
                  TESTIMONY OF DONALD P. ROINESTAD
10                EXCERPT FROM CIVIL BENCH TRIAL
                 BEFORE THE HONORABLE EDWIN G. TORRES
11                UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   FOR THE PLAINTIFF:   CHRISTOPHER ROGERS FERTIG
                          DARLENE M. LIDONDICI
14                        Fertig & Gramling
                          200 Southeast 13th Street
15                        Ft. Lauderdale, FL  33316
                          Broward T: 954.763.5020
16                        Dade T: 305.945.6250
                          F: 954.763.5412
17                        chris.fertig@fertig.com
                          dml@fertig.com
18
     FOR THE DEFENDANT:   CHARLES PHILLIP MOURE
19                        Harris & Moure
                          600 Stewart Street
20                        Suite 1200
                          Seattle, WA  98101
21                        T: 206.224.5657; F: 206.224.5659
                          charles@harrismoure.com
22
     Co-Counsel:          DONALD WARREN STRADER
23                        8522 SW 82nd Terrace
                          Miami, FL  33143-6663
24                        T: 305.274.6881
                          F: 305.274.8786
25                        dstrader@bellsouth.net
</pre>

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.

```
 1   REPORTED BY:            JILL MICHELLE HARDY-HOBBS
                             United States Court Reporter
 2                           400 North Miami Avenue, Suite 13N58
                             Miami, FL  33128
 3                           305.523.5118
                             jill_hardy-hobbs@flsd.uscourts.gov
 4

 5                           *  *  *  *  *

 6              INDEX TO EXAMINATION OF DEFENDANT'S WITNESS

 7                                                          PAGE

 8   DONALD P. ROINESTAD

 9   Direct by Mr. Strader................................    3
     Voir Dire by Ms. Lidondici..........................   33
10   Direct continued by Mr. Strader.....................   51
     Cross by Ms. Lidondici..............................   61
11   Redirect by Mr. Strader.............................  150

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            COURTROOM DEPUTY:  All rise.  The United States

2   District Court for the Southern District of Florida is now in

3   session.  The Honorable Edwin G. Torres presiding.  Calling

4   case State National Insurance Company versus Anzhela Explorer,

5   Case Number 07-61162-Civil-Judge Torres.

6            Counsel, please state your appearances for the

7   record.

8            MR. FERTIG:  Chris Fertig and Darlene Lidondici on

9   behalf of plaintiff, State National.

10            MR. MOURE:  Charles Moure on behalf of defendant,

11   Anzhela Explorer LLC, and Donald Strader on behalf of

12   defendant, Anzhela Explorer LLC.

13            THE COURT:  Good morning, everybody.  Who is -- are

14   you calling first?

15            MR. MOURE:  It's our expert, Donald Roinestad.

16            THE COURT:  All right.  Mr. Roinestad.  This is in

17   the defendant's case at this point, right?

18            MR. MOURE:  Yes, Your Honor.

19         DONALD P. ROINESTAD, DEFENDANT'S WITNESS, SWORN

20            COURTROOM DEPUTY:  Please have a seat, sir, and state

21   and spell your name for the record.

22            THE WITNESS:  My name is Donald Roinestad.  My last

23   name is spelled R-o-i-n-e-s-t-a-d.

24                        DIRECT EXAMINATION

25   BY MR. STRADER:

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.

1  Q.  Could you state your professional experience for the

2  record, please.

3  A.  I've been in underwriting for the past 35, 36 years.  I

4  started out -- I started out with the Hartford Insurance Group

5  in 1973.  I progressed in various positions with the Hartford.

6  Then later on -- I believe it was in '87 -- I moved over to a

7  position of compliance.  I was director of litigation and

8  underwriting.  And after spending another 12 years -- 25 years

9  with the Hartford, I moved into director of compliance with

10  another company Unitrin Direct.  In 1998 I started my own

11  consulting company where I would do expert witness work, and

12  I've been involved in underwriting that whole time.

13  Q.  Can you state your educational background and

14  certifications for the record, please.

15  A.  Yes.  I have an associate in marine insurance management.

16  That is a certificate that is given by the American Institute

17  of Insurance -- excuse me -- the Institute of Insurance in

18  Melbourne, Pennsylvania, in conjunction with the -- I apologize

19  -- in conjunction with the American Institute for Marine

20  Underwriters, and it focuses on underwriting coverages and what

21  have you.

22         In addition I have a CRM, which is a Certified Risk

23  Management position certificate.  I also have a -- I'm a

24  chartered life underwriter, and that is the highest

25  professional underwriting designation you can have on life

1    insurance.  I also have a chartered property and casualty

2    underwriting designation, which is the premier designation in

3    the United States as far as property and casualty underwriting.

4    Q.  And where did you go to college?

5    A.  I went to San Diego State University.

6    Q.  And you graduated in approximately 1970?

7    A.  1970, correct.

8    Q.  Have you testified as an expert witness before?

9    A.  Yes, I have.

10   Q.  And have you testified for both the plaintiff and the

11   defendant?

12   A.  Yes, I have.

13   Q.  And that would include insurance companies and insureds?

14   A.  That's correct.

15   Q.  Could you state what documents you've reviewed to make your

16   testimony here today.

17   A.  Yes.  I have an exhibit.  I reviewed the State National

18   Insurance Company complaint for declaratory relief of damages,

19   defendant's and counter-claimant answers, defenses and amended

20   counterclaims, the deposition of Shawn LeBeouf, the deposition

21   of Karyn Price, the deposition of Wanda Didier, the deposition

22   of Jamie Robichaux.  I read the deposition of Jeff Dorsey, the

23   deposition of Mark Rosandich, the deposition of Tim Morgan;

24   documents provided by USI Placement 01 -- 001 through 1144, USI

25   claims documents 1 through 400, State National Insurance

1    Company's various disclosures, the opinions of Kenneth Draper,

2    WFT documents related to policy underwriting, category two and

3    three nonprivileged documents, privilege log.  And I also have

4    read Karyn Price's affidavit and the defendant Anzhela

5    Explorer's trial brief.

6    Q.  Would you state what you -- in your opinion is the role of

7    the underwriter in the insurance application process.

8    A.  The role of an underwriter encompasses several processes.

9    First of all, in order to be an underwriter, I think you must

10   have two traits.  You have to have common sense, and you have

11   to have curiosity.  I talk about underwriting curiosity.  But

12   the underwriting role really is to gather the information,

13   collect the information you need in order to evaluate the risk.

14   After you've gathered all your information, then the process

15   involves taking that information, reviewing it, interrelating

16   the various risk characteristics.

17            And then when you've developed all the information,

18   you've had all your questions answered, then you have -- then

19   you go into the decision mode.  The decision mode can be

20   decline the risk, it can be accept the risk with certain

21   modifications, or it can be accept the risk.

22            And once you've decided to accept the risk then the

23   next stage involves pricing the risk.  You have to make sure

24   that when you price a risk you're going to get adequate

25   premium.  One of the cardinal sins for an underwriter is to

1    underprice a risk or even overprice a risk.  It's a balancing

2    act; but if you underprice a risk, one of the problems you have

3    is that you can drive a company into insolvency where they'd be

4    unable to pay future claims.  If you overprice a risk, what

5    happens is you don't write much business and you're shortly out

6    of business, so it's a balancing act.  But what you want to do

7    is get the right price for the exposures.

8            Then after you write the risk, then the underwriter's

9    responsibility is to monitor the results, monitor that risk,

10   see how that risk progresses.  If you have any problems with it

11   so when it comes up for renewal, you can go through your

12   underwriting processes.

13           You also want to learn from what you have done in the

14   past.  Oftentimes something can go array with a risk similar as

15   we have today, and it gives you an opportunity to learn.  So in

16   subsequent days when you underwrite other risks, you can learn

17   from your experiences.  That pretty much is the role.

18   Q.   Okay.  Is there a difference in underwriting between

19   different lines of insurance?

20   A.   There is some differences; but, in essence, underwriting is

21   underwriting.  Again, if you -- you can have an automobile.

22   You can have a home.  You can have general liability.  You can

23   have commercial liability.  You can have a life risk.  You can

24   have an ocean marine risk.  It's still -- you go through the

25   same processes.

1           In the automobile, you're concerned with the driver

2    and the car.  In the home you're concerned with the owner and

3    the house.  In the ocean marine, you're concerned with the

4    owner and the vessel.  In the property risk, you're concerned

5    with the building and the liability.  So while they are

6    different they are very much the same.

7    Q.   When an insurance company contracts with the managing

8    general agency or MGA, is the agency given full underwriting

9    authority?

10   A.   The MGA is given full underwriting authority.  That is

11   their responsibility.  And when an agency has the underwriting

12   authority, they have the ability to do the activities that I

13   just spoke about, decide what risks they're going to write or

14   not write and price it.  They have the authority to bind a

15   risk.  They have the authority to make a verbal binding of

16   coverage, and they also have the responsibility of producing

17   and issuing the policy.

18   Q.   Would a verbal agreement be as binding as a written

19   agreement?

20   A.   Absolutely.  It's the same thing, only in a different

21   format.

22   Q.   Do you know the name of the broker involved here?

23   A.   WFT.

24   Q.   And do you know who the main broker was?  You said WFT?

25   A.   Oh, the managing general agent is WFT.

1    Q.   Right.   Okay.

2    A.   The broker is USI.

3    Q.   Okay.   And I guess since we're getting to that and the name

4    of the insurance company?

5    A.   State National.

6    Q.   And do you know who one of the main brokers was at USI?

7    A.   Shawn LeBeouf.

8    Q.   And what would his position entail?

9    A.   His position was -- he was actually the producer.   He's the

10   guy that hustles, gets the business, makes the contacts with

11   the potential insured, brings the business into their office.

12   And then his office would then try and place that business with

13   a carrier.   He would be the contact the office would have to

14   develop and procure any additional information that they might

15   need.

16   Q.   Okay.   And I believe it's Defendant's Exhibit 177.   Are you

17   familiar with an email dated February 15th, 2007, from Jamie

18   Robichaux?

19   A.   Yes, I am.   In this -- well, actually 177 is an email from

20   Karyn Price to Wanda Didier; but it includes the trail of the

21   Jamie Robichaux memo to Karyn Price.   And in that memo the memo

22   makes it very clear that -- the memo documents that WFT did, in

23   fact, get that email from Captain Rosandich that included the

24   survey and also included the fact that the vessel had not yet

25   received the certificate.   It says that the vessel will be U.S.

1   Coast Guard certified to carry a hundred passengers.

2           So at that point in time when Jamie sent that email

3   to Karyn Price, the email contained the survey; and it also

4   contained the memo.  And the survey, again, was attached; and,

5   again, the survey did indicate that there was no certificate of

6   authority as did the memo.  This memo to -- from Karyn Price to

7   Wanda was key because it gave written documentation that the

8   Mark Rosandich memo was referred to WFT, which throughout --

9           MS. LIDONDICI:  Objection, Your Honor.  Could we have

10  question and answer instead of a narrative?  I think he was

11  just asked if he recognized the memo.

12          THE COURT:  Sustained.

13  BY MR. STRADER:

14  Q.  Was there a schedule of operations attached to that email?

15  A.  Not that particular email.  The schedule of operations was

16  attached to a memo from Jamie Robichaux to Karyn -- it was

17  addressed to Karyn Birmingham, which I believe was her maiden

18  name; and that email --

19  Q.  Karyn Price.

20  A.  Well, Karyn Price's maiden name.  Correct.

21  Q.  Yes.

22  A.  And that email was sent on 2-15-2007, which had the

23  description of operations.  It had the unsigned application,

24  written application; and it had the supplement schedule of

25  vessels.

1   Q.  Was a certificate of inspection or COI mentioned in those

2   emails that a document's attached thereto?

3   A.  The unsigned written application, there was a comment made.

4   COI -- upgrades done.  COI is current on vessel.  That was on

5   the application.  And then in the schedule of operations, the

6   comment was:  The vessel will be U.S. Coast Guard certified to

7   carry a hundred passengers.  So there was a conflict between

8   those two memos.

9   Q.  And if there's a conflict in the information supplied to

10  the underwriter, what is the underwriter's duty?

11  A.  Well, as I said earlier, part of the role of an underwriter

12  -- one of the things an underwriter needs to be is curious.

13  They have to look at the file.  And if they have conflicting

14  information, they have to somehow address it or I guess they

15  can choose to ignore it but then suffer the consequence.

16          In this particular case where there was a conflict on

17  the COI.  Several places said -- places say they have it.

18  Other places -- the survey said it expired.  The schedule of

19  operations said they were going to get it.  The simple thing

20  for an underwriter to do would be just to call the broker,

21  Shawn LeBeouf, and say, We have conflicting information; could

22  you please FAX us this COI.  And that -- what would happen then

23  is either the COI would come in or Shawn LeBeouf would come

24  back and say, They don't have a COI.

25          MS. LIDONDICI:  Objection, Your Honor; speculation as

1    to what Shawn LeBeouf would come back and say to a question

2    that may or may not have been asked.

3            MR. STRADER:  Your Honor, I think he's stating what

4    the common procedure should have been, and it was not --

5    perhaps was not done here, so I think it's admissible --

6            MS. LIDONDICI:  Then, Your Honor --

7            MR. STRADER:  -- for the expert to testify at this

8    point.

9            THE COURT:  At that point, though, he was

10   unresponsive.  So let me stop him there and then re-ask that

11   question.

12           MR. STRADER:  Okay.

13   BY MR. STRADER:

14   Q.  Would it be fair to the insured to ask the insured to be

15   aware of an unwritten policy of the underwriter that was never

16   expressed to the insured?

17           MS. LIDONDICI:  Objection; vague, foundation, and

18   predicate.

19   BY MR. STRADER:

20   Q.  If there was testimony that a certificate of inspection was

21   required on a commercial vessel as an unwritten policy of the

22   underwriter, would it be fair to expect the insured to

23   understand that when they weren't told?

24   A.  No, it would not.

25   Q.  So in that case the insured would not be aware of the

1    significance of the certificate of inspection with respect to

2    the underwriter?

3    A.   The underwriting process is the underwriting process, and

4    the insured's responsibility is to provide the information that

5    is expected of him.

6    Q.   In the documents you reviewed during the underwriting

7    process, did Shawn LeBeouf obtain a verbal agreement from Karyn

8    Price to extend coverage for the Anzhela Explorer's trip from a

9    location in Florida to Louisiana?

10   A.   In reviewing the documents, Shawn LeBeouf did obtain a

11   verbal -- in my opinion he did obtain a verbal agreement from

12   Karyn Price extending coverage for the Anzhela Explorer's trip

13   from Florida to Louisiana.

14         The various -- in reviewing the documents, in Shawn

15   LeBeouf's deposition is when Karyn Price -- in the deposition

16   it states that Karyn Price was first notified of the trip

17   exposure.  And then Karyn Price in her deposition on June 9th

18   testified that coverage had been provided from (sic) the trip

19   from Florida to Louisiana.

20         She said -- the question was:  But the vessel had

21   insurance while it was on voyage to Florida; is that correct?

22         It had the coverage on the way down to Louisiana.

23   Q.   And would that be at page 101?

24   A.   That was page 101.  The other reason why the underwriter,

25   Karyn Price --

1          MS. LIDONDICI:  Objection, Your Honor; again,

2     nonspeculative (sic) as to other reasons an underwriter might

3     do something; and he was testifying as to a specific

4     conversation or information.

5          THE COURT:  Overruled.  He can finish his answer.

6          THE WITNESS:  Okay.  What I was going to say is that

7     in the documents sent to Karyn Price, there is an email that

8     was sent from Karyn Price to Jessica Squires.  I believe it's

9     Defendant's Exhibit 212.  And this contains a trail of emails.

10    And in this trail of emails, there was an email from a -- Bob

11    Palmer I believe is his name -- Bob Palmer where he says, I

12    thought the vessel was located in Miami, Florida.  Here again,

13    she has information that they're questioning the location of

14    the risk.

15          In addition to that, we have the email which is

16    Defendant's Exhibit 10 which says, No problem on trip coverage.

17    This is an email that Shawn LeBeouf sent to I believe it was

18    Mark Rosandich.  And in reviewing these files, one of the

19    thoughts I had in evaluating whether there was coverage or not

20    was why --

21          MS. LIDONDICI:  Objection again, Your Honor.  We're

22    now in a narrative.

23          THE COURT:  I need to have you go ahead and ask

24    another question.

25    BY MR. STRADER:

1   Q.  If you received as an underwriter emails with respect to an

2   insurance policy with which you had underwritten or were about

3   to underwrite, would you read them?

4   A.  Absolutely.

5   Q.  And if someone failed to read the emails or just laid them

6   on their desk, would you consider that good underwriting

7   practice?

8   A.  No, I would not.

9   Q.  Would there be any purpose in discussing trip coverage if

10  this vessel had been located on the Gulf side to make its trip

11  to Golden Meadow, Louisiana?

12  A.  There --

13  Q.  Gulf side of Florida.  Excuse me.

14  A.  There would be no purpose to discuss it because the

15  unwritten application said coverage was within a hundred miles

16  within the Gulf.  And there were no -- it makes no sense to

17  discuss a trip coverage if you already had coverage provided.

18          THE COURT:  I have a question.  Why does the broker's

19  confirmation bind the insurer, the underwriter.

20          THE WITNESS:  Why does the -- why did Shawn LeBeouf's

21  memo bind coverage with the underwriter?  The memo itself does

22  not bind coverage for the risk.  It's taking that memo along

23  with all the other pieces of information that we have here is

24  what makes me draw the conclusion that there was coverage for

25  the trip from Ft. Lauderdale to Louisiana.  It's just -- as I

1   say, the underwriting process is just not one item.  It's

2   taking all the information, interrelating it, and then coming

3   to a conclusion.  And the only conclusion that I could draw was

4   there would be coverage from Ft. Lauderdale to Louisiana.  This

5   is just a piece of a puzzle.

6   BY MR. STRADER:

7   Q.  Do you believe the Anzhela Explorer LLC through its broker

8   USI provided all the requested and the required information to

9   WFT?

10  A.  Absolutely.  Any time the WFT requested information from

11  USI they were quick to respond.  There was emails where they

12  were asking about the crew's experience, which was responded to

13  immediately.  Actually Karyn Price had written questions about

14  the risk.  They were answered immediately.  I think that you

15  can -- that email was Exhibit 6.  So whatever Ms. Price asked

16  of the insured and/or the broker that information was responded

17  to in a rather rapid form.

18  Q.  Does WFT require submission of a signed application prior

19  to the binding the coverage, issuing of the policy?

20  A.  In reviewing the depositions, there was no requirement to

21  have a signed application prior to the attachment of the

22  policy.

23  Q.  Did you review the pricing of the policy in this situation

24  and do you have any comments on that?

25  A.  One of the comments that -- I did review the pricing, and

1    the pricing of the policy did puzzle me somewhat.  I examined

2    the initial quote, the second quote, and the final quote as to

3    or the price that was -- the policy was actually written for.

4    And if you were to look at the original quote, the premium --

5    and that would be Exhibit 4, Defendant's Exhibit 4.   The

6    original premium on the hull was $20,000.   This $20,000

7    provided protection for the million dollars' worth of hull, and

8    it also provided a million dollars' worth of collision

9    liability protection and a million dollars worth' of suit and

10   labor protection.   That premium, as I said, was $20,000 or $2

11   per hundred.

12          Typically you -- some companies use percentages, 2

13   percent.  Others just would use a term $2 per hundred.  So the

14   initial quote was $2 per hundred.  Now, for the protection and

15   indemnity portion of the policy, the initial quote was for $1

16   million, and the premium on that was $28,000.  So you could say

17   -- well, if you do the math, it would be $2.80 per hundred.

18          Then there was a second quote.  Shawn LeBeouf had

19   said, We need $5 million worth of P&I.  Now, when you move into

20   the higher levels of protection, the higher levels, the rates

21   per hundred drop dramatically because the potential for loss

22   reduces.  There's always that possibility of loss, but you're

23   usually not involved in the first -- you're not involved in

24   first-hour loss.

25          MS. LIDONDICI:  Objection, Your Honor.  Unless this

1    witness has specific knowledge as to State National or WFT's

2    rating policy, there's no predicate for his testimony as to

3    what the differential would or should be.

4              MR. STRADER:  Your Honor, his testimony --

5              MS. LIDONDICI:  He also doesn't have information or

6    has not established a predicate as to marine underwriting rates

7    and underwriting at that time in question.  He was at that time

8    in question not a marine underwriter.

9              THE COURT:  Overruled.  You can bring that out in

10   cross.

11             MS. LIDONDICI:  Yes, sir.  Thank you.

12             THE WITNESS:  Okay.  The rate -- Shawn LeBeouf wanted

13   $5 million.  So Exhibit 5, a new premium was sent out; and the

14   premium was going to be $55,000.  The hull premium remained the

15   same at 20,000; and the P&I premium went up to $35,000.  So for

16   an additional $4 million worth of coverage, the insured was

17   then paying seventeen-and-a-half cents per hundred.  So you can

18   see the drop.  But in fairness the exposure -- well, there's $4

19   million worth of exposure.  The likelihood of a loss diminishes

20   tremendously.

21             Then you have your final quote where the premium on

22   the hull dropped down to $15,000.  Now, that was a 25-percent

23   drop in premium, and I really didn't see any reason for that

24   significant a drop.  There wasn't anything that I saw in the

25   file that was significant enough to make that drop; but there

1   was also a $5,000 drop in the P&I premium.  And with that you

2   now have a dollar-fifty for a hull.  For the first million, you

3   have $2.80.  And then for the next $4 million, it drops from

4   seventeen-and-a-half cents to five cents, which is a tremendous

5   drop.

6          And when you think of the $5 million access that New

7   York Marine provided on this -- provided to the policyholder,

8   the policyholder got an additional $5 million worth of P&I

9   coverage from New York Marine.  And in my review of the policy,

10  I came up with an approximate rate of 11 cents per hundred.  So

11  the excess $5 million, they're being charged 11 cents.

12         WFT is charging five cents on a lower level amount of

13  risk.  And to me that just doesn't make sense.  It lends

14  credence to Mr. LeBeouf's comment in his deposition that they

15  were trying to get into the market, and they were pricing to

16  write the risk.

17  Q.  When you said lower level of risk, do you mean the initial

18  part of the insurance?

19  A.  Right.  You have -- really you can have four levels here

20  with a P&I.  The first million -- you know, anytime you have a

21  P&I loss it's going to paid out of that.  You're not going to

22  go into the next 4 million unless you have a loss greater than

23  1 million, so the potential for loss is greatly diminished.

24         Then when you go up to 5 million -- from 5 million to

25  10 million, the potential of loss is extremely low, not that it

1    can't happen; but it's extremely low, and you don't need the

2    rate.  But in this particular case, the excess carrier was

3    getting 11 cents -- approximately 11 cents per hundred, whereas

4    State National was getting five cents.  It doesn't make sense.

5    Q.   Is there any reason for WFT to retain the premium or on

6    behalf of State National to retain the premium in this matter?

7    A.   Excuse me?

8    Q.   I'll repeat the question.  Strike that.  Is there any

9    reason that State National Insurance Company should retain the

10   premium that they've been paid in this matter?

11   A.   You mean after the loss?

12            MS. LIDONDICI:  Objection, Your Honor.

13            MR. STRADER:  After the loss.

14            MS. LIDONDICI:  That's a legal conclusion for

15   determination by this Court.  It's also beyond the scope of

16   this witness' disclosed testimony.

17            THE COURT:  As to the latter point?

18            MR. STRADER:  Your Honor, you know, we supplied a

19   very complete affidavit as to what his testimony would be.  His

20   testimony will include the policy, so I'm asking -- I perhaps

21   did not phrase the question well.  But I'm asking with respect

22   to the policy, the terms of the policy whether the insurance

23   company who, generally speaking, would be entitled to retain

24   the premium or whether they should return the premium to the

25   insured; or if they have earned a premium, how much premium

1    would they have earned.

2              THE COURT:  Well, did he opine on that in his

3    deposition?

4              MR. STRADER:  He opined.

5              MS. LIDONDICI:  Not in his disclosure but --

6              MR. STRADER:  But, you know, we've had him available

7    for deposition.  They chose not to depose him.

8              THE COURT:  Well, he was never deposed?

9              MR. STRADER:  He was never deposed.

10             THE COURT:  Oh, okay.

11             MR. STRADER:  So it's not -- it's nothing we -- you

12   know, he was never deposed.  You know, this probably would have

13   come out at deposition.  He submitted a multi-page affidavit to

14   the Courts and record.

15             THE COURT:  Is any of this in here?

16             MR. STRADER:  Perhaps not specifically, Your Honor;

17   but they've made an issue -- you know, an issue has come up as

18   to the testimony and so forth with respect to the $45,000

19   premium; and the insurance company has retained that.  And we'd

20   like to ask our expert whether they are entitled to retain it

21   or if they're not entitled to retain it and on what basis they

22   would retain it or on what basis they would return it; how much

23   they would have earned if they keep it.

24             THE COURT:  Do you have the disclosure?

25             MS. LIDONDICI:  I'm sorry?

1           THE COURT:  Do you have the disclosure?

2           MR. FERTIG:  Judge, if I may, there's a much simpler

3    exhibit.

4           MR. MOURE:  Your Honor, I would request if Ms.

5    Lidondici's going to be doing the objections, it only be her.

6    Mr. Fertig does not need to also be --

7           MS. LIDONDICI:  Well, then perhaps you shouldn't be

8    making that objection as well.  It should be Mr. Strader making

9    it, but --

10          MR. STRADER:  So I guess then you're in agreement

11   with me?

12          THE COURT:  I'll hear from Mr. Fertig.  Go ahead.

13   But let me read this first because that's the objection on the

14   table.  All right.  Well, the witness' disclosure is clearly

15   talking about how State National handled the claim, the

16   reservation of rights, the response to the claim.  So there's a

17   lot of -- now, whether or not a predicate's been added remains

18   a different question.  And that wasn't necessarily the basis

19   for your objection, but I might entertain that.  But with

20   respect to the issue of the disclosure, I think the disclosure

21   is communicating that State National did not conduct the claims

22   process properly and improperly voided the policy.  So the

23   question as to whether or not they should retain the premium I

24   think is a subset of that.  So I don't think I could sustain

25   your objection based upon the disclosure.  If you want to raise

1    a predicate issue with respect to the scope of his testimony,

2    you can.

3              MR. FERTIG:  I would leave that to Ms. Lidondici.

4    But what I was going to say it's a matter of law.  It's

5    decisional law for decades that an insurance company does not

6    need to return the premium when it approves a dec action.

7    That's number one.

8              Number two, you can't create coverage by estoppel.

9    Number three, if the insurance company did, in fact, return the

10   premium, then the insured is put into a trick box as to whether

11   to accept it or not.  If he accepts the tender of return of

12   premium, then he doesn't have a claim.  So what we're talking

13   about --

14             THE COURT:  You may be right, but I can't decide that

15   on the kind of basis of the objection to one question to the

16   witness.

17             MR. FERTIG:  Well, what I'm saying is as a matter of

18   law there's no requirement.  There's case law on that point.

19   It's been litigated time and time again.  So having this

20   witness say, Well, did the insurance company do wrong?  It's a

21   matter of law.  The insurance company did not in any event

22   violate any kind of protocol or procedure that's in the Federal

23   Courts.

24             THE COURT:  Then you'll make that clear to me in your

25   cross-examination of the witness.

```
 1              MR. FERTIG:  Yes, sir, I will.
 2              MR. STRADER:  And Wanda Didier stated in her
 3     testimony that she felt the claim was denied.  I think that's
 4     relevant to whether the premium should be returned or not or --
 5              THE COURT:  I'll let you make your case, and they'll
 6     make their case in defense.
 7              THE WITNESS:  May I answer the question?
 8              THE COURT:  Rephrase the question.  Go ahead.
 9              MR. STRADER:  I'll rephrase it.
10     BY MR. STRADER:
11     Q.  Are you aware of the premium -- well, you just testified
12     about the premium.  So are you aware of the premium charged in
13     this -- for this insurance policy?
14     A.  Yes.  It was $45,000.
15     Q.  Do you believe -- if the claim had been denied, it should
16     be -- the policy is the premium should be returned in your
17     experience?
18     A.  Well, there are actually two subsets to that question.  The
19     first subset is if you look at this policy, there are two parts
20     to the policy.  There's the hull part, and then there's the P&I
21     part.  Now, if you look at the hull clause, there's a specific
22     -- they specifically speak to the -- they specifically speak to
23     the premium issue and say, Full annual premium shall be
24     considered earned and immediately due and payable in the event
25     of a total loss of a vessel.  So the hull policy is clear that
```

1    it says if it's considered -- full annual premium shall be

2    considered earned and immediately due and payable in the event

3    of a total loss of a vessel.

4            Now, if you go -- and if you recall the premium for

5    the hull was $15,000.  Now, if you go over to the P&I part of

6    the policy -- and the P&I premium was $28,000 -- you will not

7    find any clause in the P&I part that addresses the return of

8    the premium.  So based on the initial P&I clause -- and the P&I

9    was $28,000 -- it's silent as to what should happen to the

10   premium.  So since the policy was in effect three days based on

11   that clause the company would have only earned three days'

12   worth of premium of about $246.  What makes it a little

13   stickier is that in the conditions --

14   Q.   The general conditions?

15   A.   General conditions, condition 8.  It says, In the event of

16   payment -- in the event of payment by the underwriters for a

17   total constructive loss the named insurer's vessel, the full

18   premium shall be deemed earned.  So payment has to be made in

19   order for them to earn the premium on the vessel.  Here the

20   payment was never made by the underwriters and therefor not

21   earned.

22           Now, there would be no loss to the company in

23   returning that premium because in the event that through these

24   proceedings there's a ruling that there is no coverage for this

25   vessel, the insured would be entitled to get that money back.

1  If they return that premium to the insured at the time of the

2  request and the insured would have got that money back and then

3  the Court's ruled there was coverage, the only thing that would

4  happen is that premium would have been deducted from the pay

5  out of the loss.  So there would have been no harm in returning

6  that premium.

7          The question that becomes confusing is:  Does this

8  clause apply just to the hull or is it -- does it also include

9  the P&I premium?  And that might require a legal conclusion.

10  But from an underwriting perspective, I think it's -- I think

11  there's a question as to whether it is or isn't.  And it speaks

12  of a constructive total loss, which is the hull damage.  If you

13  go back to the base policy, the hull policy, that speaks to

14  returning of the premium.  The P&I does not speak to it.

15          THE COURT:  What is a P&I policy supposed to be for

16  again?

17          THE WITNESS:  For liability.

18          THE COURT:  Third-party liability?

19          THE WITNESS:  Third-party liability.

20          THE COURT:  Okay.  Now, what if the -- to follow up

21  on that, so you really don't know the answer to the ultimate

22  question?

23          THE WITNESS:  No, I didn't say that.  I said that the

24  premium should be returned -- should have been returned, okay,

25  because there was no payment of loss.  Their contract says, In

1    the event of payment --

2              THE COURT:  Now, what if they paid the cost of the

3    wreck removal?  Was that not a payment on the loss?

4              THE WITNESS:  The wreck removal is -- that's not for

5    the total -- they haven't paid out for the total loss of the

6    vessel, though.  It says here, If payment by the underwriters

7    for the total or constructive loss of the named vessel.  They

8    have not paid out that.

9              THE COURT:  And what about in a situation where there

10   may be coverage but not for this occurrence?  Why would the

11   premium have to be returned?

12             THE WITNESS:  If there was --

13             THE COURT:  In other words, if there's coverage for

14   the vessel --

15             THE WITNESS:  Correct.

16             THE COURT:  -- that doesn't necessarily answer the

17   question as to whether there is coverage for this occurrence,

18   correct?

19             THE WITNESS:  I'm sorry.  I'm not --

20             THE COURT:  In other words, say for example the Court

21   were to find that the damage to the vessel occurred prior to

22   the effective date as an example.

23             THE WITNESS:  Okay.

24             THE COURT:  The Court may find or the trier of fact

25   may find that there is a coverage here but that the terms of

1    the coverage have not been satisfied or not been triggered, I

2    guess, based upon the nature of this occurrence.  In that

3    circumstance would there have to be return of premium?

4           THE WITNESS:  If a loss occurred prior to the

5    inception -- let's say prior to the inception of the policy?

6           THE COURT:  Right.  Exactly.

7           THE WITNESS:  And the Court rules that there was

8    coverage?

9           THE COURT:  There was coverage, but it did not

10   trigger until after the occurrence occurred.

11          THE WITNESS:  Okay.  So in essence the loss occurred

12   on the 1st.  The policy was supposed to take effect --

13          THE COURT:  Right.

14          THE WITNESS:  -- the 5th.

15          THE COURT:  Right.

16          THE WITNESS:  And then there was a loss.

17          THE COURT:  Right.

18          THE WITNESS:  The Court rules that there was coverage

19   for that loss that occurred on the 1st?

20          THE COURT:  That there was not coverage.

21          THE WITNESS:  There was not coverage on the 1st?

22          THE COURT:  Correct.  What if that happened?

23          THE WITNESS:  There was not coverage on the 1st?

24          THE COURT:  Right.

25          THE WITNESS:  And now the policy takes effect.  Then

1    there's a subsequent loss?

2              THE COURT:  There's a subsequent -- yes.

3              THE WITNESS:  A subsequent total loss?

4              THE COURT:  Right.

5              THE WITNESS:  Then if the insurance company pays out

6    for that constructive total loss, then they're entitled to keep

7    the premium.

8              THE COURT:  And if that insurance company doesn't pay

9    because the occurrence predated the date of the policy, then

10   what?

11             THE WITNESS:  If the loss occurred -- predated the

12   policy, then if it's a constructive total loss, then there's no

13   need to have the premium.  But if they do pay out on the loss

14   prior to the inception, then I believe that they are entitled

15   to keep that premium.

16   BY MR. STRADER:

17   Q.  So where would the salvage payment that was just discussed

18   be in the policy?  What policy coverage?  What part of the

19   policy would apply to that coverage?

20   A.  Suit and labor.

21   Q.  Would that affect the premium earned?

22   A.  Suit and labor is part of the -- is part of the hull

23   clause, but the premium earned has -- really is not -- does not

24   deal with suit and labor.  It deals with the total constructive

25   loss of the vessel.

1    Q.   Are you aware of where the vessel sank?

2    A.   Yes, I am.   It sank in the Atlantic Ocean off the coast of

3    Florida.

4    Q.   And do you know if State National was promptly notified

5    about sinking in the Atlantic Ocean?

6    A.   They were notified on 3-26 that the vessel had -- that they

7    had suffered a loss, and that can be found on Defendant's

8    Exhibit 83.

9    Q.   Okay.   Would that be USI Placement 0912 and 0913 if you

10   know?

11   A.   Excuse me.   O83 -- I'm sorry.   Hold on one second here.

12            THE COURT:   If you don't know, that's fine.

13            THE WITNESS:   I have it, but I can't locate it at

14   this time.

15   BY MR. STRADER:

16   Q.   When -- so the loss was essentially reported the same day

17   it occurred?

18   A.   Correct.

19   Q.   And once the loss is reported, what does that trigger on

20   the part of the insured and/or the insurance company?   What

21   events usually occur or if you're aware, what events occurred

22   in this situation, particular situation?

23   A.   Well, the loss was reported, and then -- when this loss

24   occurred, this loss clearly occurred in the Atlantic Ocean.

25            MS. LIDONDICI:   Objection, Your Honor.   I move to

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT PRODUCED BY COMPUTER.

1   strike; nonresponsive.  Move to strike; nonresponsive.  The

2   question is what does the report cover.  Sorry.  Move to

3   strike; nonresponsive.  The question is what does the loss

4   reporting trigger; not questions regarding where the vessel

5   was.  Also objection to predicate and foundation as to claims

6   handling with this witness.  He's not a claims person and to

7   the extent he's going to testify as to claims procedures as

8   opposed to underwriting, predicate, and foundation.

9           THE COURT:  And the latter point with respect to the

10  scope of his knowledge as to claims processing?

11          MR. STRADER:  I believe that he's testified already

12  as to his qualifications.  That is part of that testimony.  He

13  testified that as an underwriter, you always pay attention to

14  the claims process so that you will learn from it as far as

15  writing a future risk so that if an incident occurred, that

16  would be one of your basis that you rate policies.  It also

17  would be one of the basis that you'd use in making a decision

18  whether to write another similar policy.

19          And maybe that a loss occurs and you decide, you

20  know, that's what insurance is for; it's towards an event; and

21  I would do the same thing again.  Or you may decide as an

22  underwriter that it was a bad idea to write this sort of

23  coverage, and I am not going to do it again.  So I think he has

24  experience in making these determinations and the procedures to

25  follow, and part of this procedure would be the notification

```
1   from the broker to the underwriter.  So there would be some
2   underwriting involved in this situation.  And I believe it
3   shows that the underwriter was notified.
4           THE COURT:  Do you want -- are you going to get into
5   more of this or is it just an isolated question?
6           MR. STRADER:  Well, I just want him to -- when he
7   reviewed the documents, it's clear that it occurred in the
8   Atlantic, so that -- and that affects the claims process as
9   opposed to did it occur in the Gulf.  It occurred in the
10  Atlantic, and they were promptly notified.  And I wanted him to
11  discuss what happened after that.
12          THE COURT:  So you do want to get into that?
13          MR. STRADER:  Yes, I do want to get that.  Right.
14          THE COURT:  Okay.  Do you want to voir dire on this
15  issue?
16          MS. LIDONDICI:  Yes, Your Honor.
17          THE COURT:  Okay.
18          THE WITNESS:  Good morning.
19          THE COURT:  I would say at this point the defendant
20  hasn't objected -- excuse me.  The plaintiff hasn't objected to
21  the scope of any opinion he's given relevant to underwriting
22  and policy creation, so obviously that's already in.  So just
23  focus in on the claim processing.
24          MS. LIDONDICI:  Yes, Your Honor.  We're not
25  challenging his having been underwriter, although we will get
```

```
 1   into it on cross-examination as to his marine experience.
 2              THE COURT:  Right.  That's fine.
 3                          VOIR DIRE
 4   BY MS. LIDONDICI:
 5   Q.  But as to your claims experience, sir, have you ever been a
 6   claims adjuster?
 7   A.  I've not been a claims adjuster.
 8   Q.  Have you ever been a claims supervisor?
 9   A.  No, I have not.
10   Q.  Have you ever adjusted or assessed a claim as a
11   professional in the insurance industry?
12   A.  Yes, I have.
13   Q.  For what companies have you assessed or adjusted claims and
14   when?
15   A.  I have assessed claims.  I've not adjusted claims.  With
16   the Hartford from the beginning, I believe 1987 until when I
17   left, part of my responsibility was in the claims-litigation
18   area.  My role there was to -- they wanted to benefit from my
19   underwriting experience to help in the claims process, in the
20   litigation process.
21              My role -- and sometimes I use a term when I try to
22   explain it -- was to be the 30(b)(6) of the company.  My job
23   was to review all the underwriting information, the claims
24   information to see that the underwriters -- the underwriting
25   part of the process was handled properly and at the same time
```

1    the claims handling process was also done properly.  So at that

2    point in time I can make a decision as to whether we want to

3    continue with litigation or whether we wanted to try and

4    resolve this situation as quickly as possible to avoid the

5    expenses that are associated with litigation.

6    Q.    Well --

7    A.    So I was directly in this --

8    Q.    -- other than --

9    A.    -- claims litigation.

10   Q.    -- your assessment and evaluation role in litigation

11   support or litigation evaluation, let's talk about claims

12   adjustment.  Are you a licensed claims adjuster?

13   A.    No.

14   Q.    Have you ever been a licensed claim adjuster in any

15   jurisdiction?

16   A.    No.

17   Q.    Have you ever held any professional designation regarding

18   claims adjustment?

19   A.    No.

20   Q.    Have you ever managed or operated a claims office?

21   A.    No.

22   Q.    Have you ever worked in a claims office?

23   A.    Well, I worked in the claims operation.

24   Q.    In the claim department?

25   A.    No.

1   Q.   Have you ever had any specific State-recognized training in

2   claims adjustment that would enable you to obtain an adjuster's

3   license?

4   A.   Yes.

5   Q.   What training besides your CPCU?

6   A.   My CPCU, my CIC.  All those designations would -- for me it

7   would require me to fill out an application, send it into the

8   state, in my home state, and I could be licensed as an

9   adjuster.

10  Q.   That's a life -- is that a life adjuster or is that a --

11  A.   P&C.

12  Q.   -- marine casualty adjuster?

13  A.   P&C.

14  Q.   Property & casualty.  Have you ever done that?

15  A.   No, I have not.

16  Q.   And you've never testified as a claims adjuster or to

17  claims adjustment in court as an expert, have you?

18  A.   I've testified about claims handling in court; and I've

19  been proffered as an expert in that, yes.

20  Q.   Claims adjustment, sir?

21  A.   Not claims adjustment.  Claims handling.

22        MS. LIDONDICI:  Your Honor --

23        THE COURT:  What is the difference between claims

24  adjustment and handling?

25        THE WITNESS:  Well, claims adjustment is you're

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT PRODUCED BY COMPUTER.

1    evaluating the damages.  Claims handling is the processes that

2    a claims person would go through in the handling of a claim

3    from the onset until the conclusion.  Do they gather all the

4    information?  Do they work to -- do they review all the

5    necessary information to help them in their process?  Do they

6    send out, if necessary, the reservation-of-rights letter?  Did

7    they contact all the necessary people that had information

8    about that claim?  You review all that information so you can

9    -- and I've testified in many courts as to whether there's

10   unfair claims practices involved in the handling of a claim.

11   And I've been an expert in various states as an expert in

12   talking about --

13             THE COURT:  Have you testified in bad-faith cases?

14             THE WITNESS:  Yes.

15             THE COURT:  How many times?

16             THE WITNESS:  In court it was bad faith with Richard

17   Childress Racing versus United Omaha Mutual.  That was the

18   death of Dale Earnhardt.  Also in bad faith testified in

19   Governor's Landing versus Zurich.

20             THE COURT:  And with respect to claim handling have

21   you ever been involved in the claims handling role?

22             THE WITNESS:  The actual person who's doing the daily

23   task, no, sir.

24             THE COURT:  Okay.  And why deal with it in a

25   supervisory position for a claim-handling role?

1          THE WITNESS:  If you're talking about there's five

2   people here; I'm their boss; I'm overviewing what they've done,

3   no.

4          If you're talking about a different role where I'm

5   sitting over here and as a compliance person, as a person who

6   is reviewing a claims file, I am overseeing the work that they

7   did and making decisions as to what they do.  And hopefully if

8   there was issues that were inappropriate or it wasn't done,

9   they would learn from that and make necessary corrections.  And

10  if --

11          THE COURT:  How long were you in a compliance role?

12          THE WITNESS:  I've been in compliance since 1987.

13          THE COURT:  And what about with marine loss claims?

14          THE WITNESS:  Marine loss claims?  I've not been

15  involved in marine loss litigation.  But, again, it goes back

16  to the process.  You have a claim.  One says marine.  One says

17  property.  But, in essence, you follow the same processes

18  through it.  There's different policies, granted.  There's

19  different clauses.  But while they're different, they're very

20  much the same.

21  BY MS. LIDONDICI:

22  Q.  Sir, did any of those bad-faith cases you testified on

23  involve marine policies?

24  A.  No.

25  Q.  Did they involve marine coverages?

1    A.   No.

2    Q.   Have you ever testified in a bad-faith case involving

3    marine policies?

4    A.   No.

5    Q.   Have you testified in any coverage case involving marine

6    policies besides this one?

7    A.   It would have been -- you know, it would be something --

8    when you talk about marine, marine covers a multitude of

9    things.  And I've been involved in jewelry and what have you,

10   and that's part of marine; but it's not --

11   Q.   Not commercial marine vessels?

12   A.   No, ma'am.

13   Q.   Have you been a compliance officer for commercial marine

14   accounts and policies?

15   A.   No, ma'am.

16            MS. LIDONDICI:  Then, Your Honor, we --

17            THE COURT:  Do you have any further questions?

18            MS. LIDONDICI:  No further questions, Your Honor.

19            THE COURT:  Do you have anything further?

20            MR. STRADER:  I'd like to respond; perhaps not a

21   question.

22            THE COURT:  Go ahead.

23            MR. STRADER:  I'd also like to point out that I was

24   asking regarding the claims handling, what happened with

25   respect to handling of the claim.  I wasn't asking him to state

```
 1    whether -- and I don't think there's an issue here as to
 2    adjusting the claim anyway.  I wasn't asking him whether -- you
 3    know, so I'm not asking him any specific amounts.  I'm not
 4    asking him whether he believes there was an overpayment of the
 5    salvage or anything like that.  I'm asking him whether he feels
 6    that the claims procedure was adequate and what happened in
 7    this claims procedure.
 8              THE COURT:  Let me ask this question actually as I'm
 9    thinking it through based upon your definition, your
10    description rather.  Given the claims in the case, how is the
11    claims handling, general claims handling, because he obviously
12    has no knowledge with respect to the particular issues dealing
13    with salvage and wreck removal.
14              But respect to the general claims handling of the
15    file as to when the reservation-of-rights letter was sent, when
16    should it have been sent, how is that relevant I guess since
17    this isn't a bad-faith case?
18              MR. STRADER:  It's relevant, Your Honor, as to
19    whether the proper procedures were filed by underwriters.
20    They've made a lot of issues regarding the survey.  They sued
21    on the survey, you know, not being provided when it was
22    provided.  And, you know, he's testified also that he was not
23    in the department but he was over the department in litigation.
24    And so if he found that there was improper claims handling
25    procedure, he could have instructed the insurance company that
```

1   it was his belief that the claim should have been paid, and he

2   stated as much the fact.

3          THE COURT:  And what I'm saying --

4          MR. STRADER:  Also, Your Honor --

5          THE COURT:  No.

6          MR. STRADER:  I'm sorry.

7          THE COURT:  What I'm saying is, is it relevant to the

8   claims in the case.  Obviously the underwriting part, which

9   he's already testified to, is relevant because it goes to the

10  creation of the coverage and the scope of the policy and the

11  scope of -- all that.  That's all clearly relevant.

12         With respect to actually the claims-handling process,

13  how is that directly relevant except as it relates to the

14  valuation of, for example, the salvage or how salvage is itself

15  handled which he can't testify about.

16         MR. STRADER:  Well, they've raised the issue in as to

17  utmost good faith, Your Honor.  So even though it's not

18  necessarily a bad-faith claim at this point, the respective

19  duties of the insured and the respective duties of the

20  insurance company itself and its representatives, which include

21  the claims-handling people, and Optimum is specifically

22  mentioned in the policy as handling the claims here.

23         So, you know, as an underwriter he's entitled to

24  testify about the policy and provisions of the policy.  And one

25  of those provisions of the policy is how the claims are going

1  to be handled.  And, you know, also they had --

2          THE COURT:  I guess my question --

3          MR. STRADER:  -- an expert testify that it bled over

4  very far into the underwriting practices, and it would go to

5  the weight of the testimony perhaps.  But he was -- their

6  expert was allowed to testify even though he had never been an

7  underwriter.  He was only a broker his whole life.

8          THE COURT:  Who was their expert?

9          MS. LIDONDICI:  Mr. Strader -- Sorry.  Mr. Strader is

10  referring to Mr. Draper.  And the Court had ruled on a motion

11  in limine regarding the ability to testify.  Actually it was a

12  Daubert Challenge.  I'm sorry.

13          THE COURT:  Yeah.  I remember Mr. Draper testifying

14  on the claims handling.

15          MS. LIDONDICI:  Mr. Draper testified Friday morning

16  regarding --

17          MR. MOURE:  It was Monday morning.

18          MS. LIDONDICI:  It was Monday?

19          MR. MOURE:  Yes, it was.

20          MS. LIDONDICI:  I apologize.

21          THE COURT:  Everything has just flown.

22          MR. STRADER:  My point is their expert was allowed to

23  testify, and perhaps it might go to the weight of the

24  testimony; but you did allow the testimony.

25          MS. LIDONDICI:  Mr. Draper did not testify as to

1    claims handling, Your Honor.  He testified as to policy

2    placement, brokering of the policies, and general underwriting

3    issues which this Court had found he was capable to do so in

4    its order on that Daubert motion.

5         MR. STRADER:  If he was a broker, Your Honor, and he

6    testified regarding underwriting --

7         THE COURT:  Hold on.  I think I have my notes.  No,

8    he didn't testify regarding the claims-handling process.  He

9    was talking about the scope of the policy more than policy

10   provisions applied in duty of good faith.  He did testify to --

11   relative to the insured's duty at the time of the application,

12   so --

13        MR. STRADER:  But Karyn Price was the underwriter,

14   and she gets notice of the claim.

15        THE COURT:  Right.

16        MR. STRADER:  So that's why the claim --

17        THE COURT:  I guess my question is, though, since I'm

18   trying to make sure I understand what I'm supposed to do --

19        MR. STRADER:  Okay.

20        THE COURT:  Okay.  What claim -- I recognize it may

21   have come up at some point, but some of that may be ultimately

22   lost because I'm going to be focussing on the claim.  What

23   claim or defense is at issue that would require me to evaluate

24   the reasonableness other than the valuation of the salvage

25   issue?  And I recognize that is a different problem.  But with

1   respect to the overall claims handling, what claim or defense

2   would require me to evaluate the reasonableness of that

3   process?

4           MR. MOURE:  Your Honor, can I address that quickly?

5   They filed a cause of action, the remaining cause of action

6   other than their dec action.  All the other ones were

7   dismissed.

8           THE COURT:  Right.

9           MR. MOURE:  On the basis of utmost good faith, and

10  they chose not to dismiss that claim.  They've left that in

11  here.

12          THE COURT:  That claim goes to the policy should be

13  voided, correct?

14          MR. MOURE:  Correct.  That our client did not act in

15  the utmost good faith.

16          THE COURT:  Okay.

17          MR. MOURE:  And this witness --

18          THE COURT:  And that's what Mr. Strader testified

19  about?

20          MR. MOURE:  Well, yes.  Yes.  It wasn't Strader.

21          THE COURT:  I'm sorry.

22          MR. MOURE:  It was Mr. Draper.  That's Mr. Draper's

23  testimony.  He did -- yes, he testified that in 45 years he

24  acted as a marine broker.  He's actually from Seattle.  He's

25  actually a very well-known broker there.  He never once in his

```
 1   life ever seen a claim for an insurance company try and void a
 2   policy on the basis of utmost good faith.
 3              THE COURT:  Okay.
 4              MR. MOURE:  But yet he came in on --
 5              THE COURT:  Well, how does that go to their good
 6   faith, their -- I mean the insurance company's good faith,
 7   their reasonableness in the claims-handling process?  For
 8   example, did the reservation-of-rights letter get properly
 9   sent?  Isn't that a bad-faith issue?
10              MR. MOURE:  Well, I think they -- I think they merge.
11   I think the -- I think -- and it is unique to marine policy
12   underwriting.  It's this idea of utmost good faith.  They've
13   asserted it.  It works both ways.  The way they handled the
14   claim was not in utmost good faith.  We contend it was bad
15   faith.  But I think this witness is qualified.  He oversaw the
16   department.
17              THE COURT:  And you don't have -- this isn't a breach
18   of contract claim on a bad-faith issue at least yet obviously.
19   That may be for another day, but -- obviously depending on what
20   happens in this case -- but technically that claim is not in
21   there.  So as long as I make sure, for example, if some of that
22   has come in through a sworn witness or another, that's one
23   thing; but from the trier of facts perspective, I'm focusing on
24   Mr. Draper's testimony as it relates to the breach or not
25   breach of the duty of good faith on the part of both parties at
```

 1   the inception of the policy because obviously their bad faith

 2   is -- the insurance company's action in connection with the

 3   formation of the coverage is certainly relevant.  And Mr. --

 4           THE WITNESS:  Roinestad.

 5           THE COURT:  -- Roinestad testified to that.  Mr.

 6   Draper testified to that.  Various witnesses have testified to

 7   that.  Ms. Didier testified to that.  So that testimony is

 8   clearly at issue.

 9           My question, though, is really as to the -- either

10   the insured's or the insurance company's reasonableness or good

11   faith in connection with how they got the claim going.  I'm not

12   sure that's really relevant.  And so, therefore, put aside the

13   question of whether or not he's qualified to testify in that,

14   in a marine-loss case.  And he may very well be, at least with

15   respect to general issues.  Why do I need to know that?

16           MR. STRADER:  Well, Your Honor, they're making issue

17   of the validity of the verbal agreement.  And what happened

18   after the claim -- they were notified of the loss is important

19   relative to establishing that verbal agreement.  So, you know,

20   I think perhaps as to the way I stated the question; but I just

21   wanted to go through the procedure in the notice of loss.

22           THE COURT:  Right.

23           MR. STRADER:  And that notice of loss did go to the

24   underwriters, and it -- I probably would have taken less time

25   arguing about it, but I think that's important.  You know, the

1    insurance company has made an issue of the contract.

2         THE COURT:  As long as I make it clear that I'm not

3    going to be -- or let me ask you actually.  Let me go back.

4    Maybe I shouldn't -- I'm speaking too quickly.  Are you making

5    an issue as to anything that the insured did?  Except as to the

6    valuation of things, the salvage issue, you know, whether the

7    salvage should have been sold or not, except as it relates to

8    salvage issues which came up in a variety of ways; but with

9    respect to the handling or the processing of the claim, are you

10   making an issue with the insured's communication to the

11   insurance company?  In other words, the bottom line is:  Is the

12   coverage here voided or affected by how the insured handled the

13   loss subsequent to March 22nd?

14        MS. LIDONDICI:  With respect to the pleadings there

15   is no pleading or assertion in the pleadings of post-loss bad

16   faith which would void the policy.  What is relevant post-loss

17   and has come up is the fact that the application was then

18   submitted post-loss which we believe ratifies the terms of the

19   written agreements and documentation and dissuades the Court

20   hopefully that there isn't a verbal agreement.

21        THE COURT:  But that relates to the --

22        MS. LIDONDICI:  But that's the --

23        THE COURT:  -- creation of coverage.

24        MS. LIDONDICI:  -- only post-loss issue.

25        THE COURT:  That relates to creation of coverage.

1          MS. LIDONDICI:   Correct.

2          THE COURT:   But with respect to, for example, Mr.

3    Rosandich's responses to Mr. Cairns, for example.   Mr. Cairns

4    said at various points he felt that he wasn't getting a

5    straight story or that he testified yesterday about he didn't

6    get access to the vessel, I think he said, or he didn't have

7    access to the crew.

8          Will you stipulate that that frankly is not really

9    directly relevant because even if he's right, that doesn't void

10   the policy if proper coverage existed?

11         MS. LIDONDICI:   That's correct, Your Honor.

12         THE COURT:   Will you agree with that?

13         MS. LIDONDICI:   And that is not a basis of the

14   pleadings or the declaratory judgment action brought by State

15   National post-loss claims behavior.

16         THE COURT:   Okay.   All right.   In that case then I

17   think we can then -- I'll make that clear on the record that to

18   the extent any testimony has come in regarding the insured's

19   actions post -- as it relates to the claims processing

20   post-March 26th, I'm not going to take that into account.   And

21   so, therefore, you don't need to get into that with him; nor is

22   Mr. Draper's testimony at all relevant to that.   So that way --

23   that way to the extent you have a concern that something has

24   come up here at some point in answer to somebody's question,

25   it's not going to be an issue for you.

1          If I find that there's coverage on the policy, then

2    whether or not Mr. Rosandich provided adequate information or

3    handled the reservation issue is not going to void it.  Okay?

4    So as long as we're clear on that.

5          MR. STRADER:  But, Your Honor, they did bring in

6    Harold Heno to talk about the claims and the

7    reservation-of-rights letter, also.

8          THE COURT:  What about Harold Heno?

9          MR. STRADER:  You know, they're still contesting

10   whether, you know, the verbal -- if they're not contesting

11   there was a verbal agreement for the trip coverage, we wouldn't

12   be arguing this point; but the specific occurrences that

13   happened as part -- post-loss specifically go back to coverage

14   and what that coverage was.

15         THE COURT:  What about Harold --

16         MR. STRADER:  And they've made an issue as to what is

17   on the application as far as the navigational limits.

18         THE COURT:  Well, that goes to the creation of

19   coverage.  Obviously the creation of coverage issue is

20   relevant.  Is that what Mr. -- that was what Mr. Heno was

21   talking about?

22         MS. LIDONDICI:  Mr. Heno was brought in for two

23   purposes, Your Honor.  The first was with respect to the

24   documentation and payment of the Sea Tow claim by Optimum Claim

25   Services.  The second was because Mr. Dorsey had stated on the

1    stand that he was told there was coverage; not to worry about

2    it; your claim may not be fully covered.  And that was to rebut

3    that claim that there was any verbal ratification that there

4    was coverage and to make clear that the removal of the salvage

5    was under a full and complete reservation of rights.

6          MR. STRADER:  Your Honor, they also used him to try

7    to bring in the reservation-of-rights letter but failed because

8    he did not have any specific knowledge with respect to that, so

9    they have made that an issue already and tried to bring in

10   testimony to that effect.  Now they're objecting to me even

11   getting close to that issue, which is actually not the

12   direction that I was going with it.

13         MS. LIDONDICI:  The reservation of rights was not

14   based on post-loss behaviors.  It was based on policy

15   formation, terms and conditions of the policy, what is a

16   covered loss, and where the loss occurred.

17         MR. STRADER:  But Herald Heno was the claims handler,

18   and he's testified here today -- yesterday.

19         THE COURT:  Let me go back to Mr. Heno.

20         MR. STRADER:  And, you know, he was an employee of

21   Optimum, which is what the policy specifies.  It's the company

22   that handles the claims.  And there has been some testimony

23   that there's an inter-relationship between WFT and Optimum and

24   ownership and, also, whether WFT has interfered in this claims

25   process with respect to Optimum or whether they were actually

1    within their rights.

2         MS. LIDONDICI:  Again, Your Honor, those were all

3    issues that the defendant has inserted and we have rebutted

4    through Mr. Heno's testimony.

5         THE COURT:  Well, I'm going to let him go into that

6    latter issue since he's made that an issue before because I

7    don't think that has to do with the claims-handling processes.

8    That has to do with the underwriter's role in this.  And

9    clearly he can testify to that because he was an underwriter

10   and has been for a long time.  So to the extent that you want

11   to get into that, feel free.

12        MR. STRADER:  Okay.  Your Honor, I think part of the

13   problem is I was just trying to lay a predicate that he's aware

14   of where the vessel sank --

15        THE COURT:  Right.

16        MR. STRADER:  -- because some people have not known

17   where, you know, Ft. Lauderdale is to Miami, Florida, or

18   Hollywood or Golden Beach.

19        THE COURT:  Okay.  Go ahead.  Let me let you go ahead

20   a little further and then re-evaluate it if need be.  But you

21   understand my concern so far.  So ahead.

22        MR. STRADER:  I don't think I'm going to go too far

23   past what you would allow.

24        THE COURT:  Okay.

25        MR. STRADER:  And I'm sure you will notify me if I

1    did.  If you don't, opposing counsel will.

2                    CONTINUED DIRECT EXAMINATION

3    BY MR. STRADER:

4    Q.   When the claim is -- well, I sort of lost track here.  So I

5    believe we were at the point where a claim had been submitted

6    the same day of the loss.

7    A.   Correct.

8    Q.   Now, from an underwriting perspective or just handling that

9    claim with the underwriter or its claims-handling people under

10   the policy, what would normally happen?  What would the insured

11   normally do and what would the insurance company normally do?

12   A.   Well, the insured obviously is going to submit a request to

13   receive payment for his loss, and he's going to request that

14   the company pay for his losses.  The insured is also going to

15   take the necessary actions that is required by him under the

16   policy contract, and it's also the expectation that the

17   insurance company is going to adhere to their policy contract.

18   And they both have obligations, and they're both -- they both

19   should be complying with those obligations.

20   Q.   Okay.  Once the claim was submitted are you aware of the

21   interchange between the underwriter and the claims-handling

22   people, communications they made with respect to the claim?

23   A.   Yeah.  Yes, I am aware.  I've read the -- I read the

24   documents, and I am aware of the interchange.  I know that they

25   -- that the claims people proceeded to move forward with the

1    claim.  There's documents that they even talked about

2    subrogating against the welder.  I know that the loss occurred

3    in the Atlantic Ocean.  And from an underwriting perspective if

4    you have a policy that says coverage is only going to be

5    effective in the Gulf, the first thing that an underwriter

6    makes sure that they do is that nothing would be paid out until

7    it was properly investigated.

8              In this particular case, though, the underwriter here

9    I believe based on the record knew that there was coverage for

10   this loss in the Atlantic and, therefore, did not initially

11   attempt to stop it.  Had the underwriter felt that there was no

12   coverage, I would have suspected that there would have --

13             MS. LIDONDICI:  Objection, Your Honor --

14             THE WITNESS:  -- been an immediate --

15             MS. LIDONDICI:  -- as to his suspicion as to what the

16   underwriter would do; lack of foundation.

17             MR. STRADER:  Your Honor, he's not testifying what --

18   he's testifying in his expert opinion.

19             THE COURT:  He's giving an opinion, and so let him go

20   forward.

21             THE WITNESS:  It's my opinion that I as an

22   underwriter would want that claim person to send out immediate

23   reservations of rights letter based on the fact that the vessel

24   sank in a location where there was purportedly no coverage.

25   BY MR. STRADER:

1  Q.  Would the insurance company be entitled to make a

2  subrogation claim if there was no coverage and no payment by

3  the insurance company?

4  A.  No.  If they haven't paid out anything, they're not

5  entitled to anything.

6  Q.  What should the underwriters have provided to Optimum

7  Claims so that they would be able to handle this claim?

8  A.  They should have provided all the underwriting information

9  so that the claims person could evaluate the -- they have to do

10 an evaluation on the pre-claim activity, what happened before

11 the claim, what happened during the underwriting process to

12 make sure that they can make the proper decision from a claims

13 perspective.

14       A claims person needs to know what happened on the

15 underwriting part because they are to give equal -- an insured

16 pays a lot of money for protection, and they deserve a full

17 investigation of a claim prior to any denial.  So the -- all

18 the information that was available to Karyn Price, the various

19 emails that she had sworn under oath that she never got should

20 have been provided.  The various discussions that she -- she

21 should have talked to the claims people about the various

22 discussions she had with Shawn LeBeouf.  All that information

23 should have been provided so then the claims adjuster, the

24 claims department could have done their job effectively.

25 Q.  Do you know if the underwriter provided a survey to the

1    claims-handling group, Optimum?

2    A.  Well, the initial -- I read the reservation-of-rights

3    letter which indicated that there was no survey report done.  I

4    think there's clear testimony that there was a survey done; but

5    the fact of the matter is in this claim a survey would not have

6    been required to proceed with this claim according to the

7    policy contract.

8    Q.  Could you specify where in the policy that's dealt with,

9    the issue of a survey is dealt with.

10   A.  Yes.  Under -- excuse me.  Under condition 29, survey

11   warranty, warranted that the coverages provided herein is

12   subject to a condition-and-valuation survey approved by

13   underwriters within 30 days of attachment; such survey to be

14   for the account of the insured unless otherwise agreed.

15           So the insured had up to 30 days from the attachment

16   of the policy to get the survey completed.  Now, we know the

17   survey was done; but at the time of the loss this survey should

18   have been a nonissue because according to the contract that

19   they provided the customer -- the insured, it would not have

20   been a requirement until 30 days after the attachment.

21   Q.  So if I understand your testimony correctly then, it's

22   actually -- since the vessel was a constructive total loss and

23   under water for part of the time and then later was a wreck,

24   there would be no requirement for a survey at all in this

25   matter?

1   A.  It would not have had to have been completed, correct, in

2   order to proceed with the claim.

3   Q.  If you as an underwriter received a survey relative to a

4   risk that you were considering or had insured, would you pay

5   any attention to the survey?

6   A.  Absolutely.  That goes back to common sense and

7   underwriting curiosity.  You have a vessel here that is 20

8   years old and to be insured for a million dollars.  You want to

9   know what it is that you're insuring.  You need to know what

10  you're insuring so you can price that -- you can price it

11  correctly if you want to write it or make the decision to

12  decline it.

13  Q.  When you were working as a compliance officer or person

14  with respect to an insurance company, if you saw that a survey

15  had been provided and ignored an issue regarding a certificate

16  of inspection where there was -- it was clear even on the email

17  that said there was a certificate of inspection; there was

18  another document that said there was not a certificate of

19  inspection, would you -- what would your -- would you advise

20  the insurance company to go ahead and deny this claim?

21  A.  No.  If you have conflicting information as regards to the

22  COI, the Certificate of Inspection, which was not a requirement

23  to writing this risk, and there's conflicting information, you

24  need to address that.  You need to clear that up if you're

25  going to make that an issue in the claims-handling process, if

1   you want to make it an issue in the claims-handling process.

2   Q.  Do you believe that WFT in its position as the managing

3   general agent for State National Insurance Company, if that

4   combination act in good faith in handling this claim from an

5   underwriting perspective?

6           MS. LIDONDICI:  Objection, Your Honor.  They're now

7   going into their bad-faith case which may or may not follow

8   this litigation; but it's not an issue in this case.

9           THE COURT:  Well, he phrased it -- I'll sustain as to

10  the form of the question.  The topic generally goes to the

11  underwriter's activities post-claim, which I'm letting him do

12  that so --

13          MR. STRADER:  I'll back up, Your Honor.

14  BY MR. STRADER:

15  Q.  After evaluating the documents that you've testified to

16  that you evaluated, do you believe that the insured acted in

17  good faith in making the insured's application and providing --

18  and eventually providing a claim to the insurance company for

19  its loss?

20  A.  Did the --

21  Q.  Insured.

22  A.  Insured?  The insured acted in good faith, correct.

23  Q.  Do you have any specific reasons why you believe that?

24  A.  The insured provided all the information that was requested

25  of the company in a timely fashion.  Any questions that were

 1   asked of the insured through their broker were responded to

 2   immediately.  The insured -- there's no evidence at all that

 3   they were -- that they were unhelpful, but every indication is

 4   that they were trying to be as helpful as possible in order to

 5   get the risk written.

 6   Q.  Is there any -- we talked about the survey.  Is there any

 7   requirement in the policy for a certificate of inspection?

 8   A.  No.  There's no -- there's no -- there is no requirement in

 9   the policy for a certificate of inspection.

10   Q.  Do you see any document in the file, in the documents that

11   you reviewed that require a certificate of inspection?

12   A.  No.  There were no documents in the file that showed that

13   there was a requirement for a certificate of inspection.

14   Q.  Do you believe the insurance company and the person of WFT

15   and State National combined operated in good faith in

16   processing this claim?

17          MS. LIDONDICI:  Objection, Your Honor.  We're again

18   getting into the processing of the claim.

19          THE COURT:  Sustained as to form.

20   BY MR. STRADER:

21   Q.  Do you believe the insurance company acted in good faith

22   with its underwriting decisions with respect to the coverages

23   they had extended and their later allegations against the

24   insured for documents that were provided that aren't even

25   required under the policy but yet they claim they have

1    received?

2    A.   They did not act in -- the underwriter, specifically Karyn

3    Price, did not act in good faith.  In fact, she -- and the

4    documents show that she went as far as -- she withheld

5    documents, and she went as far as to perjure herself in her

6    testimony when she gave her deposition.  She said that infamous

7    email that she never got --

8            MS. LIDONDICI:  Your Honor, I move to strike the

9    reference regarding perjury.

10           THE COURT:  Let him finish his question (sic), and

11   I'll re-visit that.

12           THE WITNESS:  Karyn Price said numerous times in her

13   deposition that she had never seen that document, never seen

14   it.  And then three weeks later the documents were provided

15   that show not only did she receive it, she referred it to her

16   boss.  And an underwriter does not knowingly and willingly

17   withhold information from the claims process in order to avoid

18   coverage, and this is what Karyn Price did.

19   BY MR. STRADER:

20   Q.   Should the chief underwriter Wanda Didier who also was

21   signatory in the policy be aware of the provisions in the

22   policy?

23   A.   As far as provisions of the policy, no one is going to know

24   everything about a policy.  You know, you just can't learn

25   every line about the policy; but you should have a familiarity

1  with it.  You should know at least the basics of the policy.
2  And you should realize that you do not know everything and that
3  if what you don't know, you should have means to check to make
4  sure you can learn what it is you need to know at some future
5  time.
6  Q.  Is there an extended venture and perils clause in this
7  policy?
8  A.  There is.
9  Q.  And could you indicate where that is in the policy.  Read
10  it into the record and explain your understanding of that,
11  please.
12  A.  Basically the additional perils section of the policy is
13  found on line 75 to 86.  There's three groupings of perils.
14  You have the perils clause.  And then you have the additional
15  perils clause.  And then you have the deliberate damage or
16  pollution hazard clause.  And the additional perils clause can
17  be found on line 75 to 86.
18  Q.  Is there a held covered provision?
19  A.  The held covered provision is found later on in the policy.
20  Let's see.  Let me see.  The held covered provision is located
21  directly prior to the perils provisions, and they're found on
22  line 67 through 69.
23          THE COURT:  What is that?  What does that do?
24          THE WITNESS:  Held covered?  What held covered does
25  -- we talked earlier about where the underwriter Karyn Price

```
 1   has authority to verbally bind coverage orally.  Well, the held
 2   covered provision in the policy, what that does is if someone
 3   goes outside the warranted navigational area, what an insured
 4   can do in order to insure coverage is notify the insurance
 5   company that they are going to be violating this warranty.  And
 6   then when they notify the insurance company, the insurance
 7   company then has the opportunity to evaluate that risk and
 8   charge an additional premium, but what it does is it provides
 9   automatic coverage for that person when they go outside the --
10   in this particular case, the area of operations meaning the
11   Gulf.  In this particular case, it would provide coverage while
12   that vessel was going from Ft. Lauderdale until it got into the
13   Gulf.  So in essence it allows -- when the underwriter says,
14   I'm verbally binding the coverage, this documents that that
15   coverage is provided.
16   Q.  Do you know if the held covered clause would apply to
17   seaworthiness?
18   A.  Whether the boat is seaworthy?
19   Q.  No.  Is there any impact on the seaworthiness -- strike
20   that.  Does the held covered clause have any impact on the
21   issue of seaworthiness under the policy if you know?
22   A.  Not that I'm aware of.
23            MR. STRADER:  Your Honor, no further questions.
24            THE COURT:  All right.  Let's go ahead and take our
25   morning break, and then we'll begin cross-examination.
```

1          MR. STRADER:  Thank you, Your Honor.

2          COURTROOM DEPUTY:  All rise.

3          (Break)

4          COURTROOM DEPUTY:  All rise.  Court is now in

5     session.

6          THE COURT:  All right.  Are we ready to begin the

7     cross-examination?  Go ahead.

8                    CROSS-EXAMINATION

9     BY MS. LIDONDICI:

10    Q.  Mr. Roinestad, good afternoon -- good morning.

11    A.  Good morning.

12    Q.  I'd like to go through some things you discussed; but,

13    first, let me ask you a little bit about your marine

14    background.  Have you worked as a marine?  And by that I mean

15    commercial marine underwriter; not inland marine that might

16    include jewelry policies and things of that nature?

17    A.  I have not underwritten inland marine; but as I testified

18    earlier, underwriting transcends all lines of insurance.

19    Basically when you underwrite one risk, it's very similar to

20    the other risks.  You might have different characteristics as

21    to what you access, but it pretty much transcends all lines of

22    insurance.

23    Q.  Are you aware that there are unique peculiarities with

24    respect to marine underwriting that don't necessarily apply to

25    other risks?

1    A.   Certainly.

2    Q.   And you're aware of the doctrine of utmost good faith?

3    A.   Yes.

4    Q.   And would you explain to the Court your understanding of

5    the doctrine of upmost good faith.

6    A.   The doctrine of utmost good faith in marine is where the

7    insured is to be upfront, forthright with information about the

8    risk that he wishes to insure.  He's supposed to make an effort

9    to make the company aware of everything that the company should

10   be made aware of.

11   Q.   Doesn't the doctrine place on the insured an affirmative

12   obligation to come forward with any material information that

13   might affect an underwriter's determination to accept this

14   risk?

15   A.   An insured has to make an affirmative effort, but they also

16   have to know what they need.  You know, if you don't know what

17   you don't know, it's kind of hard to come forth with what you

18   need to know.

19   Q.   Okay.  So under the doctrine of utmost good faith, an

20   insured would have an obligation to advise an insurance company

21   of prior losses and risks?

22   A.   Yes.

23   Q.   And he would have an obligation to advise of groundings of

24   a vessel?

25   A.   That would be true.

1    Q.  He would have an obligation to advise if his vessel has

2    failed Coast Guard inspections or critical inspections and that

3    hasn't been rectified?

4    A.  Well, let's put it this way:  And we talk about this case.

5    In this particular case, the insured was upfront.  He provided

6    an application -- a memo that said that the vessel did not have

7    its certificate of inspection.  It was going to get the

8    certificate of inspection.  And that was brought up several

9    times.  So the insured can make an effort to bring the

10   information; but then the insurer has an obligation to step

11   forward and make a decision as to whether they want to pursue

12   additional information, if they want to clarify any issues.

13        The underwriter -- and sometimes with acting in

14   utmost good faith some people like to think that an underwriter

15   can just sit back, Okay, insured give me everything that you

16   know and have and I can just sit here and do nothing because I

17   know that we've got a policy of utmost good faith.  It doesn't

18   work that way.

19        In marine underwriting and in any underwriting, an

20   underwriter is supposed to gather information to make -- be

21   curious about the information, to seek information so that they

22   can properly evaluate the risk.  They cannot sit in a corner

23   and hope that all information comes to them.  They need to

24   pursue that information.  And yet the assured should provide

25   information, should be upfront as this insured did, provide all

1    the information that was requested.

2    Q.   Sir, you're not an underwriter in the jurisdiction of the

3    11th Circuit, are you?

4    A.   I would disagree with that.

5    Q.   You underwrite in Florida?

6    A.   That's correct.

7    Q.   You underwrite marine in Florida?

8    A.   Ocean marine, no.

9    Q.   Are you aware of the 11th Circuit's holdings regarding the

10   doctrine of upmost good faith and the obligation of an insured

11   to affirmatively come forward with information that could be

12   material to the underwriting of the loss?

13           MR. STRADER:  I'd object, Your Honor.  She's asking

14   for a legal conclusion from the witness and, in fact, specific

15   case law.

16           THE COURT:  Well, I'll overrule it for now.

17           THE WITNESS:  Am I aware of the particular case law

18   that you're talking about?  I know -- I understand --

19   BY MS. LIDONDICI:

20   Q.   As it applies to the case.

21   A.   I will limit -- I will respond to you by saying I -- utmost

22   good faith, I understand it as a principle.  To say I

23   understand the nuances in this jurisdiction versus another

24   jurisdiction, I do not know that.

25   Q.   Are you aware having reviewed all the documentation that

1    you --

2              THE COURT:  Can you please stand by that microphone.

3              THE WITNESS:  Thank you.

4              THE COURT:  Go ahead.

5    BY MS. LIDONDICI:

6    Q.  Are you aware having reviewed all the documentation in

7    which you did that anytime Jeff Dorsey, Mark Rosandich, USI, or

8    any other representative of the insured coming forward and

9    advising the underwriter that the vessel had failed Coast Guard

10   inspection and had critical deficiencies outstanding?

11   A.  My answer would be that they provided the -- they told the

12   underwriter that they did not have a Coast Guard inspection as

13   of that date and that they were going to pursue it.  The

14   underwriter at the same time knowing that they didn't have that

15   Coast Guard inspection could have done one of two things.  They

16   could have asked for it and held off binding coverage until

17   they got it or said that I don't want to just -- I won't write

18   this risk without a Coast Guard inspection.  Again, it goes

19   back to the function and the responsibility of an underwriter.

20   Q.  Sir, are you aware that USI -- and let's clarify this.  USI

21   is the insured's agent, correct?

22   A.  Broker, yes.

23   Q.  And as their agent placing the insurance, they make

24   representations to WFT on behalf of their insured?

25   A.  Correct.

1  Q.  WFT doesn't talk directly to the insured.  It talks to USI?

2  A.  Correct.

3  Q.  And WFT has a right to rely on the representations that are

4  made by USI?

5  A.  Correct.

6  Q.  And when USI makes a representation of an affirmative fact,

7  WFT has no further obligation to say, Are you really sure that

8  you told me what you told me?

9  A.  I would disagree with that assessment.  And my disagreement

10  is that on the written application, it says that a certificate

11  of inspection was done; but at the same time the underwriter

12  had the survey that said it hadn't been done.  They had that

13  email from Captain Rosandich that it hadn't yet been completed.

14  And they had that statement of operations that said that they

15  were going to go to it.  So the underwriter cannot put their

16  head in the sand and say, I can assume that they've got a

17  certificate of inspection; I'm just going to assume it.  They

18  have an affirmative obligation to verify that information.

19  Q.  Well, I'm not talking about putting your head in the sand.

20  I'm talking about relying on express, affirmative, unequivocal

21  representations that a COI was current.  Could WFT rely on such

22  a representation by USI?

23  A.  If that was a sole piece of information.  If the only piece

24  of information out there was that comment that there was a

25  certificate of inspection completed, I might agree with you;

1   but the fact is that there was numerous other pieces of

2   information out there -- and I repeat, the survey, the email,

3   and what have you -- that had conflicting information.  And,

4   again, I say that the underwriter had an obligation.  An

5   underwriter not verifying that information is remiss in their

6   responsibilities.  Whether you're doing ocean marine, inland

7   marine, auto, homeowners, or what have you they have a

8   responsibility to the company to take those actions.

9   Q.  The survey was August prior to the application, correct?

10  A.  Correct.

11  Q.  And the application in February noted it had a COI,

12  correct?

13  A.  In February, correct.

14  Q.  And Exhibit 67 in evidence, an email from Jamie Robichaux

15  at USI, affirmatively represents in the last sentence of the

16  first paragraph what, sir?

17  A.  In the last paragraph it says --

18  Q.  The last sentence --

19  A.  Last sentence.

20  Q.  -- of the first paragraph.

21  A.  Excuse me.  This vessel has undergone Coast Guard

22  inspection and has a certificate of inspection, however --

23  Q.  Sir, I just asked you --

24  A.  Excuse me.  Let me complete my answer.

25          MR. MOURE:  Let him finish his answer.

1          THE COURT:  Let him finish his answer.

2          MS. LIDONDICI:  Certainly.

3          THE WITNESS:  Okay.  In this same document, there is

4   a description of operations attached.  And in this description

5   of operations, it makes clear, makes clear -- and this

6   statement of operation are the words of Captain Mark Rosandich

7   -- makes it clear that they are in the process of getting a

8   certificate of inspection.  They want to get an inspection for

9   the vessel for a hundred man crew.  So, again, you have to look

10  at what is said in this email, and you also have to look at the

11  attachments to this email.

12  BY MS. LIDONDICI:

13  Q.  And the attachments to the email say, We will be getting.

14  And the email says they have, correct?

15  A.  But you have to evaluate the difference.  You have to look

16  at these.  You know, as I said, you cannot keep your head in

17  the sand and just draw that kind of conclusion.  An underwriter

18  can't ill-afford to do that.  When underwriters make those type

19  of decisions, bad things happen.

20  Q.  And if the underwriter had called USI and spoken to Shawn

21  LeBeouf, they would have been told that the vessel had a COI

22  completed based on Shawn LeBeouf's deposition testimony at page

23  61, wouldn't they?

24  A.  I would have to see it.  May I see it?

25  Q.  Well, you have the deposition, don't you, sir?

1   A.   Yeah.   Yes.   I will.   Hold on one second.   He's only

2   relaying what was said on a particular document.

3   Q.   No.   He's stating that question and answer.   It states

4   upgrades done.   COI is current on the vessel.   Question:   Is

5   that accurate?   Answer:   That came from Mark Rosandich on the

6   phone.   Question:   That is your recollection?   Answer:   That my

7   recollection.

8               MR. STRADER:   Objection, Your Honor.   It's

9   argumentative, and it's not asking a specific question of the

10  witness.   And it's -- you know, they're just interpreting the

11  testimony differently.

12              THE COURT:   Overruled.   I'll give her some leeway.

13              THE WITNESS:   Would you repeat that, please.

14  BY MS. LIDONDICI:

15  Q.   Certainly.   Reading the deposition of Shawn LeBeouf on page

16  61, lines 3 through 11, does he not state that he received the

17  information from Mark Rosandich that upgrades were done, and

18  the COI is current on the vessel; and that is where the

19  information on the application came from?

20  A.   May I look at document 814, please, which is -- do we have

21  that document?

22  Q.   Document 814 is the handwritten application, sir.

23  A.   Okay.

24  Q.   The one that says COI is current.

25  A.   Okay.   This -- from what you say it says that that is Shawn

1    LeBeouf's recollection of the conversation with Mark -- Captain

2    Mark Rosandich, but at the same time he had the email.  Captain

3    Mark Rosandich had the email that clearly stated that it did --

4    it was not done and it was their intent to have it done.

5            Again, I go back to the point -- you're looking at

6    one piece.  You have to look -- as an underwriter you have to

7    look at all the pieces.  And the fact of the matter is this

8    whole issue could have been resolved easily by just if Ms.

9    Price had called up Shawn LeBeouf and said, FAX me in a copy of

10   the COI.  It's that simple.

11   Q.  Is it your opinion, sir, that in marine insurance an

12   underwriter has an affirmative obligation to verify the

13   affirmative representations made to them by the agent of the

14   insured?

15   A.  It is my opinion that an underwriter has an affirmative

16   obligation to the companies that they work for to do that.

17   Karyn Price was a chief underwriter with WFT.  She had an

18   obligation to State National to do a thorough and comprehensive

19   job.  That is her responsibility, so yes.

20   Q.  And the insured and his agents had an obligation to make

21   truthful representations regarding the status of the COI,

22   didn't they?

23   A.  I'm not saying that there wasn't -- they should have --

24   that that comment should not have been there.  I won't argue

25   that point, but I continually go back to the position I have.

You have to verify all the information.

Q. It's not that the comment shouldn't have been there, sir. Both the application and the email transmitting the application affirmatively stated a COI was in place; and that was untrue, wasn't it?

MR. STRADER: Objection, Your Honor. I think it mischaracterizes what he's already testified to and is argumentative.

THE COURT: Overruled.

THE WITNESS: Again, the document says what it says. You can't -- I can't argue with what the document says. I can only go by what the underwriter responsibilities are. And their responsibilities are, yes, this says one thing; but I have a number of documents that says something else. I have to verify it. Underwriters verify information all the time. That's if as an underwriter you're looking to underwrite the business. I'm not sure Karyn Price was interested in underwriting.

MS. LIDONDICI: Move to strike, Your Honor, as to his comments regarding Karyn Price's intentions.

THE COURT: That part is nonresponsive, yes.

MS. LIDONDICI: Thank you, Your Honor.

BY MS. LIDONDICI:

Q. An insured has an obligation not to lie on an application that is submitted; is that true, sir?

1    A.   Correct.

2    Q.   An insured's agent has an obligation not to make false

3    statements to an insurer in seeking the placement of marine

4    insurance; is that true, sir?

5              MR. STRADER:   Objection, Your Honor.   It is not

6    necessarily a false statement.   It can be a mistake.   That's

7    why the underwriter -- you know, he's already testified that's

8    why the underwriter should analyze all these details.

9              THE COURT:   What's your legal objection?

10             MR. STRADER:   It mischaracterizes the application.

11             THE COURT:   Overruled.

12             THE WITNESS:   Repeat that question for me.

13   BY MS. LIDONDICI:

14   Q.   An insured's agent has an obligation not to make false or

15   untrue statements in its submission of a risk to an

16   underwriter; is that true?

17   A.   An agent should -- has an obligation to accurately complete

18   an application, correct.

19   Q.   Under the doctrine of utmost good faith, an insured has an

20   obligation not to by either false statement, misstatement, or

21   concealment mislead or prevent the insurer from obtaining

22   complete information; is that true?

23   A.   That is true.   But, again, you have to go back and look at

24   the full picture.   When the insured is saying one thing that is

25   contrary to what the application is saying, contrary to what

1    the survey is saying, yes, that application should have been

2    completed correctly.  I won't argue with you there.  All I'm

3    saying is as an underwriting responsibility, you have to look

4    at the whole picture and then make an assessment.  In this case

5    what should have been done if -- what an underwriter should

6    have done here is, if it was so important in the evaluation, is

7    to get a copy of that certificate of inspection.

8    Q.  But you would agree, sir, that the statement on the

9    application said the COI was current, and the representation in

10   the email that they had a current COI were untrue?

11          MR. STRADER:  Your Honor, I think that

12   mischaracterizes the circumstances.  He's testified to

13   repeatedly here that that application went in with an email

14   that had several documents attached that became part of the

15   application, and those other documents had conflicting

16   information that told the correct story.

17          THE COURT:  I'll sustain as asked and answered

18   because I think you've made your point and he made his answer.

19   BY MS. LIDONDICI:

20   Q.  At any time did you see any document from either Jamie or

21   Shawn Robichaux -- Shawn LeBeouf that advised Karyn Price or

22   WFT that our assertion that there was an COI was incorrect?

23   A.  Did I -- if I understand your question, was there any

24   documents where Shawn LeBeouf or Jamie Robichaux told WFT that

25   there was, in fact, no COI?

1  Q.  That our assertion that there was a COI in Jamie's email,

2  which is in front of you, was incorrect?

3  A.  Again, the only thing I can say is in that email, there was

4  the attachment that said the COI was being worked on.

5  Q.  Is it reasonable for an underwriter to presume that before

6  one obtains a COI, one doesn't have a COI?

7  A.  Is it --

8  Q.  Would you like me to rephrase it?

9  A.  Yes, yes, please.

10  Q.  All boats don't immediately have a COI, do they?

11  A.  That's correct.

12  Q.  They don't come, you know --

13  A.  They don't come stamped on a boat.

14  Q.  Okay.  They have to do something to obtain it?

15  A.  Correct.

16  Q.  And before they obtain it, they either don't have it or

17  they're in the process of getting it and will have it, correct?

18  A.  Correct.

19  Q.  And then once they get it they have it?

20  A.  For a certain -- like this particular vessel had it at one

21  point in time, and then it expired as the survey said.  And now

22  they were in the process of getting it again.

23  Q.  Correct.

24  A.  And then if they got it at some future time, it would

25  expire; and they'd have to get it again.

1    Q.  So there's no illogical progression to be in a position of

2    I don't have, I'm getting and will have, I have.  Would you

3    agree with that, sir?

4              MR. STRADER:  Objection, Your Honor.  It's asked and

5    answered.  It's getting back to the same point.  He's testified

6    repeatedly the same email that has the application had another

7    statement as part of the application that the COI was in

8    process.  And she's just -- she just doesn't like the answer.

9              THE COURT:  Let me let her get an answer to that

10   question.  Overruled.  Do you understand the question?

11             THE WITNESS:  If a person doesn't have -- there's

12   three steps.  You don't have it, you're in the process of

13   getting it, and you get it.  Okay.  That is correct.  Until you

14   get it you don't have it.  You won't get it until you enter

15   into the process.  Before you enter into the process, you don't

16   have anything.  And that -- I agree with that statement.

17             But we're talking here about underwriting, and that's

18   what I'm -- that's what I'm trying to let you understand is

19   underwriting is a process.  In underwriting not everything is

20   black and white.  You have to look at the picture in its

21   entirety.  You have to look at the various characteristics

22   about the risk.

23             For instance, in this particular case had the vessel

24   been one-year-old, this issue might not even have come up

25   because the assumption would have been that the COI was done.

1   But this is a 20-year-old vessel, and it requires the

2   underwriter to truly evaluate the condition of that vessel

3   because of the age.  Underwriting the vessel is a primary

4   obligation of the underwriter especially when you have a

5   20-year-old vessel.  And I continue to say that Ms. Price

6   ignoring or it appears to have ignored all the different parts

7   of this particular issue did not do her job here.

8   BY MS. LIDONDICI:

9   Q.  Ms. Price has a history of placing risks with Ms. Robichaux

10  and Mr. LeBeouf, doesn't she?

11  A.  From the testimony I've heard, Mr. LeBeouf and Ms. Price

12  have some history.  Exactly what they did in the past, you

13  know, how many risks they wrote or didn't write I cannot recall

14  at this point in time.

15  Q.  Are you aware that Karyn Price had been doing business with

16  Jamie Robichaux for in excess of 20 years I believe?

17  A.  I might have read that in the deposition.

18  Q.  And are you aware that with respect to commercial vessels

19  during the period of time that Karyn Price has been doing

20  business with Jamie Robichaux she testified she requires a COI

21  on them to be considered?

22          MR. STRADER:  Objection, Your Honor.  I don't know

23  that this is in evidence or whether it's particularly relevant.

24          THE COURT:  Overruled.

25          THE WITNESS:  Would you restate that question.

1    BY MS. LIDONDICI:

2    Q.  Are you aware that during the period of time that they had

3    been doing business when a commercial vessel is submitted to

4    Karyn Price by Jamie Robichaux, Karyn Price requires a COI in

5    order to consider the risk?

6    A.  I've never saw where Karyn Price has said that she requires

7    a COI to get a risk.

8    Q.  I want you to assume for the moment that that is the

9    testimony that was given to this Court.

10   A.  Just so I understand, the testimony was --

11          MR. STRADER:  Your Honor, I would object.  If she has

12   testimony to this effect, she should use it.  She's making a

13   strained hypothetical.

14          THE COURT:  He's an expert witness.  She's allowed to

15   do that.

16          THE WITNESS:  Okay.  So your statement is if it was

17   Ms. Price's practice throughout her years to require a

18   certificate of inspection prior to writing a risk?

19   BY MS. LIDONDICI:

20   Q.  A commercial risk.

21   A.  A commercial risk.  I don't know what --

22   Q.  And that Ms. Robichaux was aware of that requirement.

23   A.  Okay.  And Ms. Robichaux was aware of that requirement.

24   Q.  Do you believe it would be inappropriate given the history

25   for Karyn Price to rely on Jamie Robichaux's representation

1   that that requirement had been satisfied?

2   A.   It wouldn't have been inappropriate; but it would have been

3   foolish because, again, you have to go back and do your job as

4   an underwriter.  And, again, as I said earlier, there is a host

5   of conflicting information.

6   Q.   Is there any document submitted to WFT after the February

7   e-mail from Jamie Robichaux which is before you that was

8   authored after that date that states there is no COI?

9   A.   Is there any document after this --

10  Q.   Yes.

11  A.   -- that says --

12  Q.   There is no COI.

13  A.   No.  But I don't think there's any document that says there

14  is a COI either.

15  Q.   Except for Jamie's email and the application?

16  A.   You said after this document if I'm not mistaken, and there

17  is no document after this email that says there was a COI.

18  Q.   And based on your review of Ms. Robichaux's deposition

19  testimony and Mr. LeBeouf's deposition testimony can you

20  identify for me anything that Mr. LeBeouf or Ms. Robichaux

21  would have said to Karyn Price had she called other than Mark

22  Rosandich had told us that upgrades are done and there's a

23  current COI as testified to on page 61 of Mr. LeBeouf's

24  deposition?

25  A.   There wasn't -- there was no conversation to that effect

1    because when you look at the file, Karyn Price was not

2    interested in verifying the COI issue.

3    Q.   No.   She relied on Ms. Robichaux.

4    A.   No.   She ignored the information in the file.   She chose to

5    ignore the information.   It could have been, as I said, easily

6    resolved with a simple phone call, a simple request for a FAX.

7    And even then -- even if it came back that there wasn't a COI,

8    I'm not sure that she would have made any decision; but that's

9    my opinion.

10   Q.   What fact do you base your opinion that Karyn Price would

11   have written this policy without a COI?

12   A.   First of all, she ignored all the evidence that there might

13   not be a COI, and there is -- I've not seen anything that even

14   remotely requires someone to submit a COI with an application.

15   The only thing that they're looking for at best is a survey.

16   And that survey isn't even, you know, by definition of the

17   contract due until 30 days after attachment.   This one happened

18   to be done approximately six months before, but there is no

19   requirement -- there is no written requirement.   There is no

20   evidence to suggest that a COI is even required.

21   Q.   Well, isn't it true, sir, that an underwriter can require

22   things in addition to what's on an application to accept a

23   risk?

24   A.   Absolutely.   That's where -- that's, again, where I go to

25   here.   The underwriter should have requested a copy of the COI.

1   Q.   And if the evidence before this Court is that an

2   affirmative representation that a COI is in place from the

3   agent is required before the risk is written, do you have any

4   fact to contradict that?

5   A.   There is no evidence before this Court that says that a COI

6   is required that I'm aware of.

7   Q.   Do you have any fact to contradict such testimony by Karyn

8   Price?

9   A.   That they require -- that Karyn Price requires a COI?

10  Q.   Yes.

11  A.   Well, if Karyn Price required a COI, it would be part of

12  the application.   Why would not they request a copy of the COI?

13  Why would they not ask for a COI?   Why would they not include

14  it in their underwriting guidelines, practices, or procedures?

15  There's nothing to suggest that this is required.   The COI

16  issue came up as a result of this case.   And hopefully Karyn

17  Price has learned by this, and maybe she'll -- you know, that's

18  part of the underwriting process is learn by your mistakes.

19  Q.   Since it wasn't a requirement and since it's not an issue

20  Jamie Robichaux just threw in reference to a COI unsolicited

21  for no reason?

22  A.   I can't --

23          MR. STRADER:  Your Honor; objection.  She's asking

24  for speculation from the witness.

25          THE COURT:  Sustain as to the form of the question.

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.

1   BY MS. LIDONDICI:

2   Q.  Other than her knowledge that a COI or confirmation of a

3   COI is required by Karyn price to write commercial vessels, can

4   you provide any evidence as to another reason why Jamie

5   Robichaux would have written, The vessel has undergone Coast

6   Guard inspection and has a certificate of inspection?

7   A.  I don't know why Jamie Robichaux would do what she does.

8   I've not -- I've not had -- I don't know her.  I can only go by

9   what I have presented before me.  And what I have presented

10  before me as far as a certificate of inspection is various

11  conflicting pieces of information.  And to say that Karyn Price

12  always required a COI from Jamie Robichaux in all her dealings,

13  I don't see any evidence that that -- to me based on my

14  dealings with Ms. Price, that is probably as credible as her

15  not seeing the various documents that she testified to.

16  Q.  What dealings have you had with Ms. Price?

17  A.  My dealings with Ms. Price are right here in this file.  My

18  dealings with Ms. Price is when I review the files, a lot of

19  what she said is either questionable from my opinion or, as I

20  said earlier, she's made some false statements.

21  Q.  But you don't know Ms. Price.  You've never spoken to her.

22  You've never worked with her, have you?

23  A.  No.  I only -- I can only go by what was in the file and

24  her testimony, her deposition testimony.

25  Q.  Would it be reasonable to assume that a reason why Jamie

1   might have included that last sentence on her email is because

2   she knew Karyn required a COI?

3           MR. STRADER:  Objection to the form of the question,

4   Your Honor.

5           THE COURT:  I'll sustain it.

6   BY MS. LIDONDICI:

7   Q.  Based on your experience as an underwriter do submitting

8   producers include information to the underwriters that they

9   know the underwriters routinely require in their submissions?

10  A.  If a producer knows that a particular underwriter wants a

11  particular piece of information, it makes sense that they would

12  include that information there.

13  Q.  Thank you, sir.  Now, you have testified that you believe

14  that there was a verbal agreement with respect to the

15  insurance, correct?

16  A.  That is correct.

17  Q.  And can you tell me when this verbal agreement was entered

18  into, what day?

19  A.  The verbal agreement was entered into over a period of time

20  through various conversations between Shawn LeBeouf and Karyn

21  Price.

22  Q.  What was the date of the first conversation?

23  A.  I believe the first date -- the first conversation would

24  have been on February 15th where Ms. Price was first advised of

25  the trip exposure on the initial call made by Jamie Robichaux

1  where Mr. LeBeouf was there.  And I'll refer you to his

2  deposition, page 58 and 59.

3  Q.  Which deposition?

4  A.  Mr. Shawn LeBeouf's deposition.

5  Q.  Page 79?

6  A.  No.  I said -- no.  58 and 59.

7  Q.  58 and 59.  I'd like you to turn to page 59 to 60 where

8  Shawn LeBeouf has that conversation or recounts that

9  conversation and tell me if you see anywhere in the recounting

10 of that conversation a reference to Miami, Dania, Hallandale,

11 or the east coast of Florida?

12 A.  First of all, I referred to page 58, 59, and 60; but there

13 is no reference to Florida, Miami, in this particular

14 deposition.  However, there is documentation that Karyn Price

15 received in the form of email where the Miami location was

16 addressed.

17 Q.  We'll get to that.  Trust me.

18 A.  Okay.

19 Q.  But right now we're talking about this verbal agreement for

20 coverage.  So you would agree that in this first conversation

21 as recounted by Mr. LeBeouf, there's no reference to the east

22 coast of Florida?

23 A.  There's no reference to the east coast.  Let me complete my

24 -- there's no reference to the east coast of Florida; however,

25 it does talk about the trip from Florida to Louisiana.  And

1    there would be no need to talk about a trip from Florida to

2    Louisiana if the vessel was on the Gulf side of the state.

3    There would be automatic coverage.  You would only bring that

4    up if it was outside if you want to use the term area of

5    operations.  It's clear that this discussion was talking about

6    an area outside of the Gulf.  There's no reason to discuss a

7    trip from, let's say, Ft. Meyers to Louisiana because it was in

8    the Gulf.  The only reason you'd bring this up is because it's

9    outside the areas of operations.

10   Q.  Well, working in the Louisiana oil fields would be in the

11   Gulf; and that was discussed in this conversation, wasn't it?

12   A.  That's -- that is correct, but what I'm talking about is

13   the trip.  They talked about a trip from Florida to Louisiana.

14   Q.  Okay.

15   A.  And my point there is you don't need to talk about a trip

16   if you're already in the Gulf.

17   Q.  Would you tell me where on pages 59 and 60 the phrase trip

18   from Florida to Louisiana is contained?

19   A.  On -- let's see.  If you go to page 58, line 23, But is

20   your understanding that whatever coverage you are asking would

21   also include the voyage of the vessel from Florida to

22   Louisiana.

23   Q.  I'm sorry.  You're on Shawn LeBeouf's deposition --

24   A.  Okay.

25   Q.  -- page 58?

1   A.   Yes.

2   Q.   Line 23?

3   A.   I think I'm on --

4   Q.   Okay.

5   A.   Okay.  And then you objected.  And he answered, Of course,

6   of course.  That was specifically discussed numerous times.

7   Again, I say why would you discuss something numerous times if

8   it's already covered?  If it was covered, if you brought it up

9   -- Karyn Price -- it's covered.  Don't worry about it.

10  Q.   Well, the crew was discussed numerous times, also, wasn't

11  it?

12  A.   Yes.

13  Q.   And the configuration of the boat was discussed numerous

14  times, wasn't it?

15  A.   Yes.

16  Q.   And all those were covered, weren't they?

17  A.   Well, the crew -- you want to understand the nature of the

18  crew because a crew is an important underwriting

19  characteristic, and I think we would agree.  I'll compliment

20  Karyn on her -- anything in her underwriting was addressing the

21  qualifications of the crew but -- and as far as the vessel, you

22  might have several conversations about that because of the age

23  and condition of it; but to -- if you say the area of

24  operations is going to the Gulf, a hundred miles within the

25  Gulf of Mexico, there's no real reason to go into a lot of

```
 1   detail unless you have a situation where the vessel is outside
 2   of that area at a point in time and you want to get it into
 3   that area of operation --
 4   Q.  Or you need --
 5   A.  -- and then you would have discussions.
 6   Q.  I'm sorry.  I apologize.  Or you need to make sure that the
 7   vessel isn't going to be more than 100 miles off shore from the
 8   Gulf traveling across the Gulf and not hugging the shoreline.
 9   That would be something to discuss about the trip, wouldn't it?
10   A.  I'm sure we can come up with a lot of possibilities that
11   are outside the realm of reason, but that's not the case here.
12   Q.  Okay.  Can you point to me to any conversation prior to the
13   agreement to binding where Shawn LeBeouf told Karyn the boat
14   was at Hallandale, Dania, or Miami?
15   A.  He did not use those terms.  He referred to Florida.  And,
16   again, I go back.  There's no -- there would have been no
17   reason to discuss this whole issue if the vessel was in the
18   Gulf.  It was on the Atlantic side.  And the Captain and the
19   insured wanted to make sure that they had coverage for this
20   voyage.
21   Q.  Now, do you recall in your reviewing of -- I'm sorry.  Let
22   me go back to this verbal conversation.  Other than the
23   conversation discussed on pages 59 and 60, were there any other
24   incidents that you can pinpoint to a point in time as to when
25   this verbal conversation occurred?
```

1    A.   Okay.   There was a verification of the coverage with Karyn

2    Price, and I refer you to Exhibit 10 where --

3    Q.   It's Exhibit 10 to the deposition, sir, or --

4    A.   No.   Exhibit 10 to defense -- to defense exhibits.   It's

5    USI document 86.

6    Q.   And may I see what you're referring to, sir?

7              MR. STRADER:   It's Trial Exhibit Defense 10.   He's

8    using a trial exhibit.

9              MS. LIDONDICI:   Defense 10?

10             THE WITNESS:   Yeah.

11             MR. STRADER:   Yes.   He's using a trial exhibit.

12   BY MS. LIDONDICI:

13   Q.   Again, sir, my question was as to conversations between

14   Shawn and Karyn.   Can you show me documentation of the next

15   conversation between Shawn and Karyn involving this verbal

16   contract?

17   A.   As I recall -- and I don't have the specific page in his

18   deposition; but when this issue of this email came up where he

19   said, No problem on trip coverage in his deposition, he had

20   testified that he had called up Karyn Price, spoke to her to

21   make sure that there would not be any problems on the trip from

22   Ft. Lauderdale to Louisiana.   He pulled over from the road,

23   made the call.   After the call is when he sent this particular

24   email to the assured saying, No problem on trip coverage.

25   Q.   Did he send an email to Karyn confirming no problem trip

1   coverage?

2   A.   Not that I'm aware of.

3   Q.   Did he get back to his office and then send an email or

4   note to Karyn confirming this conversation?

5   A.   Not that I'm aware of.

6   Q.   Did he make a memo in his file regarding this conversation?

7   A.   He sent this email which is part of his file that documents

8   that there would be no problem with the coverage.   Why -- you

9   know, it makes no sense for a broker to tell his assured that

10  there would be coverage for a particular thing after just

11  getting off the phone with the underwriter if the underwriter

12  hadn't agreed to the coverage.

13  Q.   Unless he made a mistake.   That would make sense?

14           MR. STRADER:   Your Honor, I object.   That's not

15  really a question.

16           MS. LIDONDICI:   I withdraw that, Your Honor.

17  BY MS. LIDONDICI:

18  Q.   Sir, is there any documentation, phone record, email,

19  express notation to the file regarding a conversation with

20  Karyn, an email from his Blackberry to Karyn regarding this

21  verbal conversation?

22  A.   Not other than what we've talked about already.

23  Q.   All right.   Now, you are aware, aren't you, sir, that Mr.

24  LeBeouf testified at his deposition that it was his practice to

25  document all communications he had with WFT?

1    A.  His practice was to document as much as possible, and that

2    is a practice that should be adhered to.  Correct.  That

3    doesn't mean it's always done.  And, again, I go back to the

4    fact that he sent this email that said that there's no problem

5    with coverage to Captain Rosandich.  And there's just no reason

6    for him to send an email like that if coverage hadn't been

7    verbally agreed to by Karyn Price.

8    Q.  But other than Shawn's testimony you have no other evidence

9    confirming that, that he actually spoke to Karyn?

10   A.  Well, Jamie -- not on that particular day, no.  But Jamie

11   Robichaux was also I believe in that initial conversation when

12   they brought up the trip to Florida.

13   Q.  And Jamie Robichaux in her deposition stated she had no

14   idea where in Florida that boat was, didn't she?

15   A.  That's correct.  But --

16   Q.  So to Jamie --

17   A.  But, but --

18   Q.  -- she didn't know that boat was in the east coast of

19   Florida --

20   A.  Could I --

21   Q.  -- based on --

22   A.  Could I -- could I -- could I finish my answer first?

23   Q.  Sure.  I thought you did.

24   A.  No, I didn't.  She said she didn't know where it was in

25   Florida, and that might be correct.  But, again, I go back to

1    my point is why make it an issue if it's on the Gulf side?

2    It's on the Atlantic side, and that's why it becomes an issue.

3    Whether it was in Miami or Ft. Lauderdale, it's still a concern

4    and has to be addressed.

5    Q.   That initial conversation that Jamie and Shawn had with

6    Karyn advising Karyn that the boat was in Florida was the first

7    conversation of, Hi, we've got a risk even before we sent it to

8    you, wasn't it?

9    A.   That's correct.

10   Q.   Okay.  So they would be explaining the nature of the risk,

11   the parties involved and what was going on.  And that might be

12   why they mentioned it's in Florida, but it's coming to

13   Louisiana to work with Fisher Offshore?

14   A.   And also that there would be a trip from the Atlantic coast

15   side of Florida to Louisiana.

16   Q.   But language of that trip in the Atlantic coast side to

17   Louisiana and Florida wasn't contained in Shawn's recounting of

18   that conversation and wasn't contained in Jamie's recounting of

19   that conversation, was it?

20   A.   Those specific words Atlantic coast, no; but it's clearly

21   implied that it's on the Atlantic coast just by the nature of

22   the risk.

23   Q.   Now, you said it's implied.  Wasn't it Shawn's practice in

24   dealing with Karyn at WFT to dot all his i's, cross all his

25   t's, and make sure everything was documented?

1   A.   In the real world that's correct, but that doesn't always

2   happen.

3   Q.   Well, isn't that what he testified his express practice was

4   with WFT at pages 257 and -- 255 and 256 of his deposition?

5   A.   I've read the -- it says that he wanted to make sure that

6   all the i's were dotted and the t's crossed.  That's correct.

7   Your reading of it was correct.

8   Q.   And he also went on to say, Make sure that you're doing

9   everything tit for tat and making sure, double checking, triple

10  checking everything, right?

11  A.   Yes.  And in essence when Ms. -- before telling the assured

12  or Captain Rosandich that there was coverage for the trip, he

13  did go out of his way to call Karyn Price one last time to

14  verify that there would be no problem with the trip coverage.

15  Q.   But there was no written confirmation of either a

16  discussion of trip coverage before or after that email prior to

17  the loss, was there?

18  A.   That's correct.

19  Q.   Now, after this initial conversation where they discuss the

20  nature of the risk being placed and talk about it's in Florida

21  and going to be working in Louisiana with Fisher Offshore, an

22  application was submitted, wasn't it?

23  A.   That is correct.

24  Q.   And the application indicated the areas of operation and

25  navigation limits for the vessel, didn't it?

1    A.   That is correct.

2    Q.   And that application makes no reference to Atlantic coast

3    waters, does it?

4    A.   That is correct.

5    Q.   That application makes reference only to Gulf waters,

6    correct?

7    A.   That is correct.

8    Q.   So the application submitted subsequent to this

9    conversation talks about Gulf waters?

10             MR. STRADER:   Your Honor, there's been testimony

11   there's more to this application than one sheet of paper.   I

12   think she's asking questions about the one sheet of paper, but

13   she's not -- you know, she's not -- I'm not sure if the

14   question's referring to the whole application in which case

15   there would be --

16             THE COURT:   What's your --

17             MR. STRADER:   It would also include other documents

18   such as the survey.

19             THE COURT:   What's your legal objection?

20             MR. STRADER:   Well, it assumes facts not in evidence.

21   And the question is vague because it's not clear to me whether

22   she's talking about one sheet of the application, which does

23   not mention Ft. Lauderdale, or the survey that does mention Ft.

24   Lauderdale, Florida, which was submitted.

25             THE COURT:   Overruled.

1          THE WITNESS:  Could you repeat that question, please.

2          MS. LIDONDICI:  I can rephrase it if you want me to,

3    Your Honor.

4          THE COURT:  Well, I've already ruled in your favor.

5          THE WITNESS:  I asked if you could repeat the

6    question.

7          THE COURT:  Overruled.

8          THE WITNESS:  And I asked if you could repeat the

9    question.

10         THE COURT:  He asked to repeat the question.

11         MS. LIDONDICI:  Certainly.

12         THE WITNESS:  Okay.

13   BY MS. LIDONDICI:

14   Q.  The application that was submitted by USI makes reference

15   only to Gulf coast.  It makes no reference to Atlantic coast,

16   does it?

17   A.  Well, you have to -- when you talk about application, there

18   is more than just one specific document.  Application includes

19   verbal conversations.  It includes documents attached.

20         THE COURT:  But her question is focused strictly on

21   the written application.

22         THE WITNESS:  On the written -- on that written --

23   that is correct.  It does not say Atlantic on there.

24   BY MS. LIDONDICI:

25   Q.  Okay.  And the written application was submitted by USI

1   based on information that they wanted WFT to consider for

2   placing this risk?

3   A.   Correct.

4   Q.   In response to the written application, a quote was issued,

5   correct?

6   A.   In response to the written application and other

7   information, a quote was provided.

8   Q.   And the quotation had a description of the navigation

9   limitation, correct?

10  A.   Could I -- do you have that document?

11  Q.   I wasn't able to put my hands on it.  Do you have it in

12  front of you, otherwise we can move on.  Do you have it in your

13  file?

14  A.   Yes.  But can I find it is another issue.

15  Q.   Sure.

16  A.   I don't know if I can find it.

17  Q.   Let me rephrase the question.  Do you recall the quotation

18  indicating navigation limits other than Gulf coast 100 miles

19  off shore?

20  A.   No, I don't.

21  Q.   Okay.  After the quotation was issued, do you recall any

22  written documentation between USI and WFT prior to the loss

23  requesting a change in the terms of the quote with respect to

24  two navigation limits?

25  A.   Did I see any documentation in the file after the quote was

1   done requesting change in the navigation limits?

2   Q.   Yes, sir.

3   A.   Yes.

4   Q.   Before the loss?

5   A.   No.

6   Q.   Well, let's stick to before the loss --

7   A.   Okay.

8   Q.   -- before we go to afterwards.

9   A.   Okay.

10  Q.   You did see documentation in the file asking for a change

11  on the quote as to the amount of the quote?

12  A.   Correct.

13  Q.   And that was accommodated?

14  A.   That's correct.

15  Q.   But at any time either in that correspondence or in other

16  emails before the loss were any emails sent from USI saying,

17  And, wait a minute, this quote was supposed to include Atlantic

18  waters?

19  A.   The written documentation that was provided did not include

20  Atlantic waters.  What my testimony is is about the verbal

21  communications.

22  Q.   Now, that verbal communication was before the written

23  documentation was issued, correct?  That conversation took

24  place you've testified at the time before even the application

25  was sent in?

1    A.   When I testified was when -- just before the binding of

2    coverage where Shawn LeBeouf called Karyn Price and he later

3    sent an email to Captain Mark Rosandich saying that there was

4    no coverage.  So that was after the unsigned application was

5    submitted but prior to the typed signed application being

6    submitted.

7    Q.   Let me keep it clear.  I'm asking you for documentation

8    between USI and WFT.  I don't care what Mark may have received

9    from his agent or his agent may have sent Mark because USI

10   isn't WFT's agent, are they?

11   A.   That is correct.

12   Q.   USI is Mark Rosandich or Jeff Dorsey's agent?

13   A.   That is correct.

14   Q.   And they owe certain obligations to them to keep them

15   informed and advised and provide them truthful and accurate

16   information?

17        MR. STRADER:  I object, Your Honor, in that it's

18   vague.  I don't believe she has any ill-intention, so it may be

19   a worthless objection; but whether -- I assume when she says

20   either Mark or Mr. Dorsey, she's trying to be fairly

21   all-encompassing as she should be; but that would also include

22   the actual corporate defendant who would be the signatory.

23        MS. LIDONDICI:  And the ultimate corporate defendant.

24   BY MS. LIDONDICI:

25   Q.   USI is the agent to the vessel owner, its representatives,

1    its owner?

2    A.   Correct.

3    Q.   Okay.  USI owed an obligation to its vessel owner, insured,

4    to provide them with accurate information?

5    A.   The USI owed Captain Dorsey to provide them with accurate

6    information, correct.

7    Q.   And if USI gave inaccurate information to Captain Dorsey,

8    that's between USI and Captain Dorsey, correct?

9    A.   If USI gave wrong information between that operation and

10   Captain Dorsey, one could say that that would be on USI's watch

11   and not WFT if that, in fact, was the case; but I think the

12   evidence shows differently.

13   Q.   And I understand what your position is, and you're

14   advocating it quite clearly, sir; but let's just if we can go

15   with my questions and not necessarily --

16            MR. STRADER:  I object to that.  It's not really a

17   question that she's --

18            THE COURT:  What's your next question?  Ask your next

19   question.

20            MS. LIDONDICI:  I will, Your Honor.

21   BY MS. LIDONDICI:

22   Q.   Is there any documentation just so we are clear between USI

23   and WFT between the issuance of the binder and the submission

24   of the typed application advising WFT that USI believes the

25   navigation limits are different or incorrect or were agreed to

1    differently?

2    A.  I did not see any written documentation.

3    Q.  Are you aware that USI requires substantive conversations

4    such as negotiation of terms and conditions to be documented in

5    their file?  Do you recall reading Ms. Robichaux's testimony as

6    to that?

7    A.  I recall that they do document issues in their file.  They

8    should be documenting the issues in their file, yes.

9    Q.  And do you recall Ms. Robichaux testifying that a change in

10   navigation limits is the type of issue that should be

11   documented in the file?

12   A.  Yes.  I would agree with that.

13             THE COURT:  How much further do you have for

14   cross-examination?

15             MS. LIDONDICI:  I'm sorry?

16             THE COURT:  How much further do you have?

17             MS. LIDONDICI:  I have a good while to go yet, Your

18   Honor.

19             THE COURT:  In that case then -- I was thinking that

20   you might be done so that's why I was going over it; but since

21   you have more to go we need to go ahead and take our lunch

22   break and we'll come back at 1:20.  Okay?

23             COURTROOM DEPUTY:  All rise.

24             (Lunch)

25             COURTROOM DEPUTY:  Court is now back in session.

1           THE COURT:  All right.  Continuing then with the

2   cross-examination of defendant's expert.

3   BY MS. LIDONDICI:

4   Q.  Sir, if I may, I'm going to show you a document that has

5   been marked as Plaintiff's 116 already in evidence in this

6   matter.  Is this one of the documents you considered in

7   reaching your opinions?

8   A.  This was one of my documents that I used to evaluate this

9   risk.  Correct.

10  Q.  And is that an email between Mr. LeBeouf and the insured's

11  representatives with respect to the ratings and premiums for

12  the policies to be issued?

13  A.  It is that.  Correct.

14  Q.  Anywhere in that document does it indicate that this

15  premium -- this policy is being rated or that the premium is

16  being predicated on Atlantic water navigation?

17  A.  This memo refers to being underwriting for the work, as you

18  know, for the work that's going to be done; and that would be

19  in the Gulf of Mexico.  But as I stated earlier, the

20  conversations and everything else refer to -- there was

21  separate discussions on the trip from Florida, the Atlantic

22  coast side of Florida to Louisiana.

23          MS. LIDONDICI:  Move to strike the last portion as

24  nonresponsive.

25          THE COURT:  Ditto.

1    BY MS. LIDONDICI:

2    Q.  Is there any reference to Atlantic coast or Atlantic waters

3    in that email?

4    A.  In this particular email, no.  But there are other emails

5    that refer to the Atlantic coast.

6    Q.  Is there any other email that refers to the premium

7    calculation for the policy being based on Atlantic navigation?

8    A.  Repeat that question, please.

9    Q.  Is there any other email which you were aware of which

10   refers to the premium for the policy being based on Atlantic

11   navigation?

12   A.  When you're talking about the premium, if you're just

13   talking specifically to a document, no; but, again, you have to

14   take in the totality of the discussions both verbally and in

15   written form.  And, in fact, the other companies were -- seemed

16   to have knowledge that it was in Florida.  In fact, if you

17   recall, there's one document here that says, I thought the

18   vessel was in Miami.

19           So the underwriters and the pricing on that -- when

20   you talked about the pricing on that memo that included

21   premiums, is it related just to Florida, well, I think you have

22   to go back to this other memo where one of the underwriters for

23   New York Marine commented, I thought the risk was in Miami.  So

24   that clearly implies that there was knowledge that the vessel

25   was, in fact, on the Atlantic side of the --

1          MS. LIDONDICI:  Move to strike as nonresponsive.

2          THE COURT:  He answered your question.  The answer is

3     you don't know any -- just to make it clear, with respect to

4     the setting of the premium, do you know of any document

5     establishing that premium would be calculated based upon the

6     vessel operating on or from the Atlantic?

7          THE WITNESS:  And, Your Honor, if you were to look at

8     the email from Jessica Squires to Karyn Price, Defendant's

9     Exhibit 212, in that chain of emails, the underwriter or the

10    representative of -- or the underwriter for New York Marine

11    said, I thought the vessel was located in Miami.  He obviously

12    when he did his rates rated it predicated on the location being

13    in Miami.  So in answer to your question, there is

14    documentation when the pricing was done as it relates to that

15    memo that was vessel was in Miami.

16    BY MS. LIDONDICI:

17    Q.  Sir, just so we're clear, the memo you're referring to was

18    in March of 2007.  The memo I've shown you is February 2007.

19    A.  That is correct.  But the memo that I refer to was prior to

20    the attachment of the policy, and it is the rates that were

21    used for the policy.  They're the rates for -- New York Marine

22    did not change after this memo, and he made it very clear in

23    this memo of March 22nd that he thought the vessel was located

24    in Miami, Florida.

25    Q.  Well, since you're so eager to get to that memo, I'll jump

1    ahead and we'll get to that and come back so that maybe we can

2    answer other questions without having to refer back to it.

3    Again, the underwriter you're referring to was not an

4    underwriter for State National, was it?

5    A.   No, ma'am.

6    Q.   The underwriter you're referring to was not an underwriter

7    for WFT, was he?

8    A.   That is correct.

9    Q.   The underwriter you're referring to received a separate

10   application and submission for the coverages which he wrote,

11   didn't he?

12   A.   That's correct.

13   Q.   The underwriter you're referring to had separate

14   communications with USI personnel regarding his underwriting

15   questions or parameters, didn't he?

16   A.   That's correct.

17   Q.   Karyn Price was not privy to all of the communications

18   between Robert Palmer and USI, was she?

19   A.   She was not; but she certainly had numerous conversations

20   about this trip from Florida to Louisiana with Shawn LeBeouf.

21   And my getting to this email was based on your question, the

22   previous questions you asked me, specific was there any

23   documentation that shows that these premiums were associated

24   with an Atlantic-coast exposure, and I answered that it was.

25   Q.   I'll rephrase it, sir, to be more clear.  Is there any

1    documentation that shows that the premium for the State

2    National policy was predicated upon Atlantic navigation?

3    A.   Was there any written document?

4    Q.   Yes, sir.

5             MR. STRADER:  I object, Your Honor.  It's asked and

6    answered.

7             THE COURT:  You mean other than 212?

8             MS. LIDONDICI:  The document he's saying refers to

9    various policies including the WQIS.

10            THE COURT:  Right.

11            MS. LIDONDICI:  And he's now relating back to this

12   email to show QIS (sic) took into consideration its

13   understanding of the location of the vessel.

14            THE COURT:  Right.

15            MS. LIDONDICI:  I'm asking with respect to State

16   National policy only.  Is there any documentation that refers

17   that the Atlantic was taken into consideration for the premium

18   rating.

19            THE COURT:  Okay.  Overruled.

20            THE WITNESS:  And, again, you can't just look at a

21   single piece of paper.  You have to look at the totality of

22   when you do underwriting.  Underwriting is you're looking at

23   the whole picture.  And I refer you back to that email of Shawn

24   LeBeouf where he says there's no problem on trip coverage.

25   That -- this whole -- they were going into the binding process

1    then.  The rate had been set I think at $45,000.  He's

2    verifying that there would be coverage for the trip from

3    Florida to Louisiana.  So you have to look at more than just a

4    specific piece of paper.  And that really was part of the

5    flawed Karyn Price's underwriting.

6    Q.  I appreciate your position, sir.  Is there a single piece

7    of paper or multiple pieces of paper you can refer me to that

8    shows that State National's underwriting was predicated on

9    Atlantic coast waters?

10   A.  If you're talking, again, about a specific piece of paper,

11   no; but you have to look beyond a specific piece of paper.

12   Q.  Now, this email that you have referred to from Robert

13   Palmer dated March 22nd, 2007, was a 4:15 p.m. time.  That was

14   not sent from Mr. Palmer to Karyn, was it?

15   A.  No.  But it was forwarded to Karyn.

16   Q.  But we'll get to that.

17   A.  Okay.

18   Q.  No one at WFT was a recipient on the initial email from Mr.

19   Palmer to USI, were they?

20   A.  No one was initially a recipient, correct; but they

21   ultimately got it.

22   Q.  There was a separate request to bind coverage between USI

23   and Karyn Price, wasn't there?

24   A.  Could you show me the document that you're referring to.

25   Q.  Sure.  Did you review of the documents reflect an email

1  from Karyn to bind and an email separate to Mr. Palmer to bind?

2  A.  I looked at many documents.  If you could show me a email

3  to refresh my memory, that would be fine.

4  Q.  I show you document Plaintiff's Exhibit 20.  My question to

5  you simply is that a request to Karyn to bind?

6  A.  That is a request to Karyn to bind, correct.

7  Q.  And what is the time and date of that request to Karyn to

8  bind?

9  A.  The date was March 22nd, 2007, at 3:57 p.m.

10  Q.  And it actually is a confirmation of the agreement to bind,

11  is it not?

12  A.  To bind coverage effective noon at three twenty -- on

13  3-23-07 for the hull and P&I.

14  Q.  What is the time of Mr. Palmer's email inquiring regarding

15  Miami?

16  A.  3:46 p.m.

17  Q.  And what is the time that that was then forwarded to Karyn

18  as she was not a recipient of the original email?

19  A.  It was forwarded to her on March 23rd at 9:40 a.m.

20  Q.  That would have been after she had already agreed to bind

21  without any information from Mr. Palmer regarding Miami,

22  correct?

23  A.  Well, she agreed to bind; but she also got this

24  information.

25  Q.  The agreement to bind was made prior to Mr. Palmer's email

1    being forwarded to her, was it not?

2    A.   It was.  But, again, she did get additional information.

3    Q.   I'm sorry?

4    A.   She did get additional information.

5    Q.   Would you agree, sir, that knowledge that one insurer may

6    have for one type of coverage even though it's on the same loss

7    isn't imputed to another insurer writing different coverages?

8    A.   There is truth in that statement; however, that knowledge

9    was transmitted to Karyn Price in that email.

10   Q.   That knowledge was transmitted to Karyn Price in that email

11   after she had already agreed to bind?

12   A.   That is correct.  But she was made -- that email made her

13   very much aware of the Miami location, and I don't think it was

14   -- in my opinion based on the review of the documents, it was

15   not an issue for her because she had verbally bound coverage

16   from the Atlantic coast of Florida to Louisiana.

17   Q.   But there's no documentation confirming that verbal binding

18   of coverage for Atlantic travel, is there?

19              MR. STRADER:  Objection; asked and answered.

20              THE COURT:  Sustained.

21   BY. MS. LIDONDICI:

22   Q.   Did the written binder that was issued by WFT indicate

23   Atlantic navigation?

24   A.   Could I see that binder, please.

25              MS. LIDONDICI:  Since I can't find my -- seem to

1    place my hands on it right now, counsel, unless you remember

2    what number the binder was.

3              MR. STRADER:  No.

4              MS. LIDONDICI:  Move on.

5    BY MS. LIDONDICI:

6    Q.  Do you recall reviewing the binder in your review of

7    documents?

8    A.  Could you hold on one second.

9    Q.  Sure.

10   A.  I found the email, but I didn't find the binder.  I'm

11   sorry.

12   Q.  I'm sorry?

13   A.  I thought I had the binder, but it wasn't that.  I'm sorry.

14   Q.  Okay.

15   A.  Could you restate your question, please.

16   Q.  Do you recall reviewing the binder in your documents?

17   A.  Yes, I do.

18   Q.  Do you recall if the binder had a navigation limit shown on

19   it other than the Gulf of Mexico?

20   A.  The reason I wanted to look at the binder is because

21   there's some documentation that didn't include that, and I just

22   would like to see the document before I testify to it.

23   Q.  Okay.  I'll move on.  After agreement was entered to bind

24   the coverage, a confirmation of coverage was prepared by USI

25   once they received the binder.  Are you aware of that?

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.

1    A.   Yes, I am.

2    Q.   And are you aware of what steps USI took in preparing that

3    confirmation of coverage before sending it to Mr. Dorsey?

4    A.   I'm not sure I understand your question as to what steps.

5    Q.   Do you recall Ms. Robichaux testifying that the binder

6    would have been reviewed and attached to the file and reviewed

7    to make sure it was consistent with the file and the

8    applications prior to sending out the confirmation coverage to

9    the insured?

10   A.   I recall that she testified that she reviewed the

11   declaration page prior to sending out the policy, but I can't

12   say that I recall that testimony about the binder.  You know,

13   there's a lot of testimony to remember.

14   Q.   Would you expect the insured's agent to review the binder

15   and compare to their file in the application and their notes to

16   confirm that what was being bound by written agreement was

17   consistent with the agreements and submissions that they had?

18   A.   That's something that they should do, correct.

19   Q.   And that's something that you would expect in the ordinary

20   course of business USI would do?

21   A.   Correct.

22   Q.   I'm going to show you a document marked as Exhibit 121.

23   A.   Excuse me.  I didn't hear what --

24   Q.   I'm going to show you Plaintiff's Exhibit 121.

25   A.   Okay.

1   Q.  That exhibit consists of a facsimile transmittal -- I'm

2   sorry -- an email transmittal to Mr. Dorsey, a confirmation of

3   coverage, and a letter to Mr. Dorsey from USI as well as

4   supporting documentation; is that correct?

5   A.  The document speaks for itself, yes.

6   Q.  Sir, is that what's contained in the document?

7   A.  What?

8   Q.  Is that what's contained in the document?

9   A.  Yes.

10  Q.  Okay.  Please turn to the confirmation of coverage.

11  A.  I have it.

12  Q.  When was that prepared?

13  A.  It appears to have been prepared on March 22nd, 2007.

14  Q.  So that would have been after any conversations that may

15  have been had with anyone at USI and WFT as to what the

16  coverages are and should be regarding this risk, right?

17  A.  That would have been done after many conversations,

18  correct.

19  Q.  Does that confirmation of coverage in any way indicate that

20  the Atlantic coast is a navigation for the policy?

21  A.  It does not; but, again, you had the verbal agreement that

22  afforded coverage for the Atlantic trip.

23  Q.  Does that confirmation of coverage have a little asterisk

24  or notation that says, Oh, and by the way there's a verbal

25  agreement for coverage in the Atlantic?

1  A.  If it had that, it wouldn't have been a verbal agreement.

2  Q.  Can a written submission and agreement supersede a verbal

3  agreement?

4  A.  Yes.  You can make changes if you so desire, yes.

5  Q.  So that if I have a verbal agreement, which I don't concede

6  we had; but if one existed and then there's a written

7  submission and the policy is issued consistent with that

8  written submission, would that supersede any inconsistent terms

9  in the verbal agreement?

10  A.  Well, I contend that that's not what happened.  What I

11  contend happened was that Shawn LeBeouf agreed to bind coverage

12  with Karyn Price.  And during that conversation that's when he

13  had the off-road conversation where they discussed the verbal

14  agreement to bind coverage from the Atlantic to Louisiana, so I

15  don't think that this negates that -- this does not negate that

16  conversation -- that agreement.

17  Q.  I'm just asking -- I'm sorry.  I'm just asking you, sir, as

18  a general principle in underwriting if I have verbal

19  conversations, an agreement and then I subsequently submit a

20  written submission seeking insurance and the coverage is issued

21  pursuant to that written submission and the written submission

22  has terms that were different than the verbal agreement, would

23  the written submission supersede the verbal agreement?

24      MR. STRADER:  I object, Your Honor.  It's asked and

25  answered.  It doesn't allege that the subsequent writing deals

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.

1    with any verbal agreement or specifies that it's going to

2    abrogate the whole agreement or anything.

3              THE COURT:  Overruled.  He can answer.

4              THE WITNESS:  My answer is that the verbal agreement

5    would still remain in effect.

6    BY MS. LIDONDICI:

7    Q.   So it is your opinion that conversations which are had when

8    a written submission is made for the insurance that may differ

9    with those conversations and the insurance is issued pursuant

10   to that written submission, the parole conversations supersede

11   the written submission and policy issued?

12   A.   It is my opinion that those verbal conversation take

13   precedent.  It was the intent to provide the coverage.  And

14   regardless of what the written document says those verbal

15   agreements take precedent over this written document.

16   Q.   Whose intent was it to provide Atlantic coverage?

17   A.   Whose intent was it?

18   Q.   Yes.

19   A.   It was the intent for the assured to get coverage from the

20   Atlantic to Louisiana.  It was the broker Shawn LeBeouf in

21   discussion with Karyn price to get and he did obtain coverage

22   for a trip from the Atlantic side of Florida to Louisiana.

23   They had to get the vessel there.  It was known that the vessel

24   was in Florida.  Again, the survey report even indicated that.

25   So to me there is no doubt in my mind that there was coverage

```
 1   from that time regardless of what the written document --
 2   Q.  Are you aware that Karyn Price has testified she never
 3   intended to provide coverage for an Atlantic voyage?
 4   A.  I'm sorry.  But Karyn Price's comment I find very suspect.
 5   She through all this time has withheld information, has
 6   misrepresented information.  And I can -- based on everything
 7   I've seen there was conversations between her and Shawn LeBeouf
 8   about the coverage, and this -- she wanted to write this
 9   policy.  She was aware that it was on the Atlantic coast of
10   Florida.
11            And to say she didn't know that it was in Florida,
12   all she had to do was look at that survey that she had that
13   said it was in Florida.  There's nothing that would make an
14   underwriter believe it was any place other than in Florida, the
15   Atlantic coast of Florida.
16   Q.  Boats move, don't they, sir?  They're not stationary
17   objects?
18   A.  Absolutely.
19   Q.  And according to that survey that boat was in good enough
20   condition to travel just about anywhere?
21   A.  That vessel was capable of being taken out.  That vessel
22   was seaworthy and capable of being taken out.  At the same time
23   it was being worked on for the intended purpose of a crew
24   operation.
25   Q.  Is there anything in the submissions that you have seen
```

1   that shows where the work was being done?

2   A.   The point is the survey said it was in Florida.   The

3   discussion said it was in Florida.   For Karyn Price at any time

4   to say that that was not her understanding is just not

5   credible.   I'm sorry.   That's my opinion.

6           MS. LIDONDICI:   Your Honor, move to strike as

7   nonresponsive.   May I have an answer?

8           MR. STRADER:   Your Honor, she asked the question.   He

9   answered it.   I think it's responsive.

10          THE COURT:   I won't strike it, but if you would ask

11  -- what was the original question?   What was the original

12  question?

13          MS. LIDONDICI:   May I have the question read back,

14  please.

15          THE COURT:   Oh, you asked him about boats moving.

16          THE WITNESS:   Yeah.

17          MS. LIDONDICI:   It was after that.

18          THE COURT:   It was after that?

19          MS. LIDONDICI:   Yes, indeed.

20          THE COURT:   Ask another question.

21  BY MS. LIDONDICI:

22  Q.   Sir, is there any documentation that was submitted to WFT

23  to show where the work was being done on the boat, whether it

24  was in Ft. Myers, where it was supposed to be getting a new

25  propeller, a life raft and other things before going to

1    Louisiana or elsewhere?

2    A.   The documentation is the survey itself.  That's the

3    documentation that --

4    Q.   The survey that was eight months prior to the first

5    submission?

6    A.   Eight months prior to what?

7    Q.   The August prior to the first submission.

8    A.   August prior to the submission, yes, which was six months I

9    believe.

10   Q.   Okay.  I apologize.  The survey did not -- by the way,

11   since we're talking about the survey -- did not disclose that

12   there were hull breaches on that boat, did it?

13   A.   I don't know that there were hull breaches on that.

14   Q.   Did the survey disclose hull breaches?

15   A.   I can't recall.  I'd have to -- let me review the survey.

16   I don't see any breaches noted in the survey.

17   Q.   And the survey did not disclose that the vessel did not

18   have watertight compartments, did it, or that the watertight

19   compartments were not, in fact, watertight and had

20   penetrations?

21          MR. STRADER:  I object, Your Honor.  She's -- now

22   she's getting into survey questions with an underwriting

23   expert.  There might be some slight relevance.

24          THE COURT:  In other words, what you're saying is

25   it's beyond the scope of direct?

1        MR. STRADER:  Yes.

2        THE COURT:  Isn't it beyond the scope of direct?

3        MS. LIDONDICI:  Again, he raised the survey, Your

4   Honor; but I'll move on.

5        THE COURT:  Okay.

6   BY MS. LIDONDICI:

7   Q.   I'm going to show you a document marked as Exhibit 69.

8   It's a typed application signed by Jeff Dorsey, the owner of

9   the vessel or the owner of the LLC which owned the vessel.

10  Have you seen this before?

11  A.   Yes, ma'am.

12  Q.   And this is after any purported verbal agreement which is

13  disputed regarding navigation other than Gulf coast, correct?

14  A.   This is after --

15  Q.   The disputed verbal agreement.

16  A.   Yeah.  This --

17  Q.   Okay.  And this was indeed after the binder was issued?

18  A.   Correct.

19  Q.   And upon receipt of this signed application WFT then issued

20  the policy?

21  A.   They issued the policy after the receipt of this

22  application.  That's correct.

23  Q.   And this signed application specifies navigation limits as

24  Gulf of Mexico not to exceed 100 miles off shore; is that

25  correct?

1   A.   That is correct.

2   Q.   This signed application does not state transiting from the

3   east coast of Florida and then Gulf of Mexico not to exceed 100

4   miles off shore?

5   A.   In response to that, I would say the loss had already

6   occurred when this was submitted.  The broker knew the vessel

7   went down in the Atlantic.  If there was -- if there had not

8   been any verbal agreement for coverage in the Atlantic at all,

9   the broker would have known there would have been no coverage;

10  and there would have been no reason to continue the pursuit of

11  the application.  There would have been no coverage.  They

12  would have -- you know, they could easily have said the

13  Atlantic coast, so I'm not sure your point is --

14  Q.   But it doesn't say Atlantic coast when he knew where the

15  boat went down, and it doesn't say he had an agreement for

16  Atlantic navigation.  It says navigation, Gulf of Mexico,

17  doesn't it?

18  A.   The document does say -- the document speaks for itself.

19  That's correct.  But, again --

20  Q.   And nowhere --

21  A.   But, again, you have to go to the totality of what was done

22  between the underwriters and the broker.

23  Q.   So I can't rely on the written documents that are submitted

24  to the insurance company before or after the loss that all say

25  Gulf of Mexico.  I have to rely only on your disputed

1   accounting of a verbal conversation between Shawn LeBeouf and

2   Karyn Price?

3        MR. STRADER:   Objection, Your Honor; asked and

4   answered and a couple of other questions as opposed to a long

5   one.

6        THE COURT:   He can answer.   Overruled.

7        THE WITNESS:   It's not so much important what you

8   understood.   It's what the underwriter understood, and the

9   underwriter understood that there was coverage in the Atlantic.

10  BY MS. LIDONDICI:

11  Q.   And you base that on your speculation of the operation of

12  Ms. Price's mind although you don't credit any of her

13  testimony?

14  A.   I don't base it on speculation.   I base it on the review of

15  the facts in the file.

16  Q.   Did you review in the file a single document to or from WFT

17  and USI prior to the loss that says that there is Atlantic

18  navigation?

19  A.   Again, you're talking about written form, and I'm talking

20  -- and my conversation and my answer has always been the verbal

21  with the exception of that one document that we talked earlier

22  about which had the Miami location and also the survey which

23  had the Ft. Lauderdale location.

24  Q.   Well, let's talk about this verbal agreement for Atlantic

25  navigation.   What was the limits?   Was it the entire Atlantic?

1    A.   It was to go from the Ft. Lauderdale location to Louisiana.

2    Typically you don't go across to Africa and back to get to the

3    Gulf.   You go a direct route.

4    Q.   Well, was it supposed to be an inland crossing or an

5    open-ocean crossing?

6    A.   I can't answer that question.

7    Q.   Well, did you see the terms and conditions of this

8    purported agreement and what waters would be traversed set

9    forth anywhere?

10   A.   The terms --

11          MR. STRADER:   Objection, Your Honor.   It's asked and

12   answered, and he's already stated it was an oral agreement.

13   Now she's asking -- she keeps repeating -- asking what writing.

14   He keeps repeating there's an oral agreement.

15          THE COURT:   No.   She's asking about a verbal

16   agreement.   Overruled.

17          THE WITNESS:   Restate that question, please.

18   BY MS. LIDONDICI:

19   Q.   Did you see the terms and conditions of this verbal

20   agreement set forth anywhere as to what waters would be

21   traversed, when the trip would be undertaken, whether it would

22   be off the coast or it would be inland?

23   A.   The agreement was to get from the Atlantic coast of Florida

24   to Louisiana.   There are no other -- I'm not aware of any other

25   specifics.

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT PRODUCED BY COMPUTER.

1    Q.  So theoretically if they wanted to sail all around in the

2    Atlantic and then ultimately come up the Gulf, that would be

3    covered since they're getting from the Atlantic coast to

4    Louisiana eventually?

5    A.  I think your comments are a little stretched.  I think you

6    have to use some reasonable and prudent understanding about an

7    oral agreement and what the agreement was.  It was to get from

8    Ft. Lauderdale to Louisiana.  And a sea captain, an owner, is

9    not going to go all the way over to Africa and back to get to

10   the Gulf coast.  It just -- it doesn't make sense.  They're

11   going to take a direct route.  Now, there could be multiple

12   routes, but -- I'm not a navigator, but you go in a direct and

13   most prudent way.

14   Q.  Well, under this verbal agreement, could they stop off in

15   Cuba on their way?

16   A.  You wouldn't -- first of all, you wouldn't stop off in Cuba

17   because you couldn't get in.  You couldn't get into Cuban

18   waters or it wouldn't be prudent to get into Cuban waters.  You

19   know, your questions are being --

20          MR. STRADER:  Objection, Your Honor.  She's

21   interrupting the witness, but it's asked and answered anyway.

22          THE COURT:  Go ahead.

23   BY MS. LIDONDICI:

24   Q.  The fact is there's no specific term and condition of this

25   oral agreement with respect to the limits of navigation or the

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.

1    waters to be navigated or the journey undertaken, is there?

2    A.   And if that's the case, then you should fault your

3    underwriter Karyn Price for not putting those stipulations

4    down.  You can't fault the -- I don't -- you cannot fault the

5    assured for that.

6    Q.   I'm not faulting you, sir.  I'm saying --

7    A.   I didn't say you're --

8    Q.   -- with respect to the contract.

9    A.   I didn't say you were faulting me.  I said you can't fault

10   the assured.

11   Q.   Sir, what was the additional premium for Atlantic

12   navigation?

13   A.   The premium was all-inclusive in that $45,000.

14   Q.   Didn't we establish earlier, sir, that the initial

15   quotations for premium were based on Gulf waters and didn't

16   reference Atlantic?

17   A.   I thought we established that there was conversation at the

18   very beginning that there would be a trip from Florida into

19   Louisiana.

20   Q.   So that Mr. LeBeouf's comment in his email to Mr. Rosandich

21   that this is based on Gulf navigation rates which are different

22   than other rates meant nothing, and it wasn't based on Gulf

23   navigation rates?

24   A.   The nature of the operation was to take place in the Gulf

25   as opposed to if the area of operation would have been in the

1    Atlantic.  The trip was a side single trip.  It was only to

2    provide coverage from point A to point B.  There was not to be

3    coverage to go back from point B to point A.  The coverage, as

4    I said, was verbally bound.

5    Q.  But we don't know the cost for this coverage, the terms of

6    this coverage, or the actual point A to point B route, correct?

7              MR. STRADER:  Objection, Your Honor.  That misstates

8    the testimony of the witness.

9              THE COURT:  I think he answered that.  Go ahead and

10   move on to another point.

11   BY MS. LIDONDICI:

12   Q.  After the confirmation of coverage was sent to Mr. Dorsey

13   referencing Gulf navigation and after the policy was received

14   by USI referencing Gulf navigation, what did USI do?

15   A.  They did a number of things.  Are you asking for some

16   specific area?

17   Q.  No.  I'll make it more specific.

18   A.  You know, that's kind of a broad question.

19   Q.  I'll make it more specific.  Did USI review the policy that

20   was issued?

21   A.  Yes.

22   Q.  And just as a follow-up before we get on that since we

23   could not find it before, I have located the binder of

24   insurance which is Exhibit 31.

25             MR. STRADER:  Is this Plaintiff's or Defendant's 31?

1  BY MS. LIDONDICI:

2  Q.  And for clarity of the record does that state Gulf

3  navigation, sir?

4          THE COURT:  Is that Plaintiff's 31?

5          MS. LIDONDICI:  Yes, sir.

6          THE COURT:  Okay.

7          THE WITNESS:  It says the area of operations is the

8  Gulf of Mexico, correct.  It doesn't reference, you know -- and

9  that's where the area of operations was.  The trip was from the

10  Atlantic coast to Louisiana.

11  BY MS. LIDONDICI:

12  Q.  Back to the policy, the policy was reviewed by USI, wasn't

13  it?

14  A.  I believe that was Jamie Robichaux's testimony, correct.

15  Q.  And Ms. Robichaux testified --

16  A.  Robichaux.  Excuse me.

17  Q.  -- that in reviewing the policy she actually made little

18  checkmarks or ticks on the policy?

19  A.  That's correct.

20  Q.  And that was her reviewing the different items and

21  confirming them with her file, correct?

22  A.  That is correct.

23  Q.  I show you what has been marked as Exhibit 65 which is a

24  copy of the policy with the checkmarks which had been

25  identified by Ms. Robichaux in her deposition.  Is there a

1   checkmark next to navigation limits?

2   A.   Would you mind -- I just want to go through this for a

3   second just to make sure that this is --

4          THE COURT:  What's the exhibit number again?

5          MS. LIDONDICI:  I'm sorry?

6          THE COURT:  What's the exhibit number?

7          MS. LIDONDICI:  65.

8          MR. STRADER:  Plaintiff's 65?

9          MS. LIDONDICI:  Yes.

10         THE WITNESS:  Okay.  Your question, ma'am?

11  BY MS. LIDONDICI:

12  Q.   Is there a checkmark next to the navigation limits?

13  A.   There's a checkmark under the area of operations.

14  Q.   And what does area of operations say?

15  A.   Warranted confined to the use and navigation of the Gulf of

16  Mexico not to exceed 100 miles off shore.

17  Q.   Would you agree that operating your vessel in the Atlantic

18  is not using and navigating your vessel in the Gulf of Mexico?

19  A.   I would agree with that.  However, again, I go back to the

20  oral binder.

21  Q.   And in light of this oral binder, did USI immediately

22  contact WFT and say, Woe, this policy we've just received

23  doesn't have the right navigation limits?

24  A.   Well, there was an email sent to them.

25  Q.   That was in June, right?

1    A.   I would have to see the email to --

2    Q.   We'll get to that.

3    A.   Okay.

4    Q.   Did Ms. Robichaux testify that she contacted USI

5    immediately upon review of the policy and say there's an error.

6    Please make a correction to the navigation limits?

7    A.   I don't believe she made that statement.

8    Q.   In fact, I'm going to show you Exhibits 44 and 45,

9    Plaintiff's 44 and 45, which are a letter from Nataly Garcia to

10   WFT and a schedule of vessels with navigation limits and ask if

11   you've seen these.

12   A.   Yes, I have seen these.

13   Q.   And those were issued approximately a month or within a

14   couple of weeks after the loss?

15   A.   Two-and-a-half weeks.

16   Q.   Two-and-a-half weeks?

17   A.   Yes.

18   Q.   Okay.  And they knew when the boat went down as of that

19   time, right?

20   A.   They knew when the boat went down -- the vessel went down.

21   Correct.

22   Q.   Does that correspondence from USI to WFT make any reference

23   to changing the navigation limits?

24   A.   No, it does -- it does not.

25   Q.   It does ask for changes to the policy, though, doesn't it?

1   A.   That it does.   But, again, I go back to the oral binder.

2   And, you know, if you want, I can go even further.   Within the

3   claims process they never -- you know, they never halted the

4   claims process from the very beginning knowing that the

5   navigational limits as stated on the dec page was limited to

6   the Gulf of Mexico.   If you think about it, you have a vessel

7   that sunk off the Atlantic coast; and there was nothing done

8   other than proceeding with the claim until several weeks later.

9   To me that definitely implies that they thought that there was

10  coverage.

11  Q.   Well, you are aware that when the claim occurred, the

12  policy hadn't even been issued yet, aren't you?

13  A.   Yes, I am aware of that; but they did have the application,

14  and they did -- if I'm not mistaken, they did speak to -- they

15  did have the application.   They had the underwriting file.

16  Because a document hadn't been issued -- they had received that

17  application.   They had the survey.   They had the handwritten

18  application.   They had multiple documents that would imply that

19  the navigational limits was in the Gulf of Mexico, but they

20  took no action.

21  Q.   Well, implications aside, you are aware that the wreck

22  removal and recovery was done under a reservation of rights,

23  aren't you?

24  A.   The reservation of rights was not sent out I don't believe

25  until May 15th.

1    Q.   Are you aware that the insured and its agent were both

2    advised that the wreck removal would be done under a

3    reservation of rights prior to the letter being issued?

4    A.   If I recall, there was an email that Optimum claims was

5    going to send out a reservation-of-rights letter, but I never

6    saw that reservation -- there was no reservation-of-rights

7    letter sent out until May 15th.

8    Q.   You're aware, though, that initially the insurer advised

9    the insured they would not become involved in the salvage and

10   wreck removal and then agreed to do so under a reservation of

11   rights, a letter to follow?

12   A.   I didn't see any reservation-of-rights letter go out.

13   There can't be a reservation of rights if there's no

14   reservation-of-rights letter.

15   Q.   A reservation-of-rights letter was issued, wasn't it, sir?

16   A.   May 15th I believe is the date.

17   Q.   And that was following the proof of loss by the insured,

18   correct?

19   A.   The proof of loss I believe was submitted on May 3rd.

20   Q.   Okay.  But regardless of when the letter went out, the

21   insured was advised and its agent was advised that the

22   underwriter agreed to become or the insurer agreed to become

23   involved in the wreck removal without prejudice to any rights

24   it might have in a full reservation of rights?

25   A.   There was an email from -- her name was Donna.  I can't

1    recall her last -- Theriot?

2    Q.   Theriot.

3    A.   Theriot.  Who said there was to be a reservation-of-rights

4    letter sent out.  Again, I never saw it.

5    Q.   And Donna is the insured's agent, correct?

6    A.   She works for USI, correct.

7    Q.   So Donna understood that this was being done without

8    prejudice to the parties?

9    A.   Well, they had discussions of it.  Yes.

10   Q.   Okay.  Now, going back to the policy, once the policy was

11   issued we had Exhibits 44 and 45 which requested changes to the

12   policy, correct?

13   A.   I'm sorry, but I --

14   Q.   Exhibit 44.

15   A.   They're not numbered, so I'm having --

16   Q.   On the back.

17   A.   Okay.  45.

18   Q.   44 is the page before it, sir.

19   A.   Okay.  I'm sorry.

20   Q.   Exhibit 44 requests a change to the policy, correct?

21   A.   Correct.

22   Q.   Does Exhibit 44 expressly request that the navigation

23   limits shown on the policy be changed or modified or endorsed?

24   A.   No, it does not.

25   Q.   Okay.  There did come a time, however, when a request to

1    change additional terms in the policy were made on June 18th.

2    Are you aware of that, sir?

3    A.   I recall some documents.  I'd have to see them to

4    understand -- to acknowledge the date that it was done.

5    Q.   I will show you Plaintiff's Exhibit 66 in evidence and ask

6    you to keep your attention focused on the second page for the

7    purpose of these questions.  And we'll move on to the other

8    pages I promise you.  But right now the second page, the June

9    18th email from Jamie Robichaux to Jessica Squires.  We're now

10   April, May, June, three months' post-loss, correct?

11   A.   If that's what the documents says, but I'll reserve my

12   answer till I see it.  There was a request from Jamie on June

13   18th.  Correct.

14   Q.   That request from Jamie to WFT requested three changes or

15   modifications to the policy; is that correct?

16   A.   That is correct.

17   Q.   Did any of those three changes or modifications to the

18   policy in the June 18th letter reflect the navigation limits?

19   A.   No.

20   Q.   Okay.  Subsequent to the June 18th letter or email there

21   was a request again from Jamie or a question from Jamie about

22   the navigation limits; is that correct?

23   A.   Are you referring to --

24   Q.   The first page now.

25   A.   Okay.  There's a memo on June 27th, 2007, that states,

```
 1    Also, Wanda, still waiting for the policy amendment for the

 2    navigation limits requested by Shawn LeBeouf at the time of

 3    binding.

 4    Q.   And what is the time of that email?

 5    A.   That's June 27th.

 6    Q.   Time.

 7    A.   Oh, 1:22 p.m.

 8    Q.   P.m.  okay.  Based on your review of the records, sir, had

 9    you seen any document to WFT regarding change in navigation

10    limits prior to that June 27th 1:22 p.m. email?

11    A.   No, ma'am.

12    Q.   I'm going to show you a document which will be marked as

13    Exhibit -- offered as Plaintiff's 72.  Actually I think it may

14    be in evidence.  It's Robichaux Number 10.

15    A.   Okay.

16    Q.   Had you seen that document before, sir?

17    A.   Yes.

18    Q.   And is that a document of June 27th?

19    A.   Correct.

20    Q.   And is that an email to USI?

21    A.   An email to Sandra Andre, USI.  Correct.

22    Q.   And what is the time of that email?

23    A.   10:46 a.m.

24    Q.   And from whom is that email?

25    A.   Counselor Strader.
```

1    Q.   And is Mr. Strader's email to USI the first time the

2    question of the navigation limits being changed is raised?

3    A.   I would have to say no.

4    Q.   When did you see a document raising the question of

5    changing the navigation limits prior to his email?

6    A.   I didn't necessarily say I saw any documents about it, but

7    I'm sure that the discussion had taken place prior.

8    Q.   Let me rephrase the question.  Is that email from Mr.

9    Strader to USI prior to Ms. Robichaux's first email from USI to

10   WFT regarding the purported request for change in navigation

11   limits at the time of binding the first documentation you have

12   seen regarding changing the navigation limits at time of

13   binding?

14   A.   It appears to be written -- in a written form, yes.

15   Q.   And then upon USI receiving Mr. Strader's email raising the

16   change in navigation limits, USI for the first time sends a

17   written request or notification to WFT regarding the navigation

18   limits?

19   A.   Jamie Robichaux sent -- raised that question to Wanda

20   Didier.  Correct.

21   Q.   Following Mr. Strader's email?

22   A.   Correct.

23   Q.   And what did Ms. Didier respond?  I believe it's the front

24   page.

25   A.   How did Wanda -- how did Wanda Didier respond?

1    Q.   Yes.

2    A.   I'm looking at page -- is it USI 499?

3    Q.   Okay.

4    A.   Okay.  And she writes that this was forwarded for review in

5    conjunction with the file.  An endorsement is being issued to

6    correct the name as was reflected in the binder and earlier

7    correspondence.  Apparently WFT made an error when they were

8    issuing the policy.  In regards to this endorsement --

9    Q.   Excuse me.  Does the email say WFT made an error when they

10   were issuing the policy?

11   A.   No.  It says that it was -- the name has to be corrected as

12   reflected in the binder.  So if the binder had the correct

13   name, they should be issuing it off that binder.  Apparently

14   they made an error.

15        In regards to the endorsement noted, item 3, these

16   are incorporated into the standard offering and may be removed

17   in some cases.  As the file does not reflect an agreement to

18   amend the endorsement or wording prior to the losses, we are

19   unable to revise the coverage at this time.

20   Q.   May I see the document.  Did Ms. Didier respond to the

21   request as to the navigation limits?

22   A.   As I recall there was some documentation in the file to

23   that effect.

24   Q.   And did she in her response to the request regarding the

25   navigation limits ask for any support that would show such a

1   conversation existed?

2   A.   Could I see the document?

3   Q.   I'll show you what has been marked as Exhibit 71; direct

4   your attention to the June 2nd response of Wanda Didier.

5   A.   This was July 2nd.

6   Q.   Sorry.  July 2nd.

7           MR. STRADER:  Excuse me.  What number is that?  What

8   number?

9           MS. LIDONDICI:  71.

10          MR. STRADER:  Thanks.

11          THE COURT:  71, right?

12          THE WITNESS:  Correct.

13          THE COURT:  Plaintiff's 71?

14          THE WITNESS:  That's what's reflected back here.

15  Okay.  I see the document.

16  BY MS. LIDONDICI:

17  Q.   And what is the response, sir?

18  A.   I have been through the file here, and everything shows the

19  navigation limits as the policy.  Please forward a request from

20  Shawn referred to below.

21          I would comment the one thing she didn't say was, I

22  talked to Karyn Price to see if there was -- you know, she went

23  by the paper documents.  And, as we all know, this was an oral

24  binder.

25  Q.   Did Jamie ever respond to Wanda's request?

1    A.   I'd have to see the document.  I don't recall.

2    Q.   Do you recall reviewing from your review of Ms. Robichaux's

3    email that Jamie did not respond to Wanda's request?

4    A.   I cannot remember any email, so --

5    Q.   No.  I'm asking from your review of the deposition.

6    A.   I apologize.  I just don't recall that.

7    Q.   I'll show you a document which will be marked -- well, I

8    think has been marked as 187a, USI placement file 644 and 645.

9    Do you recognize that as a document that you reviewed in this

10   matter?

11   A.   Yes, I reviewed this document.

12   Q.   And is that a response or an email from Natalie and a

13   response by Wanda?

14   A.   There is a response from Natalie to Wanda.

15   Q.   What does Natalie write to Wanda and when?

16   A.   She writes on August 15th, 2007, at 10:06 a.m.  Wanda,

17   further to your email to Jamie on 6-27 please advise status on

18   policy amendment for the navigation limits requested by Shawn

19   at time of binding.

20   Q.   Okay.  Did that provide any documentation as Wanda had

21   requested or an indication that this was -- there is no

22   documentation and it's just conversation?

23   A.   Well, it says that -- requested by Shawn at time of

24   binding, so there was a request.  The request was done orally.

25   Q.   And what does Wanda reply?  Top of the page.

1    A.  She replies, See the attached dated July 2nd.  All

2    correspondence here indicates navigation limits as shown on the

3    policy.

4            And, again, I say the discussion as far as the

5    navigation limits was done orally.  She never bothered to check

6    with the underwriter.

7            THE COURT:  How much more do you have, Ms. Lidondici?

8            MS. LIDONDICI:  About 15 minutes, Your Honor.

9    BY MS. LIDONDICI:

10   Q.  Are you aware that Ms. Didier testified that she spoke to

11   Karyn Price with respect to these requests?

12   A.  I can't recall.  There could be -- I might have reviewed

13   it; but if you could show me something that would refresh my

14   memory, that --

15   Q.  So you don't know that Ms. Didier and Ms. Price spoke and

16   that Ms. Price told her there was no such conversation?

17   A.  I didn't see -- I don't recall seeing any such

18   documentation.

19           MS. LIDONDICI:  Your Honor, at this time I move in

20   Exhibit 72.

21           THE COURT:  This is Plaintiff's 72, correct?

22           MS. LIDONDICI:  Yes, sir.

23           THE COURT:  It's already in.

24           COURTROOM DEPUTY:  It's already in.

25           MS. LIDONDICI:  Is it?  Okay.

```
 1   BY MS. LIDONDICI:
 2   Q.   The next document, sir, I'm going to show you is already in
 3   exhibit as 188e as in Edward.   Had you seen that document
 4   before, sir?
 5   A.   Yes, ma'am.
 6   Q.   And what is it?
 7   A.   That's a hull proof of loss.
 8   Q.   And is that a document that is submitted by an insured in
 9   the ordinary course of making a claim that you testified to
10   earlier?
11   A.   That would be correct.
12   Q.   And is that document submitted for a particular purpose?
13   A.   It's a proof of loss.   You know, it speaks for itself.
14   Q.   And in marine insurance is a proof of loss a sworn document
15   submitted to the insurer with respect to the nature of the loss
16   and the damages?
17   A.   It should provide accurate information based on knowledge
18   at the time it's completed, correct.
19   Q.   And what is the date of that document?   It's dated on the
20   second page I believe.
21   A.   May 9th, 2007.
22   Q.   And as of May 9th, 2007, would the insured have had an
23   opportunity to ascertain what caused the loss?
24   A.   As an underwriter I'm not sure that that's something that I
25   should --
```

1    Q.   Okay.

2    A.   -- answer.

3    Q.   No problem.  I need to accept your self-restriction.

4         THE COURT:  Didn't you move in limine to restrict his

5    testimony or am I thinking of somebody else?

6         MS. LIDONDICI:  I'm sorry, Your Honor?

7         MR. MOURE:  No -- yeah.  That was their -- their

8    expert gave a very interesting opinion on seaworthiness, you

9    know, and no qualifications to do so.

10        THE COURT:  So it was the plaintiff's -- the

11   defendant's motion?

12        MR. MOURE:  It was our motion, yes.

13        THE COURT:  Did I grant that?

14        MR. MOURE:  You did, Your Honor.

15        THE COURT:  Okay.

16        MR. MOURE:  His only qualification was he was a

17   member of the Seattle Yacht Club, which is a fine yacht club.

18   I'm not a member of it, but it doesn't qualify you to render

19   opinions on seaworthiness of vessels.

20        THE COURT:  Okay.  Well, in that case nobody's going

21   to render that then.

22   BY MS. LIDONDICI:

23   Q.   Based on the subject that Mr. Moure has just raised does

24   this policy have a warranty of seaworthiness in it?

25   A.   Yes, it does, ma'am.

```
 1    Q.   And where is that warranty found?

 2    A.   It is found in the special conditions, item 1.

 3    Q.   And as a condition of the policy, what is its effect?

 4    A.   The effect is -- it says that it's warranted at the

 5    inception of the policy.  The vessel shall be in seaworthy

 6    condition and thereafter during the currency of the policy.

 7    The insured shall exercise due diligence to keep the vessel

 8    seaworthy and in regard fit tight and properly manned,

 9    equipped, and supplied.

10    Q.   What is the effect of a breach of a warranty contained in

11    the policy?

12    A.   That depends on the breach or the warranty.  There's

13    various results that can be depending on the warranty.

14    Q.   If a warranty is breached which is found to be proximately

15    -- and the breach of which is found to be proximately related

16    to the loss incurred, what is the effect in your knowledge of

17    the breach of warranty?  Doesn't it void the coverage?

18    A.   No.  You -- for instance, in this particular case, in the

19    particular policy, you warrant that the vessel will be in a

20    particular area.  However, if you breach that warranty by going

21    out elsewhere, the coverage still -- the policy can still

22    provide coverage under the held covered provision as long as

23    the underwriter is notified.  So there can be breaches in

24    warranty throughout the policy where coverage continues.

25    Q.   We'll get to that in a few minutes, but let's stay
```

1   specifically with the seaworthiness warranty.

2   A.   Okay.  Your question wasn't specific to seaworthy.

3   Q.   I realize that.  I will get more specific.  Thank you.

4          MR. STRADER:  Your Honor, I'd object to -- if another

5   part of the policy has an affect on another part of the policy,

6   then they have to both be considered.  You can't necessarily

7   separate from one part of the policy from the other.

8          THE COURT:  What's your legal objection?

9          MR. STRADER:  It mistakes the evidence in the record.

10          THE COURT:  Overruled.

11  BY MS. LIDONDICI:

12  Q.   Let's first focus on the seaworthiness warranty.  Then

13  we'll talk about the other provisions and warranties, sir.  If

14  the trier of fact finds that the vessel was unseaworthy at the

15  inception of the policy and that unseaworthiness proximately

16  was related to the loss, will the breach of that warranty void

17  coverage?

18          MR. STRADER:  Objection, Your Honor.  It calls for a

19  legal conclusion.

20          MS. LIDONDICI:  He's here as an underwriting expert,

21  Your Honor.

22          THE COURT:  Well, as long as we clarify that it's

23  based upon his understanding.  Do you have an understanding?

24  Ask the predicate question first and then see if he can answer

25  it.

```
 1              MS. LIDONDICI:  I will rephrase it.

 2   BY MS. LIDONDICI:

 3   Q.  Based on your knowledge and understanding with respect to

 4   maritime policies realizing you're not a maritime underwriter,

 5   if there is a breach of the warranty of the seaworthiness

 6   clause contained in the policy and the Court finds that the

 7   vessel was not seaworthy at the inception of the policy and

 8   that unseaworthy condition contributed or proximately caused

 9   the loss, does that void the coverage?

10              MR. STRADER:  I object, Your Honor.  The question is

11   vague.  It actually gets -- it's essentially summarizing the

12   entire case.

13              THE COURT:  Overruled.  Can you answer that question?

14   Let me interject.

15              THE WITNESS:  Your Honor, what I would say is in this

16   particular case if something -- and I know there's discussion

17   about grounding of the vessel.  And if there's been no change

18   to the vessel because of an action, then there's not a

19   seaworthy issue as far as I can assess.  But when you -- I do

20   think it's a matter of -- well, it's my opinion on it; not that

21   I'm a lawyer or anything like that.  But that is something I

22   think would be best dealt with by someone other than myself.

23              THE COURT:  Okay.  Move on to something else.

24              MS. LIDONDICI:  Let me try one more time if I may.

25              THE COURT:  He doesn't want to give an opinion to
```

1    your question.

2         MS. LIDONDICI:  I just want to make sure.

3         THE COURT:  Okay.

4    BY MS. LIDONDICI:

5    Q.  Is it fair to say that as an underwriter you are not

6    willing to offer an opinion as to whether or not a breach of

7    the warranty of seaworthiness at the inception of the policy

8    which proximately causes or contributes to the loss voids

9    coverage?

10        MR. STRADER:  Objection, Your Honor; unless she's

11   stating that as a hypothetical.

12        MS. LIDONDICI:  I'm asking if he's willing to give an

13   opinion.

14        THE COURT:  I think he's answered pretty clearly he's

15   not going to give an opinion on that.

16   BY MS. LIDONDICI:

17   Q.  Would it be fair to say you're also unwilling to give an

18   opinion as to whether or not a breach of the ongoing duty of

19   seaworthiness contained in the seaworthiness clause, not just

20   at inception of the policy, but during the course of the voyage

21   voids coverage?

22   A.  I do not care to opine on that.

23   Q.  Okay.  So you won't opine on the breach of warranty of

24   seaworthiness?

25   A.  I think that's been my statement.

1    Q.   But you do have an opinion on the held covered clause?

2    A.   Well, that goes to the binding of coverage.   That's not

3    assessing whether there is a validity to a claim or not.

4    Q.   Okay.   If an insured breaches the stated navigational

5    limits on a policy absent operation of the held covered clause,

6    what is the effect of that breach?

7         MR. STRADER:   Your honor, that asks for a legal

8    conclusion from the witness beyond necessarily the scope of a

9    policy.   For one thing, you know, the case -- there is -- case

10   law goes different ways.   Some case law suggests other than

11   what she's asking.

12        THE COURT:   That's also beyond the scope of his

13   direct opinion.   The only thing he can talk about in terms of

14   that hull policy -- not that hull policy -- the held covered

15   clause was general definition, so I don't think he went any

16   further than that.

17   BY MS. LIDONDICI:

18   Q.   Back to Exhibit 70, getting back to the policy and the

19   receipt of the policy by USI for a moment.   Can you identify

20   Plaintiff's Exhibit 70?

21   A.   I believe this is a checklist that Jamie Robichaux

22   testified that she uses in her organization when they get a

23   policy in prior to -- that they use prior to delivering it to

24   the assured.

25   Q.   And does that checklist reflect that Ms. Robichaux reviewed

1   the policy and undertook certain activities?

2   A.   This document doesn't reflect that she reviewed it.   It

3   reflects that somebody reviewed it.

4   Q.   Let me rephrase.   Does it reflect that USI and its

5   personnel reviewed the policy and made entries on the

6   checklist?

7   A.   Yes.

8   Q.   And does it reflect that USI's checklist includes making

9   any requests for changes of coverage?

10  A.   It has a request corrections after the policy was received.

11  Q.   Okay.   And do you see in the bottom left-hand corner of

12  that document handwriting numbered 1 and 2.

13  A.   Yes, I do.

14  Q.   Do you recall Ms. Robichaux's testimony that the items on

15  number 1 and 2 were the two items that she was requesting to be

16  changed in the policy?

17  A.   I don't recall that, but I'm not saying that that didn't

18  occur.

19  Q.   Neither of those reflect or refer to the navigational

20  limits, do they?

21  A.   Actually I'm having trouble reading them where they are.

22  Q.   Okay.   We'll defer to Ms. Robichaux's deposition then.

23  Earlier you had testified about information as to the COI and

24  representations made about the COI.   Are you aware that the

25  insured's agent provided a website that indicated that the

1    vessel was certified?

2    A.   I'm not --

3           THE COURT:   I missed that.   I didn't hear the

4    question.   Provided a what?   I'm sorry.

5           MS. LIDONDICI:   That the insured's agent provided a

6    link to a website which indicated that the vessel was

7    certified.

8           MR. STRADER:   Your Honor, there was specific

9    testimony by Mark Rosandich on that issue which I do not

10   believe -- he's not privy to the testimony here.   I don't

11   recall specifically whether he testified at his deposition

12   regarding that website or not.   And, therefore, he wouldn't

13   have had, you know -- so she's asking a question that may be

14   beyond the scope of his knowledge.

15          THE COURT:   Well, let him answer, I don't know.   Do

16   you know anything about --

17          MR. STRADER:   I guess that's true, Your Honor.   Thank

18   you.

19          THE COURT:   Right.   Do you know anything about this

20   website?

21          THE WITNESS:   No, I don't.

22   BY MS. LIDONDICI:

23   Q.   So you didn't see that link in the emails that were part of

24   the various submissions?

25   A.   The only link that I saw was a link that showed pictures of

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT PRODUCED BY COMPUTER.

1   the vessel, a Bottom Line II vessel.

2   Q.  And did that link also contain information that the vessel

3   was certified?

4   A.  I didn't see that.

5   Q.  Do you have an opinion as an underwriter whether or not a

6   marine insurer has an obligation to independently verify

7   information provided to it by an agent?

8   A.  Yes, I have an opinion.

9   Q.  And what is that opinion?

10  A.  My opinion is as an underwriter you are to look at -- and I

11  think I've stated this -- you are to look at all the

12  information, evaluate all the information that was provided to

13  you.  And then, as I said, one of the qualities of a good

14  underwriter is underwriting curiosity.  And when you see

15  something that just doesn't make sense, you find out what that

16  information is because we are all human.  We all make mistakes.

17  And it's only prudent to -- if you make the inquiry now, you

18  don't run -- if Karyn had made that inquiry back then, we might

19  not have been sitting here today.

20  Q.  My question to you is whether there was an obligation to

21  independently verify information.  For example, if the

22  application says the boat was built in 1987, does the

23  underwriter have to go and check with the boatyard to make sure

24  it was built in 1987 and not 1986 or 1988?

25           MR. STRADER:  Objection, Your Honor.  That's been

1    asked and answered.

2            THE COURT:  Overruled.  He can answer.

3            THE WITNESS:  Well, you have a survey there that said

4    the vessel was built in 1987.  You had the schedule of vessels

5    that indicate the vessel was built in 1987.  You had the

6    application that said the vessel was built in 1987.  There's

7    really no conflicting information.  It's fairly uniform.  And

8    in a situation like that, an underwriter wouldn't go out of his

9    way to verify it.  It's when you have conflicting information

10   such as the COI or when you're missing information.  That's

11   when the underwriter should pursue that information.

12   Q.  So that if the application says the boat belongs to Mr.

13   Rosandich but then in a later submission says the boat belongs

14   to Mr. Dorsey and a later information says it belongs to

15   Anzhela LLC, the underwriter can't rely on the request for

16   change but needs to go out and independently verify the address

17   of Anzhela LLC?

18   A.  Well, an underwriter would provide clarification for the

19   ownership of that vessel because the ownership of the vessel is

20   a key factor in underwriting ocean marine.  Now, WFT chose not

21   to do that.  That was their prerogative.  They could have

22   easily come back and asked questions.

23   Q.  Let me see if I've got this right.

24   A.  Just let me -- the only thing that WFT did with the change

25   of the name from Rosandich to the Anzhela Explorer was to

1  verify that they had a licensed agent in Washington so that

2  they could continue to write this policy.  If they didn't have

3  the license there, they wouldn't have been able to provide

4  coverage for this -- for Mr. Dorsey, so --

5  Q.  So your testimony and your opinion, sir, is that an

6  insurance company can't rely on the representation in a signed

7  application and submission by the insurance broker as to who

8  the vessel owner is in issuing a policy?

9  A.  My --

10         MR. STRADER:  Objection, Your Honor.  That

11  mischaracterizes his testimony.

12         THE COURT:  Overruled.  He can answer.

13         THE WITNESS:  My testimony is that an underwriter's

14  job is to look at the file, to look at this information, and

15  make an evaluation.  If there's issues there that don't make

16  sense, that are conflicting or provide new and additional

17  changes in information that are pertinent to the risk, they

18  have an obligation to go in and make the necessary inquiries.

19  They can't just sit back and say, It's not my job.

20  BY MS. LIDONDICI:

21  Q.  And is it the broker's job to submit true and accurate

22  information to the underwriter?

23  A.  As I said earlier, it is true that they're supposed to

24  supply true and accurate information; but that does not dismiss

25  the obligation of the underwriter.  The underwriter has the

1  responsibility -- in this case WFT had a responsibility to

2  State National to do the job that they were hired to do, and by

3  all indications was that Karyn failed.

4  Q.  And is it the insured's obligation to submit true and

5  accurate information to the underwriter?

6  A.  Yes.

7  Q.  And is it the insured's obligation under the duty of utmost

8  good faith to disclose material facts whether asked or not?

9  A.  They are supposed to provide information that is pertinent

10  to the case.  Now, I'm not sure whether you're referring to the

11  COI or whether you're referring to the -- what you're referring

12  to; but if you want to be specific, I'll address those

13  questions.

14  Q.  Is it the insured's obligation to provide true and accurate

15  information as to the condition of the vessel at the inception

16  of the policy whether asked or not under the doctrine of utmost

17  good faith?

18  A.  They are to provide accurate information.  In this

19  particular case, the vessel -- there was talk that the vessel

20  had grounded; but the fact that a vessel grounds -- is grounded

21  does not necessarily mean -- that does not mean that they have

22  to report that to the insurer because if there was no change in

23  the condition of the vessel, there is no need to report that to

24  the insurance company.  Just as if a vessel was docking and it

25  had bummed into the dock, you wouldn't report that to your

1    carrier.  That happens every day.  There's no change to the

2    vessel.  So if there's no change, there's no need to report

3    that to the carrier.

4    Q.  So I just want to make sure I have it correctly.  It's your

5    opinion that there's no obligation on the part of the insured

6    to have reported the groundings which occurred prior to the

7    inception of this policy and the damage that may have done to

8    the vessel?

9    A.  If there was no change to the vessel, there was no need to

10   report it.

11   Q.  If there was change to the vessel such as propeller damage,

12   would there have been a need to report it?

13   A.  I do not wish to opine on that.  All I would offer an

14   opinion on, if there's no change, there's no need to report it.

15   There becomes a line.  You know, I don't know where the line

16   is, and I'm not qualified to make that assessment.

17   Q.  Would an insured have an obligation under the duty of

18   utmost good faith in your opinion to report the fact that the

19   main bilge pump was missing on the starboard side when they

20   undertook the voyage?

21   A.  I'm not into bilge pumps, and I would not offer an opinion

22   on that.

23   Q.  In your opinion as an underwriter, would an insured have an

24   obligation under the doctrine of utmost good faith to advise

25   the underwriter of the fact that the vessel was sailing -- was

```
 1   not sailing as a certified vessel or under a certification?
 2   A.  Here again --
 3            MR. STRADER:  Your Honor --
 4            THE COURT:  I think we've covered the -- we covered
 5   the certification, didn't we?
 6            MS. LIDONDICI:  Coast Guard certification.
 7            THE COURT:  Yes.  I believe we've covered that.
 8   BY MS. LIDONDICI:
 9   Q.  Would an insured under the doctrine of utmost good faith
10   have a duty or obligation to its insurer to report or inform
11   the insurer that it was using the vessel in an illegal manner
12   or unlawful manner?
13   A.  Well, the warranty -- if you are running drugs, it would --
14   which would be an illegal use of your vessel, that would negate
15   the -- that would invalidate the coverage or something like
16   that.  But, again, I don't want to get into what vessel was --
17   what was done to the vessel or what wasn't done to the vessel.
18   I'll stick to my opinions as to underwriting and some claims
19   issues.
20   Q.  I'm sorry.  I missed that.
21   A.  I prefer to opine on the underwriting.
22   Q.  Okay.
23            MS. LIDONDICI:  Your Honor, nothing further.
24            THE COURT:  All right.  Any redirect?
25            MR. STRADER:  Perhaps one or two questions, Your
```

1    Honor.

2              THE COURT:  Okay.

3              THE WITNESS:  Excuse me, Counselor.  Do you want to

4    take these before I mess them up.  I don't want to destroy your

5    files.

6              MR. STRADER:  Don't worry, Your Honor.  I don't have

7    very many questions.  You're looking at me suspiciously, Your

8    Honor.

9              THE WITNESS:  Excuse me.  Just one second.

10                       REDIRECT EXAMINATION

11   BY MR. STRADER:

12   Q.  When was the survey first provided by USI to WFT if you

13   know?

14   A.  I believe it was provided on --

15   Q.  I would be satisfied with just the month and the year.

16   A.  It was provided on July 15th.

17   Q.  July 15th or February?

18   A.  Excuse me.  February 15th -- I apologize -- 2007.

19   Q.  So just to make sure the record is clear, you're stating

20   that the policy was first provided -- the survey was first

21   provided during February 2007?

22   A.  Correct.

23   Q.  So that would have been the first time that WFT would

24   probably have seen it?

25   A.  That's correct.

1    Q.   Okay.  One last question with respect to Defendant's

2    Exhibit 10.  Do you have Defense Exhibit 10?

3    A.   Which is -- that's it.  Okay.

4    Q.   Could you tell me what it states at the bottom right corner

5    of that email.

6    A.   USI placement 086.

7    Q.   Yes.  So that would be from the documents of the broker?

8    A.   Correct.

9    Q.   So essentially that would mean that the broker did document

10   their file?

11   A.   Correct.

12           MR. STRADER:  Sorry, Your Honor.

13           THE WITNESS:  I have it right here.

14           MR. STRADER:  Oh, you have it?

15           THE WITNESS:  Yes.

16           MR. STRADER:  Never mind.

17   BY MR. STRADER:

18   Q.   When was the inquiry by Mark Rosandich at the bottom email

19   if you can tell?

20   A.   The email from Mark was on February 28th, 2007, at 4:28

21   p.m.

22   Q.   Actually I believe that's a different email chain.

23   A.   Oh, excuse me.  You're correct.  It was March 19th, 2007,

24   at 10:07 a.m.

25   Q.   Okay.  And when did Shawn LeBeouf reply?

1    A.   He replied 15 minutes later at 10:22.

2    Q.   And does it show -- underneath where it says, No problem on

3    trip coverage, does it show how that email was sent?

4    A.   Yes.   It was sent by GoodLink.

5              MR. STRADER:   No further questions, Your Honor.

6              THE COURT:   All right.   Thank you, sir.   You may step

7    down.   Thank for your appearance.

8              THE WITNESS:   Thank you.

9              (Testimony concluded)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an accurate

4    transcription of proceedings in the above-entitled matter.

5

6

7
     3-12-09                   /s/ Jill Michelle Hardy-Hobbs
8    -------                   --------------------------------------
      DATE                     JILL MICHELLE HARDY-HOBBS
9                              UNITED STATES COURT REPORTER
                               400 NORTH MIAMI AVENUE, SUITE 13N58
10                             MIAMI, FL  33128
                               305.523.5118
11                             jill_hardy-hobbs@flsd.uscourts.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$15,000** [2] - 18:22, 25:5
**$2.80** [2] - 17:17, 19:3
**$20,000** [3] - 17:6, 17:10
**$246** [1] - 25:12
**$28,000** [3] - 17:16, 25:6, 25:9
**$35,000** [1] - 18:15
**$45,000** [4] - 21:18, 24:14, 104:1, 120:13
**$5,000** [1] - 19:1
**$55,000** [1] - 18:14

## '

**'87** [1] - 4:6

## /

**/s** [1] - 153:7

## 0

**001** [1] - 5:24
**01** [1] - 5:24
**07-61162-Civil-Judge** [1] - 3:5
**07-CIV-61162-TORRES** [1] - 1:2
**086** [1] - 151:6
**0912** [1] - 30:9
**0913** [1] - 30:9

## 1

**1** [7] - 1:8, 5:25, 17:15, 19:23, 137:2, 142:12, 142:15
**10** [10] - 14:16, 19:25, 87:2, 87:3, 87:4, 87:7, 87:9, 129:14, 151:2
**100** [5] - 86:7, 94:18, 115:24, 116:3, 123:16
**101** [2] - 13:23, 13:24
**10:06** [1] - 133:16
**10:07** [1] - 151:24
**10:22** [1] - 152:1
**10:46** [1] - 129:23
**11** [5] - 19:10, 19:11, 20:3, 69:16
**1144** [1] - 5:24
**116** [1] - 99:5
**11th** [2] - 64:3, 64:9
**12** [1] - 4:8
**1200** [1] - 1:20
**121** [2] - 108:22,

108:24
**13N58** [2] - 2:2, 153:9
**13th** [1] - 1:14
**15** [2] - 134:8, 152:1
**150** [1] - 2:11
**15th** [9] - 9:17, 82:24, 125:25, 126:7, 126:16, 133:16, 150:16, 150:17, 150:18
**177** [2] - 9:16, 9:19
**187a** [1] - 133:8
**188e** [1] - 135:3
**18th** [5] - 128:1, 128:9, 128:13, 128:18, 128:20
**1970** [2] - 5:6, 5:7
**1973** [1] - 4:5
**1986** [1] - 144:24
**1987** [7] - 33:16, 37:12, 144:22, 144:24, 145:4, 145:5, 145:6
**1988** [1] - 144:24
**1998** [1] - 4:10
**19th** [1] - 151:23
**1:20** [1] - 98:22
**1:22** [2] - 129:7, 129:10
**1st** [4] - 28:12, 28:19, 28:21, 28:23

## 2

**2** [6] - 17:10, 17:12, 17:13, 17:14, 142:12, 142:15
**2-15-2007** [1] - 10:22
**20** [3] - 55:7, 76:16, 105:4
**20,000** [1] - 18:15
**20-year-old** [2] - 76:1, 76:5
**200** [1] - 1:14
**2007** [14] - 9:17, 101:18, 104:13, 105:9, 109:13, 128:25, 133:16, 135:21, 135:22, 150:18, 150:21, 151:20, 151:23
**2009** [1] - 1:7
**206.224.5657** [1] - 1:21
**206.224.5659** [1] - 1:21
**212** [3] - 14:9, 101:9, 103:7
**22nd** [5] - 46:13,

101:23, 104:13, 105:9, 109:13
**23** [2] - 84:19, 85:2
**23rd** [1] - 105:19
**25** [1] - 4:8
**25-percent** [1] - 18:22
**255** [1] - 91:4
**256** [1] - 91:4
**257** [1] - 91:4
**26th** [1] - 47:20
**27th** [4] - 128:25, 129:5, 129:10, 129:18
**28th** [1] - 151:20
**29** [1] - 54:10
**2nd** [4] - 132:4, 132:5, 132:6, 134:1

## 3

**3** [3] - 2:9, 69:16, 131:15
**3-12-09** [1] - 153:7
**3-23-07** [1] - 105:13
**3-26** [1] - 30:6
**30** [5] - 1:7, 54:13, 54:15, 54:20, 79:17
**30(b)(6)** [1] - 33:22
**305.274.6881** [1] - 1:24
**305.274.8786** [1] - 1:24
**305.523.5118** [2] - 2:3, 153:10
**305.945.6250** [1] - 1:16
**31** [3] - 121:24, 121:25, 122:4
**33** [1] - 2:9
**33128** [2] - 2:2, 153:10
**33143-6663** [1] - 1:23
**33316** [1] - 1:15
**35** [1] - 4:3
**36** [1] - 4:3
**3:46** [1] - 105:16
**3:57** [1] - 105:9
**3rd** [1] - 126:19

## 4

**4** [6] - 17:5, 18:16, 18:18, 19:3, 19:22
**400** [3] - 2:2, 5:25, 153:9
**44** [7] - 124:8, 124:9, 127:11, 127:14, 127:18, 127:20, 127:22

**45** [5] - 43:23, 124:8, 124:9, 127:11, 127:17
**499** [1] - 131:2
**4:15** [1] - 104:13
**4:28** [1] - 151:20
**4TH** [1] - 1:4

## 5

**5** [8] - 17:19, 18:13, 19:6, 19:8, 19:11, 19:24
**51** [1] - 2:10
**58** [6] - 83:2, 83:6, 83:7, 83:12, 84:19, 84:25
**59** [7] - 83:2, 83:6, 83:7, 83:12, 84:17, 86:23
**5th** [1] - 28:14

## 6

**6** [1] - 16:15
**6-27** [1] - 133:17
**60** [4] - 83:7, 83:12, 84:17, 86:23
**600** [1] - 1:19
**61** [4] - 2:10, 68:23, 69:16, 78:23
**644** [1] - 133:8
**645** [1] - 133:8
**65** [3] - 122:23, 123:7, 123:8
**66** [1] - 128:5
**67** [2] - 59:22, 67:14
**69** [2] - 59:22, 115:7

## 7

**70** [2] - 141:18, 141:20
**71** [4] - 132:3, 132:9, 132:11, 132:13
**72** [3] - 129:13, 134:20, 134:21
**75** [2] - 59:13, 59:17
**79** [1] - 83:5

## 8

**8** [1] - 25:15
**814** [2] - 69:20, 69:22
**82nd** [1] - 1:23
**83** [1] - 30:8
**8522** [1] - 1:23
**86** [3] - 59:13, 59:17, 87:5
**8:48** [1] - 1:7

## 9

**954.763.5020** [1] - 1:15
**954.763.5412** [1] - 1:16
**98101** [1] - 1:20
**9:40** [1] - 105:19
**9th** [3] - 13:17, 135:21, 135:22

## A

**a.m** [5] - 1:7, 105:19, 129:23, 133:16, 151:24
**ability** [2] - 8:12, 41:11
**able** [3] - 53:7, 94:11, 146:3
**above-entitled** [1] - 153:4
**abrogate** [1] - 111:2
**absent** [1] - 141:5
**Absolutely** [6] - 8:20, 15:4, 16:10, 55:6, 79:24, 112:18
**accept** [7] - 6:20, 6:21, 6:22, 23:11, 62:13, 79:22, 136:3
**accepts** [1] - 23:11
**access** [4] - 19:6, 47:6, 47:7, 61:21
**accommodated** [1] - 95:13
**according** [3] - 54:6, 54:18, 112:19
**account** [2] - 47:20, 54:14
**accounting** [1] - 117:1
**accounts** [1] - 38:14
**accurate** [11] - 69:5, 96:15, 97:4, 97:5, 135:17, 146:21, 146:24, 147:5, 147:14, 147:18, 153:3
**accurately** [1] - 72:17
**acknowledge** [1] - 128:4
**act** [6] - 7:2, 7:6, 43:14, 56:4, 58:2, 58:3
**acted** [4] - 43:24, 56:16, 56:22, 57:21
**acting** [1] - 63:13
**action** [2] - 23:6, 43:5, 43:6, 45:2, 47:14, 125:20, 139:18

**actions** [3] - 47:19, 51:15, 67:8
**activities** [3] - 8:12, 56:11, 142:1
**activity** [1] - 53:10
**actual** [3] - 36:22, 96:22, 121:6
**added** [1] - 22:17
**addition** [3] - 4:22, 14:15, 79:22
**additional** [13] - 9:14, 18:16, 19:8, 59:12, 59:14, 59:16, 60:8, 63:12, 106:2, 106:4, 120:11, 128:1, 146:16
**address** [5] - 11:14, 43:4, 55:24, 145:16, 147:12
**addressed** [3] - 10:17, 83:16, 90:4
**addresses** [1] - 25:7
**addressing** [1] - 85:20
**adequate** [3] - 6:24, 39:6, 48:2
**adhere** [1] - 51:17
**adhered** [1] - 89:2
**adjusted** [3] - 33:10, 33:13, 33:15
**adjuster** [9] - 33:6, 33:7, 34:12, 34:14, 35:9, 35:10, 35:12, 35:16, 53:23
**adjuster's** [1] - 35:2
**adjusting** [1] - 39:2
**adjustment** [8] - 34:12, 34:18, 35:2, 35:17, 35:20, 35:21, 35:24, 35:25
**admissible** [1] - 12:5
**advise** [6] - 55:19, 62:20, 62:23, 63:1, 133:17, 148:24
**advised** [7] - 73:21, 82:24, 96:15, 126:2, 126:8, 126:21
**advising** [3] - 65:9, 90:6, 97:24
**advocating** [1] - 97:14
**affect** [3] - 29:21, 62:13, 138:5
**affected** [1] - 46:12
**affects** [1] - 32:8
**affidavit** [3] - 6:4, 20:19, 21:13
**affirmatively** [3] - 64:11, 67:15, 71:4
**afford** [1] - 68:18

**afforded** [1] - 109:22
**Africa** [2] - 118:2, 119:9
**afternoon** [1] - 61:10
**afterwards** [1] - 95:8
**age** [2] - 76:3, 85:22
**agency** [3] - 8:8, 8:11
**agent** [22] - 8:25, 56:3, 65:21, 65:23, 70:13, 72:2, 72:14, 72:17, 80:3, 96:9, 96:10, 96:12, 96:25, 108:14, 126:1, 126:21, 127:5, 142:25, 143:5, 144:7, 146:1
**agents** [1] - 70:20
**agree** [11] - 47:12, 66:25, 73:8, 75:3, 75:16, 83:20, 85:19, 98:12, 106:5, 123:17, 123:19
**agreed** [11] - 54:14, 88:12, 89:7, 97:25, 105:20, 105:23, 106:11, 110:11, 126:10, 126:22
**agreement** [49] - 8:18, 8:19, 13:7, 13:11, 22:10, 45:17, 45:19, 46:20, 48:11, 82:14, 82:17, 82:19, 83:19, 86:13, 105:10, 105:25, 107:23, 108:16, 109:21, 109:25, 110:1, 110:2, 110:3, 110:5, 110:9, 110:14, 110:16, 110:19, 110:22, 110:23, 111:1, 111:2, 111:4, 115:12, 115:15, 116:8, 116:15, 117:24, 118:8, 118:12, 118:14, 118:16, 118:20, 118:23, 119:7, 119:14, 119:25, 131:17
**agreements** [3] - 46:19, 108:17, 111:15
**ahead** [15] - 14:23, 22:12, 24:8, 38:22, 50:19, 50:21, 55:20, 60:24, 61:7, 65:4, 98:21, 102:1, 119:22, 121:9
**all-encompassing** [1] - 96:21
**all-inclusive** [1] -

120:13
**allegations** [1] - 57:23
**allege** [1] - 110:25
**allow** [2] - 41:24, 50:23
**allowed** [3] - 41:6, 41:22, 77:14
**allows** [1] - 60:13
**amend** [1] - 131:18
**amended** [1] - 5:19
**amendment** [2] - 129:1, 133:18
**American** [2] - 4:16, 4:19
**amount** [2] - 19:12, 95:11
**amounts** [1] - 39:3
**analyze** [1] - 72:8
**Andre** [1] - 129:21
**annual** [2] - 24:23, 25:1
**answer** [31] - 10:10, 14:5, 24:7, 26:21, 27:16, 47:24, 65:11, 67:24, 67:25, 68:1, 69:3, 73:18, 75:8, 75:9, 89:22, 101:2, 101:13, 102:2, 111:3, 111:4, 113:7, 117:6, 117:20, 118:6, 128:12, 136:2, 138:24, 139:13, 143:15, 145:2, 146:12
**Answer** [2] - 69:5, 69:6
**answered** [17] - 6:18, 16:14, 73:17, 75:5, 85:5, 101:2, 102:24, 103:6, 106:19, 110:25, 113:9, 117:4, 118:12, 119:21, 121:9, 140:14, 145:1
**answers** [1] - 5:19
**anytime** [2] - 19:20, 65:7
**anyway** [2] - 39:2, 119:21
**Anzhela** [10] - 3:4, 3:11, 3:12, 6:4, 13:8, 13:12, 16:7, 145:15, 145:17, 145:25
**ANZHELA** [1] - 1:7
**apologize** [6] - 4:18, 41:20, 86:6, 114:10, 133:6, 150:18
**appearance** [1] - 152:7
**APPEARANCES** [1] - 1:12

**appearances** [1] - 3:6
**Application** [1] - 93:18
**application** [69] - 6:7, 10:23, 10:24, 11:3, 11:5, 15:15, 16:18, 16:21, 35:7, 42:11, 46:17, 48:17, 56:17, 63:6, 66:10, 67:9, 67:11, 69:19, 69:22, 71:3, 71:24, 72:10, 72:18, 72:25, 73:1, 73:9, 73:13, 73:15, 75:6, 75:7, 78:15, 79:14, 79:22, 80:12, 91:22, 91:24, 92:2, 92:5, 92:8, 92:11, 92:14, 92:22, 93:14, 93:17, 93:21, 93:25, 94:4, 94:6, 95:24, 96:4, 96:5, 97:24, 102:10, 108:15, 115:8, 115:19, 115:22, 115:23, 116:2, 116:11, 125:13, 125:15, 125:17, 125:18, 144:22, 145:6, 145:12, 146:7
**applications** [1] - 108:8
**applied** [1] - 42:10
**applies** [1] - 64:20
**apply** [4] - 26:8, 29:19, 60:16, 61:24
**appreciate** [1] - 104:6
**approved** [1] - 54:12
**approves** [1] - 23:6
**approximate** [1] - 19:10
**April** [1] - 128:10
**area** [15] - 33:18, 60:3, 60:10, 84:4, 84:6, 85:23, 86:2, 86:3, 120:25, 121:16, 122:7, 122:9, 123:13, 123:14, 137:20
**areas** [2] - 84:9, 91:24
**argue** [3] - 70:24, 71:11, 73:2
**arguing** [2] - 45:25, 48:12
**argumentative** [2] - 69:9, 71:8
**array** [1] - 7:14
**ascertain** [1] - 135:23

**aside** [2] - 45:12, 125:21
**asserted** [1] - 44:13
**assertion** [3] - 46:15, 73:22, 74:1
**assess** [1] - 139:19
**assessed** [3] - 33:10, 33:13, 33:15
**assessing** [1] - 141:3
**assessment** [4] - 34:10, 66:9, 73:4, 148:16
**associate** [1] - 4:15
**associated** [2] - 34:5, 102:23
**assume** [5] - 66:16, 66:17, 77:8, 81:25, 96:19
**assumes** [1] - 92:20
**assumption** [1] - 75:25
**assured** [8] - 63:24, 87:24, 88:9, 91:11, 111:19, 120:5, 120:10, 141:24
**asterisk** [1] - 109:23
**Atlantic** [62] - 30:2, 30:5, 30:24, 32:8, 32:10, 52:3, 52:10, 86:18, 90:2, 90:14, 90:16, 90:20, 90:21, 92:2, 93:15, 93:23, 95:17, 95:20, 99:16, 99:21, 100:2, 100:5, 100:7, 100:10, 100:25, 101:6, 102:24, 103:2, 103:17, 104:9, 106:16, 106:18, 106:23, 109:20, 109:22, 109:25, 110:14, 111:16, 111:20, 111:22, 112:3, 112:9, 112:15, 116:7, 116:8, 116:13, 116:14, 116:16, 117:9, 117:17, 117:24, 117:25, 118:23, 119:2, 119:3, 120:11, 120:16, 121:1, 122:10, 123:17, 125:7
**Atlantic-coast** [1] - 102:24
**attached** [9] - 10:4, 10:14, 10:16, 11:2, 68:4, 73:14, 93:19, 108:6, 134:1
**attachment** [7] -

16:21, 54:13, 54:15, 54:20, 74:4, 79:17, 101:20
**attachments** [2] - 68:11, 68:13
**attempt** [1] - 52:11
**attention** [4] - 31:13, 55:5, 128:6, 132:4
**August** [4] - 67:9, 114:7, 114:8, 133:16
**authored** [1] - 78:8
**authority** [7] - 8:9, 8:10, 8:12, 8:14, 8:15, 10:6, 60:1
**auto** [1] - 67:7
**automatic** [2] - 60:9, 84:3
**automobile** [2] - 7:21, 8:1
**available** [2] - 21:6, 53:18
**AVENUE** [1] - 153:9
**Avenue** [1] - 2:2
**avoid** [2] - 34:4, 58:17
**aware** [46] - 12:15, 12:25, 24:11, 24:12, 30:1, 30:21, 50:13, 51:20, 51:23, 51:24, 58:21, 60:22, 61:23, 62:2, 62:9, 62:10, 64:9, 64:17, 64:25, 65:6, 65:20, 76:15, 76:18, 77:2, 77:22, 77:23, 80:6, 88:2, 88:5, 88:23, 98:3, 100:9, 106:13, 107:25, 108:2, 112:2, 112:9, 118:24, 125:11, 125:13, 125:21, 126:1, 126:8, 128:2, 134:10, 142:24

## B

**background** [2] - 4:13, 61:14
**bad** [15] - 31:22, 36:13, 36:16, 36:18, 37:22, 38:2, 39:17, 40:18, 44:9, 44:14, 44:18, 45:1, 46:15, 56:7, 68:19
**bad-faith** [8] - 36:13, 37:22, 38:2, 39:17, 40:18, 44:9, 44:18, 56:7
**balancing** [2] - 7:1, 7:6
**base** [5] - 26:13,

79:10, 117:11, 117:14
**based** [25] - 22:25, 25:8, 25:10, 28:2, 39:9, 49:14, 52:9, 52:23, 68:22, 78:18, 81:13, 89:21, 94:1, 100:7, 100:10, 101:5, 102:21, 106:14, 112:6, 120:15, 120:21, 120:22, 135:17, 138:23
**Based** [4] - 82:7, 129:8, 136:23, 139:3
**basics** [1] - 59:1
**basis** [9] - 21:21, 21:22, 22:18, 23:15, 31:16, 31:17, 43:9, 44:2, 47:13
**Beach** [1] - 50:18
**became** [1] - 73:14
**become** [3] - 126:9, 126:22
**becomes** [3] - 26:7, 90:2, 148:15
**BEFORE** [1] - 1:10
**begin** [2] - 60:25, 61:6
**beginning** [3] - 33:16, 120:18, 125:4
**behalf** [5] - 3:9, 3:10, 3:11, 20:6, 65:24
**behavior** [1] - 47:15
**behaviors** [1] - 49:14
**belief** [1] - 40:1
**believes** [2] - 39:4, 97:24
**belongs** [3] - 145:12, 145:13, 145:14
**below** [1] - 132:20
**BENCH** [1] - 1:10
**benefit** [1] - 33:18
**best** [2] - 79:15, 139:22
**between** [20] - 7:18, 11:7, 35:23, 49:23, 51:21, 82:20, 87:13, 87:15, 94:22, 96:8, 97:8, 97:9, 97:22, 97:23, 99:10, 102:18, 104:22, 112:7, 116:22, 117:1
**beyond** [7] - 20:15, 104:11, 114:25, 115:2, 141:8, 141:12, 143:14
**bilge** [1] - 148:19, 148:21
**bind** [20] - 8:14, 15:19, 15:21, 15:22, 60:1, 104:22, 105:1,

105:5, 105:6, 105:8, 105:10, 105:12, 105:20, 105:23, 105:25, 106:11, 107:23, 110:11, 110:14
**binder** [24] - 97:23, 106:22, 106:24, 107:2, 107:6, 107:10, 107:13, 107:16, 107:18, 107:20, 107:25, 108:5, 108:12, 108:14, 115:17, 121:23, 123:20, 123:21, 125:1, 131:6, 131:12, 131:13, 132:24
**binding** [15] - 8:15, 8:18, 16:19, 60:14, 65:16, 86:13, 96:1, 103:25, 106:17, 129:3, 130:11, 130:13, 133:19, 133:24, 141:2
**Birmingham** [1] - 10:17
**bit** [1] - 61:13
**black** [1] - 75:20
**Blackberry** [1] - 88:20
**bled** [1] - 41:3
**boat** [16] - 60:18, 74:13, 85:13, 86:13, 89:14, 89:18, 90:6, 112:19, 113:23, 114:12, 116:15, 124:18, 124:20, 144:22, 145:12, 145:13
**boats** [2] - 74:10, 113:15
**Boats** [1] - 112:16
**boatyard** [1] - 144:23
**Bob** [2] - 14:10, 14:11
**boss** [2] - 37:2, 58:16
**bothered** [1] - 134:5
**Bottom** [1] - 144:1
**bottom** [4] - 46:11, 142:11, 151:4, 151:18
**bound** [3] - 106:15, 108:16, 121:4
**box** [1] - 23:10
**breach** [14] - 44:17, 44:24, 44:25, 137:10, 137:12, 137:15, 137:17, 137:20, 138:16, 139:5, 140:6, 140:18, 140:23, 141:6

**breached** [1] - 137:14
**breaches** [6] - 114:12, 114:13, 114:14, 114:16, 137:23, 141:4
**break** [2] - 60:25, 98:22
**Break** [1] - 61:3
**brief** [1] - 6:5
**bring** [7] - 18:9, 48:5, 49:7, 49:9, 63:9, 84:3, 84:8
**brings** [1] - 9:11
**broad** [1] - 121:18
**Broker** [1] - 65:22
**broker** [20] - 8:22, 8:24, 9:2, 11:20, 16:7, 16:16, 32:1, 41:7, 42:5, 43:24, 43:25, 57:1, 88:9, 111:20, 116:6, 116:9, 116:22, 146:7, 151:7, 151:9
**broker's** [2] - 15:18, 146:21
**brokering** [1] - 42:2
**brokers** [1] - 9:6
**brought** [5] - 47:14, 48:22, 63:8, 85:8, 89:12
**Broward** [1] - 1:15
**building** [1] - 8:5
**built** [5] - 144:22, 144:24, 144:4, 145:5, 145:6
**bummed** [1] - 147:25
**business** [10] - 7:5, 7:6, 9:10, 9:11, 9:12, 71:17, 76:15, 76:20, 77:3, 108:20
**BY** [65] - 2:1, 3:25, 10:13, 12:13, 12:19, 14:25, 16:6, 24:10, 29:16, 30:15, 33:4, 37:21, 51:3, 52:25, 56:14, 57:20, 58:19, 61:9, 64:19, 65:5, 68:12, 69:14, 71:23, 72:13, 73:19, 76:8, 77:1, 77:19, 81:1, 82:6, 87:12, 88:17, 93:13, 93:24, 96:24, 97:21, 99:3, 100:1, 101:16, 106:21, 107:5, 111:6, 113:21, 115:6, 117:10, 118:18, 119:23, 121:11, 122:1, 122:11, 123:11, 132:16, 134:9, 135:1,

136:22, 138:11, 139:2, 140:4, 140:16, 141:17, 143:22, 146:20, 149:8, 150:11, 151:17

## C

**Cairns** [2] - 47:3
**calculated** [1] - 101:5
**calculation** [1] - 100:7
**cannot** [6] - 63:22, 66:15, 68:16, 76:13, 120:4, 133:4
**capable** [3] - 42:3, 112:21, 112:22
**captain** [1] - 119:8
**Captain** [13] - 9:23, 66:13, 68:6, 70:1, 70:2, 86:18, 89:5, 91:12, 96:3, 97:5, 97:7, 97:8, 97:10
**car** [1] - 8:2
**cardinal** [1] - 6:25
**care** [2] - 96:8, 140:22
**carrier** [4] - 9:13, 20:2, 148:1, 148:3
**carry** [2] - 10:1, 11:7
**case** [44] - 3:4, 3:17, 11:16, 12:25, 20:2, 23:18, 24:5, 24:6, 38:2, 38:5, 39:10, 39:17, 40:8, 44:20, 45:14, 47:16, 52:8, 56:7, 56:8, 60:10, 60:11, 63:4, 63:5, 64:15, 64:17, 64:20, 73:4, 75:23, 80:16, 86:11, 92:14, 97:11, 98:19, 120:2, 136:20, 137:18, 139:12, 139:16, 141:9, 141:10, 147:1, 147:10, 147:19
**CASE** [1] - 1:2
**Case** [1] - 3:5
**cases** [3] - 36:13, 37:22, 131:17
**casualty** [4] - 5:1, 5:3, 35:12, 35:14
**category** [1] - 6:2
**caused** [2] - 135:23, 139:8
**causes** [1] - 140:8
**cents** [9] - 18:17, 19:4, 19:10, 19:11, 19:12, 20:3, 20:4

**certain** [4] - 6:20, 74:20, 96:14, 142:1
**Certainly** [4] - 62:1, 68:2, 69:15, 93:11
**certainly** [2] - 45:3, 102:19
**certificate** [25] - 4:16, 4:23, 9:25, 10:5, 11:1, 12:20, 13:1, 55:15, 55:17, 55:18, 57:7, 57:9, 57:11, 57:13, 63:7, 63:8, 66:10, 66:17, 66:25, 67:22, 68:8, 73:7, 77:18, 81:6, 81:10
**Certificate** [1] - 55:22
**certification** [3] - 149:1, 149:5, 149:6
**certifications** [1] - 4:14
**certified** [6] - 10:1, 11:6, 143:1, 143:7, 144:3, 149:1
**Certified** [1] - 4:22
**certify** [1] - 153:3
**chain** [2] - 101:9, 151:22
**Challenge** [1] - 41:12
**challenging** [1] - 32:25
**change** [19] - 94:23, 95:1, 95:10, 98:9, 101:22, 127:20, 128:1, 129:9, 130:10, 130:16, 139:17, 145:16, 145:24, 147:22, 148:1, 148:2, 148:9, 148:11, 148:14
**changed** [3] - 127:23, 130:2, 142:16
**changes** [7] - 110:4, 124:25, 127:11, 128:14, 128:17, 142:9, 146:17
**changing** [3] - 124:23, 130:5, 130:12
**characteristic** [1] - 85:19
**characteristics** [3] - 6:16, 61:20, 75:21
**charge** [1] - 60:8
**charged** [2] - 19:11, 24:12
**charging** [1] - 19:12
**Charles** [1] - 3:10
**CHARLES** [1] - 1:18
**charles@ harrismoure.com** [1] - 1:21

**chartered** [2] - 4:24, 5:1
**check** [3] - 59:3, 134:5, 144:23
**checking** [2] - 91:9, 91:10
**checklist** [4] - 141:21, 141:25, 142:6, 142:8
**checkmark** [3] - 123:1, 123:12, 123:13
**checkmarks** [2] - 122:18, 122:24
**chief** [2] - 58:20, 70:17
**Childress** [1] - 36:17
**choose** [1] - 11:15
**chose** [4] - 21:7, 43:10, 79:4, 145:20
**Chris** [1] - 3:8
**chris.fertig@fertig. com** [1] - 1:17
**CHRISTOPHER** [1] - 1:13
**CIC** [1] - 35:6
**Circuit** [1] - 64:3
**Circuit's** [1] - 64:9
**circumstance** [1] - 28:3
**circumstances** [1] - 73:12
**CIVIL** [1] - 1:10
**Claim** [1] - 48:24
**claim** [63] - 22:15, 22:16, 23:12, 24:3, 24:15, 32:23, 33:10, 34:14, 34:24, 36:2, 36:8, 36:10, 36:20, 36:25, 37:16, 38:25, 39:2, 40:1, 40:18, 42:14, 42:16, 42:20, 42:22, 42:23, 43:1, 43:10, 43:12, 44:1, 44:14, 44:18, 44:20, 45:11, 45:18, 46:9, 48:24, 49:2, 49:3, 51:4, 51:5, 51:9, 51:20, 51:22, 52:1, 52:22, 53:2, 53:7, 53:10, 53:11, 53:17, 54:5, 54:6, 55:2, 55:20, 56:4, 56:11, 56:16, 56:19, 57:18, 57:25, 125:8, 125:11, 135:9, 141:3
**claim-handling** [1] - 36:25
**claimant** [1] - 5:19
**Claims** [4] - 35:20, 35:21, 36:1, 53:7

**claims** [82] - 5:25, 7:4, 22:21, 31:5, 31:6, 31:7, 31:10, 31:14, 32:8, 33:5, 33:6, 33:7, 33:8, 33:13, 33:15, 33:17, 33:19, 33:23, 34:1, 34:9, 34:11, 34:12, 34:18, 34:20, 34:22, 34:23, 35:2, 35:16, 35:17, 35:18, 35:21, 35:23, 35:25, 36:2, 36:10, 36:21, 37:6, 37:13, 37:14, 38:24, 39:6, 39:7, 39:10, 39:11, 39:14, 39:24, 40:8, 40:12, 40:21, 40:22, 40:25, 41:14, 42:1, 42:8, 43:1, 44:7, 47:15, 47:19, 48:6, 49:17, 49:22, 49:24, 50:7, 51:9, 51:21, 51:25, 53:9, 53:12, 53:14, 53:21, 53:23, 53:24, 54:1, 55:25, 56:1, 58:17, 125:3, 125:4, 126:4, 149:18
**claims-handling** [10] - 40:12, 40:21, 42:8, 44:7, 50:7, 51:9, 51:21, 54:1, 55:25, 56:1
**claims-litigation** [1] - 33:17
**clarification** [1] - 145:18
**clarify** [3] - 63:12, 65:20, 138:22
**clarity** [1] - 122:2
**clause** [18] - 24:21, 25:7, 25:8, 25:11, 26:8, 29:23, 59:6, 59:14, 59:15, 59:16, 60:16, 60:20, 139:6, 140:19, 141:1, 141:5, 141:15
**clauses** [1] - 37:19
**clear** [23] - 9:22, 23:24, 24:25, 32:7, 46:2, 47:17, 48:4, 49:4, 54:4, 55:16, 55:24, 68:5, 68:7, 84:5, 92:21, 96:7, 97:22, 101:3, 101:17, 101:22, 102:25, 150:19
**clearly** [10] - 22:14, 30:24, 40:11, 45:8, 50:9, 70:3, 90:20, 97:14, 100:24, 140:14

**client** [1] - 43:14
**close** [1] - 49:11
**Club** [1] - 136:17
**club** [1] - 136:17
**Co** [1] - 1:22
**Co-Counsel** [1] - 1:22
**coast** [33] - 30:2, 83:11, 83:22, 83:23, 83:24, 89:18, 90:14, 90:16, 90:20, 90:21, 92:2, 93:15, 94:18, 99:22, 100:2, 100:5, 102:24, 104:9, 106:16, 109:20, 112:9, 112:15, 115:13, 116:3, 116:13, 116:14, 118:22, 118:23, 119:3, 119:10, 122:10, 125:7
**Coast** [10] - 10:1, 11:6, 63:2, 65:9, 65:12, 65:15, 65:18, 67:21, 81:5, 149:6
**COI** [59] - 11:1, 11:4, 11:17, 11:22, 11:23, 11:24, 55:22, 66:21, 67:11, 68:21, 69:4, 69:18, 69:24, 70:10, 70:21, 71:4, 73:9, 73:10, 73:22, 73:25, 74:1, 74:4, 74:6, 74:10, 75:7, 75:25, 76:20, 77:4, 77:7, 78:8, 78:12, 78:14, 78:17, 78:23, 79:2, 79:7, 79:11, 79:13, 79:14, 79:20, 79:25, 80:2, 80:5, 80:9, 80:11, 80:12, 80:13, 80:15, 80:20, 81:2, 81:3, 81:12, 82:2, 142:23, 142:24, 145:10, 147:11
**collect** [1] - 6:13
**college** [1] - 5:4
**collision** [1] - 17:8
**combination** [1] - 56:4
**combined** [1] - 57:15
**coming** [3] - 16:2, 65:8, 90:12
**comment** [9] - 11:3, 11:6, 19:14, 66:24, 70:24, 71:2, 112:4, 120:20, 132:21
**commented** [1] - 100:23
**comments** [4] -

16:24, 16:25, 71:20, 119:5
**commercial** [10] - 7:23, 12:21, 38:11, 38:13, 61:15, 76:18, 77:3, 77:20, 77:21, 81:3
**common** [3] - 6:10, 12:4, 55:6
**communicating** [1] - 22:21
**communication** [2] - 46:10, 95:22
**communications** [5] - 51:22, 88:25, 95:21, 102:14, 102:17
**companies** [5] - 5:13, 17:12, 33:13, 70:16, 100:15
**company** [44] - 4:10, 4:11, 7:3, 8:7, 9:4, 20:23, 21:19, 23:5, 23:9, 23:20, 23:21, 25:11, 25:22, 29:5, 29:8, 30:20, 33:22, 39:25, 40:20, 44:1, 46:1, 46:11, 49:21, 51:11, 51:14, 51:17, 53:1, 53:3, 55:14, 55:20, 56:18, 56:25, 57:14, 57:21, 60:5, 60:6, 60:7, 62:9, 62:20, 67:8, 116:24, 146:6, 147:24
**Company** [4] - 3:4, 5:18, 20:9, 56:3
**COMPANY** [1] - 1:3
**company's** [3] - 44:6, 45:2, 45:10
**Company's** [1] - 6:1
**compare** [1] - 108:15
**compartments** [2] - 114:18, 114:19
**complaint** [1] - 5:18
**complete** [6] - 20:19, 49:5, 67:24, 72:17, 72:22, 83:23
**completed** [7] - 54:16, 55:1, 66:13, 66:25, 68:22, 73:2, 135:18
**compliance** [7] - 4:7, 4:9, 37:5, 37:11, 37:12, 38:13, 55:13
**compliment** [1] - 85:19
**complying** [1] - 51:19
**comprehensive** [1] - 70:18

**concealment** [1] - 72:21

**concede** [1] - 110:5

**concern** [3] - 47:23, 50:21, 90:3

**concerned** [4] - 8:1, 8:2, 8:3, 8:4

**concluded** [1] - 152:9

**conclusion** [10] - 15:24, 16:3, 20:14, 26:9, 36:3, 64:14, 68:17, 138:19, 141:8

**condition** [12] - 25:15, 54:10, 54:12, 76:2, 85:23, 112:20, 119:24, 137:3, 137:6, 139:8, 147:15, 147:23

**condition-and-valuation** [1] - 54:12

**conditions** [8] - 25:13, 25:14, 25:15, 49:15, 98:4, 118:7, 118:19, 137:2

**conduct** [1] - 22:21

**configuration** [1] - 85:13

**confined** [1] - 123:15

**confirm** [1] - 108:16

**confirmation** [12] - 15:19, 81:2, 91:15, 105:10, 107:24, 108:3, 108:8, 109:2, 109:10, 109:19, 109:23, 121:12

**confirming** [5] - 87:25, 88:4, 89:9, 106:17, 122:21

**conflict** [3] - 11:7, 11:9, 11:16

**conflicting** [11] - 11:13, 11:21, 55:21, 55:23, 67:3, 73:15, 78:5, 81:11, 145:7, 145:9, 146:16

**confusing** [1] - 26:7

**conjunction** [3] - 4:18, 4:19, 131:5

**connection** [2] - 45:2, 45:11

**consequence** [1] - 11:15

**consider** [3] - 15:6, 77:5, 94:1

**consideration** [2] - 103:12, 103:17

**considered** [6] - 24:24, 25:1, 25:2, 76:21, 99:6, 138:6

**considering** [1] -

55:4

**consistent** [3] - 108:7, 108:17, 110:7

**consists** [1] - 109:1

**constructive** [7] - 25:17, 26:12, 27:7, 29:6, 29:12, 29:24, 54:22

**consulting** [1] - 4:11

**contact** [3] - 9:13, 36:7, 123:22

**contacted** [1] - 124:4

**contacts** [1] - 9:10

**contain** [1] - 144:2

**contained** [10] - 10:3, 10:4, 84:18, 90:17, 90:18, 109:6, 109:8, 137:10, 139:6, 140:19

**contains** [1] - 14:9

**contend** [3] - 44:14, 110:10, 110:11

**contesting** [2] - 48:9, 48:10

**continually** [1] - 70:25

**continue** [4] - 34:3, 76:5, 116:10, 146:2

**continued** [2] - 2:10

**CONTINUED** [1] - 51:2

**continues** [1] - 137:24

**Continuing** [1] - 99:1

**contract** [10] - 26:25, 44:18, 46:1, 51:16, 51:17, 54:7, 54:18, 79:17, 87:16, 120:8

**contracts** [1] - 8:7

**contradict** [2] - 80:4, 80:7

**contrary** [2] - 72:25

**contributed** [1] - 139:8

**contributes** [1] - 140:8

**conversation** [37] - 14:4, 70:1, 78:25, 82:22, 82:23, 83:8, 83:9, 83:10, 83:20, 84:11, 86:12, 86:22, 86:23, 86:25, 87:15, 88:4, 88:6, 88:19, 88:21, 89:11, 90:5, 90:7, 90:18, 90:19, 91:19, 92:9, 95:23, 110:12, 110:13, 110:16, 111:12, 117:1, 117:20, 120:17, 132:1,

133:22, 134:16

**conversations** [14] - 82:20, 85:22, 87:13, 93:19, 98:3, 99:20, 102:19, 109:14, 109:17, 110:19, 111:7, 111:9, 111:10, 112:7

**copy** [5] - 70:9, 73:7, 79:25, 80:12, 122:24

**corner** [3] - 63:22, 142:11, 151:4

**corporate** [2] - 96:22, 96:23

**correct** [81] - 5:7, 5:14, 13:21, 27:18, 43:13, 47:11, 55:1, 56:22, 64:6, 65:21, 66:9, 67:12, 67:13, 68:14, 72:18, 73:16, 74:11, 74:17, 75:13, 82:15, 82:16, 84:12, 89:15, 89:25, 90:9, 91:1, 91:6, 91:7, 91:18, 91:23, 92:1, 92:4, 92:6, 92:7, 93:23, 94:5, 94:9, 95:14, 95:23, 96:11, 96:13, 97:6, 97:8, 101:19, 102:8, 102:12, 102:16, 104:20, 105:6, 105:22, 106:12, 108:18, 109:4, 109:18, 115:13, 115:22, 115:25, 116:1, 116:19, 121:6, 122:8, 122:14, 122:19, 122:21, 122:22, 126:18, 127:5, 127:6, 127:12, 127:20, 128:10, 128:15, 128:16, 128:22, 131:6, 131:12, 134:21, 135:11, 135:18, 150:25, 151:23

**Correct** [34] - 10:20, 27:15, 28:22, 30:18, 43:14, 47:1, 51:7, 65:25, 66:2, 66:5, 67:10, 72:1, 74:15, 74:18, 74:23, 89:2, 94:3, 95:12, 97:2, 99:9, 99:13, 108:21, 115:18, 124:21, 127:21, 128:13, 129:19, 129:21, 130:20, 130:22, 132:12, 150:22,

151:8, 151:11

**corrected** [1] - 131:11

**correction** [1] - 124:6

**corrections** [2] - 37:9, 142:10

**correctly** [4] - 54:21, 55:11, 73:2, 148:4

**correspondence** [4] - 95:15, 124:22, 131:7, 134:2

**cost** [2] - 27:2, 121:5

**counsel** [2] - 51:1, 107:1

**Counsel** [2] - 1:22, 3:6

**Counselor** [2] - 129:25, 150:3

**counter** [1] - 5:19

**counter-claimant** [1] - 5:19

**counterclaims** [1] - 5:20

**couple** [2] - 117:4, 124:14

**course** [5] - 85:5, 85:6, 108:20, 135:9, 140:20

**court** [3] - 35:17, 35:18, 36:16

**COURT** [183] - 1:1, 3:13, 3:16, 10:12, 12:9, 14:5, 14:23, 15:18, 18:9, 20:17, 21:2, 21:8, 21:10, 21:15, 21:24, 22:1, 22:12, 23:14, 23:24, 24:5, 24:8, 26:15, 26:18, 26:20, 27:2, 27:9, 27:13, 27:16, 27:20, 27:24, 28:6, 28:9, 28:13, 28:15, 28:17, 28:20, 28:22, 28:24, 29:2, 29:4, 29:8, 30:12, 31:9, 32:4, 32:12, 32:14, 32:17, 32:19, 33:2, 35:23, 36:13, 36:15, 36:20, 36:24, 37:11, 37:13, 38:17, 38:19, 38:22, 39:8, 40:3, 40:5, 40:7, 41:2, 41:8, 41:13, 41:21, 42:7, 42:15, 42:17, 42:20, 43:8, 43:12, 43:16, 43:18, 43:21, 44:3, 44:5, 44:17, 45:5, 45:22, 46:2, 46:21, 46:23, 46:25, 47:2,

47:12, 47:16, 48:8, 48:15, 48:18, 49:19, 50:5, 50:15, 50:19, 50:24, 52:19, 56:9, 57:19, 58:10, 59:23, 60:24, 61:6, 64:16, 65:2, 65:4, 68:1, 69:12, 71:9, 71:21, 72:9, 72:11, 73:17, 75:9, 76:24, 77:14, 80:25, 82:5, 92:16, 92:19, 92:25, 93:4, 93:7, 93:10, 93:20, 97:18, 98:13, 98:16, 98:19, 99:1, 99:25, 101:2, 103:7, 103:10, 103:14, 103:19, 106:20, 111:3, 113:10, 113:15, 113:18, 113:20, 114:24, 115:2, 115:5, 117:6, 118:15, 119:22, 121:9, 122:4, 122:6, 123:4, 123:6, 132:11, 132:13, 134:7, 134:21, 134:23, 136:4, 136:10, 136:13, 136:15, 136:20, 138:8, 138:10, 138:22, 139:13, 139:23, 139:25, 140:3, 140:14, 141:12, 143:3, 143:15, 143:19, 145:2, 146:12, 149:4, 149:7, 149:24, 150:2, 152:6, 153:9

**Court** [17] - 2:1, 3:2, 20:15, 27:20, 27:24, 28:7, 28:18, 41:10, 42:3, 46:19, 61:4, 62:4, 77:9, 80:1, 80:5, 98:25, 139:6

**Court's** [1] - 26:3

**COURTROOM** [7] - 3:1, 3:20, 61:2, 61:4, 98:23, 98:25, 134:24

**Courts** [2] - 21:14, 23:23

**courts** [1] - 36:9

**cover** [1] - 31:2

**coverage** [133] - 8:16, 13:8, 13:12, 13:18, 13:22, 14:16, 14:19, 15:9, 15:15, 15:17, 15:21, 15:22, 15:24, 16:4, 16:19, 18:16, 19:9, 23:8, 25:24, 26:3, 27:10,

27:13, 27:17, 27:25, 28:1, 28:8, 28:9, 28:18, 28:20, 28:21, 28:23, 29:18, 29:19, 31:23, 38:5, 40:10, 45:3, 46:12, 46:23, 46:25, 47:10, 48:1, 48:11, 48:13, 48:14, 48:19, 49:1, 49:4, 52:4, 52:9, 52:12, 52:24, 53:2, 58:18, 60:1, 60:4, 60:9, 60:11, 60:14, 60:15, 65:16, 83:20, 84:3, 84:20, 86:19, 87:1, 87:19, 87:24, 88:1, 88:8, 88:10, 88:12, 89:5, 89:6, 91:12, 91:14, 91:16, 96:2, 96:4, 103:24, 104:2, 104:22, 105:12, 106:6, 106:15, 106:18, 107:24, 108:3, 108:8, 109:3, 109:10, 109:19, 109:22, 109:23, 109:25, 110:11, 110:14, 110:20, 111:13, 111:16, 111:19, 111:21, 111:25, 112:3, 112:8, 116:8, 116:9, 116:11, 117:9, 121:2, 121:3, 121:5, 121:6, 121:12, 125:10, 131:19, 137:17, 137:21, 137:22, 137:24, 138:17, 139:9, 140:9, 140:21, 141:2, 142:9, 146:4, 149:15, 152:3
 **coverages** [7] - 4:20, 37:25, 54:11, 57:22, 102:10, 106:7, 109:16
 **covered** [22] - 49:2, 49:16, 59:18, 59:19, 59:20, 59:24, 60:2, 60:16, 60:20, 85:8, 85:9, 85:16, 119:3, 137:22, 141:1, 141:5, 141:14, 149:4, 149:7
 **covers** [1] - 38:8
 **CPCU** [2] - 35:5, 35:6
 **create** [1] - 23:8
 **creation** [6] - 32:22, 40:10, 46:23, 46:25, 48:18, 48:19
 **credence** [1] - 19:14
 **credible** [2] - 81:14, 113:5
 **credit** [1] - 117:12

 **crew** [8] - 47:7, 68:9, 85:10, 85:17, 85:18, 85:21, 112:23
 **crew's** [1] - 16:12
 **critical** [2] - 63:2, 65:10
 **CRM** [1] - 4:22
 **cross** [8] - 18:10, 23:25, 33:1, 60:25, 61:7, 90:24, 98:14, 99:2
 **CROSS** [1] - 61:8
 **Cross** [1] - 2:10
 **cross-examination** [6] - 23:25, 33:1, 60:25, 61:7, 98:14, 99:2
 **CROSS-EXAMINATION** [1] - 61:8
 **crossed** [1] - 91:6
 **crossing** [2] - 118:4, 118:5
 **Cuba** [1] - 119:15, 119:16
 **Cuban** [2] - 119:17, 119:18
 **curiosity** [4] - 6:11, 55:7, 144:14
 **curious** [2] - 11:12, 63:21
 **currency** [1] - 137:6
 **current** [8] - 11:4, 66:21, 69:4, 69:18, 69:24, 73:9, 73:10, 78:23
 **customer** [1] - 54:19

## D

 **Dade** [1] - 1:16
 **daily** [1] - 36:22
 **Dale** [1] - 36:18
 **damage** [5] - 26:12, 27:21, 59:15, 148:7, 148:11
 **damages** [3] - 5:18, 36:1, 135:16
 **Dania** [2] - 83:10, 86:14
 **Darlene** [1] - 3:8
 **DARLENE** [1] - 1:13
 **DATE** [1] - 153:8
 **date** [11] - 27:22, 29:9, 65:13, 78:8, 82:22, 82:23, 105:7, 105:9, 126:16, 128:4, 135:19
 **dated** [4] - 9:17, 104:13, 134:1, 135:19

 **Daubert** [2] - 41:12, 42:4
 **days** [6] - 7:16, 25:10, 54:13, 54:15, 54:20, 79:17
 **days'** [1] - 25:11
 **deal** [2] - 29:24, 36:24
 **dealing** [2] - 39:12, 90:24
 **dealings** [5] - 81:12, 81:14, 81:16, 81:17, 81:18
 **deals** [2] - 29:24, 110:25
 **dealt** [3] - 54:8, 54:9, 139:22
 **death** [1] - 36:18
 **dec** [3] - 23:6, 43:6, 125:5
 **decades** [1] - 23:5
 **decide** [4] - 8:13, 23:14, 31:19, 31:21
 **decided** [1] - 6:22
 **decision** [8] - 6:19, 31:17, 34:2, 52:12, 55:11, 63:11, 79:8
 **decisional** [1] - 23:5
 **decisions** [2] - 37:7, 57:22, 68:19
 **declaration** [1] - 108:11
 **declaratory** [2] - 5:18, 47:14
 **decline** [2] - 6:20, 55:12
 **deducted** [1] - 26:4
 **deemed** [1] - 25:18
 **DEFENDANT** [1] - 1:18
 **defendant** [8] - 3:10, 3:12, 5:11, 6:4, 32:19, 50:3, 96:22, 96:23
 **Defendant** [1] - 1:8
 **Defendant's** [8] - 9:16, 14:9, 14:16, 17:5, 30:7, 101:8, 121:25, 151:1
 **DEFENDANT'S** [2] - 2:6, 3:19
 **defendant's** [4] - 3:17, 5:19, 99:2, 136:11
 **defense** [5] - 24:6, 42:23, 43:1, 87:4
 **Defense** [3] - 87:7, 87:9, 151:2
 **defenses** [1] - 5:19
 **defer** [1] - 142:22
 **deficiencies** [1] -

65:10
 **definitely** [1] - 125:9
 **definition** [3] - 39:9, 79:16, 141:15
 **deliberate** [1] - 59:15
 **delivering** [1] - 141:23
 **denial** [1] - 53:17
 **denied** [2] - 24:3, 24:15
 **deny** [1] - 55:20
 **department** [5] - 34:24, 39:23, 44:16, 53:24
 **depose** [1] - 21:7
 **deposed** [2] - 21:8, 21:9, 21:12
 **deposition** [39] - 5:20, 5:21, 5:22, 5:23, 13:15, 13:17, 19:14, 21:3, 21:7, 21:13, 58:6, 58:13, 68:22, 68:25, 69:15, 76:17, 78:18, 78:19, 78:24, 81:24, 83:2, 83:3, 83:4, 83:14, 84:23, 87:3, 87:18, 87:19, 88:24, 89:13, 91:4, 122:25, 133:5, 142:22, 143:11
 **depositions** [1] - 16:20
 **DEPUTY** [7] - 3:1, 3:20, 61:2, 61:4, 98:23, 98:25, 134:24
 **description** [5] - 10:23, 39:10, 68:4, 94:8
 **deserve** [1] - 53:16
 **designation** [4] - 4:25, 5:2, 34:17
 **designations** [1] - 35:6
 **desire** [1] - 110:4
 **desk** [1] - 15:6
 **destroy** [1] - 150:4
 **detail** [1] - 86:1
 **details** [1] - 72:8
 **determination** [2] - 20:15, 62:13
 **determinations** [1] - 31:24
 **develop** [1] - 9:14
 **developed** [1] - 6:17
 **Didier** [12] - 5:21, 9:20, 24:2, 45:7, 58:20, 130:20, 130:23, 130:25, 131:20, 132:4, 134:10, 134:15

 **Diego** [1] - 5:5
 **differ** [1] - 111:8
 **difference** [3] - 7:18, 35:23, 68:15
 **differences** [1] - 7:20
 **different** [18] - 7:19, 8:6, 8:20, 22:18, 37:4, 37:18, 37:19, 42:25, 61:20, 76:6, 97:25, 106:7, 110:22, 120:21, 122:20, 141:10, 151:22
 **differential** [1] - 18:3
 **differently** [3] - 69:11, 97:12, 98:1
 **diligence** [1] - 137:7
 **diminished** [1] - 19:23
 **diminishes** [1] - 18:19
 **Dire** [1] - 2:9
 **dire** [1] - 32:14
 **DIRE** [1] - 33:3
 **direct** [7] - 114:25, 115:2, 118:3, 119:11, 119:12, 132:3, 141:13
 **DIRECT** [2] - 3:24, 51:2
 **Direct** [3] - 2:9, 2:10, 4:10
 **direction** [1] - 49:12
 **directly** [5] - 34:7, 40:13, 47:9, 59:21, 66:1
 **director** [2] - 4:7, 4:9
 **disagree** [2] - 64:4, 66:9
 **disagreement** [1] - 66:9
 **disclose** [4] - 114:11, 114:14, 114:17, 147:8
 **disclosed** [1] - 20:16
 **disclosure** [7] - 21:5, 21:24, 22:1, 22:14, 22:20, 22:25
 **disclosures** [1] - 6:1
 **discuss** [8] - 15:14, 15:17, 32:11, 84:6, 85:7, 86:9, 86:17, 91:19
 **discussed** [8] - 29:17, 61:12, 84:11, 85:6, 85:10, 85:13, 86:23, 110:13
 **discussing** [1] - 15:9
 **discussion** [7] - 84:5, 91:16, 111:21, 113:3, 130:7, 134:4, 139:16

**discussions** [6] - 53:20, 53:22, 86:5, 99:21, 100:14, 127:9
**dismiss** [2] - 43:10, 146:24
**dismissed** [1] - 43:7
**disputed** [3] - 115:13, 115:15, 116:25
**dissuades** [1] - 46:19
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 3:2
**Ditto** [1] - 99:25
**DIVISION** [1] - 1:2
**dml@fertig.com** [1] - 1:17
**dock** [1] - 147:25
**docking** [1] - 147:24
**doctrine** [10] - 62:2, 62:5, 62:6, 62:11, 62:19, 64:10, 72:19, 147:16, 148:24, 149:9
**Document** [1] - 69:22
**document** [65] - 55:18, 57:10, 58:13, 68:3, 69:2, 69:20, 69:21, 71:10, 71:11, 73:20, 78:6, 78:9, 78:13, 78:16, 78:17, 87:5, 88:25, 89:1, 93:18, 94:10, 98:7, 99:4, 99:14, 100:13, 100:17, 101:4, 103:3, 103:8, 104:24, 105:4, 107:22, 108:22, 109:5, 109:6, 109:8, 111:14, 111:15, 112:1, 115:7, 116:18, 117:16, 117:21, 125:16, 129:9, 129:12, 129:16, 129:18, 130:4, 131:20, 132:2, 132:15, 133:1, 133:7, 133:9, 133:11, 135:2, 135:3, 135:8, 135:12, 135:14, 135:19, 142:2, 142:12, 151:9
**document's** [1] - 11:2
**documentation** [31] - 10:7, 46:19, 48:24, 64:25, 65:6, 83:14, 87:14, 88:18, 94:22, 94:25, 95:10, 95:19, 95:23, 96:7, 97:22, 98:2, 101:14, 102:23,

103:1, 103:16, 106:17, 107:21, 109:4, 113:22, 114:2, 114:3, 130:11, 131:22, 133:20, 133:22, 134:18
**documented** [3] - 90:25, 98:4, 98:11
**documenting** [1] - 98:8
**documents** [43] - 5:15, 5:24, 5:25, 6:2, 6:3, 9:22, 13:6, 13:10, 13:14, 14:7, 32:7, 51:24, 52:1, 56:15, 57:10, 57:12, 57:24, 58:4, 58:5, 58:14, 60:14, 71:14, 73:14, 73:15, 73:24, 81:15, 88:7, 92:17, 93:19, 99:6, 99:8, 104:25, 105:2, 106:14, 107:7, 107:16, 116:23, 125:18, 128:3, 128:11, 130:6, 132:23, 151:7
**dollar** [1] - 19:2
**dollar-fifty** [1] - 19:2
**dollars** [2] - 17:9, 55:8
**dollars'** [2] - 17:7, 17:8
**Donald** [3] - 3:11, 3:15, 3:22
**DONALD** [4] - 1:9, 1:22, 2:8, 3:19
**done** [42] - 7:13, 11:4, 12:5, 34:1, 35:14, 37:2, 37:8, 53:24, 54:3, 54:4, 54:17, 65:15, 66:11, 66:12, 69:4, 69:17, 70:4, 73:5, 73:6, 75:25, 78:22, 79:18, 89:3, 95:1, 98:20, 99:18, 101:14, 109:17, 113:1, 113:23, 116:21, 125:7, 125:22, 126:2, 127:7, 128:4, 133:24, 134:5, 148:7, 149:17
**Donna** [3] - 126:25, 127:5, 127:7
**Dorsey** [15] - 5:22, 48:25, 65:7, 96:20, 97:5, 97:7, 97:8, 97:10, 108:3, 109:2, 109:3, 115:8, 121:12, 145:14, 146:4
**Dorsey's** [1] - 96:12

**dot** [1] - 90:24
**dotted** [1] - 91:6
**double** [1] - 91:9
**doubt** [1] - 111:25
**down** [9] - 13:22, 18:22, 116:7, 116:15, 120:4, 124:18, 124:20, 152:7
**dramatically** [1] - 17:21
**Draper** [7] - 6:1, 41:10, 41:13, 41:15, 41:25, 43:22, 45:6
**Draper's** [3] - 43:22, 44:24, 47:22
**draw** [3] - 15:24, 16:3, 68:17
**drive** [1] - 7:3
**driver** [1] - 8:1
**drop** [7] - 17:21, 18:18, 18:23, 18:24, 18:25, 19:1, 19:5
**dropped** [1] - 18:22
**drops** [1] - 19:3
**drugs** [1] - 149:13
**dstrader@bellsouth.net** [1] - 1:25
**due** [4] - 24:24, 25:2, 79:17, 137:7
**during** [13] - 13:6, 53:11, 76:19, 77:2, 110:12, 137:6, 140:20, 150:21
**duties** [2] - 40:19
**duty** [8] - 11:10, 42:10, 42:11, 44:25, 140:18, 147:7, 148:17, 149:10

## E

**e-mail** [1] - 78:7
**eager** [1] - 101:25
**earn** [1] - 25:19
**earned** [10] - 20:25, 21:1, 21:23, 24:24, 25:2, 25:11, 25:18, 25:21, 29:21, 29:23
**Earnhardt** [1] - 36:18
**easily** [4] - 70:8, 79:5, 116:12, 145:22
**east** [6] - 83:11, 83:21, 83:23, 83:24, 89:18, 116:3
**educational** [1] - 4:13
**Edward** [1] - 135:3
**EDWIN** [1] - 1:10
**Edwin** [1] - 3:3

**effect** [13] - 25:10, 28:12, 28:25, 49:10, 77:12, 78:25, 111:5, 131:23, 137:3, 137:4, 137:10, 137:16, 141:6
**effective** [3] - 27:22, 52:5, 105:12
**effectively** [1] - 53:24
**effort** [3] - 62:8, 62:15, 63:9
**eight** [1] - 114:4
**Eight** [1] - 114:6
**either** [10] - 11:23, 45:9, 72:20, 73:20, 74:16, 78:14, 81:19, 91:15, 95:15, 96:20
**elsewhere** [2] - 114:1, 137:21
**email** [97] - 9:17, 9:19, 9:23, 10:2, 10:3, 10:14, 10:15, 10:18, 10:22, 14:7, 14:10, 14:15, 14:17, 16:15, 55:16, 58:7, 66:13, 67:2, 67:14, 68:10, 68:11, 68:13, 68:14, 70:2, 70:3, 71:3, 73:10, 73:13, 74:1, 74:3, 75:6, 78:15, 78:17, 82:1, 83:15, 87:18, 87:24, 87:25, 88:3, 88:7, 88:18, 88:20, 89:4, 89:6, 91:16, 96:3, 99:10, 100:3, 100:4, 100:6, 100:9, 101:8, 102:21, 103:12, 103:23, 104:12, 104:18, 104:25, 105:1, 105:2, 105:14, 105:18, 105:25, 106:9, 106:10, 106:12, 107:10, 109:2, 120:20, 123:24, 124:1, 126:4, 126:25, 128:9, 128:20, 129:4, 129:10, 129:20, 129:21, 129:22, 129:24, 130:1, 130:5, 130:8, 130:9, 130:15, 130:21, 131:9, 133:3, 133:4, 133:12, 133:17, 151:5, 151:18, 151:20, 151:22, 152:3
**emails** [12] - 11:2, 14:9, 14:10, 15:1, 15:5, 16:11, 53:19, 95:16, 100:4, 101:9,

143:23
**employee** [1] - 49:20
**enable** [1] - 35:2
**encompasses** [1] - 6:8
**encompassing** [1] - 96:21
**endorsed** [1] - 127:23
**endorsement** [4] - 131:5, 131:8, 131:15, 131:18
**entail** [1] - 9:8
**enter** [2] - 75:14, 75:15
**entered** [3] - 82:17, 82:19, 107:23
**entertain** [1] - 22:19
**entire** [2] - 117:25, 139:12
**entirety** [1] - 75:21
**entitled** [10] - 20:23, 21:20, 21:21, 25:25, 29:6, 29:14, 40:23, 53:1, 53:5, 153:4
**entries** [1] - 142:5
**equal** [1] - 53:15
**equipped** [1] - 137:9
**error** [4] - 124:5, 131:7, 131:9, 131:14
**especially** [1] - 76:4
**essence** [5] - 7:20, 28:11, 37:17, 60:13, 91:11
**essentially** [3] - 30:16, 139:11, 151:9
**establish** [1] - 120:14
**established** [2] - 18:6, 120:17
**establishing** [2] - 45:19, 101:5
**estoppel** [1] - 23:8
**evaluate** [11] - 6:13, 42:23, 43:2, 50:20, 53:9, 60:7, 63:22, 68:15, 76:2, 99:8, 144:12
**evaluated** [1] - 56:16
**evaluating** [3] - 14:19, 36:1, 56:15
**evaluation** [5] - 34:10, 34:11, 53:10, 73:6, 146:15
**event** [8] - 23:21, 24:24, 25:2, 25:15, 25:16, 25:23, 27:1, 31:20
**events** [2] - 30:21
**eventually** [2] -

56:18, 119:4
**evidence** [16] - 57:2,
67:14, 76:23, 79:12,
79:20, 80:1, 80:5,
81:4, 81:13, 89:8,
92:20, 97:12, 99:5,
128:5, 129:14, 138:9
**Exactly** [2] - 28:6,
76:12
**EXAMINATION** [5] -
2:6, 3:24, 51:2, 61:8,
150:10
**examination** [6] -
23:25, 33:1, 60:25,
61:7, 98:14, 99:2
**examined** [1] - 17:1
**example** [8] - 27:20,
27:22, 40:14, 44:8,
44:21, 47:2, 47:3,
144:21
**exceed** [3] - 115:24,
116:3, 123:16
**Except** [2] - 46:5,
78:15
**except** [2] - 40:13,
46:7
**exception** [1] -
117:21
**EXCERPT** [1] - 1:10
**excess** [3] - 19:11,
20:2, 76:16
**Excuse** [12] - 15:13,
20:7, 30:11, 67:21,
67:24, 108:23,
122:16, 131:9, 132:7,
150:3, 150:9, 150:18
**excuse** [4] - 4:17,
32:20, 54:10, 151:23
**exercise** [1] - 137:7
**Exhibit** [31] - 9:16,
14:9, 14:16, 16:15,
17:5, 18:13, 30:8,
67:14, 87:2, 87:3,
87:4, 87:7, 101:9,
105:4, 108:22,
108:24, 115:7,
121:24, 122:23,
127:14, 127:20,
127:22, 128:5,
129:13, 132:3,
134:20, 141:18,
141:20, 151:2
**exhibit** [8] - 5:17,
22:3, 87:8, 87:11,
109:1, 123:4, 123:6,
135:3
**Exhibits** [2] - 124:8,
127:11
**exhibits** [1] - 87:4
**existed** [3] - 47:10,

110:6, 132:1
**expect** [3] - 12:22,
108:14, 108:19
**expectation** [1] -
51:16
**expected** [1] - 13:5
**expenses** [1] - 34:5
**experience** [8] - 4:1,
16:12, 24:17, 31:24,
33:1, 33:5, 33:19,
82:7
**experiences** [1] -
7:17
**expert** [19] - 3:15,
4:11, 5:8, 12:7, 21:20,
35:17, 35:19, 36:11,
41:3, 41:6, 41:8,
41:22, 52:18, 77:14,
99:2, 114:23, 136:8,
138:20
**expire** [1] - 74:25
**expired** [2] - 11:18,
74:21
**explain** [3] - 33:22,
59:10, 62:4
**explaining** [1] -
90:10
**EXPLORER** [1] - 1:7
**Explorer** [5] - 3:4,
3:11, 3:12, 16:7,
145:25
**Explorer's** [3] - 6:5,
13:8, 13:12
**exposure** [5] - 13:17,
18:18, 18:19, 82:25,
102:24
**exposures** [1] - 7:7
**expressed** [1] -
12:16
**expressly** [1] -
127:22
**extend** [1] - 13:8
**extended** [2] - 57:23,
59:6
**extending** [1] - 13:12
**extent** [4] - 31:7,
47:18, 47:23, 50:10
**extremely** [2] -
19:25, 20:1

**F**

**facsimile** [1] - 109:1
**fact** [29] - 9:23, 9:24,
23:9, 27:24, 40:2,
46:17, 52:23, 54:5,
58:3, 64:14, 66:6,
67:1, 70:7, 73:25,

79:10, 80:4, 80:7,
89:4, 97:11, 100:15,
100:16, 100:25,
114:19, 119:24,
124:8, 138:14,
147:20, 148:18,
148:25
**factor** [1] - 145:20
**facts** [4] - 44:23,
92:20, 117:15, 147:8
**failed** [5] - 15:5,
49:7, 63:2, 65:9,
147:3
**fair** [4] - 12:14,
12:22, 140:5, 140:17
**fairly** [2] - 96:20,
145:7
**fairness** [1] - 148:18
**faith** [44] - 36:13,
36:16, 36:18, 37:22,
38:2, 39:17, 40:17,
40:18, 42:10, 43:9,
43:15, 44:2, 44:6,
44:9, 44:12, 44:14,
44:15, 44:18, 44:25,
45:1, 45:11, 46:16,
56:4, 56:7, 56:17,
56:22, 57:15, 57:21,
58:3, 62:2, 62:5, 62:6,
62:19, 63:14, 63:17,
64:10, 64:22, 72:19,
147:8, 147:17,
148:18, 148:24, 149:9
**false** [5] - 72:2, 72:6,
72:14, 72:20, 81:20
**familiar** [1] - 9:17
**familiarity** [1] - 58:25
**far** [13] - 5:3, 31:14,
41:4, 48:17, 50:21,
50:22, 58:4, 58:5,
58:23, 81:10, 85:21,
134:4, 139:19
**fashion** [1] - 56:25
**fault** [4] - 120:2,
120:4, 120:9
**faulting** [2] - 120:6,
120:9
**favor** [1] - 93:4
**FAX** [3] - 11:22, 70:9,
79:6
**February** [10] - 9:17,
67:11, 67:13, 78:6,
82:24, 101:18,
150:17, 150:18,
150:21, 151:20
**Federal** [1] - 23:22
**felt** [3] - 24:3, 47:4,
52:11
**FERTIG** [6] - 1:13,
3:8, 22:2, 23:3, 23:17,

24:1
**Fertig** [4] - 1:14, 3:8,
22:6, 22:12
**few** [1] - 137:25
**fields** [1] - 84:10
**fifty** [1] - 19:2
**file** [34] - 11:13,
18:25, 37:6, 39:15,
57:10, 57:12, 79:1,
79:4, 81:17, 81:23,
88:6, 88:7, 88:19,
94:13, 94:25, 95:10,
98:5, 98:7, 98:8,
98:11, 108:6, 108:7,
108:15, 117:15,
117:16, 122:21,
125:15, 131:5,
131:17, 131:22,
132:18, 133:8,
146:14, 151:10
**filed** [2] - 39:19, 43:5
**files** [3] - 14:18,
81:18, 150:5
**fill** [1] - 35:7
**final** [2] - 17:2, 18:21
**fine** [4] - 30:12, 33:2,
105:3, 136:17
**finish** [5] - 14:5,
58:10, 67:25, 68:1,
89:22
**First** [3] - 6:9, 79:12,
83:12
**first** [34] - 3:14,
13:16, 17:23, 17:24,
19:2, 19:20, 22:13,
24:19, 48:23, 52:5,
61:13, 67:16, 67:20,
82:22, 82:23, 82:24,
83:20, 89:22, 90:6,
114:4, 114:7, 119:16,
128:24, 130:1, 130:9,
130:11, 130:16,
138:12, 138:24,
150:12, 150:20,
150:23
**first-hour** [1] - 17:24
**Fisher** [2] - 90:13,
91:21
**fit** [1] - 137:8
**five** [4] - 19:4, 19:12,
20:4, 37:1
**FL** [4] - 1:15, 1:23,
2:2, 153:10
**flawed** [1] - 104:5
**FLOOR** [1] - 1:4
**Florida** [51] - 3:2,
13:9, 13:13, 13:19,
13:21, 14:12, 15:13,
30:3, 50:17, 64:5,
64:7, 83:11, 83:13,

83:22, 83:24, 83:25,
84:1, 84:13, 84:18,
84:21, 86:15, 89:12,
89:14, 89:19, 89:25,
90:6, 90:12, 90:15,
90:17, 91:20, 92:24,
99:21, 99:22, 100:16,
100:21, 101:24,
102:20, 104:3,
106:16, 111:22,
111:24, 112:10,
112:11, 112:13,
112:14, 112:15,
113:2, 113:3, 116:3,
118:23, 120:18
**FLORIDA** [2] - 1:1,
1:5
**flown** [1] - 41:21
**focus** [2] - 32:23,
138:12
**focused** [2] - 93:20,
128:6
**focuses** [1] - 4:20
**focusing** [1] - 44:23
**focussing** [1] - 42:22
**follow** [6] - 26:20,
31:25, 37:17, 56:7,
121:22, 126:11
**follow-up** [1] -
121:22
**Following** [1] -
130:21
**following** [1] -
126:17
**foolish** [1] - 78:3
**FOR** [2] - 1:13, 1:18
**foregoing** [1] - 153:3
**form** [9] - 16:17,
56:10, 57:19, 80:25,
82:3, 83:15, 100:15,
117:19, 130:14
**format** [1] - 8:21
**formation** [2] - 45:3,
49:15
**forth** [4] - 21:18,
62:17, 118:9, 118:20
**forthright** [1] - 62:7
**forward** [7] - 51:25,
52:20, 62:12, 63:11,
64:11, 65:8, 132:19
**forwarded** [5] -
104:15, 105:17,
105:19, 106:1, 131:4
**foundation** [4] -
12:17, 31:5, 31:8,
52:16
**four** [1] - 19:19
**frankly** [1] - 47:8
**free** [1] - 50:11
**Friday** [1] - 41:15

**FROM** [1] - 1:10
**front** [3] - 74:2, 94:12, 130:23
**Ft** [14] - 1:15, 15:25, 16:4, 50:17, 60:12, 84:7, 87:22, 90:3, 92:23, 113:24, 117:23, 118:1, 119:8
**full** [8] - 8:8, 8:10, 25:1, 25:17, 49:5, 53:16, 72:24, 126:24
**Full** [1] - 24:23
**fully** [1] - 49:2
**function** [1] - 65:19
**future** [4] - 7:4, 31:15, 59:4, 74:24

**G**

**Garcia** [1] - 124:9
**gather** [3] - 6:12, 36:3, 63:20
**gathered** [1] - 6:14
**General** [1] - 25:15
**general** [11] - 7:22, 8:8, 8:25, 25:14, 39:11, 39:14, 42:2, 45:15, 56:3, 110:18, 141:15
**generally** [2] - 20:23, 56:10
**given** [6] - 4:16, 8:8, 8:10, 32:21, 77:9, 77:24
**Given** [1] - 39:10
**Golden** [2] - 15:11, 50:18
**GoodLink** [1] - 152:4
**Governor's** [1] - 36:19
**graduated** [1] - 5:6
**Gramling** [1] - 1:14
**grant** [1] - 136:13
**granted** [1] - 37:18
**greater** [1] - 19:22
**greatly** [1] - 19:23
**grounded** [2] - 147:20
**grounding** [1] - 139:17
**groundings** [2] - 62:23, 148:6
**grounds** [1] - 147:20
**Group** [1] - 4:4
**group** [1] - 54:1
**groupings** [1] - 59:13
**Guard** [10] - 10:1, 11:6, 63:2, 65:9, 65:12, 65:15, 65:18,

67:21, 81:6, 149:6
**guess** [8] - 9:3, 11:14, 22:10, 28:2, 39:16, 41:2, 42:17, 143:17
**guidelines** [1] - 80:14
**Gulf** [44] - 15:10, 15:13, 15:16, 32:9, 52:5, 60:11, 60:13, 84:2, 84:6, 84:8, 84:11, 84:16, 85:24, 85:25, 86:8, 86:18, 90:1, 92:5, 92:9, 93:15, 94:18, 99:19, 107:19, 115:13, 115:24, 116:3, 116:16, 116:25, 118:3, 119:2, 119:10, 120:15, 120:21, 120:22, 120:24, 121:13, 121:14, 122:2, 122:8, 123:15, 123:18, 125:6, 125:19
**guy** [1] - 9:10

**H**

**half** [4] - 18:17, 19:4, 124:15, 124:16
**Hallandale** [2] - 83:10, 86:14
**halted** [1] - 125:3
**hand** [1] - 142:11
**handle** [1] - 53:7
**handled** [7] - 22:15, 33:25, 40:15, 41:1, 44:13, 46:12, 48:3
**handler** [1] - 49:17
**handles** [1] - 49:22
**handling** [34] - 31:6, 34:1, 35:18, 35:21, 35:24, 36:1, 36:2, 36:10, 36:20, 36:21, 36:25, 38:24, 38:25, 39:11, 39:14, 39:24, 40:12, 40:21, 40:22, 41:14, 42:1, 42:8, 43:1, 44:7, 46:9, 50:7, 51:8, 51:9, 51:21, 54:1, 55:25, 56:1, 56:4
**hands** [2] - 94:11, 107:1
**handwriting** [1] - 142:12
**handwritten** [2] - 69:22, 125:17
**hard** [1] - 62:17
**HARDY** [2] - 2:1, 153:8

**Hardy** [1] - 153:7
**Hardy-Hobbs** [1] - 153:7
**HARDY-HOBBS** [2] - 2:1, 153:8
**harm** [1] - 26:5
**Harold** [3] - 48:6, 48:8, 48:15
**Harris** [1] - 1:19
**Hartford** [4] - 4:4, 4:5, 4:9, 33:16
**hazard** [1] - 59:16
**head** [3] - 66:16, 66:19, 68:16
**hear** [3] - 22:12, 108:23, 143:3
**heard** [1] - 76:11
**Held** [1] - 59:24
**held** [13] - 34:17, 59:18, 59:19, 59:20, 59:24, 60:1, 60:16, 60:20, 65:16, 137:22, 141:1, 141:5, 141:14
**help** [2] - 33:19, 36:5
**helpful** [1] - 57:4
**Heno** [6] - 48:6, 48:8, 48:20, 48:22, 49:17, 49:19
**Heno's** [1] - 50:4
**Herald** [1] - 49:17
**hereby** [1] - 153:3
**herein** [1] - 54:11
**herself** [1] - 58:5
**Hi** [1] - 90:7
**higher** [2] - 17:20
**highest** [1] - 4:24
**hired** [1] - 147:2
**history** [3] - 76:9, 76:12, 77:24
**Hobbs** [1] - 153:7
**HOBBS** [2] - 2:1, 153:8
**hobbs@flsd.
uscourts.gov** [2] - 2:3, 153:11
**hold** [1] - 107:8
**Hold** [3] - 30:11, 42:7, 69:1
**holdings** [1] - 64:9
**Hollywood** [1] - 50:18
**home** [3] - 7:22, 8:2, 35:8
**homeowners** [1] - 67:7
**Honor** [91] - 3:18, 10:9, 11:25, 12:3, 12:6, 14:1, 14:21, 17:25, 18:4, 20:12, 20:18, 21:16, 22:4,

30:25, 32:16, 32:24, 35:22, 38:16, 38:18, 39:18, 40:4, 40:17, 42:1, 42:5, 43:4, 45:16, 47:11, 48:5, 48:23, 49:6, 50:2, 50:12, 52:13, 52:17, 56:6, 56:13, 57:17, 58:8, 60:23, 61:1, 64:13, 69:8, 71:6, 71:19, 71:22, 72:5, 73:11, 75:4, 76:22, 77:11, 80:23, 82:4, 88:14, 88:16, 92:10, 93:3, 96:17, 97:20, 98:18, 101:7, 103:5, 110:24, 113:6, 113:8, 114:21, 115:4, 117:3, 118:11, 119:20, 121:7, 134:8, 134:19, 136:6, 136:14, 138:4, 138:18, 138:21, 139:10, 139:15, 140:10, 143:8, 143:17, 144:25, 146:10, 149:3, 149:23, 150:1, 150:6, 150:8, 151:12, 152:5
**honor** [1] - 141:7
**Honorable** [1] - 3:3
**HONORABLE** [1] - 1:10
**hope** [1] - 63:23
**hopefully** [3] - 37:7, 46:20, 80:16
**host** [1] - 78:4
**hour** [1] - 17:24
**house** [1] - 8:3
**hugging** [1] - 86:8
**hull** [20] - 17:6, 17:7, 18:14, 18:22, 19:2, 24:20, 24:21, 24:25, 25:5, 26:8, 26:12, 26:13, 29:22, 105:13, 114:12, 114:13, 114:14, 135:7, 141:14
**human** [1] - 144:16
**hundred** [13] - 10:1, 11:7, 15:15, 17:11, 17:13, 17:14, 17:17, 17:21, 18:17, 19:10, 20:3, 68:9, 85:24
**hustles** [1] - 9:10
**hypothetical** [2] - 77:13, 140:11

**I**

**i's** [2] - 90:24, 91:6
**idea** [3] - 31:22, 44:12, 89:14

**identified** [1] - 122:25
**identify** [2] - 78:20, 141:19
**ignore** [2] - 11:15, 79:5
**ignored** [4] - 55:15, 76:6, 79:4, 79:12
**ignoring** [1] - 76:6
**II** [1] - 144:1
**ill** [2] - 68:18, 96:18
**ill-afford** [1] - 68:18
**ill-intention** [1] - 96:18
**illegal** [2] - 149:11, 149:14
**illogical** [1] - 75:1
**immediate** [2] - 52:14, 52:22
**immediately** [8] - 16:13, 16:14, 24:24, 25:2, 57:2, 74:10, 123:21, 124:5
**impact** [2] - 60:19, 60:20
**implications** [1] - 125:21
**implied** [2] - 90:21, 90:23
**implies** [2] - 100:24, 125:9
**imply** [1] - 125:18
**important** [5] - 45:18, 45:25, 73:6, 85:18, 117:7
**improper** [1] - 39:24
**improperly** [1] - 22:22
**imputed** [1] - 106:7
**inaccurate** [1] - 97:7
**inappropriate** [3] - 37:8, 77:24, 78:2
**inception** [11] - 28:5, 29:14, 45:1, 137:5, 138:15, 139:7, 140:7, 140:20, 147:15, 148:7
**incident** [1] - 31:15
**incidents** [1] - 86:24
**include** [14] - 5:13, 20:20, 26:8, 40:20, 61:16, 80:13, 82:8, 82:12, 84:21, 92:17, 95:17, 95:19, 96:21, 107:21
**included** [4] - 9:23, 9:24, 82:1, 100:20
**includes** [4] - 9:20, 93:18, 93:19, 142:8
**including** [1] - 103:9
**inclusive** [1] -

120:13
 **inconsistent** [1] - 110:8
 **incorporated** [1] - 131:16
 **incorrect** [3] - 73:22, 74:2, 97:25
 **incurred** [1] - 137:16
 **indeed** [2] - 113:19, 115:17
 **indemnity** [1] - 17:15
 **independently** [3] - 144:6, 144:21, 145:16
 **INDEX** [1] - 2:6
 **indicate** [6] - 10:5, 59:9, 99:14, 106:22, 109:19, 145:5
 **indicated** [5] - 54:3, 91:24, 111:24, 142:25, 143:6
 **indicates** [1] - 134:2
 **indicating** [1] - 94:18
 **indication** [2] - 57:3, 133:21
 **indications** [1] - 147:3
 **industry** [1] - 33:11
 **infamous** [1] - 58:6
 **inform** [1] - 149:10
 **information** [97] - 6:12, 6:13, 6:14, 6:15, 6:17, 9:14, 11:9, 11:14, 11:21, 13:4, 14:4, 14:13, 15:23, 16:2, 16:8, 16:10, 16:16, 18:5, 33:23, 33:24, 36:4, 36:5, 36:7, 36:8, 48:2, 53:8, 53:18, 53:22, 55:21, 55:23, 56:24, 58:17, 62:7, 62:12, 63:10, 63:12, 63:20, 63:21, 63:23, 63:24, 63:25, 64:1, 64:11, 66:18, 66:23, 66:24, 67:2, 67:3, 67:5, 69:17, 69:19, 71:1, 71:15, 72:22, 73:16, 78:5, 79:4, 79:5, 81:11, 82:8, 82:11, 82:12, 94:1, 94:7, 96:16, 97:4, 97:6, 97:7, 97:9, 105:21, 105:24, 106:2, 106:4, 112:5, 112:6, 135:17, 142:23, 144:2, 144:7, 144:12, 144:16, 144:21, 145:7, 145:9, 145:10, 145:11, 145:14, 146:14,

146:17, 146:22, 146:24, 147:5, 147:9, 147:15, 147:18
 **informed** [1] - 96:15
 **initial** [12] - 17:2, 17:14, 17:15, 19:17, 25:8, 54:2, 82:25, 89:11, 90:5, 91:19, 104:18, 120:14
 **inland** [5] - 61:15, 61:17, 67:6, 118:4, 118:22
 **inquiries** [1] - 146:18
 **inquiring** [1] - 105:14
 **inquiry** [3] - 144:17, 144:18, 151:18
 **inserted** [1] - 50:3
 **insolvency** [1] - 7:3
 **inspection** [28] - 11:1, 12:20, 13:1, 55:16, 55:17, 55:19, 57:7, 57:9, 57:11, 57:13, 63:7, 63:8, 65:10, 65:12, 65:15, 65:18, 66:11, 66:17, 66:25, 67:22, 68:8, 73:7, 77:18, 81:6, 81:10
 **Inspection** [1] - 55:22
 **inspections** [2] - 63:2
 **instance** [2] - 75:23, 137:18
 **instead** [1] - 10:10
 **Institute** [3] - 4:16, 4:17, 4:19
 **instructed** [1] - 39:25
 **Insurance** [8] - 3:4, 4:4, 4:17, 5:18, 5:25, 20:9, 56:3
 **INSURANCE** [1] - 1:3
 **insurance** [58] - 4:15, 5:1, 5:13, 6:7, 7:19, 8:7, 9:4, 13:21, 15:2, 19:18, 20:22, 21:19, 23:5, 23:9, 23:20, 23:21, 24:13, 29:5, 29:8, 30:20, 31:20, 33:11, 39:25, 40:20, 44:1, 44:6, 45:2, 45:10, 46:1, 46:11, 51:11, 51:17, 53:1, 53:3, 55:14, 55:20, 56:18, 57:14, 57:21, 60:4, 60:6, 61:18, 61:22, 62:20,

65:23, 70:11, 72:4, 82:15, 110:20, 111:8, 111:9, 116:24, 121:24, 135:14, 146:6, 146:7, 147:24
 **insure** [2] - 60:4, 62:8
 **insured** [65] - 9:11, 12:14, 12:16, 12:22, 12:25, 16:16, 18:16, 20:25, 23:10, 25:25, 26:1, 26:2, 30:20, 40:19, 46:5, 46:12, 51:10, 51:12, 51:14, 53:15, 54:14, 54:15, 54:19, 55:4, 55:8, 56:16, 56:22, 56:24, 57:1, 57:2, 57:24, 60:3, 62:7, 62:11, 62:15, 62:20, 63:5, 63:9, 63:15, 63:25, 64:10, 65:8, 65:24, 66:1, 70:14, 70:20, 71:24, 72:19, 72:24, 86:19, 97:3, 108:9, 126:1, 126:9, 126:17, 126:21, 135:8, 135:22, 137:7, 141:4, 148:5, 148:17, 148:23, 149:9
 **Insured** [2] - 56:21, 56:22
 **insured's** [17] - 13:4, 42:11, 45:10, 46:10, 47:18, 56:17, 65:21, 72:2, 72:14, 99:10, 108:14, 127:5, 142:25, 143:5, 147:4, 147:7, 147:14
 **insureds** [1] - 5:13
 **insurer** [13] - 15:19, 63:10, 72:3, 72:21, 106:5, 106:7, 126:8, 126:22, 135:15, 136:13, 139:19, 143:9, 147:22, 149:10, 149:11
 **insurer's** [1] - 25:17
 **insuring** [1] - 55:9, 55:10
 **intended** [1] - 112:3, 112:23
 **intent** [5] - 70:4, 111:13, 111:16, 111:17, 111:19
 **intention** [1] - 96:18
 **intentions** [1] - 71:20
 **inter** [1] - 49:23
 **inter-relationship** [1] - 49:23
 **interchange** [2] -

51:21, 51:24
 **interested** [2] - 71:17, 79:2
 **interesting** [1] - 136:8
 **interfered** [1] - 49:24
 **interject** [1] - 139:14
 **interpreting** [1] - 69:10
 **interrelating** [2] - 6:15, 16:2
 **interrupting** [1] - 119:21
 **invalidate** [1] - 149:15
 **investigated** [1] - 52:7
 **investigation** [1] - 53:17
 **involve** [2] - 37:23, 37:25
 **involved** [12] - 4:12, 8:22, 17:23, 32:2, 36:10, 36:21, 37:15, 38:9, 90:11, 126:9, 126:23
 **involves** [2] - 6:15, 6:23
 **involving** [3] - 38:2, 38:5, 87:15
 **isolated** [1] - 32:5
 **issuance** [1] - 97:23
 **issue** [48] - 21:17, 22:20, 23:1, 24:23, 32:15, 39:1, 40:16, 42:23, 42:25, 44:9, 44:18, 45:8, 45:16, 46:1, 46:5, 46:6, 46:10, 46:24, 47:25, 48:3, 48:16, 48:19, 49:9, 49:11, 50:6, 54:9, 55:15, 55:25, 56:1, 56:8, 60:21, 70:8, 75:24, 76:7, 79:2, 80:16, 80:19, 86:17, 87:18, 90:1, 90:2, 94:14, 98:10, 106:15, 139:19, 143:9
 **issued** [20] - 94:4, 94:21, 95:23, 99:12, 106:22, 110:7, 110:20, 111:9, 111:11, 115:17, 115:19, 115:21, 121:20, 124:13, 125:12, 125:16, 126:3, 126:15, 127:11, 131:5
 **issues** [12] - 37:8, 39:12, 39:20, 42:3,

45:15, 46:8, 50:3, 63:12, 98:7, 98:8, 146:15, 146:19
 **issuing** [6] - 8:17, 16:19, 131:8, 131:10, 131:13, 146:8
 **item** [3] - 16:1, 131:15, 137:2
 **items** [3] - 122:20, 142:14, 142:15
 **itself** [7] - 15:21, 40:14, 40:20, 109:5, 114:2, 116:18, 135:13

## J

 **Jamie** [35] - 5:22, 9:17, 9:21, 10:2, 10:16, 67:14, 73:20, 73:24, 76:16, 76:20, 77:4, 77:25, 78:7, 80:20, 81:4, 81:7, 81:12, 81:25, 82:25, 89:10, 89:13, 89:16, 90:5, 122:14, 128:9, 128:12, 128:14, 128:21, 130:19, 132:25, 133:3, 133:17, 141:21
 **Jamie's** [3] - 74:1, 78:15, 90:18
 **JANUARY** [1] - 1:7
 **Jeff** [4] - 5:22, 65:7, 96:12, 115:8
 **Jessica** [3] - 14:8, 101:8, 128:9
 **jewelry** [2] - 38:9, 61:16
 **JILL** [2] - 2:1, 153:8
 **Jill** [1] - 153:7
 **jill_hardy** [2] - 2:3, 153:11
 **jill_hardy-hobbs@ flsd.uscourts.gov** [2] - 2:3, 153:11
 **job** [9] - 33:22, 53:24, 70:19, 76:7, 78:3, 146:14, 146:19, 146:21, 147:2
 **journey** [1] - 120:1
 **JUDGE** [1] - 1:11
 **Judge** [1] - 22:2
 **judgment** [1] - 47:14
 **July** [5] - 132:5, 132:6, 134:1, 150:16, 150:17
 **jump** [1] - 101:25
 **June** [13] - 13:17, 123:25, 128:1, 128:8, 128:10, 128:12,

128:18, 128:20, 128:25, 129:5, 129:10, 129:18, 132:4
**jurisdiction** [4] - 34:15, 64:2, 64:23, 64:24

## K

**Karyn** [89] - 5:21, 6:4, 9:20, 9:21, 10:3, 10:6, 10:16, 10:17, 10:19, 10:20, 13:7, 13:12, 13:15, 13:16, 13:17, 13:25, 14:7, 14:8, 16:13, 42:13, 53:18, 58:2, 58:12, 58:18, 59:25, 70:17, 71:17, 71:20, 73:21, 76:15, 76:19, 77:4, 77:6, 77:25, 78:21, 79:1, 79:10, 80:7, 80:9, 80:11, 80:16, 81:3, 81:11, 82:2, 82:20, 83:14, 85:9, 85:20, 86:13, 87:1, 87:14, 87:15, 87:20, 87:25, 88:4, 88:20, 89:7, 89:9, 90:6, 90:24, 91:13, 96:2, 101:8, 102:17, 104:5, 104:14, 104:15, 104:23, 105:1, 105:5, 105:6, 105:7, 105:17, 106:9, 106:10, 110:12, 111:21, 112:2, 112:4, 113:3, 117:2, 120:3, 132:22, 134:11, 144:18, 147:3
**keep** [8] - 21:23, 29:6, 29:15, 68:16, 96:7, 96:14, 128:6, 137:7
**keeps** [2] - 118:13, 118:14
**Kenneth** [1] - 6:1
**key** [2] - 10:7, 145:20
**kind** [5] - 23:15, 23:22, 62:17, 68:17, 121:18
**knowing** [2] - 65:14, 125:4
**knowingly** [1] - 58:16
**knowledge** [14] - 18:1, 31:10, 39:12, 49:8, 81:2, 100:16, 100:24, 106:5, 106:8, 106:10, 135:17, 137:16, 139:3, 143:14
**known** [4] - 43:25,

50:16, 111:23, 116:9
**knows** [1] - 82:10

## L

**labor** [4] - 17:10, 29:20, 29:22, 29:24
**lack** [1] - 52:16
**laid** [1] - 15:5
**Landing** [1] - 36:19
**language** [1] - 90:16
**Last** [1] - 67:19
**last** [9] - 3:22, 67:15, 67:17, 67:18, 82:1, 91:13, 99:23, 127:1, 151:1
**latter** [3] - 20:17, 31:9, 50:6
**Lauderdale** [12] - 1:15, 15:25, 16:4, 50:17, 60:12, 87:22, 90:3, 92:23, 92:24, 117:23, 118:1, 119:8
**law** [9] - 23:4, 23:5, 23:18, 23:21, 64:15, 64:17, 141:10
**lawyer** [1] - 139:21
**lay** [1] - 50:13
**learn** [8] - 7:13, 7:15, 7:16, 31:14, 37:9, 58:24, 59:4, 80:18
**learned** [1] - 80:17
**least** [3] - 44:18, 45:14, 59:1
**leave** [1] - 23:3
**LeBeouf** [35] - 5:20, 9:7, 11:21, 11:23, 12:1, 13:7, 13:10, 14:17, 17:18, 18:12, 53:22, 68:21, 69:15, 70:9, 73:21, 73:24, 76:10, 76:11, 78:20, 82:20, 83:1, 83:8, 83:21, 86:13, 88:24, 96:2, 99:10, 102:20, 103:24, 110:11, 111:20, 112:7, 117:1, 129:2, 151:25
**LeBeouf's** [10] - 13:15, 15:20, 19:14, 68:22, 70:1, 78:19, 78:23, 83:4, 84:23, 120:20
**leeway** [1] - 69:12
**left** [3] - 33:17, 43:10, 142:11
**left-hand** [1] - 142:11
**legal** [8] - 20:14, 26:9, 64:14, 72:9, 92:19, 138:8, 138:19,

141:7
**lends** [1] - 19:13
**less** [1] - 45:24
**letter** [20] - 36:6, 39:15, 44:8, 48:7, 49:7, 52:23, 54:3, 109:3, 124:9, 126:3, 126:5, 126:7, 126:11, 126:12, 126:14, 126:15, 126:20, 127:4, 128:18, 128:20
**letting** [1] - 56:11
**level** [2] - 19:12, 19:17
**levels** [3] - 17:20, 19:19
**liability** [7] - 7:22, 7:23, 8:5, 17:9, 26:17, 26:18, 26:19
**license** [2] - 35:3, 146:3
**licensed** [4] - 34:12, 34:14, 35:8, 146:1
**Lidondici** [3] - 3:8, 23:3, 134:7
**LIDONDICI** [129] - 1:13, 10:9, 11:25, 12:6, 12:17, 14:1, 14:21, 17:25, 18:5, 18:11, 20:12, 20:14, 21:5, 21:25, 22:7, 30:25, 32:16, 32:24, 33:4, 35:22, 37:21, 38:16, 38:18, 41:9, 41:15, 41:18, 41:20, 41:25, 46:14, 46:22, 46:24, 47:1, 47:11, 47:13, 48:22, 49:13, 50:2, 52:13, 52:15, 56:6, 57:17, 58:8, 61:9, 64:19, 65:5, 68:2, 68:12, 69:14, 71:19, 71:22, 71:23, 72:13, 73:19, 76:8, 77:1, 77:19, 81:1, 82:6, 87:9, 87:12, 88:16, 88:17, 93:2, 93:11, 93:13, 93:24, 96:23, 96:24, 97:20, 97:21, 98:15, 98:17, 99:3, 99:23, 100:1, 101:1, 101:16, 103:8, 103:11, 103:15, 106:21, 106:25, 107:4, 107:5, 111:6, 113:6, 113:13, 113:17, 113:19, 113:21, 115:3, 115:6, 117:10, 118:18, 119:23, 121:11,

122:1, 122:5, 122:11, 123:5, 123:7, 123:9, 123:11, 132:9, 132:16, 134:8, 134:9, 134:19, 134:22, 134:25, 135:1, 136:6, 136:22, 138:11, 138:20, 139:1, 139:2, 139:24, 140:2, 140:4, 140:12, 140:16, 141:17, 143:5, 143:22, 146:20, 149:6, 149:8, 149:23
**Lidondici's** [1] - 22:5
**Lidondici.................** ......... [1] - 2:9
**Lidondici.................** ............ [1] - 2:10
**lie** [1] - 71:24
**life** [4] - 4:24, 4:25, 7:23, 35:10, 41:7, 44:1, 113:25
**light** [1] - 123:21
**likelihood** [1] - 18:19
**limine** [2] - 41:11, 136:4
**limit** [2] - 64:21, 107:18
**limitation** [1] - 94:9
**limited** [1] - 125:5
**limits** [37] - 48:17, 91:25, 94:18, 94:24, 95:1, 97:25, 98:10, 115:23, 117:25, 119:25, 123:1, 123:12, 123:23, 124:6, 124:10, 124:23, 125:5, 125:19, 127:23, 128:18, 128:22, 129:2, 129:10, 130:2, 130:5, 130:11, 130:12, 130:16, 130:18, 131:21, 131:25, 132:19, 133:18, 134:2, 134:5, 141:5, 142:20
**Line** [2] - 85:2, 144:1
**line** [8] - 46:11, 58:25, 59:13, 59:17, 59:22, 84:19, 148:15
**lines** [4] - 7:19, 61:18, 61:21, 69:16
**link** [5] - 143:6, 143:23, 143:25, 144:2
**litigated** [1] - 23:19
**litigation** [11] - 4:7, 33:17, 33:20, 34:3, 34:5, 34:9, 34:10, 34:11, 37:15, 39:23,

56:8
**LLC** [7] - 1:7, 3:11, 3:12, 16:7, 115:9, 145:15, 145:17
**locate** [1] - 30:13
**located** [6] - 14:12, 15:10, 59:20, 101:11, 101:23, 121:23
**location** [10] - 13:9, 14:13, 52:24, 83:15, 101:12, 103:13, 106:13, 117:22, 117:23, 118:1
**log** [1] - 6:3
**look** [26] - 11:13, 17:4, 24:19, 24:21, 68:9, 68:10, 68:15, 69:20, 70:6, 70:7, 72:23, 73:3, 75:20, 75:21, 79:1, 101:7, 103:20, 103:21, 104:3, 104:11, 107:20, 112:12, 144:10, 144:11, 146:14
**looked** [1] - 105:2
**looking** [6] - 70:5, 71:16, 79:15, 103:22, 131:2, 150:7
**loss** [86] - 17:21, 17:22, 17:24, 18:19, 19:21, 19:22, 19:23, 19:25, 20:11, 20:13, 24:25, 25:3, 25:17, 25:22, 26:5, 26:12, 26:25, 27:3, 27:5, 27:7, 28:4, 28:11, 28:16, 28:19, 29:1, 29:3, 29:6, 29:11, 29:12, 29:13, 29:25, 30:7, 30:16, 30:19, 30:23, 30:24, 31:3, 31:19, 37:13, 37:14, 37:15, 45:14, 45:18, 45:21, 45:23, 46:13, 46:15, 46:16, 46:18, 46:24, 47:15, 48:13, 49:14, 49:16, 51:6, 51:13, 52:2, 52:10, 54:17, 54:22, 56:19, 64:12, 91:17, 94:22, 95:4, 95:6, 95:16, 106:6, 116:5, 116:24, 117:17, 124:14, 126:17, 126:19, 128:10, 135:7, 135:13, 135:14, 135:15, 135:23, 137:16, 138:16, 139:9, 140:8

**losses** [3] - 51:14, 62:21, 131:18
**lost** [2] - 42:22, 51:4
**Louisiana** [33] - 13:9, 13:13, 13:19, 13:22, 15:11, 15:25, 16:4, 83:25, 84:2, 84:7, 84:10, 84:13, 84:18, 84:22, 87:22, 90:13, 90:15, 90:17, 91:21, 99:22, 102:20, 104:3, 106:16, 110:14, 111:20, 111:22, 114:1, 118:1, 118:24, 119:4, 119:8, 120:19, 122:10
**low** [2] - 19:25, 20:1
**lower** [2] - 19:12, 19:17
**lunch** [1] - 98:21
**Lunch** [1] - 98:24

---

**M**

**ma'am** [8] - 38:12, 38:15, 102:5, 115:11, 123:10, 129:11, 135:5, 136:25
**MAGISTRATE** [1] - 1:11
**maiden** [2] - 10:17, 10:20
**mail** [1] - 78:7
**main** [3] - 8:24, 9:6, 148:19
**man** [1] - 68:9
**managed** [1] - 34:20
**management** [1] - 4:15
**Management** [1] - 4:23
**managing** [3] - 8:7, 8:25, 56:2
**manned** [1] - 137:8
**manner** [2] - 149:11, 149:12
**March** [9] - 46:13, 47:20, 101:18, 101:23, 104:13, 105:9, 105:19, 109:13, 151:23
**marine** [39] - 4:15, 7:24, 8:3, 18:6, 18:8, 33:1, 35:12, 37:13, 37:15, 37:16, 37:23, 37:25, 38:3, 38:5, 38:8, 38:10, 38:11, 38:13, 43:24, 44:11, 45:14, 61:13, 61:14, 61:15, 61:17, 61:24,

62:6, 63:19, 64:7, 64:8, 67:6, 67:7, 70:11, 72:3, 135:14, 144:6, 145:20
**Marine** [7] - 4:19, 19:7, 19:9, 37:14, 100:23, 101:10, 101:21
**marine-loss** [1] - 45:14
**maritime** [2] - 139:4
**Mark** [19] - 5:23, 10:8, 14:18, 65:7, 68:6, 69:5, 69:17, 70:1, 70:2, 70:3, 78:21, 96:3, 96:8, 96:9, 96:12, 96:20, 143:9, 151:18, 151:20
**marked** [8] - 99:5, 108:22, 115:7, 122:23, 129:12, 132:3, 133:7, 133:8
**market** [1] - 19:15
**material** [3] - 62:12, 64:12, 147:8
**math** [1] - 17:17
**matter** [12] - 20:6, 20:10, 23:4, 23:17, 23:21, 54:5, 54:25, 70:7, 99:6, 133:10, 139:20, 153:4
**Meadow** [1] - 15:11
**mean** [9] - 19:17, 20:11, 44:6, 61:14, 89:3, 103:7, 147:21, 151:9
**meaning** [1] - 60:10
**means** [1] - 59:3
**meant** [1] - 120:22
**Melbourne** [1] - 4:18
**member** [2] - 136:17, 136:18
**memo** [26] - 9:21, 9:22, 10:4, 10:6, 10:8, 10:11, 10:16, 15:21, 15:22, 63:6, 88:6, 99:17, 100:20, 100:22, 101:15, 101:17, 101:18, 101:19, 101:22, 101:23, 101:25, 128:25
**memory** [2] - 105:3, 134:14
**memos** [1] - 11:8
**mention** [2] - 92:23
**mentioned** [3] - 11:1, 40:22, 90:12
**merge** [1] - 44:10
**mess** [1] - 150:4

**Mexico** [12] - 85:25, 99:19, 107:19, 115:24, 116:3, 116:16, 116:25, 122:8, 123:16, 123:18, 125:6, 125:19
**Meyers** [1] - 84:7
**MGA** [2] - 8:8, 8:10
**Miami** [20] - 1:23, 2:2, 2:2, 14:12, 50:17, 83:10, 83:13, 83:15, 86:14, 90:3, 100:18, 100:23, 101:11, 101:13, 101:15, 101:24, 105:15, 105:21, 106:13, 117:22
**MIAMI** [4] - 1:2, 1:5, 153:9, 153:10
**Michelle** [1] - 153:7
**MICHELLE** [2] - 2:1, 153:8
**microphone** [1] - 65:2
**might** [21] - 9:14, 14:2, 22:19, 26:9, 41:23, 61:15, 61:20, 62:13, 66:25, 75:24, 76:17, 79:12, 82:1, 85:22, 89:25, 90:11, 98:20, 114:23, 126:24, 134:12, 144:18
**miles** [7] - 15:15, 85:24, 86:7, 94:18, 115:24, 116:4, 123:16
**million** [20] - 17:7, 17:8, 17:9, 17:16, 17:19, 18:13, 18:16, 18:19, 19:2, 19:3, 19:6, 19:8, 19:11, 19:20, 19:22, 19:23, 19:24, 19:25, 55:8
**mind** [4] - 111:25, 117:12, 123:2, 151:16
**minute** [1] - 95:17
**minutes** [3] - 134:8, 137:25, 152:1
**mischaracterizes** [4] - 71:7, 72:10, 73:12, 146:11
**mislead** [1] - 72:21
**misrepresented** [1] - 112:6
**missed** [2] - 143:3, 149:20
**missing** [2] - 145:10, 148:19
**misstatement** [1] - 72:20

**misstates** [1] - 121:7
**mistake** [2] - 72:6, 88:13
**mistaken** [2] - 78:16, 125:14
**mistakes** [3] - 80:18, 138:9, 144:16
**mode** [2] - 6:19
**modifications** [3] - 6:21, 128:15, 128:17
**modified** [1] - 127:23
**moment** [2] - 77:8, 141:19
**Monday** [2] - 41:17, 41:18
**money** [3] - 25:25, 26:2, 53:16
**monitor** [2] - 7:9
**month** [2] - 124:13, 150:15
**months** [4] - 79:18, 114:4, 114:6, 114:8
**months'** [1] - 128:10
**Morgan** [1] - 5:23
**morning** [7] - 3:13, 32:18, 41:15, 41:17, 60:25, 61:10, 61:11
**most** [1] - 119:13
**motion** [4] - 41:10, 42:4, 136:11, 136:12
**MOURE** [20] - 1:18, 3:10, 3:15, 3:18, 22:4, 41:17, 41:19, 43:4, 43:9, 43:14, 43:17, 43:20, 43:22, 44:4, 44:10, 67:25, 136:7, 136:12, 136:14, 136:16
**Moure** [3] - 1:19, 3:10, 136:23
**Move** [7] - 31:1, 31:2, 71:19, 99:23, 101:1, 107:4, 139:23
**move** [13] - 17:19, 30:25, 51:25, 58:8, 94:12, 107:23, 112:16, 113:6, 115:4, 121:10, 128:7, 134:19, 136:4
**moved** [2] - 4:6, 4:9
**moving** [1] - 113:15
**MR** [136] - 3:8, 3:10, 3:15, 3:18, 3:25, 10:13, 12:3, 12:7, 12:12, 12:13, 12:19, 14:25, 16:6, 18:4, 20:13, 20:18, 21:4, 21:6, 21:9, 21:11, 21:16, 22:2, 22:4, 22:10, 23:3, 23:17,

24:1, 24:2, 24:9, 24:10, 29:16, 30:15, 31:11, 32:6, 32:13, 38:20, 38:23, 39:18, 40:4, 40:6, 40:16, 41:3, 41:17, 41:19, 41:22, 42:5, 42:13, 42:16, 42:19, 43:4, 43:9, 43:14, 43:17, 43:20, 43:22, 44:4, 44:10, 45:16, 45:23, 48:5, 48:9, 48:16, 49:6, 49:17, 49:20, 50:12, 50:16, 50:22, 50:25, 51:3, 52:17, 52:25, 56:13, 56:14, 57:20, 58:19, 60:23, 61:1, 64:13, 67:25, 69:8, 71:6, 72:5, 72:10, 73:11, 75:4, 76:22, 77:11, 80:23, 82:3, 87:7, 87:11, 88:14, 92:10, 92:17, 92:20, 96:17, 97:16, 103:5, 106:19, 107:3, 110:24, 113:8, 114:21, 115:1, 117:3, 118:11, 119:20, 121:7, 121:25, 123:8, 132:7, 132:10, 136:7, 136:12, 136:14, 136:16, 138:4, 138:9, 138:18, 139:10, 140:10, 141:7, 143:8, 143:17, 144:25, 146:10, 149:3, 149:25, 150:6, 150:11, 151:12, 151:14, 151:16, 151:17, 152:5
**MS** [128] - 10:9, 11:25, 12:6, 12:17, 14:1, 14:21, 17:25, 18:5, 18:11, 20:12, 20:14, 21:5, 21:25, 22:7, 30:25, 32:16, 32:24, 33:4, 35:22, 37:21, 38:16, 38:18, 41:9, 41:15, 41:18, 41:20, 41:25, 46:14, 46:22, 46:24, 47:1, 47:11, 47:13, 48:22, 49:13, 50:2, 52:13, 52:15, 56:6, 57:17, 58:8, 61:9, 64:19, 65:5, 68:2, 68:12, 69:14, 71:19, 71:22, 71:23, 72:13, 73:19, 76:8, 77:1, 77:19, 81:1, 82:6, 87:9, 87:12, 88:16, 88:17,

93:2, 93:11, 93:13,
93:24, 96:23, 96:24,
97:20, 97:21, 98:15,
98:17, 99:3, 99:23,
100:1, 101:1, 101:16,
103:8, 103:11,
103:15, 106:21,
106:25, 107:4, 107:5,
111:6, 113:6, 113:13,
113:17, 113:19,
113:21, 115:3, 115:6,
117:10, 118:18,
119:23, 121:11,
122:1, 122:5, 122:11,
123:5, 123:7, 123:9,
123:11, 132:9,
132:16, 134:8, 134:9,
134:19, 134:22,
134:25, 135:1, 136:6,
136:22, 138:11,
138:20, 139:1, 139:2,
139:24, 140:2, 140:4,
140:12, 140:16,
141:17, 143:5,
143:22, 146:20,
149:6, 149:8, 149:23
**multi** [1] - 21:13
**multi-page** [1] -
21:13
**multiple** [3] - 104:7,
119:11, 125:18
**multitude** [1] - 38:8
**must** [1] - 6:9
**Mutual** [1] - 36:17
**Myers** [1] - 113:24

# N

**name** [13] - 3:21,
3:22, 3:23, 8:22, 9:3,
10:18, 10:20, 14:11,
126:25, 131:6,
131:11, 131:13,
145:25
**named** [2] - 25:17,
27:7
**narrative** [2] - 10:10,
14:22
**Natalie** [3] - 133:12,
133:14, 133:15
**Nataly** [1] - 124:9
**National** [20] - 3:4,
3:9, 5:17, 5:25, 9:5,
18:1, 20:4, 20:6, 20:9,
22:15, 22:21, 30:4,
47:15, 56:3, 57:15,
70:18, 102:4, 103:2,
103:16, 147:2
**NATIONAL** [1] - 1:3
**National's** [1] - 104:8
**nature** [8] - 28:2,

61:16, 85:17, 90:10,
90:21, 91:20, 120:24,
135:15
**navigated** [1] - 120:1
**navigating** [1] -
123:18
**navigation** [51] -
91:25, 94:8, 94:18,
94:24, 95:1, 97:25,
98:10, 99:16, 100:7,
100:11, 103:2,
106:23, 107:18,
109:20, 115:13,
115:23, 116:16,
117:18, 117:25,
119:25, 120:12,
120:21, 120:23,
121:13, 121:14,
122:3, 123:1, 123:12,
123:15, 123:23,
124:6, 124:10,
124:23, 127:22,
128:18, 128:22,
129:2, 129:9, 130:2,
130:5, 130:10,
130:12, 130:16,
130:17, 131:21,
131:25, 132:19,
133:18, 134:2, 134:5
**navigational** [6] -
48:17, 60:3, 125:5,
125:19, 141:4, 142:19
**navigator** [1] -
119:12
**necessarily** [10] -
22:18, 27:16, 40:18,
61:24, 72:6, 97:15,
130:6, 138:6, 141:8,
147:21
**necessary** [6] - 36:5,
36:6, 36:7, 37:9,
51:15, 146:18
**need** [29] - 6:13,
9:15, 14:23, 17:19,
20:1, 22:6, 23:6,
29:13, 45:15, 47:21,
50:20, 55:9, 55:24,
59:4, 62:16, 62:18,
63:23, 84:1, 84:15,
86:4, 86:6, 98:21,
136:3, 147:23, 148:2,
148:9, 148:12, 148:14
**needs** [1] - 11:12,
53:14, 145:16
**negate** [2] - 110:15,
149:14
**negates** [1] - 110:15
**negotiation** [1] -
98:4
**Never** [1] - 151:16

**never** [21] - 12:15,
21:8, 21:9, 21:12,
25:20, 35:16, 41:6,
43:25, 53:19, 58:7,
58:13, 77:6, 81:21,
81:22, 112:2, 125:3,
126:5, 127:4, 134:5
**new** [3] - 18:13,
113:24, 146:16
**New** [5] - 19:6, 19:9,
100:23, 101:10,
101:21
**next** [9] - 6:23, 19:3,
19:22, 87:14, 97:18,
123:1, 123:12, 135:2
**nobody's** [1] -
136:20
**nonissue** [1] - 54:18
**nonprivileged** [1] -
6:3
**nonresponsive** [7] -
31:1, 31:3, 71:21,
99:24, 101:1, 113:7
**nonspeculative** [1] -
14:2
**noon** [1] - 105:12
**normally** [3] - 51:10,
51:11
**North** [1] - 2:2
**NORTH** [1] - 153:9
**notation** [2] - 88:19,
109:24
**note** [1] - 88:4
**noted** [3] - 67:11,
114:16, 131:15
**notes** [2] - 42:7,
108:15
**nothing** [8] - 21:11,
52:6, 63:16, 80:15,
112:13, 120:22,
125:7, 149:23
**notice** [3] - 42:14,
45:21, 45:23
**notification** [2] -
31:25, 130:17
**notified** [7] - 13:16,
30:4, 30:6, 32:3,
32:10, 45:18, 137:23
**notify** [3] - 50:25,
60:4, 60:6
**nowhere** [1] - 116:20
**nuances** [1] - 64:23
**NUMBER** [1] - 1:2
**number** [9] - 23:7,
71:14, 107:2, 121:15,
123:4, 123:6, 132:7,
132:8, 142:15
**Number** [4] - 3:5,
23:8, 23:9, 129:14
**numbered** [2] -

127:15, 142:12
**numerous** [7] -
58:12, 67:1, 85:6,
85:7, 85:10, 85:13,
102:19

# O

**O83** [1] - 30:11
**oath** [1] - 53:19
**object** [10] - 64:13,
77:11, 88:14, 96:17,
97:16, 103:5, 110:24,
114:21, 138:4, 139:10
**objected** [3] - 32:20,
85:5
**objecting** [1] - 49:10
**Objection** [26] - 10:9,
11:25, 12:17, 14:1,
14:21, 17:25, 20:12,
30:25, 52:13, 56:6,
57:17, 69:8, 71:6,
72:5, 75:4, 76:22,
82:3, 106:19, 117:3,
118:11, 119:20,
121:7, 138:18,
140:10, 144:25,
146:10
**objection** [11] - 22:8,
22:13, 22:19, 22:25,
23:15, 31:5, 72:9,
80:23, 92:19, 96:19,
138:8
**objections** [1] - 22:5
**objects** [1] - 112:17
**obligation** [31] -
62:12, 62:20, 62:23,
63:1, 63:10, 64:10,
66:7, 66:18, 67:4,
70:12, 70:16, 70:18,
70:20, 71:24, 72:2,
72:14, 72:17, 72:20,
76:4, 97:3, 144:6,
144:20, 146:18,
146:25, 147:4, 147:7,
147:14, 148:5,
148:17, 148:24,
149:10
**obligations** [3] -
51:18, 51:19, 96:14
**obtain** [7] - 13:7,
13:10, 13:11, 35:2,
74:14, 74:16, 111:21
**obtaining** [1] - 72:21
**obtains** [1] - 74:6
**Obviously** [2] - 40:8,
48:19
**obviously** [7] -
32:22, 39:11, 44:18,
44:19, 45:1, 51:12,
101:11

**occur** [3] - 30:21,
32:9, 142:18
**occurred** [19] -
27:21, 28:4, 28:10,
28:11, 28:19, 29:11,
30:17, 30:21, 30:24,
31:15, 32:7, 32:9,
49:16, 52:2, 86:25,
116:6, 125:11, 148:6
**occurrence** [5] -
27:10, 27:17, 28:2,
28:10, 29:9
**occurrences** [1] -
48:12
**occurs** [1] - 31:19
**ocean** [5] - 7:24, 8:3,
67:6, 118:5, 145:20
**Ocean** [5] - 30:2,
30:5, 30:24, 52:3,
64:8
**OF** [3] - 1:1, 1:9, 2:6
**off-road** [1] - 110:13
**offer** [3] - 140:6,
148:13, 148:21
**offered** [1] - 129:13
**offering** [1] - 131:16
**office** [6] - 9:11,
9:12, 9:13, 34:20,
34:22, 88:3
**officer** [2] - 38:13,
55:13
**Offshore** [2] - 90:13,
91:21
**Oftentimes** [1] - 7:14
**oil** [1] - 84:10
**old** [2] - 55:8, 75:24
**Omaha** [1] - 36:17
**once** [6] - 6:22,
30:19, 43:25, 74:19,
107:25, 127:10
**Once** [1] - 51:20
**One** [5] - 6:25, 16:25,
37:16, 151:1
**one** [51] - 7:2, 9:6,
11:12, 14:18, 16:1,
23:7, 23:15, 30:11,
31:16, 31:17, 38:6,
40:24, 44:22, 58:23,
61:19, 65:15, 69:1,
69:24, 70:6, 71:13,
72:24, 74:6, 74:20,
75:24, 79:17, 91:13,
92:11, 92:12, 92:22,
93:18, 97:10, 99:6,
99:8, 100:17, 100:22,
104:18, 104:20,
106:5, 106:6, 107:8,
110:6, 117:5, 117:21,
132:21, 138:7,
139:24, 141:9,

144:13, 149:25, 150:9
**one-year-old** [1] - 75:24
**ones** [1] - 43:6
**ongoing** [1] - 140:18
**onset** [1] - 36:3
**open** [1] - 118:5
**open-ocean** [1] - 118:5
**operated** [2] - 34:20, 57:15
**operating** [2] - 101:6, 123:17
**operation** [10] - 34:23, 68:6, 86:3, 91:24, 97:9, 112:24, 117:11, 120:24, 120:25, 141:5
**operations** [16] - 10:14, 10:15, 10:23, 11:5, 11:19, 60:10, 66:14, 68:4, 68:5, 84:5, 84:9, 85:24, 122:7, 122:9, 123:13, 123:14
**opine** [5] - 21:2, 140:22, 140:23, 148:13, 149:21
**opined** [1] - 21:4
**opinion** [34] - 6:6, 13:11, 32:21, 52:18, 52:19, 52:21, 70:11, 70:15, 79:9, 79:10, 81:19, 106:14, 111:7, 111:12, 113:5, 136:8, 139:20, 139:25, 140:6, 140:13, 140:15, 140:18, 141:1, 141:13, 144:5, 144:8, 144:9, 144:10, 146:5, 148:5, 148:14, 148:18, 148:21, 148:23
**opinions** [4] - 6:1, 99:7, 136:19, 149:18
**opportunity** [3] - 7:15, 60:7, 135:23
**opposed** [4] - 31:8, 32:9, 117:4, 120:25
**opposing** [1] - 51:1
**Optimum** [8] - 40:21, 48:24, 49:21, 49:23, 49:25, 53:6, 54:1, 126:4
**oral** [8] - 118:12, 118:14, 119:7, 119:25, 123:20, 123:21, 125:1, 132:23
**orally** [3] - 60:1, 133:24, 134:5

**order** [9] - 6:9, 6:13, 25:19, 42:4, 55:2, 57:4, 58:17, 60:4, 77:5
**ordinary** [2] - 108:19, 135:9
**organization** [1] - 141:22
**original** [5] - 17:4, 17:6, 105:18, 113:11
**otherwise** [2] - 54:14, 94:12
**outside** [7] - 60:3, 60:9, 84:4, 84:6, 84:9, 86:1, 86:11
**outstanding** [1] - 65:10
**overall** [1] - 43:1
**overpayment** [1] - 39:4
**overprice** [2] - 7:1, 7:4
**overrule** [1] - 64:16
**Overruled** [17] - 14:5, 18:9, 69:12, 71:9, 72:11, 75:10, 76:24, 92:25, 93:7, 103:19, 111:3, 117:6, 118:16, 138:10, 139:13, 145:2, 146:12
**oversaw** [1] - 44:15
**overseeing** [1] - 37:6
**overviewing** [1] - 37:2
**owe** [1] - 96:14
**owed** [2] - 97:3, 97:5
**own** [1] - 4:10
**owned** [1] - 115:9
**owner** [9] - 8:2, 8:4, 96:25, 97:1, 97:3, 115:8, 115:9, 119:8, 146:8
**ownership** [3] - 49:24, 145:19

# P

**P&C** [2] - 35:11, 35:13
**P&I** [16] - 17:19, 18:15, 19:1, 19:8, 19:20, 19:21, 24:20, 25:5, 25:6, 25:7, 25:8, 26:9, 26:14, 26:15, 105:13
**P.m** [1] - 129:8
**p.m** [6] - 104:13, 105:9, 105:16, 129:7, 129:10, 151:21
**Page** [1] - 83:5

**page** [22] - 13:23, 13:24, 21:13, 68:22, 69:15, 78:23, 83:2, 83:7, 83:12, 84:19, 84:25, 87:17, 108:11, 125:5, 127:18, 128:6, 128:8, 128:24, 130:24, 131:2, 133:25, 135:20
**PAGE** [1] - 2:7
**Pages** [1] - 1:8
**pages** [4] - 84:17, 86:23, 91:4, 128:8
**paid** [8] - 19:21, 20:10, 27:2, 27:5, 27:8, 40:1, 52:6, 53:4
**Palmer** [8] - 14:11, 102:18, 104:13, 104:14, 104:19, 105:1, 105:21
**Palmer's** [2] - 105:14, 105:25
**paper** [9] - 92:11, 92:12, 103:21, 104:4, 104:7, 104:10, 104:11, 132:23
**paragraph** [3] - 67:16, 67:17, 67:20
**parameters** [1] - 102:15
**parole** [1] - 111:10
**part** [33] - 11:11, 19:18, 24:20, 24:21, 25:5, 25:7, 29:18, 29:22, 30:20, 31:12, 33:25, 33:17, 33:25, 38:10, 40:8, 44:25, 48:13, 50:12, 53:15, 54:23, 71:21, 73:14, 75:7, 80:11, 80:18, 88:7, 104:4, 138:5, 138:7, 143:23, 148:5
**particular** [27] - 10:15, 11:16, 20:2, 30:22, 39:12, 52:8, 60:10, 60:11, 63:5, 64:17, 69:2, 74:20, 75:23, 76:7, 82:10, 82:11, 83:13, 87:23, 88:10, 89:10, 100:4, 135:12, 137:18, 137:19, 137:20, 139:16, 147:19
**particularly** [1] - 76:23
**parties** [3] - 44:25, 90:11, 127:8
**parts** [2] - 24:19, 76:6
**party** [2] - 26:18,

26:19
**passengers** [2] - 10:1, 11:7
**past** [4] - 4:3, 7:14, 50:23, 76:12
**pay** [7] - 7:4, 26:4, 29:8, 29:13, 31:13, 51:14, 55:4
**payable** [2] - 24:24, 25:2
**paying** [1] - 18:17
**payment** [12] - 25:16, 25:18, 25:20, 26:25, 27:1, 27:3, 27:6, 29:17, 48:24, 51:13, 53:2
**pays** [2] - 29:5, 53:16
**peculiarities** [1] - 61:23
**penetrations** [1] - 114:20
**Pennsylvania** [1] - 4:18
**people** [9] - 36:7, 37:2, 40:21, 50:16, 51:9, 51:22, 51:25, 53:21, 63:14
**per** [8] - 17:11, 17:13, 17:14, 17:17, 17:21, 18:17, 19:10, 20:3
**percent** [1] - 17:13
**percentages** [1] - 17:12
**perhaps** [7] - 12:5, 20:20, 22:7, 38:20, 41:5, 41:23, 45:20
**Perhaps** [2] - 21:16, 149:25
**perils** [7] - 59:6, 59:12, 59:13, 59:14, 59:15, 59:16, 59:21
**period** [3] - 76:19, 77:2, 82:19
**perjure** [1] - 58:5
**perjury** [1] - 58:9
**person** [12] - 31:6, 36:2, 36:22, 37:5, 52:22, 53:9, 53:14, 55:13, 57:14, 60:9, 75:11
**personnel** [2] - 102:14, 142:5
**perspective** [6] - 26:10, 44:23, 51:8, 52:3, 53:13, 56:5
**pertinent** [2] - 146:17, 147:9
**PHILLIP** [1] - 1:18
**phone** [4] - 69:6,

79:6, 88:11, 88:18
**phrase** [2] - 20:21, 84:17
**phrased** [1] - 56:9
**picture** [4] - 72:24, 73:4, 75:20, 103:23
**pictures** [1] - 143:25
**piece** [1] - 16:5, 66:23, 70:6, 82:11, 103:21, 104:4, 104:6, 104:10, 104:11
**pieces** [5] - 15:23, 67:1, 70:7, 81:11, 104:7
**pinpoint** [1] - 86:24
**place** [9] - 9:12, 62:11, 71:4, 80:2, 95:24, 107:1, 112:14, 120:24, 130:7
**placed** [1] - 91:20
**placement** [4] - 42:2, 72:3, 133:8, 151:6
**Placement** [2] - 5:24, 30:9
**places** [3] - 11:17, 11:18
**placing** [3] - 65:23, 76:9, 94:2
**plaintiff** [3] - 3:9, 5:10, 32:20
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:13
**plaintiff's** [1] - 136:10
**Plaintiff's** [12] - 99:5, 105:4, 108:24, 121:25, 122:4, 123:8, 124:9, 128:5, 129:13, 132:13, 134:21, 141:20
**pleading** [1] - 46:15
**pleadings** [3] - 46:14, 46:15, 47:14
**point** [36] - 3:17, 10:2, 12:8, 12:9, 20:17, 23:18, 31:9, 32:19, 34:2, 38:23, 40:18, 41:22, 42:21, 47:24, 48:12, 51:5, 70:5, 70:25, 73:18, 74:21, 75:5, 76:14, 84:15, 86:2, 86:12, 86:24, 90:1, 113:2, 116:13, 121:2, 121:3, 121:6, 121:10
**points** [1] - 47:4
**policies** [11] - 31:16, 37:18, 37:23, 38:3, 38:6, 38:14, 42:2, 61:16, 99:12, 103:9,

139:4
**policy** [150] - 6:2, 8:17, 12:15, 12:21, 15:2, 16:19, 16:22, 16:23, 17:1, 17:3, 17:15, 18:2, 19:9, 20:20, 20:22, 22:22, 24:13, 24:16, 24:19, 24:20, 24:25, 25:6, 25:10, 26:13, 26:15, 28:5, 28:12, 28:25, 29:9, 29:12, 29:18, 29:19, 31:18, 32:22, 40:10, 40:22, 40:24, 40:25, 42:1, 42:9, 43:12, 44:2, 44:11, 45:1, 46:16, 47:10, 48:1, 49:14, 49:15, 49:21, 51:10, 51:16, 51:17, 52:4, 54:7, 54:8, 54:16, 57:7, 57:9, 57:25, 58:21, 58:22, 58:23, 58:24, 58:25, 59:1, 59:7, 59:9, 59:12, 59:19, 60:2, 60:21, 63:17, 79:11, 99:15, 100:7, 100:10, 101:20, 101:21, 103:2, 103:16, 108:11, 109:20, 110:7, 111:11, 112:9, 115:20, 115:21, 121:13, 121:19, 122:12, 122:17, 122:18, 122:24, 123:22, 124:5, 124:25, 125:12, 127:10, 127:12, 127:20, 127:23, 128:1, 128:15, 128:18, 129:1, 131:8, 131:10, 132:19, 133:18, 134:3, 136:24, 137:3, 137:5, 137:6, 137:11, 137:19, 137:21, 137:24, 138:5, 138:7, 138:15, 139:6, 139:7, 140:7, 140:20, 141:5, 141:9, 141:14, 141:18, 141:19, 141:23, 142:1, 142:5, 142:10, 142:16, 146:2, 146:8, 147:16, 148:7, 150:20
**policyholder** [2] - 19:7, 19:8
**pollution** [1] - 59:16
**portion** [2] - 17:15, 99:23

**position** [10] - 4:7, 4:23, 9:8, 9:9, 36:25, 56:2, 70:25, 75:1, 97:13, 104:6
**positions** [1] - 4:5
**possibilities** [1] - 86:10
**possibility** [1] - 17:22
**possible** [3] - 34:4, 57:4, 89:1
**post** [11] - 46:15, 46:16, 46:18, 46:24, 47:15, 47:19, 47:20, 48:13, 49:14, 56:11, 128:10
**post-claim** [1] - 56:11
**post-loss** [8] - 46:15, 46:16, 46:18, 46:24, 47:15, 48:13, 49:14, 128:10
**post-March** [1] - 47:20
**potential** [4] - 9:11, 17:21, 19:23, 19:25
**practice** [7] - 15:7, 77:17, 88:24, 89:1, 89:2, 90:23, 91:3
**practices** [3] - 36:10, 41:4, 80:14
**pre** [1] - 53:10
**pre-claim** [1] - 53:10
**precedent** [2] - 111:13, 111:15
**predated** [2] - 29:9, 29:11
**predicate** [8] - 12:18, 18:2, 18:6, 23:1, 31:5, 31:8, 50:13, 138:24
**predicate's** [1] - 22:17
**predicated** [4] - 99:16, 101:12, 103:2, 104:8
**prefer** [1] - 149:21
**prejudice** [2] - 126:23, 127:8
**premier** [1] - 5:2
**premium** [66] - 6:25, 17:4, 17:6, 17:10, 17:16, 18:13, 18:14, 18:15, 18:21, 18:23, 19:1, 20:5, 20:6, 20:10, 20:24, 20:25, 21:19, 22:23, 23:6, 23:10, 23:12, 24:4, 24:11, 24:12, 24:16, 24:23, 25:1, 25:4, 25:6, 25:8, 25:10,

25:12, 25:18, 25:19, 25:23, 26:1, 26:4, 26:6, 26:9, 26:14, 26:24, 27:11, 28:3, 29:7, 29:13, 29:15, 29:21, 29:23, 60:8, 99:15, 100:6, 100:10, 100:12, 101:4, 101:5, 103:1, 103:17, 120:11, 120:13, 120:15
**premiums** [3] - 99:11, 100:21, 102:23
**prepared** [3] - 107:24, 109:12, 109:13
**preparing** [1] - 108:2
**prerogative** [1] - 145:21
**presented** [2] - 81:9
**presiding** [1] - 3:3
**presume** [1] - 74:5
**pretty** [3] - 7:17, 61:21, 140:14
**prevent** [1] - 72:21
**previous** [1] - 102:22
**Price** [71] - 5:21, 9:20, 9:21, 10:3, 10:6, 10:19, 13:8, 13:12, 13:15, 13:16, 13:17, 13:25, 14:7, 14:8, 16:13, 16:15, 42:13, 53:18, 58:3, 58:12, 58:18, 59:25, 70:9, 70:17, 71:17, 73:21, 76:5, 76:9, 76:11, 76:15, 76:19, 77:4, 77:6, 77:25, 78:21, 79:1, 79:10, 80:8, 80:9, 80:11, 80:17, 81:11, 81:14, 81:16, 81:17, 81:18, 81:21, 82:21, 82:24, 83:14, 85:9, 87:2, 87:20, 89:7, 91:13, 96:2, 101:8, 102:17, 104:23, 106:9, 106:10, 110:12, 112:2, 113:3, 117:2, 120:3, 132:22, 134:11, 134:15, 134:16
**price** [8] - 6:24, 7:7, 8:14, 17:3, 55:10, 81:3, 111:21
**Price's** [7] - 6:4, 10:20, 71:20, 77:17, 104:5, 112:4, 117:12
**pricing** [8] - 6:23, 16:23, 16:25, 17:1,

19:15, 100:19, 100:20, 101:14
**primary** [1] - 76:3
**principle** [2] - 64:22, 110:18
**privilege** [1] - 6:3
**privy** [2] - 102:17, 143:10
**problem** [12] - 14:16, 42:25, 50:13, 87:19, 87:24, 87:25, 88:8, 89:4, 91:14, 103:24, 136:3, 152:2
**problems** [3] - 7:2, 7:10, 87:21
**procedure** [7] - 12:4, 23:22, 31:25, 39:6, 39:7, 39:25, 45:21
**procedures** [4] - 31:7, 31:24, 39:19, 80:14
**proceed** [2] - 54:6, 55:2
**proceeded** [1] - 51:25
**proceeding** [1] - 125:8
**proceedings** [2] - 25:24, 153:4
**process** [36] - 6:7, 6:14, 13:3, 13:7, 16:1, 22:22, 31:14, 32:8, 33:19, 33:20, 33:25, 34:1, 36:5, 37:16, 40:12, 42:8, 43:3, 44:7, 49:25, 53:11, 55:25, 56:1, 58:17, 68:7, 74:17, 74:22, 75:8, 75:12, 75:15, 75:19, 80:18, 103:25, 125:3, 125:4
**processes** [6] - 6:8, 7:12, 7:25, 36:1, 37:17, 50:7
**processing** [6] - 31:10, 32:23, 46:9, 47:19, 57:16, 57:18
**procure** [1] - 9:14
**producer** [2] - 9:9, 82:10
**producers** [1] - 82:8
**producing** [1] - 8:16
**professional** [4] - 4:1, 4:25, 33:11, 34:17
**proffered** [1] - 35:19
**progressed** [1] - 4:5
**progresses** [1] - 7:10
**progression** [1] -

75:1
**promise** [1] - 128:8
**promptly** [2] - 30:4, 32:10
**proof** [5] - 126:17, 126:19, 135:7, 135:13, 135:14
**propeller** [2] - 113:25, 148:11
**proper** [3] - 39:19, 47:10, 53:12
**properly** [7] - 22:22, 33:25, 34:1, 44:8, 52:7, 63:22, 137:8
**property** [4] - 5:1, 5:3, 8:4, 37:17
**Property** [1] - 35:14
**protection** [6] - 17:7, 17:9, 17:10, 17:14, 17:20, 53:16
**protocol** [1] - 23:22
**provide** [21] - 13:4, 60:11, 63:24, 63:25, 81:4, 96:15, 97:4, 97:5, 111:13, 111:16, 112:3, 121:2, 133:20, 135:17, 137:22, 145:18, 146:3, 146:16, 147:9, 147:14, 147:18
**Provided** [1] - 143:4
**provided** [36] - 5:24, 13:18, 15:17, 16:8, 17:7, 17:8, 19:7, 39:21, 39:22, 48:2, 53:6, 53:8, 53:20, 53:23, 53:25, 54:11, 54:19, 55:15, 56:24, 57:24, 58:14, 60:15, 63:5, 65:11, 94:7, 95:19, 142:25, 143:5, 144:7, 144:12, 150:12, 150:14, 150:16, 150:20, 150:21
**provides** [1] - 60:8
**providing** [2] - 56:17, 56:18
**provision** [5] - 59:18, 59:19, 59:20, 60:2, 137:22
**provisions** [7] - 40:24, 40:25, 42:10, 58:21, 58:23, 59:21, 138:13
**proximately** [5] - 137:14, 137:15, 138:15, 139:8, 140:8
**prudent** [4] - 119:6, 119:13, 119:18,

144:17
  **pulled** [1] - 87:22
  **pump** [1] - 148:19
  **pumps** [1] - 148:21
  **purported** [3] -
115:12, 118:8, 130:10
  **purportedly** [1] -
52:24
  **purpose** [5] - 15:9,
15:14, 112:23, 128:7,
135:12
  **purposes** [1] - 48:23
  **pursuant** [2] -
110:21, 111:9
  **pursue** [4] - 63:11,
63:24, 65:13, 145:11
  **pursuit** [1] - 116:10
  **put** [5] - 23:10,
45:12, 63:4, 66:15,
94:11
  **putting** [2] - 66:19,
120:3
  **puzzle** [2] - 16:5,
17:1

## Q

**QIS** [1] - 103:12
  **qualification** [1] -
136:16
  **qualifications** [3] -
31:12, 85:21, 136:9
  **qualified** [3] - 44:15,
45:13, 148:16
  **qualify** [1] - 136:18
  **qualities** [1] - 144:13
  **question's** [1] -
92:14
  **questionable** [1] -
81:19
  **questioning** [1] -
14:13
  **questions** [21] -
6:18, 16:13, 31:4,
38:17, 38:18, 56:25,
60:23, 92:12, 97:15,
102:2, 102:15,
102:22, 114:22,
117:4, 119:19, 128:7,
145:22, 147:13,
149:25, 150:7, 152:5
  **quick** [1] - 16:11
  **quickly** [3] - 34:4,
43:4, 46:4
  **quite** [1] - 97:14
  **quotation** [2] - 94:8,
94:17, 94:21
  **quotations** [1] -
120:15
  **quote** [15] - 17:2,

17:4, 17:14, 17:15,
17:18, 18:21, 94:4,
94:7, 94:23, 94:25,
95:11, 95:17

## R

**R-o-i-n-e-s-t-a-d** [1] -
3:23
  **Racing** [1] - 36:17
  **raft** [1] - 113:25
  **raise** [1] - 22:25
  **raised** [5] - 40:16,
115:3, 130:2, 130:19,
136:23
  **raising** [2] - 130:4,
130:15
  **rapid** [1] - 16:17
  **rate** [5] - 18:12,
19:10, 20:2, 31:16,
104:1
  **rated** [2] - 99:15,
101:12
  **rates** [8] - 17:20,
18:6, 101:12, 101:20,
101:21, 120:21,
120:22, 120:23
  **rather** [2] - 16:17,
39:10
  **ratification** [1] - 49:3
  **ratifies** [1] - 46:18
  **rating** [2] - 18:2,
103:18
  **ratings** [1] - 99:11
  **re** [3] - 12:10, 50:20,
58:11
  **re-ask** [1] - 12:10
  **re-evaluate** [1] -
50:20
  **re-visit** [1] - 58:11
  **reaching** [1] - 99:7
  **read** [11] - 5:22, 6:4,
15:3, 15:5, 22:13,
51:23, 54:2, 76:17,
91:5, 113:13
  **Read** [1] - 59:9
  **reading** [3] - 91:7,
98:5, 142:21
  **Reading** [1] - 69:15
  **ready** [1] - 61:6
  **real** [2] - 85:25, 91:1
  **realize** [2] - 59:2,
138:3
  **realizing** [1] - 139:4
  **really** [13] - 6:12,
18:23, 19:19, 26:21,
29:23, 45:9, 45:12,
47:8, 66:7, 88:15,
97:16, 104:4, 145:7
  **realm** [1] - 86:11

**reason** [15] - 13:24,
18:23, 20:5, 20:9,
80:21, 81:4, 81:25,
84:6, 84:8, 85:25,
86:11, 86:17, 89:5,
107:20, 116:10
  **reasonable** [3] -
74:5, 81:25, 119:6
  **reasonableness** [4] -
42:24, 43:2, 44:7,
45:10
  **reasons** [2] - 14:2,
56:23
  **rebut** [1] - 49:2
  **rebutted** [1] - 50:3
  **receipt** [3] - 115:19,
115:21, 141:19
  **receive** [2] - 51:13,
58:15
  **received** [13] - 9:25,
15:1, 55:3, 58:1,
69:16, 83:15, 96:8,
102:9, 107:25,
121:13, 123:22,
125:16, 142:10
  **receiving** [1] -
130:15
  **recipient** [3] -
104:18, 104:20,
105:18
  **recognize** [3] -
42:20, 42:25, 133:9
  **recognized** [2] -
10:11, 35:1
  **recollection** [3] -
69:6, 69:7, 70:1
  **record** [12] - 3:7,
3:21, 4:2, 4:14, 21:14,
47:17, 52:9, 59:10,
88:18, 122:2, 138:9,
150:19
  **records** [1] - 129:8
  **recounted** [1] -
83:21
  **recounting** [3] -
83:9, 90:17, 90:18
  **recounts** [1] - 83:8
  **recovery** [1] - 125:22
  **rectified** [1] - 63:3
  **Redirect** [1] - 2:11
  **redirect** [1] - 149:24
  **REDIRECT** [1] -
150:10
  **reduces** [1] - 17:22
  **refer** [9] - 83:1, 87:2,
99:20, 100:5, 101:19,
102:2, 103:23, 104:7,
142:19
  **reference** [15] - 58:9,
80:20, 83:10, 83:13,

83:21, 83:23, 83:24,
92:2, 92:5, 93:14,
93:15, 100:2, 120:16,
122:8, 124:22
  **referencing** [2] -
121:13, 121:14
  **referred** [6] - 10:8,
58:15, 83:12, 86:15,
104:12, 132:20
  **referring** [13] -
41:10, 87:6, 92:14,
101:17, 102:3, 102:6,
102:9, 102:13,
104:24, 128:23,
147:10, 147:11
  **refers** [5] - 99:17,
100:6, 100:10, 103:8,
103:16
  **reflect** [8] - 104:25,
128:18, 131:17,
141:25, 142:2, 142:4,
142:8, 142:19
  **reflected** [3] - 131:6,
131:12, 132:14
  **reflects** [1] - 142:3
  **refresh** [2] - 105:3,
134:13
  **regard** [1] - 137:8
  **regarding** [28] - 31:4,
34:17, 38:24, 39:20,
41:11, 41:16, 42:6,
42:8, 47:18, 55:15,
58:9, 64:9, 70:21,
71:20, 88:6, 88:19,
88:20, 102:14,
105:14, 105:21,
109:16, 115:13,
129:9, 130:10,
130:12, 130:17,
131:24, 143:12
  **regardless** [3] -
111:14, 112:1, 126:20
  **regards** [3] - 55:21,
131:8, 131:15
  **related** [4] - 6:2,
100:21, 137:15,
138:16
  **relates** [7] - 40:13,
44:24, 46:7, 46:21,
46:25, 47:19, 101:14
  **relating** [1] - 103:11
  **relationship** [1] -
49:23
  **relative** [2] - 42:11,
45:19, 55:3
  **relaying** [1] - 69:2
  **relevance** [1] -
114:23
  **relevant** [15] - 24:4,
32:21, 39:16, 39:18,

40:7, 40:9, 40:11,
40:13, 45:3, 45:12,
46:16, 47:9, 47:22,
48:20, 76:23
  **relied** [1] - 79:3
  **relief** [1] - 5:18
  **rely** [7] - 66:3, 66:21,
77:25, 116:23,
116:25, 145:15, 146:6
  **relying** [1] - 66:20
  **remain** [1] - 111:5
  **remained** [1] - 18:14
  **remaining** [1] - 43:5
  **remains** [1] - 22:17
  **remember** [4] -
41:13, 107:1, 108:13,
133:4
  **remiss** [1] - 67:5
  **remotely** [1] - 79:14
  **removal** [8] - 27:3,
27:4, 39:13, 49:4,
125:22, 126:2,
126:10, 126:23
  **removed** [1] - 131:16
  **render** [2] - 136:18,
136:21
  **renewal** [1] - 7:11
  **Repeat** [2] - 72:12,
100:8
  **repeat** [7] - 20:8,
67:2, 69:13, 93:1,
93:5, 93:8, 93:10
  **repeatedly** [2] -
73:13, 75:6
  **repeating** [2] -
118:13, 118:14
  **Rephrase** [1] - 24:8
  **rephrase** [8] - 24:9,
74:8, 93:2, 94:17,
102:25, 130:8, 139:1,
142:4
  **replied** [1] - 152:1
  **replies** [1] - 134:1
  **reply** [2] - 133:25,
151:25
  **report** [12] - 31:2,
54:3, 111:24, 147:22,
147:23, 147:25,
148:2, 148:10,
148:12, 148:14,
148:18, 149:10
  **REPORTED** [1] - 2:1
  **reported** [4] - 30:16,
30:19, 30:23, 148:6
  **REPORTER** [1] -
153:9
  **Reporter** [1] - 2:1
  **reporting** [1] - 31:4
  **representation** [6] -
66:6, 66:22, 73:9,

77:25, 80:2, 146:6
   **representations** [6] -
65:24, 66:3, 66:21,
70:13, 70:21, 142:24
   **representative** [2] -
65:8, 101:10
   **representatives** [3] -
40:20, 96:25, 99:11
   **represents** [1] -
67:15
   **request** [26] - 22:4,
26:2, 51:12, 51:13,
79:6, 80:12, 104:22,
105:5, 105:6, 105:7,
127:22, 127:25,
128:12, 128:14,
128:21, 130:10,
130:17, 131:21,
131:24, 132:19,
132:25, 133:3,
133:24, 142:10,
145:15
   **requested** [11] -
16:8, 16:10, 56:24,
64:1, 79:25, 127:11,
128:14, 129:2,
133:18, 133:21,
133:23
   **requesting** [3] -
94:23, 95:1, 142:15
   **requests** [3] -
127:20, 134:11, 142:9
   **require** [10] - 16:18,
26:9, 35:7, 42:23,
43:2, 57:11, 77:17,
79:21, 80:9, 82:9
   **required** [13] - 12:21,
16:8, 51:15, 54:6,
57:25, 79:20, 80:3,
80:6, 80:11, 80:15,
81:3, 81:12, 82:2
   **requirement** [14] -
16:20, 23:18, 54:20,
54:24, 55:22, 57:7,
57:8, 57:13, 77:22,
77:23, 78:1, 79:19,
80:19
   **requires** [7] - 76:1,
76:20, 77:4, 77:6,
79:14, 80:9, 98:3
   **reservation** [23] -
22:16, 36:6, 39:15,
44:8, 48:3, 48:7, 49:5,
49:7, 49:13, 54:2,
125:22, 125:24,
126:3, 126:5, 126:6,
126:10, 126:12,
126:13, 126:14,
126:15, 126:24, 127:3
   **reservation-of-**

   **rights** [12] - 36:6,
39:15, 44:8, 48:7,
49:7, 54:2, 126:5,
126:6, 126:12,
126:14, 126:15, 127:3
   **reservations** [1] -
52:23
   **reserve** [1] - 128:11
   **resolve** [1] - 34:4
   **resolved** [2] - 70:8,
79:6
   **respect** [36] - 13:1,
15:1, 20:21, 21:18,
22:20, 23:1, 31:9,
36:20, 38:25, 39:12,
39:14, 40:12, 43:1,
45:15, 46:9, 46:14,
47:2, 48:23, 49:8,
49:25, 51:22, 55:14,
57:22, 61:24, 76:18,
82:14, 94:23, 99:11,
101:3, 103:15,
119:25, 120:8,
134:11, 135:15,
139:3, 151:1
   **respective** [2] -
40:18, 40:19
   **respond** [8] - 16:11,
38:20, 64:21, 130:23,
130:25, 131:20,
132:25, 133:3
   **responded** [3] -
16:12, 16:16, 57:1
   **response** [10] -
22:16, 94:4, 94:6,
116:5, 131:24, 132:4,
132:17, 133:12,
133:13, 133:14
   **responses** [1] - 47:3
   **responsibilities** [3] -
67:6, 71:12, 71:13
   **responsibility** [11] -
7:9, 8:11, 8:16, 13:4,
33:17, 65:19, 67:8,
70:19, 73:3, 147:1
   **responsive** [1] -
113:9
   **restate** [2] - 76:25,
107:15
   **Restate** [1] - 118:17
   **restrict** [1] - 136:4
   **restriction** [1] -
136:3
   **result** [1] - 80:16
   **results** [2] - 7:9,
137:13
   **retain** [8] - 20:5,
20:6, 20:9, 20:23,
21:20, 21:21, 21:22,
22:23

   **retained** [1] - 21:19
   **return** [8] - 20:24,
21:22, 23:6, 23:9,
23:11, 25:7, 26:1,
28:3
   **returned** [5] - 24:4,
24:16, 26:24, 27:11
   **returning** [3] - 25:23,
26:5, 26:14
   **review** [21] - 16:23,
16:25, 19:9, 33:23,
36:4, 36:8, 78:18,
81:18, 104:25,
106:14, 107:6,
108:14, 114:15,
117:14, 117:16,
121:19, 124:5, 129:8,
131:4, 133:2, 133:22
   **reviewed** [18] - 5:15,
5:17, 13:6, 32:7,
57:11, 64:25, 65:6,
108:6, 108:10,
122:12, 133:9,
133:11, 134:12,
141:25, 142:2, 142:3,
142:5
   **reviewing** [12] - 6:15,
13:10, 13:14, 14:18,
16:20, 37:6, 86:21,
107:6, 107:16,
122:17, 122:20, 133:2
   **revise** [1] - 131:19
   **Richard** [1] - 36:16
   **rights** [24] - 22:16,
36:6, 39:15, 44:8,
48:7, 49:5, 49:7,
49:13, 50:1, 52:23,
54:2, 125:22, 125:24,
126:3, 126:5, 126:6,
126:11, 126:12,
126:13, 126:14,
126:15, 126:23,
126:24, 127:3
   **rise** [4] - 3:1, 61:2,
61:4, 98:23
   **Risk** [1] - 4:22
   **risk** [54] - 6:13, 6:16,
6:20, 6:21, 6:22, 6:23,
6:24, 7:1, 7:2, 7:4,
7:8, 7:9, 7:10, 7:14,
7:23, 7:24, 8:4, 8:15,
14:14, 15:22, 16:14,
19:13, 19:16, 19:17,
31:15, 55:4, 55:23,
57:5, 60:7, 61:19,
62:8, 62:14, 63:22,
65:18, 72:15, 75:22,
77:5, 77:7, 77:18,
77:20, 77:21, 79:23,
80:3, 90:7, 90:10,

90:22, 91:20, 94:2,
99:9, 100:23, 109:16,
146:17
   **risks** [7] - 7:16, 8:13,
61:20, 61:25, 62:21,
76:9, 76:13
   **road** [2] - 87:22,
110:13
   **Robert** [2] - 102:18,
104:12
   **Robichaux** [34] -
5:22, 9:18, 9:21,
10:16, 67:14, 73:21,
73:24, 76:9, 76:16,
76:20, 77:4, 77:22,
77:23, 78:7, 78:20,
79:3, 80:20, 81:5,
81:7, 81:12, 82:25,
89:11, 89:13, 98:9,
108:5, 122:15,
122:16, 122:25,
124:4, 128:9, 129:14,
130:19, 141:21,
141:25
   **Robichaux's** [8] -
77:25, 78:18, 98:5,
122:14, 130:9, 133:2,
142:14, 142:22
   **ROGERS** [1] - 1:13
   **Roinestad** [6] - 3:15,
3:16, 3:22, 45:4, 45:5,
61:10
   **ROINESTAD** [2] -
1:9, 2:8, 3:19
   **role** [13] - 6:6, 6:8,
6:12, 7:17, 11:11,
33:18, 33:21, 34:10,
36:21, 36:25, 37:4,
37:11, 50:8
   **Rosandich** [22] -
5:23, 9:23, 10:8,
14:18, 48:2, 65:7,
66:13, 68:6, 69:5,
69:17, 70:2, 70:3,
78:22, 89:5, 91:12,
96:3, 96:12, 120:20,
143:9, 145:13,
145:25, 151:18
   **Rosandich's** [1] -
47:3
   **route** [3] - 118:3,
119:11, 121:6
   **routes** [1] - 119:12
   **routinely** [1] - 82:9
   **ruled** [3] - 26:3,
41:10, 93:4
   **rules** [2] - 28:7,
28:18
   **ruling** [1] - 25:24
   **run** [1] - 144:18

   **running** [1] - 149:13

## S

   **sail** [1] - 119:1
   **sailing** [2] - 148:25,
149:1
   **salvage** [11] - 29:17,
39:5, 39:13, 40:14,
42:24, 46:6, 46:7,
46:8, 49:4, 126:9
   **San** [1] - 5:5
   **sand** [3] - 66:16,
66:19, 68:17
   **Sandra** [1] - 129:21
   **sank** [4] - 30:1, 30:2,
50:14, 52:24
   **satisfied** [3] - 28:1,
78:1, 150:15
   **saw** [7] - 18:24,
55:14, 77:6, 126:6,
127:4, 130:6, 143:25
   **schedule** [7] - 10:14,
10:15, 10:24, 11:5,
11:18, 124:10, 145:4
   **scope** [12] - 20:15,
23:1, 31:10, 32:21,
40:10, 40:11, 42:9,
114:25, 115:2, 141:8,
141:12, 143:14
   **Sea** [1] - 48:24
   **sea** [1] - 119:8
   **seat** [1] - 3:20
   **Seattle** [3] - 1:20,
43:24, 136:17
   **seaworthiness** [13] -
60:17, 60:19, 60:21,
136:8, 136:19,
136:24, 138:1,
138:12, 139:5, 140:7,
140:19, 140:24
   **seaworthy** [7] -
60:18, 112:22, 137:5,
137:8, 138:2, 139:7,
139:19
   **second** [11] - 17:2,
17:18, 30:11, 48:25,
69:1, 107:8, 123:3,
128:6, 128:8, 135:20,
150:9
   **section** [1] - 59:12
   **see** [39] - 7:10,
18:18, 18:23, 33:24,
57:10, 59:20, 68:24,
73:20, 81:13, 83:9,
84:19, 87:6, 94:25,
95:10, 98:2, 106:24,
107:22, 114:16,
118:7, 118:19, 124:1,
126:12, 128:3,

128:12, 130:4, 131:20, 132:2, 132:15, 132:22, 133:1, 134:17, 138:24, 142:11, 143:23, 144:4, 144:14, 145:23
**See** [1] - 134:1
**seeing** [2] - 81:15, 134:17
**seek** [1] - 63:21
**seeking** [2] - 72:3, 110:20
**seem** [1] - 106:25
**self** [1] - 136:3
**self-restriction** [1] - 136:3
**send** [7] - 35:7, 36:6, 52:22, 87:25, 88:3, 89:6, 126:5
**sending** [3] - 108:3, 108:8, 108:11
**sends** [1] - 130:16
**sense** [11] - 6:10, 15:16, 19:13, 20:4, 55:6, 82:11, 88:9, 88:13, 119:10, 144:15, 146:16
**sent** [26] - 10:2, 10:22, 14:7, 14:8, 14:17, 18:13, 39:15, 39:16, 44:9, 87:23, 88:7, 89:4, 90:7, 95:16, 95:25, 96:3, 96:9, 104:14, 121:12, 123:24, 125:24, 126:7, 127:4, 130:19, 152:3, 152:4
**sentence** [4] - 67:15, 67:18, 67:19, 82:1
**separate** [6] - 99:21, 102:9, 102:13, 104:22, 105:1, 138:7
**Services** [1] - 48:25
**session** [3] - 3:3, 61:5, 98:25
**set** [3] - 104:1, 118:8, 118:20
**setting** [1] - 101:4
**seventeen** [2] - 18:17, 19:4
**seventeen-and-a-half** [2] - 18:17, 19:4
**Several** [1] - 11:17
**several** [5] - 6:6, 63:8, 73:14, 85:22, 125:8
**shall** [5] - 24:23, 25:1, 25:18, 137:5, 137:7

**Shawn** [41] - 5:20, 9:7, 11:21, 11:23, 12:1, 13:7, 13:10, 13:14, 14:17, 15:20, 17:18, 18:12, 53:22, 68:20, 68:22, 69:15, 69:25, 70:9, 73:21, 73:24, 82:20, 83:4, 83:8, 84:23, 86:13, 87:14, 87:15, 90:5, 96:2, 102:20, 103:23, 110:11, 111:20, 112:7, 117:1, 129:2, 132:20, 133:18, 133:23, 151:25
**Shawn's** [3] - 89:8, 90:17, 90:23
**sheet** [3] - 92:11, 92:12, 92:22
**shore** [5] - 86:7, 94:19, 115:24, 116:4, 123:16
**shoreline** [1] - 86:8
**shortly** [1] - 7:5
**show** [23] - 58:4, 58:15, 87:14, 99:4, 103:12, 104:24, 105:2, 105:4, 108:22, 108:24, 113:23, 115:7, 122:23, 124:8, 128:5, 129:12, 131:25, 132:3, 133:7, 134:13, 135:2, 152:2, 152:3
**showed** [2] - 57:12, 143:25
**shown** [4] - 101:18, 107:18, 127:23, 134:2
**shows** [7] - 32:3, 97:12, 102:23, 103:1, 104:8, 113:1, 132:18
**sic** [4] - 13:18, 14:2, 58:10, 103:12
**side** [13] - 15:10, 15:13, 84:2, 86:18, 90:1, 90:2, 90:15, 90:16, 99:22, 100:25, 111:22, 121:1, 148:19
**signatory** [2] - 58:21, 96:22
**signed** [8] - 16:18, 16:21, 96:5, 115:8, 115:19, 115:23, 116:2, 146:6
**significance** [1] - 13:1
**significant** [2] - 18:24, 18:25
**silent** [1] - 25:9
**similar** [3] - 7:14,

31:18, 61:19
**simple** [4] - 11:19, 70:10, 79:6
**simpler** [1] - 22:2
**simply** [1] - 105:5
**single** [4] - 103:21, 104:6, 117:16, 121:1
**sinking** [1] - 30:5
**sins** [1] - 6:25
**sit** [4] - 63:15, 63:16, 63:22, 146:19
**sitting** [2] - 37:5, 144:19
**situation** [8] - 16:23, 27:9, 30:22, 32:2, 34:4, 86:1, 145:8
**six** [2] - 79:18, 114:8
**slight** [1] - 114:23
**sold** [1] - 46:7
**sole** [1] - 66:23
**someone** [4] - 15:5, 60:2, 79:14, 139:22
**sometimes** [2] - 33:21, 63:13
**somewhat** [1] - 17:1
**sorry** [24] - 21:25, 27:19, 30:11, 40:6, 41:12, 43:21, 84:23, 86:6, 86:21, 98:15, 106:3, 107:11, 107:12, 107:13, 109:2, 110:17, 112:4, 113:5, 123:5, 127:13, 127:19, 136:6, 143:4, 149:20
**Sorry** [4] - 31:2, 41:9, 132:6, 151:12
**sort** [2] - 31:22, 51:4
**Southeast** [1] - 1:14
**Southern** [1] - 3:2
**SOUTHERN** [1] - 1:1
**speaking** [2] - 20:23, 46:4
**speaks** [5] - 26:11, 26:13, 109:5, 116:18, 135:13
**special** [1] - 137:2
**specific** [25] - 14:3, 18:1, 24:21, 35:1, 39:3, 48:12, 49:8, 56:23, 64:14, 69:9, 87:17, 90:20, 93:18, 102:22, 104:4, 104:10, 104:11, 119:24, 121:16, 121:17, 121:19, 138:2, 138:3, 143:8, 147:12
**specifically** [10] - 21:16, 24:22, 40:21,

48:13, 58:2, 85:6, 100:13, 138:1, 143:11
**specifics** [1] - 118:25
**specifies** [3] - 49:21, 111:1, 115:23
**specify** [1] - 54:8
**speculation** [4] - 11:25, 80:24, 117:11, 117:14
**spell** [1] - 3:21
**spelled** [1] - 3:23
**spending** [1] - 4:8
**spoken** [2] - 68:20, 81:21
**Squires** [3] - 14:8, 101:8, 128:9
**stage** [1] - 6:23
**stamped** [1] - 74:13
**stand** [2] - 49:1, 65:2
**standard** [1] - 131:16
**starboard** [1] - 148:19
**started** [3] - 4:4, 4:10
**State** [23] - 3:4, 3:9, 5:5, 5:17, 5:25, 9:5, 18:1, 20:4, 20:6, 20:9, 22:15, 22:21, 30:4, 35:1, 47:14, 56:3, 57:15, 70:18, 102:4, 103:1, 103:15, 104:8, 147:2
**STATE** [1] - 1:3
**state** [13] - 3:6, 3:20, 4:1, 4:13, 5:15, 6:6, 35:8, 38:25, 69:16, 84:2, 116:2, 122:2
**State-recognized** [1] - 35:1
**statement** [11] - 66:14, 68:6, 72:6, 72:20, 73:8, 75:7, 75:16, 77:16, 106:8, 124:7, 140:25
**statements** [3] - 72:3, 72:15, 81:20
**states** [6] - 13:16, 36:11, 69:3, 78:8, 128:25, 151:4
**States** [3] - 2:1, 3:1, 5:3
**STATES** [3] - 1:1, 1:11, 153:9
**stating** [4] - 12:3, 69:3, 140:11, 150:19
**stationary** [1] - 112:16
**status** [2] - 70:21, 133:17
**stay** [1] - 137:25

**step** [2] - 63:10, 152:6
**steps** [3] - 75:12, 108:2, 108:4
**Stewart** [1] - 1:19
**stick** [2] - 95:6, 149:18
**stickier** [1] - 25:13
**still** [7] - 7:24, 48:9, 90:3, 111:5, 129:1, 137:21
**stipulate** [1] - 47:8
**stipulations** [1] - 120:3
**stop** [4] - 12:10, 52:11, 119:14, 119:16
**story** [2] - 47:5, 73:16
**Strader** [8] - 3:11, 22:8, 41:9, 43:18, 43:20, 129:25, 130:9
**STRADER** [113] - 1:22, 3:25, 10:13, 12:3, 12:7, 12:12, 12:13, 12:19, 14:25, 16:6, 18:4, 20:13, 20:18, 21:4, 21:6, 21:9, 21:11, 21:16, 22:10, 24:2, 24:9, 24:10, 29:16, 30:15, 31:11, 32:6, 32:13, 38:20, 38:23, 39:18, 40:4, 40:6, 40:16, 41:3, 41:22, 42:5, 42:13, 42:16, 42:19, 45:16, 45:23, 48:5, 48:9, 48:16, 49:6, 49:17, 49:20, 50:12, 50:16, 50:22, 50:25, 51:3, 52:17, 52:25, 56:13, 56:14, 57:20, 58:19, 60:23, 61:1, 64:13, 69:8, 71:6, 72:5, 72:10, 73:11, 75:4, 76:22, 77:11, 80:23, 82:3, 87:7, 87:11, 88:14, 92:10, 92:17, 92:20, 96:17, 97:16, 103:5, 106:19, 107:3, 110:24, 113:8, 114:21, 115:1, 117:3, 118:11, 119:20, 121:7, 121:25, 123:8, 132:7, 132:10, 138:4, 138:9, 138:18, 139:10, 140:10, 141:7, 143:8, 143:17, 144:25, 146:10, 149:3, 149:25, 150:6, 150:11, 151:12,

151:14, 151:16, 151:17, 152:5
**Strader's** [3] - 130:1, 130:15, 130:21
**Strader**................. . [1] - 2:10
**Strader**................. ......... [1] - 2:11
**Strader**................. ......... [1] - 2:9
**straight** [1] - 47:5
**strained** [1] - 77:13
**Street** [2] - 1:14, 1:19
**stretched** [1] - 119:5
**strictly** [1] - 93:20
**Strike** [1] - 20:8
**strike** [10] - 31:1, 31:3, 58:8, 60:19, 71:19, 99:23, 101:1, 113:6, 113:10
**subject** [2] - 54:12, 136:23
**submission** [19] - 16:18, 72:15, 97:23, 102:10, 110:2, 110:7, 110:8, 110:20, 110:21, 110:23, 111:8, 111:10, 111:11, 114:5, 114:7, 114:8, 145:13, 146:7
**submissions** [4] - 82:9, 108:17, 112:25, 143:24
**submit** [5] - 51:12, 79:14, 110:19, 146:21, 147:4
**submitted** [21] - 21:13, 46:18, 51:5, 51:20, 71:25, 77:3, 78:6, 91:22, 92:8, 92:24, 93:14, 93:25, 96:5, 96:6, 113:22, 116:6, 116:23, 126:19, 135:8, 135:12, 135:15
**submitting** [1] - 82:7
**subrogating** [1] - 52:2
**subrogation** [1] - 53:2
**Subsequent** [1] - 128:20
**subsequent** [7] - 7:16, 29:1, 29:2, 29:3, 46:13, 92:8, 110:25
**subsequently** [1] - 110:19
**subset** [2] - 22:24, 24:19
**subsets** [1] - 24:18

**substantive** [1] - 98:3
**sued** [1] - 39:20
**suffer** [1] - 11:15
**suffered** [1] - 30:7
**suggest** [2] - 79:20, 80:15
**suggests** [1] - 141:10
**suit** [2] - 17:9, 29:24
**Suit** [2] - 29:20, 29:22
**Suite** [2] - 1:20, 2:2
**SUITE** [1] - 153:9
**summarizing** [1] - 139:11
**sunk** [1] - 125:7
**supersede** [4] - 110:2, 110:8, 110:23, 111:10
**supervisor** [1] - 33:8
**supervisory** [1] - 36:25
**supplement** [1] - 10:24
**supplied** [3] - 11:9, 20:18, 137:9
**supply** [1] - 146:24
**support** [2] - 34:11, 131:25
**supporting** [1] - 109:4
**supposed** [10] - 26:15, 28:12, 42:18, 62:8, 63:20, 95:17, 113:24, 118:4, 146:23, 147:9
**survey** [51] - 9:24, 10:3, 10:4, 10:5, 11:18, 39:20, 39:21, 53:25, 54:3, 54:4, 54:5, 54:9, 54:10, 54:12, 54:13, 54:16, 54:17, 54:24, 55:3, 55:5, 55:14, 57:6, 66:12, 67:2, 67:9, 73:1, 74:21, 79:15, 79:16, 92:18, 92:23, 111:24, 112:12, 112:19, 113:2, 114:2, 114:4, 114:10, 114:11, 114:14, 114:15, 114:16, 114:17, 114:22, 115:3, 117:22, 125:17, 145:3, 150:12, 150:20
**suspect** [1] - 112:4
**suspected** [1] - 52:12

**suspicion** [1] - 52:15
**suspiciously** [1] - 150:7
**Sustain** [1] - 80:25
**sustain** [4] - 22:24, 56:9, 73:17, 82:5
**Sustained** [3] - 10:12, 57:19, 106:20
**SW** [1] - 1:23
**SWORN** [1] - 3:19
**sworn** [3] - 44:22, 53:19, 135:14

# T

**t's** [2] - 90:25, 91:6
**table** [1] - 22:14
**talks** [2] - 66:1, 92:9
**task** [1] - 36:23
**tat** [1] - 91:9
**technically** [1] - 44:20
**tender** [1] - 23:11
**term** [4] - 17:13, 33:21, 84:4, 119:24
**terms** [15] - 20:22, 27:25, 46:18, 49:15, 86:15, 94:23, 98:4, 110:8, 110:22, 118:7, 118:10, 118:19, 121:5, 128:1, 141:13
**Terrace** [1] - 1:23
**testified** [50] - 5:8, 5:10, 13:18, 24:11, 31:11, 31:13, 35:16, 35:18, 36:9, 36:13, 36:18, 37:22, 38:2, 38:5, 39:22, 40:9, 41:15, 42:1, 42:6, 43:18, 43:23, 45:5, 45:6, 45:7, 47:5, 49:18, 56:15, 61:17, 71:7, 72:7, 73:12, 75:5, 76:20, 78:23, 81:15, 82:13, 87:20, 88:24, 91:3, 95:24, 96:1, 108:10, 112:2, 122:15, 134:10, 135:9, 141:22, 142:23, 143:11
**testify** [15] - 12:7, 31:7, 40:15, 40:24, 41:3, 41:6, 41:11, 41:23, 41:25, 42:8, 42:10, 45:13, 50:9, 107:22, 124:4
**testifying** [6] - 14:3, 41:13, 52:17, 52:18, 98:9, 108:5
**Testimony** [1] -

152:9
**testimony** [52] - 5:16, 12:20, 18:2, 18:4, 20:16, 20:19, 20:20, 21:18, 23:1, 24:3, 31:12, 41:5, 41:24, 43:23, 44:24, 45:7, 47:18, 47:22, 49:10, 49:22, 50:4, 54:4, 54:21, 58:6, 68:22, 69:11, 76:11, 77:9, 77:10, 77:12, 78:19, 80:7, 81:24, 89:8, 92:10, 95:20, 98:5, 108:12, 108:13, 117:13, 121:8, 122:14, 136:5, 142:14, 143:9, 143:10, 146:5, 146:11, 146:13
**TESTIMONY** [1] - 1:9
**THE** [257] - 1:10, 1:13, 1:18, 3:13, 3:16, 3:22, 10:12, 12:9, 14:5, 14:6, 14:23, 15:18, 15:20, 18:9, 18:12, 20:17, 21:2, 21:8, 21:10, 21:15, 21:24, 22:1, 22:12, 23:14, 23:24, 24:5, 24:7, 24:8, 26:15, 26:17, 26:18, 26:19, 26:20, 26:23, 27:2, 27:4, 27:9, 27:12, 27:13, 27:15, 27:16, 27:19, 27:20, 27:23, 27:24, 28:4, 28:6, 28:7, 28:9, 28:11, 28:13, 28:14, 28:15, 28:16, 28:17, 28:18, 28:20, 28:21, 28:22, 28:23, 28:24, 28:25, 29:2, 29:3, 29:4, 29:5, 29:8, 29:11, 30:12, 30:13, 31:9, 32:4, 32:12, 32:14, 32:17, 32:18, 32:19, 33:2, 35:23, 35:25, 36:13, 36:14, 36:15, 36:16, 36:20, 36:22, 36:24, 37:1, 37:11, 37:12, 37:13, 37:14, 38:17, 38:19, 38:22, 39:8, 40:3, 40:5, 40:7, 41:2, 41:8, 41:13, 41:21, 42:7, 42:15, 42:17, 42:20, 43:8, 43:12, 43:16, 43:18, 43:21, 44:3, 44:5, 44:17, 45:4, 45:5, 45:22, 46:2, 46:21, 46:23,

46:25, 47:2, 47:12, 47:16, 48:8, 48:15, 48:18, 49:19, 50:5, 50:15, 50:19, 50:24, 52:14, 52:19, 52:21, 56:9, 57:19, 58:10, 58:12, 59:23, 59:24, 60:24, 61:6, 64:16, 64:17, 65:2, 65:3, 65:4, 68:1, 68:3, 69:12, 69:13, 71:9, 71:10, 71:21, 72:9, 72:11, 72:12, 73:17, 75:9, 75:11, 76:24, 76:25, 77:14, 77:16, 80:25, 82:5, 87:10, 92:16, 92:19, 92:25, 93:1, 93:4, 93:5, 93:7, 93:8, 93:10, 93:12, 93:20, 93:22, 97:18, 98:13, 98:16, 98:19, 99:1, 99:25, 101:2, 101:7, 103:7, 103:10, 103:14, 103:19, 103:20, 106:20, 111:3, 111:4, 113:10, 113:15, 113:16, 113:18, 113:20, 114:24, 115:2, 115:5, 117:6, 117:7, 118:15, 118:17, 119:22, 121:9, 122:4, 122:6, 122:7, 123:4, 123:6, 123:10, 132:11, 132:12, 132:13, 132:14, 134:7, 134:21, 134:23, 136:4, 136:10, 136:13, 136:15, 136:20, 138:8, 138:10, 138:22, 139:13, 139:15, 139:23, 139:25, 140:3, 140:14, 141:12, 143:3, 143:15, 143:19, 143:21, 145:2, 145:3, 146:12, 146:13, 149:4, 149:7, 149:24, 150:2, 150:3, 150:9, 151:13, 151:15, 152:6, 152:8
**theoretically** [1] - 119:1
**thereafter** [1] - 137:6
**therefor** [1] - 25:20
**therefore** [4] - 45:12, 47:21, 52:10, 143:12
**thereto** [1] - 11:2
**Theriot** [3] - 127:1,

127:2, 127:3
**They've** [3] - 39:20, 43:10, 44:12
**they've** [6] - 20:10, 21:17, 37:2, 40:16, 48:16, 66:16
**thinking** [3] - 39:9, 98:19, 136:5
**Third** [2] - 26:18, 26:19
**Third-party** [2] - 26:18, 26:19
**thorough** [1] - 70:18
**thoughts** [1] - 14:19
**three** [11] - 6:3, 23:9, 25:10, 25:11, 58:14, 59:13, 75:12, 105:12, 128:10, 128:14, 128:17
**threw** [1] - 80:20
**throughout** [3] - 10:8, 77:17, 137:24
**ticks** [1] - 122:18
**tight** [1] - 137:8
**Tim** [1] - 5:23
**timely** [1] - 56:25
**tit** [1] - 91:9
**TO** [1] - 2:6
**today** [4] - 5:16, 7:15, 49:18, 144:19
**took** [4] - 95:23, 103:12, 108:2, 125:20
**Top** [1] - 133:25
**topic** [1] - 56:10
**TORRES** [1] - 1:10
**Torres** [2] - 3:3, 3:6
**total** [12] - 24:25, 25:3, 25:17, 26:12, 27:5, 27:7, 29:3, 29:6, 29:12, 29:24, 54:22
**totality** [3] - 100:14, 103:21, 116:21
**Tow** [1] - 48:24
**towards** [1] - 31:20
**TOWER** [1] - 1:4
**track** [1] - 51:4
**trail** [3] - 9:20, 14:9, 14:10
**training** [2] - 35:1, 35:5
**traits** [1] - 6:10
**transcends** [2] - 61:18, 61:21
**transcription** [1] - 153:4
**transiting** [1] - 116:2
**transmittal** [2] - 109:1, 109:2
**transmitted** [2] - 106:9, 106:10

**transmitting** [1] - 71:3
**travel** [2] - 106:18, 112:20
**traveling** [1] - 86:8
**traversed** [2] - 118:8, 118:21
**tremendous** [1] - 19:4
**tremendously** [1] - 18:20
**TRIAL** [1] - 1:10
**trial** [3] - 6:5, 87:8, 87:11
**Trial** [1] - 87:7
**trick** [1] - 23:10
**tried** [1] - 49:9
**trier** [3] - 27:24, 44:23, 138:14
**trigger** [3] - 28:10, 30:19, 31:4
**triggered** [1] - 28:1
**trip** [41] - 13:8, 13:12, 13:16, 13:18, 14:16, 15:9, 15:10, 15:17, 15:25, 48:11, 82:25, 83:25, 84:1, 84:7, 84:13, 84:15, 84:17, 86:9, 87:19, 87:21, 87:24, 87:25, 89:12, 90:14, 90:16, 91:12, 91:14, 91:16, 99:21, 102:20, 103:24, 104:2, 109:22, 111:22, 118:21, 120:18, 121:1, 122:9, 152:3
**triple** [1] - 91:9
**trouble** [1] - 142:21
**true** [13] - 62:25, 71:25, 72:4, 72:16, 72:22, 72:23, 79:21, 143:17, 146:21, 146:23, 146:24, 147:4, 147:14
**truly** [1] - 76:2
**Trust** [1] - 83:17
**truth** [1] - 106:8
**truthful** [1] - 70:21, 96:15
**try** [6] - 9:12, 33:21, 34:3, 44:1, 49:6, 139:24
**trying** [6] - 19:15, 42:18, 50:13, 57:4, 75:18, 96:20
**turn** [2] - 83:7, 109:10
**twenty** [1] - 105:12
**Two** [2] - 124:15,

124:16
**two** [11] - 6:2, 6:10, 11:8, 23:8, 24:18, 24:19, 48:22, 65:15, 94:24, 142:15, 149:25
**Two-and-a-half** [2] - 124:15, 124:16
**type** [3] - 68:18, 98:10, 106:6
**typed** [3] - 96:5, 97:24, 115:8
**Typically** [2] - 17:12, 118:2

# U

**U.S** [2] - 9:25, 11:6
**ultimate** [2] - 26:21, 96:23
**ultimately** [3] - 42:21, 104:21, 119:2
**unable** [2] - 7:4, 131:19
**under** [20] - 49:5, 51:9, 51:15, 53:19, 54:23, 57:25, 60:21, 62:19, 119:14, 123:13, 125:22, 126:2, 126:10, 137:22, 147:7, 147:16, 148:17, 148:24, 149:1, 149:9
**Under** [3] - 54:10, 72:19
**undergone** [2] - 67:21, 81:5
**underneath** [1] - 152:2
**underprice** [2] - 7:1, 7:2
**understood** [4] - 117:8, 117:9, 127:7
**undertaken** [2] - 118:21, 120:1
**undertook** [2] - 142:1, 148:20
**underwrite** [6] - 7:16, 15:3, 61:19, 64:5, 64:7, 71:16
**underwriter** [108] - 4:24, 6:7, 6:8, 6:9, 6:25, 11:10, 11:11, 11:12, 11:20, 12:15, 12:22, 13:2, 13:24, 14:2, 15:1, 15:19, 15:21, 18:8, 31:13, 31:22, 32:1, 32:3, 32:25, 40:23, 41:7, 42:13, 50:9, 51:9, 51:21, 52:5, 52:8,

52:11, 52:16, 52:22, 53:25, 55:3, 58:2, 58:16, 58:20, 59:25, 60:13, 61:15, 63:13, 63:14, 63:20, 64:2, 65:9, 65:12, 65:14, 65:19, 66:11, 66:15, 67:4, 67:5, 68:17, 68:20, 70:6, 70:12, 70:15, 70:17, 71:12, 71:16, 72:7, 72:8, 72:16, 73:5, 74:5, 76:2, 76:4, 78:4, 79:21, 79:25, 82:7, 82:10, 88:11, 101:9, 101:10, 102:3, 102:4, 102:6, 102:9, 102:13, 112:14, 117:8, 117:9, 120:3, 126:22, 134:6, 135:24, 137:23, 139:4, 140:5, 144:5, 144:10, 144:14, 144:23, 145:8, 145:11, 145:15, 145:18, 146:22, 146:25, 147:5, 148:23, 148:25
**underwriter's** [6] - 7:8, 11:10, 50:8, 56:11, 62:13, 146:13
**underwriters** [14] - 25:16, 25:20, 27:6, 33:24, 39:19, 45:24, 53:6, 54:13, 68:18, 82:8, 82:9, 100:19, 100:22, 116:22
**Underwriters** [2] - 4:20, 71:15
**Underwriting** [2] - 76:3, 103:22
**underwriting** [71] - 4:3, 4:8, 4:12, 4:20, 4:25, 5:2, 5:3, 6:2, 6:11, 6:12, 7:12, 7:18, 7:20, 7:21, 8:8, 8:10, 8:11, 13:3, 13:6, 15:6, 16:1, 18:6, 18:7, 26:10, 31:8, 32:2, 32:21, 33:19, 33:23, 33:24, 40:8, 41:4, 42:2, 42:6, 44:12, 51:8, 52:3, 53:8, 53:11, 53:15, 55:7, 56:5, 57:22, 61:18, 61:24, 63:19, 64:12, 71:18, 73:3, 75:17, 75:19, 80:14, 80:18, 85:18, 85:20, 99:17, 102:14, 103:22, 104:5, 104:8, 110:18,

114:22, 125:15, 138:20, 144:14, 145:20, 149:18, 149:21
**underwritten** [2] - 15:2, 61:17
**unequivocal** [1] - 66:20
**unfair** [1] - 36:10
**unhelpful** [1] - 57:3
**uniform** [1] - 145:7
**unique** [2] - 44:11, 61:23
**UNITED** [3] - 1:1, 1:11, 153:9
**United** [4] - 2:1, 3:1, 5:3, 36:17
**Unitrin** [1] - 4:10
**University** [1] - 5:5
**unlawful** [1] - 149:12
**Unless** [2] - 17:25, 88:13
**unless** [5] - 19:22, 54:14, 86:1, 107:1, 140:10
**unresponsive** [1] - 12:10
**unseaworthiness** [1] - 138:15
**unseaworthy** [2] - 138:14, 139:8
**unsigned** [3] - 10:23, 11:3, 96:4
**unsolicited** [1] - 80:20
**untrue** [3] - 71:4, 72:15, 73:10
**unwilling** [1] - 140:17
**unwritten** [3] - 12:15, 12:21, 15:15
**up** [27] - 7:11, 18:15, 19:10, 19:24, 21:17, 26:20, 42:21, 46:8, 46:17, 47:24, 54:15, 55:24, 56:13, 63:8, 70:9, 75:24, 80:16, 84:4, 84:8, 85:8, 86:10, 87:18, 87:20, 89:12, 119:2, 121:22, 150:4
**upfront** [3] - 62:7, 63:5, 63:25
**upgrades** [4] - 11:4, 69:4, 69:17, 78:22
**upmost** [2] - 62:5, 64:10
**uses** [1] - 141:22
**USI** [64] - 5:24, 9:2, 9:6, 16:8, 16:11, 30:9,

65:7, 65:20, 66:1, 66:4, 66:6, 66:22, 67:15, 68:20, 87:5, 93:14, 93:25, 94:22, 95:16, 96:8, 96:9, 96:12, 96:25, 97:3, 97:5, 97:7, 97:8, 97:9, 97:22, 97:24, 98:3, 102:14, 102:18, 104:19, 104:22, 107:24, 108:2, 108:20, 109:3, 109:15, 117:17, 121:14, 121:19, 122:12, 123:21, 124:4, 124:22, 127:6, 129:20, 129:21, 130:1, 130:9, 130:15, 130:16, 131:2, 133:8, 141:19, 142:4, 150:12, 151:6

**USI's** [2] - 97:10, 142:8

**utmost** [18] - 40:17, 43:9, 43:15, 44:2, 44:12, 44:14, 62:2, 62:6, 62:19, 63:14, 63:17, 64:21, 72:19, 147:7, 147:16, 148:18, 148:24, 149:9

## V

**vague** [4] - 12:17, 92:21, 96:18, 139:11
**validity** [2] - 45:17, 141:3
**valuation** [4] - 40:14, 42:24, 46:6, 54:12
**variety** [1] - 46:8
**various** [16] - 4:5, 6:1, 6:16, 13:14, 36:11, 47:4, 53:18, 53:20, 53:21, 75:21, 81:10, 81:15, 82:20, 103:9, 137:13, 143:24
**Various** [1] - 45:6
**venture** [1] - 59:6
**verbal** [46] - 8:15, 8:18, 13:7, 13:11, 45:17, 45:19, 46:20, 48:10, 48:11, 49:3, 82:14, 82:17, 82:19, 83:19, 86:22, 86:25, 87:15, 88:21, 93:19, 95:20, 95:22, 106:17, 109:21, 109:24, 110:1, 110:2, 110:5, 110:9, 110:13, 110:18, 110:22, 110:23, 111:1, 111:4,

111:12, 111:14, 115:12, 115:15, 116:8, 117:1, 117:20, 117:24, 118:15, 118:19, 119:14
**verbally** [6] - 60:1, 60:14, 89:7, 100:14, 106:15, 121:4
**verification** [1] - 87:1
**verify** [11] - 66:18, 70:12, 71:1, 71:15, 91:14, 144:6, 144:21, 145:9, 145:16, 146:1
**verifying** [3] - 67:5, 79:2, 104:2
**versus** [4] - 3:4, 36:17, 36:19, 64:23
**vessel** [108] - 8:4, 9:24, 9:25, 11:4, 11:6, 12:21, 13:20, 14:12, 15:10, 24:25, 25:3, 25:17, 25:19, 25:25, 27:6, 27:7, 27:14, 27:21, 29:25, 30:1, 30:6, 31:4, 47:6, 50:14, 52:23, 54:22, 55:7, 60:12, 62:24, 63:1, 63:6, 65:9, 67:21, 68:9, 68:21, 69:4, 69:18, 74:20, 75:23, 76:1, 76:2, 76:3, 76:5, 77:3, 81:5, 84:2, 84:21, 85:21, 86:1, 86:7, 86:17, 91:25, 96:25, 97:3, 100:18, 100:24, 101:6, 101:11, 101:15, 101:23, 103:13, 111:23, 112:21, 114:17, 115:9, 116:6, 123:17, 123:18, 124:20, 125:6, 137:5, 137:7, 137:19, 138:14, 139:7, 139:17, 139:18, 143:1, 143:6, 144:1, 144:2, 145:4, 145:5, 145:6, 145:19, 146:8, 147:15, 147:19, 147:20, 147:23, 147:24, 148:2, 148:8, 148:9, 148:11, 148:25, 149:1, 149:11, 149:14, 149:16, 149:17
**vessels** [7] - 10:25, 38:11, 76:18, 81:3, 124:10, 136:19, 145:4
**violate** [1] - 23:22

**violating** [1] - 60:5
**visit** [1] - 58:11
**void** [7] - 44:1, 46:16, 47:9, 48:3, 137:17, 138:16, 139:9
**voided** [3] - 22:22, 43:13, 46:12
**voids** [2] - 140:8, 140:21
**Voir** [1] - 2:9
**voir** [1] - 32:14
**VOIR** [1] - 33:3
**voyage** [6] - 13:21, 84:21, 86:20, 112:3, 140:20, 148:20
**vs** [1] - 1:6

## W

**WA** [1] - 1:20
**wait** [1] - 95:17
**waiting** [1] - 129:1
**Wanda** [16] - 5:21, 9:20, 10:7, 24:2, 58:20, 129:1, 130:19, 130:25, 132:4, 133:13, 133:14, 133:15, 133:16, 133:20, 133:25
**Wanda's** [2] - 132:25, 133:3
**wants** [1] - 82:10
**warrant** [1] - 137:19
**warranted** [3] - 54:11, 60:3, 137:4
**Warranted** [1] - 123:15
**warranties** [1] - 138:13
**warranty** [18] - 54:11, 60:5, 136:24, 137:1, 137:10, 137:12, 137:13, 137:14, 137:17, 137:20, 137:24, 138:1, 138:12, 138:16, 139:5, 140:7, 140:23, 149:13
**WARREN** [1] - 1:22
**Washington** [1] - 146:1
**watch** [1] - 97:10
**water** [2] - 54:23, 99:16
**waters** [13] - 92:3, 92:5, 92:9, 95:18, 95:20, 100:2, 104:9, 118:8, 118:20, 119:18, 120:1, 120:15
**watertight** [3] -

114:18, 114:19
**ways** [3] - 44:13, 46:8, 141:10
**website** [4] - 142:25, 143:6, 143:12, 143:20
**weeks** [5] - 58:14, 124:14, 124:15, 124:16, 125:8
**weight** [2] - 41:5, 41:23
**welder** [1] - 52:2
**well-known** [1] - 43:25
**WFT** [54] - 6:2, 8:23, 8:24, 8:25, 9:22, 10:8, 16:9, 16:10, 16:18, 19:12, 20:5, 49:23, 49:24, 56:2, 57:14, 65:24, 66:1, 66:3, 66:7, 66:21, 70:17, 73:22, 73:24, 78:6, 88:25, 90:24, 91:4, 94:1, 94:22, 96:8, 97:11, 97:23, 97:24, 102:7, 104:18, 106:22, 109:15, 113:22, 115:19, 117:16, 123:22, 124:10, 124:22, 128:14, 129:9, 130:10, 130:17, 131:7, 131:9, 145:20, 145:24, 147:1, 150:12, 150:23
**WFT's** [2] - 18:1, 96:10
**whereas** [1] - 20:3
**white** [1] - 75:20
**whole** [9] - 4:12, 41:7, 70:8, 73:4, 86:17, 92:14, 103:23, 103:25, 111:2
**willing** [2] - 140:6, 140:12
**willingly** [1] - 58:16
**wish** [1] - 148:13
**wishes** [1] - 62:8
**withdraw** [2] - 88:16
**withheld** [2] - 58:4, 112:5
**withhold** [1] - 58:17
**witness** [17] - 4:11, 5:8, 18:1, 23:16, 23:20, 23:25, 31:6, 43:17, 44:15, 44:22, 64:14, 69:10, 77:14, 80:24, 119:21, 121:8, 141:8
**WITNESS** [75] - 2:6, 3:19, 3:22, 14:6,

15:20, 18:12, 24:7, 26:17, 26:19, 26:23, 27:4, 27:12, 27:15, 27:19, 27:23, 28:4, 28:7, 28:11, 28:14, 28:16, 28:18, 28:21, 28:23, 28:25, 29:3, 29:5, 29:11, 30:13, 32:18, 35:25, 36:14, 36:16, 36:22, 37:1, 37:12, 37:14, 45:4, 52:14, 52:21, 58:12, 59:24, 64:17, 65:3, 68:3, 69:13, 71:10, 72:12, 75:11, 76:25, 77:16, 87:10, 93:1, 93:5, 93:8, 93:12, 93:22, 101:7, 103:20, 111:4, 113:16, 117:7, 118:17, 122:7, 123:10, 132:12, 132:14, 139:15, 143:21, 145:3, 146:13, 150:3, 150:9, 151:13, 151:15, 152:8
**witness'** [2] - 20:16, 22:14
**witnesses** [1] - 45:6
**Woe** [1] - 123:22
**wording** [1] - 131:18
**words** [6] - 27:13, 27:20, 46:11, 68:6, 90:20, 114:24
**works** [2] - 44:13, 127:6
**world** [1] - 91:1
**worry** [3] - 49:1, 85:9, 150:6
**worth** [7] - 17:7, 17:8, 17:19, 18:16, 18:19, 19:8, 25:12
**worth'** [1] - 17:9
**worthless** [1] - 96:19
**WQIS** [1] - 103:9
**wreck** [8] - 27:3, 27:4, 39:13, 54:23, 125:21, 126:2, 126:10, 126:23
**write** [14] - 7:5, 7:8, 8:13, 8:14, 19:16, 31:18, 31:22, 55:11, 65:17, 76:13, 81:3, 112:8, 133:15, 146:2
**writes** [2] - 131:4, 133:16
**writing** [6] - 31:15, 55:23, 77:18, 106:7, 110:25, 118:13
**written** [46] - 8:18, 10:7, 10:24, 11:3,

16:13, 17:3, 46:19,
57:5, 66:10, 79:11,
79:19, 80:3, 81:5,
91:15, 93:21, 93:22,
93:25, 94:4, 94:6,
94:22, 95:19, 95:22,
98:2, 100:15, 103:3,
106:22, 108:16,
110:2, 110:6, 110:8,
110:20, 110:21,
110:23, 111:8,
111:10, 111:11,
111:14, 111:15,
112:1, 116:23,
117:19, 130:14,
130:17
  **wrote** [2] - 76:13,
102:10

## Y

  **Yacht** [1] - 136:17
  **yacht** [1] - 136:17
  **year** [2] - 75:24,
150:15
  **years** [7] - 4:3, 4:8,
43:23, 55:8, 76:16,
77:17
  **yesterday** [2] - 47:5,
49:18
  **York** [5] - 19:7, 19:9,
100:23, 101:10,
101:21

## Z

  **Zurich** [1] - 36:19