UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION


STATE NATIONAL INSURANCE COMPANY,

                    Plaintiff,

vs.

ANZHELA EXPLORER LLC.,

                    Defendant.

_____/

07-61162-CV-TORRES

January 22, 2009
Thursday

9:00 a.m.


- - - - - - -


    TRIAL before the Honorable Edwin G. Torres United States District Judge, United States District Judge, proceedings recorded by mechanical stenography, transcript produced by computer.


APPEARANCES:

For the Plaintiff:
    CHRISTOHER R. FERTIG,
    FERTIG & GRAMLING
    200 Southeast 13 Street
    Ft. Lauderdale, Florida

For the Defendant:
    CHARLES P. MOURE, ESQ.
    HARRIS & MOURE
    600 Stewart St. Suite 1200
    Seattle, WA 98101

    DONALD W. STRADER, ESQ.
    8522 SW 8 2Terrace
    Miami, Florida

1                 (Thereupon, the following proceedings were had:)

2                 THE CLERK:  State National Insurance Company versus

3       ANZHELA EXPLORER, LLC, Case Number 07-61162, Civil, Judge

4       Torres.

5                 Counsel, state your appearances for the record.

6                 MR. FERTIG:  Chris Fertig and Darlene Lidondici on

7       behalf of the plaintiff, State National.

8                 MR. MOURE:  Charles Moure on behalf of the Anzhela

9       Explorer.  And I'll let my co-counsel make his own --

10                MR. STRADER:  And Donald Strader also on behalf of the

11      ANZHELA EXPLORER, LLC.

12                MR. MOURE:  Your Honor, we have Jeff Dorsey here, too,

13      the owner of the corporation ANZHELA EXPLORER, LLC, the

14      defendant in this case.

15                THE COURT:  Good morning.

16      **A.**   Good morning.

17                THE COURT:  All right, good morning, everybody.  Have

18      a seat.  Before we begin the presentation of the evidence is

19      there anything that I need to take up at this point?  I have

20      reviewed your pre-trial stipulations, the materials you all

21      submitted.  My recollection was that this case was, we were

22      going to try to do it in the next ten days.  I haven't fully

23      confirmed whether or not the week of February 2nd to the extent

24      that he carry over will go -- will be available if possible, if

25      we need like a day or two that might be possible.

1              So but I'll let you know more about that mid next

2    week, okay?  Just in terms of the representation of the case

3    Mr. Fertig, how many witnesses do you anticipate today?

4              MR. FERTIG:  Today, Judge, just one, Mr. Rosandich.

5              THE COURT:  Okay.  Anything that you wish to take up

6    at this point other than calling your first witness?

7              MR. FERTIG:  No, Judge.  I think we are working

8    collegiately.  And so far we don't have any issues.

9              THE COURT:  Okay.  Mr. Moure?

10             MR. MOURE:  No, no, Your Honor.  At this moment we do

11   not have any issues at this moment.

12             THE COURT:  Okay, great.  We'll go through lunchtime,

13   and take a mid morning brake and then reassume about 1:15 and

14   take a mid afternoon break and conclude around 5:00, okay?

15             MR. MOURE:  Thank you, Your Honor.

16             THE COURT:  We'll turn to the plaintiff, then, and

17   call your first witness.

18             MR. FERTIG:  Judge, could we do openings to lay out

19   the case for the Court, the various causes of action?

20             THE COURT:  You could.  But I think it would be more

21   efficient if you go ahead and having studied the complaint and

22   the answer and your position I think it probably would be a

23   better use of time to call your first witness.

24             MR. FERTIG:  Okay.  First witness, then, Judge is mark

25   Rosandich.

1           THE COURT:  Mr. Rosandich?

2           (Thereupon, the witness was duly sworn in by the Clerk

3   after which the following proceedings were had:)

4           THE WITNESS:  I do.

5       THE CLERK:  Please have a seat.  State and spell your name

6   for the record.

7           THE WITNESS:  Yes.  My name is Mark Rosandich, would

8   you like me to spell it?

9           THE CLERK:  Yes, please.

10          THE WITNESS:  Yes.  M-A-R-K, last name spelling is

11  R-O-S-A-N-D-I-C-H.

12          THE CLERK:  Thank you.

13          THE WITNESS:  And good morning.

14      THE CLERK:  There is water there also.

15          THE WITNESS:  Thank you.

16          THE CLERK:  Uh-huh.

17          MR. FERTIG:  If the Court will give me one moment to

18  get my exhibits for this witness.

19          THE COURT:  Okay.

20          MR. FERTIG:  If it please the Court?

21          THE COURT:  Ready to go?

22          MR. FERTIG:  Thank you, Judge.

23                      DIRECT EXAMINATION.

24  BY MR. FERTIG:

25      Q.    Mr. Rosandich, would you please just give the Court

1   a brief background of your maritime experience that leads you up

2   to the acquisition of the vessel that became known as the

3   ANZHELA EXPLORER?

4   **A.**   Yes, sir, I would be happy to.  After returning from the

5   middle east where I worked as an engineer in the oil field for

6   some number of years I -- the industry at that period of time

7   back in the early '80's was in a big down turn and I had made a

8   decision, a career decision, to basically change from a land

9   based oil field activities to the maritime industry.  So I,

10   rather than being on a rig floor out in the middle of the Gulf

11   of Mexico I decided, having owned and operated my own personal

12   landing craft I would work my way up through the ranks to the

13   point where I later became an anchor handling and supply boat

14   captain in the Gulf of Mexico with a 1,600 ton master U.S. Coast

15   Guard license.  That educational process, as most captains that

16   work out there you work from the bottom up.  I had enough

17   experience where I was able to basically go forego the deck

18   department as a deck hand and my experience actually started in

19   the engine room as an engineer on a -- with a crew boat company

20   in Morgan city, Louisiana.

21       At some point in time during that tenure I again kind of

22   transcended from being a captain with the background that I had

23   to being and becoming a Marine consultant to a number of

24   different companies both foreign and domestic to help them

25   acquire vessels all the way through the process of reactivating

1  them on many occasions and as a delivery service to the new

2  owners and their home ports.  That included re-activating over

3  22 180 foot supply boats that came out of Louisiana that we --

4  were laid up, reactivated in Louisiana and converted into

5  bursetainers (ph) for the fishing industry in South America the

6  country of Chili, which has the longest, narrowest coast in all

7  of South America and very dependent on their maritime industries

8  as an economic source.

9       Obviously, as a part of that as a marine consultant it's a

10  situation where I'm always dealing with problems and many

11  occasions problem vessels to help owners in some instances

12  obtain their certificate of inspections to be able to pass

13  certification to be able to operate in the United States as

14  inspected vessels.

15      These pretty much it in a nutshell.  That's up to the

16  ANZHELA EXPLORER.

17  **Q.**   Thank you, sir.  With respect to your license is your

18  license current?

19  **A.**   It is not current.

20  **Q.**   Was it current in February of 2007?

21  **A.**   It was not.

22  **Q.**   When was last time your license was current?

23  **A.**   You know, I don't have the exact date that it expired.  Let

24  me reiterate one point on that.  Having obtained the 1,600 ton

25  license as a master with the experience that entails as a

1   transition from being a captain with a an active license to what

2   I was doing as a consultant there was no longer a requirement

3   for me to keep that license active so I just basically let it

4   expire.

5   **Q.**   What I was asking is just a rough time frame.  How long

6   prior to February of 2007 had your license lapsed or expired?

7   **A.**   I would -- I don't have an exact recollection of that.  But

8   I would say probably maybe even a decade.  I don't know, sir.

9   **Q.**   So, for that decade before the ANZHELA EXPLORER you were

10  not a licensed U.S. Coast Guard captain with respect to your

11  ability to sail on U.S. commercial vessels?

12  **A.**   I wouldn't answer that as my ability, sir.  My ability have

13  always been there.  My license was expired.

14  **Q.**   Well, let me rephrase it.

15  **A.**   Please do.

16  **Q.**   Without the United States coast Guard captain's license you

17  would not be able to legally sail as captain on a

18  U.S. documented commercial vessel?

19  **A.**   The key word there is commercial vessel.

20  **Q.**   Yes, sir, but you do agree?

21  **A.**   That is correct.

22  **Q.**   Okay.  And you also said that as a marine consultant you

23  were involved with getting certain vessels inspected by Coast

24  Guard?  Is that --

25  **A.**   That is correct.

Page 8

1    **Q.**   Are you familiar with the process of inspection?

2    **A.**   That is correct.  Yes.

3    **Q.**   You are familiar with term certificate of inspection?

4    **A.**   COI?  Correct.

5    **Q.**   That's what I was going to ask you.  For the purposes of

6    this trial we'll be referring to a COI.  And would you describe

7    to the Court what a COI is?  What it constitutes.

8    **A.**   Basically a COI is what everybody refers to as, I would say

9    the goose that laid the golden egg, so to speak.  Because the

10   certificate of inspection is basically a set of regulations

11   that, I guess it's Homeland Security now, U.S. Coast Guard

12   requires of any owner-operator to obtain to be able to use the

13   vessel in commercial business within the confines of the United

14   States.  They are very, very stringent.  Mainly for the purposes

15   of safety.  And, yes.  I'm aware of them, yes.

16   **Q.**   To condense what you've said it's necessary for a

17   commercial vessel to have issued a current certificate of

18   inspection or COI by the Coast Guard before it can operate?

19   **A.**   The key word there again is before it can operate in

20   commercial trade.

21   **Q.**   I believe when you said it was stringent that means the

22   Coast Guard takes this process very seriously.  They make sure

23   that all the T's are crossed and the I's are dotted with respect

24   to their safety check sheets?

25   **A.**   That's absolutely correct.  In addition to that so do the

1  owners.

2  **Q.**   And you have worked with, I believe you said various

3  classes of vessels trying to obtain the COI's prior to the

4  ANZHELA EXPLORER?

5  **A.**   Yes, that's correct.  That number of different classes of

6  vessels from oil field supply boats in the oil industry through

7  to, you know, passenger carrying vessels.

8  **Q.**   Does that extend to both the Louisiana oil patch as wells

9  to Port of Miami, the Seventh Coast Guard district?

10  **A.**   Well, to answer your question on that going back to when I

11  was a captain, an active captain in Louisiana, obviously the

12  captains are fully involved with the COI process because all

13  vessels need to be inspected annually as far as topside is

14  concerned.  And in most instances I believe it's a requirement

15  of a two year dry docking.  But as far as after my captainship,

16  I had not done an inspection for the oil field in Louisiana.

17  They have been in other areas in South Florida mainly.

18  **Q.**   Well, during this ten year period of time that you allowed

19  your license to lapse and you were acting as a marine consultant

20  during that time were you involved with clearing vessels and

21  getting them to pass their certificate of inspection?

22  **A.**   Yes.

23  **Q.**   And that would also be in Miami as well as in the oil

24  patch?

25  **A.**   To reiterate again as a captain with my license active I

1    was involved in the COI process of inspection in Louisiana.  But

2    to answer your question succinctly I had not done an inspection

3    in Louisiana.  The COI work that I did was all here in South

4    Florida.

5    **Q.**    Okay, thank you.  So then you are familiar with Mr. Bates

6    at the Coast Guard?

7    **A.**    Very.

8    **Q.**    When did you first learn of the existence of a vessel which

9    ultimately became the ANZHELA EXPLORER?

10   **A.**    It was estimated about two and a half years ago.  I was, at

11   that period of time acting as a consultant to some interests in

12   the island very close to here, actually ninety degrees true,

13   it's 47 miles called Bimini.  There was a group of developers

14   that are building a huge resort on Bimini and they asked me to

15   look at the market of what was out there as a potential link

16   between Miami and Bimini.  And at that time the name of the

17   vessel was the BOTTOM TIME II, Roman numeral II, which was

18   ideally suited for that very tough crossing across the

19   Gulfstream.  Having the vessel's history as a live aboard dive

20   vessel that had worked that route on many, man years.  It was

21   the leading candidate as far as I was concerned to fill that

22   need.

23   **Q.**    Please describe to the Court what the service that the

24   BOTTOM TIME II was operating as at the time you looked at it?

25   **A.**    The vessel was operating as a U.S. flag documented vessel.

1  There are some gray areas in the law relative to its operation

2  at the time of which I discussed with Mr. Bates.  The law

3  basically states that if a -- U.S. flag, U.S. certified flag

4  commercial is in operation it doesn't matter if the vessel is

5  operating foreign or not, that vessel shall maintain its

6  certificate of inspection.  I know where you are going with

7  this.  Your next question is going to be did the vessel have a

8  certificate of inspection at the time that I was looking at it?

9  And the answer is no.  I believe the previous operators were

10 operating it in that gray area.  I think that's as far as I'm

11 going to go there.

12 **Q.**  Okay.  I'm not going to ask you about the prior owners as

13 to that point.

14 **A.**  Okay.

15 **Q.**  The BOTTOM TIME II was a dive boat.  It took people on dive

16 trips.  It had accommodations.  Was that its primary purpose?

17 **A.**  Yes.  The company was operating as a live aboard high speed

18 dive vessel.  Very nicely decored, photo lab, full galley,

19 lounge, living quarters, and set up to be able to sustain itself

20 for trips up to seven days at a time under private charter for

21 dive groups.

22 **Q.**  And I think this would be an appropriate time just to

23 generally describe the boat, the BOTTOM TIME II that ultimately

24 became the ANZHELA EXPLORER.

25 **A.**  Very simple definition would be that it is a Catamaran.

1   The hull design is one of the best that's out there.  It's a

2   Gladden Hern design which means it's a good blue water boat,

3   meaning rough water boat.  Very, very simplistic in nature.  It

4   doesn't have all of that sophisticated jets.  And it's

5   conventional propellers and dipping rudders and from my point of

6   view as a consultant it's a very, very, easy vessel to maintain

7   and operate.  I like the vessel for another reason because it

8   was built fairly smartly.  The regulations as far as

9   international load line requirements basically says that

10  anything that's over 79 feet going foreign would require an

11  international load line.  Anything under 79 foot is exempt.

12  **Q.**   And how long was the BOTTOM TIME II?

13  **A.**   It was built to 79 feet.

14  **Q.**   So it was built right to the line where it didn't go over

15  the 79 feet that would require an international load line?

16  **A.**   Yes, that's correct.

17  **Q.**   And you said is a Catamaran?  And again, just so the record

18  is clear that is two hulls?

19  **A.**   Yes, sir.

20  **Q.**   And you said that she was a good rough water boat?

21  **A.**   That's correct.

22  **Q.**   And that means she was designed to withstand the rigors,

23  the normal rigors of the ocean?

24  **A.**   Yes, that's correct.

25  **Q.**   When you first discovered the existence or availability of

1    the BOTTOM TIME II at that time had you known or were you

2    familiar with Mr. Dorsey?

3    **A.**    No.  I was not.

4    **Q.**    And again, since this is the first time we raised his

5    name.  Who is Mr. Dorsey?

6    **A.**    Mr. Dorsey is the, I believe he is the 100 percent sole

7    proprietor of the ANZHELA EXPLORER, LLC.

8    **Q.**    So when you saw the BOTTOM TIME II or initially looking at

9    it and she was in service as this dive boat over in Bimini what

10   was your intention?  How did you intend to use the boat if you

11   were to purchase it?

12   **A.**    Precisely for that route.  I was looking at it as a

13   potential purchaser of the vessel and as an operator to put it

14   in operation for the Copple Group in Bimini.

15   **Q.**    Did you ultimately purchase the BOTTOM TIME II?

16   **A.**    I did not.

17   **Q.**    Explain to the Court what intervened and how you became

18   associated ultimately with the acquisition of the BOTTOM TIME

19   II?

20   **A.**    Yes, okay.  As a potential purchaser and operator of this

21   vessel I obviously had look at the full spectrum of its

22   viability in that particular route.  With the advent of that

23   tragic day of 9-11 we looked very, very, very carefully at

24   operating a U.S. passenger vessel as a foreign destination.  The

25   rigors, and the changes of the law and the new security issues

1  surrounding foreign operation where you are bringing passengers

2  in and out of the country with the Customs and the Immigration

3  and the notification prior to landing through electronic filings

4  through Langley, all of those kinds of things made it to me not

5  viable when you start to crunch the numbers.  So it was a

6  financial decision to go away from the boat.  Actually, to be

7  more clear not necessarily to go away from the boat, but to go

8  away from the business.

9  **Q.**   So your first interest then, in the BOTTOM TIME II was back

10  in 2001 or prior to 9-11-2001?

11  **A.**   That's correct.

12  **Q.**   9-11 came, security regulations were beefed up and security

13  zones erected around our coasts and with all of the bureaucratic

14  and security problems you decided it was not the boat for you?

15  **A.**   No.  It was a headache.

16  **Q.**   When next did you become involved with the BOTTOM TIME II?

17  **A.**   Well, as a creature of opportunity I obviously had gone so

18  far down the road with this boat.  I then put my other hat on

19  and I started looking for another place to work within the

20  confines of the United States without all of those

21  restrictions.  And so I just continued.  It was there.  It

22  wasn't my main issue.  I went on to take another position with

23  another company, Fast Cats Ferry Services, they had some

24  problems with another passenger ferry boat.  But it was always

25  kind of like in the peripheral vision.  It was there.

1        With my background in Louisiana I started looking at

2    various venues of which it could be used.  And in commercial

3    trade here.  And, you know, that's when I decided that I would

4    go out and maybe solicit the vessel to an operator.

5    **Q.**   Would you put an approximate year or month to when you

6    decided that you are actually going to try to put together an

7    operating deal with the BOTTOM TIME II?

8    **A.**   I guess a couple of years ago.  I can't put an exact month

9    on it.  I can go into, if you would like me, I have no problem

10   telling you how the contact between myself and Mr. Dorsey

11   derived.

12   **Q.**   That was going to be my next topic.  But let me just -- so

13   we can establish a chronology.  I believe from the paperwork

14   provided the BOTTOM TIME II was actually purchased by either

15   Mr. Dorsey or ANZHELA EXPLORER in July of 2006.

16       You could back from there about how long prior to July of

17   2006 were you involved with looking at the boat and trying to --

18   **A.**   I would say about a year or so, uh-huh.  I

19   actually went onboard the vessel and did a trip on it with the

20   previous owners.

21   **Q.**   That was a dive trip?

22   **A.**   It was a dive trip.

23   **Q.**   What was your intended service for the vessel in 2005/2006

24   when you renewed your interest in boat?

25   **A.**   It actually came post Katrina.  I recognized that the

1  magnitude of that natural disaster Katrina, which decimated

2  Louisiana and having a background in Louisiana I thought there

3  was an opportunity there to utilize the vessel since it was set

4  up as a dive boat and a living quarters boat.  It was perfectly

5  suited to enter into a business as a underwater dive inspection

6  vessel.  Because all of the rigs offshore needed to be inspected

7  underwater.

8  **Q.**   So your idea was that the BOTTOM TIME II would have made an

9  ideal boat to go out into the oil patch to put divers on --

10 commercial divers who would inspect the rigs and anchors and

11 pipelines.  And that, of course, required inspection?

12 **A.**   That's correct.

13 **Q.**   And did you have a specific operator in mind?

14 **A.**   No.  Not at that time.  It was an opportunity that was

15 there.  And again, I'm working other jobs.  And I always have

16 eight or nine things that are kind of like out there, you know.

17 **Q.**   And while we're talking about the eight or nine things, do

18 you own any vessels yourself?

19 **A.**   At this time, no.  I just sold one.  My last vessel.

20 **Q.**   But you have owned vessels?

21 **A.**   Yes, that's true.

22 **Q.**   And operated the vessels?

23 **A.**   Yes, that's correct.

24 **Q.**   With respect to your renewed interest in the BOTTOM TIME II

25 were you looking at that point in time to purchase the vessel

1   for use in the oil patch as a dive inspection vessel?  Or were

2   you looking for someone to purchase it so you could then operate

3   it for them?

4   **A.**   It was a combination of both.  Cash resources,

5   capitalization.  I obviously try to cut the best deal I can.  In

6   some instances it's in a partnership.  And if I would have been

7   able to go alone on this one I probably would have.  But at that

8   particular time due to other kinds of things that were going on

9   I didn't have the capital to do the job myself.

10  **Q.**   How did you meet Mr. Dorsey?

11  **A.**   Well, Mr. Dorsey owns a number of vessels and one of them

12  was the COHIBA EXPLORER which, by the way, was named the COHIBA

13  EXPLORER at that time, another very nice mono hull vessel as a

14  mother ship for fishing and diving.  For some number of years it

15  was located very close to my home here in Miami Beach at a

16  marina.  And that's another one of the vessels that I kind of

17  had my eye on.  And then I learned one day that the vessel had

18  been purchased.  And I asked the marina manager who had

19  purchased the vessel and he was kind enough to give me the phone

20  number of Mr. Dorsey here.

21  **Q.**   So, you were looking to purchase a vessel that Mr. Dorsey

22  purchased and that led to you contacting Mr. Dorsey?

23  **A.**   That is correct.

24  **Q.**   What was the purpose behind contacting Mr. Dorsey after he

25  purchased this COHIBA EXPLORER?

1   **A.**   Basically to give him a call and let him know that, with

2   his acquisition that I had various venues that might be suited

3   for him if he was interested in discussing those with me.

4   **Q.**   And these various venues would be this offshore dive

5   inspection in the Gulf?

6   **A.**   No.  It wasn't Louisiana oriented.

7   **Q.**   Did you become involved in any type of management of the

8   COHIBA EXPLORER?

9   **A.**   No.  I was not.

10  **Q.**   How did your relationship mature into the BOTTOM TIME II?

11  **A.**   Well, I made mention of the BOTTOM TIME II to Jeff as

12  another vessel that might be of interest to him.  But mainly, my

13  initial conversations with Jeff were the COHIBA EXPLORER is here

14  in Miami.  This is my background.  If you need some kind of

15  assistance, you know, there is nothing like local knowledge on

16  who your vendors are.  And, you know, I was looking for a job.

17  **Q.**   You operate boats and you were looking to operate the

18  COHIBA EXPLORER.  But I believe we have already established you

19  didn't become involved with that boat.  Tell us how your

20  involvement with the BOTTOM TIME II which became the ANZHELA

21  EXPLORER evolved?

22  **A.**   Well, there was a maturity to the relationship.  When I say

23  that I wasn't involved with ANZHELA EXPLORER, that's not

24  necessarily the case.  Jeff was down here with his crew and he

25  did pay me some fees to help him get the vessel ready to go to

1   Mexico.  So I was working with Jeff down at the dock on the

2   Miami River.  You know, I was putting in computer systems and,

3   you know, outfitting the vessel to get it ready to go.

4   Actually, as a sea trial rode the vessel with him on its maiden

5   voyage to Mexico from Miami to Key West where I disembarked.

6   **Q.**   But that was on the COHIBA EXPLORER; correct?

7   **A.**   That's correct.

8   **Q.**   Let's talk about the BOTTOM TIME II.  How did that come

9   about with respect to the purchase of the BOTTOM TIME II by

10   Mr. Dorsey or one of his companies and your involvement with

11   that?

12   **A.**   Well, sir, you know, it was a process.  I, like probably

13   Mr. Dorsey, wanted to get to know each other a little bit and

14   the reason that I mentioned the previous vessel is that there

15   was transactions that took place here locally and it was kind of

16   a feeling out, proving time for the both of us.  So it evolved.

17   And then, we -- you know with the ANZHELA left, and we kind of

18   gravitated towards, you know, the next vessel at that time the

19   BOTTOM TIME II.

20   **Q.**   When you said the ANZHELA left, was the COHIBA renamed --

21   **A.**   I'm sorry.  Yeah.  I believe it was ANZHELA EXPLORER?  What

22   was the name of the boat?  I know it as the COHIBA EXPLORER.  I

23   think it was CHULA?

24          MR. DORSEY:  Uh-huh.

25   **A.**   ANZHELA CHULA or something?  You wanted to define the two

OFFICIAL REPORTING SERVICES, LLC (954) 467-8204

1  boats.

2      **Q.**     I just wanted to make sure that when you said the

3  ANZHELA left, that that was once known as the COHIBA?

4  **A.**   Yes, that's correct.

5  **Q.**   And it's different than the boat that we're here today on,

6  the ANZHELA EXPLORER?

7  **A.**   Yes.  Two different vessels.  Do you mind if I get a class

8  of water here?

9  **Q.**   Oh, please.  I may do the same.

10  **A.**   I would like to apologize to the Court.  I flew back from

11  back from Panama, the Republic of Panama yesterday.  I'm doing

12  some training down there and my voice is a little horse.  It's

13  kind of tough when are you not exactly -- I speak Spanglish, so

14  --

15          THE COURT:  I understand.  We're all very grateful

16  that you are here to help us sort out these issues.

17  **Q.**   At some point in time you approached Mr. Dorsey with an

18  idea or a proposed business venture in which the BOTTOM TIME II

19  would be purchased and operated as a dive inspection vessel in

20  the Gulf of Mexico; is that accurate?

21  **A.**   Fairly accurate with exception of the acquisition, I

22  believe, was consummated prior to a final decision of where it

23  was ultimately going to work.  We had discussed a number of

24  different possible venues.

25  **Q.**   But that was just a background question.  You, at some

1   point in time you and Mr. Dorsey --

2   **A.**   I'm just trying to be accurate here.

3   **Q.**   I know.  I understand.  And it wasn't intended to be a

4   trick question.

5   **A.**   Okay.  I believe that.

6   **Q.**   Okay.  Not at this point.  Those trick questions will come

7   later.

8   **A.**   They are coming, they are coming.

9   **Q.**   Sir, did you propose to Mr. Dorsey that he purchase the

10  BOTTOM TIME II?

11  **A.**   I did.

12  **Q.**   And when you proposed that Mr. Dorsey purchase the BOTTOM

13  TIME II what did you describe to him as how that purchase of

14  that vessel would make economic sense?

15  **A.**   Basically it comes down to the price of the boat versus

16  what I believed what its value was.  The vessel was in

17  operation.  It was in fairly good condition.  We had, I believe

18  a hurricane named Wilma, that came through here.  The vessel,

19  during that storm at its mooring in Dania came loose from its

20  moorings and had some fairly -- and had some damage to it.  And

21  since the owner of the vessel was borderline at that point in

22  time on continuing the business.  That was the catalyst that

23  basically said he was out and the vessel became available at a

24  very reasonable price.  So I evaluated, with my background, what

25  I considered to be fairly minimal damage to the vessel.  And

1   then entered into post Wilma and new negotiations at the reduced

2   price of the vessel.

3   **Q.**   When you said a renewed or new price prior to Wilma you

4   were negotiating a purchase price for the BOTTOM TIME II,

5   weren't you?

6   **A.**   I was.

7   **Q.**   And that price was in the neighborhood of $750,000?

8   **A.**   That's correct.

9   **Q.**   Wilma came along.   The boat was damaged.

10  **A.**   (Nodding yes).

11  **Q.**   And you saw an opportunity to come in and negotiate a

12  better price if you purchased the boat as is?

13  **A.**   Yeah.   I low-balled him.

14  **Q.**   And the purchase price ultimately was $200,000; wasn't it?

15  **A.**   I believe that's around what was, yes.

16  **Q.**   Now, at the time the ANZHELA EXPLORER was purchased for

17  $200,000 it was purchased by whom?

18  **A.**   It was purchased by Mr. Dorsey.

19  **Q.**   And up to the date of purchase what had been your active

20  involvement with procuring vessel?

21  **A.**   Basically looking at the, and doing an evaluation of the

22  damage of the vessel to come up with a ballpark figure of what

23  it would cost to repair the vessel and get its certificate of

24  inspection renewed on the vessel.

25        And then also, obviously go back to the previous insurance

1   surveyors, or the surveyor who had been assigned or working that

2   vessel for some number of years to come up with a determination

3   of what the value, of the hull value of the vessel would be with

4   a current certificate of inspection.  Basically it's the same

5   thing anybody would do when you are looking at a business plan

6   or a proposal.  It's the cost of the vessel at the end of the

7   deal.

8   **Q.**   Right.  A lot of issues you just raised.  Let's talk about

9   one.  A boat that is not damaged in it hurricane but is turn

10  key.  You can walk onboard and operate it obviously has greater

11  value than a boat that has damage,

12  **A.**   Substantially.

13  **Q.**   And the boat that is a certificate of inspection, a valid

14  one, that's in effect, is worth more than a vessel that does not

15  have a certificate of inspection?

16  **A.**   Yeah, that is a given.

17  **Q.**   So part of your plan was to get the boat cheap because not

18  only was it damaged in a hurricane but it did not have a current

19  certificate of inspection.  So you purchased the boat in your

20  mind below what you thought its market value was?

21  **A.**   Oh, yes.

22  **Q.**   And you said you had to estimate how much it would cost to

23  put this BOTTOM TIME II back into a condition that it could pass

24  a certificate of inspection?

25  **A.**   That's correct.

1    **Q.**    What did you estimate to be that cost?

2    **A.**    It's a huge process.  A vessel whose COI has expired beyond

3    grace has to be brought back under what is called new T

4    regulations.  All of those kinds of things had to be taken into

5    consideration, flow system, fire, all of that stuff.  You are

6    aware of them.  I would estimate probably around $600,000, you

7    know, when it's all said and done, yeah.

8    **Q.**    And that $600,000 entails a great deal of oversight and

9    labor from the person who is managing the vessel; doesn't it?

10   **A.**    In oversight, yes.  Let me also reiterate on that, on that

11   $600,000 figure.  I always base those figures on a full service

12   shipyard.  Part of the things that I do is any time that we, as

13   long as it's done properly and obviously with the U.S. Coast

14   Guard involved we have serious oversight is to do the work

15   ourselves in a self repair yard.

16   **Q.**    So the $600,000 figure in addition to the purchase price of

17   200 would be the price of a full service shipyard performing the

18   work but it was your plan to do it yourself; subcontract out the

19   work and get it down hopefully for a cheaper price?

20   **A.**    Oh, yeah.  Let me correct that.  The $600,000 figure

21   included the purchase price of the vessel, turn key.

22   **Q.**    Okay.

23   **A.**    But, yes.  The idea was that I felt that I had the skills

24   and oversight.  Particularly with the vessel being brought back

25   into class or COI with weekly inspections or sometimes bi-weekly

1   inspections of the Miami group COI, which, by the way one of the

2   toughest one in the United States.  Yeah, that was the idea.

3   **Q.**   Again, you corrected the record.  I just wanted to make

4   sure that I understand you.  The $600,000 figure was comprised

5   of the $200,000 purchase price with an additional estimated

6   $400,000 to bring it into a COI condition?

7   **A.**   Yes.

8   **Q.**   Okay.

9   **A.**   Let me -- there is something else I would like to make

10  clear here as well.  The $200,000 purchase price of the vessel

11  was only derived at by agreement between myself and the owner of

12  the vessel on his insurance claim.  So he basically -- the

13  purchase price of the vessel really never changed much from that

14  $700,000 level.  It was contingent upon him settling his

15  insurance case on the damage of Hurricane Wilma and then for

16  him, he was very pleased that vessel would have a new life.

17  **Q.**   I'm not sure that I understand that.  But let me go back

18  and ask you this.

19  **A.**   Okay.

20  **Q.**   When the BOTTOM TIME II was damaged in Hurricane Wilma at

21  the time you were negotiating that $750,000 figure the boat was

22  damaged, an insurance claim was pending with the prior owner?

23  **A.**   That is correct.

24  **Q.**   Were you actively involved with negotiating with the prior

25  owner's insurance carrier to obtain policy benefits?

1  **A.**   No.  I did -- I did have some conversations with

2  Mr. McClury (ph) who was the insurance -- was representing that

3  owner's insurance company relative, obviously, for my own

4  knowledge of what his feelings were on what the damages, and the

5  extent the damage was.  That was basically the extent of any

6  participation I had on any of that.

7  **Q.**   You just worked with James McCrory (ph) a marine

8  surveyor --

9  **A.**   I didn't work with him.  I consulted with him.

10  **Q.**   Okay.  And did the owner obtain -- when you said he came to

11  the same price.  Are you suggesting --

12  **A.**   More or less, yes.

13  **Q.**   -- that the owner received insurance proceeds in the amount

14  of about $550,000?

15  **A.**   I don't have the exact amount.  But that -- you know,

16  hearsay.

17  **Q.**   Uh-huh.

18  **A.**   I think that's fairly accurate.

19  **Q.**   So you back filled in the $200,000 that wasn't paid for by

20  insurance?

21  **A.**   Basically, yes.

22  **Q.**   What I'm trying to do now is to discern what was your

23  involvement with locating the boat, negotiating the price, and

24  carrying it through closing and contrasted with what Mr. Dorsey

25  did?

1   **A.**   I think I have already explained to that to you early.

2   That I was interested in purchasing the vessel.  I had a

3   pre-Wilma negotiation.  A price was agreed upon, or more or less

4   agreed upon.  It was a process.  I basically, really at that

5   $700,000 price based on its last COI it wasn't, it wasn't really

6   viable.  It was there, but it was something that was beyond, in

7   my estimation economic sense.  My interest was reinstituted or

8   renewed, I guess is a better word, when I learned that the

9   vessel was taken out of service.  And that it had been sitting

10  in a self repair yard in Ft. Lauderdale for some number of

11  months, almost a year while this insurance situation was going

12  on with the previous owner.

13  **Q.**   What I'm asking is, you were one that put together the

14  deal, to purchase the BOTTOM TIME II?

15  **A.**   That's correct.

16  **Q.**   Okay.

17  **A.**   I brought the deal to Mr. Dorsey.

18  **Q.**   Did you bring anything else to the table with respect to

19  what you represented or what you agreed to do for Mr. Dorsey

20  after the vessel was purchased?

21  **A.**   Yes.  My obviously great skills.  They got real value.

22  **Q.**   Great skills.  But great skills could do what?

23  **A.**   Put the vessel back together and get it ready to go.

24  **Q.**   And also you brought to the table the business or the

25  service that you were going to put the vessel into, this

1  offshore marine inspection in the Gulf?

2  **A.**   Yes, my background being Louisiana.  Mr. Dorsey is life's

3  most dangerous catch guy.  He's a retired crab boat captain from

4  Alaska.  So we have -- I don't know what you call -- interesting

5  careers.

6  **Q.**   What I was trying to establish is you put together the

7  initial purchase of the boat.  You were also going to oversee

8  the --

9  **A.**   The COI process.

10  **Q.**   Yeah, the refit of the boat, the repairs, the COI process,

11  and you were also intending on managing the boat from a

12  commercial standpoint, and that is finding it a market --

13  **A.**   That's all correct.

14  **Q.**   Excuse me?

15  **A.**   That's all correct, yes.

16  **Q.**   Okay.  What was your understanding at this time as to how

17  you were going to participate financially with respect to doing

18  all of these activities you just described?

19  **A.**   Mr. Dorsey and I had come to an arrangement, whereby I

20  would, with the work that I did on the acquisition of the vessel

21  and its ultimate purchase price reactivation of the vessel,

22  working together to find its market, or its venue.  I guess they

23  call sweat equity, that's the word that you looking for, I

24  guess.

25  **Q.**   Well --

1   **A.**   And so we came to an arrangement.

2   **Q.**   Okay, and what was that arrangement?

3   **A.**   That when the vessel went to work that I would own 30

4   percent -- well, actually Jeff, it was supposed to be 50.  But

5   30 percent of the business.  Not of the vessel, no.  Of the

6   business.

7   **Q.**   Did you ever anticipate prior to the loss that you would

8   have an ownership interest in the vessel?

9   **A.**   My understanding and it was -- again, Jeff Dorsey's and my

10  relationship evolved.  There was never anything really written

11  on it.  My understanding was is that the vessel would be owned

12  by the LLC, the limited liability corporation.  And that it

13  would go to work ultimately under contract in Louisiana.  That

14  at that time I would manage the vessel.  Kind of the same thing

15  that I'm doing in Panama with the high speed ferry service right

16  now, that I would receive 30 percent of the net profits of the

17  operating company.

18       Again, this is my recollection because the main thing for

19  us was to acquire the vessel and to get it repaired and then to

20  basically to go forward from there.

21  **Q.**   Okay.  In your mind was this in the nature of a a joint

22  venture?

23  **A.**   I would say a little -- I would say a joint venture could

24  be -- yeah, I guess that would be all right.

25  **Q.**   I'm just -- pardon me -- I'm using words that you may have

1   used in your deposition.  Isn't it true in the beginning it was

2   your understanding that you would obtain a fifty percent share

3   of the net profits?

4   **A.**   That was the initial discussion is that it would be

5   shared.  And that was basically derived at the amount of work

6   that I put into the vessel prior to its acquisition.  Again, I'm

7   going back to its value --

8   **Q.**   Uh-huh.

9   **A.**   -- versus its purchase price.

10  **Q.**   Right.  And when the boat was purchased it was initially

11  purchased by Mr. Dorsey as an individual; is that correct?

12  **A.**   That's my recollection.

13  **Q.**   And at some point in time between time it was purchased and

14  the time she ultimately sank off Golden Beach the boat was put

15  into an LLC?

16  **A.**   My recollection is that is the case.  Probably at the

17  advice of his counsel that, you know, personal liability issues.

18  **Q.**   Right.  And do you know when that transfer

19  occurred between Mr. Dorsey individually owning the vessel to

20  the LLC?

21  **A.**   I can't speak to that.  I don't know.  I don't know the

22  times for when that -- I wasn't involved in that.

23  **Q.**   Did you ever have or perceive to have any ownership

24  interest in the boat?

25  **A.**   I did.

1  **Q.**  At what time did you perceive to have ownership interest in

2  the boat?

3  **A.**   In the beginning.  In the beginning of the discussions.

4  When Jeff and I were, like any anybody, it's, you know, he is

5  going to try to make the best deal he can.  It's a business

6  venture.  It was negotiated.  It ultimately fell on the 30

7  percent participation.

8  **Q.**  Right.

9  **A.**   And again, my -- what I had envisioned or what my ultimate

10  understanding was, while it was never really written anywhere,

11  we were getting to that.  But he is in Seattle.  He owns a

12  number of vessels.  He is in real estate.  And it wasn't the

13  only thing I was doing.  I have other clients.  So we just

14  really didn't get to that.

15  **Q.**  Okay.

16  **A.**   But ultimately, as to my understanding it was that he would

17  own or his family, or whoever the principals are in that

18  company.  I can't even speak to that, was that they would own

19  100 percent of the vessel and then I would get 30 percent of

20  vessel's proceeds.

21  **Q.**  Where I'm headed if I could just jump ahead of it --

22  **A.**   Okay.

23  **Q.**  Are you aware that on the initial application for insurance

24  that you were listed as the owner of the vessel?

25  **A.**   I am aware of that.

1   **Q.**   Okay.

2   **A.**   I might have even filled that paperwork out.  I can't

3   remember.  But at that time that was my understanding of the

4   deal.

5   **Q.**   Find.  And that's all I was trying to --

6   **A.**   Okay.

7   **Q.**   -- reconcile.  At one point in time when your name appeared

8   on the application that was no intention of misrepresenting

9   anything --

10  **A.**   None whatsoever.

11  **Q.**   Fine.  Because are you are aware that the name did change

12  on the insurance policy at some time to the LLC?

13  **A.**   It would have had to.  That's kind of a given.

14  **Q.**   And jumping ahead again, just a little bit, because we are

15  not to procuring insurance, but you were the initiating, for the

16  first person to approach an insurance broker on behalf of the

17  boat itself to obtain insurance?

18  **A.**   Yes.  That was a referral.  At that period of time we were

19  talking to a company in Louisiana under a management contract

20  for receiving the vessel in Louisiana.  And who owns and

21  operates boats in the Louisiana oil field.  Ultimately it was

22  their crew that was sent down here to deliver the boat to

23  Louisiana.  But they had made the referral to their insurance

24  company for coverage.

25  **Q.**   Okay.  And we'll get to that in a moment.  But let's just

1    put a name to that operating company.  What name did that have?

2    **A.**    I believe it was a company called Fish Offshore.

3    **Q.**    And that was owned by a Greg Blanchard?

4    **A.**    That's my understanding

5    **Q.**    Let's come back in time to the time that the boat was

6    purchased.  Where was the boat physically located?

7    **A.**    It was on hard deck in Lauderdale Marine Center.

8    **Q.**    And that is up the New River in Ft. Lauderdale?

9    **A.**    That's correct.

10   **Q.**    Okay.

11   **A.**    I don't have the exact address here.

12   **Q.**    And the boat was purchased, I believe we said, in July of -

13   - let me get the contract -- July of 2006; does that resonate?

14   Is that an proximate date in your mind?

15   **A.**    Yes.  I would say that's accurate.

16   **Q.**    Okay.  The boat is purchased.  It's at Lauderdale Marine

17   Center on the hard.  That means on the deck as you said.  Out of

18   the water.

19   **A.**    Correct.

20   **Q.**    What did you set out to do?

21   **A.**    The U.S. Coast Guard was immediately consulted.  I went

22   into the base over here to the MSO office and sat down with

23   Mr. Bates and some of his inspectors.  And we pulled a file out

24   and came up with a plan of repairs that they required to obtain

25   its -- initially, which is basically the hardest one of all,

1    which is its hull, passing its hull inspection towards the

2    issuance of the certificate of inspection COI.

3    **Q.**    And this hull inspection is called a hull credit; isn't

4    it?

5    **A.**    That is correct.

6    **Q.**    That's its term of art.

7    **A.**    That's the correct term, sir.

8    **Q.**    And tell the Court who Paul Bates is so we can understand

9    what his role is in this.

10   **A.**    Mr. Bates, which he shall be called.  It's Mr, because he

11   is no longer active.  He is civil servant, ex-U.S. Coast Guard

12   but after his retirement from the service he was retained as a

13   civil servant in the position of head of head of vessel

14   inspections and in the MSO office in the Miami group.

15   **Q.**    Paul Bates oversees, he runs the Coast Guard branch that

16   inspects boats and issues certificates of inspection?

17   **A.**    That is correct.

18   **Q.**    Okay.  And when you sat down to talk to Mr. Bates did he

19   run an activity summary report for you?

20   **A.**    He did.

21   **Q.**    Have you had occasions to see various activity summary

22   reports with respect to the ANZHELA EXPLORER?

23   **A.**    No.  I never did follow the process because my -- I was

24   following the specific instructions of the field inspectors.

25   They would come around about every two or three days, look at

1    the work that we were doing, and give me their requirements as

2    to those repairs to obtain that hull credit.

3    **Q.**    Since I mentioned an activity summary report would you

4    describe to the Court just what that is?

5    **A.**    Well, it's an ongoing, updating on the data base of the

6    activities surrounding the repairs of the vessel.  I suspect,

7    while I'm not privy to, that the inspectors have a running file

8    that they update from time to time during the process within the

9    data base.

10    **Q.**    And the activity summary report will show outstanding

11    deficiencies with respect to what the Coast Guard believes needs

12    to be performed?

13    **A.**    That's correct.

14    **Q.**    And it also contains dates of inspection?

15    **A.**    I would think so.

16    **Q.**    And it also contains dates in which hull credits, or the

17    certificates were issued?

18    **A.**    Correct.

19    **Q.**    Okay.  Are you aware of how one could access this data

20    base?

21    **A.**    Yes.  You can go into the U.S. Coast Guard web site and

22    pull up, I think by official number and download the stuff.

23    It's a -- I believe it falls under the Freedom of Information

24    Act.  You know.  It's nothing that's secure.

25    **Q.**    It's public records?

1  **A.**    It's public record.

2  **Q.**    That's where --

3  **A.**    Okay.

4  **Q.**    I'm going to hand you a document that we have marked as

5  Plaintiff's Exhibit 50.  And just ask if you can identify this

6  as the vessel activity summary report for the ANZHELA EXPLORER?

7  **A.**    Yeah, this is one of them.

8  **Q.**    Have you had an opportunity at any time to review the

9  contents of this activity summary report?

10 **A.**    Well, I saw the initial one when I went in and saw

11 Mr. Bates the first time when we came up.  I needed to know what

12 they were.  Basically it was this boat has got some problems.

13 **Q.**    Okay.  That's where I'm?

14 **A.**    That's where are you going.

15 **Q.**    That's where I'm going.

16 **A.**    I follow you, Counselor.

17 **Q.**    Okay.  Let me ask you this question:  What came first, the

18 survey of the vessel by Mr. Elliot or the United States Coast

19 Guard inspecting the vessel for purposes of reestablishing the

20 COI?

21 **A.**    The U.S. Coast Guard.  I brought Mr. Elliot in fairly,

22 towards the end of the process of the hull credit.

23 **Q.**    Okay.  Let me take care of one detail.

24        Plaintiff's Exhibit 13 has been identified as the survey

25 report, BOTTOM TIME II.

1          THE CLERK:  I'm sorry, counsel?  Survey report?

2          MR. FERTIG:  Survey report, BOTTOM TIME II.  And if it

3   would help the Court I have a copy.

4          THE COURT:  I have it here.

5          MR. MOURE:  Your Honor, those are simply my exhibits.

6   But they are -- we did multiple exhibits.  So I you can go to

7   the binder and it's listed in my binders as Exhibit Number 50.

8          THE COURT:  Don't I have --

9          MR. FERTIG:  We have Defendant's exhibits in binders,

10  and Plaintiff's exhibits.  And I don't know which one the Court

11  has.

12         THE COURT:  I'm working off of plaintiff's.

13         MR. FERTIG:  Okay, okay.

14         THE CLERK:  Okay.

15         THE COURT:  For now until I get to the defendant's

16  case.  That's the way that I usually do it.

17         MR. FERTIG:  Okay.  I was just asking the Court as a

18  courtesy if it wanted a copy.

19         THE COURT:  I got it here.  Exhibit 13, you said?

20         MR. FERTIG:  Yes, sir.

21  Q.   Is that a copy of the survey of the BOTTOM TIME II?

22  A.   It is.

23  Q.   Was it performed by Malcolm Elliot?

24  A.   That's correct.

25  Q.   Who is Malcolm Elliot?

1  **A.**   He is a certified marine surveyor.  I believe he belongs to

2  a variety of different endorsement companies, or however they do

3  that, sir.

4  **Q.**   And have you used, or solicited, or retained the services

5  of Mr. Elliot on any prior occasions?

6  **A.**   I have.

7  **Q.**   And in connection with boats that you have owned or boats

8  that you managed?

9  **A.**   Both.  He is a pretty good surveyor.

10 **Q.**   When you contacted Mr. Elliot to perform the survey what

11 type of survey did you ask that he perform?

12 **A.**   A general hull survey.  I'm not sure of the timing on the

13 dates of that.  But I really wanted him to come in when we are

14 at the point of getting our hull credit for the purposes of

15 coming up with what I felt we needed to put the right number on

16 the request for hull insurance, the value of what the vessel

17 would be.

18 **Q.**   Well, there are various kinds of surveys; aren't there?

19 **A.**   This was a dry dock.  This was a basic, same thing.  Hull

20 inspection.  Dry dock survey.

21 **Q.**   Right.  Was the boat in the water at the time?

22 **A.**   No.  You can't do a dry dock survey in the water, sir.

23 **Q.**   Well, I wasn't mincing words with you but many times boats

24 are put on the hard for purposes of inspection and then they are

25 put in the water for an operational, like a sea trial to check

1    the systems.

2    **A.**    That's correct, that's correct.

3    **Q.**    My question was --

4    **A.**    This was a dry dock survey on the hard deck.

5    **Q.**    Dry dock only?

6    **A.**    No.  It was a complete survey.  I mean, the boat happened

7    to be on the hard deck when I brought him in to do his

8    evaluation of the vessel.  But I asked him to do a complete

9    evaluation of the vessel.  So this is not -- I wouldn't say this

10   could be defined as a hull inspection survey only.  It was a

11   survey of the vessel while it was on the hard deck.

12   **Q.**    Okay.  Well, so then he was able to operate the engines, to

13   bring them up to speed, to determine whether or not the engines

14   and gears, the running gear underneath the boat, the cutlas

15   bearings and everything were operating normally?

16   **A.**    They could certainly inspect that running gears and the

17   cutlas bearings on the hard deck.  That's really the only place

18   that you can do it.  But as far as running the engines, the

19   answer is no.  We didn't run the engines there.  Because for

20   obvious reasons, we have raw water intakes, and that kind of

21   stuff.  We were going to bring them back.  We were going to

22   bring him back for those.

23   **Q.**    Right.  And so this wasn't a full survey.  I mean, he

24   didn't operate it.  He didn't test out the navigational

25   systems.  He didn't test the effectiveness --

1   **A.**   Well, he couldn't.

2   **Q.**   -- of the steering system.

3   **A.**   You can't do it on the hard deck.

4   **Q.**   Thank you.

5   **A.**   It was for purposes of a general survey.

6   **Q.**   Well, the question I was going to ask, and let me just

7   define the categories then.  There are different types of

8   surveys.  There are surveys that for buyers, pre-purchase

9   surveys.

10  **A.**   Yes.

11  **Q.**   There are loss surveys.  There are surveys for insurance

12  purposes, there are surveys for purposes of financing, to obtain

13  financing.

14  **A.**   Yes.  Yes, sir.  Yes, sir.

15  **Q.**   Of those categories where did this survey fit into the

16  scheme of things?

17  **A.**   I asked him to do an evaluation and survey of the vessel

18  for the purposes of being able to provide an insurance

19  underwriter some documentation on the value of the boat

20  completed.

21  **Q.**   Was this also to be used for financing?

22  **A.**   Yes, I believe so.  We were talking about, I should say

23  Mr. Dorsey and I had discussions about financing the vessel when

24  it was completed.  So obviously, this would be a backing

25  document to that.  But its primary purpose was for the

1  submission to obtain insurance coverage for this trip.

2  **Q.**   So, you knew when you asked for this survey that it would

3  be relied upon by some insurance company, whoever that may be,

4  to determine whether or not the boat was a good insurance risk?

5  **A.**   I don't know.  I can't speak to what insurance companies

6  rely on.  For me, it was a document that I felt that I needed

7  based on my experience.  Most insurance companies require a

8  fairly recent survey.

9  **Q.**   Well, given your experience in the community do you know

10  why insurance companies request surveys of boats?

11  **A.**   Yes.  They would like to know what they are insuring has

12  close to the same value of what it's being insured for, for

13  obvious reasons.

14  **Q.**   Uh-huh.  And when you brought Mr. Elliot, the surveyor to

15  the boat did you tell him that you purchased the boat for

16  $200,000?

17  **A.**   I don't believe so.

18  **Q.**   Did you tell him that you intended upon spending about

19  $400,000 to put the boat back into service?

20  **A.**   I didn't tell him that.

21  **Q.**   Did you mention to Mr. Elliot anything about the intentions

22  to restore the boat's certificate of inspection so it could

23  operate as a commercial boat?

24  **A.**   Yes.  I discussed its intended venues in Louisiana, where

25  it was going to work.  Yes, I did do that.  I don't believe I

1  discussed any of the financial factors surrounding the vessel.

2  **Q.**   Well, first of all the survey report was issued to you

3  personally; is it that accurate?

4  **A.**   Yeah, that's accurate.  On page one it says here who it was

5  requested by, and it's filled in with Mark A. Rosandich.

6  **Q.**   And you saw the valuation of the boat?

7  **A.**   When he finished his report, yes.

8  **Q.**   Did you have any input with valuing the boat?

9  **A.**   I did not.  Well, let me go back on that.  Input meaning

10 what?  Did I attend the survey with him when he was doing the

11 survey?  Yes.  I was telling him, basically walking him through

12 the boat with -- what certain things were.  I guess that's not

13 right either.  He is a qualified surveyor.  But I attended the

14 survey with him, yes.

15 **Q.**   I wasn't Referring to the general.  I'm saying did you ever

16 suggest to him figures?  Did you ever tell him that you would

17 like to see it survey out to a particular amount so certain

18 financing could be obtained?  Did you provide him with any

19 market data as to what your opinion would be that this boat

20 would sell for in a commercial context?

21 **A.**   I would say yes.  I told him that I thought that the vessel

22 would have a finish value of about 1.5 or 1.6 million dollars.

23 And that was the extent of it.

24 **Q.**   And I am certain that in your experience managing vessels

25 and captaining vessels that you have gone through survey

1   processes on numerous occasions for numerous vessels for

2   numerous reasons?

3   **A.**   That is correct.

4   **Q.**   Please describe to the Court -- or let me just ask you

5   this:  At the back of each survey the surveyors usually put

6   together a list of deficiencies.  Are you familiar with that

7   practice of marine surveys?

8   **A.**   Yes.  Generally, yeah.  You get a list of deficiencies.

9   **Q.**   Because the surveyor's job, first of all he goes in and he

10   describes the vessel, and he then lists the various equipment

11   that's onboard the vessel.  And gives his opinion with respect

12   to the condition of the hull and the equipment; is that an

13   accurate statement?

14   **A.**   Yes.  And he always says without prejudice.

15   **Q.**   Right.  You injected that.  What does that mean to you;

16   without prejudice?

17   **A.**   That means that he is basically to give his opinion on what

18   he sees without the input of any other party.  That's what I

19   understand it to be.

20   **Q.**   Do you understand it to mean you can't come back and sue me

21   because I'm not warranting this condition?

22   **A.**   I would suspect that it has a dual role there.

23   **Q.**   You know surveyors?

24   **A.**   Sure, yeah.

25   **Q.**   But at the end of the survey, after the surveyor describes

1  the boat and how many tanks it has and what its general layout

2  and equipment and its condition isn't it customary that

3  surveyors have a list of recommendations, those things that need

4  to be done to the boat to put her into a seaworthy condition for

5  whatever service she's intended?

6  **A.**   Sometimes yes, sometimes no.

7  **Q.**   Okay.

8  **A.**   Basically he does an evaluation of what he sees and puts a

9  value on it.  I have seen it both ways.

10 **Q.**   Let's talk about this survey.  Malcolm Elliot, at the end

11 of his survey, states or lists on the last page, page 15 must

12 recommendations.  Do you see that?

13 **A.**   Yes, I do.

14          MR. FERTIG:  And before we read that into the record,

15 Judge, I would like to offer Plaintiff's Exhibit 13 into

16 evidence at this time as the Malcolm Elliot survey procured by

17 Mr. Rosandich.

18          THE COURT:  Any objection to Exhibit 13?

19          MR. MOURE:  Only in that, Your Honor, my exhibit, I

20 think is a more complete exhibit.  But other than that, no

21 objection.

22          THE COURT:  All right.  We'll clear that up later.

23 But for purposes of this exhibit 13 on the Plaintiff's list,

24 we'll admit that.

25          MR. FERTIG:  And I believe what counsel is referring

1    to are the photographs?

2            MR. MOURE:  No.  There were additional documents.

3            MR. FERTIG:  We'll take that up later.

4            MR. MOURE:  Yes.

5    **Q.**   Please -- let me go over the must recommendations.  What is

6    your understanding of what a must recommendation is?

7    **A.**   Basically things that he lists that should be done on the

8    vessel prior to going into commercial service.

9    **Q.**   Right.  A must recommendation is more -- well, is a

10   mandatory something that has to be done before the boat can

11   safely be put into service; is that an accurate summation of

12   what these -- the purpose of this on the survey report is?

13   **A.**   I believe that the recommendations that are made prior to

14   the vessel going into commercial service.

15   **Q.**   Okay.  And right above that Mr. Elliot acknowledges that

16   the present owners are having the vessel re-inspected as a

17   passenger carrying vessel, licensed for fifty persons overnight,

18   including crew and/or 149 passengers for day excursions.

19   **A.**   Yeah.  Because at that period of time there was no final

20   decision on this vessel going to Louisiana.  So it was an

21   either/or situation.  We were discussing as at is today the

22   vessel is 140- -- was bought by another party.  The hull was.

23   And it is 150 passenger ferry vessel.  And if it was going into

24   the venue in Louisiana then it would be an overnight, yes.

25   **Q.**   What I'm asking you is; you conveyed to Malcolm Elliot that

1   this was the vessel's intended service.  He obtained that

2   information from you; correct?

3   **A.**   He did.

4   **Q.**   And when you obtained this survey as a reasonably prudent

5   vessel manager -- can I call you a vessel manager?

6   **A.**   I guess so.

7   **Q.**   For this boat?

8   **A.**   Yes.

9   **Q.**   Did you review the survey?

10  **A.**   Yes, I did.

11  **Q.**   And when you reviewed it did you find anything that was

12  reported by Mr. Elliot that you took issues with?

13  **A.**   Not really.

14  **Q.**   Well, let me ask it to you this way:  Did you -- were you

15  aware that this vessel had watertight bulkheads installed?

16  **A.**   Yes.

17  **Q.**   And you are aware that any vessel in commercial service

18  from your experience with certificates of inspection require

19  watertight bulkheads?

20  **A.**   Yes.

21  **Q.**   Well, did you go through this survey and see how many

22  watertight bulkheads Mr. Elliot thought this boat had?

23  **A.**   No.  I never did.  I didn't.  I missed that.

24  **Q.**   Okay.  Do you know how many watertight bulkheads this

25  vessel had?

1   **A.**   If you give me a minute I can, in my head, count them

2   **Q.**   Okay.

3   **A.**   You got a pen?  I have to draw the boat.  This has been a

4   long time now.  I have to draw the boat.  Your Honor, can you

5   indulge me one minute so I can count these?

6            THE COURT:  Actually, why don't we do this; let's go

7   ahead and take our midmorning break and you think about how many

8   watertight bulkheads are on the vessel.

9   **A.**   Okay.

10           THE COURT:  And we'll follow up in ten minutes.

11  Okay?

12  **A.**   All right.  Thank you, Your Honor.

13           THE COURT:  Thank you,

14           THE CLERK:  All rise.

15                    (Short recess.)

16           THE CLERK:  All rise.

17           THE COURT:  Okay, we are now back in session.

18  **Q.**   Have you had an opportunity to calculate how many

19  watertight bulkheads are on each hull?

20  **A.**   Well, there is eight compartments.  So, if you want me to

21  on my little drawing here I could tell you how many bulkheads

22  there are that consists of those compartments.  There are eight

23  watertight compartments.

24  **Q.**   On each hull or on both hulls?

25  **A.**   On each hull.

1  **Q.**   Okay.  On Mr. Elliot's survey isn't it true he was of the

2  opinion there were only three watertight compartments per hull?

3  **A.**   Well, you know, I can't answer to how he determined those

4  three watertight compartments.  For example, one of those

5  compartments is from the bottom of the keel all the way to the

6  top, the fuel tank, okay?

7        Compartment number two and number three are integrated as

8  one compartment but they do have -- but it does have a door

9  between them that is supposed to be watertight.  As the vessel

10 is now going back to new T regulations it was a requirement that

11 that door be taken out and a top access point be put in.

12       So, I can't make a determination on how or why he came up

13 with that number.  But for me, for me, you have your collision

14 bulkhead.

15       You have the next two compartments are really are, -- if

16 you look at them, one compartment.  So there is one/two.

17       Then you have your bulkhead which he probably didn't

18 count.

19       And then he has his engine room.

20       And the rudder rooms.

21       There is two empty voids in the stern.  So --

22 I can't answer that.  I don't know why he did that.

23 **Q.**   Well, my question is when you reviewed the survey, just on

24 this one little point, did you question him and say, Malcolm,

25 you got it wrong.

1  **A.**   You know, when you say did I review the survey?  I got the

2  survey in.  I didn't thoroughly read the survey.  And that -- I

3  didn't catch that.  So --

4       If I would have thoroughly looked at the survey I probably

5  would have called him up on the phone and walked him through the

6  boat again and asked him why he did it that way.

7  **Q.**   But you did look at the survey?  I mean to determine what

8  deficiencies there were --

9  **A.**   Of course.  That's the first place I turned to was what he

10 had as deficiencies.  And then I skim read the rest of this.  I

11 checked to make sure that the KW ratings were right, and main

12 engines were right, that kind of stuff.

13      But honestly, I just did not -- I didn't catch the

14 compartmentalization bulkhead number.

15 **Q.**   Okay.  Well, let's just talk about this survey that was

16 issued on August 12, 2006.  When you received the

17 recommendations of things that would be necessary that had to be

18 performed to put this boat back into service didn't you notice

19 there were a variety of very critical issues that were

20 outstanding and required attention that were not addressed by

21 Mr. Elliot?

22 **A.**   Yes, I did.  But now again, there is two processes in the

23 COI, sir.

24 **Q.**   Uh-huh?

25 **A.**   We were going through the hull credit on this.  Any time a

1  vessel changes jurisdiction from one jurisdiction to the other

2  it has a new to zone inspection.  I was not so concerned with

3  those at the time of this survey because there was going to be a

4  new to zone survey done when the vessel arrived to Louisiana.

5       The actual topside new to zone inspection was going to be

6  comprised with the issuance of the COI in Louisiana.  I believe

7  there is a document somewhere that's going to come forward that

8  is noted by U.S. Coast Guard that the vessel was going to go to

9  Louisiana and that the topside was going to be completed there.

10 **Q.**  But back to this survey, you said, you got, you obtained

11 this survey because you knew an insurance company would be

12 looking at it.  But when you received the survey from Mr. Elliot

13 and you didn't see a lot of critical findings that you knew

14 existed on the vessel but weren't pick up by the surveyor what

15 did you do to supplement the survey report or tell Mr. Elliot

16 that he missed some significant findings?

17 **A.**  Sir, sir.  I'm going to go back -- wait a minute here.

18       MR. MOURE:  I just objecting.  Let me just form that

19 objection.

20       THE COURT:  You are the witness.  He is the lawyer.

21 **A.**  I can't cross him?

22       THE COURT:  No.  If he tries to object just be quiet.

23 **A.**  Okay.  Yes, sir?

24       MR. MOURE:  Thank you, Your Honor.  I just would

25 object in that the witness has not been presented the full

1   survey.

2            MR. FERTIG:  Okay, let's --

3            THE COURT:  Overruled on the basis of that objection.

4   Go ahead and --

5            MR. FERTIG:  All right.

6   **Q.**   Did you correct or approach Mr. Elliot to advise him of the

7   deficiencies that he did not include in the written portion of

8   his report?

9   **A.**   Now, would you repeat that?  I don't understand.

10  **Q.**   Did you ever approach Mr. Elliot after he issued this

11  August 12, 2006 survey report to correct him insofar as the

12  existing significant deficiencies?

13  **A.**   My answer to the question is no.

14  **Q.**   Okay.

15  **A.**   But then again, I didn't catch those deficiencies in his

16  report has previously stated.  This vessel -- this vessel --

17  when you look at it relative to its watertight compartments I

18  can't answer as to how he would have come up with that number.

19  Did he include the fuel tank?  I don't know.  Did you take into

20  consideration that voids number two and number three were

21  actually intricate?  I don't know.  I guess those will be

22  questions for him to answer.

23  **Q.**   And let me ask you this:  What is your email address?

24  **A.**   It's highseas@atlanticbb.net.

25  **Q.**   And that was your E-mail address back in August 16 of 2006?

1  **A.**   That's correct.

2  **Q.**   I'm going to hand you a document that we have identified as

3  Plaintiff's Exhibit 182 and ask if this is a copy of an E-mail

4  you authored to Mr. Bates at the marine safety office?

5          THE COURT:  What is the number again?

6          MR. FERTIG:  The number was 182.  I have an additional

7  copy if the Court would --

8          THE COURT:  I have that as a Coast Guard report.

9          MR. FERTIG:  Oh, I'm sorry.  This came through the

10 prior ruling.  This was a document, an E-mail that was attached

11 to the report.

12         THE COURT:  Thanks.  Okay.

13         MR. FERTIG:  But it wasn't generated by the report.

14 Maybe it would help if I just segregate out.

15         THE COURT:  Okay.

16         MR. FERTIG:  (Handing to the Court.)

17         THE COURT:  All right.

18         THE CLERK:  Whoa.  So are we calling this, if it's not

19 the report --

20         MR. FERTIG:  Well, can we call it 182-sub-1?

21         THE COURT:  182-A.

22         THE CLERK:  Okay.

23 **A.**   Is the question is that I authored this?

24 **Q.**   Yes, sir.

25 **A.**   Yes, I did.

1  **Q.**  And is the date correct that you sent it August 16th, 2006?

2  **A.**  Yes, it is.

3  **Q.**  Did you send that to the United States Coast Guard,

4  Mr. Bates?

5  **A.**  Yes, I did.

6  **Q.**  The Coast Guard redacted the name, but --

7  Now this report that you sent to Mr. Bates at the Coast

8  Guard is dated four days after the August 16 survey report of

9  Mr. Elliot; correct?

10  **A.**  Looking at the documents it looks like it's accurate.

11  **Q.**  Right.  And your first paragraph that you write Mr. Bates

12  at the Coast Guard you tell him it should be noted that we had a

13  full survey of the vessel done by Florida Nautical Surveyors,

14  Malcolm Elliot, to include all audio gauging which I have

15  included herein.

16  **A.**  Yep.  That's what I said.

17  **Q.**  So you sent to the Coast Guard Mr. Elliot's findings?

18  **A.**  No, I did not.

19  **Q.**  Did you send to him just the audio gauge portion of the

20  report?

21  **A.**  No, I did not.  I didn't send anything to them.  They are

22  their own inspectors.  Let met tell you something about

23  Mr. Bates.  Mr. Bates doesn't take anybody's word for anything.

24  This is a document that I sent to him as an FYI to keep him kind

25  of up to speed on what we were doing.  His inspectors perform

Page 54

1    their inspections and they report to Mr. Bates.

2    **Q.**   Okay.  What then did you mean when you say to include audio

3    gauging which I have included herein.

4    **A.**   I believe that that was a separate attachment.  I can't

5    remember.  That basically had some audio gauge figures on it as

6    a drawing of the hull.

7    **Q.**   And then you go on to list work that you believe is

8    necessary to put the boat into COI condition; that that an

9    accurate summary of those issues that you raise in your August

10   16th E-mail?

11   **A.**   Yeah, this is basically a communication to the MSO over

12   there, Mr. Bates, of some of my findings, either things that

13   have been done or things that are ongoing.

14   **Q.**   Okay, let's talk about the finding in number one.  About

15   half way you said Wilma caused the house to be shifted back on

16   the starboard hull back about one inch.  The house that he

17   talking about is the deck house, the accommodation portion of

18   the vessel; correct?

19   **A.**   Yeah.  This vessel is a very interesting design.  It's

20   actually two pieces.  The hulls and then the three story super

21   structure that sits on top of it is connected via rubber and

22   stainless steel isolator mounts.  And that's how they are

23   connected, the two pieces are tied together.

24   **Q.**   Okay.  And if I can, I'm not sure I can quickly put my hand

25   on a picture of the vessel to explain what are you talking

1    about.  But let's talk about this.

2         On August 16th you were aware that the boat had hurricane

3    damage that caused this entire three story deckhouse to shift to

4    the -- or shift back on the starboard about one inch; correct?

5    **A.**    That's correct.

6    **Q.**    And you told the Coast Guard how you proposed it rectify

7    that condition.  You had some slings that you were going to make

8    custom made and the whole process.

9    **A.**    The slings were provided by the previous owner.  They were

10   pre-made.

11   **Q.**    Okay.  What I'm saying is that was work that you were

12   telling the Coast Guard you were going to perform to put the

13   deckhouse back in its proper orientation?

14   **A.**    That's correct.  It wasn't a requirement by the U.S. Coast

15   Guard, by the way.  That was my own requirement.

16   **Q.**    Well, did you see anywhere in Mr. Elliot's report where he

17   mentioned the deckhouse had shifted aft one inch and would

18   require being moved to be restored to its proper orientation?

19   **A.**    I don't recall that.  I don't recall that at all.

20   **Q.**    Did you advise Mr. Elliot that it had Wilma damage that

21   would require such repairs?

22   **A.**    I don't recall if I did or I didn't.  It's a long time now.

23   **Q.**    Okay.  Last, or the second to the last sentence

24   on number one said the two stress cracks in the mount

25   gussets to port will be repaired by placing them -- replacing

1   them.  Understanding they cannot be re-welded a second time.

2       Mr. Elliot's report that was issued four days before didn't

3   contain any reference to these two stress cracks to the gusset

4   mounts; did they?

5   **A.**   Probably not.  I haven't seen the document in a long time.

6   But let me also state this.  These cracks were pointed out, and

7   very, very difficult to get to see.  I believe that, I believe

8   that they were noticed after Elliot's inspection.  This was an

9   ongoing process sir.  I mean, this is not -- but go ahead.

10  **Q.**   Okay.  Well, the fact is you knew of these cracks in the

11  mount gussets four days after he wrote his report, this is

12  Mr. Elliot.  Did you correct Mr. Elliot in saying Mr. Elliot if

13  we're going to submit this report to an insurance company or

14  anyone else, a bank?  You should correct this?  You should put

15  more of these, this finding in your report?

16  **A.**   I know where are you going with this, sir.  The United

17  States Coast Guard MSO is issuing the certificate of inspection

18  on this boat, not Mr. Elliot.

19  **Q.**   Okay.

20  **A.**   I did not feel the need to go back to Mr. Elliot after the

21  fact and correct him on a couple cracks that the U.S. Coast

22  Guard found or I found that needed to be repaired, sir.

23  **Q.**   Okay.  Well, let's go on.  Mr. Elliot also missed item

24  number two in your report.  The stress cracks in the port and

25  starboard bow tunnel hull seams will be grinded out and

1    re-welded.  You didn't say anything about that in his report;

2    did you?

3    **A.**    Yeah.  Mr. Elliot doesn't have the practice of doing dye

4    penetration.  Unless you do use a dye penetrant on it, I'm sure

5    you are familiar with it, sir.  You spray is on one side.  You

6    cannot see these cracks.  It's a process that we are going

7    through, the timing of the, the timing of the survey being on

8    the 12th and the issuance of this letter on the 16th.  There is

9    a lapse of time there.  I'm also telling you is that surveyors

10   do not carry dye penetrants with them and walk around boats

11   spraying the developers penetrant.  These cracks are very, very

12   hard to see by the naked eye.  So to answer your question, no.

13   **Q.**    But when you were there that day with Mr. Elliot didn't you

14   point out to Mr. Elliot this information that you knew existed

15   with respect to the condition of the boat?

16   **A.**    No.

17   **Q.**    And after the report was issued but before it was sent to

18   an insurance company did you make any changes or advise anyone

19   that Mr. Elliot's report missed these findings?

20   **A.**    Sir, I'm going back to the fact that when the Nautical --

21   the Florida Nautical Surveyor's report came out I didn't

22   thoroughly review it because I was going through the United

23   States Coast Guard inspection process it really did not concern

24   me because they go ten times over and pass the inspection of a

25   survey before they issue a hull credit.  So the answer to your

1  question, sir, is, If I'm going through that COI process for a

2  hull credit I depend on the United States Coast Guard inspectors

3  and not on the surveyor regardless of whether this is going to

4  an insurance company or not because I know it's going to be

5  right.  So I did not put that big an emphasis on his report,

6  sir.

7  **Q.**   And in part because if the boat had a certificate of

8  inspection that then -- anybody that was aware of that, to take

9  that to the bank.  That boat has a COI, and it passed the

10  rigorous inspection?

11  **A.**   In my mind, sir, yes.  My little mind.

12  **Q.**   So what was on the survey report was not as important as

13  what would occur had the boat had a COI?

14  **A.**   I would answer that question yes.

15  **Q.**   Let's just quickly not spend a lot of time on the remainder

16  of your report.  But I'm just going to, for economy and since

17  this is a non jury trial.  I'm just going to through these and

18  ask if you recall these deficiencies being identified in

19  Mr. Elliot's report.

20      Number three, port side hull plating:  Adjacent to forward

21  cargo fuel tank will be cut up to include the area showing

22  electrolysis.  It talks about putting new plate in.

23      Do you see any recommendation four days earlier of

24  Mr. Elliot stating due to areas of electrolysis they are going

25  to --

1    **A.**    I'm going to answer that the same way as the next four

2    questions that you are going to ask me, sir.

3    **Q.**    Right.

4    **A.**    For the purposes of expediency here.  I'm not running this

5    trial.

6    **Q.**    Right.

7    **A.**    But I'm telling you I did not review Mr. Elliot's survey to

8    that degree based on my processes with the United States Coast

9    Guard inspectors ongoing.

10   **Q.**    Okay.  And for the record, number four is areas of bare

11   aluminum in the hull be properly sanded, prepped and painting.

12   That number five, the grey water tank at center was hit by a

13   skill saw when they were removing the under deck sheeting.

14   **A.**    I do remember that.  That actually happened after Malcolm's

15   visit.

16   **Q.**    So that happened in the interim period of time.  How about

17   we -- let's see -- four under deck spotlight fixtures completely

18   corroded out.  All four fixtures are being replaced with new

19   ones.

20   **A.**    Not required by the U.S. Coast Guard.  As a matter of fact

21   I told Mr. Elliot that I had not made a decision whether I was

22   going to put them in.  I thought that they were a safety hazard,

23   having electric, 110 volt electrical lights outside of the hull

24   with divers in the water, and that I probably was not going to

25   repair those.

1    **Q.**    Uh-huh.

2    **A.**    And therefore, they were a non issue.

3          As a matter of fact, they were taken out.

4    **Q.**    Well, the point is Mr. Elliot didn't even note in his

5    report that these underwater lights were completely corroded

6    out; did he?

7    **A.**    Did he -- did Mr. Elliot take a ladder, go up underneath

8    the boat and remove the lens from them?  These are big

9    spotlights, sir.  Like these up here above us.  They have a lens

10   with a gasket on them.  Would most surveyors go up and take a

11   screwdriver and drop the lens down to look inside a light

12   fixture?  In nine out of ten times, no, they wouldn't.

13   **Q.**    Let me ask it to you this way --

14   **A.**    That, and the fact that I did tell him I was removing them

15   from the boat anyhow.

16   **Q.**    Do you believe that Mr. Elliot's must recommendations in

17   the paragraph below he said it is, reported the present owners

18   are intending this to be a passenger carrying vessel, licensed

19   for fifty persons overnight, there were 149 passengers for day

20   excursions that his five must recommendations of to fill the

21   fuel tanks to prove integrity, anchor --

22   **A.**    That was --

23   **Q.**    Let me finish, please.

24   **A.**    All right, all right.

25   **Q.**    Safety wire all shackles on the anchor, service and date

1  the fire extinguishers, service and date tag the life rafts, and

2  to renew and install life raft hydrostatic releases accurately

3  depicted the condition of the ANZHELA EXPLORER on August 12th,

4  2006?

5  **A.**   I thought that his list of deficiencies was rather small.

6  **Q.**   Now, let's talk about the Coast Guard.  The Coast Guard

7  inspected the vessel on August 12th; did it not?

8  **A.**   I don't know.

9  **Q.**   If you look at Exhibit 182-A --

10  **A.**   Is the one you just gave me?

11  **Q.**   Yes, sir.

12  **A.**   Okay.

13  **Q.**   -- on the top of that there is an email from Sector Miami

14  prevention operations.  And it says we will commence inspection

15  for credit dry dock as requested on 12 August.  Does that

16  refresh your recollection?

17  **A.**   Yes.

18  **Q.**   So, on the same day that Malcolm Elliot issued his report

19  the Coast Guard went onboard and conducted its own inspection;

20  correct?  Or at that time, not that same day.

21  **A.**   Okay

22  **Q.**   You agree with that, in that time period?

23  **A.**   In a time period.

24  **Q.**   Okay.

25  **A.**   I don't remember the exact day of the Malcolm survey and

1    date of the issuance.  I'm not sure by this document right here

2    if the survey was issued on the 12th or if the inspection took

3    place on the 12th.  I don't know.

4    **Q.**   Okay, and that's a fair enough comment.  All we know is

5    that it's dated August 12?

6    **A.**   That's correct.

7    **Q.**   And I'm not suggesting he was there when the Coast Guard

8    was there?

9    **A.**   That's correct.  That's correct.  That was kind of the

10   point that I was making.

11   **Q.**   Okay.  I'm just trying to establish the chronology.

12   **A.**   Okay.

13   **Q.**   If you would look at the activity summary report that we

14   have previously discussed and I believe that is Exhibit 176.  Do

15   you have that in front of you?

16   **A.**   Yes, I do.

17   **Q.**   Would the Court, for ease, I would like to -- Judge, for

18   ease of use.

19        (Handing to the Court.)

20            THE COURT:  Thank you.

21   **Q.**   Okay.  On the first page you see activities conducted?  The

22   Coast Guard has a hull examination and this is actually on

23   August 22; do you see that, sir?

24   **A.**   Yes.

25   **Q.**   And that would be about ten days after Mr. Elliot issued

1   his report.  So, when we said the Coast Guard came in that time

2   frame does this refresh your recollection?

3   **A.**   Yes.

4   **Q.**   And this inspection actually occurred six days after you

5   sent your email to Mr. Bates in which you outline certain things

6   that you propose to do; is that an accurate -- just putting it

7   in chronology

8   **A.**   Well, basic math.  Yeah.

9   **Q.**   Okay.  The inspection results for engineering, fire

10  fighting, life saving, navigation, operations management,

11  personnel, pollution prevention response, accommodations,

12  occupational safety, construction load line, documentation and

13  electrical, are all of those reports on that day when the Coast

14  Guard looked at the boat it found that outstanding deficiencies

15  existed?

16  **A.**   Sir, you have to --let's talk about deficiencies, the word

17  deficiencies.

18          THE COURT:  Let me ask you this --

19  **A.**   Yes?

20          THE COURT:  The first thing you want to do is answer

21  his question and I will give you plenty of time to explain it.

22  **A.**   Oh.

23          THE COURT:  For the record, answer his question.

24  **Q.**   Did all of these existencies (sic) in the eye of the Coast

25  Guard that inspected the vessel on August 22nd exist?

Page 64

1   **A.**   Yes.

2   **Q.**   And you wanted now to explain the term deficiencies.

3   **A.**   What I like to do is talk about deficiencies here for a

4   moment.

5         The United States Coast Guard COI process uses the word

6   deficiencies because many of those are, for example, the

7   electrical.  Lets take, use that one at the bottom there, okay?

8   Under the new T boat regulations they are requiring a new

9   electrical drawing be made up.

10        That's something that the surveyor doesn't see.  That's a

11   document that hadn't been submitted yet.  So it's listed as a

12   deficiency.

13        Documentation.  Okay?  That again is not a surveyor item.

14   That's documentation relative to the vessel and it's coming into

15   being through a COI process.

16        Load line, construction load line.  That again is a piece

17   of paper.  That's a deficiency on a piece of paper.  This has

18   nothing to do with a survey.

19        Let's go up to the next one.  The commendation occupational

20   safety.  That's a crew issue.

21        Pollution prevention, response.  That again is a crew

22   issue.

23        Personnel.  Crew issue.  Nothing to do with the survey on

24   the evaluation of the vessel.

25        Operational management.  That's a management program.  It

1   has nothing to with your survey of the vessel.

2       Navigation.  Nothing to do with the survey on the vessel,

3   sir.

4       Lifesaving.  Of course, lifesaving is very, very important

5   on the vessel also.  But that also is a process through the

6   COI.

7       Fire fighting.

8       I mean, engineering.  I mean, these deficiencies listed

9   here, sir, on very few occasions here would be incorporated into

10  the survey report.

11  **Q.**   Okay.  Let's talk about them then.  Because Coast guard on

12  the next couple of pages lists with specificity the outstanding

13  deficiencies and which subsystem it fits into.  Such as, we'll

14  deal with number one just as an example.  Under item one under

15  the system construction load line it talks about hull.  And

16  there it said remove false deck between hulls to facilitate

17  inspection on all hull isolators.

18      And then on the next column it has date issued, which with

19  this one it was back in 2002.  And then it has a date resolved.

20  Do you see that?

21  **A.**   Yes.  I understand the process.  How they do it, yeah.

22  **Q.**   Okay.  That's what I'm saying.  And the date resolved is

23  the date that the Coast Guard has come back and certified that

24  that deficiency has been rectified?

25  **A.**   That's correct.  That's correct.  That's correct.

1    **Q.**   Just make sure we're all interpreting the report in the

2    proper manner.  Well, let's go to the next item that I see on

3    this list, which is item 13.  And I don't know why, where the

4    other ones are, but this is on the Coast Guard document.  Item

5    13; the system is construction load line, the subsystem is

6    structures.  And the issue is make all penetrations through

7    hull, through watertight bulkheads watertight.  Let me say it

8    right for the record.  Make all penetrations through watertight

9    bulkheads watertight.  And it's talking about the component

10   transverse bulkheads.  And that was issued on August 22nd,

11   2006.  A transverse bulkhead that it's referring to are those

12   watertight bulkheads --

13   **A.**   That run transversely.

14   **Q.**   Yes.  Transverse means across, through the hull, forward

15   ships; correct?

16   **A.**   Yes.

17   **Q.**   Do you agree?

18   **A.**   I agree.

19   **Q.**   It has no resolved date; does it, sir?

20   **A.**   Yes -- no, it does not.  I have an answer for that, though,

21   if you would like to ask it.

22   **Q.**   I am going to ask you that in a moment.

23   **A.**   All right.

24   **Q.**   The Coast Guard, when they inspected the vessel on August

25   22nd they determined that there were penetrations through the

1  watertight bulkheads that were not watertight for them to issue

2  this statement; correct?

3  **A.**   No.  You are incorrect.

4  **Q.**   Well, let me ask it to you this way.  Do you see anything

5  on Mr. Elliot's report that places any reasonably prudent reader

6  of the survey that there were penetrations on the watertight

7  bulkheads that were not watertight?

8  **A.**   There is not.  And I have an answer for that if you want to

9  ask it.

10  **Q.**   I'm going to get to that.  And you would agree, would you

11  not, that a watertight bulkhead is intended to be watertight?

12  **A.**   By definition, yes.

13  **Q.**   And having your watertight bulkheads be watertight is a

14  rather significant component of keeping a boat seaworthy; is

15  that an accurate statement?

16  **A.**   That's accurate, sir.

17  **Q.**   Now, you wanted to explain why -- well, you wanted to

18  explain --

19  **A.**   Yeah, I'd like to explain this.

20  **Q.**   Yes.

21  **A.**   Between compartments number -- so you understand what I'm

22  talking from on the boat.  From the bow to the stern let's call

23  compartment collision bulkhead number one, or collision

24  compartment number, or that compartment number one going back to

25  the stern, 2, 3, 4, and so on.

Page 68

1        For the purposes of ongoing testimony here so we are both

2   singing off the same song sheet.

3   **Q.**   Uh-huh.

4   **A.**   I had made mention earlier that with the vessel previously

5   falling under the previous T-regs there has been some changes to

6   the T-regulations when this vessel had its certificate of

7   inspection and with it having being lapsed going into new

8   regulations.  Again, going back to a process, sir.  As a -- call

9   me a manager, or whatever, there is going to be times where,

10  when I will argue a point with the United States Coast Guard

11  relative to the validity of what they are requiring of us in

12  certain areas.

13       In this particular instance between void number two and

14  void number three there was a locking door with a seal on it

15  that under the previous T-regulations was acceptable as being

16  watertight.  The United States Coast Guard inspectors then had

17  mandated that I cut that door out and install an access hatch on

18  top of that void so those two compartments, so a door couldn't

19  be left open.

20       I had submitted a request that an indicator switch, visual-

21  audio in the pilot house would be acceptable.  And that was

22  under review at the time.

23       So, of course, this would, this particular item would be

24  unresolved.  Another issue was certain materials during the old

25  T-regulations for hull penetrations relative to fire had

1  changed.  And, at that point in time while they were

2  watertight.  With the change in regulations I was going through

3  the processes of a review of that and what material would be

4  adequate to them for the topside COI later on.

5       So, I understand.  I understand precisely your line of

6  questioning on this, sir.  But that was ongoing as well.  And

7  the Coast Guard is not going to post a date resolved until it's

8  been resolved.

9  **Q.**  All right, and it was not resolved as of the date of this

10 sinking, was it?

11 **A.**  It was not resolved as of the date of the sinking.  It had

12 nothing to do with the watertight integrity of the vessel.  It

13 had to do with whether our submission was going to be approved

14 or not.  Again, we were going to a new to zone inspection.  The

15 United States Coast Guard here locally had basically approved

16 the vessel with the hull credit to proceed to Louisiana as not

17 to have to go and finish the COI on the topside up where of

18 which, at that point in time these issues were going to be

19 discussed and decided by that jurisdiction.

20      There is a vast difference because I do deal with various

21 jurisdictions.  For example, if I'm down in Louisiana and I'm

22 looking at a shuttle boat for a casino company of what they

23 define that in the regulation's language, English.  I think

24 there was a famous guy that says it all depends upon what is,

25 is, you know.  They determine the regulations from zone to zone

Page 70

1   vastly differently.

2       So it was unresolved in the report.  But as far as the hull

3   integrity of the vessel, when that vessel left for Louisiana

4   those hulls were, in my opinion, watertight.

5   **Q.**   And let's just zoom way ahead for just one question and

6   we'll come back.

7   **A.**   Okay.

8   **Q.**   The ANZHELA EXPLORER did not have a certificate of

9   inspection issued by the Coast Guard when she departed Dania,

10  Florida on her last voyage; did she?

11  **A.**   She did not.  But she also was not going into commercial

12  trade and we had clearance to move the boat from Louisiana to

13  Louisiana with a crew provided to us by Fish Offshore.  She was

14  a safe boat to go, sir.

15  **Q.**   Let's go through other findings of August 22nd and these

16  that I'm going to list appear to be resolved by December 15,

17  2006.  And that would be 14, make repair proposal for repairing

18  fractures in way of isolators.

19      Number 15, grind down old welded areas marked and prepare

20  for nondestructive testing.

21      Redo insert at starboard hull inboard side and make

22  eighteen inch wide.

23      Seventeen, make all welds at fore body undersigned

24  available for nondestructive testing.

25      Eighteen, make proper inserts starboard side under deck

Page 71

1   where topon (ph) was removed.

2       Nineteen, remove underbody plate coverings of

3   superstructure to allow examination of transfers I-beams.

4       Remove fuel from abandoned fuel tank in port hull.

5       Let's see, 29.  Make permanent repairs to forward sewage

6   tank.

7       Thirty, prop and renew starboard engine room bulge.  In the

8   language of the Coast Guard crop and renew means to cut out and

9   put in a new piece?

10  **A.**   It's an insertion, sir.

11  **Q.**   Okay.  Crop means to cut out?

12  **A.**   Uh-huh.

13  **Q.**   Is that correct?

14  **A.**   Correct.

15  **Q.**   Okay.  Continuing on, 31, present for inspection main

16  engine exhaust penetrations.

17      Thirty-three, extend cut line of repair as marked on inside

18  of hull.

19      Item four, was resolved.  Well, that's a dry docking

20  issue.

21      Okay, let's go to 21.  Make repairs to fractured internals

22  in four peak both port and starboard.

23      Twenty-two, remove corrosion at sea chest nipples to allow

24  further inspection.

25      Twenty-three, remove corrosion in rudder well and gauge.

1          Twenty-four, well, that's provide copies of test

2     reports for isolators and hull metal.

3          Twenty-seven, repair all cracked or broken welds on

4     outboard side of house above isolators.

5          Those deficiencies, and those cracks, those welds that

6     required repairing existed when Mr. Elliot examined the vessel?

7     **A.**   Are you incorrect, sir.

8     **Q.**   Well, the date they issued appears to be August 22nd which

9     is ten days after Mr. Elliot issued his report.

10    **A.**   Those deficiencies were brought up to me long, long time

11    before Mr. Elliot surveyed the vessel.  The date of resolved is

12    only the date when this inspector back to his office after his

13    inspection and entered the data, sir.  Mr. Elliot -- these

14    deficiencies were deficiencies that were listed in the file.

15    This was an ongoing ten day, sometimes twelve hour a day process

16    to get this boat ready.  It was -- what are you looking is date

17    the data was entered into the file, not the date that it was

18    corrected.  I'm sorry.  I know where you are going with this.

19    You are wrong.

20    **Q.**   I thought we had established that the date of the hull

21    examination was August 22nd and these deficiencies existed as of

22    August 22nd and the last column is the date that you resolved

23    those deficiencies insofar as the Coast Guard re inspecting --

24    **A.**   Are you wrong.  I'm sorry, sir.  You are wrong in the

25    process.  I'm just going to disagree with you on that.

1  **Q.**   Okay.

2  **A.**   This was, these deficiencies were from day one when the

3  they inspected the boat.  We were working through them.  They

4  are only entered into the data base after the inspector comes

5  back and he doesn't come out there and look at one thing, sir.

6  He comes out there and looks at 40 things.  This report in

7  itself, sir, this report in itself indicates to you the kind of

8  work that was going on this vessel in the resolving of these

9  deficiencies which was major, major activity to comply with who

10 I consider the leading authority here and not Mr. Malcolm, but

11 the United States Coast Guard.

12 **Q.**   So then it's your testimony that these deficiencies raised

13 by the Coast Guard under date issued of August 22nd, 2006 did

14 not exist on that date when they inspected the boat?

15 **A.**   That's precisely what I am saying.

16 **Q.**   Okay.

17 **A.**   I have seen a number of documents over the years from the

18 United States Coast Guard relative to deficiencies.  It's the

19 date the letter was written.  It says we'll commence on the

20 12th.

21     But it all depends upon when the inspectors get there, when

22 they get back, when that they enter the data into their data

23 base.  You are trying to draw a line, sir, between deficiencies

24 that were present when a surveyor came out to discredit the

25 surveyor.  That's not going to work.

1   Q.   Okay.  And when you wrote your report of August 16th, those

2   deficiencies were not rectified prior to the time the Coast

3   Guard inspected the boat on August 22nd?

4   A.   You know sir, a lot of those deficiencies the Coast Guard

5   didn't even know about.  Being prudent as I am, I'm pointing

6   them out to the Coast Guard.  The Coast Guard will testify that

7   half the stuff that they found as deficiencies were things that

8   they missed that I pointed out, sir.

9   Q.   But you did not point these out to Mr. Elliot, did you?

10  A.   Because a lot of them were already done.  I'm telling you,

11  sir, that when the report came out of Mr. Elliot's report came

12  out to me I did not thoroughly review it because I'm dealing

13  with the United States Coast Guard.  I felt his report was

14  accurate relative to the value of the vessel upon completion of

15  the vessel and that 90 percent of what he had there as far as

16  his listings on machinery was accurate.

17  Q.   Let's go to item 34.  It's under the topic system

18  engineering subsystem bilge water management system.  It says

19  submit drawings for bilge piping system for approval.  Bilge

20  piping must be one and a half inches and provide a fifty gallon

21  per minute bilge pumps, two per hull, and it refers to certain

22  CFR regulations.

23  A.   What item is that, again?

24  Q.   Thirty-four.  That item was not resolved when the ANZHELA

25  EXPLORER departed Dania on her has voyage; was it?

1   **A.**   That's a part of the top side inspection that was being

2   performed in Louisiana.  But to answer your question, sir, the

3   bilge system met the spec.

4   **Q.**   Okay.  So there are two fifty gallon-per-minute bilge pumps

5   per hull installed to a bilge pump manifold that was operational

6   when the boat left Dania to go on her has voyage?

7   **A.**   This is a requirement to be completed prior to the vessel

8   going into commercial service, sir.  My understand -- my

9   understanding to the vessel -- the vessel's departure to

10  Louisiana that it complied with the spec.

11  **Q.**   Okay.  And you are familiar with the specs, are you not, as

12  a person experienced and skilled with certifying vessels for

13  certificates of inspection?

14  **A.**   I am.  In most cases.

15  **Q.**   And you are aware then that the CFR specification requires

16  these bilge pumps to be permanently mounted and self-priming?

17  **A.**   That's correct, sir.

18  **Q.**   And that they have debris screens to prevent clogs?

19  **A.**   That's correct.

20  **Q.**   And that they are connected if there are watertight

21  compartments to a manifold that would allow this bilge pump to

22  de-water other watertight compartments.

23  **A.**   That's correct.

24  **Q.**   And all of this was installed and operational on the

25  ANZHELA EXPLORER when she left Dania on her last voyage?

1   **A.**   I believe there was an issue with one of the two bilge

2   pumps on the starboard side of the boat.

3   **Q.**   And that issue involved the bilge pump that was connected

4   to the bilge pump manifold; correct?

5   **A.**   That's correct.

6   **Q.**   And for the court this bilge pump manifold is just a series

7   of pipes that come together on a common system with valves that

8   allow you to open up and direct the suction to wherever you want

9   the suction to go?

10  **A.**   That's correct.  That's correct.

11  **Q.**   In fact, that bilge pump that was connected to the

12  starboard hull bilge pump manifold was not installed when the

13  vessel left Dania that night; was it?

14  **A.**   The answer to that question is I don't know.

15  **Q.**   Well, I believe --

16  **A.**   It was provided -- it was provided to the engineer that

17  provided by Fish Offshore but for me to answer whether that pump

18  was installed I can't answer that.

19  **Q.**   Well, weren't --

20  **A.**   Or functioning, let's put it that way.

21  **Q.**   Just go ahead a little bit and we'll come back again.

22  Haven't you already testified that the primary bilge pump, the

23  one that's connected to the manifold was not functioning, it was

24  under repair, that you intended to meet the boat on the west

25  coast of Florida to have it stalled prior to its voyage across

1  the Gulf?

2  **A.**   That's correct.  But a temporary pump was provided to the

3  engineers.  I think your question to me was the manifold tied

4  into the bilge system; both of them functional.  So I answered

5  your question saying there was an issue with one of the pumps

6  but that the vessel had sufficient pumps onboard it.

7  **Q.**   Well, you are aware, sir, when the vessel was raised there

8  was no bilge pump connected to the manifold on the starboard

9  hull?

10  **A.**   I am aware that when the vessel was raised that there was

11  no bilge pump on that manifold.  What transpired between the

12  raising of the vessel I can't speak to you because I obviously

13  wasn't there.  The boat wouldn't have sunk had I been there.

14  **Q.**   I would like to explore that last comment.  What saw did

15  you say; "Or the boat would not have sunk"?

16  **A.**   I think there was -- I think we're jumping way ahead.  I'll

17  retract if I can.  I have issues with the competency of this

18  crew.  But that will come out later, I'm sure.

19  **Q.**   Well -- would boat have sunk, in your opinion, had there

20  been a bilge pump installed attached to the bilge pump manifold

21  on the starboard hull?

22  **A.**   In my opinion, yes.

23  **Q.**   Okay.

24       MR. FERTIG:  I'll tell you what, since we're getting

25  close to 12:00.  Let me run ahead and I'll come back and get

1   this after lunch.  If necessary we'll continue on and we'll talk

2   more about the bilge pump later, sir.

3   **A.**   Would you ask me the last question again to make sure that

4   I heard it properly?

5   **Q.**   Well, I'm retracting the whole topic because, I think, we

6   are getting to the loss and we haven't gone through other issues

7   as well.  And that has to do with obtaining the policy of

8   insurance.  And I just didn't want to take the time to locate

9   the exhibit numbers.  And while we're taking this little side

10  break at which time does the Court wish to break for lunch?

11          THE COURT:  We'll probably break around another ten,

12  fifteen minutes?

13          MR. FERTIG:  Okay, thank you, Judge.  I'm just trying

14  to organize.

15  **Q.**   Were you -- I think we established before that you were the

16  individual that made first contact with the insurance brokers

17  with respect to --

18  **A.**   Yeah.  That's correct.  I was referred to them by the

19  company that provided the crew from Louisiana, yes.

20  **Q.**   And that would be Greg Blanchard again at Fish Offshore?

21  **A.**   That would be.

22  **Q.**   And the company that you had contacted was USI?

23  **A.**   I'm not sure.  I just -- I really didn't take note of the

24  name.  He gave me a name and a phone number.  I gave them a

25  call.

1   **Q.**   When you contacted this insurance brokers do you recall the

2   name of the individual you discussed this with?

3   **A.**   Can you refresh my memory?

4   **Q.**   Mr. Laboff(ph)?

5   **A.**   That's correct.

6   **Q.**   Okay.  And what is it that you told Mr. Laboff(ph) that you

7   were trying to obtain or accomplish?

8   **A.**   I guess I was calling him for an insurance quote.  That was

9   what I was trying to accomplish.

10  **Q.**   No, I understand that's why you talked to an insurance

11  broker.  But you have to describe the risk that you are seeking

12  to be insured.  You have to ask him what type of coverage that

13  you are seeking.  I mean, he didn't know if you wanted to insure

14  a house or a car or a Donzi?

15  **A.**   They are a marine insurance group.  I think that they would

16  assume that i am calling about a boat, sir.

17  **Q.**   Okay.  So did you describe the boat to them?

18  **A.**   I told them that a, that the spec on the vessel would be

19  submitted to him.  But, yes, in a nutshell, yes.

20  **Q.**   But generally, when you talk to the gentleman on the phone

21  he is going to ask you the size of the boat.  He is going to ask

22  you the service that you intend on putting the boat.  He is

23  going to ask you --

24  **A.**   Okay, I see what your question is.  Yes.  I had indicated

25  to him the vessel was going to be COI'ed in Louisiana, topside

1  was going to be COI'ed in Louisiana, the boat was going

2  ultimately to be used in the oil field as a rig inspection

3  vessel, dive boat.  And we talked a little bit about its history

4  and, you know, when it was used for previously which was very

5  parallel to what the -- okay?

6  **Q.**   When you say parallel what you are saying is this is not a

7  new service for the boat.  It had worked as a dive boat.  It's

8  well equipped as a dive boat.

9  **A.**   It was suited for the service.

10  **Q.**   And the type of policy that you were obtaining was going to

11  be a policy that would permit the boat to be operated

12  commercially; wasn't it?

13  **A.**   That's correct.  Under charter.

14  **Q.**   Uh-huh.  So you told Mr. LaBoff(ph), the insurance broker,

15  that you were going to require --

16  **A.**   Appropriate coverage.

17  **Q.**   Right, appropriate coverage for a commercial operation?

18  **A.**   That's correct.

19  **Q.**   And as part of that you wanted to insure the hull of the

20  boat; correct?

21  **A.**   Yes.  Hull and machinery, liability, whatever.  and then I

22  also asked him what he recommended from his experience in

23  Louisiana what the PMI would be.  You know, and not having

24  worked in Louisiana other than being a captain there, there was

25  certain information I didn't have.  It was an inquiry and he

1    answered some questions and I gave him some information.

2    **Q.**   I mean, he would want to know at that first conversation

3    about the qualifications of the owner or the captain?

4    **A.**   Not on that first conversation, no.

5    **Q.**   Did you disclose to him the description of the vessel?

6    **A.**   I believe I did.

7    **Q.**   And the amounts you sought to be insured?

8    **A.**   I kind of left that to them to tell me what was required.

9    He did ask what the value of the vessel was.  And I said it was

10   somewhere over one million dollars.

11   **Q.**   I mean, those are the things that you would have to convey

12   to the broker so he would know --

13   **A.**   Generally the broker asks me the questions because I really

14   don't know what information that they required.  But certainly

15   the specifications one the vessels and what its worth, venue was

16   going to be.  There wasn't any discussion at that time relative

17   to the qualifications of the crew.

18   **Q.**   Well, at some time before the policy was issued was there

19   any discussion as to the qualification of anyone on the crew?

20   **A.**   I didn't see any document that required that at that time.

21   But there may have been.  I don't know.  I can't remember.  I

22   just can't remember.

23   **Q.**   In the waning moments, let me just ask you two or three

24   questions.

25   **A.**   Okay.

1   **Q.**   How many conversations did you have with this

2   Mr. Laboff(ph)?

3   **A.**   I think we had quite a few conversations.  But a lot of

4   them were -- well, never mind.  Quite a few, yes.

5   **Q.**   Before the loss?

6   **A.**   Before the loss, yes.

7   **Q.**   And you were asked --

8   **A.**   And subsequent after the loss as well.

9   **Q.**   Right, but I'm limiting now before the loss you had quite a

10  few conversations with Mr. Laboff(ph).  And those conversations

11  dealt with obtaining a policy of insurance.

12  **A.**   A lot of those conversations had to do with the fact that

13  one of my clients owns and operates a fleet of some 23 vessels.

14  And he had also asked me to obtain insurance quotes for those

15  vessels as well.  So, relative to the subject vessel at hand

16  that we're talking about it I would say we had two or three

17  conversations relative to information on the vessel; coming and

18  going, information he was giving me and information that I was

19  giving him in return.  But the majority of the conversations had

20  more to do with some other clientele for the agency.

21  **Q.**   Okay.  Were you, Mark Rosandich --

22  **A.**   Rosandich.

23  **Q.**   I'm sorry.  Were you authorized to obtain insurance,

24  provide information to the brokers as part of the insuring

25  process by the owner?

1            MR. MOURE:  I'm going to object, it's a compound

2   question.  I think there were actually two questions there.  He

3   said obtain insurance and then he also said authorize to make an

4   inquiry.

5   **A.**   That was going to be my question actually.

6   **Q.**   Let me ask you this, when you called the broker,

7   Mr. Laboff(ph) did you have the authority or permission from

8   Mr. Dorsey to obtain insurance coverage for the ANZHELA

9   EXPLORER?

10  **A.**   The answer to that question was probably no.  I'm just a

11  guy that -- I'm just a little aggressive I guess, how you could

12  say.  I was basically just going about my business of what I

13  knew was going to be required.  And Jeff Dorsey is in Seattle,

14  and I'm in Florida, and they are in Louisiana.  So I was

15  exploring what needed -- you know, they were a referral, you

16  know.  I was doing my due diligence.

17  **Q.**   Did you tell Jeff Dorsey that you were going to obtain

18  insurance or start the process?

19  **A.**   I never obtained any insurance, sir.  I never obtained any

20  insurance for this vessel.

21  **Q.**   Okay.  Well --

22  **A.**   It wasn't want my job.  I'm not the owner of the vessel.

23  **Q.**   Did you tell Mr. Dorsey that you would be contacting

24  Mr. Laboff(ph) above at U.S.I to start the process?

25  **A.**   I told Mr. Dorsey that I was going to be contacting a

1   number of resources relative to getting insurance quotes, sir.

2   **Q.**   And did he tell you to go ahead?

3   **A.**   He basically agreed with that.  He needs insurance.

4   **Q.**   And at that time you considered yourself either an equity

5   partner or a 30 percent of the net profits of the company as

6   part of your, what you were with respect to the vessel?

7   **A.**   At that point in time I wasn't thinking about that at all.

8   He was paying me what is called my minimums as a guy overseeing

9   the project.  So I would have to answer that question at that

10  point in time if I was to wear a hat I was an employee.

11  **Q.**   Were you a vessel manager?

12  **A.**   I was a consultant.

13  **Q.**   Were you the person that was managing the vessel at that

14  time?

15  **A.**   I never managed that vessel.  The vessel never made it to

16  Louisiana, sir.  My management hat would come on when it got to

17  Louisiana.

18  **Q.**   So when Mr. Laboff(ph) listed you as the owner of the boat

19  you never gave him any information that might lead him to

20  believe that you were, in fact, the owner of the boat.

21  **A.**   When he files his papers with the insurance underwriter the

22  name that's on that piece of paper which is ANZHELA EXPLORER LLC

23  is the owner of that boat.

24  **Q.**   Well, we'll deal with that after lunch.

25  **A.**   Okay.

1            THE COURT:  I think we can.

2            MR. MOURE:  Thank you.

3            THE COURT:  That's fine.  All right.  We'll go ahead

4    and take our lunch break and come back at 1:15.

5    **A.**   Thank you, Your Honor.

6            THE COURT:  All right.

7            THE CLERK:  All rise.

8            THE COURT:  Remember, Mr. Rosandich, you are still

9    under oath, and you are in the middle of your examination.

10   **A.**   I understand, sir.

11           THE COURT:  So don't communicate regarding the

12   substance of your testimony, okay?

13   **A.**   I understand, sir.

14           THE COURT:  Okay?

15   **A.**   Yes, sir.

16           THE COURT:  Thank you.

17   (Thereupon the court was in recess after which the following

18   proceedings were had:)

19

20           THE COURT:  Are we ready to resume with

21   Mr. Rosandich?

22           MR. FERTIG:  Yes, sir.  As a matter of housekeeping I

23   had referred to Exhibit 182-A which was the August 16th, 2006

24   emailed authored by Mr. Rosandich and I would like to offer that

25   into evidence at this time.

Page 86

1              THE COURT:  Any objection to 182-A?

2              MR. MOURE:  The only comment I have, Your Honor, is

3    more, and I think it was pointed out by the Court it's the

4    labeling.  I just would like to know how many exhibits are going

5    to be under 182; multiple exhibits?

6              MR. FERTIG:  Depending upon the course of trial there

7    may be two or three more.  But I don't even know if it will be

8    that many.

9              MR. MOURE:  I guess what I'm trying to get to, if

10   Counsel could, you know, by tomorrow morning just identify which

11   additional documents are going to be presented.

12             MR. FERTIG:  I will look tonight and see if there are

13   any more.

14             THE COURT:  Well, for the purposes of my description

15   this is an email communication dated August 16th, 2006; right?

16             MR. FERTIG:  Yes, sir.

17             THE COURT:  Okay.

18             MR. MOURE:  And I have no objection to that being

19   entered into the record.

20             THE COURT:  All right.  So number 182-A will be

21   admitted.

22             (Thereupon, the document referred to was marked and

23   admitted into evidence.)

24             THE COURT:  All right.  Any other documents?

25             MR. FERTIG:  Yes, sir.  The activity summary report

Page 87

1   that we had discussed as Exhibit 176.

2           THE COURT:  No objection to admission of 176?

3           MR. STRADER:  No objection.

4           MR. MOURE:  No objection, Your Honor.

5           THE COURT:  All right.  Plaintiff's 176 will be

6   admitted.

7       (Thereupon, the document referred to was marked and

8   admitted into evidence.)

9   **Q.**  Mr. Rosandich, do I have it right?

10  **A.**  That's very good.  Thank you.  Good afternoon, sir.

11  **Q.**  Thank you.  Prior to your first contact with Mr. Laboff(ph)

12  of U.S.I. --

13  **A.**  (Nodding yes.)

14  **Q.**  To your knowledge had the vessel been insured before that

15  date under the ownership of Mr. Dorsey?

16  **A.**  No.  To my knowledge sir, no.

17  **Q.**  To your knowledge it was not insured?

18  **A.**  To my knowledge.

19  **Q.**  And the reason why the vessel wasn't insured from the time

20  it was purchased till sometime in February when you were seeking

21  to get it insured is what; if you know?

22  **A.**  Well, I can't speak for the owner, sir.  I can only

23  probably answer that by saying the boat was on the hard deck.

24  It wasn't going anywhere.  I would say port risk might have been

25  appropriate.  But I would suspect that's a question for him at

1   some point.

2   **Q.**   So in your mind there is it no particular reason why it

3   wasn't insured?

4   **A.**   I can't speak to that.  I don't know.

5   **Q.**   Well, what motivated you or what was the fact that got you

6   to make contact with Mr. Laboff(ph)?

7   **A.**   Again, going back to testimony prior to lunch I was

8   basically just doing my due diligence, knowing that the vessel

9   was going to be needing insurance.  And as a matter of fact I

10  contacted some Arthur Gallagher (ph).

11      Gallagher?  I'm sure you know them?  They're a major

12  insurance company.  Royal Marine here in Miami?  And of course

13  one in Louisiana.  The one in Louisiana again was in a referral

14  and from my experiences you are always better off dealing with

15  an agency within the jurisdiction of where the vessel was

16  working because they are probably more knowledgeable of the

17  territory and that environment.

18  **Q.**   And this agency in Louisiana, that is Mr. Laboff's(ph)

19  agency, U.S. I?

20  **A.**   Yes.  That's my understanding.

21  **Q.**   And when you first communicated with Mr. Laboff(ph) above

22  did you tell him that you were not authorized to bind coverage

23  on behalf of the vessel?

24  **A.**   That never came up in any discussion.  I just gave him a

25  call and explained to him that they were a referral from Fish

1  Offshore.  He didn't ask it and I didn't say.

2  **Q.**  I would like to refer you to a document that has been

3  marked as Plaintiff's Exhibit 109.  It is U.S.I. placement 001.

4  **A.**  Thank you.

5  **Q.**  109 with the U.S.I. placement bate stamp 001 is an email

6  that appears to be from yourself to Sean Laboff(ph) dated

7  February 14th, 2007.  Do you see that, sir?

8  **A.**  Yeah.  This is the one that you just handed me?

9  **Q.**  Yes, sir.

10  **A.**  Authored by Mark Rosandich, marine consultant?

11  **Q.**  Yes, sir.

12  **A.**  Yes.

13  **Q.**  Is that an email that you authored and sent to Sean

14  Laboff(ph) on February 14th, 2007?

15  **A.**  Yes.  It appears to be.

16  **Q.**  And the intro, or the first sentence reads to recap our

17  conversation of this day --

18  　　Was it safe to assume that this email was sent to

19  Mr. Laboff(ph) after your first conversation with him?

20  **A.**  Yes.  I think that's pretty safe to say.

21  **Q.**  Okay.  And does this email constitute the summary of what

22  type of insurance was expected to be obtained with respect to

23  the boat?

24  **A.**  Yes.  It's kind of, as I had testified earlier today that

25  we were somewhat depending, dependent upon him, deferring to

1   them that we would like coverage that's compatible with local

2   industry under charter hire; yes.

3   **Q.**   And you attached to your email a Word document?

4   **A.**   Yes, that's correct.

5   **Q.**   And that Word document was the survey performed by Malcolm

6   Elliot?

7   **A.**   That's correct.

8   **Q.**   That very same survey that we had previously discussed

9   earlier today; correct?

10  **A.**   Yes.  It's titled under attachments new BOTTOM TIME II

11  vessel survey document.

12  **Q.**   And the survey refers to the vessel BOTTOM TIME II and you

13  were seeking insurance on the ANZHELA EXPLORER.  To jump ahead

14  and say that we don't have any confusion you are aware that

15  originally the details on the binder was issued to a boat called

16  BOTTOM TIME II and that was changed; are you aware of that?

17  **A.**   I can't say that I am.

18  **Q.**   Okay, then I'll come at it with a different witness.

19  **A.**   Okay.

20  **Q.**   You also have a web link down below that says click here,

21  then MV ANZHELA EXPLORER, use the arrows to view the slide show

22  and you may enlarge any picture by clicking on it.

23  **A.**   Yes, that's correct.  That's what it reads.

24  **Q.**   Are you familiar with this web site TWSolution.com?

25  **A.**   Yes.  That's an in house link that I developed basically as

1   a tool, as a courtesy quite honestly.  I don't like sending

2   large files that may be difficult to open.

3        So what I do is I send a link, download the stuff into a

4   link and then forward it that way, is not to fill up somebody's

5   space, I guess that's how it works.  I'm not a computer guru by

6   any means.  But that's what it is.

7   **Q.**   And this TW Solutions is that a web site that you own or

8   control or manage?

9   **A.**   I don't own it.  It's hosted by web hosting out of

10  California.  And TW Solution is a gentleman by the name of Axel

11  Hinsch(ph) who is my computer technician.

12  **Q.**   And you recall what a person would view if they clicked on

13  that web address that was contained in your first email to Sean

14  Laboff(ph), that www.twsolution.com\fleet?

15  **A.**   What is the question again?  What would I --

16  **Q.**   Do you recall what an individual would view if you --

17  **A.**   Well yes.  It's active today.  You could go on there today

18  and see a multitude of different vessels that I either own or in

19  some way am connected with.  This vessel is no longer posted

20  there, obviously.  I don't think it is, anyway.

21  **Q.**   Well, let me just go back in time, if I can.  I'm handing

22  you a document that we have identified as plaintiff's Exhibit

23  185 and ask you if that is an accurate representation of what

24  one would view if one went to TW Solution?

25  **A.**   It is.  Well, it isn't today, but it was then.

Page 92

1   **Q.**   Okay.  That's what I'm getting at, back then.

2   **A.**   Okay.

3   **Q.**   And the first page lists several vessels; doesn't it?

4   **A.**   It does.

5   **Q.**   What vessels does it list?

6   **A.**   The CHULA EXPLORER, which is the vessel I referenced to

7   earlier, the one that I was interested in that Jeff Dorsey

8   bought of which I helped equip and get under way to Mexico.

9        The yacht ANZHELA which is another one of Jeff Dorsey's

10  boats.  It's his personal yacht.

11       The ANZHELA EXPLORER, which is the subject vessel of which

12  this court proceeding is about.

13       And the fast ferry ISLAND ROCKET which is a vessel that I

14  owned at the time.

15       And the fast ferry PERSEVERANCE which I was able to obtain

16  a COI for the owner and still have a relationship with.  That's

17  presently based over in Ft. Myers.

18  **Q.**   Someone that clicked on this web site, as you directed them

19  and saw that home page it also has your name on the bottom;

20  doesn't it?

21  **A.**   It does.

22  **Q.**   And how do you describe yourself on your web page with

23  regard to those vessels described in Exhibit 185?

24  **A.**   Managing partner, Express Boat Charters, Inc. which is the

25  reference -- which is a florida corporation.

1   Q.   Now, you directed in your email to click on the MV ANZHELA

2   EXPLORER.  Would you go to the link; the next page, I believe?

3   That's what someone would see clicking on that link; isn't that

4   correct?

5   A.   This page?

6   Q.   Yes, sir.  Well, not -- take away the hyper text language?

7   Oh.  I'm referring to --

8   A.   I was going to say that doesn't look good.

9   Q.   No.  It does not.  It's page one of one and it has the --

10   A.   Oh, yes.  Yes.

11   Q.   Oh.

12   A.   If you were to -- yeah.

13   Q.   Right.  If you were to click on there MV ANZHELA EXPLORER

14   of those list of vessels on the first page it would then take

15   you to that page?

16   A.   Yes.

17   Q.   And on that page it says the ANZHELA EXPLORER is a one of a

18   kind power catamaran specially designed for rough water

19   crossings and comfort in style.

20        Is that an accurate description?

21   A.   This is the description of the vessel at the time it was in

22   operation.

23   Q.   Right?

24   A.   Okay.

25   Q.   And underneath that where it says it's a Catamaran

1  specially designed for rough water crossings and comfort in

2  style.  It also states the vessel is U.S.C.G. certified with a

3  quality trained and experienced crew.

4  **A.**    Sir, this is an advertising.  This is not -- this was meant

5  as a reference.  I know where you are going with this.  It's

6  inaccurate.  This is only an advertisement of what the vessel

7  was going to be and what it was.  Not at the time.  It was only

8  used as a reference to the insurance company to be able to go in

9  and look at the spec.

10        So, if you going down the road where I'm misrepresenting

11  the insurance company based on the verbiage of this link you are

12  again off base; sir.

13  **Q.**    Okay.

14  **A.**    Jesus.  Unbelievable.

15  **Q.**    But the point is if someone followed your link as you

16  described here and used the arrows -- well, to get to MV ANZHELA

17  EXPLORER they would see the fact that it says the vessel is

18  U.S.C.G. certified with a quality, trained and experienced

19  crew.  Whether it's accurate or not that's what they would see;

20  correct?

21  **A.**    That's what they would see.  That is correct.  It was not

22  intended when it was presented to the insurance company as being

23  factual.  It was intended to give Mr. Laboff(ph) an idea of what

24  the vessel was going to be in Louisiana and what it previously

25  was before she was deactivated.

1   **Q.**   The U.S.C.G. certified, in terms of people who are familiar

2   with commercial boats, does that connote that it has a

3   certificate of inspection?

4   **A.**   If this was an active -- I'm going to answer it this way.

5   This is a private in house link.  This is not for the public.  I

6   point to this link from time to time if an occasion arises

7   wherein this discussion, and the purposes of the discussion

8   there was a way for me to get him to be able to take a look at a

9   picture of this boat.

10   **Q.**   Uh-huh.

11   **A.**   This is not a public domain web site.  It is not a

12   misrepresentation.  It is a private, in-house link.

13   TWSolution.com\docksboats\fleets\texasstar -- whatever.

14   **Q.**   Right.  Well, when you directed Mr. Laboff(ph) to look at

15   www.twsolution.com\fleet did you describe in your email and say

16   that the vessel was somehow not certified, that it didn't

17   have --

18   **A.**   Yes, I did.  If you look at paragraph number two do you see

19   the words 'will be'?  'Will be'?  The vessel 'will be' U.S.

20   coast Guard certified?

21   **Q.**   Uh-huh.  And you think that --

22   **A.**   I think that tells him the vessel was not U.S. Coast Guard

23   certified.

24   **Q.**   Let me just read the whole sentence and let me ask my

25   questions.

1   **A.**   I'm sorry.  I apologize.

2   **Q.**   No, I understand.  The vessel will be U.S.C.G. Certified to

3   carry 100 passengers in a crew transport role crew boat or 30

4   passengers as a live aboard housing platform if the vessel is

5   chartered as a live aboard we expect that company will carry

6   their own insurance to cover that activity.

7        The crew compliment will be for, if in a 24 hour operation

8   as crew boat, that's captain, mate, unlicensed engineer and one

9   deck.  Otherwise in a 12-hour job will be three, captain,

10  unlicensed engineer, and one deck.  If, within a 12-hour, quote,

11  live aboard, close quote, role she will carry a crew of five,

12  captain, mate, unlicensed engineer, deck and chef.

13  **A.**   That's right -- that's right out of U.S. Coast Guard

14  regulation T-book requirement under the COI.  I was basically --

15  I wasn't familiar -- I wasn't so sure how educated

16  Mr. Laboff(ph) was on manning requirements.  So, in that

17  paragraph there I was basically giving him an idea of what the

18  crew compliment would be based on the U.S. Coast Guard T-boat

19  regs.

20  **Q.**   This statement in the email, "This vessel will be U.S.C.G

21  certified to carry 100 passengers, et cetera that we read, is

22  that the only reference or description you made to

23  Mr. Laboff(ph) with respect to the certificate of inspection?

24  **A.**   It may not have been.  There was -- I can't recall.  This

25  has been some period of time now.

1  **Q.**  Let me just ask the direct question.

2      Did you ever tell Mr. Laboff(ph) this boat is not or does

3  not have a current certificate of inspection?

4  **A.**  I believe that I had at some point.  But I can't recollect.

5  **Q.**  Do you recall at what point; in the beginning in, the

6  middle?

7  **A.**  I have already answered the question, sir.  I'm telling you

8  that I cannot recollect that.  I may have, and I may not have.

9  So how do I -- if I don't recollect it how come you are asking

10 me a second question, sir, asking me to recollect it?

11 **Q.**  And as such then you don't recollect?

12 **A.**  I don't recollect.

13 **Q.**  Whether in a telephone call or email?

14 **A.**  I do not recollect.

15 **Q.**  Okay.

16 **A.**  I'm saying I might have and I may not have.  I don't know,

17 sir.

18 **Q.**  With respect to the survey that bore your name as being

19 prepared for did you pay for that survey out of your own funds?

20 Or were you eventually reimbursed for that?

21 **A.**  No.  Those were paid for out of funds that Mr. Dorsey was

22 making on deposit for me to draw against.

23 **Q.**  So, the survey that you ordered, you did that behalf of

24 Mr. Dorsey and the vessel?

25 **A.**  I think that would be an accurate description.  Because the

1   funds that were used for the acquisition of the survey were Jeff

2   Dorsey's or ANZHELA EXPLORER LLC funds that were on deposit for

3   use at my discretion.  As per Mr. Dorsey asking me to go have a

4   survey have on this boat I was doing my due diligence.  A lot of

5   times I just march along, you know.

6   **Q.**   Uh-huh.

7   **A.**   Okay.

8   **Q.**   Now, I note at you sent a copy of the survey.  Did you send

9   a copy of the Coast Guard vessel activity report?

10  **A.**   I didn't have that in my possession.

11  **Q.**   Did you direct at any time Mr. Laboff(ph) to a web link for

12  the U.S. Coast Guard web site for him to look at this particular

13  vessel?

14  **A.**   I can't recollect.  I might have and I might not have.  I

15  don't know.  I can't remember.  I would -- I would only add to

16  that, that if this is a, in my understanding on the referral was

17  that this was a very experienced and knowledgeable marine agency

18  and I would suspect that any request for insurance they would do

19  their due diligence.

20  **Q.**   And I believe you told Mr. Laboff(ph) that the vessel will

21  be arriving in Golden Meadow, Louisiana in a few weeks?

22  **A.**   Yes, sir.  That's what it says.

23  **Q.**   What was date of this; the 14th of February?

24  **A.**   Yeah.

25  **Q.**   Uh-huh.

1            MR. FERTIG:  Judge, at this time I would like to offer

2   Exhibit 109 which is the February 14th email into evidence?

3            THE COURT:  Any objection to 109?

4            MR. MOURE:  No objection.

5            MR. FERTIG:  And also Exhibit 185 with is the TW

6   Solutions web page?

7            MR. MOURE:  No objection.

8            THE COURT:  Okay, so Exhibits 109 -- and what was the

9   other one?

10            THE CLERK:  185, Judge.

11            MR. FERTIG:  185.

12            THE COURT:  Plaintiff's 185 will be admitted.

13            (Thereupon, the documents referred to were marked and

14   admitted into evidence.)

15            THE CLERK:  Did you admit Number 50?

16            MR. FERTIG:  Number 50?

17            THE CLERK:  Summary of the Coast Guard vessel.

18            MR. FERTIG:  I have that down as a different number.

19            THE CLERK:  Okay.  Go ahead

20            MR. FERTIG:  No, I'll clear that up.

21            THE CLERK:  Uh-huh, uh-huh,

22            MR. FERTIG:  Great.

23   Q.   Now, the next -- well, before I get to that what did you

24   tell Mr. Laboff(ph) regarding where the vessel would be

25   operating?

Page 100

1  **A.**   I told him that it was coming to Golden Meadow, Louisiana.

2  At that time that was the plan to be managed under Fish

3  Offshore.

4  **Q.**   I'm handing you an email now that is Plaintiff's 116.  It

5  bears U.S.I. placement number 69 --

6       (Handing to the witness,and Showing to the defense counsel,

7  Mr. Moure.)

8  **Q.**   -- and ask if you can identify that as an email you

9  received from Sean Laboff(ph) on February 19th, 2007?

10  **A.**   You know, I really don't.  I don't remember receiving this.

11  **Q.**   Okay.

12  **A.**   But that's okay.  No big deal.

13  **Q.**   Well, if you don't remember receiving it then would you

14  have any knowledge about any of the contents of the email?

15  **A.**   Yeah.  It's kind of standard stuff, you know.  Under the

16  categories listed there; PNI Pollution Haul, that kind of

17  thing.  Yeah.

18  **Q.**   Okay.

19  **A.**   Standard stuff.

20  **Q.**   He says, "Please remember that this is being underwritten

21  for Gulf of Mexico work.  And as you know, the rates for Marine

22  insurance are totally different here."

23       Do you know what he meant by that?

24  **A.**   Well, probably because we live down here in the yachting

25  capital of the world with multi-million dollar megayachts.  And

1   that, you know, if you have been to Louisiana oil field there is

2   a difference between the two environments.  Yes, I suspect

3   that's what he was referring to.

4   **Q.**   You were aware that he was quoting you coverage for Gulf of

5   Mexico?

6   **A.**   I am aware.  And all boats have to get from one place to

7   another to get to the coverage area.  So I also know where you

8   going with this.  The vessel, as far as I'm concerned, and my

9   knowledge is the vessel had coverage for trip insurance to get

10  there.  So --

11  **Q.**   Trip insurance from where?

12  **A.**   From where it was obviously being repaired in Ft.

13  Lauderdale.

14  **Q.**   Well, when you say obviously being repaired in Ft.

15  Lauderdale can you point to any email correspondence you may

16  have had with Sean Laboff(ph) that says the boat is currently in

17  Ft. Lauderdale and we will need coverage to get to Golden

18  Meadow, Louisiana?

19  **A.**   Mr. Laboff(ph) was fully, clearly, knowledgeable that the

20  vessel was located in South Florida.  It was discussed that it

21  was being operated land as a South Florida boat.  And maybe in

22  your own exhibit, maybe it's not clearly spelled out, but I knew

23  that he knew that the boat was not in Louisiana.

24      I know that you know that I know in my own letter and your

25  own exhibit that you just gave me, the motor vessel ANZHELA

1  EXPLORER which you will find on the enclosed link below with

2  recent survey attached will be arriving to Ft. Lauderdale-

3  Louisiana in the next few weeks --

4  **Q.**  Excuse me, will be arriving where?

5  **A.**  Will be arriving in to Golden Meadow, Louisiana in the next

6  few weeks.  I would have never written that statement in that

7  form if I was not 100 percent thoroughly, what is the best word,

8  convinced --

9       Mr. Laboff(ph) knew the boat was in South Florida.  Let's

10  just leave it there.  The Mr. Laboff(ph) knew the boat was in

11  Ft. Lauderdale being repaired and would be transiting to

12  Louisiana.

13  **Q.**  Because you told him personally?

14  **A.**  Yes.

15  **Q.**  You would agree that your email does not state where it

16  will be transiting from, only where it will be arriving.

17  **A.**  This is a fishing expedition.  I'm sorry.  I'm sorry.  I'm

18  a little tired.

19       THE COURT:  Mr. Rosandich?

20  **A.**  I'm sorry.  I apologize, Your Honor.

21       THE COURT:  It will be much quicker.  Just answer the

22  questions.  The quicker you answer the quicker are you done.

23  **A.**  Thank you for reminding me of that.  I apologize.  The

24  answer to your question is Mr. Laboff(ph) knew the boat was in

25  Louisiana.

1   **Q.**   And that raises the next issue.

2   **A.**   Okay.

3   **Q.**   U.S.I, or Mr. Laboff(ph) is an insurance broker?

4   **A.**   The same as Mr. Arthur Jay Gallagher is, or Marine -- they

5   go out to the underwriters.  Most of them are Lloyds of London.

6   **Q.**   Right.  Okay.  Do you have any firsthand knowledge of what

7   the relationship may be of Mr. Laboff(ph) with respect to the

8   underwriter that eventually underwrote this vessel?

9   **A.**   None soever.  As a matter of fact, sitting here today I

10  cannot even tell you who the underwriter is.  And going back to

11  your previous question that's not forget, sir, that Fish

12  Offshore who is insured by those underwriters or through this

13  agent -- I have, or had a very close relationship with this

14  agency.  So maybe there was some stuff there that was on my part

15  a given as discussions that were taking place between Fish

16  Offshore as the delivering entity of the vessel and information

17  that I thought was being given to them.  So anyway, I'm

18  certainly not perfect.

19  **Q.**   You were aware that Mr. Laboff(ph) of U.S.I. would go out

20  to various insurance companies and try to get coverage for the

21  vessel?

22  **A.**   Yes.  That's their job.  They are looking for the best rate

23  to sell the policy.

24  **Q.**   And when you said there was a relationship between Fish

25  Offshore and U.S.I. this was your first experience with U.S.I;

1   correct?

2   **A.**   I only had a phone number and a name, when I called him,

3   yes.  It was a cold call.

4   **Q.**   And what may or may not have transpired between Fish

5   Offshore and Mr. Laboff(ph) at U.S.I. would not be known to you;

6   would it?

7   **A.**   I would not think so, no.  My relationship with

8   Mr. Blanchard was cursory at best.

9   **Q.**   Now, earlier today when we were talking about the

10  application you said that you had seen an application that was

11  handwritten and you may have or may not have contributed certain

12  things to it?

13  **A.**   Yes.  That was my testimony.  I would like to see it.

14  **Q.**   That's where I'm going, sir.

15  **A.**   Okay.

16  **Q.**   I'm handing you an exhibit marked as Plaintiff 68.  It's

17  under the U.S.I. placement bate stamp of 446 through 454.  Have

18  you seen this document before?

19  **A.**   I have not.  Over there I think.  (Indicating)

20  **Q.**   Well, is this the handwritten document that you were

21  referring to earlier that you may have contributed to?

22  **A.**   I can't answer that, either.  Because having not seen this

23  document until you just handed it to me it was hard for me to

24  understand what document you were talking about.

25  **Q.**   Uh-huh?

1   **A.**   But this obviously was not filled out by me.  This is not

2   my handwriting.

3   **Q.**   I understand that, sir.  And there will be testimony later

4   by the person whose handwriting this is.

5        But I would like to ask you questions with regards to the

6   accuracy and completeness of the information that appears on

7   this U.S.I. Application.

8        First of all, do you know or have you ever spoken with

9   Jamie Robasha(ph) at U.S.I?

10  **A.**   I don't know.  I talked to a lady there after the casualty.

11  **Q.**   Prior to the casualty do you recall communicating either by

12  email or by telephone with a lady at U.S.I?

13  **A.**   I don't recall.

14  **Q.**   Well, I would like to go through the application and I will

15  at least represent to you, and I believe the evidence will bear

16  this out through other witnesses in this litigation that this

17  document was prepared by U.S.I. and was forwarded to the

18  underwriters as an unsigned application.

19       MR. MOURE:  I would object to the statement that -- in

20  the portion of the forwarding of the application.

21       THE COURT:  Rephrase your question.

22       MR. FERTIG:  Okay.

23  **Q.**   I have just represented to the witness that this was a

24  handwritten document by someone at U.S.I. that was forwarded to

25  the underwriters.  And I believe that's the evidence that you

1    will hear from the U.S.I. And the WFT witnesses.

2            MR. MOURE:  Okay.

3    **Q.**   My question is I would like to go through this and

4    determine whether or not the information contained is accurate

5    as it appears on the application.

6    **A.**   I have no problem with that.  Let's go.

7    **Q.**   Okay, let's go.  And, Judge, if it would help, I have some

8    blowups here, so if I could point to it and show the Court where

9    I'm headed?

10           THE COURT:  I have it.

11           MR. FERTIG:  Okay, good.

12   **Q.**   Okay.  Under hull section, name of assured, slash, owner.

13   It has who listed?

14   **A.**   It has myself.

15   **Q.**   That, as we have said is inaccurate?

16   **A.**   That is inaccurate.

17   **Q.**   Now, it says how long has assured lash owner operated

18   vessels?  And it has 15 years and 25 years as a captain.

19   **A.**   That's correct.

20   **Q.**   Does that describe you?

21   **A.**   It does.

22   **Q.**   When you were talking to Mr. Laboff(ph) did you tell him

23   that your license was no longer current?

24   **A.**   I did not.  Never came up.

25   **Q.**   The next block said has the assured ever been involved in

1   any bankruptcy proceeding?  You say what is checked there?

2   **A.**   No.  I mean yes.  But I see that it's checked no.

3   **Q.**   And was that an accurate statement?

4   **A.**   That's accurate, yes.

5   **Q.**   And next is description of assured's owner's operation.  It

6   says crew boat operation, see attached.  First of all, before we

7   go back to the back of it, the attached, crew boat operation; is

8   that an accurate description?

9   **A.**   I don't think so.

10   **Q.**   And if you would go to the end and you see under Bate stamp

11   number I believe it's the next to the last page.  If I could,

12   for the record, look at your copy.  It's U.S.I. placement number

13   452.  Would you read into the record how the vessel is

14   described?

15   **A.**   Well, the vessel name, BOTTOM TIME II, the year of build,

16   1987 type Catamaran, dive crew vessel, 78 foot in length, 30.3

17   beam, draft 8.6, gross registered tonnage 95, hull value

18   $1,000,000, crew compliment four to six -- four to five.

19   **Q.**   Okay.  Do you understand that that information with respect

20   to gross tons and length came from the survey that you attached?

21   **A.**   It probably did.

22   **Q.**   And the same with the name BOTTOM TIME II, you assume

23   that's where they obtained the name of the boat?

24   **A.**   Well, they probably got the name of the boat from me.  Or

25   if they had gone into the U.S. Coast Guard link they could have

1  got all of this information from there.

2  **Q.**  But the BOTTOM TIME II, at the time you were seeking

3  insurance, at least your covered email said you were seeking --

4  **A.**  Let me -- let me -- yeah.

5  **Q.**  -- insurance it said the ANZHELA EXPLORER on that, see

6  attached, someone put BOTTOM TIME II.

7      My only question to you is do you believe that that

8  information probably came from the survey that you attached

9  which identified the boat as BOTTOM TIME II?

10  **A.**  I can't assume anything of went on in that office in

11  Louisiana.  I wasn't there.  You know, I can't -- I mean, how am

12  I supposed to do that?

13  **Q.**  Did you ever tell Mr. Laboff(ph) then that the name of the

14  boat was BOTTOM TIME II?

15  **A.**  I believe that when I first called him that the name of the

16  vessel was BOTTOM TIME II.  But going back to official numbers,

17  names change, official numbers never change, unless you are

18  completely deleting the vessel from the documentation in the

19  national vessel documentation center.  So the most important

20  thing here is not the Queen Mary or the Titanic or the BOTTOM

21  TIME II, or the ANZHELA EXPLORER or the ISLAND ROCKET, it's the

22  vessel's official number as per its record in the national

23  vessel documentation.

24      So, any vessel that you are attempting to get a quotation,

25  a quotation for insurance on should be referenced which its

Page 109

1    official number.

2         But, to answer your question BOTTOM TIME II was probably

3    the identifying, quote-unquote, name at the time of the request

4    for quotation of insurance.

5    **Q.**   And that attachment accurately identifies the service,

6    doesn't it; as a dive boat?

7    **A.**   It does.

8    **Q.**   That would have come from you?

9    **A.**   Or that link.  It was clearly -- again, going back to the

10   initial discussions with Mr. Laboff(ph) he was made fully aware

11   of the intended use of the vessel within his jurisdiction or his

12   territory as a live aboard dive vessel for rig inspections.

13   **Q.**   And at that time on that attachment who does it list as

14   owner?

15   **A.**   On this attachment here?

16   **Q.**   Yes.  On that back page where it listed the service of the

17   vessel, the gross registered tons --

18   **A.**   Are you talking about my name being up here at the top of

19   this page?

20   **Q.**   Yes, sir.

21   **A.**   It doesn't list it as owner.  It has my name on it.  It

22   doesn't say owner.

23   **Q.**   Okay.  If you go to page 2 of the handwritten application

24   it says specify navigation limits required.  And I see reflected

25   Gulf of Mexico, no to exceed 100 miles offshore.

1    **A.**    Yes.

2    **Q.**    Is that something you told Mr. Laboff(ph)?

3    **A.**    When I was asked, when I was asked of the vessel's

4    navigational limits all insurance companies, as you well know,

5    and again, I know where you are going with this basically your

6    claim's going to be that the vessel was out of its sailing,

7    insured sailing parameters because it was in Ft. Lauderdale in

8    transit to Louisiana but to answer the question properly would

9    be that the intended sailing limits for long term coverage once

10   it reached Louisiana were within those parameters of 100 miles

11   offshore which is the certificate of inspection which would be

12   on your certificate of -- coastwise, inland, whatever.

13        That's what's on your document.  So the COI would list it

14   as 100 miles offshore and then you have between sailing points,

15   say Mobile, Alabama and Galveston, Texas there.

16   **Q.**    And, to be perfectly fair you said you did not see this

17   handwritten application?

18   **A.**    I did not.

19   **Q.**    So you are not aware that someone wrote in on the

20   handwritten application Gulf of Mexico not to exceed 100 miles

21   offshore.

22   **A.**    Again, I'm reiterating to you that it's a moot point.  When

23   you are getting insurance coverage, sir, the insurance company

24   wants to know what your -- insurance rates change by the

25   vastness of your coverage.  And obviously, it goes up.  They

1   want to know where your navigational limits are within an

2   insurance policy.

3        But then again, boats have to get from point A to point B.

4   And during those times you have insurance coverage for the

5   trip.  Now, one week before this boat left Louisiana we called

6   and we wouldn't move this boat unless we had confirmation of

7   coverage to move the boat to Louisiana.

8        So anyway, this was obviously a telephone -- this was a

9   very generic blank form that they fill out to get the initial

10  information on a cold call or a call in for request for

11  insurance quotations.

12  **Q.**   All right.

13  **A.**   Basically, looking at this thing I don't see any problem

14  with this document whatsoever including the 25 years as captain

15  here even though my license has expired.  I happen to own a 46

16  foot Phantom which is a 60 knot boat and I still call myself

17  captain.  So, if someone is asking me if I'm a captain, I'm a

18  captain.

19       But I see nothing in this document here that is

20  inaccurate.  And there is nothing in this document that lists me

21  as the owner of this boat other than the fact that my name is on

22  the last page.

23  **Q.**   Okay, well --

24  **A.**   But not as owner.

25  **Q.**   Then let's go to page -- on that second page where we were

Page 112

1    discussing gulf of Mexico --

2    **A.**    Uh-huh.

3    **Q.**    -- navigational limits?

4    **A.**    Okay.

5    **Q.**    The middle of the page do you see where it says --

6    **A.**    See attached.

7    **Q.**    Where it says upgrades done, COI is current on vessel.  Is

8    that an accurate statement?

9    **A.**    That is not an accurate statement.

10   **Q.**    Good.

11   **A.**    This was -- again, again, we're talking about timing here.

12   Under the change of jurisdiction of the vessel arriving to

13   Louisiana with the top side inspection during the operation of

14   that vessel it -- maybe she wrote it down wrong, the vessel will

15   be a COI vessel.  The vessel was a COI vessel.  The vessel is

16   under upgrades right now for its COI.

17       Now, had I filled this piece of paper out and signed it

18   then maybe we can go there.  But we're not.

19   **Q.**    Okay.  Because you used the term the upgrades were being

20   undertaken.  But you would agree, would you not, that the

21   handwritten application says upgrades done.  And that's --

22   **A.**    Yeah.

23   **Q.**    Rough?

24   **A.**    I mean, it is what it is.  I mean, I can read it.

25   **Q.**    I understand.  And I'm not arguing with you.

1   **A.**   Okay.

2   **Q.**   I would just like to ask you those two statements are

3   accurate statements whomever wrote this on this application?

4   **A.**   They are not accurate whoever wrote that on this statement.

5   **Q.**   And in fact earlier you said that the COI, the certificate

6   of inspection is the gold standard in the industry?

7   **A.**   It is.

8   **Q.**   And is it fair to say that anyone reading this

9   knowledgeable with the marine community --

10   **A.**   Yes.

11   **Q.**   -- and marine practice --

12   **A.**   Yes.

13   **Q.**   -- would assume that that vessel had a current certificate

14   of inspection issued by the Coast Guard?

15   **A.**   I would assume that anybody quoting this insurance would

16   know how to work a computer board and be able to access the web

17   site and pull down the information on the vessel and its current

18   status.

19   **Q.**   Yes, sir.

20   **A.**   That's what I would do if I was insuring a boat.

21   **Q.**   I hear what you are saying but my question is; when it says

22   COI is current on vessel would you agree --

23   **A.**   For the fourth time --

24   **Q.**   Yes.

25   **A.**   -- I'm telling you it's not accurate.

1   **Q.**   Okay.

2   **A.**   That's four times now.  I'm being accused of dragging this

3   out now.

4   **Q.**   Let's go on.  Let's go to page three.  Under loss

5   prevention.  Does applicant currently employ a loss prevention

6   or safety director.  It says owner handles.

7        Is that something that would be describing your role?  Or

8   is that something that would be Mr. Dorsey's role?

9   **A.**   Well again, this is going back to its active status upon

10   arriving to Louisiana.  My understanding of this document, sir,

11   is that she was asking questions of its operational status as

12   insured in Louisiana.  And under the terms and conditions of

13   what we were talking about with Fish Offshore as the management

14   operating company at that time.  The owner wanted to be able to

15   assure the safety director of that vessel was done in-house by

16   him and not deferred to the management company for his own due

17   diligence.  I mean, he is not going to trust that.  He is not

18   going to trust that department to a charter.  Let's put it that

19   way.  That would be my role.

20   **Q.**   That's your role?

21   **A.**   That would have been my role.

22   **Q.**   Because it does say, in the next paragraph, if yes, the

23   individual --

24   **A.**   Would be me.

25   **Q.**   Okay.

1   **A.**   That's where the management thing came up about Louisiana.

2   **Q.**   So then you understood and conveyed that your relationship

3   to the vessel would be assuring that the qualifications --

4   **A.**   Would be.

5   **Q.**   -- and experience of the safety director --

6   **A.**   Would be.

7   **Q.**   -- is you.

8   **A.**   Would be.

9   **Q.**   Okay.  and that part is correct?

10  **A.**   That's correct.

11  **Q.**   Now, earlier just a couple of minutes ago when you were

12  describing this application you said when she was asking

13  questions.  Who is the she?

14  **A.**   You said this was filled out by some lady in Louisiana.

15  **Q.**   Well, I asked you if you ever talked to a lady in

16  Louisiana.

17  **A.**   Okay.

18  **Q.**   Is that where the 'she' comes from?

19  **A.**   Yes.  That's where it comes from.

20  **Q.**   You don't recall talking to a she asking you questions and

21  you --

22  **A.**   No.

23  **Q.**   -- you providing answers?

24  **A.**   No.  I recognize these questions.  But I believe that they

25  were conveyed to Mr. Laboff(ph).  I don't remember talking to

1   any woman.

2   **Q.**   Do you remember Mr. Laboff(ph) asking you these questions,

3   or questions similar?

4   **A.**   Yeah, yeah.  Because he had to submit -- obviously, he had

5   to submit data to the underwriters for quotation.  So, yes.  I

6   recall these questions.

7   **Q.**   And on page 3 it says please describe the applicants

8   pre-employment screening practice for new hires.  It says

9   applications.  What did you mean by that when you told

10  Mr. Laboff(ph) that you would screen people through

11  applications?

12  **A.**   Well, that means like anything else.  When are employing

13  individuals that you go through a screening process.  But again,

14  again, we are talking about in the future when the vessel went

15  on contract to Fish Offshore in Louisiana under the management

16  agreement.

17      The questions he was asking me was, how is this going to

18  work, and it's going to Fish Offshore, and who is going to do

19  the safety and who is going to manage the crew.  And obviously,

20  there is an application process that goes along with that, and

21  drug screening and all the other kinds of things that go with it

22  in our industry today.

23  **Q.**   Uh-huh.  So I understand what you saying.  You are saying

24  that this screening process with drug tests, and physicals, and

25  applications for people that will be operating the boat was

1  something that would happen sometime in the future, but and

2  wouldn't happen --

3  **A.**    When there was a full time crew assigned to the vessel.

4  The crew that came down and took possession of that vessel was

5  provided by Fish Offshore to the owner of the vessel for

6  delivery of the vessel to Louisiana where it was going to do

7  it's new to zone topside inspection to enter into service.

8       I suspect at some point in time when the vessel arrived to

9  Louisiana that Fish Offshore, myself, and possibly even

10  Mr. Dorsey they would have got together and done their safety

11  programs and did the drug screening and the qualifications of

12  the crew.  Again, I'm just reiterating that the -- for the

13  purposes of transiting from Louisiana to the new zone Fish

14  Offshore provided the crew to Mr. Dorsey while Mr. Dorsey was

15  paying for the crew to deliver the boat.

16  **Q.**    Am I correct in stating that you did not review the

17  applications of Captain Ross Eymard, deckhand Steven Scibetta,

18  or engineer Killingsworth prior to turning over possession of

19  the vessel to them?

20  **A.**    Only the captain.  Because in our industry, is you well

21  know, it is the captain's ultimate responsibility to determine

22  whether or not he is going to leave the boat with the dock,

23  I mean leave the dock with the boat.

24       The only individual that I looked at as a part of that

25  Louisiana based crew that was sent here was the captain's

1   documents.

2   **Q.**   And when you say captain's documents what is that?

3   **A.**   His license.

4   **Q.**   And what was his license?

5   **A.**   I believe it was 16 tons.  But maybe it wasn't.  Maybe it

6   was -- I know he had a master's.  This boat requires a minimum

7   of 100 ton master.

8   **Q.**   And did you get the captain's credentials before he

9   arrived?  That is, his prior experience; what kind of boats he

10  has handled, what kind of seas he has handled?

11  **A.**   Sir, you have to understand that when Greg Blanchard, the

12  owner of Fish Offshore who has an ongoing operation in the oil

13  field in Louisiana who I checked out.  I didn't check his crew

14  out.  I checked him out.

15       And coming from Golden Meadow, Louisiana they know who is

16  sneaking around with who.  So, you know, it's a small community,

17  sir.

18       And I'm telling you, if Fish Offshore sends me a crew and

19  these guys are working in the oil field underneath his

20  organization then, you know, I kind of assume that they know

21  what they are doing.  And maybe assumption is the mother of all

22  evil.

23  **Q.**   And you did not have physicals on any of the people?

24  **A.**   No.  It wasn't a requirement at the time.  The vessel was

25  in transit to Louisiana where, as a part of the COI -- that's a

1  part of this thing.

2      The COI is, in large part, the assigned crew to the

3  vessel.  This wasn't the assigned crew to the vessel.  This was

4  a delivery crew that was provided by Fish Offshore to the owner

5  of the vessel, Mr. Dorsey.

6  **Q.**   And I believe you previously testified that a large part of

7  the vessel COI is the crew?

8  **A.**   Yes, of course.

9  **Q.**   And you went on to say that a large portion of that crew

10 portion of the COI is drug testing, whether they are S.T.C.W. --

11 **A.**   Yes, yes.  The standard requirements, yes.

12 **Q.**   And whether they are licensed?

13 **A.**   And their experience.  Uh-huh.

14 **Q.**   Well, let's talk about the captain.  Did you have any drug

15 testing done on the captain or see any results of any current

16 certificate with respect to that on the captain before you

17 allowed him --

18 **A.**   Let's do this.  I'm not trying to run this for you.  The

19 delivery crew was sent by Fish Offshore here.  And I took, I

20 took those guys as guys coming out of the oil field within a

21 working organization.  And no, I did not drug test any of them.

22 And no, I did not check out any of them.  I depended on Fish

23 Offshore to send us qualified personnel.  Why wouldn't he?  He

24 stood a chance of making a lot of money off of this boat.

25 **Q.**   And so the court understands what S.T.C.W. is, please

1  describe that.

2  **A.**   S.T.C.W.; I don't know.  Tell me.  I don't remember what it

3  stands for.

4  **Q.**   Okay.  Without going through the initials it's the

5  standards for watch keepers.  It's a course that people have to

6  take --

7  **A.**   Yeah, yeah.

8  **Q.**   -- to be certified.  It deals with the safety.  It deals

9  with protocols to be followed in cases of emergency.  Are you

10  familiar?

11  **A.**   Well, I went through the S.T.C.W. course about two years

12  ago.  It has a lot more to do with, since 9-11, and the security

13  plans onboard a vessel than it does some of those other things.

14  Of course, you have your man overboard safety drills and all

15  those other kinds of things.  But those things generally are

16  sub-courses or sub-subjects underneath your licenses.

17       But it is a special, it is a special one-day course that

18  you attend for the endorsement.

19  **Q.**   Right.  And you are aware that crews are required to be

20  S.T.C.W. certified?

21  **A.**   I would assume, yes, that they are.  Not necessarily the

22  crews, the entire crew, but certainly the captains.

23  **Q.**   That might be your understanding.  I understand.

24       Are you S.T.C.W. certified?

25  **A.**   I don't have a current license right now.

Page 121

1   **Q.**   Do you know if any of the individuals who you turned the

2   boat over to operate it were S.T.C.W. certified at the time?

3   **A.**   If the captain has got a current master's license then he

4   has got a S.T.C.W.  But to ask the question did I see his

5   S.T.C.W. endorsement or did I ask him if he was S.T.C.W. rated I

6   did not.

7   **Q.**   And you didn't do that for the engineer Killingsworth or

8   the deckhand?

9   **A.**   Well, that's an unlicensed engineer.  Killingsworth, as the

10  deckhand are not required.  They are not even licensed.  Used to

11  be they used to have an AB ticket.  But you don't even do that

12  any more.

13      The responsibility of this is from the top down, from the

14  captain down.

15  **Q.**   And to quote you from earlier you knowing where I'm going

16  you have expressed concerns over the competency of this crew,

17  haven't you, with respect to this boat sinking off the Golden

18  Beach shores?

19  **A.**   That would be probably the grossest understatement I have

20  ever heard.

21  **Q.**   Okay.  So as an understatement you blame the crew for being

22  incompetent as a reason why that boat went down?

23  **A.**   Absolutely.  That boat would not have sunk if you were on

24  it.

25  **Q.**   And you didn't follow the vetting(ph) process --

1   **A.**   The crew was provided by Fish Offshore, sir.

2   **Q.**   Okay.

3   **A.**   That's probably the sixth time.

4   **Q.**   Next page it talks about safety meetings conducted on a

5   regular basis, and that was checked yes.  Did you conduct any

6   safety meetings?

7   **A.**   Sir --

8   **Q.**   Yes.

9   **A.**   I think we have covered this.  This application was a

10  handwritten document that was taken under the premise that the

11  vessel was going to be insured by underwriters with those

12  programs in place.

13       The vessel was going to Louisiana to finish its topside

14  inspection under new jurisdiction.

15  **Q.**   And another question it talks also about -- if I can find

16  it -- our company issued safety manuals, company policy manuals,

17  and/or deckhand manuals issued to all crew.  And what was

18  represented on that handwritten application?  In front of you,

19  Exhibit 68.

20  **A.**   Counselor, the vessel was in transit from Louisiana -- from

21  South Florida to Louisiana whereby it was going to a new to zone

22  inspection where those things were to be implemented.

23  **Q.**   Uh-huh.  By your answer is it --

24  **A.**   My answer to that question is:  Were those things in effect

25  at the time of the vessel sailing; is that what your question

1  is?

2  **Q.**   Yes, sir.  At the time that the insurance policy was

3  covering the boat were those policy manuals, and safety

4  manuals --

5  **A.**   I can't answer that because the crew was supplied by Fish

6  Offshore.

7  **Q.**   Did you ever provide a company protocol, and a safety

8  manual, a deckhand manual, anything else to the crew?

9  **A.**   No, no, no, no.  The crew was provided by Fish Offshore who

10  is a viable, real, operating company in Louisiana and insured by

11  the same insurance company.

12      Why would I question that if they are insured by the same

13  insurance company?  That was one of the reasons why we asked

14  them to send a crew down here, because they were insured by the

15  same insurance company.

16  **Q.**   How do you know that?

17  **A.**   Because he told me when I asked him for a reference.  He

18  goes, go to my insurance company, the one that insures me.

19  **Q.**   By insurance company then, you are referring to U.S.I.?

20  **A.**   I'm talking about the agency.

21  **Q.**   Okay.

22  **A.**   You know.  I can't speak to underwriters.  I told you

23  previously.  I didn't even know who the underwriters were.

24  **Q.**   I understand that.  I just wanted to make sure that the

25  record was clear that when you said that Greg plan Blanchard's

Page 124

1    Fish Offshore was insured by the same insurance company.  It's

2    the agency.

3    **A.**    It's through the same agency.

4    **Q.**    Mr. Laboff(ph).

5    **A.**    Mr -- well, Mr. Laboff(ph) was the salesman.

6    **Q.**    Okay.  Did you ever have an opportunity to see the typed

7    application at any time before it was signed?

8    **A.**    I don't know.  If you'll show it to me I'll that have a

9    look.

10   **Q.**    I'll do that.

11   **A.**    Okay.  See, a lot of this stuff is pretty old.  I have to

12   take a look at it to jog my --

13   **Q.**    I understand.

14   **A.**    I'm also getting a lot older and I'm senile.

15   **Q.**    Exhibit 112?

16   **A.**    Yeah.  I see here where the proper name is now typed in.

17   ANZHELA EXPLORER is the only company with the address in

18   Seattle.

19   **Q.**    My question is, sir --

20   **A.**    The answer to your question is no.  I didn't see it.

21   **Q.**    If you would just go to one of the back pages where the

22   signature line is.  Can you at least identify the signature on

23   that as Mr. Dorsey's?

24   **A.**    That's Mr. Dorsey's signature, I guess.  It says Jeff

25   Dorsey, let me just say that.

Page 125

1   **Q.**   Okay, we will --

2   **A.**   Jeff, did you sign this?

3   **Q.**   We will address that, if I might just have one moment.  Who

4   is T-Van?

5   **A.**   I believe that's a nickname.

6   **Q.**   Is it a Van Gallagher(ph)?  Or how do you --

7   **A.**   Gay-Jon(ph) I think it is.  Isn't that in Louisiana, what

8   they call it, coon ass language?

9   **Q.**   That's what I was asking you.  I can't pronounce it.

10  **A.**   Jo-van or something like that, I think it is.

11       Isn't it?

12       Gay-Jor.  Let's call him T-Van.

13  **Q.**   That gentleman T-Van; what was his relationship to you?

14  **A.**   At the time he was a manager, slash salesman for Fish

15  Offshore.

16  **Q.**   Was he your partner?

17  **A.**   No.

18  **Q.**   I'm going to -- I believe it's Plaintiff's Exhibit 187 and

19  I'm referring to the email that has -- if we could find it,

20  U.S.I. placement document 079.  If I could just locate a copy.

21       For speed, I'll give you my highlighted copy so you will --

22       MR. FERTIG:  Let me show counsel this.

23  **Q.**   I will give it right back to you.

24  **A.**   Okay.

25       (Handing to the defense counsel.)

1  **A.**   Fish Offshore was partnering.  As far as I knew was

2  partnering in the operation of this vessel.  That's what that's

3  in reference to.

4  **Q.**   When you say my partner in Golden Meadow --

5  **A.**   I think I answered that.  That's a metaphor -- let's go

6  back to recalling what we had previously testified, Counselor.

7  T-Van works for Fish Offshore.

8       Fish Offshore was partnering with Mr. Dorsey in the

9  operation of this vessel in Louisiana.  The word partner there

10 is a metaphor for that relationship.

11 **Q.**   Okay, it's not a metaphor for Mr. Dorsey then?

12 **A.**   It's not.  This was a -- it's an off the cuff description

13 of the relationship, I guess.  Fish Offshore was, in my

14 understanding, was partnering with ANZHELA EXPLORER LLC in the

15 operation of this vessel.

16      So I consider that a form of a partnership, I guess.

17 **Q.**   Okay.

18 **A.**   All right?

19 **Q.**   I was just asking in connection to Mr. Dorsey?

20 **A.**   Okay.

21 **Q.**   But you did provide him with Mr. Dorsey's cell phone number

22 for what purpose?

23 **A.**   Greg Blanchard is a pretty hard guy to get in touch with.

24 And Mr. Gay-Jar, T-Van, was probably the liaison is probably the

25 best description between the companies.  As a matter of fact, I

1    think it was actually T-Van who had initially given us the phone

2    number to the insurance agent.

3    **Q.**   Okay.  And are you aware if coverage was bound prior to the

4    ANZHELA EXPLORER leaving dock in Davie (sic) on her last trip?

5    **A.**   I previously testified earlier this morning that the boat

6    would have never, ever left the dock without that confirmation

7    of insurance.

8    **Q.**   Did you receive the confirmation of insurance?

9    **A.**   I believe I saw it.  But I believe, I think I saw that in

10   Greg Blanchard's possession since he was present the day the

11   vessel sailed.  I think that's where I saw it.  I know I saw it

12   somewhere but I really can't recollect exactly when it was.

13        But I was also -- that was also confirmed to me that

14   insurance was bound by Mr. Laboff(ph.)  Because I did call him

15   and ask him and confirmed by Mr. Dorsey.  The boat would have

16   never left without insurance coverage.

17   **Q.**   I'm just trying to establish.  I believe you were aware

18   coverage was confirmed but you didn't see a written document?

19   **A.**   I know what confirmation of insurance looks like.  Without

20   sending the entire binder is basically a certificate, one page,

21   that you present.  Say you are going into a marina and they want

22   to know that you have insurance coverage.  Or a dry dock or

23   whatever.  It's a one page confirmation of insurance, yes.

24   **Q.**   Do you seeing that one page?

25   **A.**   I think I saw it somewhere, sometime prior to the vessel

Page 128

1    leaving.

2    **Q.**    Prior to the vessel leaving?

3    **A.**    Yes, yes.

4    **Q.**    And again, you are referencing Mr. Laboff(ph).

5          Did you ever speak to anyone at an organization called WFT

6    during this process of obtaining insurance?

7    **A.**    WFT?

8    **Q.**    Yes.

9    **A.**    Not to my recollection.

10   **Q.**    Do you ever speak to a woman by the name of Wanda

11   Didier(ph) during the insuring process at WFT?

12   **A.**    I don't recall.

13   **Q.**    You something ever speak to --

14   **A.**    Again, I was talking to Royal, Gallagher, these guys -- you

15   know.

16   **Q.**    I understand I'm just --

17   **A.**    Okay.

18   **Q.**    I'm asking you these questions --

19   **A.**    I don't recall.  I don't recall, sir.

20   **Q.**    The last name I'm going to ask you about --

21   **A.**    Yeah.

22   **Q.**    Karen Price of WFT; did you speak with her directly?

23   **A.**    Her name rings a bell.  I can't recollect what it would

24   have been about.  But I remember a Karen.  I remember talking to

25   a Karen about something sometime.

1  **Q.**   Okay.  You don't know whether it was before or after the

2  loss?

3  **A.**   I can't remember.

4  **Q.**   Okay.

5  **A.**   I can't recall.  There is no sense saying when you can't

6  remember.

7  **Q.**   So then you don't know who she is with respect to the

8  placement and where she fits in the scheme of things?

9  **A.**   You know -- no.  I really can't.  It's right there.  You

10  know what I mean?  It's right there.  But I really can't put my

11  finger on it.

12  **Q.**   Did the boat move under her own bottom at any time prior to

13  the insurance policy being in place?

14  **A.**   I don't remember the timing.  I don't know when insurance

15  was bound by the exact date because I didn't see the document.

16  The only thing that I -- the only time I really became concerned

17  about the insurance being bound was for the actual trip.  Now

18  obviously, when the boat comes out of dry dock it hits the water

19  and it has to go somewhere.  So the vessel transcended from

20  being splashed, to the house in Dania where we worked on it for

21  some number of months there in the water.

22       Then it went down to the Miami River where we did some work

23  and made it ready to go.  And then as a matter of diligence I

24  actually simulated it for three or four days offshore at anchor

25  with a crew onboard before bringing it from that anchorage up,

1  back to the house in Dania where it was from that point sent in

2  the Intercoastal Waterway to Ft. Myers.

3  **Q.**   Okay.  On this cruise down to Miami when you were

4  simulating some of these conditions and had a crew onboard were

5  you aware if there was any insurance coverage in effect at that

6  time?

7  **A.**   I was not.  I think that there was, but i don't have the

8  times and dates again.

9  **Q.**   Now, was Mr. Steven Scibetta one of those crew that was

10  onboard?

11  **A.**   I believe it's S-C-I-B-B-E-T-A

12       MR. MOURE:  Your Honor, I think it's one B and two

13  T's.

14       THE COURT:  Oh.

15       MR. FERTIG:  I got it wrong.

16  **A.**   To answer your question, I can't remember, I can't remember

17  if Steven arrived after the vessel had left Miami and went to

18  anchorage for those four or five days or he was actually onboard

19  going down from Dania to the Miami River.  I believe -- wait a

20  minute.  Actually, yeah.  He was onboard.  Yeah.  He was on

21  board, yeah.

22  **Q.**   Was the engineer Killingsworth onboard?

23  **A.**   He was.

24  **Q.**   And you had an opportunity to observe Mr. Killingsworth in

25  action during those days; didn't you?

Page 131

 1    **A.**   I did.

 2    **Q.**   You weren't very happy with Mr. Killingsworth; were you?

 3    **A.**   No.  Interesting last name.  I would have killed him.

 4    **Q.**   The point is you didn't demand his removal from the vessel

 5    before it went on its last ill-fated voyage; did you?

 6    **A.**   Again, I'm going to defer back to my statement.  If a crew

 7    is being supplied --

 8            THE COURT:  Just answer the question.  Did you remove

 9    Mr. Killingsworth --

10    **A.**   No, sir.

11            THE COURT:  From crew before --

12    **A.**   No, sir, I did not.  I'm sorry.

13    **Q.**   And you did have the authority to do that; didn't you?

14    **A.**   I did not.

15    **Q.**   You didn't have the authority as the vessel safety manager

16    and doing the acts you were doing for the vessel to tell Fish

17    Offshore that you did not want this gentleman onboard the boat?

18    **A.**   I made a recommendation.  I made a recommendation.

19    **Q.**   To whom?

20    **A.**   To Mr -- to T-Van that I was not pleased with his service.

21    But ultimately I was deferring to the captain he had to sail

22    with.

23    **Q.**   Back to my questions of authority.  Are you telling the

24    Court that if you told T-Van, you told Greg Blanchard at Fish

25    Offshore that you do not want that vessel to sail with

1  Killingsworth onboard, that you had no authority, and the boat

2  would have sailed anyway, and they would have ignored you?

3  **A.**   All I'm telling you is that I made my recommendation.   And

4  I asked that he not be onboard, and to sent me another engineer

5  and Fish Offshore chose to send him anyhow with that crew.   And

6  so I backed off on that and deferred it to the captain he had to

7  sail with.

8           THE COURT:   And the captain was Mr. Scibetta?

9  **A.**   That was the deckhand.   Steve Scibetta was the deckhand.

10  The captain was Ross --

11  **Q.**   Eymard.   E-Y-M-A-R-D.   Just trying to get to the right

12  point where we're at.   Did you ever express your displeasure

13  with the crew that was supplied by Fish Offshore with

14  Mr. Dorsey?

15  **A.**   No.   I had -- no.   I liked the deckhand, Steve.

16  **Q.**   Uh-huh.

17  **A.**   I obviously had a major problem with the engineer.

18  **Q.**   How about the captain?

19  **A.**   I didn't meet the captain.   The captain came the day before

20  the voyage and was introduced to me.   He flew down here with the

21  president of Fish Offshore.   They arrived together.   And so my

22  knowledge and my experience with that captain was very limited.

23  **Q.**   While you were on this -- can I call it a shakedown cruise?

24  **A.**   Sure.

25  **Q.**   While you were on the shakedown cruise before the vessel

1   left Dania to go to Golden Meadow, Louisiana did you have an

2   occasion to operate the boat at the helm as its captain?

3   **A.**   Yes, I did.  I drove the boat.

4   **Q.**   And during the period of time that you drove the boat did

5   you ever run the boat aground?

6   **A.**   I did.

7   **Q.**   How many times did you run the boat aground?

8   **A.**   Probably four for five times.

9   **Q.**   Where did you run the boat aground four or five times?

10  **A.**   On four occasions right in the middle of the ICW channel

11  between the markers where you are supposed to be.  And then one

12  time I got to the outside of the channel by, I think it's

13  Haulover?  You are obviously going to ask me this question:

14  Well, you know where it was.

15       Was it Haulover bridge or was it Dania bridge?

16  **Q.**   Well, the fact --

17  **A.**   By one of those bridges?

18  **Q.**   I'm not sure.  That's why I'm asking you.  I do know that a

19  bridge called Hallandale at one time was identified.

20  **A.**   Yeah.  Hallandale.  On the north side of the Hallandale

21  bridge northbound in the ICW.  Yes.

22  **Q.**   And that was --

23  **A.**   The bridge had, the bridge had closed for traffic and we

24  drifted while I was on the phone to the outside of the channel,

25  yes.

1   Q.   And on that one of the four or so groundings it was the

2   starboard hull that became in contact with the bottom; is that

3   correct?

4   A.   I don't know if it was the starboard or the -- I don't know

5   if it was the starboard or port.  Quite honestly, I don't know.

6   All I know is that we were grounded there.

7        I don't have a bottom recorder on that boat.  But the boat

8   was grounded.

9   Q.   I'm going to refer to your deposition, sir.  I'll hand you

10  a copy and ask if it refreshes your recollection at all with

11  respect to whether or not the starboard side of the hull

12  actually made contact?

13  A.   Well, let's do this.  If you are northbound, Counselor, if

14  you are northbound on the Intercoastal Waterway and you go to

15  the starboard side of the channel on your wide catamaran you

16  would probably suspect that the starboard hull would be one that

17  impacts or comes in contact.  Definition of grounding:  Draft

18  exceeds bottom depth.

19  Q.   For the sake of time and economy you were aware that the

20  starboard propeller had tip deflexion after that incident?

21  A.   I am aware because I saw it.

22  Q.   And tip deflexion on a propeller, is what?  Would you

23  describe that to the Court?

24  A.   Well, basically the propeller might have three, four or

25  five flukes, which are called blades.  And if you have a

1   grounding and your engine is used you can put dings in there, or

2   curl the tips of your propellers.

3   **Q.**   After you had this grounding event you actually looked over

4   the side and saw that there was damage to your starboard

5   propeller?

6   **A.**   I didn't look.  I actually went in the water because I

7   couldn't see it when we got back to the dock.

8   **Q.**   You went into the water with scuba gear?

9   **A.**   No.  With a mask.

10   **Q.**   Was there any scuba gear on the boat?

11   **A.**   I think there was some snorkle stuff there.  But I just put

12   on a mask on and jumped in in my underwear.

13   **Q.**   What did you observe when you looked at the starboard

14   propeller?

15   **A.**   I observed tip deflexion.

16   **Q.**   About how much?

17   **A.**   I think maybe about an inch or two.

18   **Q.**   If you previously --

19   **A.**   If you were to measure down on a propeller blade on its

20   outside radius, the tips of the blades, I have, I definitely had

21   a cup in it.  And I believe two of the three blades.  On a

22   couple of the blades, yes.

23   **Q.**   And two of the three blades and do you recall previously

24   stating it was about a 30 degree deflexion?

25   **A.**   Yeah.  If you looking this way and you take 30 degrees.

1   You know, 30 degrees would be like that.  So, it's a bending in

2   the tip.

3   **Q.**   So, then what you saw then was only to some of the blades,

4   not all of the blades were deflected?

5   **A.**   Yeah.  I didn't see any other damage than a couple of the

6   blades had tip deflexion.  I can't remember -- I don't remember

7   if it was three -- two at least.  Two at least, yes.

8   **Q.**   And I believe you were of the opinion it was a three bladed

9   prop?

10   **A.**   Yes.  I believe so.

11   **Q.**   Did you see any chips or gouges that were missing from the

12   starboard propeller blade?

13   **A.**   No, no.

14   **Q.**   Did you see bi-directional deflexion?

15   **A.**   No.  Uh-uh.

16   **Q.**   And by bi-directional --

17   **A.**   I know.

18   **Q.**   For the Court.

19   **A.**   I'm sorry.

20   **Q.**   One tip goes one way, one tip goes the other way.

21   **A.**   Correct.  Or it could be both ways on the same blade.  If

22   you are going forward you will bend them this way.  And if you

23   are going backwards you will twist them back the way other.  You

24   could actually have that occur both almost as an S on each

25   blade.

Page 137

1   **Q.**   Did you examine the port propeller?

2   **A.**   I did.

3   **Q.**   And what damage did you observe on the port propeller?

4   **A.**   I really didn't see any.

5   **Q.**   Jumping ahead again to the night in question.  Which was

6   the side of the vessel's pontoon, port or starboard, that filled

7   up with water and sank?

8   **A.**   It was the starboard side.  I wasn't out there.  But again,

9   I saw the big hole in the exhaust so I know where the water came

10  from.

11  **Q.**   We'll get to that.

12  **A.**   Okay.

13  **Q.**   When you dove on this vessel did examine the hull?

14  **A.**   I didn't need to because all of the voids and all of the

15  hull is easily examined from the internals of the vessel.  The

16  captain and I thoroughly inspected the vessel.  I inspected the

17  vessel that night, obviously.

18      And prior to taking fuel on the next day the captain and I,

19  since he had just arrived and was not familiar with the vessel

20  inspected every void and compartment on the boat.  That was

21  more, by the way, the next day as a matter of familiarization of

22  its compartmentalization to the captain.

23      My examination the night before was obviously out of

24  concern if there was any communication between the outer hull

25  and the inner hull of the compartments.

1   Q.   Didn't you go over the side and observe raw aluminum on the

2   bottom of the boat where the paint was scraped off as a result

3   of the grounding?

4   A.   No.  I never went that far forward on the dive.  I saw on

5   the keel, when I went down to take a look at the propeller with

6   the mask on I saw at the keel in the aft part of the boat where

7   some paint had been scraped off, raw aluminum.

8   Q.   Right along the bottom of the keel there was paint scraped

9   off.

10  A.   Well, obviously when we saw the boat when it came out of

11  the water after the wreck removal we saw a large amount of that,

12  yes.  But you are talking about my inspection now.  I went down

13  basically to look at the propellers.  And when I was underwater

14  there I looked at the keel of the vessel by the starboard stern

15  there and I saw some, some paint was scraped off, yes.  Uh-Huh.

16  Q.   And that was only on the aft most portion of the keel?  Or

17  what, did it extend all the way forward --

18  A.   I never went all the way forward on the boat.  The water

19  there is fairly clear.

20  Q.   Do you remember your deposition being taken?

21  A.   I do.  You know, I'm here to tell the truth, counselor.

22  After the deposition I got to start thinking about the statement

23  that I made in that deposition, and it really doesn't matter

24  anyhow because the vessel was thoroughly inspected by captain

25  before it left the dock.  That is an inaccurate statement on my

1  part in deposition and I'm correcting now.

2  **Q.**   So the inaccurate statement you made in the deposition --

3  **A.**   Was that I inspected the vessel all the way to the hull and

4  I didn't go that far forward, I think.  I'm not even looking at

5  the deposition here.

6  **Q.**   Okay.  And when you said that you saw the scrape going

7  right up to the forward collision bulkhead, and not to the stem

8  that was not an accurate statement when you made it in your

9  deposition?

10  **A.**   It was not accurate.  I was more remembering what I was

11  seeing when the boat came out of the water.  After the

12  deposition I got to thinking about it on how far up the hull

13  that I went, okay?

14  **Q.**   Well, given the damage that you observed to the propeller

15  didn't you plan to replace the propeller when the boat arrived

16  in Ft. Myers?

17  **A.**   No, we did not.  What I did do was I discussed it with the

18  captain.  And since the vessel was not going to be run hard

19  under orders to for Ft. Myers, which basically you can't do in

20  an Intercoastal Waterway with him having instructions not to

21  take the boat offshore I told him that I wanted his evaluation

22  upon the vessel's arrival to Ft. Myers whether he felt that the

23  vibration -- any time you bend a propeller you are going to have

24  a little vibration.

25       I had deferred and discussed the grounding with the captain

Page 140

1    prior to his departure and I asked him to give me an evaluation

2    if we had to send a diver down and change a wheel when he got to

3    Ft. Myers.  I later called him on the radio and when he was

4    underway and he told me that didn't think it was required after

5    he had, you know, a couple of hours on the wheel, after they got

6    underway.

7    Q.  So then you never told Captain Eymard that you had intended

8    to replace the propeller --

9    A.  What I told him was that I intended to replace the

10   propeller upon his evaluation and recommendation.  If a captain

11   comes to me and says Mark, we have a problem, we need to do

12   this, this and this; we will do it.

13        What I basically said was I don't have any problem doing

14   what needs to be done if he makes a determination that we have

15   excessive vibration.  I deferred it to him.

16   Q.  And excessive vibration can cause damage to a vessel if it

17   continues to operate in that condition; doesn't it?

18   A.  Well, vessels operate all the time with deflection in their

19   propellers.  But in the extreme I would say that's an accurate

20   statement.  Again, deferring to the captain if you have --

21   notify me if you have excessive vibration and we'll go ahead and

22   pull the wheel off and straighten out the ding and put it back

23   on was not to problem.

24   Q.  In preparation of your testifying here today have you had

25   an opportunity to read Captain Eymard's deposition?

1   **A.**   You know, I have to tell you this, Counselor.  I am the

2   most unprepared witness you have ever seen in your life.  I have

3   read no documents.  I have read no testimony.  I have been in

4   Panama training a high speed ferry service and I'm quite hoarse

5   and, you know, my -- these gentlemen over here are a little

6   upset with me but I just didn't have the time.  All I can do is

7   sit here and tell you the truth.

8   **Q.**   Okay.

9   **A.**   And it's not going to change anything.

10  **Q.**   Why did you say, "These gentlemen sitting over here";

11  referring to the attorneys?

12  **A.**   Because like -- sir -- just like you, if you are a

13  counselor in a case and, you know, you have a witness coming to

14  testify, you know, won't you like your witness to kind of be a

15  little bit versed with what this is about and what was said by

16  other witnesses?

17  **Q.**   Have they provided you with copies of the depositions?

18  **A.**   I have more unopened email than Cod liver had liver pills.

19  **Q.**   So you were provided these documents, you didn't review

20  them?

21  **A.**   No, I did not.  I just didn't have the time.  I apologize

22  for that but I just didn't have the time.

23  **Q.**   At any time?  Even before you went to Panama?

24  **A.**   No, no.

25  **Q.**   You never reviewed the depositions of either Scibetta or

1   Eymard?

2   **A.**   I have seen none of them.  Counselor, all I can do here is

3   sit here and tell you the truth.  Because as long as I tell you

4   the truth that's all that matters.

5   **Q.**   In your deposition when you said all three blades of the

6   propeller were damaged is that relying upon something you saw

7   after the collision?  Or after the sinking?  Or is that

8   something today that you have present tense recollection?

9   **A.**   Well, what I'm saying was when I jumped over the side in my

10  underwear that day with a mask on I saw tip deflexion, that's

11  what I'm saying.

12         But when I saw the mangled mess on the wreck who knows

13  what -- I can't say whether those guys ran the boat aground or

14  when the boat sank it was driven through a reef.  That was

15  serious stuff down there, that was serious stuff.

16  **Q.**   Last question on the topic of the starboard propeller

17  blade.

18  **A.**   Yeah, okay.

19  **Q.**   It's your opinion that that tip deflexion was caused when

20  you ran that boat aground one of those four times during --

21  **A.**   Well --

22  **Q.**   -- during the shakedown.

23  **A.**   I can tell you that without a doubt I caused that tip

24  deflexion.  The other -- you know, I'm being honest here.  If

25  someone was to ask me if the boat was run aground, we're running

Page 143

1  aground in the middle of the Intercoastal Waterway in a very,

2  very low drought time which is going to come up later on why

3  that boat ultimately got turned around, but boats slide along

4  the bottom, particularly a Catamaran all the time and there is

5  no damage done to them, you know?

6      So, I can tell you that I caused that damage because the

7  boat, when the boat went into the water from Ft. Lauderdale

8  Marine Center it had a U.S. Coast Guard certified hull

9  inspection.  Credit.  It was perfect.  And you have seen the

10  receipts.  I caused that damage, without to doubt.

11  **Q.**  Well, after running the boat aground this four times or so

12  during your shakedown cruise did you haul the vessel to look at

13  the bottom to see what damage you may have done?

14  **A.**  It wasn't -- listen, I have a lot of experience, okay?  If

15  I thought the vessel needed to be picked back up again I would

16  have done it.  There was a thorough hull inspection done by

17  myself and the delivery captain and the engineer.  Of course, I

18  wouldn't trust him.  Oops.

19      Anyway, the answer is no.  The answer is no.  I did not

20  feel that the vessel needed to be picked up.  It was a decision

21  that I made not under any duress by anybody, or pressure by

22  anybody or anything of the sort.

23      I would have cared less if that vessel left that day or

24  not.  I told the captain when he came down, you leave when you

25  are ready to leave and if you feel it's safe and I deferred it

1    to him.  And we thoroughly inspected that boat.  That boat was

2    not communicating in any form or fashion.

3              THE COURT:  When you say inspected the boat, at one

4    point did you inspect the boat after the grounding?

5    **A.**   Yes, sir.

6              THE COURT:  At what point?

7    **A.**   We were -- I know the grounding that did the damage was by

8    the bridge.  It was about ten minutes from the dock where we

9    went.  And as soon as we got the boat tied up the inspection

10   took place.

11             THE COURT:  At the dock.

12   **A.**   At the dock.  Immediately.

13   **Q.**   And that inspection, and I believe you corrected yourself,

14   was not a complete under the boat in the water from stem to

15   stern on both hulls but instead it was primarily you looking

16   into the hull to see if any water was coming out?

17   **A.**   I mean, yeah.  Counselor, each one of the compartments was

18   entered.  In this catamaran from the inside hull you can tell if

19   it's deflected if you have a dent in it from the outside.  I

20   knew this boat so intimately, I knew every ding, scratch in the

21   hull, okay?  I went in each compartment, physically inspected it

22   in daylight and there was no cracking, stress cracks or

23   deflexions in the hulls as a result of that grounding.  What I'm

24   telling you is that I dinged the propeller.

25   **Q.**   Are you saying today that the starboard hull did not come

1   in contact with the ground?

2   **A.**   Of course I'm not.   I'm telling you that I grounded the

3   hull.

4   **Q.**   Okay.   That's what I wanted to know.

5   **A.**   Okay.

6   **Q.**   And on these other groundings that necessarily entails the

7   fact that the bottom of the boat came in contact with the --

8   **A.**   Silt.   Sand.   Right in the middle of the channel.   Every

9   single boat I was following was grounded.   There was literally

10   thousands of groundings that day in the middle of the channel.

11   **Q.**   In the middle of the Intercoastal?

12   **A.**   Of course.   Yes.   Very, very -- I mean, it's very shallow

13   there.

14   **Q.**   That particular there where thousands of boats grounded in

15   the Intercoastal Waterway?

16   **A.**   A grounding doesn't constitute a catastrophe.   A grounding

17   -- if you are in the middle -- if you are in the middle of the

18   channel and there is a drought condition like we had in South

19   Florida for the last couple of years you are actually riding,

20   you are actually sliding along the bottom of the channel.   So

21   I'm telling you that on three occasions, that boat, if you were

22   to look at the stern, you could see sand being kicked UP, okay?

23   Listen, Counselor.   The boat was grounded.   I told you I

24   did damage to the propellers.   The boat was inspected when it

25   got to the dock.   The boat was inspected by the captain the next

Page 146

1   day.  Can we move forward?

2   **Q.**   Yes, we can once you answer this question:  It happened in

3   the Intercoastal Waterway; didn't it?

4   **A.**   It did.

5   **Q.**   And the Intercoastal Waterway is fed by the ocean and not

6   dependant upon drought conditions such as Lake Okeechobee; isn't

7   that true?

8   **A.**   Of course it is, sir.  Of course it is.

9   **Q.**   The ocean itself that controls the level was lower that day

10  due to drought conditions?

11  **A.**   Sir, there is -- we live in the Everglades.  There are

12  many, many tributaries that feed into that waterway close to --

13  there is only so many outlets on an in and out ebb tide.  It's

14  like a bottle.  Now, that Intercoastal Waterway is fed by the

15  Miami river, the Everglades River, you know, all of these other

16  tributaries and, you know, during drought conditions the

17  Intercoastal Waterway is lower than it normally is at other

18  times of the year, not other times of the year, other times of

19  the season.

20  **Q.**   Okay.  That's your opinion?

21  **A.**   No, that's not my opinion, sir.  That's fact.

22  **Q.**   Okay.  Let's talk about the pumps.  I believe we previously

23  discussed the fact that the primary bilge pump -- or you had

24  never seen the primary bilge pump that was connected to the

25  starboard side manifold connected in place?

1   **A.**   I did not.  The secondary bilge pump that's in there,

2   because redundancy is a key factor was repaired, installed by

3   Killington (sic) and the electrical part of it was hooked up by

4   what is the name of the electronic -- electrical company.  A guy

5   named Ives Jasmine(ph).

6   **Q.**  How many bilge pump manifolds were there on the starboard

7   hull?

8   **A.**   There is one primary -- primarily there is one bilge

9   manifold system for the boat.  And that's tied into obviously

10  both bilge pumps as a U.S. Coast Guard requirement you always

11  have to have a back-up.

12  **Q.**  And there is a single point of discharge from that

13  manifold?

14  **A.**   Actually, there is more than one.  But it can be

15  manifolded -- it could be manifolded back out through the

16  exhaust or overboard.

17  **Q.**   I'm going to show you two pictures that have been

18  identified as 76 Exhibit and these pictures are 126 and 127

19  within the series.  And these pictures were taken by

20  Mr. Cairns(ph).  I believe you know Mr. Cairns(ph), okay?

21          MR. MOURE:  Counsel can I see the photographs first?

22          MR. FERTIG:  Sure.

23  **A.**   What is Mr. Cairns'(ph) first name?

24  **Q.**   Ian.

25  **A.**   Oh, he is the surveyor, right?  Surveyor?

1   **Q.**   Yes, sir.  Do you remember speaking to or knowing

2   Mr. Cairns(ph)?

3   **A.**   Yeah.  I was one that pointed out the melted exhaust post

4   to him that he missed.

5                         (Off the record.)

6   **Q.**   Again, I tender to the Court I have some blow-ups of this.

7   Would it be easier for the Court if I used a blow-up or can the

8   court just follow along?

9           THE COURT:  I'll just follow on along.

10  **Q.**   On 126, the photograph, there appears on the bottom to be

11  part of a a white pedestal; do you see that?

12  **A.**   Yeah, that would be the pump stand.

13  **Q.**   Okay.  That's where the primary bilge pump would be mounted

14  if it were it place?

15  **A.**   That's correct.

16  **Q.**   And up in the center of the photo there appears to be a

17  vertical pipe which then makes a ninety degree turn to go to the

18  side of the hull; do you see that?

19  **A.**   That's correct.

20  **Q.**   Is that the primary bilge pumps overboard discharge?

21  **A.**   That's correct.

22  **Q.**   So the water that would be sucked from the bottom of the

23  boat or wherever would then discharge through that pipe?

24  **A.**   That's correct.

25  **Q.**   And that pipe on the bottom where we just see the top of it

1   making a ninety degree turn to face the top of the pedestal --

2   **A.**   That would be the suction side.

3   **Q.**   Suction.  So if the bilge pump were in place it would suck

4   water from the bottom and send it overboard through the top pipe

5   that we previously identified?

6   **A.**   That's correct.

7   **Q.**   And do you see there is what I will call a seacock or gate

8   value on the the top of the overboard discharge?

9   **A.**   Yes.

10  **Q.**   And are you familiar with the orientation of the handle

11  with respect to the flow the water?

12  **A.**   It is closed.

13  **Q.**   It is closed.  And do you also see that it has a tie on

14  it?

15  **A.**   I do.

16  **Q.**   And going to photograph number 127 that is another view of

17  the pedestal with the suction and discharge and of the primary

18  bilge pump; is that correct?

19  **A.**   That's correct.

20  **Q.**   And that suction end is attached to a pipe that runs

21  longitudinal down the boat and off to the side there are various

22  other lines; you see those?

23  **A.**   That would be called the bilge manifold.

24  **Q.**   Okay, thank you.  That's what I was going to identify.  So,

25  it is from this position that the primary bilge pump, if it is

Page 150

1   in place the suction through use of those values in 127 would

2   direct which water type compartment or which location on the

3   starboard hull --

4   **A.**   Yes.

5   **Q.**   -- would de-water the boat.

6   **A.**   You can't see it here because this is post-casualty.   But

7   each of those is marked so that the engineer knows what

8   compartment he is working with.

9   **Q.**   Uh-huh?

10  **A.**   And there is another valve there which is also in the

11  closed position it has a tie strap on it in the closed

12  position.   And that leads to the suction side of the bilge pump.

13  **Q.**   So without -- well, let me ask you this:   When the boat

14  departed the dock was there a primary bilge pump connected on

15  that pedestal to the suction side and to the discharge side?

16  **A.**   I don't know.   I can tell you that -- I can tell you that a

17  pump was provided to Killington (sic) for installation.   I can't

18  say whether it was ever installed.   And I have no idea why there

19  is tie straps on those handles.   And I can also tell you that a

20  brand new pump was being procured for this spot and was to be

21  delivered with a life raft for offshore operation to Ft. Myers

22  when I was going to meet the boat over there.

23      The secondary -- if you look at this pipe coming down the

24  other way, this way, (Indicating) it goes to the secondary bilge

25  pump which is not in this picture, which we later found -- as a

Page 151

1    matter of fact, we found all of these pumps.  We have -- after

2    some number of weeks after the insurance surveyors departed the

3    scene we dug down and found underneath all of the debris the

4    pumps of which I think they are an exhibit here somewhere.

5    **Q.**   But you never found the primary pump because the primary

6    pump was not installed; isn't that accurate?

7    **A.**   I think we found the primary pump.  Excuse me, Donald?

8    **Q.**   He can't answer you.  I'm going to refer you to your

9    deposition again, if you would, and we begin on page 73.  To

10   make it read better, please go to the bottom of page 74.

11   Beginning on line 25 and I ask that you read --

12   **A.**   It that on page 73 that you are talking about?

13   **Q.**   72, line 25 we'll begin to the next page.

14   **A.**   Now, we're on 73?

15   **Q.**   Yes.  Now we're on 73.

16   **A.**   Yeah, I have it.

17   **Q.**   Okay.  In your deposition you said the reason you did not

18   ride with the crew over to Ft. Myers was because you were going

19   to do procurement on the other side.

20   **A.**   That's correct.

21   **Q.**   And you were asked what were you going to procure and you

22   answered a water pump.

23   **A.**   That's correct.

24   **Q.**   And then you were asked what kind of water pump.

25   **A.**   And I said a bilge pump.

1   Q.   And we said the primary that we talked about that wasn't

2   there.

3   A.   That's correct.

4   Q.   And you said correct.

5   A.   Correct.

6   Q.   And then you were asked well, why were you going to wait

7   and do that on the west side as opposed to getting it done

8   before that?  You said because we were on a Saturday morning and

9   the bilge pump we had ordered hadn't come in.  And when asked,

10  but why not wait until Monday or Tuesday.  You said they wanted

11  to.  It was the decision of the crew.

12  A.   That's correct.  That's all accurate.

13  Q.   Okay.

14  A.   When I said the bilge pump that wasn't there I'm referring

15  to post casualty.  Mr. Killington was provided a pump to put

16  there as a temporary a measure until the new one came in.

17  Q.   If you provided him with a pump --

18  A.   I provided him with a number of pumps.  But, yes.  I

19  provided him with a pump for installation in that spot so that

20  he had two pumps tied into the bilge manifold.

21  Q.   And it's your testimony that that pump would have fit the

22  suction and discharge ends of the existing manifold and over --

23  A.   No, it's a very simple thing.  I mean, my grandson could do

24  it.  This guy is supposed to be an engineer.

25  Q.   Did you ever check to see whether this engineer with whom

Page 153

1    you had grave doubts about installed the pump before --

2    **A.**    I did not.  I didn't have the time.  I deferred it.  I

3    deferred it to the crew, the delivery crew to determine the

4    seaworthiness of the vessel.  That, and the fact, a very, very

5    important fact that this vessel had strict sailing instructions

6    not to go offshore.

7         For no other reason than the fact that we wanted the

8    vessel -- the most expedient way over to the other side to Ft.

9    Myers through the Okeechobee Waterway.  There was no, no chance

10   whatsoever; especially with the drought.  If this boat would

11   have sunk it wouldn't have got their ankles wet, okay?  But

12   anyway that's --

13   **Q.**    So then, your orders not to anywhere other than

14   inland was acknowledging the fact that it did not have the --

15   **A.**    Absolutely not, absolutely not.  It was my instructions to

16   take the boat in the Intercoastal Waterway to Ft. Myers across

17   the Okeechobee Waterway, period.

18   **Q.**    And it was also your strict orders that the crew was not to

19   go out in the ocean on this boat?

20   **A.**    Yes.  Because if you need the deposition, sir, I had --

21   there is another Coast Guard regulation that requires certain

22   kinds of life rafts be on onboard the boat.  The life rafts that

23   I put onboard the boat are only certified or allowed by the U.S.

24   Coast Guard for twenty mile operations, okay?  The boat didn't

25   have a full, inflatable, with static release life raft on the

1  boat.  Hence, I could not permit the boat to go offshore due to

2  the life raft situation for the crossing from Ft. Myers to

3  Louisiana.  It was a safety issue with me.

4  **Q.**  Twenty mile offshore --

5  **A.**  Twenty mile offshore is the limit for those rafts that were

6  onboard the boat.

7  **Q.**  Okay.

8  **A.**  It had nothing to do with the pump.  It had -- again -- two

9  reasons:  Number one; best way to Louisiana navigationally,

10  Intercoastal Waterway; number two, no offshore life raft was

11  onboard the boat when it sailed so it automatically fell under

12  the U.S. Coast Guard regulations which we were following with a

13  new hull examination credit that the boat remain inland and

14  within the confines of the regulations to Ft. Myers until I

15  could get over there with a static release inflatable life

16  raft.

17  **Q.**  And it's your belief --

18        THE COURT:  Let me interject before we take a break.

19  To your knowledge was the primary bilge pump installed on the

20  vessel prior to its departure?

21  **A.**  No, sir.

22        THE COURT:  Okay, we'll take a break and come back at

23  3:30.

24  **A.**  I guess I'm not going to Panama tomorrow, huh?

25        THE COURT:  Maybe, maybe not.

 1                    (Brief recess.)

 2

 3

 4       Q.    Mr. Rosandich, just two questions with

respect to the bilge bump before we move on.

 5

      So while the boat was in Dania and you talked to the crew,

 6

you said guys, look, if you want to wait here, we can get the

 7

primary bilge bump in and installed here.  We can get at life

 8

rafts put on here, that's in Dania, and you don't have to leave

 9

now if you don't want to, or words to that effect; that is

10

correct?

11

            MR. MOURE:  Counsel, if you are referring to the

12

deposition could you please give us the page number.

13

            MR. FERTIG:  Well, I was just asking the predicate.

14

But I'll be happy to give it to him anyway.  It's page 75, line

15

17 through 23, if you need to look at it.

16

A.    I don't need to look at it, no.

17

Q.    Is that essentially what you told him?

18

A.    Yes.  Yes, that is.  I had deferred it to the crew.  Again,

19

I'm going reiterate that a bilge pump was given to the engineer

20

to install.  I cannot tell you if he installed it or not.  I did

21

not see it installed prior to the vessel leaving.  And I

22

basically deferred it to the crew to, on their own decision

23

whether they wanted to go, or not to go ahead and take off.

24

Q.    Again, I'm going ahead in time so you know where I'm at.

25

1    **Q.**    Now I'm talking to you about the salvage operation or the

2    wreck removal operation.

3    **A.**    Okay.

4    **Q.**    Do you remember a gentleman by the name of Captain Tim

5    Morgan?

6    **A.**    Yes, I do.   I know who he is.

7    **Q.**    And he is associated with Sea Tow Ft. Lauderdale?

8    **A.**    Yeah.   The territory that the vessel went down is actually

9    Sea Tow Miami, Brian Hawthorn's territory.   But Captain Morgan

10   seemed to have more of an experience in this type of thing than

11   Jeff -- Brian.   They worked together on it, uh-huh.   I do know

12   him.

13   **Q.**    Do you recall telling captain Tim Morgan during the salvage

14   or wreck removal operation that you did not want him to -- or

15   when the boat was raised he would find a bilge pump missing and

16   did not want Mr. Morgan to tell the insurance company?

17   **A.**    Absolutely not.

18   **Q.**    Did you ever tell Captain Tim Morgan that if the insurance

19   company learned that the bilge pump was missing they would

20   probably deny coverage.

21   **A.**    That is not the way the conversation went.   I can tell you

22   what was said.

23   **Q.**    Okay.

24   **A.**    That is absolutely a fabrication, sir.

25   **Q.**    Okay.

Page 157

1    **A.**    Okay?

2    **Q.**    And you are aware that captain Tim Morgan has made that

3    statement?

4    **A.**    I am.  I am.

5    **Q.**    Okay.

6    **A.**    I had a conversation with captain Morgan with, in the

7    presence of Brian Hawthorn.  It was in North Bay Village.  I

8    remember it very, very clearly, distinctly at Pelican Harbor on

9    the dock.  After the fact I had learned that Mr. Killington had

10   not installed that bilge pump.  And I had expressed my concerns

11   over that, and I said it is very, very important that while are

12   you down there that you look for that bilge pump.  And that I

13   had concerns relative to the insurance claim on this thing as

14   anybody else would relative to the bilge pump situation on the

15   boat, okay?  I further indicated to Mr. Morgan that I, at this

16   point in time was told that the owner had to act in a manner as

17   if he was uninsured by the insurance company.  That was a

18   concern to me, okay?  That was a catalyst.  The insurance agent

19   telling the owner that he should act prudently as if uninsured

20   was a concern to me, okay?  I clearly told the insurance

21   underwriters, excuse me, the insurance surveyors, Ian, and he as

22   accompanied by one other gentleman, I can't remember his name.

23   There was a two man team there, initially.

24        That, at this time, basically acting on behalf of the owner

25   that it was going to be my recommendation that the job be given

1   to a real salvage company by the name of -- what is his name?

2   Joel -- Resolve.  Resolve Towing.  Even though they were like

3   the second highest bidder, even though they were a little bit

4   more expensive than Sea Tow.  That did not set well with

5   Mr. Morgan.

6   **Q.**   Mr. Morgan got the contract, didn't he?

7   **A.**   He did.  Obviously, yes.  Then he subbed it out to somebody

8   else.

9   **Q.**   Well, I think that pretty much takes us to the boat getting

10  ready to leave the dock.

11  **A.**   All right.

12  **Q.**   All right.  Now, when the boat left the dock --

13           THE COURT:  Progress.

14           MR. FERTIG:  Yes.

15  **Q.**   Did Captain Eymard have any difficulty operating the boat?

16  **A.**   He did.  That was interesting.

17  **Q.**   Yeah.  Please tell the Court about what happened.  You were

18  there.  You observed it, right?

19  **A.**   Yes.  I was actually standing on the dock with Greg

20  Blanchard, the president of Fish Offshore because it's his

21  crew.  And he got onboard the vessel and not second guessing

22  somebody but you always, when you get onboard a vessel you

23  always do what is called dock trial before you throw the lines

24  off the dock.  You put your engines in and out of gear, backward

25  and forward, and turn your rudders, but never leave the dock,

1    never leave the dock.

2         Well, he got onboard the boat, told the crew to throw the

3    lines off before he had done his dock test as I would have

4    probably done, second-guessing, Monday morning quarter backing,

5    whatever you want to say and he had a throttle control problem.

6    The throttle control problem was very, very simplistic.  All it

7    was, was a little set screw on the throttle that tightened,

8    basically it tightens up the handle on the throttle to put it in

9    and out of gear.  So he left the dock and basically lost control

10   of the vessel.

11   **Q.**   Did he take out a piling?

12   **A.**   He did.

13   **Q.**   Did he also take out part of the dock?

14   **A.**   That dock needed to go anyhow.  It was kind of rotten.

15   **Q.**   But he did take it out, didn't he?

16   **A.**   He did.  We did somebody a favor.

17   **Q.**   And you watched him from the shore fumble about.  Did you

18   ever have an opportunity to get back on the vessel after that?

19   **A.**   I sure did.

20   **Q.**   Yeah.  And when you boarded the vessel after that incident

21   did you tell him to get off the boat, not to handle it any

22   further?

23   **A.**   I did.

24   **Q.**   And you did that why?

25   **A.**   Well, I basically thought that he needed to take a breath

1    and step back for a minute while I investigated what the problem

2    was.  Because, you know, you have to understand, I'm not sure if

3    this guy is incompetent or if there is a problem, okay?  So for

4    me, at that point in time it was, you know, get your butt off

5    the boat and let me see what is going on here.

6    **Q.**   And did he follow your instruction to get off the boat?

7    **A.**   I don't think so.  Maybe he did.  I can't remember.  I

8    think he did.  Maybe.  I don't know.

9    **Q.**   But you let him back on and you let him proceed with the

10   boat.

11   **A.**   Yeah.  Because I found out that the problem was not his and

12   his capabilities.  It was a 20 cent Allen set crew that was on

13   the throttle control that had come loose and just needed to be

14   tightened up with an Allen wrench.

15        And then after I made a determination that he wasn't

16   totally incompetent I felt a little better, yes.

17   **Q.**   You felt a little better.  Did you have concerns at that

18   point about the competency of this captain and the crew?

19   **A.**   I would say no as far as the captain is concerned.  Had I

20   not found that that little old set crew was the problem I

21   probably would have shut it down.  But it was, it turned out

22   that it was not his fault.  And subsequently he had no further

23   problem.  And he got out of that very tight, the very tight

24   confines of that area without any problem and off they went.

25   **Q.**   Well, after the ANZHELA EXPLORER took out the dock piling

1   and took out a dock did you have the vessel hauled to determine

2   what damage may have been sustained?

3   **A.**   No.  Because I watched what happened there.  The boat has

4   got very, very serious rub rails on it.  And the only thing that

5   touched anything was above the water line on the rub rail.

6   **Q.**   Do you have any concerns as you sit here today about the

7   competency of the captain?

8   **A.**   I think that he made some errors in judgment.  But I

9   really, I really don't know.  Certainly, certainly some errors

10   in judgment, yes.

11   **Q.**   After the event was over you wanted to have the captain

12   drug tested; didn't you?

13   **A.**   Any time you have a loss, accident, catastrophe that's the

14   first place you go.

15   **Q.**   Right.  But you really were wondering whether that captain

16   was on drugs or not, weren't you, after --

17   **A.**   Well, when you lose a two million boat you want to find

18   out, you know, if there is drugs involved, yeah.

19        Again, we're Monday morning quarter backing here, aren't

20   we, you know?  There is the loss of our baby.  This was a boat

21   that we were very, very excited about, I had poured my heart and

22   soul into this thing and I had lost my baby.  I was pissed.  I

23   was angry.  Sorry.

24   **Q.**   But you are certain if you had been onboard and had been in

25   the capacity of the captain the boat would not have sunk?

1   **A.**   I am certain of that.  That's an absolute given.  But then

2   again, when you own something you probably have a different

3   attitude than -- and I'm not saying I was an owner.  But I felt

4   I was an owner.

5   **Q.**   Uh-huh.  When the boat left, I believe it left sometime on

6   a Saturday which would have been March 24th.

7   **A.**   Whatever the date.  It was a Saturday.

8   **Q.**   Okay.  They left in the afternoon?  Do you remember that?

9   **A.**   It was -- yeah.  Maybe about noon.

10   **Q.**   Huh-huh.

11   **A.**   Maybe even 11:30, sometime in there.

12   **Q.**   Now, before the boat set sail you established a call in or

13   check in protocol; didn't you?

14   **A.**   Yeah, correct.

15   **Q.**   That's kind of SOP; isn't it?

16   **A.**   Yeah.  It sure is.  Uh-huh.

17   **Q.**   And the call in protocol you established was every four

18   hours?

19   **A.**   That's correct.

20   **Q.**   And that's more or less the standard protocol?

21   **A.**   On a delivery such as that, yes.  Sometimes in the middle

22   of the delivery if everything is going well you change it to a

23   six-hour call-in.

24   **Q.**   Okay.  And the calls were to come to you, not to

25   Mr. Dorsey?

Page 163

1   **A.**   It would have come to me, yes.

2   **Q.**   And they came to you because guy in charge of seeing that

3   the vessel --

4   **A.**   They kind of came to me because of both reasons.  I was

5   with the president of Fish Offshore, and since the two of us

6   were together that was basically more of the factor than

7   anything.

8   **Q.**   Okay.

9   **A.**   Plus I think Jeff was in Seattle or something.  What can he

10   do from Seattle?   Or were you?  I'm sorry.

11   **Q.**   The point is you were a person of authority with respect to

12   the captain and the operation of the boat.  He checked in with

13   you?

14   **A.**   That's correct.

15   **Q.**   And you were the one that issued him the orders strictly to

16   stay inside, meaning; not to go out in the ocean?

17   **A.**   I gave him his sailing orders.  I gave him his route

18   sailing orders to take the boat in the Intercoastal Waterway to,

19   across to Okeechobee to Ft. Myers where I was going to meet up

20   with the life raft to be able to make the open water run to

21   Louisiana and of which I was going to join the vessel and

22   actually do the delivery with him.

23   **Q.**   Right.  And you also were going to bring pump?

24   **A.**   Yes, yes.  The pump and -- the new pump and the life raft.

25   **Q.**   Okay.  The first day went relatively smoothly.  You didn't

1  have any reports of any problems up to Saturday night; correct?

2  **A.**   It was Sunday night; wasn't it?

3  **Q.**   They left on a Saturday afternoon.  I'm taking that first

4  day --

5  **A.**   Oh.  Yeah, yeah, yeah.  Correct.  Correct.  Everything was

6  good.  They even stopped along the way and Steve had some

7  relatives that was on the Intercoastal Waterway.  I think they

8  stopped and had a little barbecue for an hour and then went on.

9  It was cool.

10  **Q.**   And they were checking in with you --

11  **A.**   Yeah, on schedule.  Uh-huh.

12  **Q.**   And everything is fine?

13  **A.**   Uh-huh, uh-huh.

14  **Q.**   The boat moored someplace Saturday night?

15  **A.**   Uh-huh.

16  **Q.**   And Sunday morning then it continued on?

17  **A.**   Correct.

18  **Q.**   Okay.  What is your understanding as to why the ANZHELA

19  EXPLORER did not follow the route that you had given to the

20  captain?

21  **A.**   Well, I had already -- Mr. Blanchard wanted to go to the

22  west coast to visit some friends and the boat was heading that

23  way.  So I drove Mr. Blanchard over there and actually spent the

24  night Saturday night over in Ft. Myers area.  And the next

25  morning I got a call.  I was then heading back on my own so that

Page 165

1    I was on this side to pick up the life raft and then go back and

2    meet the boat on Monday.  And while I was driving back to Ft.

3    Myers they called in and said that the lock master, I think it's

4    up there in Jupiter, had basically told them that they couldn't

5    pass Lake Okeechobee with the draft that they had due to the

6    drought.  So there was no choice.  They had to turn around.  I

7    told them to turn around and come back to Miami.

8    Q.   The captain contacted you to tell you they couldn't make it

9    through the lake because the lock master --

10   A.   It wasn't the captain.  It was the deck hand that called

11   me.

12   Q.   Scibetta?

13   A.   Yes.

14   Q.   Okay.  And Steve Scibetta told you that the lock master

15   told them they couldn't make it through the lake because of the

16   draft of the ANZHELA EXPLORER?

17   A.   That's correct.

18   Q.   And up to that time had the boat been checking in regularly

19   with its every four hours?

20   A.   Yes.

21   Q.   And what time of day was that they called you to check in

22   and told you the lock master --

23   A.   Well, that wasn't a scheduled call, obviously.  It was

24   while I was driving back from Ft. Myers.  I guess it was

25   sometime around 10 o'clock in the morning.  Early, middle

1   morning, something like that.  If I recollection is correct.

2   **Q.**   Now, when the crew would check in with you typically on a

3   radio call, be it every four hour, every six hours, the protocol

4   is generally to report where the boat is, the conditions, and

5   whether there is any problems; is that --

6   **A.**   Yeah, yeah.  It's for the purposes of notifying what his

7   position is, how things are going, you know, that kind of

8   stuff.  And the other thing that we had is because it was an

9   inland route they were within cell range the whole time so we

10   didn't need to use a radio or a satellite phone.  They were just

11   calling on their cell phone.

12   **Q.**   And you had their cell phone numbers?

13   **A.**   Yeah.

14   **Q.**   And you had the Captain's as well as Scibetta's phone

15   number?

16   **A.**   Uh-huh.

17   **Q.**   Is that a yes?

18   **A.**   Yes.  I'm sorry.

19   **Q.**   And how about Killingsworth the engineer?

20   **A.**   I had his number but I wasn't -- it was a captain thing.

21   **Q.**   You weren't about to call?

22   **A.**   The engineer?

23   **Q.**   Yes.

24   **A.**   My communications are always with the captain.

25   **Q.**   And Scibetta in this case?

1    **A.**    Well, Scibetta made one call.  I kind of wondered why it

2    was Scibetta that called me and told me that they were there --

3    they were basically blocked from transiting Lake Okeechobee due

4    to draft constraint.

5    **Q.**    Okay.

6    **A.**    And then I believe he put the captain on the phone.  I told

7    the captain to bring the boat back to Miami.  And not Dania, by

8    the way, but to the Miami River where I had dockage arranged.

9    **Q.**    When you say you had dockage arranged, why would you

10   arrange dockage --

11   **A.**    This as after the fact when I called the captain back.

12   **Q.**    I see.

13   **A.**    And I told them where -- I had plenty of time at that point

14   in time to make a determination of where we wanted to bring the

15   boat.  Certainly after the events of departing I didn't want to

16   anywhere near where it departed from.  So I had the same dock

17   that the -- one of Jeff's other boats.  We had a working

18   relationship with a dock in Miami on the Miami River.  So I just

19   called that dock and told them that I had a boat coming in.  And

20   then, of course, the plans changed because we were going to go

21   around the long way.  So it was bring the boat back to this dock

22   and we'll go ahead and put the life raft and put the extra pump

23   on the boat.

24   **Q.**    Bypassing Dania, did that have anything to do with your

25   concerns over the Captain's operation of the boat?

1   **A.**   No, not at all.  I had been being pressed by the owner of

2   the property to get away from that dock for some long period of

3   time.  I just didn't want re-appear over there again.  It was a

4   decision just to go to the Miami River.

5   **Q.**   Well, did you instruct the captain to come back on the

6   inside?

7   **A.**   I told him to bring the boat back to Miami the same way he

8   went up there.  So I guess the answer to that question is yes.

9   So, I believe that if I would have told that captain, bring that

10  boat back to Miami in the Intercoastal Waterway he would have

11  brought the boat back in the Intercoastal Waterway.

12  **Q.**   Okay.

13  **A.**   I said, bring the boat back to Miami.

14  **Q.**   So then you never specifically instructed him to bring the

15  boat back on inland route; right?

16  **A.**   I told him to bring the boat back to Miami the same way he

17  went to, was going to Ft. Myers.  I would believe that that

18  would be interpreted as to bring the boat the Intercoastal

19  Waterway.

20  **Q.**   And when he was going up you specifically told him to go

21  the inland rather than offshore.

22  **A.**   I did.

23  **Q.**   So, in your mind it was implicit that he would --

24  **A.**   It was.

25  **Q.**   Okay.  When the captain checked in every four hours coming

1   back down from the locks up at Lake Okeechobee you were aware

2   that he was offshore when he gave you his location; weren't you?

3   **A.**   Yeah, he told me he was offshore.

4   **Q.**   And at that time you didn't tell him that he had to divert

5   and enter through the next available inlet; did you?

6   **A.**   I questioned him why he was offshore.  And he said that he

7   wanted to make better time than being on the inside.  So I guess

8   that kind of answers the previous questions on whether I made it

9   clear to him that he was to return inland.  Otherwise if he

10  would have -- knowing me as I am, that would have been it for

11  him.  You know, not following direct instructions.  So there was

12  some ambiguity there.

13  **Q.**   And the ambiguity in your mind was the captain obviously,

14  you didn't fault the captain for being offshore in contravention

15  of a direct order?

16  **A.**   I did not.

17  **Q.**   Okay.  And you allowed him to proceed to come offshore the

18  rest of the way; didn't you?

19  **A.**   Well, I told him to bring the boat in the next available

20  opportunity.  And if you know the cuts between Jupiter Cut and

21  Ft. Lauderdale there is only one and it's not for that boat.  I

22  forget what the name of it is.

23  **Q.**   Port of Palm Beach?

24  **A.**   Actually, Port of Palm Beach.  But they were past Palm

25  Beach by time I talked to him.  They were already south of that.

1   **Q.**   Ft. Lauderdale?

2   **A.**   Ft. Lauderdale, certainly.

3   **Q.**   And they didn't come in Port Everglades; did they?

4   **A.**   My understanding was that the reason that he didn't go into

5   Port Everglades was they had steering problems which we now know

6   what the steering problems were.

7   **Q.**   Well, where were they when they called to tell you that

8   they had steering problems?

9   **A.**   Somewhere around the Ft. Lauderdale inlet.   Somewhere

10  around the Ft. Lauderdale inlet, yeah.

11  **Q.**   Wasn't it Golden Beach and Dania?

12  **A.**   Well, the only other cut there is Haulover Park.   And they

13  were well north of Haulover Park.   How they ended up from Ft.

14  Lauderdale inlet to Hollywood Beach, which is basically where

15  they lost the vessel is really not that far.

16  **Q.**   Jumping ahead again, when they called to tell you they had

17  an emergency they gave you -- I mean, you knew where to call.

18  You didn't call Sea Tow, Ft. Lauderdale, you called Brian

19  Hawthorne in Miami to go get the boat; didn't you?

20  **A.**   Yeah, that's correct.

21  **Q.**   So you knew that they were already into Miami-Dade County

22  where Brian Hawthorne's --

23  **A.**   No.   Brian Hawthorne is one of my neighbors and he is a

24  friend.   His numbers were readily available to me.   I know his

25  family.   He's a friend.   When you are in trouble you generally

Page 171

1    go to your friends first.  And then, if he is -- so I didn't

2    know exactly whose territory the vessel was in at that time.  I

3    was just calling a friend.

4    **Q.**  When did you first receive any indication that the vessel

5    was having difficulty?

6    **A.**  It was Sunday night.

7    **Q.**  About what time?

8    **A.**  I think it was somewhere around 9:00 or so in the evening,

9    sometime around there, I guess.  8:00 or 9:00 maybe, 10:00.

10   **Q.**  Who contacted you?

11   **A.**  It was the captain.

12   **Q.**  And by cell phone or by radio?

13   **A.**  By cell phone.

14   **Q.**  And what did the captain tell you?

15   **A.**  He had indicated to me that he was having a steering

16   problem and that he -- with the steering problem he didn't feel

17   that with a wide Catamaran that he, in the darkness, wanted to

18   try and make the approach.  And at that time he talking Ft.

19   Lauderdale and not Haulover Park.

20   **Q.**  And he told you that, that he was --

21   **A.**  Just off of Ft. Lauderdale.

22   **Q.**  And what was his plan that he relayed to you?

23   **A.**  He basically told me that they were going to work on the

24   problem.  And that he was putting the boat on the hook.

25   **Q.**  And in landlubber talk that means --

1   **A.**   Oh, I'm sorry.  He was going to drop the anchor.

2   **Q.**   And that boat anchors from the bow?

3   **A.**   It does.

4   **Q.**   And do you know how he intended to anchor the boat?  On

5   which hull or does that boat --

6   **A.**   No.  It's right in the center.

7   **Q.**   Is there a bridal arrangement?

8   **A.**   It had, past tense, a pretty good anchoring system.  Let's

9   remember that this boat was a live aboard dive vessel.  And

10  because she is so big she would anchor in the deeper water and

11  then the little smaller boats would take the divers into the

12  reef.  So she had pretty good anchoring gear on her.

13  **Q.**   And to anchor a Catamaran to keep it from gyrating wildly

14  you usually either use some type of a bridal arrangement or you

15  anchor her straight dead center?

16  **A.**   Dead center.

17  **Q.**   Okay.  Did the boat set well on anchor?

18  **A.**   Very well.  From my -- let's not forget, I put a simulated

19  three or four day with all the systems running at anchor in the

20  wide bay over here.

21  **Q.**   Right.  That's why I'm asking.  Because you had

22  experience.

23  **A.**   Right.  Sure, sure.  Uh-Huh.

24  **Q.**   When you anchor a boat -- let me ask you this question:

25  Were you aware of the sea conditions that night?

Page 173

1   **A.**   I was.

2   **Q.**   Were the sea conditions such that it was dangerous for this

3   boat to be out in the ocean?

4   **A.**   If it was me?

5   **Q.**   Yes.

6   **A.**   I think that they were -- I think that it was marginal.  I

7   think that it was one of the captain's mistakes.  But then

8   again, I wasn't there.  The guy was supposedly one of Fish

9   Offshore's most experienced captains.  I questioned him about

10  it.  And he said that he felt comfortable with it.  So I let it

11  be.

12  **Q.**   How high were the seas?

13  **A.**   I think six to eight.

14  **Q.**   Do you remember that?

15  **A.**   Uh-huh.

16  **Q.**   At that time?

17  **A.**   Uh-huh.

18  **Q.**   Your belief is this boat anchoring in six to eight seas

19  would put it in danger?

20  **A.**   Not necessarily.  It depends upon the wave length.  The

21  composite of the bottom at that point, where the anchor was

22  going to be, the scope the line that he puts out, normally it's

23  three times the bottom depth, but in rougher seas you expand the

24  scope up to five.

25  **Q.**   Well, as a reasonably prudent vessel manager did you make

1   this inquiry of the captain as to what type of bottom he was in,

2   what it holding, how much --

3   **A.**   I deferred it to the captain.

4   **Q.**   But you didn't ask knowing these seas were of such a

5   magnitude that it was marginal and follow-up and ask him these

6   very important questions?

7   **A.**   I did not.  I basically deferred it to a captain who is

8   supposed to be very, very experienced.  I suspected that if the

9   captain put the hook down and he started dragging anchor that he

10  would pick the hook back up and get me on the phone again and

11  say, Mark, you know, we're not holding well here.  The guy

12  obviously felt comfortable enough to go to sleep with the rest

13  of the crew, by the way, which we later learned.

14  **Q.**   Well, you weren't there on that night seeing the crew

15  sleeping; were you?

16  **A.**   No, I was not.  But I have information that that was the

17  case.

18  **Q.**   Okay, we'll get to that, I'm sure, in due course.  You did

19  not call your neighbor, Brian Hawthorne, of Sea Tow Miami to go

20  out and toe the boat in that evening?

21  **A.**   Had the captain called me back and told me that the

22  anchoring situation was not working certainly I would have sent

23  a tug out.  But he never called back and told me there was any

24  problems whatsoever, and obviously felt comfortable enough to go

25  to sleep.

1   Q.   Well, did you call the captain back and ask why he hadn't

2   checked in on his every four hour protocol after 9:00 o'clock?

3   A.   The next call I got from them was at sometime around 4:00

4   in the morning.  So they are a couple of hours late.  But I did

5   try calling.  I didn't get an answer.  And that's kind of what

6   led me to some questions on who was on watch.

7   Q.   Okay.  So you called all three members of the crew on their

8   cell phones?

9   A.   I called the captain's cell phone.

10  Q.   Well, when you didn't get the captain did you call

11  Scibetta?

12  A.   I don't think so.  I think I just used that one cell phone.

13  Q.   Well, obviously your level of concern was not that great or

14  you would have called everyone else.

15  A.   Yeah, it wasn't.  It really wasn't.  I mean, I was

16  concerned.  But then again, you know, this guy is an experienced

17  captain and had he had any further problems he would have

18  found -- called the U.S. Coast Guard, or called Sea Tow, or

19  called Mark Rosandich or God above.

20  Q.   Okay, and this Catamaran boat when anchored would face into

21  the winds and waves; wouldn't it?

22  A.   In most instances, yes.  Unless there was one hell of a

23  current running the other way.

24  Q.   Okay.  Do you know what the wind was blowing that night?

25  A.   Not really.  Based on a six to eight foot sea condition,

1   from my experience, and this is a guess, I would say probably

2   somewhere around fifteen, maybe twenty.

3   **Q.**   Coming from what direction?

4   **A.**   From the east.

5   **Q.**   This phone call that you received 4:00 o'clock in the

6   morning or so reported what?

7   **A.**   That they were in distress and that they were sinking.  And

8   I was absolutely flabbergasted.  I mean, it was like, I asked

9   them to repeat to like four times.

10          And then I said I'll get -- I asked them what their

11   position was, they gave me a lat and long and then I called

12   Brian Hawthorne up and started scrambling there.  And I told the

13   captain on the phone that I was going to get some real serious

14   pumps out there and he stopped me in my tracks and he said, no,

15   no, you don't understand.  We're going down.  We are sinking.

16   There is no time.  Get us off of this boat, quote-unquote.

17          So then the next call I made obviously was the U.S. Coast

18   Guard.

19   **Q.**   Were you able to determine if the Coast Guard could

20   establish contact with the captain?

21   **A.**   Yes.  They made contact.

22   **Q.**   Through what medium?

23   **A.**   VHF channel -- Channel 16 initially.  And then they went to

24   another working channel.

25   **Q.**   And you are aware the boat did in fact go down that night?

1    **A.**   Yeah, I'm aware of that.

2    **Q.**   Off Golden Beach?

3    **A.**   Uh-huh.

4    **Q.**   Is that a yes?

5    **A.**   Yes, yes.

6    **Q.**   And you first saw the crew at about 8:30 that morning?

7    **A.**   That's correct.

8    **Q.**   They were delivered to a hotel by Sea Tow?

9    **A.**   Yeah.  Brian Hawthorne's wife.

10   **Q.**   Well, I'm certain you asked the crew about what happened on

11   that voyage.

12   **A.**   At that point in time I was more concerned what their state

13   of mind was.  And wasn't about to be strong-handed with them.

14   At that point in time it was what it was and my experiences are,

15   which are limited, thank God, in these instances that there is a

16   time and place but that wasn't really the place.  Let me put it

17   this way; that wasn't the time.

18   **Q.**   Okay.  And how long did the crew stay in the Miami area?

19   **A.**   I think that they might have even left that day back to

20   Louisiana.

21   **Q.**   Well, before they departed to Louisiana did you ask anyone

22   as to what happened on that voyage?

23   **A.**   Yes.

24   **Q.**   Did you talk to Mr. Scibetta?

25   **A.**   Yes.

1    Q.    Did you ask Mr. Scibetta to describe to you any events they

2    may have had leading up to the sinking?

3    A.    I basically asked him why the boat sank.

4    Q.    And what did he tell you?

5    A.    He said he didn't know.  He was asleep.  And that he was

6    complaining that basically he was being relied on to do a lot of

7    driving and he was tired.

8    Q.    Scibetta said he had done a lot of driving?

9    A.    A captain is a captain.  But a lot of times the captain

10   will turn the wheel over to a crew member to drive the boat for

11   him a little bit.  It's not uncommon.

12   Q.    Well, it was only the characterization of he had driven it

13   enough that he was tired.

14   A.    That's what he told me.

15   Q.    Okay.  Well, did he also tell you or mention anything about

16   the engine overheating along the way?

17   A.    At some point he did.  He mentioned that they had a high

18   heat situation.

19   Q.    You previously testified that the engine high temperature

20   alarm was sounding throughout the voyage per Mr. Scibetta.

21   A.    I didn't say throughout the voyage.  I don't think.  I was

22   made aware that there was a high heat situation on the engine

23   but it wasn't --

24   Q.    Go ahead.  I'm sorry.

25   A.    It's okay.  Go ahead.

Page 179

1   Q.   But weren't you also told that the alarm was going off so

2   frequently the crew just disconnected it?

3   A.   That's what I was told.

4   Q.   Who told you that?

5   A.   I think it was Steve.  I didn't get much information from

6   the captain at all.  I really didn't.  He really clammed up.

7   The only guy that was talking at all relative to what transpired

8   was Steve Scibetta, the deckhand.  The engineer was completely

9   closemouthed.  I couldn't get any information out of him.  And

10  the captain was pretty well following suit.  He didn't have much

11  to say.

12  Q.   And it's also your testimony that Scibetta said after the

13  fact that the vessel ran aground sometime on its trip either up

14  to Okeechobee or back?

15  A.   He told me that -- I asked him if the boat was ever

16  grounded.  And that was in relationship to the high heat problem

17  on the engine.  Because sometimes you suck some sand up in your

18  sea strainers that cool the engine and I was curious as to why

19  there was a high heat situation on the engine.  That was the

20  reason for the question.

21  Q.   And what did Scibetta tell you about them running aground?

22  A.   He did tell me that they did run aground a couple of times

23  prior to leaving Jupiter Outlet, obviously.

24  Q.   Well, are you also aware that Scibetta denies telling you

25  that?

Page 180

1   **A.**   I haven't read anybody's depositions.

2   **Q.**   So you haven't been advised --

3   **A.**   I haven't had a conversation with any crew members at all

4   since that fateful day, nor have I read anybody's depositions.

5   It wouldn't surprise me if there's some form of conflict there,

6   though.

7   **Q.**   Why is that?

8   **A.**   Well, I think there is some people that are covering their

9   backsides.

10  **Q.**   What was your role in contacting an organization to try to

11  salvage the vessel?

12  **A.**   Quite frankly I was trying to be as helpful to Ian and the

13  other surveyor as I possibly could.

14       I contacted a number of organizations relative to the -- of

15  the recovery or the salvage of the vessel.  At one point it went

16  from a salvage to a wreck removal as you well know.

17  **Q.**   Yes.  And that's why I referred to salvage.  And let me

18  just explain the difference so we are all on the same level.

19  **A.**   Right.

20  **Q.**   In the beginning it was salvage.

21  **A.**   Right.

22  **Q.**   That's to recover the boat more or less intact, get her

23  up.

24  **A.**   Right.

25  **Q.**   And save her.

1   **A.**   Correct.

2   **Q.**   And then it turned into a wreck removal?

3   **A.**   Yeah.

4   **Q.**   Which is --

5   **A.**   Yes.

6   **Q.**   -- you have got to get her off the bottom because all of

7   the --

8   **A.**   Potential ramification to the environment; very, very

9   sensitive here in south Florida.

10   **Q.**   Right, and the boat went down with several thousand gallons

11   of diesel oil.

12   **A.**   Yeah.  Fortunately for us she didn't have a big load of

13   fuel her.  The kind of fuel that's put in this boat dissipates

14   rapidly in the sun and mixed seas.  So we were very, very, very

15   lucky that we did not have an oil spill situation on Golden

16   Beach.  So it dissipated.  We didn't any have any situation with

17   that.  We had some other issues, though.

18   **Q.**   When she left Dania to go to Ft. Myers she had about four

19   thousand gallons of fuel on her; didn't she?

20   **A.**   Yeah.  If you look at the fuel ticket I think that was what

21   was the -- and that boat burns a fair amount of fuel.  It's

22   100 -- I guess pretty close to 100 gallons an hour.  So I

23   suspect that when she went down she had a couple of thousand

24   gallons of fuel on her.

25   **Q.**   A 3412 burns one hundred gallons an hour?

1   **A.**   Oh, yeah.  I got one in Panama right now that I'm about

2   ready to open a new route tomorrow.  And that's what it has in

3   it.  Fuel is a big issue.

4   **Q.**   So then you didn't have any concerns about, or no one had

5   concerns about removing the boat because it had a couple

6   thousand gallons of fuel onboard that might enter the

7   environment and cause --

8   **A.**   Well, that situation would have been immediate.  By the

9   time I got down there to the scene -- and by the way, I never,

10  ever went offshore in this entire thing.  I was covering other

11  bases but by 10:00 o'clock in the morning there had already been

12  a determination that it was not an oil spill situation or a

13  petroleum-based catastrophe.

14  **Q.**   Were you eventually advised by some Governmental agency

15  that by a compulsion of law it was necessary to remove the boat?

16  **A.**   Correct.

17  **Q.**   And which agency was that?

18  **A.**   I believe it was DERM, or a representative of DERM

19  **Q.**   And at that point in time it became wreck removal?

20  **A.**   Well, wreck removal was basically determined by mother

21  nature.  There is a period of time there where the vessel could

22  have been salvaged if there was adequate resources quickly at

23  the disposal of the surveyors but it was slow in coming.  And as

24  we have discussed previously it was a very special boat.  You

25  have the two hulls, then you have isolator mounts that the house

Page 183

1   is attached to.  At the depth of water this boat went down in

2   there is a very interesting picture in the newspaper.  You

3   probably have it somewhere.  What happens is the boat is sitting

4   on the bottom and those waves start hitting the house.  When the

5   house, when the three story superstructure of the vessel left

6   its hulls that's when it became wreck removal.

7   **Q.**   The boat sank the morning of March 26, Sunday morning;

8   correct?

9   **A.**   That's correct.  Wait a minute.  Saturday, it left on

10  Saturday.

11  **Q.**   It was Monday morning to Sunday night.

12  **A.**   Yes.

13  **Q.**   It was March 26.

14  **A.**   Well, let's call it Monday morning because it went down

15  Monday morning.  That would have been that date.  Okay.

16  **Q.**   The date is more important than the week.  It was March

17  26 --

18  **A.**   Correct.

19  **Q.**   -- correct?

20  **A.**   Okay.

21  **Q.**   I am handing you another exhibit marked 87 which is the

22  U.S. open form salvage agreement.  Is that your --

23  **A.**   It is.

24  **Q.**   Okay.  Did you sign this agreement?

25  **A.**   I did.

1    Q.    And you signed it on the 26th day of March; correct?

2    A.    Yes.  Whatever date is there.

3    Q.    And that's the same day the boat actually went down?

4    A.    That's correct.

5    Q.    And had you obtained competing bids at that point in time

6    with respect to the salving the vessel?

7    A.    No.  Because at that point in time, time was of the

8    essence.  And me being a local-local, local boy, I pretty well

9    knew that the only organization that could have acted

10   expediently enough to save the ship under salvage was this

11   organization.

12   Q.    Okay.

13   A.    Based on, you know, where the boat was, offshore, sea

14   station conditions, the hull.  You know, it's an interesting

15   thing.  Had the vessel sank subsurface she would have been

16   salvageable.  The fact that this boat went from salvage to wreck

17   removal was basically because the superstructure, while it was

18   sitting on the bottom was sitting above water whereby the wave

19   action destroyed it.

20   Q.    Uh-huh.

21   A.    So, yes.  This was signed by me as a matter of necessity

22   and expediency.

23   Q.    And you signed this salvage contract as the owner's

24   representative?

25   A.    That's correct.  The owner wasn't here.

Page 185

1    Q.   Okay.  And you had authority to enter into that contract on

2    behalf of the owner?

3    A.   I probably did not.  I acted alone.

4    Q.   Well, when did Mr. Dorsey arrive in Miami?

5    A.   He got down here, I can't remember, quite honestly.  Maybe

6    he was here.  I can't remember.

7    Q.   Wasn't he here that morning before you signed this

8    contract?

9    A.   Yeah, he was here.  He was here.

10   Q.   Okay.  So he was aware that you were entering into this

11   agreement; wasn't he?

12   A.   No, he was not.

13   Q.   So you just signed it own your own --

14   A.   I signed it on my own as a matter of expediency.  We had a

15   major situation going on there.  You know, when you don't have

16   any choices you take the choice you got.

17   Q.   And the organization you signed it with, this organization

18   that had the best resources to respond was Sea Tow Ft.

19   Lauderdale; wasn't it?

20   A.   Well, Sea Tow.  Either one of them.  Because they were

21   working together on this.

22   Q.   Do you see who signed on behalf of the salvor?

23   A.   I see Tim Morgan's name there.

24   Q.   Right.  And Tim Morgan is Sea Tow Ft. Lauderdale; isn't

25   he?

1   **A.**   He is.

2   **Q.**   I mean, you have been down here long enough.  You know Tim

3   Morgan is Ft. Lauderdale.

4   **A.**   Well, I didn't until this day.  But I know that Brian

5   Hawthorne told me that he was going to be working with Sea Tow

6   Ft. Lauderdale.  And that Tim had much more the experience than

7   he did to react to this quickly.

8   **Q.**   And when you signed this as a matter of expediency you

9   hadn't even contacted or had received any contact back from the

10  insurance company; had you?

11  **A.**   No.  No.

12  **Q.**   So I just want to be absolutely sure the choice then of Sea

13  Tow to act initially was absent any kind of direction,

14  instruction of the vessel's insurance company?

15  **A.**   That's correct.  It was an immediate need situation.  We

16  were going to deal with that later.  By the time I called the

17  insurance company -- well, you know what happens.  I mean, this

18  is over.

19  **Q.**   I'm not arguing with you.  I'm just trying to establish the

20  chronology.

21  **A.**   Okay.

22  **Q.**   And when you signed this contract -- I mean, you are aware

23  that there are very various means of compensating a salvor under

24  a salvage contract?

25  **A.**   I am aware of that.

1   **Q.**   What?  You are.

2   **A.**   I am aware of that, yeah.

3   **Q.**   You could go on a no cure no pay basis.  You are familiar

4   with that term?

5   **A.**   Yes.  I am?

6   **Q.**   That means the salvor doesn't get any money unless he gets

7   the boat up?

8   **A.**   Well, they didn't give me that option.  It was this or

9   nothing.

10   **Q.**   Okay.  And this or nothing that you were presented with by

11   the salvors was what form of compensation to them?

12   **A.**   I believe it's on an hourly basis kind of thing.  At least

13   that's the way I understood it.  That's probably why there is a

14   price sheet attached to it.

15   **Q.**   That's exactly where I was going to ask.  It says, and that

16   is your initial on Exhibit 87 next to per diem hourly?

17   **A.**   Yeah, it is.

18   **Q.**   And it says see attached rate sheet.

19   **A.**   That's correct?

20   **Q.**   So Sea Tow Ft. Lauderdale --

21   **A.**   They obviously didn't salvage the boat; did they?

22   **Q.**   Well, not a salvage.  I would agree?

23   **A.**   Right.

24   **Q.**   But --

25   **A.**   And I didn't --

Page 188

1   **Q.**   The issue is --

2   **A.**   -- choose them for the wreck removal.  I recommended

3   another company.

4   **Q.**   Well, we'll talk about that in a moment.  We're still on

5   the salvage.  And there were attached four pages of price

6   sheets; weren't there?

7   **A.**   Correct.

8   **Q.**   And on each of the four pages --

9   **A.**   Is my initials.

10  **Q.**   Your initials.  So, in all fairness to Sea Tow they

11  presented you with the contract --

12  **A.**   And I signed it --

13  **Q.**   -- with the terms and the rate sheet?

14  **A.**   Correct.

15  **Q.**   And are you aware of ballpark how much the salvage portion

16  under this contract, Exhibit 87, ran up to?

17  **A.**   No.  I'm not.  I'm really not.  It was the only game in

18  town to try to save the ship.  The total, the total claim on

19  this thing would have been drastically less had this salvage

20  operation come to fruition and was successful.

21  **Q.**   My question is just the salvage component.  Do you know

22  what the bill --

23  **A.**   No I don't.

24  **Q.**   -- that was charged by Sea Tow?

25  **A.**   Well, I know that there is -- you can draw a line

1   between -- as far as I'm concerned Sea Tow was finished when

2   boat went from salvage to wreck removal.

3   **Q.**   Uh-huh.

4   **A.**   That's when it went out for bid, okay, while I'm working

5   with underwriter's surveyors.

6   **Q.**   And that would be Mr. Cairns(ph)

7   **A.**   That's correct.  I actually told Mr. Cairns(ph) at one

8   point that he was making an error in giving the contract to Sea

9   Tow and not to Joel Farrel up there at Resolve Group.  Because

10  when you look at the fine print and the numbers and, versus the

11  bid and the time and everything else involved in it, well, I

12  guess that is kind of like Monday morning quarter backing, too.

13  It would have been cheaper for Resolve to do the job at my

14  recommendation.  But they didn't go that way.

15  **Q.**   Take us to where we're at.

16         MR. FERTIG:  We'll get all the witnesses to break down

17  the salvage charges, et cetera, what was charged.

18  **Q.**   When it became obvious that the deck house --

19  **A.**   Left the hulls.

20  **Q.**   Left the hulls, that there was debris spread all over the

21  ocean bottom off of Golden Beach you then became aware that it

22  was wreck removal and you would be changing the terms of the

23  retention for Sea Tow or some other organization.

24  **A.**   Well, at that point in time I basically deferred it to the

25  insurance company to make those decisions.  And that was

1  obvious, the local on site surveyors.

2  **Q.**   When you say deferred though, you still gave your input;

3  didn't you?

4  **A.**   I gave my input, certainly, yes.  After the insurance

5  company came back -- or the insurance agent in Louisiana came

6  back and said you should act prudently as if uninsured.  So

7  obviously, I'm, it's kinds of like sitting on the fence.  Are

8  you protecting, are you protecting the end dollar sign value on

9  all party's part.

10      So what I as basically doing, I was getting as much

11  information as I possibly could and feeding it to the two

12  surveyors for their decision and input.

13  **Q.**   Were you presented with the three bids that were let out

14  with respect to the wreck removal?

15  **A.**   I wasn't presented with them but I was informed by the

16  surveyors what the amounts were.  And I knew who the players

17  were.  One company named Tuna, Big Tuna or something like that,

18  it was Resolve Group, and Sea Tow.

19  **Q.**   Well, weren't you instrumental in getting Sea Tow this

20  job?

21  **A.**   Absolutely not.  I told -- I even told Mr. Morgan that I

22  didn't want him to get the job, that I was going to recommend

23  Mr. Farrel.  That's when he came back and offered me some

24  compensation for seeing that he got the job.

25  **Q.**   Well, I'm going to hand you a document that's marked as

1  Plaintiff's exhibit 106 and ask you if you can identify the

2  email dated April 9, 2007 from Mark Rosandich to Lisa Morgan.

3  Is that an email that you sent?

4  **A.**    Yeah.  I'm sorry, yes.

5  **Q.**    And Lisa Morgan is Tim Morgan's wife?

6  **A.**    I believe she is.

7  **Q.**    And she works at Sea Tow Ft. Lauderdale doing the back

8  office accounting and organization work; doesn't she?

9  **A.**    Well, she get's paid $350 an hour to answer the phone

10  during this wreck removal so -- that's also upset with me.  I

11  didn't agree to the wreck removal.  I agreed to a salvage

12  contract to get the boat off the bottom of the ocean as fast as

13  I could.  I didn't agree with anything to do with Sea Tow.  As a

14  matter of fact, I was quite upset with Sea Tow.

15  **Q.**    Well, on April 9th you wrote Tim and Lisa under the subject

16  of, what a mess.

17  **A.**    That's correct.  That was a fairly accurate description.

18  **Q.**    Right.  And in that you say I do not know if you are aware

19  of things that I have done behind the scenes but was

20  instrumental in getting Sea Tow the job.  Low bidder was not the

21  only consideration.

22  **A.**    They were low bidder on the job.

23  **Q.**    What did you do behind the scenes that you were

24  representing to Tim and Lisa Morgan on April 9th that was

25  instrumental in them --

1   A.   The signing of the salvage contract.  That's what it was in

2   reference to.  I was working behind the scenes with Brian

3   Hawthorne in making all of the phone calls to find out who was

4   best suited to go out and salvage this boat.  The job of

5   salvage, the job of salvage on the boat.  There was no other

6   game in town.  I had to sign the paper.  I was somewhat

7   instrumental.  If you are making, if you are insinuating that

8   I'm trying to sell these people a boat to raise a little bit of

9   money by being instrumental in getting these people the job you

10  should talk to your surveyors.  I told them not no give them the

11  job.

12  Q.   Were you represented with a copy of the wreck removal

13  contract prior to it becoming effective?

14  A.   I wasn't presented.  I think the surveyors were presented

15  with it.

16  Q.   Well, let me ask you this.  First, I'll show it to you.

17  A.   Okay.

18  Q.   Exhibit 89.

19  A.   Yeah, that is a salvage.  It says on a salvage plan.  This

20  is not wreck removal.

21  Q.   This, despite what it says, isn't this the wreck removal

22  which the bid price was $379,000, no cure no pay?

23  A.   This is salvage.

24  Q.   But you already signed the salvage contract on March 30.

25  A.   Well, that's what the -- that's the only thing that I

1   signed and the only thing that had to do with Sea Tow.

2   **Q.**   Let me just ask you this.  On this Exhibit 89 did you ever

3   see this contract?

4   **A.**   No.

5   **Q.**   Did Harold Hayno(ph,) or anyone, Ian Cairns(ph,) or the

6   Morgans ever provide you with a copy of this agreement for you

7   to approve?

8   **A.**   No.  Not that I recall.

9   **Q.**   Were you ever advised that the wreck removal contract would

10  be a fixed price contract?

11  **A.**   Yeah, I was.

12  **Q.**   And you were aware of other bids that had come in?

13  **A.**   I was.

14  **Q.**   And you had seen the other bids?

15  **A.**   I had not.

16  **Q.**   You had not?

17  **A.**   I was given the figures verbally.

18  **Q.**   Well, I'm handing you another exhibit that is marked as

19  99.  And number 99 appears to be an email from yourself to Lisa

20  Morgan dated April 21 with a copy to Brian Hawthorne?

21  **A.**   Yeah.  That is a complaint about some of the charges.  I

22  think there is reference here of $350 an hour and the admin

23  charges being charged.

24  **Q.**   And in that you say that you approved the wreck removal

25  contract check, that is payment to Sea Tow; didn't you?

Page 194

1   **A.**   That's what I was told by the surveyors.

2   **Q.**   Well, it says, "I approved it two days ago with the

3   surveyors."

4   **A.**   Well, I was with the surveyors in their office when this

5   was brought up.  Yeah.  This was, yeah.  This was basically some

6   complaint.  The surveyors, on one hand, the insurance company is

7   telling us to act as if we are uninsured and I wanted to make

8   sure that the things that were down there that still had value

9   to Jeff as the owner didn't just dissipate as what eventually

10  happened.  I mean, a lot of the stuff that I considered evidence

11  was given to Sea Tow as part of compensation.

12  **Q.**   Right?

13  **A.**   Either they own the boat or they don't.

14  **Q.**   And compensation is clearly spelled out in their bid where

15  it says bid is contingent upon Sea Tow --

16  **A.**   I was very, very upset with Sea Tow.  It was obvious in

17  this letter.  You know?  I just didn't want to deal with them.

18  Okay.  Next?

19  **Q.**   Okay.  But the Sea Tow bid, the fixed price bid stated it

20  was contingent upon Sea Tow Ft. Lauderdale retaining and

21  disposing of superstructure and/or any scrap aluminum not

22  attached to vessel's hull with no offset to bid price for any

23  monies received or scrap value of aluminum; you to see that?

24  **A.**   Where is that?

25  **Q.**   On Sea Tow contract.  The bid for the wreck removal.  It's

1   on front of you.

2   **A.**   Well, I have already told that, you are asking me if I had

3   seen this document.  All I heard was figures.

4   **Q.**   Well, what I'm getting to is were you aware that that bid

5   from Sea Tow contained that term?

6   **A.**   Not at that time.  I became knowledgeable of it afterward

7   when I started asking where all of this potential evidence was

8   going.  It was being sold off as a part of a contract that the

9   underwriters of the insurance company entered into.

10  **Q.**   So I understand it's your testimony that you were never

11  provided with a copy or a draft of the Sea Tow bid or any other

12  bids for the wreck removal in this case?

13  **A.**   I was not.  I never saw the document.  There was a meeting

14  that took place where the figures were discussed.  Again, only

15  after the wreck started being brought in, and I started asking

16  questions of where the items of value was going and/or potential

17  evidence in this case I did learn that it was given to Sea Tow

18  as a part of compensation as I understood it and I complained

19  about it.

20      Remember, there were certain items there that had real

21  value to us.  Like we wanted to be able to examine the anchor.

22  The anchor was sold off by the insurance company.  There was

23  other evidence that was out there that would have been helpful

24  to both parties here was given to Sea Tow as part of the thing.

25  I never saw this.  I never agreed to it.

1   **Q.**   The insurance company sold the anchor and --

2   **A.**   Well --

3   **Q.**   Kept the proceeds; is that your testimony?

4   **A.**   That's not what I'm saying, sir.  What I'm saying is that

5   as far as I was concerned as a part of the wreck removal, Sea

6   Tow, we didn't sign this.  The owner didn't sign this.  The

7   surveyors gave the job to Sea Tow against my wishes.  Then,

8   equipment that could be vital to this case was being -- I never

9   got any of it.  I went to battle with these people from Sea

10  Tow.  Bring the stuff back.  We want to put it in a warehouse

11  the same way you do a wrecked aircraft.   You piece it together,

12  you find out what happened, you have a better truth.

13       The stuff was being sold.

14  **Q.**   And you were on the barge --

15  **A.**   I never was on the barge, was never offshore for any of

16  this.

17  **Q.**   Well, the barge was brought back to Brian Hawthorne's dock;

18  wasn't it?

19  **A.**   It was not.  The barge -- to show you how screwed up this

20  was they got the contract when they got the boat up they didn't

21  know where to bring it to.  That's part of the contract.  Who

22  did they call?  They called Mark Rosandich.  "Mark, can you give

23  us a hand here?  We haven't, we haven't procured the place to

24  get, to get the boat off the barge.  Oh, yeah.  Maybe I can help

25  you out.  Maybe I can find a place to bring the barge to.  They

1  brought it up the Miami River to a yard that is owned by a

2  friend of mine to be taken off of the barge so that the barge

3  could be dismissed as quickly as possible because those carry

4  big meters, time meters, by the way.

5  **Q.**  Is it your testimony that the hull of the ANZHELA EXPLORER

6  was placed on a barge to be taken to a location for storage?

7  **A.**  Yes.

8  **Q.**  She didn't float on her on bottom?

9  **A.**  Actually, yes.  I think she did come in on her bottom, yes.

10 **Q.**  Okay, so you were a --

11 **A.**  Okay, yeah.

12 **Q.**  -- little mistaken there.

13 **A.**  What I'm thinking about is the crane barge, to dismiss --

14 the crane barge was offshore and as long as that boat didn't

15 have a place for it to come into the crane barge was going to

16 stay there.  So you are right.  I stand corrected.  I stand

17 corrected in my testimony.  The boat was -- the hull was floated

18 in, and then picked up and set on the, set on the hard deck.

19 Yeah.

20    It was more about getting the expensive crane and barge

21 from offshore in as quickly as possible and to find a place for

22 that, for what was left of the wreck, for what was left of the

23 boat to come in.

24 **Q.**  During this process such as these retrieved items weren't

25 you advised by email on April 10th as to what debris had been

1   retrieved and Sea Tow would be disposing of it?

2   **A.**   I don't remember the email.

3   **Q.**   And were you then contacted by Brian Hawthorne as to where

4   the debris was located?

5   **A.**   I asked him on a number of occasions.  He was always vague

6   and it was always inconvenient for him to tell me where the

7   stuff was.  We tried five or six times to visit where they were

8   taking the stuff and they were always illusive.  They never gave

9   us a straight answer.  I finally --

10  **Q.**   Is your neighbor, Brian Hawthorne.

11  **A.**   That's true.  But Mike Morgan is involved with this.  All

12  of this stuff was going through Ft. Lauderdale.

13  **Q.**   Are you saying -- that's your neighbor.  He lives what, two

14  houses down?

15  **A.**   He lives in my neighborhood, yes.  The relationship --

16  let's put it this way --

17  **Q.**   He would not tell you where --

18  **A.**   Sir, sir --

19  **Q.**   Let me ask my question, please.  He did not tell you and

20  would not tell you where the debris was?

21  **A.**   What I'm telling you is that it was always inconvenient and

22  vague.  And by the way, my relationship with Brian Hawthorne

23  since this event has gone severely south.  We don't even speak

24  anymore as a result of this.  But he doesn't --

25  **Q.**   You went to his house trying to discuss this matter with

1  him; haven't you?

2  **A.**   I went to his house when I heard the comments that

3  Mr. Morgan made relative to insinuating about a certain

4  conversation that was fabricated.  And that's the only

5  conversation that I have had regarding this case and that I was

6  hoping that he would be there to testify honestly regarding this

7  case.

8  **Q.**   And you spoke to his wife; didn't you?

9  **A.**   I did speak with his wife.  And then he called me on the

10  phone, yes.

11  **Q.**   The wife felt threatened; didn't she?

12  **A.**   Well --

13  **Q.**   Yeah.  That's what she said.

14  **A.**   She is entitled to her opinion.  I was upset about a Sea

15  Tow operator making the statement that you brought up into this

16  Court insinuating that I was making deals to get Sea Tow this

17  job.  It's a complete and utter fabrication.

18  **Q.**   Lisa Morgan responded to your complaint; didn't she, on

19  April 22?  I am handing you an exhibit marked 91, the Tim Morgan

20  deposition, Exhibit 5.  Did you ever receive that email from

21  her?

22  **A.**   You know, I really don't recall this.

23  **Q.**   Okay.

24  **A.**   I might have got it and skim read it.

25  **Q.**   Well, do you recall or communicating to you that you have

Page 200

1   been advised of every step of our progress.  Such as the

2   retrieved items you are advised via email on April 10th, 2007 at

3   14:56 as to what debris had been retrieved from and around the

4   site and that we would be disposing of it.  Do you ever recall

5   her communicating that to you?

6   **A.**   I do not.  At that time my liaison in this project was

7   really Brian Hawthorne.  He was the guy that I was asking where

8   the stuff was going.

9   **Q.**   In that email she also goes on to say you were then

10  contacted by Captain Brian Hawthorne to where this debris was

11  located and you declined; is that an accurate statement?

12  **A.**   That's inaccurate.

13  **Q.**   And then she goes on to say, further, you did not respond

14  to my email until this late date?  Did you respond to her

15  earlier April 10 email?

16  **A.**   I don't recall.  Again, I'm telling you that I was dealing

17  with Brian Hawthorne.  The vessel was in his jurisdiction.  As

18  far as I'm concern it was Brian's job and not Sea Tow Ft.

19  Lauderdale.

20  **Q.**   Did you ever recall Lisa Morgan telling you that she is and

21  has been the primary point of contact on this project and has

22  been available 24/7?

23  **A.**   At $350 an hour I bet she was.

24  **Q.**   All right.  And she says at no time have you made an

25  attempt to contact me or my office with regards to any theses

Page 201

1    issues except for now.  Is that an accurate statement?

2    **A.**    For a third time my contact was with Brian.  The boat was

3    in his jurisdiction.  He was my point.  I didn't really care to

4    speak with her.  I wanted to talk to the guy that was on the

5    scene, and not with an office admin.

6    **Q.**    Notwithstanding the fact that you contracted voluntarily on

7    the first day with Sea Tow for --

8    **A.**    For salvage.  Salvage.  Salvage.

9    **Q.**    And you were aware that Sea Tow Ft. Lauderdale obtained the

10   wreck removal contract; weren't you?

11   **A.**    After the fact.

12   **Q.**    Have you ever seen the state of the debris as it was lifted

13   from the bottom?

14   **A.**    Yes.  I saw a lot of it after Sea Tow subcontracted the

15   debris field to a small organization on the Miami River.  I only

16   became knowledgeable of that when I saw some of our stuff going

17   down South River Drive in the back of a truck and recognized it.

18   **Q.**    And the debris was in twisted pieces of aluminum; wasn't

19   it?

20   **A.**    Much of it was, yeah.

21   **Q.**    Are you contending that that aluminum had any value other

22   than scrap value?

23   **A.**    What I'm saying is that there were component parts onboard

24   the vessel that we would have wanted to look at as potential

25   evidence in this case that we didn't have access to.

1   Q.   Can you point to me any kind of --

2   A.   I can tell you the first one is the anchor.  I can tell you

3   the second one is some pumps that are missing.  There is a trash

4   pump that was at that engineer's disposal that was never

5   recovered.  Those kind of items that could have been picked up

6   off the bottom certainly could have helped our case.  Or, the

7   other way around helped the insurance company's case in fighting

8   the payment of this claim.  It could have worked both ways.

9   Q.   Do you know for a fact that a trash pump was ever

10  recovered?

11  A.   I can't answer that.  I don't know.  Somebody told me that

12  a trash pump was recovered, a gasoline driven trash pump.

13  Q.   Who?

14  A.   I guy by the name of Bauer, the guy who ran the little

15  landing craft.  Wayne Bauer.

16  Q.   Did you ask Wayne for it?

17  A.   He had already disposed of it.

18  Q.   And prior to its disposal had you ever sent any written

19  letter to Sea Tow, to Ian Cairns(ph), to the insurance company,

20  to Harold Hayno(ph) saying I want to see this debris before it's

21  disposed?

22  A.   I can't remember if I did or not.  Again, I was dealing

23  directly with Brian Hawthorne.  I believe to a degree that's

24  clearly kind of mentioned in the letter, the original letter to

25  Lisa of my displeasure of the removal of this equipment without

1   access to it.

2   **Q.**   And that was after the fact though; wasn't it?

3   **A.**   Well, yeah.  It was part of my problem.  It was pretty well

4   after the fact that we learned that the stuff was being disposed

5   of without us being able to take a look at it.

6   **Q.**   And did you consult with Mr. Dorsey about this?

7   **A.**   I did.  I expressed my concerns to Mr. Dorsey regarding --

8   it's, I called it a cake and eat it, too, situation.  You are

9   either insured or not insured.  What gives the insurance company

10  the right to sell Mr. Dorsey's pilot house even though it's a

11  wreck as a part of the value of a removal?

12       I mean, what is that about?  I don't understand that.  But

13  that was discussed.  We discussed the fact that there was debris

14  being removed from the site that either had value or more

15  importantly had some potential, what do you call them, value as

16  far as evidence.

17  **Q.**   I want to be absolutely certain of this.  The Sea Tow

18  proposal for the wreck removal has your name on it.  Did you

19  sign this contract?

20  **A.**   I don't believe that I did.  If I did it was in mass

21  confusion.  If I did sign it, it was salvage plan.  You got to

22  remember, there was paperwork flying all over the place on

23  this.  I mean, it was a mess from day one.

24            THE COURT:  How much more time do you need of this

25  witness?

Page 204

1              MR. FERTIG:  Excuse me?

2              THE COURT:  How much more time do you need with the

3    witness?

4              MR. FERTIG:  Well, we haven't gotten to the post-loss

5    yet.  We just finished -- more or less the salvage.  I only have

6    about another two or three minutes on the salvage.

7              THE COURT:  When you say post-loss what do you mean?

8              MR. FERTIG:  I believe Mr. Rosandich was involved with

9    some of the inspections of the hull and things that occurred

10   after the fact.  I'm not sure it's going to take that long.

11             THE COURT:  Okay, all right.  We'll go ahead and take

12   our break then for the day.  And then I take it you want to

13   cross-examine him?

14             MR. MOURE:  Yes, Your Honor.  It's going to be cross

15   examination but also we are asking that the testimony be part of

16   our case also because he is heading back to Panama.

17             THE COURT:  Right, okay.  All right.  We'll adjourn at

18   this point in time.  See you back tomorrow morning at nine

19   o'clock.  Remember, Mr. Rosandich, you are still under

20   examination so don't discuss the substance of your testimony

21   with anybody.

22   **A.**   Yes, sir.

23             THE COURT:  All right.  So, see you tomorrow morning.

24   **A.**   Thank you, Your Honor.

25             MR. MOURE:  Thank you, Your Honor.

Page 205

1           THE CLERK:  All rise.

2           (Thereupon, the hearing was adjourned until the

3     following day, January 23, 2009)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 206

1

2

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4                    CERTIFICATE OF REPORTER

5        I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7

8    _____     _____
     Darien H. Fremont                    Date
9    Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25