**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division**

CASE NUMBER: 07-61162-CIV-MORENO/TORRES

STATE NATIONAL INSURANCE
COMPANY,
Plaintiff/Counter Defendant

vs.

ANZHELA EXPLORER LLC, JEFF
DORSEY, MARK ROSANDICH,
Defendants/Counter Plaintiffs

_____/

**Proposed Findings of Fact and Conclusions of Law**

    **THIS CAUSE** came before the Court for a trial beginning January 22, 2009. During and after the trial, the Court reviewed the evidence admitted, and considered all applicable law and arguments presented by counsel. Following trial, the parties submitted proposed findings and memoranda of law. The following proposed findings of fact and conclusions of law are therefore made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure.

**Background**

    Plaintiff, State National Insurance Company, filed an Eleven Count Complaint against Anzhela Explorer LLC, Jeff Dorsey, Mark Rosandich, on August 15, 2007 seeking declaration by the Court with respect to a marine insurance policy issued by State National to Anzhela Explorer LLC. The causes of action as to Dorsey and Rosandich individually were dismissed without prejudice for failure to effect service of process on Jan 25, 2008. (D.E.11). The remaining counts against Anzhela Explorer LLC were for Breach of Duty of Good Faith, Breach of Absolute Warranty of Seaworthiness, Breach of Warranty of Continuing Seaworthiness, Breach of Navigational Warranty,

Declaration by the Court of No Coverage for Pollution, Declaration by the Court of No Coverage for Fines and Penalties and Reimbursement for $613,421.50 for the Costs to Mark and Removal of the Wreck.

Anzhela Explorer LLC filed a Counterclaim alleging six counts: Breach of Contract, Breach of Statutory Obligations, Tortious Breach of Contract, Breach of Fiduciary Duty, Fraudulent Misrepresentation and Spoliation and Conversion of Evidence and Property.  By order of May 29, 2008 (D.E. 48) Counts II (Breach of Statutory Obligations i.e. Bad Faith), III (Tortious Breach of Contract), IV (Breach of Fiduciary Duty), and V (Fraudulent Misrepresentation) were dismissed and Defendant was granted leave to amend the Counterclaim. The Amended Counterclaim consisted of two counts - Count I Breach of Contract and Count II Conversion of Property.

The Plaintiff has requested the Court to determine and declare the duties, rights, and obligations under the policy for a loss sustained to the Anzhela Explorer on March 26, 2007.  Plaintiff seeks a declaration of non-coverage premised upon breach of navigational warranty, breach of absolute warranty of seaworthiness, breach of continuing warranty of seaworthiness, breach of duty of good faith, and the pollution and fines and penalties exclusions. Plaintiff also seeks an award of $612,421.50 plus interest from April 16,2007 for the costs to mark and remove the wreck.

Defendant seeks an award of at least $1,000.000.00 for breach of contract together with attorney fees and interest.

## **Findings of Fact**

On July 7, 2006 Mark Rosandich (Rosandich) entered into a purchase agreement for the Bottom Time II on behalf of Jeff Dorsey. (Rosandich Trial testimony 1/22/09, page 25; Plaintiff Exhibit 201)  The vessel was a 70' twin hull catamaran which was used as a commercial dive/ passenger vessel. It was purchased for use in commercial service as a dive support vessel. The purchase price of the vessel was

$200,000.00. The vessel was purchased on an "as is where is" basis. The sale of the vessel was consummated on October 27, 2006.  The vessel was renamed the Anzhela Explorer.

The vessel was a United States Coast guard documented vessel and had been a certified vessel for commercial use however its certificate of inspection had expired in 2003.

On August 22, 2006 the United States Coast Guard conducted an inspection of the vessel. Subsequent to the inspection the Coast Guard issued a Critical Deficiency Report which itemized 34 different deficiencies which would need to be rectified before the Coast Guard would issue a new Certificate of Inspection for the vessel.  (Plaintiff Exhibit 50) As of March 26, 2007 6 of the critical deficiencies noted by the Coast Guard had not been resolved or corrected.  These deficiencies included penetrations in the transverse watertight bulkheads that were not seal and problems with the bilge pump system.

The M/V Anzhela Explorer was purchased with the intent of chartering her as a dive boat in association with dive operations for the oil and gas industry off the shore of Louisiana. (Rosandich Trial Testimony 1/22/09 page 80)

The Application

In February of 2007, Mark Rosandich on behalf of Jeff Dorsey and the M/V Anzhela Explorer contacted Shawn Le Beouf of USI to procure insurance for the vessel. (Rosandich Trial Testimony 1/22/09 pages 80-84) USI acted as agent for the vessel and its owners in the acquisition of the insurance.  (Le Beouf Deposition page 135,136) Rosandich forwarded Lebeouf a description of the intended use and operation of the vessel. The e-mail from Rosandich indicated the vessel would be used in commercial service out of Golden Meadow La. and operated by Fish Off Shore. (Plaintiff Exhibit 109; Rosandich Trial Testimony, 1/22/09, pages 80-81)

During the initial contact with USI it was represented to the insurance broker that the vessel was to be placed in service as a commercial dive boat. Mr. Rosandich, the vessel's manager directed USI to his website where the Anzhela Explorer was displayed as a fully certified dive vessel.

In response to the initial contact by Rosandich, USI prepared and submitted an unsigned application for insurance to WFT. (Plaintiff Exhibit 68)  WFT was the managing agent for State National with authority to bind marine insurance.  (Draper Trial Testimony page10) Karyn Price was the underwriter at WFT who received the request for coverage.

The application submitted by USI affirmatively represented that the vessel had a current COI. (Certificate of Inspection). (Plaintiff Exhibit 68; Robichaux Deposition Page 67- 68; LeBeouf Deposition page 61, 64)  The application was accompanied by an e-mail from Robichaux affirmatively stating the vessel had a current COI.  (Plaintiff Exhibit 67; Price Trial Transcript, page78)  This application was prepared by Jamie Robichaux. (Robichaux Deposition Page 67) This information was obtained by Jamie Robicheaux and Shawn LeBeouf of USI from the vessel's representative Mark Rosandich. (Robichaux Deposition page 68; LeBeouf Deposition pages 61, 166, 167).

At no time between the submission of the application and the loss was Ms. Robichaux ever advised the vessel did not have a current COI. (Robichaux Deposition Page 76) At no time between the submission of the application and the loss was WFT advised the certificate of inspection was not current.  (Price Trial Testimony, page 146)

A Certificate of Inspection is considered the "gold standard "for commercial vessels as it indicates the vessel has been inspected by the Coast Guard and found in compliance with Coast Guard standards. (Rosandich Trial Testimony, 1/22/09, pages 8,113)

Karyn Price will not write a marine insurance policy for a commercial vessel if it does not have a current COI. (Price Trial Transcript, page 81-82,151,152). The

requirement for a current COI. was known to USI and Ms. Robichaux (Price Trial Transcript, page 82) who had worked with Karyn Price for over 15 years. (Price Trial Transcript, page 69)

In the February 15, 2007 e-mail to Ms. Price transmitting the application Ms. Robichaux affirmatively represented "This vessel has undergone Coast Guard inspection and has a Certificate of Inspection." (Plaintiff Exhibit 67)

WFT relied upon the representation that the vessel had a current C.O.I. (Price Trial Transcript, page 81,154)  WFT would not have accepted the risk or agreed to place the insurance if they had not been informed the COI was current. (Price Trial Transcript, page 82,151,152) The Certificate of Inspection was material to the underwriting of the policy.

Although the initial application and transmitting February 15, 2007 e-mail from Ms. Robichaux stated the COI was current, the vessel did not have a current COI at the time of the submission for insurance or at any time prior to the loss. (Rosandich Trial Testimony,1/22/09, page 112)

At no time after the February 15, 2007 e-mail did Anzhela Explorer or its representatives advise State National or WFT that the COI was not current or that the vessel had failed Coast Guard inspection.

Ms. Robichaux at USI never knew (pre loss) that the vessel did not have a current COI.  Additional inquiry to Ms. Robichaux by Ms. Price would not have revealed to WFT that the vessel did not have a current COI. (Robichaux Deposition Page 76)

Shawn LeBeouf did not learn the vessel did not have a current COI until after the loss. Additional inquiry to him by Ms. Price would not have revealed to WFT that the vessel did not have a current COI (LeBeouf deposition page 53)

Anzhela Explorer has conceded that the representation that the vessel had a current COI was false. (Rosandich Trial Testimony, 1/22/09, pages112 -114)

The application for insurance and e-mail transmitting the application described the commercial nature of the vessel's service. The initial application submitted to WFT by USI also contained a representation as to the requested navigation limits for the vessel. (Plaintiff Exhibit 68) The application stated "Specify Navigation Limits Required: Gulf of Mexico not to exceed 100 miles offshore".

The decision to underwrite the policy and the premiums charged for the policy were for Gulf of Mexico navigational limits. (Price Trial Transcript, page 83 -85)

The application did not request navigational limits for the Atlantic coast and the policy premium was not based on Atlantic navigation.  The premium which would be charged for Atlantic navigation is different that that charged for Gulf of Mexico navigation. (Price Trial Testimony, page 68, 67, 97)

In addition to the initial application the schedule of vessels submitted by USI contains the following language: "LIMITS Warranted confined to the use and navigation of the Gulf of Mexico, not to exceed 100 miles offshore." (Plaintiff Exhibit 67)

On February 16, 2007, a Quotation was issued by WFT to USI.  The quote contained the following language "Warranted confined to the use and navigation of the Gulf of Mexico, not to exceed 100 miles offshore."

A revised schedule of vessels was submitted by USI correcting the name of the vessel to Anzhela Explorer and again contained the following language: "LIMITS Warranted confined to the use and navigation of the Gulf of Mexico, not to exceed 100 miles offshore."

The application signed by Jeff Dorsey after the loss confirmed to State National the navigation limits requested as "Gulf of Mexico not to exceed 100 miles offshore." (Plaintiff Exhibit 69 and 112; Price Trial Transcript, page 93)

There is no written request for modification or change of the navigation limits from USI to WFT prior to the date of loss.

There are no pre loss records documenting any discussions or agreements between USI and WFT for navigation limits other than the Gulf of Mexico, not to exceed 100 miles offshore.

On March 22, 2007 USI requested that coverage be bound and WFT agreed to bind coverage. (Plaintiff Exhibits 20 and 31; Price Trial Transcript, pages 89 and 90) The agreement to bind coverage effective March 23, 2007 was based upon the representations contained in the initial application and the February 15, 2007 e-mail from Ms. Robichaux which affirmatively represented the vessel had a current COI and a request for navigation limits in the Gulf of Mexico as well as the responses by USI to additional questions posed regarding the use and operations of the vessel. (Price Trial Transcript page 89 and 90)

As a commercial vessel, the boat required a Certificate of Inspection to operate. The COI is the seaworthiness standard that governs the service of the Anzhela Explorer as a commercial passenger carrying vessel. A COI is required of all U.S. documented vessels in commercial service.

The Policy

A binder consistent with the application and written request for coverage was issued by WFT and received by USI. (Plaintiff Exhibit 30). The coverage bound was commercial insurance for a vessel engaged in dive support services.

Upon binding of coverage USI issued a confirmation of coverage to Anzhela Explorer LLC confirming coverage bound with Navigation Limits: GULF OF MEXICO NOT TO EXCEED 100 MILES OFFSHORE. (Plaintiff Exhibit 64)

The loss of the vessel did not occur within the confines of the navigation limits contained in the policy.

On June 27, 2007, approximately three months after issuance of the binder and the loss of the vessel, the first written request is sent to WFT by USI for a change or modification of the navigation limits.  (Robichaux deposition page 101; Plaintiff Exhibit 66)

The June 27, 2007 e- mail from USI to WFT was sent after counsel for Anzhela Explorer wrote to USI to inquire as to changes of the navigation limits. (Robichaux deposition page 101; Plaintiff Exhibit 72)

The policy was issued by WFT pursuant to the application submitted by USI for Anzhela Explorer. (Draper Trial testimony page 12; Plaintiff Exhibit 30)

The policy, as issued, contains the following navigational warranty, an express warranty of seaworthiness and exclusions for pollution coverage and fines and penalties.

The Navigation Warranty provided as follows:
Warranted confined to the use and navigation of the Gulf
of Mexico not to exceed 100 miles offshore.

(Draper Trial testimony page13; Plaintiff Exhibit 30)

The Navigation Warranty mirrors the requested coverage in the applications and correspondence from USLI. (Price Trial Transcript, page 98; Plaintiff Exhibits 30,67,68,69 and 112)

There was no agreement to modify or change the navigational limits. (Price Trial Transcript, page 98)

The policy contains, in the Special Conditions section, a Warranty of Seaworthiness which expressly warrants that at the inception of the policy "the vessel shall be in a seaworthy condition and thereafter during the currency of the policy, the insured shall exercise due diligence to keep the vessel seaworthy, and in all regards, fit, tight and properly manned, equipped and supplied." (Draper Trial testimony, page 16-17; Plaintiff Exhibit 30)

The policy incepted March 23, 2007.  At the time of inception the vessel was not seaworthy and the vessel owner did not exercise due diligence to keep the vessel in a seaworthy condition during the currency of the policy.

The United States Coast Guard inspected the M/V Anzhela Explorer on August 22, 2006.  The vessel did not pass its commercial inspection and no Certificate of Inspection (COI) was issued.  The U.S.C.G. issued an inspection report detailing numerous deficiencies with the vessel.

These deficiencies existed at the inception of the insurance policy. Anzhela Explorer LLC was aware of the deficiencies at the time of the application of insurance, at the time the policy incepted and at the time the vessel embarked upon its voyage.

On March 24, 2007, the M/V Anzhela Explorer began her voyage to Louisiana. The vessel was unseaworthy at the time of commencement of the voyage.

Pollution and Fines and Penalties

The policy of insurance contains express exclusions for Fines and Penalties as well as for pollution claims. (Plaintiff Exhibit 30)

Anzhela Explorer LLC maintained separate coverage for pollution which responded to the claim on their behalf. (Draper Trial Testimony, page 43; Dorsey Trial Testimony Feb 11, 2009, page 54)

No request for payment of fines or penalties imposed by any governmental authority as a result of the March 26, 2007 sinking has been submitted to State National. Any charges or costs related to pollution or possible pollution were paid by the pollution carrier WQIS. (Dorsey Trial Testimony Feb 11, 2009, page 54)

**UNSEAWORTHINESS**

The ANZHELA EXPLORER was purchased for use in commercial service as a dive support vessel.  The ANZHELA EXPLORER was a 78 foot aluminum hulled

catamaran that was previously used a dive boat taking passengers on scuba diving trips. It was a UNITED STATES COAST GUARD documented vessel.

During the initial contact with USI it was represented to the insurance broker that the vessel was to be placed in service as a commercial dive boat.  Mr. Rosandich, the vessel's manager directed USI to his website where the ANZHELA EXPLORER was displayed as a fully certificated dive vessel.

The application for insurance described the commercial nature of the vessel's service.  The ANZHELA EXPLORER was insured as a commercial vessel.  The policy of insurance was a commercial policy.

As a commercial vessel, the boat required a Certificate of Inspection (COI) for it to operate. The COI is the seaworthiness standard that governs the service of the ANZHELA EXPLORER as a commercial passenger carrying vessel.  A COI is required of all U.S. documented vessel in commercial service.

At the time of he March 24th voyage, the ANZHELA EXPLORER did not posses a COI.  According to the UNITED STATES COAST GUARD the boat was deficient in the following categories: Engineering, Fire Fighting, Lifesaving, Navigation, Operations/Management, Personnel, Pollution Prevention/ Response, Accommodation/Occupational Safety, Construction/Loadline, Documentation & Electrical. (Plaintiff Exhibit 50)

On the date of the ANZHELA EXPLORER's last trip, there were outstanding unresolved deficiencies regarding the boat's bilge pump system and penetrations in the ANZHELA EXPLORER's watertight bulkhead that compromised the watertight integrity of the watertight compartments. The UNITED STATES COAST GUARD Activity Summary Report (Plaintiff Exhibit 50) detailed the following with respect to the penetrations and bilge pump.

| ITEM | SYSTEM | SUBSYSTEM | COMPONENT |
|------|--------|-----------|-----------|
| 13 | Construction/Loadline | Structures | Transverse Bulkhead |

Make all penetrations through water tight bulkheads watertight

| | | | |
|------|--------|-----------|-----------|
| 34 | Engineering | Bilge Water Management | Piping |

Submit drawings for bilge piping system for approval. Bilge piping must 1.5" and provide a 50 gpm bilge pumps (2) per hull ref. 182.510(b) and 182.520(j)."

<u>Penetrations in the Watertight Bulkheads</u>

Loss surveyor Ian Cairns inspected the ANZHELA EXPLORER with the UNITED STATES COAST GUARD shortly after it was raised off the ocean floor.  Mr. Cairns identified open pipes that penetrated the watertight bulkheads that permitted water to travel from one compartment to another.  These openings were found in the forward and aft engine room bulkheads.  These penetrations permitted water entering the engine room to invade the watertight compartments forward and aft of the engine room. (Cairns Trial Testimony, 1/29/09, pages 22, 23, 44 and 45)

Naval Architect Drew Hains confirmed the fact penetrations in the jargon of the UNITED STATES COAST GUARD referred to open pipes and unsealed wire and cable chases that pierced the bulkheads compromising the water keeping ability of the bulkheads.  This condition violates UNITED STATES COAST GUARD regulations and would prevent the vessel from maintaining its water tight integrity in the event of flooding

<u>Bilge Pump System</u>

Mr. Cairns discovered during his inspection of the ANZHELA EXPLORER that the starboard bilge pump was not installed.  It had not broken loose, it wasn't there mechanically, physically or electrically. (Cairns Trial Testimony, 1/29/09, page 22)  Mr. Rosandich was aware of this condition.  He told Mr. Cairns that there was no pump on board. (Cairns Trial Testimony, 1/29/09, page 41).

Mr. Cairns further identified deficiencies in the ANZHELA EXPLORER's starboard bilge pump manifold. He discovered multiple segments of pipes and non-conforming use of hose and clamps that violated UNITED STATES COAST GUARD regulations. (Cairns Trial Testimony, 1/29/09, page 42)  There is no evidence the vessel was brought into compliance with the UNITED STATES COAST GUARD regulations prior to commencement of its last voyage.  Without the pump there was no means of discharging water over board.  The discharge and the manifold valves were wire tied closed. (Cairns Trial Testimony, 1/29/09 pages 37, 38; Plaintiff Exhibit 76; Photographs 126, 127) Because of the missing pump, it was not possible to pump out other compartments through the manifold.

Mr. Cairns could find no evidence of an engine driven pump attached to the starboard engine during his inspection.  A pump that was found detached in the bilge was shown to Mr. Cairns on a subsequent inspection, but there was no means for that pump to be connected to the bilge manifold even if installed. (Cairns Trial Testimony, 1/29/09, pages 77-79)

Drew Hains testified the UNITED STATES COAST GUARD found the ANZHELA EXPLORER's bilge pump manifold and bilge pump to be non-compliant. In order to rectify the situation, the vessel's owner must first prepare a remediation plan; send it to the UNITED STATES COAST GUARD in Washington for approval prior to commencing repairs.  There is no evidence the UNITED STATES COAST GUARD had approved a plan for the ANZHELA EXPLORER's bilge pump system at the time of the sinking.

When the ANZHELA EXPLORER departed on the subject voyage, she did not posses a valid COI.  The outstanding deficiencies directly affected the boat's ability to stay afloat when confronted with the issues present in this litigation.  The failure to have a valid COI not only predated the voyage, it predated the inception of the State National Insurance Company policy that commenced on March 23rd.

The ANZHELA EXPLORER sank a couple miles off the coast of Golden Beach Florida sometime during the early morning hours of March 26th.  In order for a boat to sink, there must be some means for water to enter the boat in sufficient quantities to cause it to lose floatation.

The record at trial documents multiple groundings that occurred prior to the March 23rd voyage. Rosandich testified he ran the boat aground 4 or 5 times before commencement of the insurance policy (Rosandich Trial Testimony, 1/22/09, page 133) Any one of these grounding could have caused the hull plates to have become weakened.  Whether the ANZHELA EXPLORER sank as a direct result of the pre-insurance grounding events causing a break in the aluminum hull can not be documented as the ANZHELA EXPLORER was pushed by wave action while sitting on the bottom of the ocean.  The vessel lost her superstructure and was propelled across a reef destroyed the bottom of the boat, rendering analysis impossible.

Source of Water Ingress

The presence of a hole in the starboard engine's exhaust system is likely candidate to permit water to enter the ANZHELA EXPLORER on her last night.  There was no eyewitness testimony at trial observing the inflow of water from the breach in the exhaust system. However, a hole was discovered during shore side inspections.  The hole was located above the waterline of the ANZHELA EXPLORER.  It was described by various witnesses as slightly above he waterline to 6 inches above.  Similarly the size of the hole varied from one half inch by four inches to one half inch by eight inches.  All witnesses agree that water entering the vessel through this opening would be intermittent until after the boat accumulated sufficient water inside to cause the boat to settle into the water far enough to cause the hole to descend beneath the waterline.

Two theories of causation were advanced by the parties regarding the creation of the hole.   The defendant contends the hole was caused by the starboard engine overheating.   The ANZHELA EXPLORER asserts the starboard engine suffered an overheating condition on the night of the sinking that ultimately resulted in the sinking. However, the vessel was equipped with temperature gauges and overheat alarms that would alert the crew of a impending problem. None of the crew reported an alarm or any abnormal condition with the starboard engine.  (Eymard Trial Testimony, 1/27/09, pages 77-78; Scibetta Trial Testimony, 1/27/09, pages 189-191)  The internal condition of the starboard engine was not inspected or documented for trial.

The defendant's expert Brad Schoenwald conducted an investigation into the cause of the loss.   Mr. Schoenwald learned the ANZHELA EXPLORER's starboard engine had suffered an overheat condition two weeks before her sinking. (Schoenwald trial testimony, 2/2/09, pages 93, 94, 96, 97)  This event would predate the insurance policy as well as the last voyage.  There were no records documenting repairs of the engine overheat, the only evidence on an overheat supports the conclusion that it occurred prior to March 24th.

Inasmuch as the only temporal evidence of an overheat occurred prior to the policy, the hole in the exhaust hose predated coverage (assuming overheat was the cause of the hole).  The crew was unaware of any evidence or malfunction on the night of the sinking.

The second theory explaining the existence of a hole in the exhaust hose is vibration.  Ian Cairns explained the hole appeared to be caused by vibration. (Cairns Trial Testimony, 1/29/09, page 167)  As neither party to this litigation had the hose tested by a forensic materials laboratory, there is no scientific analysis regarding the mechanism of the exhaust failure.  Mr. Cairns explained damaged propellers would cause vibration. (Cairns Trial Testimony 1/29/09, pages 31, 99, 125-129)  The propeller

damage observed by Mr. Cairns was rotational damage meaning the propellers were under power at the time.  The damage further indicated bi-directional force resulting from putting the gears in forward and reverse that is typical when a Captain is attempting to extract a boat from a strand.  (Cairns Trial Testimony 1/29/09, pages 24-30)   The evidence documents the propellers of the ANZHELA EXPLORER were damaged prior to the final trip.  This damage was acknowledged by Mr. Rosandich.  Captain Eymard said that Rosandich told him about the damage that resulted from the pre-voyage groundings.  (Eymard Trial Testimony, 1/27/09, pages 59-61) Mr. Rosandich was aware of the fact the damage resulted in vibration while the boat was operating.  (Eymard Trial Testimony, 1/27/09, pages 60, 61) Captain Eymard was told Mr. Rosandich was taking new propeller to Fort Myers where there would be installed before the ANZHELA EXPLORER crossed the Gulf of Mexico on its way to Golden Meadows, La.  (Eymard Trial Testimony, 1/27/09, pages 26, 63) The Captain also reports a phone call with Mr. Dorsey regarding replacement of the propeller. (Eymard Trial Testimony, 1/27/09, pages 26, 27)

Captain Eymard experienced the vibration himself. (Eymard Trial Testimony, 1/27/09, pages 27-29)   In his recorded statement taken days after the sinking, he reported a serious vibration while underway resulting from propeller damaged that resulted from the Rosandich groundings prior to the March 24th trip.  In his statement the Captain attributed the hole in the exhaust hose to the vibration.

Whether the hole was caused by either overheating of the starboard engine or vibration, the cause of both occurred prior to the inception of the State National Insurance policy and the March 23rd trip.

Watertight Bulkheads/Compartments

It is an established fact the ANZHELA EXPLORER sank at sea early March 26th. This fact alone requires water to have entered the ANZHELA EXPLORER in sufficient

quantity to cause it to sink.  The ANZHELA EXPLORER has two hulls.  Each hull had five watertight compartments.  The vessel's stability book documents that the flooding of any one compartment would not result in the boat sinking.  The engine compartment where the exhaust hose was located comprised only one watertight compartment.  Even if this compartment completely filled with water, it would not cause the ANZHELA EXPLORER to sink.

Naval architect Drew Hains created a mathematical model of the ANZHELA EXPLORER using the formulas and measurements in the vessel's stability book and visual observation of the hull.  These figures were used to calculate the ability of the ANZHELA EXPLORER to remain afloat with various compartments flooded.  Mr. Hains used the same program in use by the UNITED STATES COAST GUARD to certify commercial vessels.

The computer flotation program documents the ANZHELA EXPLORER could withstand flooding of the three aft watertight compartments on the starboard side and still remain afloat.  The engine room would be the middle of the three aft watertight compartments.  Therefore, there is no reason for the ANZHELA EXPLORER to have sunk assuming the hole in the exhaust was the sole source of flooding and the watertight bulkheads separating the watertight compartments were in fact watertight.

The computer model and the formulas in the ANZHELA EXPLORER's stability book further documents that flooding of both the port and starboard engine rooms would not have resulted in the ANZHELA EXPLORER sinking.  Flooding of both engine compartments would cause the stern to sink only a couple feet.  Similarly the flooding of the starboard engine room would result in the ANZHELA EXPLORER sink only 1.5 feet below her normal draft to draw a total of 7 feet.  (Hains & Windsor) The decks would still be well above the waterline.  The Captain testified the ANZHELA EXPLORER was anchored in 28 feet of water at the time of the sinking.  Seas were running 4 to 6 feet at

the time. Thus the ANZHELA EXPLORER did not impact the bottom of the ocean due to wave action or flooding of a couple compartments. The winds that night were approximately 15 knots.

After the ANZHELA EXPLORER sank, it was reported that she came to rest flat on the bottom of the Atlantic Ocean with no residual flotation keeping the bows or any other part of the hull off the bottom. It is evident that water communicated through the watertight bulkhead causing all of the five watertight compartments to flood. The ANZHELA EXPLORER would not have sunk had the watertight bulkheads prevented the free flow of water between the compartments. Naval Architect Drew Hains concluded that none of the watertight bulkheads were watertight as evidenced by the description of the sinking. The repairs required by the UNITED STATES COAST GUARD were not made prior to sailing. Hains concluded the vessel sank because of free communication of water into the various watertight compartments. Sea Tow Captain Tim Morgan agreed with the analysis stating there must have been a failure of the watertight compartments. Otherwise, the vessel would not have sunk.

Pumps/De-Watering Ability

The UNITED STATES COAST GUARD requires the ANZHELA EXPLORER to have in each hull two 50 gallon per minute fixed bilge pump each powered by an independent source. The ANZHELA EXPLORER was equipped with a bilge manifold that would permit the dewatering of the individual watertight compartments through the use of a single pump. The manifold permits the suction of the main bilge pump to be diverted to the various wt compartments.

The ANZHELA EXPLORER departed on March 24th without her main bilge pump. The main bilge pump was designed to be attached to the bilge manifold. The pump was removed by Yves Jasmin an electrician because it did not work. Mr. Jasmin did not fix the pump motor or reinstall the pump. The vessel's manager, Mr. Rosandich said the

boat sailed without the pump.  (Rosandich Trial Testimony, 1/22/09, pages 76, 77) He was taking the pump to Fort Myers where it was intended to install it before completely the voyage.  Both the Captain and the Engineer remarked in their recorded statements taken contemporaneously with the sinking that the main starboard bilge pump was not on the boat when it set sail.   In fact, Captain Morgan testified that Rosandich approached him at the time the vessel was raised to advise Sea Tow would not find a pump in the starboard hull.  Rosandich requested Captain Morgan not reveal this fact to the insurance company because the insurer would then likely deny the claim.

The absence of the main starboard bilge pump was a significant factor in the sinking of the ANZHELA EXPLORER.  According to Mr. Hains if the fixed starboard bilge pump was installed, the vessel would not have sunk as a 50 gallon per minute pump would have kept up with the flooding given the size and location of the exhaust hose hole.

Instead of the fixed bilge pump, the ANZHELA EXPLORER was equipped with three or four portable submersible electric pumps.  These pumps required 110 volt alternating current for power.  Water was discharge through a garden hose attached to the pump.  The record does not clearly reflect how many portable submersible pumps were used that night.  There is no question at least one pump failed.

In order to use the pumps, it was necessary to run extension cords into the starboard engine room from outside the compartment.  The extension cords entered through the engine room hatch. The hatch was designed to be watertight.   The discharge hoses exited the engine room through the hatch. The electrical power cords and the hoses to discharge water required the watertight hatch to remain open. (Scibetta Trial Testimony, 1/27/09, Pages 209, 212)

The crew testified water entered into the starboard engine room causing it to flood. (Scibetta Trial Testimony, 1/27/09 pages 171, 212)

The port engine room hatch was also left open. (Scibetta Trial Testimony, 1/27/09, pages 205, 206) Some of the extension cords power the portable pumps were plugged into the port engine room.  This also required the watertight hatch on the port engine room to remain open. (Scibetta Trial Testimony, 1/27/09, page 209) Mate Scibetta observed waves breaking on the rear deck that entered the port engine room causing it to flood. Had the port hatch been closed the mate said it would have made a difference (Scibetta Trial Testimony, 1/27/09, page 208)

As a direct result of using portable pumps rather than the missing fixed starboard main bilge pump, the engine room hatch stayed open causing sea water to enter in significant quantities.  This was a primarily cause of the sinking.  Had the boat been properly equipped with main bilge pump attached to the starboard bilge pump manifold, the situation would not have required the engine room hatches to remain open permitting flooding.  Even though sea water entered both port and starboard engines rooms, flooding of these compartments alone could not caused the ANZHELA EXPLORER to sink.  Water freely communicated through penetrations in the watertight bulkheads after water entered into the respective engine room in order to cause the ANZHELA EXPLORER to lose flotation.

Crew Competency

Rosandich had issues with the competency of the crew. (Rosandich Trial Testimony 1/22/09, page 77)  The crew for the voyage between Miami and Golden Meadows, La. was provided by Fish Offshore.  Fish Offshore intended upon operating the ANZHELA EXPLORER once repairs had been completed and a COI issued by the UNITED STATES COAST GUARD.  Mr. Dorsey, himself a Captain, interviewed Captain Eymard and found his credentials acceptable.  Rosandich also reviewed the Captain's credential prior to hiring.  (Rosandich Trial Testimony 1/22/09, page 117) Captain Eymard arrived in Fort Lauderdale the day before departure.

In addition to the Captain, the ANZHELA EXPLORER had two additional crew. These two members of the crew arrived several weeks before the ANZHELA EXPLORER departed for Golden Meadows.   Neither crew had licenses or STCW certifications. The credential or lack thereof were not reviewed by Rosandich (Rosandich Trial Testimony, 1/22/09, page 118) The deck hand, Steven Scibetta, had worked on boats, sometimes working as an unlicensed engineer.   Mr. Scibetta was known to Captain Eymard but not to Dorsey or Rosandich.

David Killingsworth was an unlicensed engineer. He assisted with preparing the ANZHELA EXPLORER for departure.   Killingsworth and Scibetta were on board the ANZHELA EXPLORER during her shakedown cruise prior to the inception of the State National Insurance Company policy.   Mark Rosandich acted as captain during the shakedown voyage.  In was during the shakedown cruise that the vessel repeatedly ran aground and sustained the starboard engine overheat.  During this period of time Mark Rosandich had an opportunity to observe the deck hand and the engineer. (Rosandich Trial Testimony, 1/22/09, pages 130, 131)

Rosandich was not satisfied with the engineer's performance.   The vessel's manager contacted Val Galijour of Fish Offshore requesting removal and replacement of the engineer.   Despite his misgivings, Rosandich allowed the Captain to make the decision to keep Killingsworth on the boat.  (Rosandich Trial Testimony, 1/22/09, pages 130-132)   Dorsey overruled Rosandich's request to remove Killingsworth as the engineer labeling the conflict as a personality conflict.  This decision proved fatal to the vessel.  In hindsight Dorsey now recognizes the engineer was incompetent (Dorsey Trial Testimony, 1/28/09, page 40) and would never allow the engineer near a row boat. (Dorsey Trial Testimony, 1/28/09, page 44)

After the sinking Rosandich wrote Fish Offshore complaining about the crew and the fact Fish Offshore did not remove Killingsworth when requested. (Plaintiff Exhibit 187) In the same letter the vessel's manager complains the "your captain sailed with full knowledge of a pump that was not on line." Rosandich blames the sinking on the crew sleeping in the April 2, 2007 email asserting "this vessel would not have sunk if I was on board!" This sentiment was repeated by Dorsey, and the other witness retained by the insured.

Malcolm Elliott, the insured's surveying expert conceded the crew was incompetent to react to an emergency. He credits the crew with the ability to navigate the boat, but the crew was not competent to address the ingress of water into the hulls. (Elliott Trial Testimony, 2/10/09, page 130) The crew was incompetent in selecting the anchoring location, reaction for water ingress and lack of action for reporting, (Elliott Trial Testimony, 2/10/09, page 130) In fact Elliott a licensed marine engineer declared the crew should be stripped of their licenses and that he would never sail with any of them. (Elliott Trial Testimony, 2/10/09, pages 131-132)

The crew also failed to discover an overheat on the night of the sinking, if there overheat occurred at that time. The crew identified a problem with the steering system requiring the ANZHELA EXPLORER to anchor in the ocean rather than proceed to port. No expert witness for either party could find anything wrong with the vessel's steering system. Not only did the crew fail to identify the source of flooding and contain it, there are allegations that all of them went to sleep.

The actions of the crew leaving port without the main starboard bilge pump operative continuing to making the first radio call for assistance 10 minutes before the boat sank is not a transitory instance of incompetency. The failures of the crew were many and pervasive. The owner knew the engineer was a key member of the crew

(Dorsey Trial Testimony, 1/28/09, page 44) and had doubts about his competency yet let him remain as a member of the crew.

The crew was not competent to handle the situation of the ANZHELA EXPLORER taking on water.  The crew did not determine the source of the inflow, nor properly stem the flow.  The crew did not even recognize or appreciate the situation. Instead of calling for assistance from either the UNITED STATES COAST GUARD or a marine quick response organization such as Sea Tow the crew slept.

### Counterclaim of ANZHELA EXPLORER, LLC. for Spoliation and Conversion

Mark Rosandich signed a Salvage Contract with Sea Tow on the morning of the sinking.  (Plaintiff Exhibit 87)  At the time of formation of the contract, no representative of State National Insurance Company was present.  Services were performed on a Per Diem/Hourly basis according to a Rate Schedule attached to the Salvage Contract. Mark Rosandich initialed the Rate Schedule signifying his acceptance.

Sea Tow began performing under the Salvage Contract.  Due to inclement weather conditions, it was not possible to raise the boat immediately.  The vessel's superstructure remained above the surface of the water because the boat sank in 28' of water.  The waves impacted the portion of the superstructure that remained above the sea.  This resulted in the destruction of the superstructure.  The twin hulls remained intact underwater.

Pieces of the superstructure and the contents of the deck house were strewn about the beach and the bottom of the ocean.  The UNITED STATES COAST GUARD and environmental authorities demanded immediate removal of the vessel and debris. The day after the sinking Mr. Dorsey signed a Notice of Tender of Abandonment to Harold Heno, a claims representative initially assigned to the claim.  (Defendant Exhibit 29)  The insurance company rejected the tender reserving its rights.  Shortly thereafter,

Dorsey was advised to proceed as a reasonably prudent uninsured until coverage could be determined.

Surveyor Ian Cairns became involved on March 27th. After learning the superstructure washed away he recognized that the vessel was a constructive total loss. The nature of the salvage operation changed from salvage to wreck removal at that time. Mr. Cairns was also concerned with the expenses being incurred under the time and material contract with Sea Tow.  He recommended termination of the Sea Tow Salvage contract.  This recommendation was made to the owner and the underwriters.

A couple days later it was decided by State National Insurance Company to pay for wreck removal under a full reservation of rights.  This decision was made in order to reduce the ultimate exposure.   UNITED STATES COAST GUARD and environmental authorities were calling on an hourly basis demanding the vessel be removed from the reef.  If action was not immediately taken the UNITED STATES COAST GUARD would federalize the project.  This would have resulted in a tripling of the expense over a commercial salvor. (Cairns Trial Testimony, 1/29/09, page10)

Mr. Cairns sought competitive bids to raise the hull on a fixed price "no cure-no pay" basis. Three bids were received.  Titan Maritime bid $575,000, Lorado Construction bid $595,000 and Resolve Marine Group bid $475,000.  These bids were considered too high.   A recommendation was made to the owner and underwriters to re-bid the contracts.

On the second bid, Titan bid $425,000, Lorado bid $425,000 and Resolve resubmitted their original bid of $475,000.  Sea Tow bid independently for $379,000. Included in the bid price was an agreement to reduce the time and material Salvage invoice by 20%.  This reduction would net a saving of $58,000.

The Sea Tow fixed price contract contained a contingency that permitted Sea Tow to retain and dispose of the superstructure and/or scrap aluminum not attached to

the vessel's hull with no offset to bid price or for monies received for scrap value of aluminum.  A copy of the proposed contract was sent to Mark Rosandich for approval. (Plaintiff Exhibit 188a) The Salvage Proposal and bid contained the scrap contingency. (Plaintiff Exhibit 89) Mr. Rosandich did not object to the terms other than the price was too high acknowledging that it was the lowest bid.  (Cairns Trial Testimony, 1/29/09, pages 14-15) Captain Morgan testified that he kept Mr. Rosandich informed of the bid and terms.  Mr. Rosandich did not complain or object to any of the terms of the proposal.

Sea Tow raised the remains of the ANZHELA EXPLORER according to the terms of the proposal. Rosandich claimed that he was not kept apprised of the location of the salvage, Sea Tow vigorously contested this assertion.  Captain Morgan was never aware of an issue and his wife Lisa responded via email that she had kept Rosandich advised of the location of the debris but he declined an opportunity to inspect. (Plaintiff Exhibit 91)

There is no question that the retention of the debris by Sea Tow was authorized by the Contract in consideration for a reduced bid and in exchange for a 20% reduction of the original salvage invoice.  The issue of conversion as alleged by the insured is further resolved by Mr. Dorsey executing a Redelivery Statement on April 16th.  (Plaintiff Exhibit 105) By signing the Redelivery Statement, Mr. Dorsey relinquished his claim related to the raising and towage of the ANZHELA EXPLORER.  He did not preserve any claim of property not returned by Sea Tow.

The insured has failed to prove State National Insurance Company intentionally destroyed evidence or negligently failed to retain it as alleged in Count VI of the Counterclaim.  There is no evidence State National or its agents converted any item. The scrap as depicted in the photographs had no commercial value.  Sea Tow gave the scrap away as the disposal costs approached the scrap value.  At all times, Sea Tow was acting within its contractual authority to dispose of the scrap without objection from

ANZHELA EXPLORER, LLC.  Plaintiff did not introduce any evidence that Sea Tow kept any property of the ANZHELA EXPLORER not classed as scrap.

Sea Tow was paid for its services under the original salvage agreement executed by Rosandich and the second fixed price March 30th Salvage Contract by State National Insurance Company under a reservation of rights.  Sea Tow was paid $234,421.50 (Plaintiff Exhibit 59) for the time and material Salvage Contract and $379,000 (Plaintiff Exhibit 58) under the fixed price contract.  The total paid by State National under reservation of rights was $613,421.50.

**Claim of State National for Reimbursement of Costs to Mark and Remove Wreck**

The insured did not present evidence to contest the charges arising from the March 26th Salvage contract.  To the contrary Mark Rosandich approved the charges. (Plaintiff Exhibit 99).  The second salvage contract was a fixed price contract in which Sea Tow was the low bidder.  Therefore, the charges of Sea Tow were agreed.  The raising of the vessel was necessary as it was performed under governmental compulsion.

State National Insurance Company is entitled to return of the funds it advanced to ANZHELA EXPLORER, LLC in absence of coverage.

The insured received the return of the hulls.  The hulls were sold to an independent buyer for $30,000.

## CONCLUSIONS OF LAW

The Court has Admiralty subject matter jurisdiction pursuant to, 28 U.S.C. § 1333, and brought pursuant to Rule 9(h) of the Federal Rules of Civil Procedure and Supplemental Rules Governing Admiralty and Maritime Claims.

### *UBERRIMAE FIDE- UTMOST GOOD FAITH*

It is well settled that the marine insurance doctrine of *uberrimae fidei* (utmost good faith) is the controlling law of this circuit. *See Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir.1984).    *Uberrimae fidei* requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk. *HIH Marine Services, Inc. v. Fraser*, 211F.3d 1359, 1362 (11th Cir. 2000) (citations omitted); *see also* G. Gilmore & C. Black, *The Law of Admiralty* 62 (2d ed. 1975) ("[T]he highest degree of good faith is exacted of those entering [a marine insurance contract], for the underwriter often has no practicable means of checking on either the accuracy or the sufficiency of the facts furnished him by the assured before the risk is accepted and the premium and conditions set.").

The seminal federal case on the doctrine of *uberrimae fidei* is *Gulfstream Cargo, Ltd. v. Reliance Insurance Co.,* 409 F.2d 974 (5th Cir. 1969), in which the United States Court of Appeals for the Fifth Circuit stated that "[n]othing is better established in the law of marine insurance than that a mistake or commission material to a marine risk, whether it be willful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy." *Id.,* at 980.[1]

The duty to disclose extends to those material facts not directly inquired into by the insurer. *HIH Marine Services*, 211 F.3d at 1362 (citations omitted). Under *uberrimae fidei*, a material misrepresentation on an application for marine insurance is grounds for voiding the policy. *Id.* at 1363; *see also Steelmet*, 747F.2d at 695 (stating that the failure to disclose a material fact, whether "from mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void" (quoting *Fireman's Fund Ins. Co. v. Wilburn Boat Co.*, 300 F.2d 631, 646 (5th Cir.1962))).

---

[1] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

A misrepresentation is material if it might have a bearing on the risk to be assumed by the insurer. *HIH Marine Services*, 211 F.3d at 1363.

The "clear rule of maritime law" recognizes that it is the insured and his agent who are in the best position to know and report on any facts or circumstances which materially affect the risk being considered for insurance.   The standard for disclosure is an objective one, that is, whether a reasonable person in the insured's position would know that the particular fact is material. *Btesh v. Royal Ins. Co.*, 49 F.2d 720, 721 (2d Cir. 1931).

An insurer may void the policy even if the failure to disclose material facts was the result of actions by a person acting "on behalf of" the actual insured. *See e.g., Royal Insurance Co. of America v. Cathy Daniels, Ltd.,* 684 F. Supp. 786 (S.D.N.Y. 1986), holding that a marine insurance broker's failure to disclose material facts will result in coverage being voided for the insured, and that the latter would then have a cause of action against that broker for its breach of duty to the insured.

 USI was the agent of the insured Anzhela Explorer LLC. USI was not the agent of State National. State National is entitled to rely upon the representations made by and applications submitted by the insured's agent. *Dreiling v. Maciuszek,* 1992 A.M.C. 2482, 2488.(N.D. Ill. 1991)

State National is not liable for USI's misstatements of fact or erroneous preparation of the application. *Underwriters at Lloyd's v. Giroire* 1998 A.M.C. 2153 (S.D. Fla. 1998. Any misstatement made by USI is binding on Anzhela Explorer LLC and acts to the detriment of Anzhela Explorer not State National. *See, Dreiling v. Maciuszek,* 1992 A.M.C. 2482, 2488.(N.D. Ill. 1991) (in marine insurance, the broker acts as agent for the insured, not the insurer, thus boat owner is charged with knowledge that his broker possessed but failed to communicate to the insurer). *Underwriters at Lloyd's v. Giroire* 1998 A.M.C. 2153 (S.D. Fla. 1998) at 2161-62. See also: *Colip v. Clare*, 26 F.3d

712 (7th Cir. 1994) holding that the insurance broker's acts and knowledge are attributable to the insured; *Dickson Welding, Inc. v. Alexander & Alexander, Inc.,* 957 F.2d 1281 (5th Cir. 1992), cert. den. 506 U.S. 864 (1992); *Western World Insurance Co. v. Stack Oil, Inc.,* 922 F.2d 118 (2d Cir. 1990); *Liberty Mutual Ins. Co. v. York Hunter, Inc.,* 945 F. Supp. 742 (S.D.N.Y. 1996); *Dreiling v. Maciuszek*, 1992 A.M.C. 2482 (N.D. Ill. 1991)

A fact is material if it is "something which would have controlled the underwriter's decision" to accept the risk. *Id.* The insured's failure to meet the standard of uberrimae fidei, entitles the underwriter to void the policy *ab initio. Puritan Ins. Co.,* 779 F.2d at 870-71. Cited at *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, at 13 (2d Cir. 1986).

A misrepresentation on an application is  "material" where it is shown to have influenced the marine underwriter in arriving at or in fixing the premium to be charged. *See, West Africa Trading & Ship. Vo. V. London Int'l Group*, 1996 A.M.C. 1905 (D. N.J. 1996); *Crowley Marine Sevices v. Paul Hunt et al*, 1995 A.M.C. 2562 (W.D. Wash. 1995) where the court stated that "[a] fact is material if it would influence the judgment of a reasonable insurer in fixing the premium." *Id.*, at 2562; *Jackson v. Leeds Diamond Corp,* 767 F. Supp. 268 (S.D. Fla. 1991).

The misrepresentation as to the vessel possessing a current Certificate of Inspection was material to the acceptance of the risk as the underwriter would not have written the policy without the vessel having a certificate of inspection.

The misrepresentation as to the intended navigation and use of the vessel was material as it directly affected the premium charged for the policy. The premium for Atlantic navigation was greater than that for Gulf of Mexico navigation.

Applying the doctrine of *uberrimae fidei* to the facts of this case, the Court finds Defendant Anzhela Explorer LLC or its agents at USI made misrepresentations as to the existence of a current Certificate of Inspection and the Navigation Limits for the vessel. These representations were material to the issuance of the policy.

But for the representation as to the current Certificate of Inspection, WFT would not have issued the policy.

The representations contained in the application as to the requested Navigation Limits affected the premium charged for the coverage and were therefore material to the issuance of the policy.

These material misrepresentations are a violation of the doctrine of *uberrimae fidei* which void the policy ab initio.

### POLICY EXCLUSIONS RE FINES PENALTITES AND POLLUTION

The Policy expressly excludes coverage for losses of any kind or nature arising our of " the actual or potential discharge, emission , spillage or leakage upon or into the seas, waters, land or air, or oil , petroleum products, chemicals or other substances of any kind or nature whatsoever.

The policy also excludes coverage for "liability imposed on the Assured(s) as fines, penalties, punitive or exemplary damages".

Florida courts enforce insurance contracts in accordance with their plain language. See *Rose v. M/ V 'Gulf Stream Falcon,'* 186 F.3d 1345, 1350(11th dr. 1999); *see also Am. Med. Int'l, Inc. v. Scheller*, 462 So. 2d 1, 7 (Fla. 4th DCA 1984) (stating that where a contract is clear and unambiguous, its meaning and legal effect are questions of law for determination by the court alone).

Plain and unambiguous policy provisions allow no room for interpretation and must be applied by the Court. *Morrison Assurance Co. v. School Bd. of Suwannee County*, 414 So.2d 581 (Fla. 1st DCA 1982).  In this matter the Court finds, the plain and

unambiguous language of the policy exclusion precludes coverage for losses for pollution or fines and penalties. The policy language should be given its effect and coverage is not available under the policy for such losses.

*BREACH OF NAVIGATIONAL WARRANTY*

The policy of insurance issued by State National contains an express navigational warranty for the use and operation of the vessel. Federal admiralty law applies to navigational limit warranties in marine insurance contracts. The Navigational Limit Warranty provides:

> "Warranted confined to the use and navigation of the Gulf
> of Mexico, not to exceed 100 miles offshore"

There exist judicially established Federal rules as to the interpretation of navigation warranties in marine insurance policies which govern this claim. "[F]ederal courts, including the Eleventh Circuit, construe warranties such as the navigational limitation narrowly, holding that the breach of such a warranty will release the insurance company from liability. *See Lexington Ins. Co. v. Cooke's Seafood,* 835 F.2d 1364, 1366 (11th Cir.1988) ("Lexington correctly notes that admiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss." (citations omitted)).*La Reunion Francais v Christy*, 122 F.Supp.2d 1325, 1332 (M.D. Fla. 1999).

Application of federal construction principles requires that the navigation warranty be strictly construed against the insured and breach of such a warranty precludes coverage whether the breach increased the hazard of loss or not.

"It is well established that where a vessel ventures voluntarily outside of the navigational limits specified in a hull policy, and sinks or is otherwise destroyed while outside the mentioned limits, the insurer is relieved from liability for the loss of the

vessel". *United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832 (11th Cir.1984), *cert. denied* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402; *Robinson v. Home Ins. Co.,* 73 F.2d 3 (5th Cir.1934); *Canton Ins. Office v. Indep. Transp. Co.,* 217 F. 213 (9th Cir.1914); *R & W Boat Rentals v. Pennsylvania Ins. Co.,* 1972 A.M.C. 1783 (Ct.App.La.1972); *Vizzini v. Ins. Co. of North America,* 260 Md. 626, 273 A.2d 137 (1971); *Rosenberg v. Maritime Ins. Co.,* 1968 A.M.C. 1609, 212 So.2d 45 (Ct.App.Fla.1968); *Rosenbauer v. Standard Ins. Co.,* 1949 A.M.C. 716 (Cir.Ct.Fla.1949) *See also, Port Lynch, Inc. v. New England International Assurety of America, Inc.*, 754 F.Supp. 816, 823 (W.D.Wash.1991) *(citations omitted); see also Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 *(11th Cir.1988).*

Under Federal Law "a breach of an express trading or navigational warranty releases the insurance company from liability even if compliance with the warranty would not have avoided the loss.*" Port Lynch v. New England Int'l Assurety of America, Inc.,* 754 F.Supp. 816, 823 (W.D.Wash.1991) cited with approval in *Aetna Ins. Co. v. Dudney* 595 So.2d 238, 239 (4th DCA,1992).

The Court finds the Navigation Warranty is a material provision of the insurance policy which should be strictly construed, and breach of this warranty results in suspension of coverage for the period of time the vessel remains outside the agreed upon limits, thereby precluding coverage for the subject incident.

*Held Covered Provision*

Although the policy contains a Held Covered provision, it does not obviate the navigational warranty or increase coverage in this situation.   The held covered provisions of the State National policy provides:

> The Vessel is held covered in case of any breach of conditions as to cargo, trade, locality, towage or salvage activities, or date of sailing, or loading or discharging cargo at sea, provided (a) notice is give to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b) any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured.

The Held Covered provisions of a policy are designed to provide coverage for an unintentional inadvertent unavoidable situation where, to preserve life or under other extreme exigency, the vessel is required to deviate from its navigational limits or trading warranty. *Campbell v. Hartford Fire Ins. Co.,* 533F.2d 496 (9th Cir.1976); *Hilton Oil Transport V. T.E. Jonas,*75 F.3d 627 ( 11th Cir 1996)

A "held covered clause 'is intended to protect the assured from a particular hazard, namely, that, despite his best efforts to the contrary, he or his crew failed to comply with the terms of a warranty.'" *Campbell v. Hartford Fire Ins. Co.*, 1976 AMC 799, 1976 AMC 801 , 533 F.2d 496, 1976 AMC 497 -, 1976 AMC 98 n., n.1 (9 Cir. 1976)(citing Long "Held-Covered" Clauses in Marine Insurance Policies, 24 Ins. Council J.401, 404-06 (1957))." *International Ship Repair and Marine Services, Inc. v. St. PaulFire and Marine Ins. Co.*,944 F Supp 886, 1997 A.M.C. 1419, 1430 (M.D.Fla 1996)

A "held covered" clause can provide coverage when a breach of a navigational warranty occurs, "but only if the breach was not willfull." *Fenby v. M/V Three D of Guernsey* 217 Fed.Appx. 846,849 (C.A.11 (Fla.), 2007)

When the breach of the navigational warranty is willful or intentional the held coverage will not provide coverage for the breach.  *Fenby v. M/V Three D of Guernsey*, 2007 WL 328810, 1 (11th Cir. 2007) (holding held-covered provision did not apply in breach of warranty due to intentional sailing of vessel beyond navigational limits).

The breach of the policies navigational warranty by Anzhela Explorer was willful and intentional. The breach was not accidental. The held covered provision of the policy therefore does not apply.

### UNSEAWORTHINESS

Under General Maritime Law the term 'seaworthiness' implies a vessel which is not only staunch and strong and suitable in every respect for the voyage, but also a crew which is adequate in number and competent to meet all of the exigencies of the intended voyage. *Yates v. Dann* 11 F.R.D. 386, 392 (D.Del.1951). "[T]he concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question." *Mosley v. Cia. Mar. Adra, S.A.,* 314 F.2d 223, 227 (2d Cir.1963);. *Barlas v. U.S.* 279 F.Supp.2d 201, 206 (S.D.N.Y.,2003)

A seaworthy "vessel must, in general, be sufficiently strong and staunch and equipped with appropriate appurtenances to allow it to safely engage in trade for which it was intended. *Black's Law Dictionary* 1350 (6th ed.1990). Under federal maritime law, '[t]he general test of seaworthiness is whether the vessel is reasonably fit to perform the service which she has undertaken to perform.'" 70 Am.Jur.2d *Shipping* § 12 (1973); *see also Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 103 (1944) (vessel is unseaworthy if it or its appurtenances are inadequate for the purposes they are ordinarily used); *Mills v. Mitsubishi Shipping Co.,* 358 F.2d 609, 613 (5th Cir.1966) (explaining that classic definition of seaworthiness in marine insurance is whether vessel is reasonably suitable for purposes intended), *cert. denied,* 386 U.S. 1036 (1967). *Indemnity, Casualty, and Property, Ltd. v. R.K. Watersports, Ltd.* 1996 WL 311460, 2 (E.D.Pa.) (E.D.Pa.,1996)

Unseaworthiness can result from improper maintenance of equipment and inadequate training of those on board. *Rogers v. Lilly* 2006 WL 3342621, 7 (N.D.Ohio) (N.D.Ohio,2006) citing *In re: Complaint of Hercules Carriers,* Inc., 768 F.2d 1558, 1566 (11th Cir.1985).

The use of "defective or inadequate equipment or gear not reasonably suited for the purposes for which it is used may render a vessel unseaworthy". *Martinez v. Dixie Carriers, Inc.* 529 F.2d 457, 467 (C.A.Tex. 1976) *citing, Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499, 91 S.Ct. 514, 517-18, 27 L.Ed.2d 562, 567 (1971); *Law v. Sea Drilling Corp.*, 5 Cir., 1975, 510 F.2d 242, 248; *Grigsby v. Coastal Marine Service of Texas, Inc.*, 5 Cir., 1969, 412 F.2d 1011, 1031-32, cert. denied, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

A "vessel is rendered "unseaworthy" if either its appurtenances or its crew members are not reasonably fit for their intended use or service. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549 (1960) " *Indemnity, Casualty, and Property, Ltd. v. R.K. Watersports, Ltd.* 1996 WL 311460, 2 (E.D.Pa.) (E.D.Pa., 1996)

Vessels have been considered unseaworthy where a bilge alarm did not work,where it had uninsulated exhaust mufflers and stacks, sticking cable controls,  a broken pipe fitting; a lack of watertight integrity between the shaft alleys and engine room;  or inadequate  and  defective  bilge  pumps  and  no  bilge  alarm. *Nelsen v. Research Corp. of University of Hawaii* 805 F.Supp. 837, 851 (D.Hawaii, 1992) citing, *Lasseigne & Sons v. Bacon,* 1987 A.M.C. 2251, 2257, 1987 WL26610(D.Ore.1987).

The "lack of watertight integrity" of a vessels "hull and transverse bulkheads and compartments" have been found to render a the vessel  unseaworthy. *Ohio River Co.v. M/V Irene Chotin*  238 F.Supp. 114, 117 -118 (D.C.La. 1965).

The concept of seaworthiness extends not only to the vessel and its gear but also to its crew. *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); *Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); *Boudoin v. Lykes Bros. S. S. Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955).

"It is clearly the duty of a ship owner to not only provide a crew sufficient in number, *June T. Inc. v. King*, 290 F.2d 404 (5th Cir. 1961), but also a crew competent for the duties it may be called upon to perform, including provision for any exigency which is likely to be encountered. *Petition of United States*, 303 F.Supp. 1282 (E.D.N.C.1969) aff'd *Petition of United States & Marine Transport Lines, Inc.*, 432 F.2d 1357 (4th Cir. 1970); *Empire Seafoods, Inc. v. Anderson*, 398 F.2d 204 (5th Cir. 1968); *Admiral Towing v. Woolen*, 290 F.2d 641 (9th Cir. 1961)". *Lemar Towing Co., Inc. v. Fireman's Fund Ins. Co.* 352 F.Supp. 652, 661 (D.C.La., 1972).

That a vessel becomes unseaworthy where the crew fails to competently respond to an emergency situation is a longstanding principle of general maritime law. As was stated by Judge Hawley in Re Meyer (D.C.) 74 F. [881] 885, 'the duty of the owners of a steamer carrying goods and passengers, not only to provide a seaworthy vessel, but they must also provide the vessel with a crew adequate in number, and competent for their duty with reference to all the exigencies of the intended route'; not merely competent for the ordinary duties of an uneventful voyage, **but for any exigency that is likely to happen**". (emphasis added)

"There are two aspects to a vessel being properly manned: the crew must be adequate in number and must be competent. It is clearly the duty of a ship owner to not only provide a crew sufficient in number, *see, e.g., June T., Inc. v. King,* 290 F.2d 404 (5th Cir.1961), but also a crew competent for the duties it may be called upon to perform,

including provision for any exigency which is likely to be encountered. *See, e.g., Empire Seafoods, Inc. v. Anderson,* 398 F.2d 204, 210 (5th Cir.1968); *Admiral Towing v. Woolen,* 290 F.2d 641, 646 (9th Cir.1961)". *Acadia Ins. Co. v. Allied Marine Transport LLC* 151 F.Supp.2d 107, 118 (D.Me.,2001)

The conduct of an incompetent crew which results in a loss, can constitute unseaworthiness of the vessel. *Hercules Carriers, Inc. v. Claimant State of Fla., Dept. of Transp.* 768 F.2d 1558, 1577 (C.A.11 (Fla.),1985)

The evidence clearly established that the crew of the Anzhela Explorer was not competent to handle the emergency situation confronting them on March 26th. The failure of the crew to appreciate the situation and take corrective measures was the direct cause of the sinking. The inactions of the crew support a conclusion that they were not competent to address the issues presented on the evening of the sinking.

The Anzhela Explorer was unseaworthy. It was unseaworthy as a result of failing to maintain the watertight integrity of the bulkheads separating the watertight compartments and failure to have a proper operating main starboard bilge pump required by Untied States Coast Guard regulations.  It is obvious from the evidence that the Anzhela Explorer would not have sunk as a result of the water ingress from the exhaust hose had water been contained within the engine room compartment by a watertight bulkhead.  Similarly the failure to have the required fixed bilge pump installed and attached to the bilge manifold on the starboard hull was a cause of the sinking.  Had the pump be operative, it would have been capable to keep up with the intermittent inflow of water from the hole in the exhaust.  More significantly, had the main fixed pump been installed, it would not have been necessary to keep the watertight hatches to the port and starboard engine rooms open.  The use of portable pumps required open hatches to allow the discharge hoses and electrical connections to exit the respective engine rooms.  The open hatches permitted water to flood the engine rooms with large

quantifies of water.  The open hatches that allowed the free inflow of sea water rendered the vessel unseaworthy in addition to the free communication of water between the watertight bulkheads.

The lack of a competent crew also rendered the vessel unseaworthy.  The vessel's manager was aware the engineer was not competent prior to the voyage and recommended his removal.  The owner overruled the recommendation.  Even in absence of prior knowledge the owner owes a non-delegable duty to supply a competent crew.  The crew did not react appropriately to the situation and failed to take appropriate measure to prevent the casualty from occurring.  The pervasive unseaworthiness of the vessel and crew were breached of both the implied warranties of seaworthiness and the express warranty of seaworthiness contained in the policy.

### IMPLIED WARRANTIES OF SEAWORTHINESS

There are two implied warranties of seaworthiness in Federal Maritime Law, an absolute warranty of seaworthiness, which attaches at the inception of the policy and a negative modified warranty of seaworthiness, which applies after the policy attaches. *Employers Insurance of Wausau v. Occidental Petroleum Corp., et al,* 978 F.2d 1422, 1431-1440 (5th Cir. 1992) (providing additional analysis of its decision in *Saskatchewan Government Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385 (5th Cir. 1957)) The "warranty of seaworthiness is an absolute duty owed by a ship owner to its crew and, in this case, to its insurer, to provide 'a vessel and appurtenances reasonably fit for their intended use.' " *Underwriters at Lloyd's v. Labarca,* 260 F.3d 3, 7 (1st Cir.2001) (quoting *Mitchell v. Trawler Racer Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960)).

The implied warranty of seaworthiness means that the vessel is reasonably fit for the intended use. *Lloyd's U.S. Corp. v. S*mallwood, 719 F. Supp. 1540, 1549 (M.D. Fla., 1989); *see Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, (1960). *Breach of Absolute Warranty of Seaworthiness*

Federal maritime law implies an absolute warranty of seaworthiness into marine insurance policies and this warranty is breached if the vessel is in fact unseaworthy when the insurance policy becomes effective. *The Connecticut Indemnity Co. v. Palivoda,* No. 8:04-cv-1044-T-24MSS, 2005 AMC 2047, 2005 U.S. Dist. LEXIS 24511, *10-*12, (M.D. Fla. July 25, 2005).  This breach can occur regardless of the insured's knowledge or fault and results in the voiding of the policy. *Id.*; *Smallwood,* 719 F. Supp. At 1549; *Employers Insurance of Wausau v. Occidental Petroleum Corp., et al,* 978 F.2d 1422, 1436 (5th Cir. 1992).

A breach of the absolute warranty of seaworthiness absolutely avoids the policy and prevents it from becoming effective.  "It is enough to discharge the insurer…if 'the vessel is in fact not seaworthy' at the inception of the policy." *Employers Insurance of Wausau v. Occidental Petroleum Corp., et al,* 978 F.2d 1422, 1436 (5th Cir. 1992).

The Court finds that vessel Anzhela Explorer was unseaworthy at the inception of the policy until the date of loss. There is no evidence damage caused by the overheating of the starboard engine was repaired before the inception of the policy.  Further, the vessel set sail with damaged propellers that contributed to the loss.  More significantly the vessel did not posses a Certificate of Inspection from the United States Coast Guard. A COI is the standard of seaworthiness for the intended service of the vessel. The lack of the COI is evidence the vessel did not fulfill the seaworthiness requirements of the Coast Guard.  In particular the failure to seal the penetrations in the watertight bulkhead and make the vessel's bilge pump system compliant were causative of the loss. The vessel never became seaworthy during the dates of the policy, rendering the policy void at the time of the loss.

*Breach of Negative, Modified Warranty of Seaworthiness*

The other implied warranty of seaworthiness, the negative modified warranty, establishes that "the Owner, from bad faith or neglect, will not knowingly permit the

vessel to break ground in an unseaworthy condition." *Smallwood*, 719 F. Supp. At 1549 (*quoting Spot Pack, Inc.*, 242 F.2d at 388).

The implied negative warranty of seaworthiness is an ongoing promise that the insured will not "knowingly send a vessel to sea in an unseaworthy condition." *Employers Ins. of Wausau v. Occidental Petrol. Corp.*, 978 F.2d 1422, 1432 (5th Cir.1992*)*. The negative warranty is therefore implied each time a vessel leaves "the safety of a port for the open sea." *Royal Indem. Co. v. Deep Sea Intern.* 2007 WL 2059826, 8 (S.D.N.Y.) (S.D.N.Y.,2007)

A breach of the negative modified warranty of seaworthiness results in the denial of liability for a loss proximately caused by the unseaworthiness. *Id; see Employers Insurance of Wausau v. Occidental Petroleum Corp., et al,* 978 F.2d 1422, 1434 (5th Cir. 1992).

The vessel's manager knew the fixed main starboard bilge pump was not installed when the Anzhela Explorer departed on March 24th.   He intended upon delivering the pump to the vessel when it arrived in Fort Myers.  The vessel never arrive because of the absence of the fixed pump that was not attached to the starboard bilge manifold.   The manager also knew there was propeller damage existing at the commencement of the trip.  It was the intention of the manager to replace the propellers when the vessel arrived at Fort Myers.  Both the manager and owner knew the vessel was non-compliant with the USCG COI requirements but let the vessel sail nevertheless. Both the manager and the owner were aware of the crew competency issue regarding the engineer prior to the voyage.  The engineer is a very important member of the crew and was directly involved with the events that resulted in the vessel's sinking. The owner and manager turned a blind eye to the unseaworthy conditions.

*Breach of Express Warranty of Seaworthiness.*

In addition to the two Implied Warranties of Seaworthiness the policy contains an Express Warranty of Seaworthiness which provides:

SEAWORTHY CLAUSE

> Warranted that at the inception of this Policy the Vessel(s) shall be in a seaworthy condition and, thereafter, during the currency of the Policy, the Assured shall exercise due diligence to keep the Vessel(s) seaworthy, and in all regards, fit, tight, and properly manned, equipped and supplied.

As noted above courts enforce insurance contracts in accordance with their plain language. See *Rose v. M/ V 'Gulf Stream Falcon,'* 186 F.3d 1345, 1350(11th dr. 1999); *see also Am. Med. Int'l, Inc. v. Scheller*, 462 So. 2d 1, 7 (Fla. 4th DCA 1984) (stating that where a contract is clear and unambiguous, its meaning and legal effect are questions of law for determination by the court alone). The express warranty clearly requires the vessel to be seaworthy at the inception of the policy.  The warranty further imposes upon the owner of the vessel the affirmative obligation to use due diligence to keep it seaworthy and to keep the vessel fit, tight, properly manned, equipped and supplied.

The breach of a seaworthiness warranty precludes recovery under an insurance policy, regardless of whether the breach caused the loss. *Thanh Long P'ship v. Highlands Ins. Co.,* 32 F.3d 189, 194 (5th Cir.1994) ("Breach of the express warranty in this maritime insurance policy voids coverage"). Moreover,the violation of an express warranty voids the policy in its entirety. *See Aguirre v. Citizens Casualty Co.,* 441 F.2d 141, 143 (5th Cir.1971); *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.,* 242 F.2d 385, 388 (5th Cir.1957); *see generally* 2 THOMAS J. SCHOENBAUM, ADMIRALITY AND MARITIME LAW § 19-8 (3d ed.2001). *Acadia Ins. Co. v. Allied Marine Transport LLC.,*151 F.Supp.2d 107, 118 (D.Me.,2001)

The policy is void even if the breach did not cause the loss..*Aguirre v. Citizens Cas. Co.,* 441 F.2d 141, 143 (5th Cir.1971); *see also Port Lynch, Inc. v. New England Int'l. Assurety of Am., Inc.,* 754 F.Supp. 816, 819 (W.D.Wash.1991) (noting that "with respect to breaches of express warranties in a marine insurance contract, there is federal case law which calls for strict construction and renders policies void where such warranties are violated, even if there is no causal connection between the breach and the loss which has occurred" ( *citing Lexington Ins. Co. v. Cooke's Seafood,* 835 F.2d 1364 (11th Cir.1988)); *New Hampshire Ins. Co. v. Dagnone,* 394 F.Supp.2d 480, 486 (D.R.I.2005) (noting that "under New York law, where a warranty in a marine insurance policy pertains to any risk of marine navigation, transit or transportation on seas or inland waters, the breach of such warranty precludes recovery under such policy" *Allstate Ins. Co. v. Heil*  2007 WL 4270355, 6 (D.Hawai'i) (D.Hawai'i,2007)

As recited above the evidence documents pervasive unseaworthiness of the vessel and the crew before the voyage in question.  The Seaworthy warranty of the policy was breached void the policy.

RETURN OF PREMIUM

Where the policy is void by reason of the fraudulent representation or concealment of the insured or his or her agent, or if, by deception and false pretenses in matters material to the risk, he or she induces the insurer to assume a risk which would either have been refused, or, if taken at all, would only have been taken on different terms, the insured has no right to the return of the premium.  COUCH § 79:40 The failure to thus far offer any return of premium, has no impact on the issues before the court.

Case law makes it clear that this Court should simply make the return of premium part of the judgment upon declaring the policy void ab initio. *American Home Assur. Co. v. Masters Ship Mgt.*, 2007 A.M.C. 1888 (S.D.N.Y. 2007); *Royal Ins. Co. v. Harbor Shuttle,* 1999 A.M.C. 929 (E.D.N.Y. 1999).

The state law principle of waiver and estoppel can not result in any prejudice to Plaintiff's claim for rescission of the policy of marine insurance per the terms of the federal admiralty law doctrine of "utmost good faith." *See, e.g., Underwriters at Lloyd's v. Giroire* 1998 A.M.C. 2153 ,2156. (S.D. Fla. 1998)

This Court finds as a matter of law the policy is void ab initio for material misrepresentations on the application relied upon by the insurer to accept the risk. Further the vessel breached her navigational warranty suspending coverage for sinking that occurred in the Atlantic Ocean.

The insured vessel was unseaworthy prior to inception of the policy and the unseaworthy conditions existed prior to the Anzhela Explorer breaking ground on her final voyage.  The vessel was unseaworthy for failure to have a valid Certificate of Inspection, failure to have a proper bilge pump system including the absence of the fixed main bilge pump in the starboard engine room, failure to seal penetrations in the vessel's transverse watertight bulkheads, sailing with unrepaired damage to the starboard engine and damage to propellers, and failure to provide a competent crew.

The policy does not provide coverage for fines and penalties associated with the pollution claim.  The insured has not presented evidence of damage on this topic and further confirmed the pollution coverage was provided by a different insurance company.

The disposal of aluminum scrap not connected to the vessel by Sea Tow was authorized by the Salvage contract and did not constitute conversion.  The vessel's manager received a copy of the proposed contract containing the disposal contingency in advance of execution and did not express objection prior to commencement of salvage operations.  There was no evidence State National Insurance Company or its agents intentional withheld or destroyed evidence.  Nor is there any evidence the insured was prejudice in presenting its defense by lack of any evidence not preserved from the wreck.

07-61162-CIV-MORENO/TORRES
Page 43

State National Insurance Company in good faith advanced payment of the Salvage expenses under a reservation of rights to reduce the insured's further exposure to environmental damages and to prevent the government from federalizing the wreck removal thus reducing the insured's exposure to additional expense.  The original Sea Tow invoice was on a time and material basis agreed in advance by the insured's agent.  The second Sea Tow invoice was the low bid.  Thus both are determined to have been reasonable and necessary for State National Insurance Company to pay under the circumstances under a reservation of rights.  State National is entitled to reimbursement of the $613,421.50 advanced on behalf of Anzhela Explorer, LLC to Sea Tow with interest.

Respectfully submitted,

FERTIG & GRAMLING
Attorney for Plaintiff
200 SE 13th Street
Fort Lauderdale, FL 33316
Telephone: 954-763-5020
Facsimile: 954-763-5412
By: s/Christopher R. Fertig
Christopher R. Fertig
Chris.Fertig@Fertig.com
Fla. Bar No.: 218421
By: s/Darlene M. Lidondici
Darlene M. Lidondici
dml@fertig.com
Fla. Bar No.: 516521

CERTIFICATE OF SERVICE

We hereby certify that on 6 April 2009 we electronically filed the foregoing documents with the Clerk of the Court using CM/ECF. We also certify that the foregoing document is being served this day on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/Christopher R. Fertig
s/Darlene M. Lidondici

SERVICE LIST

Donald W. Strader
Law Office of Donald W. Strader
8522 SW 82 Terrace
Miami, FL 33143-6663
Tel: 305-274-6881
Fax: 305-274-8786
email: dstrader@bellsouth.net
Attorney for Defendant Anzhela Explorer LLC

Charles P. Moure
Harris & Moure P L L C
600 Stewart Street, Suite 1200
Seattle, WA 98101
Phone: 206-224-5657
Fax: 206-224-5659
email: charles@harrismoure.com
Attorney for Defendant Anzhela Explorer LLC

Richard Cochran
Fowler, White, et al.
Espirito Santo Plaza
1395 Brickell Avenue, 14th Floor
Miami, FL 33131
email:rcochran@fowler-white.com
Attorney for WFT, non-party