UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER 07-61162-CIV-
MAGISTRATE JUDGE EDWIN G. TORRES

STATE NATIONAL INSURANCE
COMPANY,

          Plaintiff,

vs.

ANZHELA EXPLORER, LLC,
JEFF DORSEY, MARK ROSANDICH,

          Defendants.

_____/

## DEFENDANT ANZHELA EXPLORER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Now comes the defendant Anzhela Explorer, LLC, by and through counsel, and

hereby submits its proposed Findings of Fact and Conclusions of Law in accordance

with the Order of the Court filed in this action on March 12, 2009.

DATED this 6th day of April, 2009.

Charles P. Moure
Harris & Moure P L L C
600 Stewart, Ste 1200
Seattle, Washington 98101-1878
Phone: 206-224-5657
Fax:    206-224-5659
email: charles@harrismoure.com
Attorney for Defendant Anzhela Explorer, LLC

BY:  /s/ Charles P. Moure
CHARLES P. MOURE
Fla. Bar No. 955817

**PROPOSED FINDINGS OF FACT**    1
**AND CONCLUSIONS OF LAW**

Donald W. Strader
Law Office of Donald W. Strader
8522 SW 82 Terrace
Miami, FL 33143-6663
Tel: 305-274-6881
Fax: 305-274-8786
email: dstrader@bellsouth.net
Attorney for Defendant Anzhela Explorer LLC

BY:  /s/ Donald W. Strader
    DONALD W. STRADER
    Fla. Bar No. 287342

**PROPOSED FINDINGS OF FACT**    2
**AND CONCLUSIONS OF LAW**

## I.  PROPOSED FINDINGS OF FACT

### A. THE VESSEL HAD TRIP COVERAGE.

**1.**      On  August 12, 2008, Plaintiff State National moved for Summary Judgment, Docket # 84, alleging that the vessel sank outside the navigational warranty stated on the issued policy, and denying the existence of an oral contract to cover the trip.

**2.**      After reviewing Defendant Anzhela Explorer's Response in Opposition to Plaintiff's Motion for Summary Judgment, and supporting declarations, Docket # 111, filed on September 2, 2008, and Plaintiff's Reply and Supporting Declaration of Karyn Price, Docket # 128 and 126, this Court issued an opinion, on November 28, 2008, and declared: "The record as it stands now supports an inference that the language of navigational warranty included in the written documents was overbroad as it did not reflect true intentions of the parties. Additionally, these unanswered questions support an inference, relied upon by Defendants, that an oral insurance contract for Anzhela Explorer's voyage existed at the time of the sinking."  Docket # 155 at page 7 of 9.

**3.**      Plaintiff did not overcome this inference at trial because it did not submit any new or additional evidence that was not already submitted at summary judgment.

**4.**      Both plaintiff's chief underwriter, Wanda Didier,  and defendant's expert witness underwriter, Donald Roinestad, testified that oral contracts as to insurance can be entered into prior to the issuance of coverage.

**5.**      Wanda Didier, Chief Underwriter for WFT, Inc. and the managing general agent for Plaintiff State National Insurance Company, testified during trial:

>             Q. (Moure) Can there be an oral agreement between an underwriter
>
>             and a broker to cover a specific event, vessel that would be an

addendum or change to a policy?  Is it your understanding that

such an agreement could be entered into between an underwriter

and a broker and that would not be reflected in the policy?

A. (Didier) If I understand your question, yes.

**6.** Plaintiff's witness, Karyn Price, also stated that such oral contracts are entered

into between underwriters and agents.  She went on to testify that allegedly WFT, Inc.

has a policy that all such oral agreements should be reduced to writing and placed in the

file.

**7.** Ms. Price, though, testified that she was unsure if the policy – that all oral

agreements must be reduced to writing – was written down anywhere at WFT, Inc.  Also,

no such policy or procedure was ever introduced at trial.

**8.** Plaintiff's insurance expert witness, Ken Draper, a marine insurance broker for 45

years, testified that a broker and an underwriter can have an oral agreement to bind

coverage, and enter into such agreements all the time.

Q. (Moure) Sir, can a broker and an underwriter have an oral

agreement to bind coverage?

A. (Draper) Yes, it's done all the time.

**9.** Shawn LeBeouf, a broker for USI, testified, pursuant to deposition, that he was

contacted initially by Mark Rosandich, a paid consultant, regarding insuring the vessel,

ANZHELA EXPLORER.  Shawn LeBeouf Deposition, pages 29 - 37.

**10.** Mark Rosandich sent an email, dated February 14, 2007, to Shawn LeBeouf with

an attached survey of the vessel, then known as the BOTTOM TIME II.  Defendant

Exhibit 1.  The email stated that the vessel will be under taking a voyage to Golden

**PROPOSED FINDINGS OF FACT**          4
**AND CONCLUSIONS OF LAW**

Meadows, Louisiana.  The attached survey to the email states that the vessel was located in Ft. Lauderdale, Florida.

**11.**     Shawn LeBeouf and Jamie Robichaux of USI both testified that Jamie Robichaux forwarded the Mark Rosandich email and attached survey to Karyn Price, an underwriter at WFT, Inc., who is the managing general agent for plaintiff State National.  Shawn LeBeouf Deposition, page 38-39.  Jamie Robichaux Deposition, page 32.

**12.**     The Jamie Robichaux email, dated February 15, 2007, forwarding Mark Rosandich's email is admitted as Defendant's Exhibit 2, and as Plaintiff's Exhibits' 110, and 63.

**13.**     Shawn LeBeouf testified that he explained to Ms. Price that the vessel, ANZHELA EXPLORER, needed coverage for the trip from the vessel's location in Ft. Lauderdale, Florida to Louisiana, and that they came to an oral agreement as to trip coverage and rates at this time.

> Q. (Lidondici) Now, when you told Karyn about the vessel
> coming from **Fort Lauderdale to Louisiana**, how much
> conversation did you have about that?
>
> A. (Shawn L. LeBeouf) When I told her that?
>
> Q. (Lidondici) Yes? Did you tell her once, more than once?
>
> A. (Shawn L. LeBeouf) **There were several.  The initial**
> **conversation included, you know, the vessel is in Ft.**
> **Lauderdale at such and such a dock, once everything**
> **was in place, including the insurance, they were going to**
> **have to bring it over, get it outfitted to perform in the**

**PROPOSED FINDINGS OF FACT**          5
**AND CONCLUSIONS OF LAW**

**Gulf of Mexico for oil and gas companies.** And there were several conversations with me and Jamie.  That conversation I am referring to is with Jamie and I.  There were several conversations when the – around this time, when this price was released?

Q. (Lidondici) Around February 16th?

A. (Shawn L. LeBeouf) Uh-huh (Witness answering in the affirmative).  Talking about, I think the client – it was either before or right after that the client had asked as per this email that, are you sure we have trip coverage to come – to go from Florida to Louisiana and there was nothing specifically were we had to do any type of trip policy, it was just going to be included as per our agreement.  Then again, before coverage was bound, the story that she gives us about the guy leaving from a little bit South of where the vessel was, going through the Gulf of Mexico.  There being a young Captain, I think she went into specifics, that he was in his early 20's, that the vessel sank and he died, and it was a big claim.

Shawn LeBeouf Deposition, Pages 199-201. (Emphasis added)

Q. (Moure) Okay. Do you recall what was said during that phone call?

**PROPOSED FINDINGS OF FACT**          6
**AND CONCLUSIONS OF LAW**

A. (Shawn M. LeBeouf) Just clarifying that she [Price] knew the vessel was at XYZ dock.  Again, I remember this conversation.  I was pulled over on the road on Highway 90, and I had the name of the dock. I said they are going to have to do this. They are going to try to go through the Intercoastal.

Q. (Moure) Where was the dock? What state was it in?

A. (Shawn L. LeBeouf) In Florida, South Florida.

Q. (Moure) The vessel was going where?

A. (Shawn L. LeBeouf) To Gold Meadow, Louisiana.

*  *  *  *

I asked to make sure we are okay we are coming from xyz dock and also the city, and I don't recall.  We are going to be coming to Golden Meadows, make sure everything is good.

Q. (Moure) So the conversation would have taken place on March 19, 2007?

A. (Shawn L. LeBeouf) There about, yes sir.  If I am not mistaken coverage was bound on 3:23.

Shawn M. LeBeouf Deposition, Pages 83-84

Q. (Lidondici) So if the Confirmation of Coverage indicates navigational limits, those would be the

**PROPOSED FINDINGS OF FACT**          7
**AND CONCLUSIONS OF LAW**

navigational limits, those would be the navigation that upon

review of your placement file were bound in this policy?

A. (Shawn L. LeBeouf) No, with exception, no, because

**the underwriters had agreed to give us coverage to**

**bring it from Florida to Golden Meadow to get outfitted**.

Shawn M. LeBeouf Deposition, Page. 192. (Emphasis

added); See also Shawn M. LeBeouf Deposition,  Pages 78-81;

Plaintiff Exhibit 116; Defendant Exhibit 212.

**14.**     Jamie Robichaux of USI confirmed that plaintiff State National,

through its agent Karyn Price, had entered into an oral agreement to cover

the trip.

Q. (Moure) Is it your understanding that Shawn LeBeouf

and Karyn Price had an oral agreement to bind coverage for

the vessel's trip from south Florida to Louisiana?

(Lidondici) Objection, form, predicate.

A.  (Robichaux) Yes.

Q.    (Moure) Okay.  And how do you have knowledge of

that?

A.    (Robichaux) Discussion with Shawn

Q.   (Moure) Okay.  Do you know when Shawn told you

that.

A.    (Robichaux)  During the underwriting at the very

beginning.  No, I do not have a specific date or time.

**PROPOSED FINDINGS OF FACT**          8
**AND CONCLUSIONS OF LAW**

Q.  (Moure)  Did you know the location of the vessel?

A.   (Robichaux)  We knew it was in Florida.

Jamie Robichaux Deposition, Page 35-36.

15.    Based on this oral agreement, four days prior to the vessel's final departure,

Shawn LeBeouf sent an email to Mark Rosandich confirming trip coverage.  Defendant

Exhibit 10. Email from Mark Rosandich to Shawn LeBeouf, dated March 19, 2007, states:

I think we are finally ready to bind….I think it has to be done today and will have

Jeff call in.  Have we worked out the trip insurance part of the program?  Thanks.

Again, I am nobody, just trying to see things through!!

I remain ….

Capt. Mark A. Rosandich.

Shawn LeBeouf responded in a Monday, March 19 email:

**No prob on trip coverage.**

Defendant Exhibit 10. (Emphasis added)

16.    In response to Mr. LeBeouf's email stating that the trip was covered, Mr.

Rosandich sent an email back to Mr. LeBeouf, on March 19, 2007, and included Jeff

Dorsey, the owner of Anzhela Explorer, LLC, in the email cc address line.  Mr.

Rosandich stated Mr. Dorsey would telephone Mr. LeBeouf.  Defendant Exhibit 9.

17.    Mr. Rosandich testified that he never would have let the vessel leave the dock for

its final voyage to Louisiana without insurance coverage.

Q. (Moure) Would you have let the vessel leave the dock from Dania,

Florida, on March 24th, I believe, without that insurance on the vessel?

**PROPOSED FINDINGS OF FACT**    9
**AND CONCLUSIONS OF LAW**

A. (Rosandich) Absolutely not.  I required confirmation of insurance

coverage, yes.

Q. (Moure) And can you now then look at Exhibit Number 10, Defendant

Exhibit Number 10.

A. (Rosandich) It's an email to me from Shawn LeBeouf dated March 19th,

2007, obviously in response to my query relative to the insurance being

bind.  It says, No problem on trip coverage.  And that was very important

to me because I understood the navigational limits of the policy, and I was

basically making sure that the trip was covered underneath the policy; and

he's basically confirming that.

**18.**    Mr. Dorsey testified at trial that he spoke with Mr. LeBeouf and came to an

agreement regarding trip coverage and agreed on the price of coverage.  Mr. LeBeouf

also testified that he spoke with Mr. Dorsey regarding trip coverage and regarding the

price of the coverage.  Mr. Dorsey received confirmation of coverage on March 23, 2007.

Plaintiff Exhibit 119.  The coverage was effective on March 23, 2007.  Pre-Trial

Stipulations, Docket # 148, page 7, B.

**19.**    Karyn Price also agreed in her deposition, which was made part of the record at

trial, that the vessel had coverage on its way to Louisiana from Florida.

Karyn Price, WFT, Inc. Executive Vice President, under oath, confirmed this binder:

Q. (Moure) **And you bound coverage on the vessel while it was in**

**Florida, correct?**

**A. (Karyn Price) Correct**.

**PROPOSED FINDINGS OF FACT**       10
**AND CONCLUSIONS OF LAW**

Q. (Moure) And so when you bound coverage on the vessel in Florida, it

was insured while it was in Florida, is that that not correct?

     Mr. Cochran: Object to form.

     Ms. Lidondici: Objection to form.

1)  (Karyn Price) Yes.

* * *

Q. (Moure) . . . the vessel also had insurance while it was on the voyage, is

that not correct?

     Mr. Cochran: Object to form.

     Ms. Lidondici: Objection to form.

A. **(Karyn Price) It had insurance on its way down to Louisiana, yes.**

Q. (Moure) Do you recall how many times you talked to Mr. LeBeouf

regarding underwriting this policy?

     Mr. Cochran: Form.

A. (Karyn Price) **Four to five times. We talked quite often**.

Docket # 87; Karyn Price Dep., pp. 100-101 (Emphasis supplied).

**20.**    Ms. Price and Mr. LeBeouf both testified that Ms. Price was upset when she

learned, on the day the vessel sank, that it had sunk in the Atlantic Ocean. LeBeouf

Deposition 111-113.

**21.**    Ms. Price and Mr. LeBeouf both testified that they had discussed a prior loss

suffered by a vessel that Ms. Price had underwrote.  Mr. LeBeouf testified that the vessel

had sunk off of Florida while in transit to the Gulf of Mexico from the Atlantic Ocean,

and a death had occurred resulting in a large claim. LeBeouf Dep. 46-48, Plaintiff

**PROPOSED FINDINGS OF FACT**     11
**AND CONCLUSIONS OF LAW**

Exhibit 126.  Ms. Price testified that this had occurred but could not remember much in the way of details other than it had occurred after she started working at State National and just prior to the loss of the Anzhela Explorer.

> Q. (Moure) Had you had another complete loss of a vessel just after you began working at WFT?
>
> A. (Price) We didn't have.  I don't believe it was a complete loss. I don't recall if it was a total loss.  We had a sinking, yes.
>
> Q. (Moure) Where did it occur, the sinking?
>
> A. (Price) In the Gulf of Mexico.
>
> Q. (Moure) Where did the vessel start its voyage?
>
> A. (Price) I don't remember.
>
> Q. (Moure) You have no idea?
>
> A. (Price) I do not recall.
>
> Q. (Moure) Did it start in the Atlantic?
>
> A. (Price) I do not know.
>
> ***
>
> Q. (Moure) Is it a loss of the death of a Captain?
>
> A. (Price) I believe there was a death of a crew member.
>
> Q. (Moure) Do you know the name of the vessel?
>
> A. (Price) No, I don't recall it.

**22.**     Ms. Price testified that if too many of the policies that she underwrote lead to large claims she would lose her job.

**PROPOSED FINDINGS OF FACT**     12
**AND CONCLUSIONS OF LAW**

Q. (Court) In other words, how could it affect your book of

business?

A. (Price) Well, let's say if I had a hundred other type claims and

they were paid, then I probably would be out of business, yeah.

**23.**    All of the documentation received by Ms. Price identified the vessel being on the

Atlantic side of Florida and that it needed coverage for its voyage to Louisiana.  Ms.

Price, at trial, testified that she was not aware of any documents locating the vessel on the

Gulf of Mexico side of Florida.

Q.( Moure) All of the communications that you received in writing

from the agent or anyone else on this vessel before the loss, did all

of that communication locate the vessel on the Atlantic Coast of

Florida?

A. (Price) No.

Q. (Moure) Can you identify a document that locates it elsewhere?

A. (Price) No. I don't have one in front of me, though.

Q. (Moure) So you know of none, but you think there is a

document out there?

A. (Price) I'm not sure.

Q. (Moure) I think you just testified that there is a written

document that you received pre-loss or pre-binding of coverage

locating the vessel somewhere else on the Atlantic Coast of Florida.

Can you identify it in any manner? Was it an unsigned application?

**PROPOSED FINDINGS OF FACT**     13
**AND CONCLUSIONS OF LAW**

A. (Price) It was a communication that I understood where the

vessel was.

Q. (Moure) In writing?

A. (Price) No.

Q. (Moure) Is there anything in writing?

A. (Price) I'm not aware of it, no.

***

Q.(Court) Did you see any documentation disclosing the location

of the boat in Ft. Myers?

A. (Price) No, only communication that I had with the agent.

The agent, Mr. LeBeouf, testified that he told Ms. Price that the vessel was

located in Ft. Lauderdale.  Also, all of the documentation received by Ms. Price

located the vessel either on the Atlantic side of Florida or in Ft. Lauderdale.  None

of the documentation, as Ms. Price testified, states that the vessel was in Ft. Myers.

**24.**     Defendant Exhibit 11, (Also admitted as Plaintiff's Exhibit 120, which is Exhibit

13 to Shawn LeBouf's deposition), confirms in writing that all parties, both the

underwriters and the brokers, knew the vessel was located on the Atlantic Ocean side of

Florida prior to and at the time State National bound coverage on March 23, 2007.

Shawn Lebouf Deposition page 89-93, 261-263.

**25.**     State National's own insurance expert, Kenneth Draper, testified at trial that he

was never shown Defendant's Exhibit 11, and that if he had been shown the Exhibit that

it was possible that he would have rendered a different opinion as to trip coverage.

26.     Kenneth Draper, insinuated at trial that Ms. Price did not receive all of the emails

marked as Defendant Exhibit 11, only the first page.  Karyn Price, though, confirmed,

during her testimony during trial that she had received all of the emails, including the

email between Mr. Palmer and Ms. Garcia identifying the vessel location on the Atlantic

side of Florida, and had forwarded it on to her home office in North Carolina.  Defendant

Exhibit 212.

> Q. (Lidondici) Now, on Exhibit 11, the first page is Natalie's
>
> response to Mr. Palmer.  Does Natalie make reference to Miami,
>
> Fort Lauderdale, Hallandale or Dania in her response?
>
> A. (Draper) No.
>
> Q. (Lidondici) Is the only geographic reference she makes to
>
> Florida?
>
> A. (Draper) Yes.  It says the vessel is in Florida as previously
>
> mentioned.
>
> Q. (Lidondici) But she doesn't say where in Florida or when this
>
> was previously mentioned.
>
> A. (Draper) No.
>
> DRAPER RE-CROSS EXAMINATION
>
> Q. (Moure) And you yourself, sir, in looking at that document,
>
> would it be fair to say that when Ms. Price received that document
>
> prior to buying coverage, she received all of the previous e-mails
>
> in that email exchange?

**PROPOSED FINDINGS OF FACT**          15
**AND CONCLUSIONS OF LAW**

A. (Draper) Wrong.  There is a chain.  On this one on March 22nd

is a single e-mail.  It's not part of a chain.

PRICE CROSS EXAMINATION

Q. (Moure) Did you get the prior two pages when you received

that e-mail?

A. (Price) I'm assuming I did, yes.

Q. (Moure) And does that predate the binding of coverage, this

particular e-mail.

A. (Price) I can't remember the dates.

Q. (Moure) I believe coverage was bound on the 23rd.

A. (Price) Yes, one day before.

***

Q. (Moure) And this e-mail was forwarded to you? You forwarded

this e-mail, correct? (Defendant Exhibit 212)

A. (Price) I forwarded it so it could be made part of the file.

**27.**    Defendant Exhibit 2, Mark Rosandich's email with an attached survey of the

vessel sent to Karyn Price dated February 15, 2007, is the survey that states the vessel

was located in Ft. Lauderdale, Florida.  State National, in its complaint, Docket # 1,

denied ever receiving the survey prior to issuing coverage.  After defendant obtained it,

pursuant to subpoena on a third party, USI, State National's agent, Karyn Price, denied,

at her deposition, ever receiving the Mark Rosandich email, stating that the vessel was

about to embark on a trip to Louisiana.  Ms. Price had forwarded both the email and the

survey to her boss, Wanda Didier, 30 days prior to her deposition.  Defendant Exhibit 177.

**PROPOSED FINDINGS OF FACT**          16
**AND CONCLUSIONS OF LAW**

Q. (Moure) Have you ever seen this e-mail? (Mark Rosandich

February 15, 2007 email)

***

Q. (Moure) Never seen it?

A. (Price) No.

Q. (Moure) This is the first time you are seeing this today?

A. (Price) Right.

Karyn Price Deposition page 84.

28.     At trial, Ms. Price testified that after her deposition she went back to her office,

found the email and survey on her computer, and sent it to her boss, Wanda Didier.

When Ms. Price was presented with Defendant Exhibit 177, she changed her testimony at

trial and confirmed that she had sent it before her deposition.  When asked by the Court

what prompted her to send the email and the survey to Ms. Didier prior to her deposition,

she testified that she did not recall.

29.     Plaintiff's Exhibit 188D (also admitted as Plaintiff's Exhibit 68), the attached

submissions to Ms. Robichaux's email, marked as Plaintiff's Exhibit 67, state that the

vessel captain, Mark Rosandich, was located in Miami, Florida.  When asked by the court

if Ms. Price was under the impression that Mr. Rosandich was located in some other

location other than where the vessel was located, she testified no she did not.

Q.(Court) What significance does this have that it says Miami,

Florida?

A. (Price) I guess he's trying to say that the boat was in Miami,

Florida. But, again, I was referring to the application and the vessel

and –

Q. (Court) Were you under the impression that he was a captain

somewhere else?

A. (Price) No.

**30.**    Wanda Didier drafted and sent an email stating that she could find nothing in writing in the file regarding the trip coverage, Plaintiff Exhibit 71, but the email does not state if she ever asked Ms. Price about the coverage.

**31.**    Donald Roinestad, Defendant Underwriter Expert, testified as follows: "I would comment the one thing she (Wanda Didier) didn't say was, I talked to Karyn Price to see if there was – you know, she went by the paper documents.  And, as we all know, this was an oral binder. She (Wanda Didier) replies, See the attached dated July 2nd.  All correspondence here indicates navigation limits as shown on the policy. (Plaintiff Exhibit 187a)  And, again, I say the discussion as far as the navigation limits was done orally. She never bothered to check with the underwriter."

**32.**    When asked the question at trial by State National's attorney regarding whether she had ever asked Ms. Price about whether she had agreed to insure the vessel for the trip, Ms. Didier testified that she did not recall.

Q. (Lidondici) Ms. Didier, were you the person who was involved in the original

acceptance of this risk for WFT.

A. (Didier) No.

Q. (Lidondici) Who was that?

**PROPOSED FINDINGS OF FACT**          18
**AND CONCLUSIONS OF LAW**

A. (Didier) Karyn Price

Q. (Lidondici) Were your responses to the emails (Plaintiff Exhibit 66) based on your review of the file and any conversations with anyone at WFT?

A. (Didier) Yes.

Objection. (Moure) I would then object to the question as compound. To review the file or is it conversation?

The Court: Rephrase your question. Just make it clear for the record.

Q. (Lidondici) Was your email response based in whole or in part on your review of the file?

A. (Didier) Yes.

Q. (Lidondici) Was it also based in whole or in part on conversations with anyone at WFT?

A. (Didier) I don't recall.

**33.** Donald Roinestad rendered an opinion at trial based on Ms. Price's failure to tell the truth regarding important documents at her deposition, sworn testimony from Ms. Price that the trip was covered, Ms. Didier's email marked and admitted as Plaintiff's Exhibit 66, and the sworn testimony of Shawn LeBeouf and Jamie Robichaux that Ms. Price's affidavit submitted at summary judgment – that she thought the vessel was in Ft. Myers when coverage was issued – was not credible testimony. Mr. Roinestad testified further that, in his opinion, the parties had entered into an oral binder for trip coverage, and that the vessel had coverage at the time of sinking.

Q. (Lidondici) Are you aware that Karyn Price has testified she never intended to provide coverage for an Atlantic voyage?

**PROPOSED FINDINGS OF FACT**     19
**AND CONCLUSIONS OF LAW**

A. (Roinestad) I'm sorry.  But Karyn Price's comment I find find very suspect.
She through all this time has withheld information, has misrepresented
information.  And I can – based on everything I've seen there was conversations
between her and Shawn LeBeouf about the coverage, and this – she wanted to
write this policy.  She was aware that it was on the Atlantic coast of Florida.

34.    Kenneth Draper, insurance expert for State National, testified at trial that prior to
rendering his opinion as to trip coverage, he had to go look at a map to see if Ft.
Lauderdale was located on the Atlantic Ocean.  This is after testifying that he had been a
marine insurance broker for 45 years and insured vessels all over the world including
Vietnam and Saudi Arabia.  He also testified that he believed it was possible that Ms.
Price was not telling the truth.  As to his opinion regarding trip coverage, Mr. Draper is
not a credible expert.

35.    State National, after the vessel had already sank in the Atlantic Ocean and after
WFT, its agent, had been fully informed as to where the vessel sank, acted as the vessel
had coverage.  State National agents, WFT, Inc. and Optimum Claims, sent numerous
emails regarding wreck removal, vessel salvage, and bringing a subrogation claim just
after the vessel sank in the Atlantic Ocean, without once stating that the vessel was
navigating outside of its coverage area.  Defendant Exhibit's 179, 180, 181, and 191.

36.    Defendant expert Roinestad testified as follows: "Within the claims process they
never – you know, they never halted the claims process form the very beginning knowing
that they navigational limits as stated on the dec page was limited to the Gulf of Mexico.
If you think about it, you have a vessel that sunk off the Atlantic coast; and there was

nothing done other than proceeding with the claim until several weeks later. To me that definitely implies that they thought that there was coverage."

**37.**    Captain Tim Morgan testified at his deposition, which parts of were used at trial, that at first he believed the vessel had coverage because the insurance company, full well knowing the vessel had sunk in the Atlantic Ocean, had contracted with his company to remove the vessel.  Captain Morgan then became concerned because he learned, after he had contracted for a crane and barge to remove the vessel, that the insurance company might not pay for the wreck removal.

> Q.  (Moure) Did the insurance company ever tell you that they
> were not going to pay for the salvage?
>
> A. (Morgan) That they were not?
>
> Q. (Moure) Yeah.
>
> A. (Morgan) At one point, they had said to treat the Anzhela
> Explorer as if she didn't have coverage, which was a little
> distressing at that point because they had already told us that we
> were successful low bidder and then there was some coverage
> issue.
>
> So we, at that point, were, you know a little bit in limbo.  Because
> at that point, we had already—I had already told the barge and
> crane company that we were successful low bidder and they had
> already started mobilizing.
>
> Q. (Moure) So they first told you that it was a covered loss, and
> they were going to pay the salvage?

A. (Morgan) Well, you know, I had a verbal conversation with –

with – it wasn't Harold Heno.  It may have been Jon.  It may have

been Ian.  I'm not sure. But they said, yeah, we were successful in

writing.  That didn't come. There was kind of a time window here

for availability of the barge and crane.  So I kind of gave a verbal

to the barge and crane company, and I knew I was going to be

responsible at that point to – you know , for at least mobilization,

demobilization.

So I was a little bit distressed when I got, you know, the

information basically saying, well, you're going to have to treat

them as if they don't have coverage.

**38.**      Prior to coverage being bound, Mark Rosandich testified that in the unsigned

application the navigational limitation was only regarding limitation that would have

been in effect if the vessel had successfully made the trip to Louisiana and had began to

operate as a commercial vessel.  Plaintiff Exhibit 188 D, Plaintiff Exhibit 68.  The trip

coverage had already been agreed to both by an oral agreement and confirmed in writing

by both the agent, Shawn LeBeouf, Defendant Exhibit 10, and the underwriter, Defendant

Exhibit 212, in which Karyn Price received written confirmation of the location of the

vessel, Atlantic Coast of Florida, and submitted the document to the underwriting file in

North Carolina, (9:57 am, Friday March 23, 2007) prior to the coverage being issued on

the vessel on March 23, 2007, at noon.  See Plaintiff Exhibit 119 Fax Transmission of

Confirmation of Coverage to vessel owner Anzhela Explorer, LLC.

**PROPOSED FINDINGS OF FACT**          22
**AND CONCLUSIONS OF LAW**

**39.**     Jeff Dorsey testified that he signed the last page of the application (Plaintiff

Exhibit 69), and did not initial any of the other pages of the application, four days after

the vessel sank, because everyone knew the vessel had sunk in the Atlantic.

> Q. (Fertig) In the sense that when you read this application
>
> that everything in the application is accurate and it is
>
> complete.
>
> A. (Dorsey) Well, you know, I don't see my initials on any
>
> of these previous pages.  So I guess I can't guarantee that I
>
> even filled those out.  It could have been a different
>
> application, now couldn't it have?  All I can testify to is the
>
> back page with my signature on it.

Mr. Dorsey further testified that State National was acting like they were going to cover

the loss of the vessel.  Mr. Dorsey had been told by Shawn LeBeouf of USI and had

received Mr. LeBeouf's email, Defendant Exhibit 10, stating that the vessel had trip

coverage.  Mr. Dorsey testify that at no time did he believe the navigational limitation on

the application would in anyway have an effect on coverage.

> Q.  (Fertig) You wanted coverage to include Dania, trip up the Intercoastal
>
> across Florida and its navigation in the Atlantic Ocean if necessary?
>
> A. (Dorsey) I wanted complete coverage for my vessel, right.
>
> Q. (Fertig) And you called Shawn to correct that gulf, hundred miles
>
> offshore?

**PROPOSED FINDINGS OF FACT**     23
**AND CONCLUSIONS OF LAW**

A. (Dorsey) No. I called Shawn to confirm, and he indicated to me that

indeed that policy covered and the underwriter knew very well where the

vessel was located.  No problem, I believe were his words, no problem.

**40.**     Mr. Roinestad testified that the demand by State National for a signed application

is evidence that in fact there had been an oral agreement for trip coverage otherwise there

would have been no need for a signed application.

Q. (Lidondici)  This signed application does not state transiting from the

east coast of Florida and then Gulf of Mexico not to exceed 100 miles of

shore?

A. (Roinestad) In response to that, I would say the loss had already

occurred when this was submitted.  The broker knew the vessel went

down in the Atlantic.  If there was – if there had not been any verbal

agreement for coverage in the Atlantic at all, the broker would have been

no reason to continue the pursuit of the application.  There would have

been no coverage.  They would have – you know, they could easily have

said the Atlantic coast, so I'm not sure you point is –

**B. DEFENDANT ACTED IN GOOD FAITH IN OBTAINING INSURANCE
COVERAGE WHILE PLAINTIFF ACTED IN BAD FAITH BOTH BEFORE
COVERAGE WAS ISSUED AND AFTER IT WAS ISSUED.**

**1)  All Documentation Presented by the Insured to the Plaintiff Stated that the
Vessel did not have a Current COI.**

**41.**    Kenneth Draper, plaintiff's expert, testified that in the 45 years working as an

insurance broker he is not aware of one instance were a claim was denied based on the

breach of the duty of utmost good faith and that it rarely happens.

Q. (Moure) Is it true, sir, that in the 45 years that you've acted as a broker, that you never once recall a matter where an insurance company denied paying a claim based upon the breach of the duty of utmost good faith?

A. (Draper) Not during my 45 years as a broker I don't recall any specific one, but during my last years as a consultant and expert witness, I have.

***

Q. (Court) In your whole time working in the industry and not as an expert, but at the time you were engaged in the actual business of insurance, you never saw an insurance company deny a claim based upon that doctrine?

A. (Draper) No, I don't recall having one during that time.  It doesn't happen very often that there's a bad faith claim.

**42.**     All of the underwriters who testified at trial, Karyn Price, Wanda Didier, and Donald Roinestad, all testified that if the underwriter receives contemporaneous inconsistent information, it is the underwriter's responsibility to ask additional questions.

Q. (Strader) And if there's a conflict in the information supplied to the underwriter, what is the underwriter's duty?

A. (Roinestad) Well, as I said earlier, part of the role of an underwriter – one of the things an underwriter needs to be is curious.  They have to look at the file.  And if they have conflicting information, they have to

**PROPOSED FINDINGS OF FACT**     25
**AND CONCLUSIONS OF LAW**

somehow address it or I guess they can choose to ignore it but then suffer

the consequence.

In this particular case where there was a conflict on the COI.  Several

places said – places say they have it.  Other places said – the survey said it

expired.  The schedule of operations said they were going to get it.  The

simple thing for an underwriter to do would be just to call the broker,

Shawn LeBeouf, and say, we have conflicting information; could you

please FAX us this COI.  And that – what would happen then is either the

COI would come in or Shawn Le Beouf would come back and say, They

don't have a COI.

**See also Defendant's Exhibits 2 and Plaintiff's Exhibit 67 and 68.**

**43.**      On February 15, 2007 at 9:39 a.m., Karyn Price first received an email from

Jamie Robichaux with an attached email from Mark Rosandich and an attached survey of

the vessel.  Defendant Exhibit 2.  In both the email and the survey, it states that the vessel

did not have a current U. S. Coast Guard Certificate of Inspection ("COI").  Mr.

Rosandich also testified that he told USI that the vessel did not have a current COI.

**44.**    On the same day, at 1:04 pm, Jamie Robichaux, wrote an email to Karyn Price

which stated that the vessel did have a current COI.  Plaintiff  Exhibit 67.  Attached to the

email are three additional documents: the unsigned application, the Schedule of Vessel,

and the Description of Operation. Plaintiff Exhibit 68; (Also admitted as Plaintiff Exhibit

188D).  In the unsigned application, it states that the vessel does have a current COI, but

in the Description of Operation it states that it does not have a current COI.  So on the

same day, Ms. Price received three written documents stating that the vessel did not have

**PROPOSED FINDINGS OF FACT**          26
**AND CONCLUSIONS OF LAW**

a current COI, and two that stated that it did.  Two of the written documents that Ms.

Price received on February 15, the survey and the Mark Rosandich email, came directly

from the insured.   Two of the documents that stated that the vessel did have a current

COI, the unsigned application and the Jamie Robchiaux email, were documents created

by the agent USI.  The third document, sent and created by Jamie Robchiaux, as an

attachment to her email, the vessel Description of Operation, stated the vessel did not

have a current COI.

**45.**     Ms. Price testified at trial that she received conflicting information regarding

whether the vessel had a current COI, in the submission, Plaintiff Exhibit 67 and 68 (Also

admitted as Plaintiff 188D), but she never bothered to ask additional questions.

> Q. (Moure) The first sentence.
>
> A. (Price) The vessel will be U.S. Coast Guard certified to carry a hundred
>
> passengers in a crew transport role crew boat. (Referring to Exhibit 188 D,
>
> USI Placement 454, Schedule of Operation Synopsis)
>
> Q. (Moure) Does it say the vessel is U.S. Coast Guard certified?
>
> A. (Price) In this synopsis?
>
> Q. (Moure) Yes.
>
> A. (Price) No, but it says it in another part of this document.
>
> Q.  (Moure) So, you had a conflict?
>
> A. (Price) Clearly there is.

**46.**     Donald Roinestad testified that if Ms. Price had done her job and asked questions

regarding the contemporaneous conflicting COI information, then more likely than not

USI would have gone back to the insured regarding this issue and clarified the issue.  Mr.

Roinestad further testified that Ms. Price failed to adequately perform her role as underwriter when she did not follow up on the contemporaneous conflicting COI issue on a twenty-year-old vessel.

47.    Ms.  Price testified that if she fails to ask questions, as she admitted she is suppose to do when she receives conflicting testimony, it is her fault.

> Q. (Moure) But you are the underwriter, correct?
>
> A. (Price) Correct.
>
> Q. (Moure) So, it's your job to evaluate the risk, correct?
>
> A. (Price) Correct.
>
> Q. (Moure) It's your job to evaluate all the information that is sent to you, correct?
>
> A. (Price) Correct.
>
> Q. (Moure) If you mistakenly or for some other reason do not review the information, whose fault is it?
>
> A. (Price) My fault.

48.    Mr. Roinestad testified that all of the conflicting information regarding whether the vessel had or did not have a current COI could have been quickly and easily fixed if Karyn Price had simply requested that the certificate be faxed to the underwriter and be placed in the underwriting file.  Ms. Price testified that WFT, Inc. has changed its policy and now requires having the actual U.S. Coast Guard certificate on file.

49.    Ms. Price also testified that she could have looked up on the US Coast Guard website regarding whether the vessel had a current COI, but failed to do so.

50.     Mr. Roinestad also testified that it was the insurance company's responsibility to make it clear to both the agent, USI, and the insured, Anzhela Explorer, in writing, such as in its application, that it required the insured to have a COI.

> Q. (Strader) If there was testimony that a certificate of inspection was required on a commercial vessel as an underwriter policy of the underwriter, would it be fair to expect the insured to understand that when they weren't told?
>
> A. (Roinestad) No, it was not.
>
> Q. ( Strader) So in that case the insured would not be aware of the significance of the certificate of inspection with respect to the underwriter?
>
> A. ( Roinestad) The underwriter process is the underwriter process, and the insured's responsibility is to provide the information that is expected of him.

51.     Mr. Roinestad also testified that not only is there nothing in the application that requires that the vessel have a current COI, there is also nothing in the policy that specifically requires a COI.

> Q. (Strader) Is there any – we talked about the survey.  Is there any requirement in the policy for a certificate of inspection?
>
> A. (Roinestad) No. There's no – there's no – there is no requirement in the policy for a certificate of inspection.

**2) Plaintiff did not Act in Good Faith by Failing to Maintain All Documents in the Underwriting File and then Suing the Defendant for Failing to Provide a Copy of the Survey with the Application.**

**PROPOSED FINDINGS OF FACT**     29
**AND CONCLUSIONS OF LAW**

**52.**    Ms. Price testified that she never sent the Mark Rosandich email and the
attached survey (Defendant Exhibit 2) to the home office in North Carolina, as she was
required to do, that she should have, and that it was her fault for failing to do so.

> Q. (Lidondici) At the same time that you received the first e-mail with the
> survey, did you have any reason to forward that without an application?
>
> A. (Price) I held it because I didn't have an ap, which I probably should
> not have done.

**53.**    Mr. Roinestad testified that pursuant to the policy, the insured was not required
to provide a copy of the policy until 30 days after coverage was issued.

> Q. (Strader) Could you specify where in the policy that's dealt with, the
> issue of a survey is dealt with?
>
> A. (Roinestad) Yes. Under—excuse me.  Under condition 29, survey
> warranty, warranted that the coverages provided herein is subject to a
> condition-and-valuation survey approved by underwriters within 30 days
> of attachment; such survey to be for the account of the insured unless
> otherwise agreed.
>
> So the insured had up to 30 days for the attachment of the policy to get the
> survey completed.  Now, we know the survey was done; but at the time of
> the loss this survey should have been a nonissue because according to the
> contract that they provided the customer – the insured, it would not have
> been a requirement until 30 days after the attachment.

**54.**    The policy states the following:

> General Conditions,

**PROPOSED FINDINGS OF FACT**          30
**AND CONCLUSIONS OF LAW**

29. Survey Warranty (HP-031)

Warranted that the coverage(s) provided herein is subject to a condition and

valuation survey approved by Underwriters within thirty (30) days of attachment.

Such survey to be for the account of the Assured unless otherwise agreed.

Plaintiff  Exhibit 65, page USI-Placement – 1018.

**55.**     Even though the insured, under the policy, was not required to provide Plaintiff

State National with the survey until 30 days after the policy was issued, plaintiff sued the

defendant and individuals, because, in part it failed to produce the survey and the issue

regarding whether the vessel had a current COI, even though its agent, WFT, Inc., had the

survey and at least three documents indicating that the vessel did not have a current COI.

See Complaint; Docket #1. Page 5, Paragraph 17; Page 10, Paragraph 40; Page 20,

Paragraph 92 (c); Page 24, Paragraph 113 (c).

**56.**     Mr. Roinestad offered an opinion that the plaintiff, specifically Karyn Price, acted

in bad faith because, in his opinion, she intentionally withheld critical documents – the

March Rosandich email and the survey from Optimum – and then let Optimum hire

attorneys who then brought false claims and charges against both the defendant Anzhela

Explorer, LLC and individual defendants, Jeff Dorsey and Mark Rosandich.  Mr.

Roinestad went on to testify that Ms. Price then committed perjury at her deposition by

making false statements as to the existence of the Mark Rosandich email in her file.

**57.**      Also, after the vessel sank, Optimum Claims service sent on May 15, 2007 a

Reservation of Rights letter to Anzhela Explorer, LLC, which included in its reasons for

denial of coverage the failure of the insured to submit a survey.  Plaintiff  Exhibit 153.

See pages 3 - 4 paragraph F. of the letter.

**PROPOSED FINDINGS OF FACT**          31
**AND CONCLUSIONS OF LAW**

**58.**     Mr. Roinstead testified that the failure of the underwriter to provide Optimum the entire underwriting file, including the pre-loss vessel survey, directly resulted in a bad faith denial of the claim by Optimum.

## C.  THE VESSEL WAS SEAWORTHY AT THE TIME VESSEL OWNERS INSURED HER AND AT THE TIME SHE LEFT PORT ON HER FINAL VOYAGE.

### 1)  Anzhela Explorer, LLC was the Vessel Owner.

**59**.     Mr. Jeff Dorsey, a part owner of defendant Anzhela Explorer, LLC, has extensive experience as Captain on fishing vessels operating on the Bering Sea, and as a vessel owner.  The Bering Sea Crab Fisheries is one of the most dangerous fisheries in the world.  Mr. Dorsey testified that as a Bering Sea captain, with a 1600 ton master's USCG license, he had never had a man overboard emergency and had never had a crew man hurt because he had always taken care of his vessels.

**60.**     Mr. Doresy has a part and whole interest in various companies that currently own and operate four vessels, including two 180-foot vessels and one 155-foot vessel, all with current COI certifications operating in the Gulf of Mexico.  One of his vessels just received a contract to retrieve satellites for Lockheed International.

**61.**     Mr. Rosandich, owner and operator of International Marine Consultants, also had extensive experience in the marine commercial vessel business, having served as Captain on large ocean going supply vessels in the Gulf of Mexico, and having worked as a marine consultant by assisting various vessel owners in retrofitting commercial vessels.

**62.**     Mr. Dorsey purchased two vessels in South Florida, and with Mr. Rosandich's assistance, refurbished them for both pleasure and commercial use: a pleasure yacht owned by Mr. Dorsey and a commercial vessel, the 114-foot vessel named the COBIA

**PROPOSED FINDINGS OF FACT**          32
**AND CONCLUSIONS OF LAW**

EXPLORER.  Mr. Rosandich acted as a hired consultant in the refurbishment of the vessel Cobia Explorer.  Mr. Dorsey still owns the yacht and sold the Cobia Explorer, after successfully operating it in Mexico and Panama

**63.**    Mr. Rosandich was very familiar with the vessel then known as the Bottom Time II, as he had known the vessel owners and had been on the vessel on a dive trip.  The Bottom Time II was a 79-foot commercial twin hull catamaran vessel, which had been operating as a dive vessel for paying passengers.  Defendant Exhibit 90.

**64.**     Mr. Dorsey, prior to purchasing the vessel, had spent many hours examining the vessel, and he testified that the vessel was in good condition and could have been operated as a non-COI vessel in the condition in which it was purchased in.

**65.**    Jeff Dorsey, with the assistance of a hired consultant Mark Rosandich, purchased the vessel then know as the Bottom Time II.

> (Fertig) Sir, did you propose to Mr. Dorsey that he purchase the Bottom Time II?
>
> (Rosandich) I did.
>
> **\*\*\*\***
>
> (Fertig) Now, at the time the ANZEHAL EXPLORER was purchased for $200,000.00 it was purchased by whom?
>
> (Rosandich) It was purchased by Mr. Dorsey.
>
> **\*\*\*\***

**PROPOSED FINDINGS OF FACT**          33
**AND CONCLUSIONS OF LAW**

Q. (Fertig) And at that time you considered yourself either an equity partner or a 30 percent of the net profits of the company as part of your, what you were with respect of the vessel?

A. (Rosandich) At that point in time I wasn't thinking about that at all. He was paying me what is called my minimums as a guy overseeing the project. So I would have to answer that question at that point in time if I was to wear a hat I was an employee.

Q. (Fertig) Were you a vessel manager?

A. (Rosandich) I was a consultant.

Q. (Fertig) Were you the person that was managing the vessel at that time?

A. (Rosandich) I never managed that vessel. The vessel never made it to Louisiana, sir. My management hat would come on when it got to Louisiana.

Q.(Fertig ) So when Mr. LeBeouf listed you as the owner of the boat you never gave him any information that might lead him to believe that you were, in fact, the owner of the boat.

A. (Rosandich) When he files his papers with the insurance underwriter the name that's on that piece of paper which is ANZHELA EXPLORER LLC is the owner of that boat.

**See also Plaintiff Exhibit 117 (Exhibit 110 to Shawn Lebeouf's Deposition) USI sent email to Karyn Price, underwriter at WFT, Inc., on March 22, 2207, removing Mark Rosandich as vessel owner and making Anzhela Explorer the new name on the account.**

**See also Plaintiff Exhibit 119 (Exhibit 12 to Shawn Lebeouf's deposition) USI emails sent on March 22, 2007, to MMO and WFT, Inc. stating new vessel owner is Anzhela Explorer, LLC.**

**PROPOSED FINDINGS OF FACT**       34
**AND CONCLUSIONS OF LAW**

**66.**     Jeff Dorsey first purchased the vessel in his and his wife's name, and then had the vessel documented with the U.S. Coast Guard.  Defendant Exhibit 123.

**67.**     It is uncontested that Mr. Dorsey, on March 16, 2007, formed a corporation called Anzhela Explorer, LLC.  Defendant Exhibit 133-135; Pre-Trial Stipulations, Docket # 148, Uncontested Facts, page 7, paragraph G.  Mr. Dorsey and his wife, on March 20, 2007, transferred ownership of the vessel from themselves to defendant Anzhela Explorer, LLC.  Defendant Exhibit 126; Pre-Trial Stipulations, Docket # 148, Uncontested Facts, page 7, paragraph F.

**68.**     The Dorsey's then submitted all of the documentation regarding transferring the vessel from themselves to Anzhela Explorer, LLC to the U.S. Coast Guard.

**69.**     All of the financing for the purchase of the vessel and to upgrade the vessel to a COI vessel came from Dorsey Family, LLC, a corporation started by James Dorsey, Jeff Dorsey's father.  Dorsey Family, LLC is 50% owned by James Dorsey, 25% owned by Jeff Dorsey's younger brother, and 25% owned by Jeff Dorsey.  Dorsey Family, LLC lent most of the money to Anzhela Explorer, LLC for the purchase and retrofit of the vessel. Anzhela Explorer, LLC has the same ownership structure as Dorsey Family, LLC.  Mr. Dorsey also obtained a bridge loan from Westsound Bank for the purposes of purchasing the vessel.

**70.**     Mr. Rosandich did not have any ownership interest in the vessel.  He was involved in discussions with Mr. Dorsey to act as a manager of the vessel once it went to work, and he would receive part of any profit generated by the venture once the vessel had completed the COI process and was working, but nothing was put into writing and

**PROPOSED FINDINGS OF FACT       35
AND CONCLUSIONS OF LAW**

signed, and nothing was ever finalized because the vessel never completed the COI process and started operating under any agreement because it sank.

**71.**     Prior to closing but after there had been a general agreement to purchase the vessel in August of 2006, Mr. Dorsey began work on the vessel.

**72.**     During this August period, Mark Rosandich retained a marine surveyor by the name of Malcolm Elliott of Florida Nautical Surveyors to conduct an insurance survey of the vessel.  Defendant Exhibit 90, 91, 98.

**73.**     Mr. Elliott has extensive experience as marine engineer and surveyor having graduated from the Glasgow College of Nautical Studies as a marine engineer, spending approximately 13 years at sea, most of the time as Chief Engineer on large oceangoing vessels. He has been working as a marine surveyor since 1990, and is a current member of the Association of Certified Marine Surveyors.

**74.**     Mr. Elliott drafted and submitted a final survey of the vessel to Mark Rosandich on August 12, 2006.  Defendant Exhibit 90.

**75.**     The survey identified the location of the vessel, out of the water at the Fort Lauderdale Marine Center in Fort Lauderdale, Florida.  Defendant Exhibit 90, page 2.

**76.**     The survey stated on page 3 that the vessel did not have a current COI and was for private use only, and again on page 15 the survey stated that the vessel did not have a current COI.  Defendant Exhibit 90.

**77.**     During a two day out-of-the-water examination of the vessel, Mr. Elliott conducted an extensive examination of the vessel, including using an audio gauge to determine the soundness of the vessel's hull and taking numerous photographs of the vessel.  Defendant Exhibit 90, 91.

**PROPOSED FINDINGS OF FACT**          36
**AND CONCLUSIONS OF LAW**

**78.**     Mr. Elliott, during the two days out-of-the-water survey, examined the electrical bilge pumps and the belt driven engine pumps on the vessel, and he found them in good working order.  Defendant Exhibit 90.

**79.**     Mr. Elliott rendered an opinion that the belt driven engine pumps, without the electrical bilge pump being in place, had more than adequate pumping capacity to dewater the vessel.

**80.**     Mr. Elliott also testified that for a non-COI vessel all that is required is adequate pumping capability to dewater a vessel.

**81.**     Mr. Elliott also testified that both of the vessel's engines had been completely overhauled in 2005 and only had 550 hours of operating time, and appeared to be in good condition.  Defendant Exhibit  90, page 22.

**82.**     The survey stated at the bottom of page 2 that the vessel was an acceptable fire and marine risk.  Defendant Exhibit 90.

**83.**      On the bottom of page 12, the survey stated that the vessel was surveyed to U.S. Coast Guard, National Fire Prevention, and American Boat and Yacht Council's standards for a private use vessel, and except for minor deficiencies listed on page 15 of the survey, met all of those standards.  Defendant Exhibit 90, page 20, 15.

**84.**     Mr. Elliott testified that the vessel meet all required standards for a private use vessel, at the time he conducted the survey, and was a seaworthy vessel.

> **2) Anzhela Explorer, LLC Spent Hundreds of Thousands of Dollars on the Vessel to Obtain a COI and Retained a Two Year Hull Credit.**

**85.**      Prior to closing on the vessel, the vessel owner, Jeff Dorsey, with his hired consultant Mark Rosandich, commenced work on the vessel to bring the vessel up to COI standards.

**PROPOSED FINDINGS OF FACT**          37
**AND CONCLUSIONS OF LAW**

**86.** Mr. Rosandich immediately contacted the US Coast Guard and set up a plan to bring the vessel up to COI standards.

**87.** Mr. Rosandich sent an email to USCG Marine Safety Officer Bates regarding some of the work being done to bring the vessel up to COI standard. Plaintiff Exhibit 182a.

**88.** Mr. Rosandich testified that not only was all of the work performed and completed on the email marked as Plaintiff Exhibit 182a, that he himself worked closing with the USCG Marine Safety Officers to identify any issues that needed to be worked on in order to bring the vessel up to USCG COI standards.

> Q. (Moure) That's Plaintiff's Exhibit 182a.
>
> A. (Rosandich) Yeah. This is – again, we've seen this already. This exhibit refers to a communication between myself – not between me. Actually sent to Mr. Bates of the United States Coast Guard who supervises oversight inspectors, his field inspectors. And it's just a hit list of some of the things that we are doing. Many of the things on this list were items that we had identified, some of them not even listed as deficiencies but, you know, just things that we were doing to advise the Coast Guard to what extent that we were repairing the vessel.
>
> Q. (Moure) And the part of the email that you sent were all of those items that you listed on there, were all of those satisfied, taken care of, resolved prior to the vessel departing?
>
> A. (Rosandich) That would be affirmative.

**89.** Mr. Rosandich testified that he never received a printed out copy of the USCG Activity Report, Plaintiff's Exhibit 176. The exhibit is dated July 2, 2007, and was printed out by the USCG well after the vessel had been deemed a total loss.

**PROPOSED FINDINGS OF FACT**     38
**AND CONCLUSIONS OF LAW**

**90.**    Mr. Rosandich testified that he reviewed a copy of an activity report prior to starting work on the vessel and that he worked closely with the USCG inspectors to resolve all COI deficiencies.

**91.**    Mr. Rosandich testified that out of 26 deficiencies identified by the USCG, all but six were resolved.  Three of the remaining deficiencies to bring the vessel to COI compliance were paper work matters such as submitting drawings and having a stability letter.

**92.**    Mr. Dorsey testified that Mr. Rosandich, various crew members, and contract laborer continued to work on the vessel right up to final departure, and well past the December 15, 2008 resolved list.

> Q. (Fertig) Well, let the record stand on that.
>
> A. (Dorsey) Yeah.  If you'll notice, the last inspection date to that vessel was December 15th.  Okay?  And the vessel departed March 23rd.  We worked on that boat tirelessly and nonstop until the day that vessel left. There was a ton of work done between December 15th and March 23rd to make that boat safe and sound for the transit to Louisiana to finish the COI process.

**93.**    Mr. Rosandich also testified that the dates shown on the activity report, Plaintiff Exhibit 176, were the dates that the Marine Safety Officer for the USCG actually entered the data into the activity summary report not the date that the particular deficiency was actually resolved on the vessel and not the date that the USCG actually went on the vessel for the inspection as to COI deficiencies.

**94.**    Mr. Rosandich testified that even one of the three items that was listed as not resolved and was not a paperwork issue, Item Number 13 of Plaintiff Exhibit 176, regarding water tight bulkheads, was still not a deficiency as to whether the water tight bulk heads were water tight, but whether the water tight bulk heads met the USCG COI

**PROPOSED FINDINGS OF FACT**         39
**AND CONCLUSIONS OF LAW**

standard.  Mr. Rosandich testified that while a locking door with a seal on it between two of the water tight voids met the old USCG COI standards, it did not meet the new standards meaning that the USCG required that the door be removed and that the access to the voids be put on the deck of the vessel.  This did not mean that the vessel watertight bulkheads were not watertight.

95.     The Activity Report stated that the USCG granted a hull credit on December 15, 2006.  Plaintiff Exhibit 176, page 8.

96.     Brad Schoenwald, former USCG Marine Safety Inspector, testified that based on his more than twenty years of experience in the USCG, the hull credit is a significant part of obtaining the overall COI certification.

> Q.( Moure) Based on your experience as an inspector, can you explain to the Court as a fact witness what part of the hull credit is in the whole process of getting a COI?
>
> A. ( Schoenwald) You can't break it down into a percentage.  It's in many ways a pass or fail. In other words, it's a fundamental part of the certification inspection process, and the hull credit has to be done in order to complete it. In terms of duration and time – is that what you're asking me percentage?  It's a significant part.  It's a foundational function of a certificate of inspection process in order to a receive a credit hull examination.

97.     The defendant spent more than $200,000 to bring to vessel up to a COI standard. Defendant Exhibits 136-139.

98.     Some of the individual paid invoices that represent work performed on the vessel are admitted as Defendant Exhibits 140, 141, 142, 143, 145, 146, 147, 148,151,152, 153, 154, 155, 156, 157, 159, 160, 161, 162.

**PROPOSED FINDINGS OF FACT**     40
**AND CONCLUSIONS OF LAW**

**99.**     Defendant Exhibits 140 and 145 represent work performed by Ives Jasmine, a marine electrician, who testified that he performed electrical work on the vessel.  Mr. Dorsey testified that the total spent on electrical work on the project was approximately $20,000.

**100.**     Mr. Jasmine testified that after he completed work on the vessel, and prior to her final launch, the high bilge alarm worked on the vessel, the electrical plugs in the engine room functioned, all the engine room wiring had been replaced to U.S. Coast Guard specifications. Both port and starboard engines had been freshly painted with cat yellow paint, and both the port and starboard 24-volt clutch pumps, the belt driven engine pumps, had been rewired and were working.  He also testified that the void behind the engine room had its own separate functioning pump which worked with an automatic float switch and was installed and working on both the port and starboard side.  Defendant Exhibit 140, 145 (Invoice for high water alarm, engine room wires for lights and machinery), and Defendant Exhibit 96, Page 132 (Post loss photograph taken by Malcolm Elliott depicting stern compartment bilge pump in upper left hand corner).

**101.**     Mr. Rosandich also testified that the engines had been freshly painted prior to its last voyage.

> (Moure) And was that engine – was it in that condition when the vessel left the dock on its last voyage?
>
> A. (Rosandich) No.  The engines were pristine and freshly painted.

**102.**     Mr. Dorsey testified that Defendant Exhibit 142 is a paid Fish Offshore invoice for expenses incurred for transporting the crew to and from the vessel, and for the purchase of an additional bilge pump purchased the day before the vessel left and provided to the crew.

**PROPOSED FINDINGS OF FACT**     41
**AND CONCLUSIONS OF LAW**

**103.** Mr. Dorsey testified that Defendant Exhibit 143 represents a paid invoice for work done by KAM Machine Shop to overhaul the main engine-driven bilge pump for the starboard engine.

**104.** Mr. Dorsey testified that Defendant Exhibit 144 are some of the paid invoices that represent the work done by Costa Rica Yacht Repair on the hull of the vessel so that the vessel could obtain its hull credit.

**105.** Ray Smith, owner of Costa Rica Yacht Repair, testified that he had repaired the starboard side exhaust systems on the vessel. He testified that he copied what was already there by simply replacing the hose and clamps with a new high temperature hose and four clamps. Mark Rosandich confirmed that this work was done prior to the vessel leaving on its final voyage. Mr. Schoenwald testified that such an exhaust hose is standard in the industry and is designed to withstand normal engine heat exhaust.

**106.** Ray Smith and Mark Rosandich both testified as to the extensive work done on the vessel's hull in order for the vessel to have obtained its two-year hull certification.

> A. (Rosandich) Yes. Obviously the major – the most amount of work that was being done obviously was the hull to obtain the local hull credit from the U.S. Coast Guard. That was very, very substantial. Mr. Smith was just previously here testifying. He had a full-time crew on board – I mean on site, generally ranging between two and four full-time welders eight days a week with him in a supervisory role working with the U.S. Coast Guard inspectors as to what needed to be done to obtain that credit. Id.

**107.** Mr. Dorsey testified that defendant invested, post purchase to bring the vessel to COI standards, over $200,000 in the vessel including spending $6,000 on bilge pumps,

**PROPOSED FINDINGS OF FACT**      42
**AND CONCLUSIONS OF LAW**

$20,000 in electrical work, $6,000 on the exhaust system, $36,000 to International Marine Consultants, $100,000 on labor, and close to $50,000 at the shipyard for use of the yard.

### 3) Anzhela Explorer was Seaworthy Prior To Launching on Her Final Voyage.

**108.**　Mr. Rosandich testified that upon completion of much of the work on the vessel, the vessel was returned to the water in Ft. Lauderdale and moved to a location on the New River where Mr. Rosandich carefully, after a complete check of all the systems, started up all major mechanical systems on the vessel.

**109.**　After having carefully conducted a complete examination and running of all systems dockside, Mr. Rosandich took the vessel, staying in the Intercoastal, from Ft. Lauderdale to Miami and back to operate all major systems.

**110.**　Mr. Rosandich testified that the vessel performed just fine and that the vessel was in a seaworthy condition.

**111**.　Mr. Rosandich did testify that, while bringing the vessel back to Ft. Lauderdale he had a slight grounding incident.  He testified that he put on a mask and fins, and he dove under the vessel the day before the vessel left on its final voyage. He determined that the vessel had suffered slight damage to its starboard prop.  He also testified that the vessel had not suffered any damage to its hull.

**112.**　Mr. Dorsey, when he last attended the vessel at least two weeks prior to her final departure, found her in a good seaworthy condition.  Mr. Dorsey was not present at the time the vessel finally departed from the dock in Ft. Lauderdale, Florida on its final voyage.

**PROPOSED FINDINGS OF FACT**　　43
**AND CONCLUSIONS OF LAW**

**113.**    Mr. Dorsey contracted with a company called Fish Offshore, an experienced vessel operator, to provide the crew to transport the vessel to Louisiana.

**114.**    The defendant had negotiated a contract with Fish Offshore so that when the vessel arrived in Louisiana and received its COI it was going to be chartered by Fish Offshore for use in the Gulf of Mexico.

**115.**    Karyn Price of WFT, Inc. knew Fish Offshore and its owner, Greg Blanchard, and she had underwritten several of the Fish Offshore vessels.

**116.**    Karyn Price testified that part of the reason that she agreed to underwrite the ANZEHAL EXPLORER, is because it was a Fish Offshore project and that a Fish Offshore crew was going to be on the vessel, which "gave [her] comfort" Karyn Price Transcript, page 129.

**117.**    Within a few weeks of the vessel's final departure, part of the three-man Fish Offshore transportation crew, Steve Scibetta, deckhand, and David Killingsworth, engineer, came and worked on the vessel.

**118.**    On March 23, 2007, the day before the vessel departed, Fish Offshore Captain Ross Eymard, who was hired to bring the vessel from Florida to Louisiana, arrived at the vessel.

**119.**    Both Steve Scibetta and Ross Eymard have spent their entire lives at sea.  Steve Scibetta has worked as a deckhand and a vessel engineer since 1981 when he started as a teenager working on the lobster boats off of New England.  Captain Eymard obtained his USCG captain's license when he was 19, and he is currently on his fourth issue as a licensed USCG Captain.  He is from Louisiana and has spent his entire life at sea in the Gulf of Mexico operating commercial vessels in all conditions.  Captain Eymard also has

extensive knowledge of Florida waters, having worked as a dredge boat captain in Florida waters for close to six years.  There was no evidence presented that the crew had ever been found negligent or incompetent prior to the loss of this vessel.

**120.**     While engineer David Killingsworth's hearsay statement recorded by plaintiff's investigator without the presence of a representative of the defendant was partially read in Court, he was not deposed and did not testify at trial.

**121.**     Mark Rosandich did testify that he had a personality conflict with the engineer David Killingsworth.   Mr. Dorsey, though, testified that Mr. Killingsworth was a hard worker who appeared to be performing his tasks prior to the final launch of the vessel. Mr. Dorsey also testified that a crew member can appear to be competent at the dock, but when he gets into an emergency situation, he will not always perform as required.

**122.**     Both Captain Ross Eymard and Steve Scibetta testified that the vessel was seaworthy at the time it left the dock on its final voyage.

**123.**     Ross Eymard and Mark Rosandich both testified that Captain Eymard, with Mr. Rosandich's assistance, conducted a complete examination of the vessel prior to departure and found the vessel to be completely sound.  His examination included a complete inspection of the vessel's hull and found it to be in good condition.

**124.**     Captain Eymard testified that during the hand over procedure, Mr. Rosandich told him about the slight tip deflection on the starboard prop only, and that they intended to repair the prop in Ft. Meyers, Florida.  There is no testimony that the vessel's hulls were in anyway compromised prior to her final launch.

**125.** Brad Schowenwald testified that after a complete review of the records, including the crew statements, the crew felt comfortable enough to get the vessel underway and operate the vessel.

> Q. (Fertig) Isn't that what you're just saying from your review of the statements?
>
> A. (Schoenwald) The questions are raised, yes. However, they still felt comfortable enough to get underway and operate the vessel. We can take the time to find it, and I know it's here. The captain ultimately said that the vessel was in good condition and he felt comfortable with the vessel. And I believe he reiterates that in his deposition.

**126.** Mark Rosandich testified that when the vessel departed it had nine pumps that could have been used to pump water out of the vessel. He further testified that out of the nine pumps, seven of them could have been used in the starboard hull. This included the mechanical bilge pump attached to the engine, a trash pump, and four submersible pumps. All of defendant's marine experts testified that the vessel, even without the electrical bilge pump in place, had adequate pumping capacity.

### 4) The Vessel Sank After Operating Problem Free for Close to 48 Hours, in Stormy Conditions, and Close to Shore.

**127.** The vessel left on its trip from Ft. Lauderdale to Golden Meadows, Louisiana on the morning of Saturday, March 24, 2007. The vessel was traveling to Louisiana so that it could complete its COI in Louisiana, and go to work in the Gulf of Mexico. Mark Rosandich and Jeff Dorsey both testified that they agreed on a planned trip for the vessel that included traveling up the Intercoastal to the Lake Okeechobee Water Way, crossing the state of Florida, and then crossing the Gulf of Mexico to Louisiana.

**PROPOSED FINDINGS OF FACT**          46
**AND CONCLUSIONS OF LAW**

**128.** While the vessel had not yet received its final COI, it had received a two year hull credit, and all five of the testifying marine experts testified that whether or not a vessel has a COI has nothing to do as to whether a vessel is seaworthy. There are millions of vessels operating in both this country and around the world that do not have a USCG COI and are generally considered a seaworthy vessel.

**129.** Prior to departure, Jeff Dorsey authored and sent a letter to the USCG Sector Miami and informed them that the defendant would be taking the vessel to Louisiana to complete its COI. The USCG sent the entire file for the ANZHELA EXPLORER to Louisiana. Defendant Exhibit 122.

**130.** The Activity Summary Report, admitted as Plaintiff Exhibit 176, page 8 of the exhibit USCG report, stated that the owner elected to move vessel to NOAL zone to complete certification.

**131.** On the same day the vessel left the dock on its final voyage, Captain Ross Eymard had some problems leaving the dock because of a set screw in the throttle. Captain Eymard was able to successfully navigate the vessel back to the dock, and Mr. Rosandich was able to determine the cause of the problem and fix it by tightening the set screw. Mr. Rosandich further testified that Captain Ross Eymard then was able to continue the voyage to Louisiana.

**132.** Mark Rosandich and Captain Eymard testified that the vessel did not touch ground during this incident, it had substantial rub rails, and the vessel was not damaged in anyway by this incident.

**PROPOSED FINDINGS OF FACT**     47
**AND CONCLUSIONS OF LAW**

**133.**     Mark Rosandich testified they were impressed with Captain Eymard's ability to bring the vessel back to the dock even though he had encountered a problem with the throttle.

**134.**     Captain Ross Eymard and Mr. Scibetta testified that the vessel traveled all the way up the Intercoastal to Stuart, Florida, and to the St. Lucie Lock with no problems. The vessel did not have any of the high bilge alarms go off and the vessel functioned fine. No testimony of any kind was presented at trial by the plaintiff indicating that the vessel had any problems while operating for over 24 hours on its voyage up the Intercoastal Waterway to the Lake Okeechobee Waterway.

**135.**     Ross Eymard, Steve Scibetta, and Mark Rosandich all testified that, once the vessel reached the first St. Lucie locks at the Lake Okeechobee Waterway on Sunday morning, March 25, 2007, the lockmaster informed Captain Eymard that there was not enough water depth in the waterway to allow the vessel to take the waterway to the other side of the state.

**136.**     Mark Rosandich and Captain Eymard both testified that a decision was then made to bring the vessel back south, past Ft. Lauderdale to Miami, where Mr. Rosandich planned on meeting the vessel and had arranged dockage for the vessel on the Miami River.

**137.**     Mark Rosandich testified that he told the Captain to bring the vessel back the way it had gone, meaning back down the Intercoastal.

**138.**     Captain Eymard made the decision to take the vessel outside, into the Atlantic Ocean, because the vessel would have made better time than operating back through the Intercoastal to Miami.

**PROPOSED FINDINGS OF FACT**     48
**AND CONCLUSIONS OF LAW**

**139.**     The Captain and Steve Scibetta both testified that the vessel exited the Intercoastal by using Jupiter Inlet.

**140.**     Malcolm Elliott, using the Jupiter Inlet District web site located at  http://www.jupiterinletdistrict.org/ , obtained a photograph marked as Defendant Exhibit 213, which shows the vessel ANZHELA EXPLORER, departing Jupiter Inlet on March 25, 2007 at 17:45.

**141.**     Malcolm Elliott testified that, in his opinion, the vessel ANZHELA EXPLORER, as it appeared in the photograph, looked in good trim and was operating normally as it exited Jupiter Inlet.

**142.**     Malcolm Elliott also testified that, in his opinion, Jupiter Inlet should only be used by a captain that frequently uses the Inlet.  He based that opinion on his own use of the Inlet with another Captain, his reliance on the Coast Pilot book for the area, and on the NOAA navigational chart for the area.  He testified that use of the inlet could result in a grounding, even a light grounding, that could result in sand entering through the vessel's sea strainers, resulting in an engine overheating.

**143.**     Both Steve Scibetta and Ross Eymard testified that the vessel operated fine, with no problems, as it departed the inlet and traveled south offshore in the Atlantic Ocean. They both testified that the vessel operated at speed and above 10 knots.  They both testified that the winds were between 15 to 20 knots and seas at least 6 feet.

**144.**     Both Sam Windsor and Malcolm Eillott testified that the vessel would never have been able to operate, at speed, offshore, with the props in the condition they were in when the vessel was taken out of the water after the salvage.

**PROPOSED FINDINGS OF FACT**     49
**AND CONCLUSIONS OF LAW**

**145.**      Steve Scibetta and Ross Eymard both testified that after operating at speed, 15 plus knots, for several hours, that the vessel made it to just off of Golden Beach and then lost its steering.

**146.**      All of the marine experts, Brad Schoenwald, Malcolm Elliott, Sam Windsor, and plaintiff's hired marine expert Ian Cairns, testified that the starboard engine showed significant signs of overheating.  All of the experts that attended the vessel post sinking testified that the vessel did not show any signs of damage to its steering.

**147.**      The starboard engine did suffer damages from overheating and did become seized, making the engine inoperable.

**148.**      Mark Rosandich testified that during a post loss interview with Steve Scibetta, Mr. Scibetta testified that the vessel had encountered a high heat situation on one of its engines.

> Q.(Fertig) Okay.  Well, did he also tell you or mention anything about the engine overheating along the way?
>
> A.(Rosandich) At some point he did.  He mentioned that they had a high heat situation.

**149.**      Mr. Rosandich testified that when the vessel was raised and he began removing the engine, he discovered that the sea strainers for the vessel's engines were packed with sand.  He also testified that there was a lot of sand in the remaining part of the vessel because it had been underwater for three weeks.

**150.**      The Captain Ross Eymard, because he believed that he could not have safely brought the vessel into port, decided to anchor the vessel offshore off of Golden Beach.

**151.**    The Captain Ross Eymard testified that the vessel was anchored in approximately 28 feet of water about quarter of mile off of Golden Beach, Florida.  He testified that the weather remained relatively rough with 15 to 20 knot winds and 6 foot seas.

**152.**    Mark Rosandich testified that he received a call at approximately 9:00 pm from Captain Ross Eymard when the vessel anchored off of Golden Beach, Florida.

**153.**    Steve Scibetta testified that approximately at 1:00 am, on the morning of March 26, 2007, David Killingsworth came to his cabin, woke him up, and asked for his assistance because the starboard exhaust line had broken open, and outside seawater was coming into the starboard engine space.  This is the first report of any seawater coming into the vessel.

**154.**    Steve Scibetta and Ross Eymard both testified that after using the pumps on the vessel, after approximately an hour's work, the crew successfully dewatered the vessel. There is no testimony that any of the crew knowingly made a repair to the exhaust hose, and stopped the water coming into the vessel.  Mr. Scibetta testified that he saw the port engine hatch open.

**155.**    Steve Scibetta and Ross Eymard both testified that they went to their respective bunks and left the engineer on watch.

**156.**    Steve Scibetta testified that approximately at 4:30 am on March 26, 2007, David Killingsworth woke him in his berth, and Mr. Scibetta and Captain Eymard both testified that they felt the vessel listing hard to starboard.  Captain Eymard testified that the engineer called him much later, after he had returned home to Louisiana, and told him that he had fallen asleep on watch.

**PROPOSED FINDINGS OF FACT**      51
**AND CONCLUSIONS OF LAW**

**157.**     Mr. Windsor, the defendant's marine expert, testified that the vessel's starboard engine compartment could have flooded within forty-five minutes to an hour, based on the size of the hole in the starboard exhaust hose.

**158.**     Plaintiff's own marine expert, Ian Cairns, testified that the hole in the starboard exhaust hose could have been the cause of the sinking of the vessel.  He also testified that he was not aware of any other hole in the vessel that could have sunk the vessel.

**159.**     Both Mr. Scibetta and Captain Eymard testified that the wind and seas had increased with seas running up to 8 feet and winds in excess of twenty knots.

**160.**     Plaintiff's own marine expert, Ian Cairns, testified that in his opinion the sea conditions had increased and the vessel was in heavy weather conditions.

**161.**     Plaintiff's own witness, Captain Tim Morgan, also testified that the vessel, at the time of sinking, was in heavy weather conditions.

**162.**     Mark Rosandich testified that he received a call from Captain Eymard requesting that Mr. Rosandich contact the USCG for assistance because the vessel was sinking.

**163.**     Ross Eymard and Steve Scibetta both testified that the USCG came and took the crew off the vessel just before it sank.  Ross Eymard testified that the USCG could have drug tested them while they were in USCG custody, and that the USCG would do so if they had any suspicion because of the USCG zero tolerance policy, but the USCG choose not to administer any drug testing.

**164.**     Both Steve Scibetta and Ross Eymard testified that the vessel sank with the bow or front of the vessel pointing west toward the beach and the stern faced toward the sea. Defendant Exhibit 101 (Video showing the vessel in the water with the bow toward the beach).

**PROPOSED FINDINGS OF FACT**          52
**AND CONCLUSIONS OF LAW**

**165.**      Ross Eymard testified that after the USCG released them to SeaTow who took them back to the dock, he threw a soda can at one of the reporters because he felt somewhat responsible as the captain who had lost his ship. He continued to testify that he was cold, shaking, angry, and very frustrated regarding the loss of the vessel.  See also Defendant Exhibit 102, (News video of crew at the dock shortly after Vessel sank.).

**166.**      Ross Eymard testified that after the sinking, his relationship with Mr. Dorsey was bad.  They were at odds and their relationship was not really good for awhile.

### 5) After the Vessel Sank, it Dragged Along the Ocean Bottom Until it Broke Up in the Surf Close to the Beach.

**167.**      Mark Rosandich testified that, on the night of the sinking, he notified Brian Hawthorne of SeaTow Miami regarding offering assistance to the vessel.

**168.**      Mr. Rosandich further testified that the next day he entered into a salvage contract with SeaTow to salvage the vessel because they were the only salvage company available to immediately raise and save the vessel.

**169.**      Mr. Rosandich and Captain Morgan testified that the vessel was pushed toward the beach by the wind and waves and then ended up only a few hundred yards off the beach in the surf.

**170.**      Mr. Rosandich testified that because SeaTow was slow to deploy its resources and because of the vessel's unique design with isolator mounts separating the superstructure of the vessel from the hulls of the vessel, when the vessel reached the beach it broke into two pieces with the superstructure of the vessel being sheared off from the hull.

**171.**      Captain Tim Morgan testified that as the vessel approached the beach area, it broke up in the surf.  He also testified that he dove down on the original impact zone of

**PROPOSED FINDINGS OF FACT**           53
**AND CONCLUSIONS OF LAW**

the vessel and observed deep gouging of the vessel into the sand and rock of the reef area. He testified that the hulls of the vessel left plow marks through the sand for at least part of the way to the beach.  See also Defendant Exhibit 100 Video of vessel superstructure detached from vessel.

**172.**     Plaintiff conceded at trial that the vessel was a constructive total loss.

**173.**     Several weeks after the vessel had been in the water and the superstructure has been completely removed from the vessel, SeaTow under an agreement with the plaintiff, removed the remaining wreckage of the vessel.

**174.**     Captain Morgan testified that he had to use multiple trash pumps and cut numerous holes on the vessel's top sides because of the vessel's water tight compartments.

**175.**     Ian Cairns, surveyor and marine expert for plaintiff, was present during the wreck removal of the vessel, and he also testified that during the wreck removal multiple pumps had to be deployed and the pumps had to be moved from compartment to compartment to keep the hull afloat so that it could be towed back to shore.

**176.**     Mark Rosandich and Jeff Dorsey testified that SeaTow would not give them access to the vessel superstructure that SeaTow removed from the ocean floor via crane and barge, and that under the agreement between SeaTow and the plaintiff, the insurance company had agreed to let SeaTow have the superstructure even though plaintiff then refused to pay on the hull policy.  The defendant, with plaintiff's permission, sold the hull for $30,000.00.

**177.**     Once the hull was brought up the Miami River and the hull was lifted out of the water via crane and put on land, Jeff Dorsey testified that he and his hired engineer

**PROPOSED FINDINGS OF FACT**          54
**AND CONCLUSIONS OF LAW**

Michael R. McCue took numerous photographs of the remaining hull that first day it was out of the water.  Defendant Exhibit 109.

178.     The photographs show that the vessel was severely damaged.  All that remained was the hull which had numerous ruptures and holes.  The interior of the vessel also was severely damaged with most of it having been completely destroyed.  The starboard engine showed significant signs of overheating.  The props were still attached to the vessel, but they were also badly damaged.  The entire superstructure was gone from the vessel.

179.     Jeff Dorsey testified that he took Defendant Exhibit 109 page 58 on the day the hull came out of the water.  He testified that this is a picture of the starboard exhaust hose which shows that the hose shows significant signs of overheating with a large rupture.

180.     When Ian Cairns, plaintiff's expert, was presented with the actual hose, he testified that the hole in the hose was big enough to sink the vessel.  Plaintiff Exhibit 78; the hose with the hole in it.

181.     Samuel Windsor, a marine engineer with many years of experience, testified that he believed that the circumference of the hole was at least 8 square inches.

182.     Mr. Windsor, using mathematical calculations called Bernoulli's theorem, testified that the vessel's engine room compartment would have flooded in 40 to 45 minutes with such a hole in the exhaust hose.

183.     All three of the defendant's marine experts, Brad Schoenwald, Samuel Windsor, and Malcolm Elliott testified that the hose showed signs of melting under high heat.

184.     Mr. Windsor further testified that the vessel, having an eight-and-half foot draft and subject to a six to eight foot sea, would have allowed the stern of the vessel to come

**PROPOSED FINDINGS OF FACT**          55
**AND CONCLUSIONS OF LAW**

in contact with the ocean floor.  Mr. Windsor testified that as the bow of the vessel raised

up in the waves the stern of the vessel, especially as the stern starboard engine

compartment flooded with water, would have allowed the vessel's stern to come into

direct contact with the ocean floor.

## II.  PROPOSED FINDINGS OF LAW

### A. THIS MARINE POLICY PRESUMPTIVELY PROVIDES COVERAGE.

The ancient oath of marine insurance defines all "the Adventures and Perils which

the Underwriters are contented to bear and take upon themselves" breathtakingly broadly:

> they ["Adventures and Perils"] are of the Seas, Men-of-War, Fire … Barratry of
> the Master and Mariners and of all other like Perils, Losses and Misfortunes that
> have or shall come to the Hurt, Detriment or Damage to the Vessel … excepting
> … such of the foregoing perils as may be excluded by provisions elsewhere in the
> Policy or by endorsement thereon.  Policy; Plaintiff Exhibit 65, USI Placement
> 1002, l. 70-74.

Moreover, "it is the general rule that any ambiguity must be construed against the

underwriter; that is to say, most favorably to the assured."  L. Buglass, *Marine Insurance

& General Average in The United States*, p. 98 (Cornell: 3d ed. 1991) (citations omitted).

Therefore, the overarching principle for resolving this dispute is straightforward:

"Under a policy of marine insurance, the risk undertaken by an underwriter is that if the

subject-matter insured is lost or damaged as a result of the operation of an insured peril,

he will be responsible. …. It is only necessary to see whether the loss comes within the

terms of the contract and is caused by the perils of the sea."  *Id*., p. 80 (citation omitted).

The plaintiff, in its Complaint, did not dispute that the loss of ANZHELA

EXPLORER fell within the terms of this policy, or that she sank because of flooding

caused by perils of a stormy sea.  Insuring against the marine perils of a trip from Ft.

Lauderdale, Florida to Louisiana was the prime and plain "intent and reasonable

**PROPOSED FINDINGS OF FACT          56
AND CONCLUSIONS OF LAW**

expectation of the parties in entering into the agreement." <u>American Strategic Insurance</u> <u>Co. v. Lucas-Solomon</u>, 927. So.2d 184 (Fla. App. 2006).  This core intent should be central in determining the appropriate resolution of this case.

**B. PLAINTIFF BROUGHT SUIT ON VARIOUS COUNTS, FOUR OF WHICH THIS COURT DISMISSED PRIOR TO TRIAL.**

As required under the policy and the agreement between the parties, Anzhela Explorer, LLC began paying the premiums, and continued to do so for several months after the vessel sank, until it became clear plaintiff was not going to pay for this loss. Plaintiff refuses to pay on the policy, and to return the premiums, even though plaintiff's chief underwriter testified that it appeared to her the claim had been denied.

On August 15, 2007, plaintiff filed a Complaint For Declaratory Relief and Damages, declaring the policy *void ab initio*.  Docket #1, Complaint, page 9, ¶ 37.  In its declaratory action, plaintiff brought personal claims against Jeff Dorsey and Mark Rosandich for fraud and misrepresentation, which claims this Court very quickly dismissed.  Docket #s 32, 35, and 46.

Plaintiff also alleged in its Complaint (p. 5, ¶ 17) that it never received a copy of the August 2006 survey – a principal basis for plaintiff's continuing, false claim that it knew nothing of ANZHELA EXPLORER'S seaworthiness.  Plaintiff also alleged in its Complaint (p.6, ¶ 20) that the Defendant "never mentioned in the application or otherwise to STATE that the vessel was outside of the requested navigational limits and would need to be transported to the Gulf of Mexico to be in compliance with the navigational limits requested."  This was not true for *on April 29, 2007*, pursuant to a subpoena from the defendant, USI produced *documents that plaintiff should already have produced to Anzhela defendant*, but had not.  Included among these documents was the

PROPOSED FINDINGS OF FACT          57
AND CONCLUSIONS OF LAW

email from USI to Karyn Price containing Mark Rosandich's February 14, 2007 email –
**with the vessel survey attached**.  Defendant Exhibit 1 and 2.  The email sent by Mark
Rosandich from Florida stated that the vessel was going to be taken to Louisiana.  It also
stated that the vessel did not have a current COI. The survey stated that the vessel did not
have a current COI and the vessel was located on the east coast of Florida.   When
confronted with plaintiff's failure to produce these critical responsive documents,
plaintiff's then attorneys withdrew, stating they were dong so "due to ethical reasons just
discovered." Docket # 34.

On June 9, 2008, Karyn Price finally admitted, under oath, to having received the
survey, but she maintained her claim of ignorance of the Mark Rosandich email. Docket
# 87 Price Deposition, page 72-76 read into the record at trial; Defendant Exhibit 1 and 2.
On June 30, Anzhela subpoenaed WFT, Inc. demanding all pertinent documents.  On July
22, WFT, Inc. produced an email from Karyn Price to Wanda Didier, WFT, Inc.'s Chief
Underwriter and Karyn Price's boss, dated May 6, 2008, showing that Price had not only
received a copy of the Rosandich email – she had forwarded it on to her boss!  Defendant
Exhibit # 177.  At her deposition 30 days later, Price claimed to have never seen the
Rosandich email she had forwarded to her boss. Docket # 87 Price Deposition, page 72-
76; Defendant Exhibit # 2.

Even though the plaintiff's counts VIII – XI have already been dismissed based
on the false and misleading information in the Complaint regarding what information the
underwriter had at the time she issued the policy, plaintiff failed to amend page 10 of the
Complaint paragraph 40 where the plaintiff wrongly asserts in part that the policy is void
because defendant failed to provide a copy of a survey.  Plaintiff  also failed to prevail on

its remaining counts I) Breach of Good Faith; II and III) Breach of Seaworthiness; IV)

Breach of Navigational Warranty) and VII) Reimbursement To Plaintiff of Cost because

it did not meet its burden on any of these counts.  Under Lloyd's U.S. Corp. v. Robert D.

Smallwood, 719 F. Supp. 1540, 1549;1995 AMC 1201, (M.D. Fla. 1989); *affirmed*

*without opinion* 903 F.2d 828 (11th Cir. 1990), plaintiff has the burden to proof that the

policy is void because the defendant breached one on the warranties in the policy.

Plaintiff, at trial, failed to meet its burden.

**C. PLAINTIFF'S AGENT EXTENDED COVERAGE TO THE ATLANTIC.**

The validity of an oral insurance binder is an issue of fact.  Nu-Air Mfg.Co. v.

Frank B. Hall & Co. of New York, 822 F. 2d 987, 990-991 (11th Cir. 1987) (Florida law).

As detailed below, the parties herein plainly and repeatedly covered ANZHELA

EXPLORER'S sailing plans.

In a remarkably similar decision, a policy had been limited to "in inland waters

only," until the owner obtained an oral agreement binding and extending coverage to the

Gulf of Mexico, where the vessel's loss occurred.  Great American v. Maxey, 193 F.2d

151, 1952 AMC 36 (5th Cir. 1951).  The Fifth Circuit affirmed the District Court's

holding that an oral agreement had been formed and punitively sanctioned the insurer's

refusal to pay.  Id., AMC at 37; see also McBride v. Home Ins. Co., 1952 AMC 938

(E.D.La.1952) (oral agreement to extend navigational limits of marine insurance policy

enforced over insurer's objections).

Pursuant to the testimony of Jamie Robichaux, Shawn LeBeouf, Jeff Dorsey,

Mark Rosandich and Karyn Price, the navigational limits of this policy were extended via

an oral agreement for trip coverage.  Shawn LeBeouf Deposition, page 199-201;

Robichaux Deposition, page 35-36.

Karyn Price, plaintiff's Executive Vice President, under oath, confirmed this

binder:

Q. (Moure) **And you bound coverage on the vessel while it was in**

**Florida, correct?**

**A. (Karyn Price) Correct**.

Q. (Moure) And so when you bound coverage on the vessel in Florida, it

was insured while it was in Florida, is that that not correct?

Mr. Cochran: Object to form.

Ms. Lidondici: Objection to form.

2)  (Karyn Price) Yes.

* * *

Q. (Moure) . . . the vessel also had insurance while it was on the voyage, is

that not correct?

Mr. Cochran: Object to form.

Ms. Lidondici: Objection to form.

A. **(Karyn Price) It had insurance on its way down to Louisiana, yes.**

Q.  (Moure) Do you recall how many times you talked to Mr. LeBeouf

regarding underwriting this policy?

Mr. Cochran: Form.

A. (Karyn Price) **Four to five times. We talked quite often**.

**PROPOSED FINDINGS OF FACT        60**
**AND CONCLUSIONS OF LAW**

Karyn Price Dep., pp. 100-101, Deposition testimony used at trial during

cross-examination of Ms. Price. (emphasis supplied).


Anzhela Explorer, LLC's employee Shawn M. LeBeouf confirmed Price's

testimony to this oral binder:

Q. (Moure) Okay. Do you recall what was said during that phone call?

A. (Shawn M. LeBeouf) Just clarifying that she [Price] knew the vessel

was at XYZ dock.  Again, I remember this conversation.  I was pulled

over on the road on Highway 90, and I had the name of the dock. **I said**

**they are going to have to do this. They are going to try to go through**

**the Intercoastal.**

Q. (Moure) Where was the dock? What state was it in?

A. (Shawn L. LeBeouf) In Florida, South Florida.

Q. **(Moure) The vessel was going where?**

A. **(Shawn L. LeBeouf) To Gold Meadow, Louisiana.**

        *   *   *   *

**I asked to make sure we are okay we are coming from XYZ dock and**

**also the city, and I don't recall.  We are going to be coming to Golden**

**Meadows, make sure everything is good.**

Q. (Moure) So the conversation would have taken place on March 19,

2007?

A. (Shawn L. LeBeouf) There about, yes sir.  If I am not mistaken

coverage was bound on 3:23.

**PROPOSED FINDINGS OF FACT**      61
**AND CONCLUSIONS OF LAW**

Shawn M. LeBeouf Dep. pp. 83-84 (Emphasis supplied).

Q. (Lidondici) So if the Confirmation of Coverage indicates navigational

limits, those would be the navigational limits, those would be the

navigation that upon review of your placement file were bound in this

policy?

A. (Shawn L. LeBeouf) No, with exception, no, because **the underwriters**

**had agreed to give us coverage to bring it from Florida to Golden**

**Meadow to get outfitted**.

Shawn M. LeBeouf Dep., pp. 192 (Emphasis supplied).

Karyn Price's affidavit, submitted during summary judgment and testimony at

trial, stated that she thought the vessel was in Ft. Meyers, Florida, is not believable.  She

admitted that she received nothing in writing as to the vessel being in Ft. Meyers, Florida.

Ms. Price claims that she was told that on the phone by USI, yet she failed to document

that conversation anywhere.  Having testified that it is WFT, Inc. policy to reduce all

such conversations to writing, she failed and admitted as much at trial, to do so, making

such testimony not credible.  Also, Shawn LeBeouf testified exactly the opposite: he told

Ms. Price all along that the vessel was located in Ft. Lauderdale, Florida and that is why

it needed trip insurance.  Shawn LeBeouf Deposition, page 199-201.

All of the exhibits admitted at trial located the vessel off the Atlantic coast of

Florida.  Defendant Exhibits 1, 2, 11, 177, 212.  Ms. Price, after much discovery and

changing testimony on her part, admitted under oath that she had all of these documents,

including the Mark Rosandich February 15, 2007 email and the vessel survey, prior to the

vessel's insurance coming into effect on March 23, 2007 at noon.  All of the

**PROPOSED FINDINGS OF FACT**          62
**AND CONCLUSIONS OF LAW**

documentation and most of the testimony including Ms. Price's proof that the parties entered into an oral contract to cover the trip.

Also, the plaintiff's actions for several days after the vessel sank in the Atlantic Ocean is additional proof that the plaintiff knew that it had extended coverage for the trip and then after it made a decision not to pay on the policy. All of a sudden, it asserted a defense as to a navigational limitation. The plaintiff hired surveyors, sent out numerous emails regarding subrogation claims, and generally acted as if the vessel had insurance even though it was sitting on the ocean floor of the Atlantic. Morgan Deposition Testimony, page 78. Cross-Examination of Morgan. See also Defendant Exhibits 179, 180, 181, 191.

The U.S. Supreme Court held that the parties' knowledge of the purpose of a voyage is dispositive, superseding a navigational warranty: "all parties knew that the business in which she was engaged took her in and out of the last-named port. . . . . To get to and from it ships must navigate the Gulf of Mexico." Merchants' Mutual Ins. Co. v. Allen, 121 U.S. 67, 69, 7 S. Ct. 821, 30 L. Ed. 858 (1887).

 Mr. Dorsey, as part owner, along with his father and brother, of the defendant Anzhela Explorer, LLC, testified that he signed the last page of the application with the navigational limitations of the Gulf of Mexico because he had received written and verbal confirmation from USI that the vessel had trip coverage. Defendant Exhibits 7-10.

**D. DEFENDANT ACTED WITH UTMOST GOOD FAITH WHILE PLAINTIFF ACTED IN BAD FAITH.**

It is the plaintiff's burden to prove avoidance of the policy on the grounds of misrepresentation or omission of material fact. See Contractors Realty Co. v. Insurance Co. of N. Am. 269 F. Supp. 1287, 1979 AMC 1864 (S.D.N.Y. 1979) and In re Balfour

**PROPOSED FINDINGS OF FACT**          63
**AND CONCLUSIONS OF LAW**

MacLaine Int'l Ltd. 85 F.3d 68, 1996 AMC 2266 (2d. Cir. 1996).  The plaintiff failed to meet its burden.  Once it undertook to underwrite ANZHELA EXPLORER, plaintiff had a duty to exercise care, including sufficient levels of underwriter curiosity to uncover risks it now "avers" were so material:

> [U]berrimae fidei does not require the voiding of the contract unless the undisclosed facts were material and relied upon. . . . . Further "[a] minute disclosure of every material circumstance is not required.  The assured complies with the rule if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it."

Puritan Ins. Co. v. Eagle Steamship, 779 F.2d 866, 871 (2d Cir 1985) (citations omitted).

While the doctrine of *uberrimae fidei* remains well entrenched, many courts, including the Eleventh Circuit, have recognized that the principle of *uberrimae fidei* holds a reciprocal duty of utmost good faith which is applicable not solely to the insured, but to the insurer as well. *See* Kilpatrick Marine Piling v. Fireman's Fund Ins., 795 F.2d 940. 942 (11th Cir. 1986); Gulfstream Cargo, Ltd. v. Reliance Ins. Co., 409 F.2d 974, 981 (5th Cir. 1969); Certain Underwriters at Lloyd's, London v. Giroire., 27 F.Supp2d 1306, 1311 (S.D. Fla. 1998); Intern. Ship Repair v. St. Paul Fire & Marine, 922 F.Supp. 577, 580 (M.D. Fla. 1996); Commercial Union Ins. Co. v. Flagship Marine Services, 982 F.Supp. 310, 314 (S.D.N. Y. 1997); Compagnie de Reassuralll~d'I1e de France v. New England Reinsurance Corp., 944 F.Supp. 986, 1003 (D.Mass. 1996).

Recognizing reciprocity, it remains "well-established under the doctrine of *uberrimae fidei* that the parties to a marine insurance policy must accord *each other* the highest degree of good faith." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. 1986); *see also* Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 870-71 (2d Cir. 1985).

**PROPOSED FINDINGS OF FACT**     64
**AND CONCLUSIONS OF LAW**

Under the principle of *uherrimae fidei,* an insured meets his duty of good faith **"if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it."** Puritan, 779 F.2d at 871(Emphasis added); *see also* Knight, 804 F .2d at 13; Commercial Union. 982 F.Supp. at 314. "A minute disclosure of every material circumstance is not required." Puritan, *supra* at 871. The standard of disclosure is an objective one, the question being whether a reasonable person *in the insured's position* would know that the particular matter in question is material. Port Lynch v. New England Intern. Assurety of Am., 754 F.Supp. 816, 822 (W.D. Wash. 1991). Thus, the issue is not whether a particular insurer would deem a fact "material" (particularly with the benefit of hindsight), but rather, whether a reasonable insured would, at the time of application, understand that the fact should be disclosed.

Correspondingly, an insurer cannot, in good faith, seek to void an insurance policy unless an alleged misrepresentation is found to be *both* material and **relied upon**. *Puritan*. 779 F.2d at 871. A fact meets the materiality standard if it is something that would have *controlled* an insurer's decision to underwrite a particular risk, *Giroire*, 27 F.Supp.2d at 1313, a standard based upon the judgment of a prudent insurer. Albany Ins. Co. v. Wisniewski, 579 F.Supp. 1004, 1015 (D.R.I. 1984); *see also* Kilpatrick, 795 F.2d at 942-43.  Additionally, an undisclosed or misrepresented fact on an application for marine insurance will not serve to void a marine insurance contract where such was not actually relied upon by the insurer. Puritan, 779 F.2d at 871; Commercial Union, 982 F.Supp. at 314.  Moreover, an insurer retains a good faith duty to read information given, taking such information into consideration in issuing their policies. *ld.*

Imposing a corresponding duty of good faith upon the insurer serves to negate the opportunity that insurers may otherwise have to utilize the doctrine of *uberrima fidei* as both, a sword and a shield, by refusing scrutinize information provided to them by the insured knowing that they may later rely on old common law doctrine as an ace in the hole to deny coverage. While insurers may still seek void a policy on the grounds that the risk assumed was not the one intended to be assumed, Steelme*t*, 747 F.2d at 695, insurers faced with a claim may not engage in post-claim underwriting and indiscriminately dredge up any undisclosed matter in an effort to void the policy and avoid payment of the claim

The defendant provided plaintiff with numerous documents indicating the vessel did not have a current COI.  Defendant Exhibit 2, and 177; Plaintiff Exhibit 68 and 188D. Karyn Price testified at trial that she "clearly" received contemporaneous conflicting information regarding whether the vessel had a current COI and yet chose to ignore it. Karyn Price then herself admitted that it was her "fault" for not following up on the conflicting information to determine whether the vessel had a current COI.  She and the other underwriter who testified at trial also testified that if an underwriter receives conflicting information, it is their responsibility to follow up and clarify those conflicts.

Plaintiff acted in bad faith prior to the issuance of the policy because the underwriter failed to properly maintain her underwriting file.  Ms. Price should have forwarded the survey to the home office in North Carolina.  She did not do so until eight months after plaintiff brought this case.  Ms. Price testified that she made a mistake and should have forwarded the policy when she first got it back in February 2007.

**PROPOSED FINDINGS OF FACT**          66
**AND CONCLUSIONS OF LAW**

Plaintiff then brought false accusations against the defendant regarding its failure to send a survey.  Ms. Price testified that no one asked her for a copy of the survey prior to the complaint in this case being filed.

The policy does not even require that the insured provide a copy of the survey until 30 days after the policy has been issued.  Since the vessel sank prior to the issuing of the policy, there was not even a requirement that a survey be provided to the underwriters.  Yet underwriters filed suit, in bad faith, disregarding the language in its own policy.

**1)  Parties Set Their Own Standards Regarding Misrepresentation.**

This Court also finds that binding Eleventh Circuit precedent provides that *uberrimae fidei* does not preclude parties to a marine insurance contract from entering into an agreement to contract around the strictures of the doctrine. *See* King v. Allstate Ins. Co., 906 F.2d 1537, 1541 (11th Cir. 1990) ("'[t]here being no pubic policy problem whatsoever in parties to a maritime insurance contract setting the terms of the policy) between them we uphold their freedom to do so"). In *King*, the Eleventh Circuit found that the parties to the maritime contract at issue therein contracted out of *uberrima fidei* by acknowledging that the policy would he void only upon *intentional* concealment or misrepresentation of material fact, thereby negating the insurer's ability to void the insurance contract for otherwise innocent omissions or misrepresentations; mere mistakes would not suffice to deem the policy void *ad initio.*  Other courts have followed *King* in acknowledging that parties may set their own contractual standard for assessing misrepresentations and concealment, notwithstanding federal or state law to the contrary. *See* William Penn Life Ins. Co. of N.Y. v. Sands, 912 F.2d 1 J59, 1363 (11th Cir. 1990);

Northfield Ins. Co. v. Barlow, 983 F. Supp. 1376,1379 (N.D. Fla. 1997); International

Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Ins., Co., 921 F.Supp.

577,581 (M.D. Fla. 1996).

The Eleventh Circuit emphasized the ability of parties to contract around the strict

requirement that insurance contracts may be voided for mistaken misrepresentations in

the insurance application.   In William Penn Life Ins. Co. of N.Y. v. Sands, 912 F.2d at

1362, the Court reviewed the following language above the signature line on an insurance

application: "I have carefully read all the above questions: statements and answers are

true to the best of' my knowledge and belief."  The Sands Court then found that the

"knowledge and belief" language used on the application "imposed a different

requirement of accuracy". id. at 1363, noting specifically,

> Had [the insurer] intended to retain the ability to void the contract based
> on any inaccuracy, it should not have used the "knowledge and belief"
> qualifying language. Such language would reasonably induce an insurance
> applicant to believe that they were covered under the policy if they
> answered the questions to the best of their knowledge and the insurer
> subsequently issued the policy. To permit an insurer to rescind a policy
> containing "knowledge and belief' language due to an unknowing
> misstatement not only contravenes the terms of the contract itself. but is
> unfair as well. Insurance applicants faced with a policy that
> unambiguously stated that it could be voided for unknowing
> misstatements might have rejected those terms and sought another policy,
> or they might have undergone a full [ ] examination to ensure that their
> beliefs ... conformed to their representations. id. at 1363, n. 7

The application in this case stated that "By signature below, the Applicant

warrants the information provided in this application is complete and accurate to the best

of the Applicant's knowledge and belief." See Plaintiff Exhibit 68, USI-Placement-451;

Plaintiff Exhibit 69, USI-Placement-262.

**PROPOSED FINDINGS OF FACT**     68
**AND CONCLUSIONS OF LAW**

This knowledge and belief language further sets forth a different standard with regard to the extent of information provided an insurer: "In order for an insurer to rescind a policy due to a misstatement in the insured's application, such misrepresentation or nondisclosure must be in response to an insured's application, such misrepresentation or nondisclosure must be in response to an insurer's request for that information." (inner quotations and citations omitted.) Id. Accord, Hauser v. Life General Security Ins. Co. 56 F.3rd 1330, 1335 (11th Cir. 1995) (state statute inapplicable to the concealment of information not solicited by the insurer).

On the basis of King and Sands, this Court finds that the parties set their own standards for judging the insured's omissions, requiring intent to conceal. The question therefore becomes: Did the applicant disclose the requested information to the best of his knowledge and belief?

As stated more fully above the defendant, and its agent USI, provided the plaintiff more than enough information to satisfy the Eleventh Circuit's requirements regarding utmost good faith. The defendant, then, must have also complied with the contracted to reduced standard regarding utmost good faith because plaintiff introduced no facts that the defendant, and its agent, did not disclose the requested information to the best of their knowledge. The USI agent sent to the plaintiff a Mark Rosandich email, a vessel survey, a Synopsis of Vessel, and a signed application, all of which stated the vessel did not have a current COI. With all of this information, underwriters cannot now come back and say they thought the vessel had a COI. Certainly not based on the language in its own application.

**PROPOSED FINDINGS OF FACT**     69
**AND CONCLUSIONS OF LAW**

**E. PLAINTIFF FAILED TO MEET ITS BURDEN IN PROOFING THAT THE VESSEL WAS UNSEAWORTHY AND MUST THEN PAY ON THE POLICY.**

Plaintiff did not prove, as required under Lloyd's U.S. Corp. v. Robert D. Smallwood, *Id.* , that ANZHELA EXPLORER was not fit to sail from Ft. Lauderdale, Florida to Louisiana.

The warranty of seaworthiness has been held to mean "that the vessel is reasonably fit for the intended use." Aguirre v. Citizens Casualty Co., 441 F.2d 141, 144 (5th Cir.), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971) Under the American Rule, the insured warrants to the insurer the seaworthiness of the vessel at the inception or attachment of a time policy. Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d 940, 945 (11th Cir.1986); Saskatchewan Government Ins. Office v. Spot Pack, Inc., 242 F.2d 385, 388 (5th Cir.1957); Gulfstream Cargo, Ltd. v. Reliance Ins. Co., 409 F.2d 974, 983 (5th Cir.1969). Furthermore, the negative, modified warranty of the American Rule is not that the vessel shall continue absolutely to be seaworthy, at the commencement of each voyage or at departure from each port, but "that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition." Spot Pack, 242 F.2d at 388. Unlike the result of voiding the policy upon breaching a warranty of continuing seaworthiness, the consequence of violating this "negative' burden" is a denial of liability for loss or damage proximately caused by such unseaworthiness. Id.; see, e.g., Gulf Coast Trawlers, Inc. v. Resolute Ins. Co., 239 F.Supp. 424 (S.D.Tex.1965).

Plaintiff/insurer had the dual burdens of proving that the vessel was unseaworthy and that the cause of the unseaworthiness was the proximate cause of the loss. Spot Pack, 242 F.2d at 389; see Hanover Fire Ins. Co. v. Holcombe, 223 F.2d 844, 846 (5th Cir.),

**PROPOSED FINDINGS OF FACT**      70
**AND CONCLUSIONS OF LAW**

cert. denied, 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787 (1955).  Plaintiff failed to prove

the unseaworthiness of the ANZHELA EXPLORER, but also plaintiff had failed to show

that the lack of the vessel having a current COI or having one of many pumps on the

vessel directly resulted in the sinking of the vessel.

The purpose of the Inchmaree clause for captain and crew negligence in a marine

insurance policy "is to broaden, not restrict, to expand, not withdraw, coverage" in order

to aid the owner, rather than the underwriter. Spot Pack, 242 F.2d at 391; Tropical

Marine Prods., Inc. v. Birmingham Fire Ins. Co., 247 F.2d 116, 122 (5th Cir.), cert.

denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957); see Austin v. Servac Shipping

Line, 794 F.2d 941, 946 (5th Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d

581 (1986). A defect, which could have been discovered and which results in

unseaworthiness, is covered as the master's negligence as well as a latent defect, which is

not discoverable by the master or ship owner. Tropical Marine, 247 F.2d at 122. It is

uncontroverted in this case that Captain Ross Eyamrd was the master of the ANZHELA

EXPLORER while she was out. Based upon the court's findings as to the specific failures

in the regarding setting and maintaining watch, notifying the USCG and/or SeaTow

before it was too late regarding a flooding condition in the vessel, and not taking

appropriate corrective action to stop the water coming into the vessel, by the captain and

crew under his direction, the vessel sank because of captain and crew negligence covered

by the Inchmaree clause of the subject policy. See, e.g., Continental Ins. Co. v. Hersent

Offshore, Inc., 567 F.2d 533 (2d Cir.1977); Joseph Navigation Corp. v. Chester, 411

F.Supp. 496 (S.D.N.Y.1975), aff'd mem., 556 F.2d 557 (2d Cir.1976); Carter Tug Serv.,

Inc. v. Home Ins. Co., 345 F.Supp. 1193 (S.D.Ill.1971).

**PROPOSED FINDINGS OF FACT**      71
**AND CONCLUSIONS OF LAW**

ANZHELA EXPLORER was seaworthy. Plaintiff failed to prove otherwise. All the marine experts testified that a vessel need not have a current COI in order to be considered a seaworthy vessel. Mr. Rosandich, the testifying crew members, and Ives Jasmine all testified that the vessel had adequate pumping capacity on the vessel to meet any possible emergency. All of defendant's marine experts testified that the vessel had adequate pumping capacity. The vessel did have water tight compartments, and Mark Rosandich testified that the watertight compartments were in fact watertight prior to the vessel leaving the dock.

All of defendant's marine experts testified that the vessel would not have been able to operate at speed as she did offshore with the props in the condition they were in when the vessel was eventually pulled out of the water. They all testified that all or most of the prop damaged was caused after the vessel sank. Mr. Schoenwald testified that the port prop showed significantly more damage than the starboard prop. Mr. Windsor testified that the vessel would not have been able to have left the dock with the props in the condition they were in as shown in the photographs, Defendant Exhibit 109 pages 24, 32.; Plaintiff Exhibit 76, page 52.

Even if Plaintiff did prove everything alleged in its Complaint regarding the issue of seaworthiness, this proof was inadequate for lack of proximate cause. The law, facts, and expert testimony provided at trial show that none of plaintiff's complaints actually affected ANZHELA EXPLORER'S performance. None of ANZHELA EXPLORER'S alleged defects proximately caused her loss. As Malcolm Elliott and Brad Schoenwald testified, vessels operating without a COI are not required to have a watertight compartment and only need adequate pumping capacity to be considered seaworthy.

**PROPOSED FINDINGS OF FACT**          72
**AND CONCLUSIONS OF LAW**

The law of materiality requires far more: "Plaintiff/insurer had the dual burdens of proving that the vessel was unseaworthy and that the cause of the unseaworthiness was the proximate cause of the loss." Lloyd's v. Smallwood, 719 F. Supp. at 1549. *See also* Saskatchewan Government Ins. Office v. Spot Pack, Inc., 1957 AMC 655, 662-63; 242 F. 2d 385, 389 (5th Cir. 1957).  A contention quite similar to plaintiff's herein – "that the results of an inspection by the National Cargo Bureau … should have been disclosed" – was rejected: "the survey was not material to the barge's seaworthiness."  Steelmet, Inc. v. Caribe Towing Corp., 842 F.2d 1237, 1240 n.2 (11th Cir. 1988).  Plaintiff must *prove* causation – and did not.

Plaintiff brought forward two experts regarding the issue of seaworthiness.  Its first expert witness, Ian Cairns, did not employ adequate testing and scientific methodology, and is not a credible witness.  Mr. Cairns was present at the time the remaining hull of the vessel was removed from the water, and he took photographs.  He testified that he took no photographs of the starboard exhaust hose.  He failed to photograph the starboard engine.  He did not take any photographs of the port side engine or pumps.  He testified that he had possession of the starboard exhaust hose for over 18 months but did no testing on it.  He also testified that his methodology for determining if the propellers turned while the vessel was on the seafloor was by attempting to manually turn the props.  Mr. Cairns admitted, at trial, that this was not the proper way to determine if the props would have turned while the props were dragged along the ocean floor.

Mr. Cairns did admit, at trial, that the vessel's starboard engine did show signs of overheating.  He also, when shown a time and date stamped photograph as to when the

vessel left Jupiter Inlet, corrected his testimony as to how fast the vessel was operating on its trip to just off of Golden Beach.  Mr. Cairns admitted on the stand that he had been proven wrong about another theory that he had regarding the sinking of the vessel.  He had testified at deposition that a temporary repair had been made by inserting a stick in the hull of the vessel and that the vessel owner had allowed the vessel to go to sea as such.  He based this entire theory on one photograph that he took, Plaintiff Exhibit 76, page 52, photograph 102, in which he claimed showed a stick.  When shown Defendant Exhibit 109, page 32, Mr. Cairns admitted that what he had testified to as a stick in his deposition was actually part of the vessel's hull.  Additional photographs at Defendant Exhibit 96, page 49, and Defendant Exhibit 120, page 35 also show that what Mr. Cairns thought was a stick was actually part of the vessel.  Mr. Cairns did testify that he could not identify one hole in the vessel that occurred prior to the vessel sinking other than the hole in the exhaust hose.  He also testified that the exhaust hose hole could possibly have sunk the vessel.

Plaintiff's second marine expert, Drew Haines, testified that he was working off of an old out-of-date stability book when he came up with his analysis.  He admitted that he never had actually set foot on the vessel and had only observed it from afar.  He admitted that his diagrams did not have the correct number of watertight compartments.  Most importantly, Mr. Haines testified that he was not retained to conduct the seakeeping analysis required to determine how the vessel would react with a filled starboard engine room,  a 6 to 8 foot sea, twenty knots of wind, a vessel at anchor in 28 feet of water, only a quarter mile off shore, and with an outgoing tide.  Mr. Haines admitted, in trial without

such an analysis, he could not testify as to if the vessel would have sunk with a flooded starboard engine compartment.

### 1) Plaintiff Failed to Prove That Vessel Owner had an Incompetent Crew.

Plaintiff also failed to prove that the vessel did not have a competent crew at the time of departure.  A competent crew is part of the seaworthiness requirement.  It is plaintiff's burden to prove that the defendant knowingly put an incompetent crew on the vessel.  The determining factor as if the crew is competent or not is if the crew's sea experience and experience in handling a commercial vessel is deficient. *See* Horn v. Cia de Navegacion Fruco, 1968 AMC 2548 , 2557 -58, 404 F. 2d 422, 431 (5 Cir. 1968) (considering the amount of sea experience of the crew when determining whether the vessel was seaworthy). See also Acadia Ins. Co. v. Allied Marine Transport LLC, 2001 AMC 2895 , 2906 -07, 151 F. Supp. 2d 107, 118 (D. Maine 2001).  (considering the crew's experience in handling a vessel of the type and size involved when determining whether the vessel was seaworthy Empire Seafoods, Inc. v. Anderson, 1968 AMC 2664 , 2670 , 398 F. 2d 204, 210 (5 Cir. 1968) (considering the captain's experience in navigating inland waters and his familiarity with the Inter-Coastal Waterway of Florida when determining whether the vessel was seaworthy).

The vessel's crew was and is highly accomplished and experienced with the crew having many years of experience in the operation of commercial vessels.  The Captain Eymard was and remains fully licensed with the USCG being on his fourth issue.  The USCG renews a Captain's license every five years.  The deckhand, Steve Scibetta, has been working at sea continually since 1981.  The Captain also testified that he was familiar with the coastal waters of South Florida, prior to taking command of the

**PROPOSED FINDINGS OF FACT**          75
**AND CONCLUSIONS OF LAW**

ANZHELA EXPLORER, and that he had been operating large commercial vessels as a Captain since he was nineteen.  Captain Eymard testified that he operated vessels off of the Florida coast as a Captain for over six years on dredge vessels.  Jeff Dorsey testified that the engineer was a hard worker and had appeared competent prior to departure.

Karyn Price testified that she insured the vessel based on her understanding that the transportation crew was a Fish Offshore crew, which it was.  The underwriter then approved the crew that was on the vessel at the time of loss.  Plaintiff failed to present any evidence as to crew competency regarding what knowledge the defendant had prior to letting the crew transport the vessel.

## F. PAYMENT IS DUE FOR THE "NAMED PERILS" THAT OCCCURRED: (1) MACHINERY FAILURE, (2) CREW NEGLIGENCE, (3 ) BARRATRY.

The marine policy herein includes an Inchamaree clause, thus extending coverage to any harm caused by "Negligence of Masters, Officers, Crew or Pilots" (both negligence, and deliberate acts of "barratry"); and for any "Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull" (hereinafter: "machinery failure(s)").  Plaintiff, in its Complaint, does not claim that this loss did not fall within one of the named perils listed in the policy.

### 1.      Machinery Failures.

The ANZHELA EXPLORER operated perfectly for over 48 hours prior to foundering off the beach just south of Ft. Lauderdale off of Golden Beach.  She did not begin to encounter any problems when, according to the Captain, she suffered a loss of steerage just off of Golden Beach, Florida.  Brad Schoenwald observed significant signs of overheat on the vessel's starboard engine, which then caused a rupture in the starboard

**PROPOSED FINDINGS OF FACT**          76
**AND CONCLUSIONS OF LAW**

exhaust hose causing the vessel to sink.  A finding of fact was made at trial that the starboard engine suffered massive overheating, which lead to the seizing of the starboard engine.  Mark Rosandich testified that Mr. Scibetta told him the day the vessel sank when they met at the hotel after the vessel sinking that the high heat alarm had gone off during the last voyage.

Malcolm Elliot, a well respected marine surveyor, Samuel Windsor, a licensed engineer, and Brad Schoenwald all testified regarding how mechanical failure lead to the sinking of the vessel.  They all testified that the starboard engine and the starboard exhaust hose showed significant signs of overheating.  See photographs of engine and of the exhaust hose at Defendant Exhibit 109, pages 41, 50, and 52.   Mr. Schoenwald testified that the hose was of a well know type, a high heat exhaust hose, and that it would not have torn or broken under normal operating conditions.  Ian Cairns, plaintiff's own expert, testified that it was possible for the vessel to have sunk with just the hole in the exhaust hose marked as Plaintiff Exhibit 78.

Samuel Windsor, a licensed engineer with many years experience working as a forensic engineer, testified that the vessel's starboard exhaust hose hole was at least 8 square inches.  He testified that based on his calculations, which he performed at trial, without the use of calculator or pen and paper, and with plaintiff's marine engineer present, the vessel's starboard engine compartment could have flooded in approximately forty-five minutes.  Plaintiff never once challenged the calculations done at trial by defendant's expert.  Mr. Windsor also testified that based on his review of the materials including deposition transcripts of the crew, the stability book for the vessel, crew statements, photographs of the vessel before and after she sank, and all the videos admitted at trial, along with the wind and sea conditions the night the vessel sank, 6 to 8 foot seas, over 20 knots of wind, proximity of the vessel to the beach, and an outgoing tide at the time, the vessel sank due to the overheating of the engine, resulting in the

**PROPOSED FINDINGS OF FACT**        77
**AND CONCLUSIONS OF LAW**

destruction of the starboard exhaust hose. The vessel's starboard engine compartment was allowed to flood because the crew did not take corrective action because they were asleep.

Mr. Windsor further testified that as the vessel rode on its anchor on the night of its sinking, in his opinion, seawater entered the vessel's exhaust hose by the force of the vessel moving up and down in an active sea, and water being pushed into the exhaust flume which was then connected to the exhaust hose. As the vessel rode lower and lower in the water, in his opinion, the stern of the vessel came into contact with the seafloor, causing a rupture in the vessel's stern water tight compartments. As multiple chambers of the vessel's watertight compartments began to flood and the vessel began to go lower and lower in the water, additional parts of the vessel would have flooded due to water coming over the vessel's topsides, and entering through open hatches. Mr. Windsor's opinion was a well thought analysis of how the vessel sank due to mechanical failure.

### 2.    Crew Negligence.

This rule is longstanding: "Negligence of the assured or his agent is no defense to a marine policy." Tropical Marine Products v. Birmingham Fire Ins. Co. of Pa., 247 F.2d 116, 122, 1957 AMC 1946 (5th Cir.) (citations omitted). "[T]he Inchmaree clause is an expansion of coverage of considerable magnitude. . . . . [and] does in fact underwrite unseaworthiness of many types." 247 F.2d at 122-23. This presumption of coverage has special force if a "vessel did not sink in a calm sea," but instead sank due to "the cruel sea working on a troubled hull." 247 F.2d at 122. Cf. Underwriters at Lloyd's v. LaBarca, 260 F.3d 3, 8 (1st Cir. 2001) ("when a vessel sinks in calm waters a presumption of unseaworthiness arises"). Negligence is a more likely explanation in stormy weather.

The crew members in this case were negligent.  Despite the bad weather, being just off the beach, and reportedly having no steerage, Captain Eymard has admitted that he went to his bunk and left the engineer on watch who then fell asleep allowing the vessel to flood.  Captain Eymard also testified that he was extremely upset when he was rescued from the vessel, having felt partially responsible for the loss of the vessel. Handling precisely such emergent situations in a professional way is exactly what competent crew must do.  Brad Schowenwald testified that the crew, including the engineer, failed to employ any means to stop the water from coming into the vessel. Because of this failure to employ any damage control and the failure to notify anyone that the vessel was taking on water in an uncontrolled manner, he offered an opinion that the crew behaved in a negligent manner.

Malcolm Elliott testified that the crew had numerous other means of dewatering the vessel in addition to the belt driven pump, the trash pump, and the submersibles.  He suggested, along with Jeff Dorsey, that the crew could have used the main engine as a pump by simply opening two wing nuts on the sea strainer for the main engine.  Mr. Elliott also testified that the vessel's generator could also have been used as another dewatering device for the crew.  The crew did not use any of these means to dewater the vessel, and more importantly, never notified anyone of water coming into the vessel until it was too late.

### 3. Barratry.

A captain's "deliberately and willfully disobeying" the ship owner's "instructions regarding the territorial limits of the insurance policy" was held barratrous so as to trigger marine coverage.  U.S. Fire Ins. Co. v. Cavanaugh, 1983 AMC 1261 (S.D. Fla.), aff'd,

**PROPOSED FINDINGS OF FACT**          79
**AND CONCLUSIONS OF LAW**

732 F.2d 832, 1985 AMC 1001, 1004 (11th Cir. 1984) ("gross and culpable negligence"

or "deliberate and willful disobedience" of "oral or written instructions" equal barratry).

ANZHELA EXPLORER'S owner, through its agent Captain Rosandich, told Captain

Eymard to stay in inland waters until further instructions.   Captain Eymard made a

decision, against stated instructions from the vessel owner, to take the vessel offshore to

make better time.

**G. EXTENDED PERILS CLAUSE ALSO ALLOWS FOR COVERAGE.**

Another clause in this policy confirms its extremely broad coverage: the Extended

Adventures and Perils ("EAP") provision.  <u>See</u> Plaintiff Exhibit 65, Policy USI

Placement 1027:

> It is especially understood and agreed that the Perils Clause in this Policy shall be interpreted to include the following perils, which shall in no event be construed to limit the basic coverage provided thereunder:  ***Loss or damage howsoever caused by*** theft, **flood, cloudburst, tidal action, rising water**, ice, **or other storm, tempest**, tornado, **windstorm**, landslide, falling object, **upset, capsizing, overturn**, pillage and/or looting. (emphases supplied)

Plaintiff's witnesses, Ian Cairns and Captain Tim Morgan, both testified that the

vessel was in a storm condition when it sank on the morning of March 26, 2007.

Defendant's witnesses, Captain Eymard and Steve Scibetta, both testified that at the time

they woke when the vessel began to sink the vessel was in a storm condition.  Plaintiff

presented no evidence to contradict the weather conditions at the time of sinking and is in

apparent agreement as to the poor weather conditions.

Mr. Windsor testified that the storm conditions that the vessel found itself in,

along with its proximity to the beach, allowed for the vessel's engine room compartment

to flood within the time period between when Mr. Scibetta successfully pumped out the

**PROPOSED FINDINGS OF FACT          80
AND CONCLUSIONS OF LAW**

engine room compartment and when he woke up again and the vessel was sinking.

Pursuant to Mr. Scibetta's trial testimony that was at least a two hour period.

**H. THE HELD COVERED CLAUSE ALSO COVERS THIS LOSS.**

Plaintiff included the following "held covered" clause into ANZHELA

EXPLORER'S policy here:

> The Vessel is held covered in case of any breach of conditions as to cargo, **trade, locality**, towage, or salvage activities, or date of sailing, or loading or discharging of cargo at sea, provided (a) notice is given to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b) any amended terms of cover and any amended term of cover and any additional premium required by the Underwriter are agreed to by the Assured.

*Hull and Machinery Policy* ; Plaintiff Exhibit 65; USI Placement 1022; (emphasis supplied).

"The effect of the held covered clause is that the vessel remains covered even if the insured breaches one of the warranties specified in the clause." Int'l Ship Repair & Marine Serv., Inc. v. St. Paul Fire & Marine Ins. Co., 944 F.Supp. 886, 894, 1997 AMC 1419 (M.D. Fla. 1996) (citations omitted). This clause is not "applied only to minor deviations"; instead, it "is all inclusive" and "provide[s] the broadest available type of coverage." Kalmbach, Inc. v. Ins. Co. of State of Pa., Inc., 529 F.2d 552, 555-56 (9th Cir. 1976).

The Kalmbach court held the "held covered" clause to cover the owners' "loss of their ships," despite an agreed breach of warranty; and noted UK authority (from a multi-century line of English cases) holding squarely that "even though the breach of warranty was not discovered until after the loss had occurred," the held covered clause "protected the ship against loss on a breach of the fundamental warranty of seaworthiness." 529 F.2d

at 557.  The broad held covered clause herein thus provides a basis to "cure" ANZHELA EXPLORER'S alleged lack of seaworthiness and all else.

Further, one of the key impacts of the held covered clause is that the insured vessel remains covered even if the insured breaches one or more of the warranties specified in the clause.  See Hilton Oil Transp. v. T.E. Jonas, 75 F.3d 627, 629 (11th Cir. 1996 (("By including the [held covered] clause, the insurer accepts the greater risk occasioned by a possible failure to comply with those warranties, on condition that the breach is not willful, the assured gives prompt notice in the event a breach occurs and agrees to pay an additional premium") (quoting Judge, now Mr. Justice Kennedy in Campbell v. Hartfort Fire Ins. Co., 1976 AMC at 799, 533 F.2d 496, 496 (9th Cir. 1976); see also Int'l Ship Repair, 944 F. Supp. at 895-96, 1997 A.M.C. at 1430,.

Hence, a held covered clause imposes a condition that; the breach of warranty which is covered must not be "willful."  *Campbell,* 533 F.2d at 497-498, 1976 AMC at 801; Int'l Ship Repair, 944 F.Supp., at 896.

Plaintiff's agent, Karyn Price, had full and timely knowledge of – and thus accepted under this clause – ANZHELA EXPLORER'S condition, nature, and path to Louisiana.  See also LeBeouf Dep., pp. 83-84.  Once ANZHELA EXPLORER had sunk, Plaintiff's underwriters were notified immediately of the loss and of the exact place where she sank.  There was no evidence that the vessel owner, Anzhela Explorer, LLC, acted willful in breaching either the navigational warranty or the warranty of seaworthiness, if indeed any such breaches occurred.  As to seaworthiness, the vessel's owner was not present at the time the vessel left the dock on her last voyage, as Mr.

**PROPOSED FINDINGS OF FACT**     82
**AND CONCLUSIONS OF LAW**

Dorsey was in Seattle.  Mr. Rosandich was not the vessel owner, rather he was working as an independent contractor.

Hence, plaintiff failed to prove that Anzhela Explorer, LLC breached any covered warranty *willfully*.  This lack of proof is decisive, as the Eleventh Circuit has squarely and explicitly relied upon the held covered clause to find coverage despite a mistaken belief that the vessel's course "was within the trading limits specified …." Hilton Oil, 75 F.3d at 630.  Similarly, Anzhela Explorer, LLC is entitled to full relief herein due to operation of the held covered clause.

**I.  P&I POLICY COVERED THE WRECK REMOVAL.**

Because plaintiff failed to prevail on its claim that the policy is void pursuant to the defendant's lack of good faith and/or that the vessel was unseaworthy at the inception of the policy and/or the time of the loss, defendant need not reimburse the plaintiff for its payment for wreck removal, as plaintiff was required to pay for the wreck removal under the $5,000,000.00, Protection & Indemnity Policy for wreck removal that was separate from its Hull and Machinery policy coverage of $1,000,000.  See Plaintiff Exhibit 65, USI Placement- 0995 (Protection and indemnity limit $5,000,000.00.), and P&I Policy at USI Placement 1007, ll 61-64  ("Cost or expense of, or incidental to, any attempt or actual removal or disposal of obstructions, wrecks, or their cargoes …").

**J.     DEFENDANT'S CONVERSION CLAIM.**

The defendant, with plaintiff's permission, sold the hull for $30,000.  Even though witness Captain Morgan was evasive about how salvor, and thus State, profited from superstructure and other scarp, based on the amount the hull sold for, defendant is entitled to at least nominal value.  Considering the tenor of testimony, especially by

Captain Morgan, I am assigning the same salvage or scrap value to the superstructure and other items, such as the anchor, as that of the hull.  I also find that based on the destruction of potential evidence contained in the superstructure, Defendant would be entitled to an evidentiary presumption based on the information the defendant would have learned regarding the navigational route the vessel took, pumps on the vessel, and condition of the anchor.

However, considering the ruling herein, the conversion count becomes a moot point.  The salvage value obtained for the hull, essentially served to eliminated continuing storage cost and the cost and risk attendant to arranging the hull to be scrapped.  As the plaintiff has been found liable to pay under the insurance policy, it has essentially bought the superstructure and therefore would now be entitled to use its value. Further, considering my rulings, any requirement for an evidentiary presumption is unnecessary.  The defendant has thus prevailed on its conversion count but any damages it is entitled to are included in the judgment amount and no separate award will be entered.

## K. INSURED, AS THE PREVAILING PARTY, IS ENTITLED TO ATTORNEYS' FEES AND COSTS AND BOTH PREJUDGMENT AND POST JUDGMENT INTEREST.

### 1.  Defendant Is Entitled to Attorneys' Fees and Costs.

As the prevailing party the insured/defendant is entitled to attorneys' fees and costs.  In <u>All Underwriters v. Weisberg</u>, 222 F. 3rd 1309, 1313 (11th Circuit, 2000) the Eleventh Circuit held that in a maritime declaratory action case brought by the plaintiff insurance company against a vessel owner regarding whether coverage existed on a hull policy, under Florida law, Fla. Stat. 627.428, which is applied in such case, if an insured

**PROPOSED FINDINGS OF FACT**          84
**AND CONCLUSIONS OF LAW**

prevails against an insurance company regarding the issue of coverage, the insured is entitled to attorneys fees and costs even in a marine insurance contracts case. Since this case is exactly the same as <u>All Underwriters</u>, Defendant Anzhela Explorer, LLC, as the prevailing party, is entitled to attorneys' fees and costs. See also <u>Northern Insurance Company of New York v. Lamm</u>, 2007 AMC 901, 902 (11th Circuit 2006)( Awarded of attorneys fees and costs to insured in a maritime case regarding coverage issues upheld by the 11th Circuit.)

### 2. Defendant Is Entitled To Prejudgment Interest At 11%.

Plaintiff conceded at trial, that as a total constructive loss, the entire amount of the policy is earned on the hull and machinery policy, which is one million dollars. It is well settled that under 11th Circuit law, this Court has the discretion to award defendant pre-judgment interest at the Florida pre-judgment interest rate from the date of the loss. See <u>Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.</u>, 795 F.2d 940, 947-948 (11th Cir. 1986) (Eleventh Circuit held that in a maritime coverage case, Federal Court should apply the applicable state prejudgment interest rate because under <u>Wilburn Boat</u> there is no binding Federal Maritime law as to prejudgment interest hence state law should apply.) See also <u>Steelmet, Inc. v. Caribe Towing Corp</u>. , 842 F. 2d 1237, 1243-44, 1996 AMC 292 (11th Cir. 1988) ; <u>United States Fire Ins. Co. v. Cavanaugh</u>, 1985 AMC 1001, 1002-05, 732 F.2d 832, 834-835 (11th Cir. 1985). See also <u>Lloyd's</u> 719 F. Supp. at 1550. The interest rate for Florida judgment is 11% according to the Florida Department of Revenue website located at <u>http://www.fldfs.com/aadir/interest.htm</u>. Since the loss occurred on March 26, 2007, the defendant is entitled to, in addition to the million dollar policy limits, at least an additional $220,000 in pre-judgment interest.

**PROPOSED FINDINGS OF FACT**          85
**AND CONCLUSIONS OF LAW**

**3.   Defendant is Entitled to Post-judgment Interest.**

Under applicable Florida Law and Eleventh Circuit case law, plaintiff/insurer is also obligated to pay defendant post-judgment interest.  Steelment, Inc., 842 F. at 1244-45; see Stuyvesant Inc. Co. v. Bournazian, 342 So. 2d 471, 473 (Fla. 1977); See also Lloyd's 719 F. Supp. at 1550.

## L. DAMAGES.

Finding that the contract of insurance was in force, at the time of the loss, and that plaintiff breached the contract to pay for the losses, the Court awards damages as follows:

1.   As this vessel was a total loss, no deductible is applicable, and defendant is entitled to retain the full hull premium for this vessel, which pursuant to the policy, Plaintiff Exhibit 65 is $1,000,000. See Lloyd's U.S. Corp. 719 F. Supp. at 1549 (Vessel was a constructive, total loss, warranting full recovery under the subject policy.)

2.   Defendant, pursuant to  Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d 940, 947-948 (11th Cir. 1986), is entitled to prejudgment interest at the state of Florida rate of 11% from the date of the loss which equals to $220,000.

3.   Pursuant Underwriters v. Weisberg, 222 F. 3rd 1309, 1313 (11th Circuit, 2000), this Court also awards attorneys' fees to the defendant, and reserves jurisdiction to determine the amount of fees after entry of this judgment.

## <u>CONCLUSION</u>

This Court finds that the policy at issue was in full force and effect at the time of the claimed losses, and that no action on the part of defendant suffices to deny coverage

**PROPOSED FINDINGS OF FACT**         86
**AND CONCLUSIONS OF LAW**

of its claims.  The Court awards defendant damages for plaintiff's breach of insurance contract in the following amounts and as more fully described above:

    1.  Hull & Machinery policy:    $1,000,000.00

    2.  Prejudgment interest:    <u>$220,000.00</u>

             Total Due:    $1,220,000.00

Post-judgment interest will also begin to accrue at the same rate as the prejudgment interest, 11%, on the full amount of the judgment, on the date this judgment is entered.  The Court reserves jurisdiction to determine the amount of defendant's attorneys' fees award, including the whether a multiplier is applicable.