# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 07-61162-CIV-TORRES

STATE NATIONAL INSURANCE
COMPANY,

               Plaintiff,

vs.

ANZHELA EXPLORER, L.L.C.,
JEFF DORSEY, MARK ROSANDICH,

               Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a bench trial conducted by the undersigned, upon consent of the parties [D.E. 159] and referral by the Honorable Federico A. Moreno [D.E. 160]. A bench trial was held over many days involving seventeen fact and expert witnesses. Thereafter, extensive proposed findings and conclusions of law were submitted for the Court's consideration, [D.E. 188, 189], together with supplemental authorities subsequently submitted at the Court's request. The case was ably presented by counsel for both sides, who prepared equally compelling presentations and arguments. Numerous issues of fact and law were in dispute, many of which presented very close questions for the Court's resolution, which took some time to sort through and consider. The Court reviewed all the exhibits admitted in evidence, the trial testimony, depositions of witnesses who did not testify at trial, as well as the many legal authorities submitted by the parties on multiple issues in the case.

After careful review of the record and the arguments presented, and based upon

critical credibility findings necessary to resolve many disputed issues of fact in the

case, the Court finds as follows.

**Table of Contents**

I.      FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        A.      Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        B.      The Purchase of the Anzhela Explorer . . . . . . . . . . . . . . . . . . . . . .  4

        C.      The Insurance Application and Policy . . . . . . . . . . . . . . . . . . . . . .  7

        D.      The Loss of the Anzhela Explorer . . . . . . . . . . . . . . . . . . . . . . . . .  15

        E.      The Causes of the Loss of the Vessel . . . . . . . . . . . . . . . . . . . . . .  23

        F.      Post-Loss Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

II.     CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

        A.      Uberrimae Fidei - Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

                1.      Status of COI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

                2.      Groundings & Navigational Warranty . . . . . . . . . . . . . . . .  49

                3.      Deficiencies in Watertight Bulkheads . . . . . . . . . . . . . . . . .  50

        B.      Breach of the Navigational Warranty . . . . . . . . . . . . . . . . . . . . . .  58

                1.      Oral Modification of the Navigational Warranty . . . . . . . . .  59

                2.      Held Covered Clause Applies . . . . . . . . . . . . . . . . . . . . . . . .  62

        C.      Unseaworthiness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

                1.      Seaworthiness Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

                2.      Absolute Warranties of Seaworthiness . . . . . . . . . . . . . . . .  68

                        (a)      Competency of the Crew . . . . . . . . . . . . . . . . . . . . .  71

                        (b)      Inadequate Bilge Pumping Capacity . . . . . . . . . . . . .  76

                        (c)      Lack of Watertight Integrity . . . . . . . . . . . . . . . . . . .  81

                3.      Warranties of Continuing Seaworthiness . . . . . . . . . . . . . . .  91

        D.      Counts V and VI Are Mooted . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

        E.      Count VII - Reimbursement of Costs . . . . . . . . . . . . . . . . . . . . . .  94

        F.      Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  96

## I.  *FINDINGS OF FACT*[1]

### A.   *Procedural Background*

1.     Plaintiff, State National Insurance Company ("Plaintiff" or "State National"), filed an eleven-count Complaint against Defendants Anzhela Explorer LLC ("Anzhela"), Jeff Dorsey, Mark Rosandich, on August 15, 2007, seeking declaration by the Court with respect to a marine insurance policy issued by State National to Anzhela Explorer LLC.

2.     The causes of action as to Dorsey and Rosandich individually were dismissed without prejudice for failure to effect service of process on Jan 25, 2008. [D.E.11].  The remaining counts against Anzhela were for Breach of Duty of Good Faith, Breach of Absolute Warranty of Seaworthiness, Breach of Warranty of Continuing Seaworthiness, Breach of Navigational Warranty, Declaration by the Court of No Coverage for Pollution, Declaration by the Court of No Coverage for Fines and Penalties and Reimbursement for $613,421.50 for the Costs to Mark and Removal of the Wreck.

3.     Anzhela filed a Counterclaim alleging six counts: Breach of Contract, Breach of Statutory Obligations, Tortious Breach of Contract, Breach of Fiduciary Duty, Fraudulent Misrepresentation and Spoliation and Conversion of Evidence and Property.  On May 29, 2008, the Court dismissed [D.E. 48] Counts II (Breach of Statutory Obligations i.e. Bad Faith), III (Tortious Breach of Contract), IV (Breach of

---

[1]     To the extent that any findings of fact constitute conclusions of law, they are hereby adopted as such; to the extent that any conclusions of law constitute findings of fact, they are also so adopted.

Fiduciary Duty), and V (Fraudulent Misrepresentation) and Anzhela was granted leave to amend its Counterclaim.

4.     The Amended Counterclaim consisted of two counts - Count I Breach of Contract and Count II Conversion of Property.  Those counts remain at issue.

5.     State National seeks for the Court to determine and declare the duties, rights, and obligations under the policy for a loss sustained to the Anzhela Explorer ("the Anzhela" or "the vessel") on March 26, 2007.  It seeks a declaration of non-coverage premised upon breach of navigational warranty, breach of absolute warranty of seaworthiness, breach of continuing warranty of seaworthiness, breach of duty of good faith, and the pollution and fines and penalties exclusions.

6.     State National also seeks an award of $612,421.50 plus interest from April 16,2007 for the salvage costs to mark and remove the wreck.

7.     Anzehla, through its counterclaim, seeks an award of at least $1,000.000.00 for breach of contract on the subject insurance policy, together with attorneys' fees, costs, and interest.  Anzhela also seeks damages for conversion of the salvaged parts of the vessel by State National and/or its agents following the loss of the vessel.

### B.     *The Purchase of the Anzhela Explorer*

8.     On July 7, 2006, Rosandich entered into a purchase agreement for the Bottom Time II on behalf of Jeff Dorsey.  (PX 201).  The vessel was a 70' twin hull catamaran for use as a commercial dive/passenger vessel.  It was intended for commercial use in that it was to be chartered as a dive boat for operations for the oil

and gas industry off the shore of Louisiana.  Rosandich, a vessel captain and marine consultant, was involved in the transaction because he was contracted by Dorsey to look for a vessel such as this one and assist in preparing the vessel for the intended commercial use.  He had particular experience in doing such work for vessel owners who needed assistance in obtaining approved Certificates of Inspection ("COI") from the United States Coast Guard.

9.     This vessel was a Coast Guard documented vessel and had previously been a certified vessel for commercial use as a small passenger vessel.  Its COI, however, had expired in 2003.  The COI is a required certification from the Coast Guard before a vessel can be placed in service as a commercial vessel for the transportation of passengers or cargo.  46 U.S.C. § 3306(a); 46 C.F.R. § 176.100. Vessels without a Coast Guard COI are not banned from operating on navigable waters, but cannot do so for the purposes specified in the regulations.

10.    The purchase price of the vessel was $200,000.00. The vessel was purchased on an "as is where is" basis.  The sale of the vessel was consummated on October 27, 2006.  The vessel was renamed the Anzhela Explorer.  Dorsey and Rosandich then began work and incurred considerable expense, up to $200,000, to bring the vessel to the point of a COI inspection.

11.    On August 22, 2006, the Coast Guard conducted an initial inspection of the vessel.  Subsequent to that first inspection the Coast Guard issued a Critical Deficiency Report that itemized 34 different deficiencies that would need to be rectified before the Coast Guard would issue a new COI for the vessel.  (PX176).

12.     The Coast Guard inspected the vessel again and issued a hull credit for the vessel on December 15, 2006 (PX 176), which is an important, but not complete, part of the overall COI inspection process.  *See* 46 C.F.R. § 176.610.  The hull credit confirms compliance with Coast Guard regulations as to the hull's underwater body, the hull fittings, plating and planking, appendages, propellers, shafts, bearings, rudders, sea chests, sea valves, and sea strainers.  It also confirms compliance as to the internal structure of the hull including the major internal framing, the hull plating and planking, voids, and ballast, cargo, and fuel oil tanks.

13.     The hull credit itself is not enough to comply with all regulations for a COI, which include a compliance bilge piping system, 46 C.F.R. § 182.510, and watertight bulkheads, 46 C.F.R. § 179.320.

14.     At the time of the last Coast Guard inspection in December 2006, six of the deficiencies originally identified by the Coast Guard had not been fully resolved or corrected.  Three of these remaining deficiencies related to administrative paperwork like an updated stability letter.  The other deficiencies were more substantive, including existing penetrations in the transverse watertight bulkheads that were not fully sealed that compromised the integrity of the watertight compartments, plus deficiencies in the bilge pump system. (PX 176).

15.     The work necessary for COI inspection on the vessel was to be completed upon its arrival at Golden Meadow, Louisiana, which is also from where the vessel would operate in the waters of the Gulf of Mexico.

16.     Consequently, before the vessel sailed for Louisiana on March 24, 2007, those deficiencies had not yet been addressed as the bilge piping system had not been updated and, specifically, the starboard fixed bilge pump had been removed for maintenance.  The penetrations in the watertight bulkheads had also not been cured.

### C.     *The Insurance Application and Policy*

17.     A month earlier, in February 2007, Rosandich, on behalf of Dorsey as vessel owner, contacted Shawn Le Beouf of USI, an insurance brokerage, to procure insurance for the vessel.  USI acted as agent for the vessel and its owners in the acquisition of the insurance. Rosandich forwarded to Lebeouf a description of the intended use and operation of the vessel.  Rosandich indicated the vessel would be used in commercial service out of Golden Meadow,Louisiana, and operated by Fish Off Shore. (PX 109).

18.     During the initial contact with USI it was represented to the insurance broker that the vessel was to be placed in service as a commercial dive boat.  In response to that initial contact by Rosandich, USI representatives prepared and submitted materials to WFT for the purchase of the policy.  (PX 68).  WFT was the managing agent for State National with authority to bind marine insurance.  Karyn B. Price was the underwriter at WFT who processed the application.

19.     Specifically, on February 15, 2007, at 9:39 a.m., Ms. Price received an email from Jamie Robichaux at USI that attached an email from Rosandich, together with an attached written survey of the vessel prepared in August 2006.  (PX 63, DX 2). In both the email and the survey, the vessel is identified as *not* having a current Coast

Guard COI. (PX 63 at 36 ("The vessel will be USCG certified to carry 100 passengers in a crew transport role . . . or 30 passengers as a live board housing platform.")). That was consistent with what Rosandich told USI's agents – that the vessel did not have a current COI.

20.    The written survey, prepared by marine surveyor Malcolm Elliott, indicated that a COI had expired but that work to obtain the COI was in process to allow for commercial passenger operations. (PX 63 at 52). As Mr. Elliott testified at trial, the report was not based on a complete prepurchase survey, which involves a full engine, seatrial and in water survey over a 4-5 day period. The report was more limited and prepared for insurance purposes. (PX 63 at 49). Mr. Elliott concluded that the vessel was seaworthy and in overall good condition.

21.    With respect to bilge pump capacity, which the surveyor never tested, the report indicated that the vessel had two fixed electrical pumps in "good" condition. Similarly, with respect to watertight compartments, the report stated that there were three compartments in each hull in "good" condition. No deficiencies were identified with respect to the bilge pump system or the watertight compartments. The only "must recommendations" identified in the report related to the fuel tanks, anchors, fire extinguishers, and life rafts onboard. (PX 63 at 52).

22.    On the same day, at 1:04 pm, Jamie Robichaux of USI sent another email to Ms. Price that stated that the vessel *did* have a current COI. (PX 67). Attached to the email are three additional documents: an unsigned handwritten application, the Schedule of Vessel, and the Description of Operation. (PX 68, 188D). In the unsigned

application, prepared by USI's agent and never signed or reviewed by Rosandich, it states that the vessel does have a current COI. Yet in the Description of Operation it states that it does *not* have a current COI. It is thus undisputed that on the very same day WFT, through Ms. Price, received three written documents stating that the vessel did not have a current COI, and two that stated that it did.

23.    Ms. Price acknowledged at trial that she received conflicting information regarding whether the vessel had a current COI, but she did not reconcile the discrepancies or ask additional questions of the agent or the vessel owner's representative directly. Nor did she confirm through Coast Guard vessel records available online whether or not the COI was indeed current. Nor did she ask for a copy of the current COI prior to approving the application, a practice that she acknowledged has since changed.

24.    The initial application submitted to WFT by USI also contained a representation as to the requested navigation limits for the vessel. (PX 68). The application stated "Specify Navigation Limits Required: Gulf of Mexico not to exceed 100 miles offshore."

25.    The decision to underwrite the policy and the premiums charged for the policy were for Gulf of Mexico navigational limits. The application did not request navigational limits for the Atlantic coast and the policy premium was not based on Atlantic navigation. The premium charged for Atlantic navigation is different that that charged for Gulf of Mexico navigation.

26.     In addition to the initial application, the schedule of vessels submitted by USI contains the following language: "LIMITS Warranted confined to the use and navigation of the Gulf of Mexico, not to exceed 100 miles offshore." (PX 67).

27.     On February 16, 2007, a Quotation was issued by WFT to USI.  The quote contained the following language: "Warranted confined to the use and navigation of the Gulf of Mexico, not to exceed 100 miles offshore."

28.     A revised schedule of vessels was submitted by USI correcting the name of the vessel to Anzhela Explorer and again contained the language: "LIMITS Warranted confined to the use and navigation of the Gulf of Mexico, not to exceed 100 miles offshore."

29.     The final written application signed by Jeff Dorsey after the loss confirmed to State National the navigation limits requested as "Gulf of Mexico not to exceed 100 miles offshore."  (PX 69).

30.     On March 22, 2007 USI requested that coverage be bound and WFT agreed to bind coverage.  (PX 20 and 31).

31.     A binder consistent with the application and written request for coverage was issued by WFT and received by USI.  The coverage bound was commercial insurance for a vessel engaged in dive support services.  Upon binding coverage USI issued a confirmation of coverage to Anzhela Explorer LLC confirming coverage bound with the stated Navigation Limits.  (PX 64).

32.     It is undisputed that the loss of the vessel did not occur within the confines of the as-written navigation limits contained in the policy; the sinking took place in the Atlantic waters, not 100 miles offshore in the Gulf of Mexico.

33.     As multiple witnesses testified at trial, including the Chief Underwriter for WFT, oral agreements between the underwriter and broker as to insurance can be entered into prior to the issuance of coverage.

34.     USI's agent, Shawn LeBeouf, credibly testified that he explained to Ms. Price at WFT that the vessel needed specific coverage for the trip from the vessel's location in Ft. Lauderdale, Florida to Golden Meadow, Louisiana, and that these parties reached an oral agreement as to trip coverage and rates at that time.

35.     At the time of this agreement, Ms. Price was aware through the written materials she received through the application process that the vessel was located in Ft. Lauderdale at the time the policy would be issued.  She was also aware that the intended navigational area for the vessel's operations were within 100 navigational miles of Golden Meadow, Louisiana.  She was also made aware that that is where the vessel would be outfitted and completed for commercial service.

36.     Ms. Price was specifically aware that the intended route to get the vessel from Ft. Lauderdale to the Gulf of Mexico and into Louisiana was through the intercoastal waterway.

37.     Ms. Price, and thus WFT, was on notice of the intended trip from Ft. Lauderdale to Golden Meadow, Louisiana prior to the coverage being bound on March 19, 2007.

38.     Contemporaneous written evidence of this oral agreement is found in a written email to Rosandich from LeBeouf at USI dated March 19, 2007, that confirmed to Rosandich that "trip coverage" had been negotiated and obtained from the underwriter.  (DX 10).  That is also confirmed by communications from USI

representatives to various underwriter representatives, including Ms. Price, that confirmed that the coverage was being issued while the vessel was in Florida. (DX 11).

39.    The underwriters at WTF, and thus State National, bound coverage for a policy effective March 23, 2007, for a commercial vessel that would regularly operate in the Gulf of Mexico, but including the transport of the vessel from Florida to the Gulf of Mexico.

40.    To the extent that Ms. Price questions ever receiving the survey attached to the Rosandich email, or other documents shown to her at trial that evidence the vessel was in Ft. Lauderdale, Florida prior to issuance of coverage, or to the extent that she testified that she denied reaching an oral agreement with USI's agents, the Court finds that Ms. Price was not credible, at least on this important point.

41.    That is also true with respect to her testimony regarding the importance of obtaining the COI prior to the vessel being transported to Louisiana.  That testimony is also unpersuasive and not credible.  Though a COI may indeed be relied upon by WTF or any other commercial underwriter for the issuance of a policy, the COI was not relied upon in this case in connection with the oral agreement between WTF and USI for the coverage of the vessel's voyage to Louisiana to be outfitted for service. That possibly explains why WTF did not verify the conflicting information Ms. Price had received regarding the existence of a COI.  WTF certainly anticipated that the vessel would have a COI prior to its commercial operations, but did not rely upon a valid and current COI prior to issuing the coverge for the vessel to reach Louisiana.

42.    And even if that was not the case, WTF had the ability to confirm in multiple ways the current status of the COI at the time it bound coverage, but chose

not to.  WTF did not rely upon any misrepresentation of fact of Anzhela or its agents, including USI.

43.    Further, even if WTF would have relied on the alleged misrepresentation before issuance of the policy as a whole, WTF as a matter of fact did not rely on that misrepresentation prior to issuing the policy to allow the vehicle to travel to Louisiana to complete its preparation for commercial service.  In other words, WTF's reliance on the COI would have only matured upon its use for the primary intended purpose under the policy – commercial chartering operations on the Gulf of Mexico.

44.    The Court finds Anzhela's witnesses on this issue more credible and trustworthy, rather than the testimony of Ms. Price or State National's expert witness on underwriting processes.  Having credited their testimony, the Court relies upon the resulting facts that show that no misrepresentation or omission of material fact occurred prior to the issuance of coverage with regard to the status of the COI process itself.

45.    There was also no misrepresentation or omission of material fact committed by Anzhela or its agents regarding the intended navigational limits of the policy.  Given that the parties agreed on coverage to the Gulf Coast from Ft. Lauderdale, the Court finds Anzhela's witnesses to be credible when they testified that they intended the navigational limit provision to apply only once the vessel reached the Gulf Coast and became operational.  Dorsey, specifically, testified credibly when he said that he signed the last page of the application, recognizing that it contained the navigational limit, only because he relied upon his agents' agreement with WTF for specific coverage from Ft. Lauderdale to the Gulf Coast.

46.    As it turns out, the vessel was lost on March 24, 2007, after departing from Ft. Lauderdale on route to the Gulf Coast.  The vessel sank on the Atlantic Coast, which would fall outside of the navigational limits stated on the policy, except for the parties' specific agreement on binding coverage from the point the vessel departed the Ft. Lauderdale area for the Gulf Coast.  The specific agreement supersedes the navigational limits on the policy for this specific voyage.  There was thus no misrepresentation with respect to any intent to deviate from the navigational limits of the policy.

47.    There was, however, a material non-disclosure prior to inception of the policy with respect to the state of the watertight compartments on the vessel.  The owners submitted the Elliott survey report to the underwriter that concluded in August 2006 that there were watertight compartments on the vessel that were in "good" condition.  (PX 63 at 52).  That same month, however, the Coast Guard inspected the vessel and determined that both the bilge pump system and the watertight bulkheads were deficient.  The bulkheads were deficient in particular based upon penetrations through the bulkheads that were not properly sealed and compromised the watertight integrity of the hull's compartments.

48.    In February 2007 the survey report was submitted to the underwriter as part of the insurance application process with no mention of the deficiencies in the watertight bulkheads.  Nor was the Coast Guard's inspection report itself submitted to the underwriter together with the survey report.  By February 2007, the penetrations in the watertight bulkheads had not been fully sealed and the deficiencies stated in the Coast Guard remained.  Those deficiencies were also not cured by March

2007 at the inception of the policy period, at least with regard to the sealing or capping of any penetrations through the watertight bulkheads.

49.     The failure to disclose the Coast Guard's conclusions or submit the Coast Guard's inspection report, especially given the submission of the inconsistent survey report's conclusion of seaworthiness, was a material non-disclosure because it should have been reasonably anticipated that the status of the watertight compartments could affect the underwriter's decision to bind coverage or set the premium.

50.     The failure to disclose the inspection report was not material with regard to the bilge piping system and bilge pumps onboard, because the vessel was fitted with adequate supplemental pumping capacity prior to the inception of the policy and the launch of the Anzhela on her first and last voyage.

### D.     *The Loss of the Anzhela Explorer*

51.     Upon completion of much of the work on the vessel, the vessel was returned to the water in Ft. Lauderdale and moved to a location on the New River where Rosandich started up all major mechanical systems on the vessel.  After having conducted a complete examination and running of all systems dockside, Rosandich took the vessel, staying in the intracoastal waterways, from Ft. Lauderdale to Miami and back to operate all major systems.

52.     Rosandich believed that the vessel performed well and that the vessel was in a seaworthy condition.  Rosandich acknowledged that, while bringing the vessel back to Ft. Lauderdale on a waterway he had a grounding incident the day before the boat left on its final voyage.  He put on a mask and fins, and dove under the vessel.  He

confirmed that the vessel had suffered damage to its starboard propellor, but no damage to the hull.

53.     Dorsey had contracted with a company called Fish Offshore, an experienced vessel operator based in Louisiana, to provide the crew to transport the vessel to Louisiana.  The contract provided that, after the vessel arrived in Louisiana for final work to obtain the COI, it was going to be chartered by Fish Offshore for use in the Gulf of Mexico.  This was known to WFT and thus State National, as Ms. Price knew Fish Offshore and its owner, Greg Blanchard, and she had underwritten several of the Fish Offshore vessels.  Ms. Price conceded that part of the reason that she agreed to underwrite the vessel was because it was a Fish Offshore project and that a Fish Offshore crew was going to be on the vessel, which gave her comfort.

54.     Within a few weeks of the vessel's final departure, part of the three-man Fish Offshore transportation crew, Steve Scibetta, deckhand, and David Killingsworth, engineer, came and worked on the vessel.  On March 23, 2007, the day before the vessel departed, Fish Offshore Captain Ross Eymard, who was hired to bring the vessel from Florida to Louisiana, arrived at the vessel.  Eymard had some knowledge of Florida waters, having worked as a dredge boat captain in Florida waters for close to six years.  The deck hand, Scibetta, had worked on boats, sometimes working as an unlicensed engineer.  He was known to Eymard but not to Dorsey or Rosandich. Killingsworth was an unlicensed engineer.  He assisted with preparing the vessel for departure.  Killingsworth and Scibetta were on board during the vessel's test cruise prior to the inception of the State National policy.  Rosandich acted as captain during the "shakedown" voyage.

55.     Both Eymard and Scibetta testified that they considered the vessel seaworthy at the time it left the dock on its final voyage.  Eymard conducted a complete examination of the vessel prior to departure and found the vessel to be sound. His examination included a complete inspection of the vessel's hull and found it to be in good condition.   Eymard acknowledged that, during the hand over procedure Rosandich told him about the slight tip deflection on the starboard propellor, and that they intended to repair the prop in Ft. Meyers, Florida.  Prior to departure, Eymard also encountered a problem navigating the vessel, which related to a problem while docking the vessel.  This did not result in any damage to the vessel.  The throttle problem was solved and the vessel was deemed ready for departure.

56.     The vessel left on its trip from Ft. Lauderdale to Golden Meadows, Louisiana at 12:30 p.m., Saturday, March 24, 2007.  Rosandich and Dorsey agreed on a planned trip for the vessel that included traveling up the intracoastal to the Lake Okeechobee Intercoastal Water Way, crossing the state of Florida, and then crossing the Gulf of Mexico to Louisiana.  (Prior to departure, Dorsey authored and sent a letter to the Coast Guard - Sector Miami to notify them that the Defendants would be taking the vessel to Louisiana to complete its COI.  The Coast Guard officials forwarded the entire file for the vessel to the Louisiana sector).

57.     The vessel traveled all the way up the intracoastal waterways to Stuart, Florida, and then west to the St. Lucie locks, from which the vessel was supposed to cross the Okeechobee waterway west-southwest all the way to Ft. Myers.  The vessel did not have any of the high bilge alarms go off and the vessel functioned normally.

The vessel had no problems while operating for over 24 hours on its voyage up to the St. Lucie Lock of the Okeechobee Waterway.

58. Once the vessel reached the St. Lucie lock, the lockmaster informed Eymard that there was not enough water depth in the waterway to allow the vessel, given its draft, to proceed on the waterway to the other side of the state. A decision was then made between Rosandich and Eymard to bring the vessel back south, past Ft. Lauderdale to Miami, where Mr. Rosandich planned on meeting the vessel and had arranged dockage for the vessel on the Miami River. Rosandich credibly testified that he instructed Eymard to bring the vessel back the same way it had travelled, through the intracoastal waterways.

59. Eymard, however, made the fateful decision to take the vessel outside the waterways and into the Atlantic Ocean to save time. Eymard and Scibetta testified that the vessel exited the intercoastal waterway by using the Jupiter Inlet. The problem with that decision is that Jupiter Inlet should only be used by a captain that frequently uses the Inlet. He based that opinion on his own use of the Inlet with another Captain, his reliance on the Coast Pilot book for the area, and on the NOAA navigational chart for the area. He credibly testified that use of the inlet could result in a grounding, even a light grounding, that could result in much more sand entering through the vessel's sea strainers, which could contribute to an overheated condition on the type of engine used on the vessel.

60. Rosandich did not know that the crew decided to take the vessel south on Atlantic waters until after he received a call from Scibetta. He did not direct them to turn around and proceed immediately down the intracoastal.

61.     The crew denied any instances of grounding as the vessel navigated through the Jupiter Inlet.  According to Eymard and Scibetta, the vessel operated properly, with no problems, as it departed the inlet and traveled south offshore in the Atlantic Ocean. They both testified that the vessel operated at speed and above 10 knots.  The winds were between 15 to 20 knots and seas at about 6 feet.  After operating at speed, between 10 - 15 knots, for several hours the vessel reached the area off the coast near Golden Beach.

62.     At that point, at approximately 9:00 p.m., the vessel developed what the crew believed was a starboard steering problem.  The vessel began turning to the right and the starboard paddle locked in the down position.  The vessel is steered through aft paddles on each hull that operate hydraulically and control the forward thrust of the boat to make a turn.  Eymard claimed that the problem related to a hydraulic leak that he could see in the hull, which was lit enough for him to see.  But the crew purportedly decided not to try and fix the problem at that point given the time and darkness.  They anchored the boat offshore.

63.     The crew communicated with Rosandich at that point to inform him of the problem and their intention to anchor the vessel overnight.  Rosandich was reassured by Eymard that the problem was not serious enough to warrant assistance and that they could assess the issue in the morning.

64.     The crew never communicated to Rosandich about any problem with the starboard engine at that time or any high heat alarms.  Yet, we know from a post-loss inspection that the engine showed signs of significant overheating.  And no evidence

was identified at trial that confirmed the crew's claims regarding a steering problem related to a hydraulic leak or other problem with the paddle.

65.     Rosandich credibly testified, however, that after the loss Scibetta told him that the vessel had encountered a high heat situation on one of its engines. Scibetta denied it at trial and claimed that he never saw any evidence of abnormal engine vibration, engine overheat, high heat alarms, or smoke coming from the engine room.

66.     In any event, it is undisputed that Eymard anchored the vessel in approximately 28 feet of water about one quarter of mile off of Golden Beach, Florida. He testified that the weather remained relatively rough with 15 to 20 knot winds and 6 foot seas. Over the course of the night, the seas would reach up to 8 feet.

67.     Eymard and Scibetta turned in for the night, leaving engineer Killingsworth on watch. At approximately 1:00 a.m. on the morning of March 25, 2007, Killingsworth woke up Eymard and Scibetta to ask for help because the starboard exhaust line had broken open, and outside seawater was coming into the starboard engine space. This is the first report of any seawater coming into the vessel.

68.     Scibetta laid down three of the four available submersible bilge pumps in the hull to remove the incoming water through hoses extending out the starboard engine hatch. The water reached the second rung of the ladder of the hull in the aft and engine compartments. After approximately an hour to an hour and a half, the crew successfully de-watered the hull to the point that only six to eight inches of water remained. But the crew did not try to repair the exhaust hose to stop all water from entering into the vessel. That was difficult under the circumstances, given the lateness

of the hour, the tired crew, the darkness of the aft section of the hull, and the condition of the seas.

69.     A gasoline powered pump was also available to the crew, in addition to the main engine bilge pump.  The main engine bilge pump was not used.  The crew never credibly explained at trial why these additional pumps were not used, other than the fact that the three submersible pumps had been working and successfully de-watering the vessel.   The fact that the main engine pump was not used is circumstantial evidence that the engine, in fact, was not properly functioning at that point in time.  If it had been working, that pump could have been used to prevent the engine compartment from flooding.

70.     In fact the port engine hatch had been opened to power the submersible pumps used in the starboard hull.

71.     Once the situation was under control, or so they believed, Eymard and Scibetta went back to their respective bunks and left the engineer Killingworth on watch.  That too proved to be a fateful decision.  Without proper monitoring, given the size of the hole in the starboard exhaust hose, the vessel's engine compartment could have flooded within forty-five minutes.

72.     At approximately 4:30 a.m. on March 26, 2007, David Killingsworth woke Scibetta in his berth to alert him of another problem.  Scibetta woke up Eymard.  At that point Scibetta and Eymard both sensed the vessel listing hard to starboard.  When they examined the starboard hull water had already reached above the engines.  Scibetta could see that the port hull was now filling with water, as the engine room doors were being filled out by the waves.

73.     The wind and seas had materially increased with seas running up to 8 feet and winds in excess of twenty knots.  The vessel was now in heavy weather conditions. Scibetta credibly testified that the situation worsened when another large wave came over the rear of the boat and filled each pontoon with more water.  There was no time and it was too dangerous to try and pump water out given the surrounding conditions. The crew were fearful that the entire vessel would roll over hard starboard. They decided it was time to abandon the vessel.

74.     At that point Eymard called Rosandich on the cell phone and asked for him to contact the Coast Guard for assistance because the vessel was sinking. Rosandich was shocked by the call, given that Eymard had not indicated in the earlier call that the vessel was in such a dire condition.  Rosandich called Brian Hawthorne with Sea Tow to assist the vessel and get more pumps in the water.  He also called the Coast Guard.

75.     The Coast Guard arrived at the scene shortly thereafter.  They assisted the three-member crew to abandon the vessel just before it sank.  The vessel sank with the bow of the vessel pointing west toward the beach and the stern faced toward the sea.

76.     Later that morning, after Rosandich arrived at the scene and met with the crew at a local hotel, he entered into a salvage contract with SeaTow to salvage the vessel.  SeaTow was available to immediately raise and save the vessel.

77.     By then the vessel was pushed toward the beach by the wind and waves and then ended up only a few hundred yards off the beach in the surf.  This complicated the salvage mission because of the vessel's unique design with isolator

mounts separating the superstructure of the vessel from the hulls of the vessel.  When the vessel reached the beach it broke into two pieces with the superstructure of the vessel being sheared off from the hull.

### E.    *The Causes of the Loss of the Vessel*

78.    As previously discussed, at the time of the last Coast Guard inspection on August 22, 2006, the inspection report detailed certain deficiencies with the vessel that precluded a COI.   Specifically, on the date of the vessel's voyage there were outstanding unresolved deficiencies regarding her bilge pump system and penetrations in the watertight bulkheads that compromised the watertight integrity of the hull's compartments.

79.    The Coast Guard Activity Summary Report identified the need to "make all penetrations through water tight bulkheads watertight," plus the need for drawings for a bilge piping system that had to provide for two 50 gallon-per-minute fixed bilge pumps in each hull as per Coast Guard Regulations, § 182.510(b) and 182.520(j).

80.    Loss surveyor Ian Cairns inspected the vessel shortly after it was raised off the ocean floor.   Mr. Cairns credibly testified that he identified open pipes that penetrated the watertight bulkheads that permitted water to travel from one compartment to another.   These openings were found in the forward and aft engine room bulkheads.   These penetrations permitted water entering the engine room to invade the watertight compartments forward and aft of the engine room.   Similarly, water entering the hull aft of the engine room may invade the engine room and forward compartments.

81.    Naval Architect Drew Hains confirmed the fact that "penetrations" identified by the Coast Guard more probably than not referred to open pipes and unsealed wire and cable chases that pierced the bulkheads, thus compromising the water keeping ability of the bulkheads.  Hains also credibly testified that watertight compartments would have prevented the total loss of the vessel.  Though the Coast Guard issued a hull credit for the vessel in December 2006, there was no credible evidence presented the penetrations in the watertight bulkheads were sealed or capped or otherwise addressed prior to the inception of coverage.

82.    After the sinking, it was reported that she came to rest flat on the bottom of the Atlantic Ocean with no residual flotation keeping the bows or any other part of the hull off the bottom.  From this we find it more probable than not that water communicated through the watertight bulkhead causing all of the five watertight compartments to flood.  The presence of watertight bulkheads could certainly have helped prevent the loss of the vessel, though the deficiencies in the bulkheads were not necessarily the proximate cause of the sinking.

83.    Moreover, the Coast Guard required that each hull have two, 50 gallon per minute, fixed bilge pumps, with each powered by an independent source.  The vessel was equipped with a bilge manifold that would permit the de-watering of the individual watertight compartments through the use of a single pump.  The manifold permits the suction of the main bilge pump to be diverted to the various water tight compartments.

84.    It is undisputed, and indeed Mr. Cairns's inspection showed, that the starboard bilge pump was not installed.  Anzhela's agent, Rosandich, was aware of this condition.  He confirmed for Mr. Cairns that there was no fixed pump on board.

85.    The record shows, however, that the vessel had bilge water pumping capacity through other means, principally an engine-drive pump attached to the starboard engine plus portable pumps of varying sizes that had been placed in the hull prior to the voyage.  Plaintiff's experts' contrary testimony in this regard was not credible when compared to other record evidence in the case that showed that multiple bilge pumps were onboard the vessel and were, in fact, utilized successfully to stabilize the ingress of water into the vessel when she first encountered that problem.

86.    In any event, the vessel ultimately sank a few miles off the coast of Golden Beach, Florida, after taking on water through the exhaust hose, as well as wave action on the open hatches on the port and starboard hulls.  It is undisputed that in order for a boat to sink, there must be some means for water to enter the boat in sufficient quantities to cause it to lose floatation.  The record at trial documents minor groundings that occurred prior to and likely during the March 23rd voyage.  Rosandich testified he ran the boat aground four or five times before commencement of coverage on the the insurance policy.  Any one of these groundings could have caused the hull plates to weaken.  We can not know for sure, however, if this type of damage contributed to the sinking because a break in the aluminum hull could also have been caused by the vessel being pushed by wave action while sitting on the bottom of the ocean.  The vessel lost her superstructure and was propelled across a reef destroyed the bottom of the boat, rendering definitive analysis impossible.

87.     The presence of a hole in the starboard engine's exhaust system is more probably than not related to the intrusion of water into the starboard hull of the vessel that night.  There was no eyewitness testimony at trial observing the inflow of water from the breach in the exhaust system.  However, a hole was discovered during shore-side inspections. The hole was located above the waterline.  It was described by various witnesses as slightly above the waterline, up to 6 inches above.  The size of the hole varied from one half inch by four inches to one half inch by eight inches.

88.     All witnesses agreed that water entering the vessel through this opening would be intermittent until after the boat accumulated sufficient water inside the hull to cause the boat to settle into the water far enough to cause the hole to descend beneath the waterline.

89.     Two theories of causation were advanced by the parties regarding the creation of the hole.  The Anzhela contends the hole was caused by the starboard engine overheating, which overheating condition ultimately resulted in the sinking. However, the vessel was equipped with temperature gauges and overheat alarms that would have alerted the crew of an impending problem.  The two crew members who testified at trial testified that they did not hear any high engine temperature alarm or observe any abnormal condition with the starboard engine either prior to the steering problems they encountered that night or thereafter.  State National concludes as a result that engine overheating did not necessarily directly contribute to the vessel's loss that night.  Or, alternatively, if the engine did suffer from such a condition, the problem occurred prior to the voyage of the vessel and prior to the inception of coverage.

90.     Nevertheless, given the level of malfeasance displayed by the crew on that night, it is hard to reconcile the crew members' testimony with the known fact that a significant source of heat likely burned through the engine exhaust hose.  The most immediate source for such a condition is the engine.  And as no water intrusion into the hull was detected prior to the evening of the sinking, despite the vessel being operated for some time during its voyage preparation and being worked on by various personnel, it is more likely than not that the heating damage – sufficient to burn through the exhaust hose – occurred some time *after* the voyage began.

91.     The greater weight of the evidence shows in fact that the engine overheat condition was manifesting itself during the voyage.  The vessel had not been operated under stressful conditions prior to the voyage.  At the time of the loss, the vessel was on ocean waters, in six to eight feet seas, after having been operating for many hours.  Only that level of stress on the engines would have provided sufficient time and presented the conditions necessary for an overheat condition that could cause the type of collateral damage – a burnt hole through the exhaust hose – that likely contributed to the loss of the vessel.  And given the captain's decision to navigate the vessel through the Jupiter Inlet and into the Atlantic waters, contrary to the owner's prior instructions, it is more likely than not that groundings that may have occurred in this leg of the voyage materially contributed to the problem.

92.     The Court finds the crew members' testimony lacked credibility on this point.  Instead, Rosandich's testimony as to the crew members' initial reactions to him right after the sinking more credibly shows that the crew was at some point aware of

an engine overheat problem on the vessel.  He was told the morning after the loss that they had suffered a high engine heat condition and that the temperature alarms had gone off, so much so that the crew disconnected it.  Rosandich was not made aware of this prior to the sinking of the vessel.

93.    Based upon the evidence presented at trial, it is more likely than not that an overheated engine did in fact contribute in some material way to the loss of the vessel, because the hole in the exhaust hose was caused by a burning, high temperature condition.

94.    The internal condition of the starboard engine was not inspected or documented for trial.  Nor were the water pumps that fed the engine cooling system analyzed.  But Anzhela's expert, Brad Schoenwald, conducted an investigation into the cause of the loss and he concluded that the engine had at some point suffered an overheat condition.  Significantly, State National's own expert could not discount the possibility of engine overheat damage.  Anzhela's expert added that he learned that the starboard engine had suffered an overheat condition two weeks before her sinking.  There were no records introduced, however, documenting repairs of the engine overheat.  To the extent that it occurred, of course, it could have pre-dated the date of coverage on the policy.  But given the work that was being conducted on the vessel prior to her voyage, it is difficult to explain how such an overheat condition could have caused the damage to the exhaust system, but not been identified by the vessel representatives, engineers, or crew members prior to the voyage.  Given the overwhelming credible evidence that the engines were in very good condition before the

voyage, we find that it was more probable than not that an engine overheat condition contributed to the loss of the vessel.

95.    State National argued that the primary cause of the exhaust problem was vibration caused by propeller damage.  As neither party to the litigation had the hose tested by a forensic materials laboratory, there is no specific scientific analysis in this record regarding the mechanism of the exhaust failure.  State National's expert Mr. Cairns explained, however, that damaged propellers could cause vibration.  The propeller damage observed by Mr. Cairns evidenced rotational damage, which means that the propellers were under power at the time.  The damage further indicated bi-directional force resulting from putting the gears in forward and reverse that is typical when a piloting captain is attempting to extract a boat from a strand.

96.    It is indeed more probable than not that the vessel's propellers were damaged to some extent prior to the final trip.  This damage was acknowledged by Rosandich.  Captain Eymard credibly testified that Rosandich told him about the damage that resulted from the pre-voyage groundings.  Rosandich was aware of the fact the damage resulted in vibration while the boat was operating.  Eymard was told that Rosandich was taking a new propeller to Fort Myers where it could be installed before the vessel crossed the Gulf of Mexico on its way to Louisiana.  Eymard also discussed that subject, replacement of the propeller, with Dorsey.

97.    Eymard experienced some vibration during the voyage.  In a recorded statement taken days after the sinking, he reported a serious vibration while underway.  Significantly, in his post-loss statement the Captain attributed the hole in the exhaust hose to the vibration.

98.    The evidence at trial showed that propeller damage was possible when the vessel was operated by the crew members retained for the voyage, as Rosandich attested based upon his interview with the crew right after the sinking.  Moreover, while Rosandich was commanding the boat prior to the voyage the vessel ran aground on the intracoastal waterway.  That occurred, according to Rosandich, four or five times.  On one occasion, he personally went into the water to inspect any grounding damage and observed the starboard propeller tips deflected.  He even discussed with Eymard that it may be necessary to change the propeller blades when the vessel reached the Gulf Coast at Ft. Myers.  Rosandich credibly claimed, however, that Eymard did not tell him that there was significant vibration during the voyage.

99.    It is indeed possible that the propeller damage itself is linked to the overheated exhaust condition, if in fact that condition occurred after the vessel was on her way to the Gulf Coast.  As Rosandich and Anzhela's mechanical engineering expert explained, the intake of sand into the exhaust system could contribute to an engine overheat because sand getting into the water pump system that cools the engine, and specifically clogging the sea strainers at the intake to the pump, could reduce the amount of cool water taken into the system to cool the exhaust.  This engine utilizes a standard wet exhaust system, which uses cold water to spray the exhaust stack from the engines to reduce the temperature of exhaust gases emanating from the engine.  A normally operating system would cool the exhaust gases, and expel those cooled gases through the exhaust hose and out of the vessel at the waterline.  But if the system gets clogged – such as through sand on the sea strainer – and not enough cool

water enters the system, the exhaust gases cannot be adequately cooled prior to expulsion through the exhaust hose and out of the rear of vessel.

100.   The absence of the main starboard bilge pump undoubtedly did not help matters.  Had the fixed starboard bilge pump been installed, its 50 gallon-per-minute capacity would have helped deal with the water intrusion given the size and location of the exhaust hose hole.

101.   On the other hand, the vessel was equipped with four portable submersible electric pumps, three of which may have been used to de-water the vessel. These pumps required 110 volt alternating current for power.  Water was discharged through a garden hose attached to the pump.  The record was not crystal clear as to how many portable submersible pumps were in use that night.  One may have failed. Another complication is that in order to use the pumps, it was necessary to run extension cords into the starboard engine room from outside the compartment.  The extension cords entered through the engine room hatch.  The discharge hoses exited the engine room through the hatch.  The electrical power cords and the hoses to discharge water required the watertight hatch to remain open.

102.   The crew confirmed that fact at trial.  The crew testified that water entered into the starboard engine room through the hatch.  The port engine room hatch was also left open as the extension cords that powered the portable pumps were plugged into the port engine room. This also required the watertight hatch on the port engine room to remain open.  Crew member Scibetta credibly testified that he observed waves breaking on the rear deck that entered the port engine room causing it to flood.

103.    Nevertheless, we know that the crew stabilized the situation when the water intrusion was first discovered using the portable pumps.  Without the main engine or main bilge pump, the crew successfully de-watered the vessel, to the extent that the crew felt comfortable not calling in for Coast Guard assistance and the Captain retired to his berth with Killingsworth on watch.   Given the Court's assessment of Eymard's credibility and seamanship experience, we find it more probable than not that this decision would not have been taken had the vessel remained in peril.  The portable pumping capacity on the vessel proved to be capable to address the immediate peril even with the absence of the fixed pump and with deficient watertight integrity in the hull compartments.

104.    Hence, the deficiencies highlighted in State National's case that were known to the owners – the absent main bilge pump and failure in the watertight compartments – did not proximately cause the loss of the vessel by the greater weight of the evidence.  These deficiencies clearly did not help matters, and indeed may have exacerbated the problem, but they did not prove to be dispositive.  (We recognize, of course, that the failure to correct the deficiencies in the watertight bulkheads is nevertheless fatal to Anzhela's position).

105.    In any event, the most proximate cause of the vessel was the negligence of the crew.  As discussed earlier, the crew for the voyage between Miami and Golden Meadows, La. was provided by Fish Offshore, an entity known to and approved by WFT.   Fish Offshore was retained to operate the vessel once repairs had been completed and a COI issued.  Dorsey interviewed and approved of the Captain. Rosandich, however, was not satisfied with Killingsworth's performance.  He contacted

Val Galijour of Fish Offshore requesting removal and replacement of the engineer, but Dorsey overruled Rosandich's request to remove Killingsworth as the engineer, labeling their conflict as a personality conflict.

106.   In hindsight Dorsey recognized the incompetence of the engineer and would now not allow the engineer near a row boat.  Malcolm Elliott, the Defendants' surveying expert, conceded the crew incompetently reacted to the situation on board the vessel.  He credits the crew with the ability to navigate the boat, but the crew was not competent to address the ingress of water into the hulls.   The crew was incompetent in selecting the anchoring location, reaction for water ingress and lack of action for reporting.   He also faulted the crew or failing to discover or realize of an overheated condition if the overheat occurred at that time.  The crew identified a problem with the steering system requiring the vessel to anchor in the ocean rather than proceed to port.  But no expert witness for either party could find anything wrong with the vessel's steering system.  It is more likely than not that the problems the crew encountered on the vessel were unrelated to any steering issue, and again could have been related to a loss of thrust generated by an overheated engine.

107.   Having said all that, however, the crew did initially manage to control the initial ingress of water.   The crew was able to utilize the portable bilge pumps available to them from both hulls and stabilize the situation at the initial phase of the emergency.  At that point, again unwisely in hindsight, Eymard and Scibetta returned to their quarters and left Killingsworth on watch.  Killingsworth did not testify at trial; however, the evidence in the record shows that, more likely than not, he fell asleep while the portable pumps were still operating.  Given his past experience and his own

self-preservation, it is unlikely that Killingsworth while awake would have again allowed the situation to de-stabilize without calling for assistance from the other crew members, and the Coast Guard if necessary, if he was physically observing the ingress of water reach a critical level. Similarly, if the weather conditions worsened to the point that the bilge pumping capacity on the vessel was being overwhelmed by topside wave action, a competent and awake engineer would have immediately reacted to get assistance.

108.     In other words, under the circumstances, close observation of the status of the pumping capacity and the level of water intrusion were essential to safe operation of that vessel. Had Killingsworth, who undoubtedly was tired from a very long day, remained on watch he would not have waited until ten minutes prior to the *sinking* of the vessel to seek assistance from the other crew members and abandon the vessel. The circumstantial evidence in the record shows instead that he likely fell asleep well before 4:00 a.m. that next morning, during which time the portable bilge pumps were overwhelmed by the level of water intrusion in the starboard hull coupled with additional water intrusion into the port hull caused by the open hatches and the wave action on the vessel.

109.     So, by the time he woke up and realized the even greater peril the vessel was in, it was too late. Each instance of crew neglect or incompetence compounded itself, reaching a point at which a vessel anchored just offshore had to be abandoned before timely Coast Guard or SeaTow assistance was called in to aid the vessel prior to its loss.

110.    Despite the many issues imperiling the vessel that night, the most proximate and immediate cause of the loss of the vessel was the crew's negligence in properly appreciating the risk facing the vessel, in reacting to that risk in a competent fashion and in a manner in which a reasonable seaman would have under the circumstances, and then in compounding that simple negligence with gross negligence by allowing the vessel to sink while the crew slept.

111.    This finding is critical to understand the reason why the vessel was lost. Even with the remaining issues with the watertight compartments in the hull and the limited bilge pumping capacity onboard, we know for a fact that the vessel *did not sink* when the water ingress problem was first observed.  We know from direct and circumstantial evidence in the record that the vessel, while taking on water, was seaworthy enough to face that problem with the portable bilge pumping capacity that was onboard.  The vessel's owner representative was made aware of the problem and believed, reasonably, that the situation had stabilized well before the sinking.

112.    The facts show as well that crew members Eymard and Scibetta, who testified credibly on this issue, concluded that any imminent threat to the vessel had dissipated before they returned to their quarters.  The record shows that these crew members would have called in for additional assistance had they recognized that the bilge pumping capacity on the vessel was insufficient and incapable of preserving the vessel's stability.  Eymard had extensive seaman experience, including a fourth-issued Coast Guard captain's license.  Scibetta had spent his entire life at sea and had extensive experience as a deckhand and vessel engineer.

113.   In short, the vessel did not sink because of those deficiencies.  To the contrary, the peril to the vessel was stabilized.  But then the crew literally fell asleep. It was this latter act of malfeasance that most directly and in natural and continuous sequence substantially produced the loss of the vessel.

### F.   _Post-Loss Claims_

114.   After the vessel was lost, Rosandich signed a Salvage Contract with Sea Tow on the morning of the sinking. (PX 87)  At the time of formation of the contract, no representative of State National was present.  Services were performed on a Per Diem/Hourly basis according to a Rate Schedule attached to the Salvage Contract. Mark Rosandich initialed the Rate Schedule signifying his acceptance.  Sea Tow began performing under the Salvage Contract.

115.   Due to inclement weather conditions, it was not possible to raise the boat immediately. The vessel's superstructure remained above the surface of the water because the boat sank in 28' of water. The waves impacted the portion of the superstructure that remained above the sea.  This resulted in the destruction of the superstructure. The twin hulls remained intact underwater. Pieces of the superstructure and the contents of the deck house were strewn about the beach and the bottom of the ocean.

116.   The Coast Guard and environmental authorities demanded immediate removal of the vessel and debris.  The day after the sinking Dorsey signed a Notice of Tender of Abandonment to Harold Heno, a claims representative initially assigned to the claim. (DX 29)  The insurance company rejected the tender reserving its rights.

117.    Shortly thereafter, Dorsey was advised to proceed as a reasonably prudent uninsured until coverage could be determined.  Surveyor Ian Cairns became involved on March 27th.  After learning the superstructure washed away he recognized that the vessel was a constructive total loss.  The nature of the salvage operation changed from salvage to wreck removal at that time.  Mr. Cairns was also concerned with the expenses being incurred under the time and material contract with Sea Tow.  He recommended termination of the Sea Tow Salvage contract.

118.    This recommendation was made to the owner and the underwriters.  Days later State National decided to pay for wreck removal under a full reservation of rights. This decision was made in order to reduce the ultimate exposure.  Coast Guard and environmental authorities were repeatedly demanding the vessel be removed from the reef.  If action was not immediately taken the Coast Guard threatened to federalize the project.  This would have resulted in a tripling of the expense over a commercial salvor.

119.    Mr. Cairns sought competitive bids to raise the hull on a fixed price "no cure-no pay" basis.  Three bids were received.  Titan Maritime bid $575,000, Lorado Construction bid $595,000 and Resolve Marine Group bid $475,000.  These bids were considered too high.  A recommendation was made to the owner and underwriters to re-bid the contracts.  On the second bid, Titan bid $425,000, Lorado bid $425,000 and Resolve resubmitted their original bid of $475,000.  Sea Tow bid independently for $379,000.  Included in the bid price was an agreement to reduce the time and material Salvage invoice by 20%.  This reduction would net a saving of $58,000.

120.    The Sea Tow fixed price contract contained a contingency that permitted Sea Tow to retain and dispose of the superstructure and/or scrap aluminum not

attached to the vessel's hull with no offset to bid price or for monies received for scrap value of aluminum.   A copy of the proposed contract was sent to Rosandich for approval.  The Salvage Proposal and bid contained the scrap contingency.  Rosandich did not object to the terms other than the price was too high acknowledging that it was the lowest bid.  Captain Morgan credibly testified that he kept Rosandich informed of the bid and terms.  Rosandich did not complain or object to any of the terms of the proposal.

121.    Sea Tow raised the remains of the vessel according to the terms of the proposal.  Rosandich claimed that he was not kept apprised of the location of the salvage, but Sea Tow contested this assertion.  Captain Morgan was never aware of an issue and his wife Lisa responded via email that she had kept Rosandich advised of the location of the debris but he declined an opportunity to inspect.

122.    There is no question that the retention of the debris by Sea Tow was authorized by the Contract in consideration for a reduced bid and in exchange for a 20% reduction of the original salvage invoice.  The issue of conversion is further resolved by Dorsey executing a Redelivery Statement on April 16th.  (PX 105)  By signing the Redelivery Statement, Dorsey relinquished his claim related to the raising and towage of the vessel.  He did not preserve any claim of property not returned by Sea Tow.  Defendant failed to prove State National intentionally destroyed evidence or negligently failed to retain it as alleged in Count VI of the Counterclaim.  There is no evidence State National or its agents converted any item.  The scrap as depicted in the photographs had little commercial value.  Sea Tow discarded the scrap as the

disposal costs approached the scrap value.  At all times, Sea Tow was acting within its contractual authority to dispose of the scrap without objection from Defendant.

## II.   CONCLUSIONS OF LAW

State National initially filed this declaratory judgment action pursuant to the Court's admiralty jurisdiction cognizable under 28 U.S.C. § 1333. [D.E. 1].  The parties do not dispute that jurisdiction lies and that federal maritime law applies. [D.E. 148].  The issues in dispute now focus on the remaining counts in the Complaint and Anzhela's Counterclaim.

Specifically, State National's declaratory action did not challenge that a maritime insurance policy was issued on or about March 23, 2007 that provided coverage for the Anzhela's Hull and Machinery and Protection and Indemnity. [D.E. 1 ¶21].  The vessel was lost at sea on March 25, 2007, within the coverage effective period, on a policy that included traditional broad protection for breakdown of electrical machinery, any latent defect in the machinery or hull, or even the negligence of the masters, officers, crew or pilots. [D.E. 65].

State National claims in Count I of the complaint that, notwithstanding the scope of the policy's protections, coverage was void and/or unenforceable due to the Anzhela's owner's breach of the duty of good faith.  That breach occurred following material misrepresentation regarding the vessel's COI, plus material non-disclosures regarding the Coast Guard's latest inspection of the vessel, the grounding of the vessel prior to coverage attaching, and the intent to exceed the scope of the navigational warranty in the policy.  If State National meets its burden of establishing a breach of

the duty of good faith, the policy would be void ab initio and no payment would be due under the policy for the loss of the vessel.

Count II of the complaint claims that the Anzhela's owner breached the absolute warranty of seaworthiness because the vessel was not, in fact, seaworthy at the time that coverage attached. State National relies on the warranty under federal maritime law and specifically from the provisions of the policy itself. State National seeks to void the policy under this claim and relieve it from any obligation under the policy.

Similarly, Count III claims that Anzhela cannot recover under the policy based upon its breach of the policy's express duty of continuing seaworthiness that required due diligence on the owner to keep the vessel seaworthy following the issuance of coverage. State National cites various deficiencies in the vessel, including the lack of adequate bilge pumps in the starboard hull, as evidence of the failure to maintain the vessel in a seaworthy condition. Therefore State National seeks to void the policy on this basis as well.

Count IV focuses on the Anzhela's breach of the express navigational warranty in the policy that the vessel would remain within the Gulf of Mexico and not to exceed 100 miles offshore. Because the vessel was lost in the Atlantic waters prior to its ever reaching the Gulf of Mexico. State National claims that this too voided the policy and relieves State National from any obligation under the policy.

Finally, Counts V and VI relate to specific coverage exclusions that State National relies upon to reduce the extent of any covered losses assuming the policy is not otherwise invalidated. State National relies upon a policy exclusion in the general conditions of the policy that relieves it of any obligation to cover for losses or claims

relating to fuel spillage or other chemical leaks that resulted from the loss of the vessel.  Similarly, State National disclaims any responsibility for fines or penalties assessed against the owners of the Anzhela for environmental damage or regulatory violations following the loss of the vessel.[2]

Apart from defenses raised to these claims, Anzhela's remaining counterclaims seek payment on the maritime policy from State National plus fees and costs, as well as damages for the conversion of the salvage that remained from the loss of the vessel, which Anzhela claims was unlawfully converted by State National's agents.

## A.   *Uberrimae Fidei – Good Faith*

The well-established marine insurance doctrine of *uberrimae fidei* is the controlling law in this circuit.  *E.g., Steelmet, Inc. v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir. 1984). The doctrine requires that an insured fully and voluntarily disclose to insurer facts material to a calculation of the insurance risk.  *Id.*  As our predecessor circuit explained, "[n]othing is better established in the law of marine insurance than that a mistake or commission material to a marine risk, whether it be wilful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy." *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 980 (5th Cir. 1969).

The duty of good faith by necessity extends to those facts not directly inquired into by the insurer.  *HIH Marine Services v. Fraser,* 211 F.3d 1359, 1362-63 (11th Cir.

---

[2]     The remaining counts in the State National complaint against Anzhela and the individually named defendants were previously dismissed by separate Orders and are not addressed herein.  The same is true for Anzhela's original counterclaims that were dismissed and superseded by the amended counterclaims that remain.

2000) (citing *Jackson v. Leads Diamond Corp.,* 767 F. Supp. 268, 271 (S.D. Fla. 1991));

*see also Certain Underwriters at Lloyds v. Inlet Fisheries, Inc.,* 518 F.3d 645, 648 (9th

Cir. 2008) ("Under uberrimae fidei, [insured] would have been obligated to disclose all

material information, regardless of a request by Lloyds."). As the Supreme Court

defined the scope of this duty, "[i]t is the duty of the assured to place the underwriter

in the same situation as himself; to give to him the same means and opportunity of

judging of the value of the risks; and when any circumstance is withheld, however

slight and immaterial it may have seemed to himself, that, if disclosed, would probably

have influenced  the terms of the insurance, the concealment vitiates the policy." *Sun*

*Mut. Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 510-11 (1882) (quotation omitted).

Consequently a material misrepresentation or non-disclosure on an application

for marine insurance is grounds for voiding the policy. *E.g., HIH Marine,* 211 F.3d at

1363; *Steelmet,* 747 F.2d at 695 (the failure to disclose a material fact, whether "from

mistake, accident, or forgetfulness, is attended with the rigorous consequences that the

policy never attaches and is void" (quoting *Fireman's Fund Ins. Co. v. Wilburn Boat*

*Co.,* 300 F.2d 631, 646 (5th Cir.1962))). To void a policy, the insurer must show, first,

that a misrepresentation or non-disclosure was indeed made by the insured prior to

coverage attaching and, second, that this deficient disclosure was material to or relied

upon by the insurer. *See Kilpatrick Marine Piling v. Fireman's Fund Ins.,* 795 F.2d

940, 942-43 (11th Cir. 1986); *Puritan Ins. Co. v. Eagle Steamship Co., S.A.,* 779 F.2d

866, 871 (2d Cir. 1985). The insurer need not show that the non-disclosure was

intentional or willful; the policy is voided "whether the concealment be due to fraud,

negligence, accident, or mistake." *Kilpatrick,* 795 F.2d at 943 (citing *Gulfstream Cargo,*

409 F.2d at 980-81).[3]

As to the first element, the insurance applicant satisfies the doctrine of

uberrimae fidei by informing the insurer of the facts known to the insured.   *See Sun*

*Mut.,* 107 U.S. at 510-11.   He must disclose to the underwriter at least sufficient

---

[3]       On this particular point, one of the arguments raised by Anzhela is that, notwithstanding the general principles that govern the duty of disclosure, "parties are free to 'contract-out' or 'contract around' state or federal law with regard to an insurance contract, so long as there is nothing void as to public policy or statutory law about such a contract."   *King v. Allstate Ins. Co.,* 906 F.2d 1537, 1539-40 (11th Cir. 1990) (the parties contracted for their own standard to show misrepresentation or omission where the maritime insurance policy stated it is void if "you intentionally conceal or misrepresent any material fact or circumstance, before or after a loss . . . ."). Anzhela concludes, therefore, that State National can recover on this theory only if it can show an intentional willful act of misrepresentation or concealment.   The problem, however, is that there is no provision in this policy that mirrors the language cited in *King*.

Instead, Anzhela points by analogy to cases in other insurance contexts where language from the certification portion of an insurance application was deemed to modify the traditional duty of disclosure.   *See William Penn Life Ins. Co. of N.Y. v. Sands,* 912 F.2d 1359, 1362-63 (11th Cir. 1990) (in a life insurance application the language "I have carefully read all the above questions; statements and answers are true to the best of my knowledge and belief" was construed to mean that the applicant's answers must be assessed in the light of his actual knowledge and belief); *Hauser v. Life General Sec. Ins. Co.,* 56 F.3d 1330, 1335 (11th Cir. 1995) (quoting *Sands,* another health insurance policy included similar language and the court found that, "[w]here an insurer only requests the disclosure of information to the best of the insured's 'knowledge and belief,' and where the applicant so complies, we will decline to protect the insurer 'from a risk it assumed by virtue of the contractual language it drafted.'").

We cannot rely on this line of cases because we doubt whether the longstanding maritime doctrine can be modified by contract simply by pointing to the boilerplate "knowledge and belief" certification on an application, as opposed to an actual provision within the policy itself that defines and narrows the duty of disclosure as was the case in *King*.   None of the cases that Anzhela relies upon adopted the view that this certification language constituted a contractual modification of the duty of disclosure in the maritime context, nor have we found any as well.   Given how entrenched the doctrine is in the maritime insurance context, it seems to us that a much more explicit and unambiguous contractual modification would have to be enacted to modify the traditional test.

knowledge that, if the latter desires further information, he can ask for it.  *Puritan,* 779 F.2d at 871.  And when an insurer does ask for that information, the carrier has an obligation to read it under its own reciprocal duty of good faith to the insured.  *See Commercial Union Ins. Co. v. Flagship Marine Services,* 982 F. Supp. 310, 314 (S.D.N.Y. 1997) (citing *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 944 F. Supp. 986, 1003 (D. Mass. 1996) ("The duty of uberrimae fidei is a reciprocal one.")).

As to the latter element, a misrepresentation or non-disclosure is material if it might have a bearing on the risk to be assumed by the insurer.  *HIH Marine,* 211 F.3d at 1363 (citing *Kilpatrick,* 795 F.2d at 942-43 (materiality is "that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk")).  In the context of marine insurance, concealment or non-disclosure is the failure to disclose facts that "in relation to the subject matter of the contract which may increase the liability to loss, or affect the risk assumed, . . . and of which the other party has no actual or presumptive knowledge." *Certain Underwriters at Lloyd's v. Giroire,* 27 F. Supp. 2d 1306, 1312-13 (S.D. Fla. 1998) ("*Giroire*") (quoting *Steelmet,* 747 F.2d at 695); *see, e.g., Jackson,* 767 F. Supp. at 271-72 (voiding marine insurance policy because insured breached the "duty to disclose voluntarily every material fact and circumstance within his knowledge and unknown to the insurer even though no direct inquiry was made").

After-the-fact, conclusory statements by the insurer that a certain fact was material and would have affected its decision to insure are not enough.  *See Great*

*Lakes Reinsurance (UK) PLC. v. Roca,* 2009 WL 200252, at *6 (S.D. Fla. Jan. 27, 2009) (citing *AXA Global Risks (UK) Ltd. v. Pierre,* 2001 WL 1825853, at *9 (S.D. Fla. Nov. 8, 2001) (citing *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985)).  An insurer must provide some specific evidence capable of showing the omitted fact's materiality, *see AXA Global,* 2001 WL 1825853, at *9, and the Court must consider that evidence under an objective standard – whether a reasonable person in the assured's position would know that the particular fact is material.  *See American Home Assur. Co. v. Masters' Ship Mgmt. S.A.,* 423 F. Supp. 2d 193, 221 (S.D.N.Y. 2006) (citing *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir. 1986)), *aff'd,* 489 F.3d 497 (2d Cir. 2007).

Another relevant consideration here is the principle that, in the context of marine insurance, the broker acts as an agent for the insured.  *Giroire,* 27 F. Supp. 2d at 1313 (citing *Dreiling v. Maciuszek,* 780 F. Supp. 535, 540 (N.D. Ill. 1991)).  Hence, an insurer may void the policy even if the failure to disclose material facts was the result of actions by a person acting "on behalf" of the actual insured.  The insurer is not to blame if the broker erroneously prepares the application, because the insurer issued the policy based on the application.  *Id.*  The insurer is entitled to rely on the representations of the insured's agent.  *Id.* (citing *Dreiling,* 780 F. Supp. at 541) (in marine insurance, the broker acts as agent for the insured, not the insurer, thus boat owner is charged with knowledge that his broker possessed but failed to communicate to the insurer).

Based upon the record presented in the case, the Court finds that for the most part State National did not meet its burden of showing that, by the greater weight of the evidence, Anzhela breached its obligations under the doctrine of uberrimae fidei. See *supra* ¶¶ 17-46.  But with respect to the deficiencies in the watertight bulkheads, State National did show that Anzhela failed to disclose material information. *Id.* ¶¶ 47-50.

### 1.   *Status of COI*

The thrust of State National's claim focuses in general on the alleged misrepresentation over the status of the COI and the failure to inform the underwriter that the vessel had not yet been certified by the Coast Guard.  There was clearly conflicting information submitted to the underwriter, including an email attaching handwritten notations on the application (by Anzhela's insurance broker) that the vessel had a COI, with emailed communications and a survey prepared in anticipation of insurance coverage that clearly and accurately reflected the status of the COI.  That documentation reflected that a COI had expired, that work to obtain the COI was in process, and that the owner would seek Coast Guard certifications at a later point before the vessel engaged in commercial operations.  This was all disclosed to the underwriter.[4]  The record indeed shows that the underwriter may have paid little

---

[4]     As an example, one of the earliest communications between the broker and State National's underwriter requested a review for a "new account" with an attached memorandum explaining, accurately, the status of the vessel and the owner's intent to obtain Coast Guard certification.  (PX 63 at 36 ("The vessel will be USCG certified to carry 100 passengers in a crew transport role . . . or 30 passengers as a live board housing platform.")).  That same communication attached the survey report that also specifically referenced the expired Coast Guard certification and the owner's intent to obtain Coast Guard certification as a passenger carrying vessel.

attention to the conflicting documentation despite the insurer's own duty of good faith. But whether or not that represented a breach of the insurer's own duties to the insured, the fact remains that State National was provided sufficient information to satisfy itself further. See *supra* ¶¶ 40-44. The first element necessary to void the policy on this general basis has not been met.

Again, truthful information was submitted to the underwriter before the policy issued. That information was certainly not consistent with the broker's handwritten notation on the original application that a COI was current on the vessel. Faced with that ambiguity, further clarification could have been requested to the extent that the COI was dispositive to the underwriter, but none was. Nevertheless, there is no evidence in the record that the Anzhela's agents misrepresented any facts or concealed the true state of the COI for the vessel. The application's notation was, more likely than not, a miscommunication or misunderstanding that resulted from either the owner to the broker or the broker to the underwriter. Nevertheless, this is an adequate explanation for the discrepancy from the Anzhela's perspective, which the Court credits. And the Court finds that the testimony of Anzhela's owner and agents were credible in this regard.

State National's position would have been more persuasive had the application been the entirety of the information submitted to the underwriter. In such a case, whether mistaken or not, the duty to disclose may have been breached. But State National received far more accurate information through the Elliott survey that State National could rely upon to either reject the application or condition final issuance on

receipt of the actual COI.  State National decided instead to issue coverage based on the existing documentation.  A misrepresentation or non-disclosure did not take place in this respect.  *See, e.g., Federal Ins. Co. v. PGG Realty, LLC,* 538 F. Supp. 2d 680, 696 (S.D.N.Y. 2008), *aff'd,* 340 Fed. Appx. 5, 2009 WL 2030139 (2d Cir. July 9, 2009) (finding that duty of good faith had not been violated when certain copies of surveys were forwarded to underwriter as opposed to other complete copies, where insured took reasonable steps to fulfill its duty and underwriters chose to bind coverage without reviewing all surveys made known to them; moreover, functionally identical information was in fact provided to the insurer).

Even if it had taken place, the second element of materiality also fails for similar reasons.  The Court does *not* find the underwriter's testimony credible that, had she realized that the survey's statement of the status of the COI was accurate, the policy would not have issued.  The record rebuts that because the trip coverage was indeed issued notwithstanding the underwriter's knowledge that the vessel was still being prepared for final operations.  A reasonable insurance applicant would have concluded that the information that was indeed supplied to the carrier's underwriter was all that was required given those circumstances.

In any event, for the reasons discussed above, the lack of a COI was already known by State National's underwriter given the overall disclosures and information provided by Anzhela's agents.  Therefore, the purported misrepresentation in the application could not be found to be material under the law or as a matter of fact because it was known to State National.  *See Steelmet,* 747 F.2d at 695.

Accordingly, on both bases the Court cannot find that State National has met its burden of showing a breach of the duty of good faith sufficient to void the policy, with respect to the status of the COI for the vessel.

## 2.  *Groundings & Navigational Warranty*

We reach the same conclusion as to certain other alleged non-disclosures that State National points to.  The relatively minor groundings of the vessel prior to the inception of coverage would not have been material to a reasonable insurance applicant who would not deem it necessary to disclose it prior to coverage.  They were relatively minor events that, even if some propellor damage resulted, would have been cured prior to final operations of the vessel.  The Court finds the Anzhela's explanation for that to be credible.  See *supra* ¶¶ 95-98.

Moreover, there was no credible testimony presented at trial, either from the underwriter or any expert witness, that these events per se had to have been disclosed to the underwriter.  And the Court also finds that the insurer would not have deemed those events material or serious enough not to issue the policy.  No credible evidence was submitted by State National on that point as well.

The Court also finds that the Anzhela owner's or agents' intent to void the navigational warranty was not a breach of the duty of good faith, principally because there was no such intent.  To the contrary, Anzhela's representatives fully and accurately disclosed to the underwriter what the purpose of the voyage was from Fort Lauderdale to Golden Beach and that coverage was requested for that voyage.  See *supra* ¶¶24-40.  Put another way, the disclosures that Anzhela made gave rise to a

specific exception to the navigational warranty for the initial voyage to Golden Meadow.  Therefore, the alleged failure to disclose the intent to void the warranty was never material to or relied upon by the insurer given the subsequent oral agreement that clarified the insured's intentions.  Therefore, on either element State National failed to show that duty of good faith was breached with respect to the intent over the navigational warranty, which warranty we address in more detail below.

### 3.  *Deficiencies in Watertight Bulkheads*

State National's first theory was founded on the general failure to disclose to the underwriter that the vessel was not yet COI certified.  There was no misrepresentation in that regard because Anzhela did in fact disclose the accurate status of the COI certification process prior to the inception of the policy. But State National also alleged more specifically that the duty of good faith was breached by Anzhela not disclosing the Coast Guard's assessed deficiencies in the watertight bulkheads.  On that narrower point, the Court's review of the record shows that this aspect of the claim in Count I has merit.

Anzhela is correct when it reminds us that "[a] minute disclosure of every material circumstance is not required. The assured complies with the rule if he discloses sufficient [information] to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it." *Puritan,* 779 F.2d at 871.  But there can be no dispute that once disclosures are made, they must be accurate and, if not, must be corrected by the insured prior to coverage attaching. *See, e.g., Gulfstream,* 409 F.2d at 982 (underwriter has "absolute right to demand full, open,

*honest, complete, accurate* disclosure of facts then well known which bore directly upon the condition of the vessel") (emphasis added); *HIH Marine,* 211 F.3d at 1363 (a material misrepresentation on an application for marine insurance is grounds for voiding the policy); *Giroire,* 27 F. Supp. 2d at 1311 ("The insurance applicant must *voluntarily and accurately* disclose to the insurance company all facts which might have a bearing on the insurer's decision to accept or reject the risk.") (emphasis added).

And in particular, when an insured has gained knowledge that there are material deficiencies in the vessel that may affect its seaworthiness, a reasonable insured must disclose those facts to the insurer or otherwise correct the deficiencies prior to coverage attaching. *See Puritan,* 779 F.2d at 870 ("[W]here a party orders insurance, and afterwards receives intelligence material to the risk, or has knowledge of a loss, he ought to communicate it to the agent, . . . for the purpose of countermanding the order, or laying the circumstances before the underwriter.") (quoting *Thebes Shipping, Inc. v. Assicurazzioni Ausonia SPA,* 599 F. Supp. 405, 426 (S.D.N.Y. 1984)). That is the case even if the information material to the risk is actually untrue, as the Fifth Circuit noted in *Gulfstream,* 409 F.2d at 981 n.20 ("All the precedents agree with the general rule . . . [that] 'it is immaterial that information received by insured is in fact untrue, and the policy is avoided if he, without knowledge of its untruth, failed to disclose it. Where insurance is effected through an agent or broker, insured must exercise diligence to inform such agent or broker of the facts of which he is possessed.'") (quoting 45 C.J.S. *Insurance* § 645a).

To illustrate, one of the cases that Anzhela heavily relies upon, *Federal Ins.,* found in part that an insured had not breached the duty of good faith with respect to the unseaworthy condition of watertight bulkheads. 538 F. Supp. 2d at 691-92. The reason why that court found no breach, however, is telling. First, many of the deficiencies cited by the insurer, including penetrations in the watertight bulkheads, had in fact been cured prior to inception of the policy. *Id.* at 692, 695. Second, the court found no misrepresentation at all because the survey provided to the underwriter specifically referenced that condition. *Id.* at 692 (according to the survey, "All watertight bulkheads . . . have been compromised by plumbing penetrations and unfilled cut-throughs.").

Unfortunately, the facts in our case cut in the opposite direction. The record here shows that, like *Federal Ins.,* a survey was submitted to the underwriter. But there was an inaccurate and/or misleading disclosure in that survey, prepared in August 2006, with regard to the watertight integrity of the bulkheads. It concluded that there were watertight compartments on the vessel that were in "good" condition. In February 2007, Anzhela submitted that report to the underwriter. Hence, the only information submitted by Anzhela to the underwriter with respect to this matter prior to the inception of the policy was that the vessel had watertight compartments that were seaworthy. See *supra* ¶¶ 47-49.

Anzhela acknowledges, however, that the survey report failed to identify any problems with the watertight integrity of the bulkhead resulting from unsealed penetrations through the bulkheads. Rosandich, Trans. Jan. 22, 2009 at 67:4-8 (D.E.

186).  Rosandich conceded at trial as well that the integrity of watertight bulkheads on the vessel is a matter that directly affects the seaworthiness of a vessel.[5]  Rosandich further admitted that the Coast Guard's inspection in August 2006 revealed an issue with penetrations running through the watertight bulkheads that the Coast Guard believed affected their watertight integrity.  Those issues were not "resolved" to the Coast Guard's satisfaction when the last inspection of the vessel took place in December 2006.

The problem lies, however, with the fact that the Coast Guard's noted deficiencies were never transmitted to the underwriter prior to the policy being issued.  Nor was the Coast Guard's activity report (PX 176) itself submitted to the underwriter.  Anzhela does not dispute these facts, which are in stark contrast with *Federal Ins.* where the issues with penetrations in the bulkheads were indeed identified in a survey report and submitted to the underwriter.

Anzhela instead takes issue with the contention that the deficiencies at issue had anything to do with the watertight integrity of the vessel.  Rosandich testified at trial that the bulkheads were watertight, but that the concerns raised by the Coast Guard had to do with the vessel's technical compliance with new subchapter T regulations in place at the time, dealing with a locking door in one compartment that the Coast Guard wanted to have removed, as well as the type of sealing materials used

---

[5]        "Q.        And having your watertight bulkheads be watertight is a rather significant component of keeping a boat seaworthy; is that an accurate statement?
            A.        That's accurate, sir."

            *Id.* at 67:13-16.

in the bulkhead penetrations.  Putting aside, for the moment, whether Rosandich's explanation was credible, the fact is that the dispute over the watertight integrity of the bulkheads was a matter that affected the seaworthiness of the vessel and had to be disclosed to the underwriter.[6]  As Rosandich conceded, watertight integrity of bulkheads on a vessel like the Anzhela is an important component of seaworthiness. Under the duty of good faith, the underwriter had a right to be made aware of that issue, at least so that it could consider Rosandich's explanation and accept the risk, just as the underwriter in *Federal Ins.* had the ability to consider whether that survey report's concerns over penetrations in the bulkheads of that vessel affected its underwriting decision.  *See also Gulfstream,* 409 F.2d at 981 n.20 ("It is immaterial that information received by insured is in fact untrue[;] . . . insured must exercise diligence to inform such agent or broker of the facts of which he is possessed.") (quotation omitted).

This conclusion is buttressed by the fact this matter is not just one of non-disclosure.  It indeed involves a misrepresentation or inaccuracy in the application, at least if one construes the Coast Guard's deficiency report at face value.  The only reasonable inference that can be drawn from the activity report is that the inspector believed the penetrations through the bulkheads were not in fact watertight.  No reference is made to merely a dispute regarding a sealed locking door or the type of epoxy used to seal the piping running transverse through the bulkheads.  The Coast

---

[6]    The credibility of Anzhela's position with regard to the watertight bulkheads will be addressed in more detail in the discussion that soon follows regarding the actual seaworthiness of the vessel.  See *infra* Sec. II.C.2.c.

Guard's assessment cannot be squared with the surveyor's generic conclusion that the watertight compartments were "good."[7]

Again, for purposes of the uberrimae fidei analysis, we need not decide whether the Coast Guard's deficiency report overstated the issue or whether the Elliott survey was flatly incorrect.  What is relevant is whether a reasonable insured who had knowledge of this issue would consider it important to the underwriter.  *See, e.g., HIH Marine,* 211 F.3d at 1363 (citing *Kilpatrick,* 795 F.2d at 942-43 (materiality is "that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk")).  We conclude that the answer is yes.  A reasonable underwriter insuring commercial vessels would want to know whether the Coast Guard inspected a vessel and found deficiencies *in any way* with the watertight integrity of the bulkheads because, as Rosandich testified, they may directly relate to the seaworthiness of the vessel.

To hold otherwise would undermine the intended purpose of the uberrimae fidei doctrine because it would leave the insured in the position of assessing for itself the quality and quantity of information that the insurer should have.  That flies in the face of the well-entrenched state of admiralty law in this circuit that must chart our course.  *See Gulfstream,* 409 F.2d at 980-81 ("In the case of marine insurance the insured must disclose *all* facts material to the risk" and *"all* material facts which are known to him

---

[7]     We cannot ignore this inaccuracy in the Elliott survey, especially given that we have relied on that same survey to find, as Anzhela argued, that the disclosure of the COI process cured the incorrect disclosure in the application.  In this respect, however, that survey included incorrect, or at least incomplete, information which was never cured.

and unknown to the insurer.") (quoting *Fireman's Fund,* 300 F.2d at 646) (emphasis added); *HIH Marine,* 211 F.3d at 1363-64 (rejecting insured's opinion that omitted facts were not material because they decreased, not increased, the risk to the insurer; "As the insurer, HIH had the right to assess the risk using accurate information on the identity of its insured and the use of the vessel. . . . The [insured's] opinion that the [vessel] was at less risk . . . is simply irrelevant to the materiality analysis and, we might add, possibly wrong[.]").

As *Gulfstream* illustrates, the issues raised by this record are not novel in our circuit.  The former Fifth Circuit held in that case, affirming a trial court's judgment, that an insured breached the duty of good faith.  409 F.2d at 975-83.  The owners of the vessel involved sought to obtain marine insurance coverage for commercial purposes.  An initial survey report obtained for that purpose showed that the vessel, like the Anzhela, was in generally good shape. *Id.* at 975.[8]  Because the old vessel was experiencing leaking and excessive vibrations, a second survey was obtained that yielded far different conclusions; the vessel required extensive repair work to address significant rotting of the stern.  Like our case, the first survey was submitted to the underwriter, while the second critical report was not. *Id.* at 977.  The trial court found, and the Fifth Circuit affirmed, that the insured breached the duty of good faith in failing to disclose the second report and its conclusions that the vessel was

---

[8]     Ironically, that survey included the same type of certification that surveyor Elliott used in the Anzhela report, (PX 63 ("signed without prejudice")), which the Court took issue with in sarcastic terms.  "Opposite [surveyor's] signature was that enigma wrapped in a mystery which is as much a part of the legendary folklore of the sea as a fid or marlin spike, the ubiquitous, ambiguous, amphibious, if not meaningless 'without prejudice.'" *Id.* n.6.

unseaworthy and required extensive repairs. *Id.* at 982.  The policy was voided as a result, even though the seaworthiness issues raised in the report were not causally related to the actual loss of the vessel. *Id.* at 974.  The reason why is that, once alerted to the material deficiencies affecting the seaworthiness of the vessel, which contradicted the information submitted to the underwriter, the insureds had an obligation to disclose material facts going to the "state of the ship." *Id.* at 982-83 ("A request for a survey report having been made, this rule now urged would not tolerate, much less approve, Assured's failure to come forward with fair and full information once the facts reflected in the [second] report and also then known personally to the [assureds] came to light.").

We do not contend that the seaworthiness of the Anzhela was on par with the vessel in *Gulfstream*.  The Anzhela was not "spectacularly" unseaworthy. Nevertheless, the facts in *Gulfstream* are analogous and the analysis is binding precedent.  Having submitted a "generous" survey report to the underwriter, the Anzhela had an obligation to disclose the second report's contradictory conclusions, *especially* when that second report comes in the form of a Coast Guard inspection.  The issues raised in that inspection included, at the very least, a question as to the watertight integrity of the bulkheads, in contrast with the "good" watertight compartments identified in the Elliott survey.  That contradiction was material to any reasonable underwriter and any reasonable insured would have or should have recognized it.  Like *Gulfstream,* we must also conclude that the failure to inform the underwriter of the issue breached the duty of good faith, even though the Anzhela did

not intentionally seek to defraud State National and even though we find that watertight integrity of the bulkheads was not the proximate cause of the loss.

In sum, though State National did not satisfy its burden of proof on other issues, we find by the greater weight of the evidence that it did establish a breach of the duty of good faith with respect to the deficient penetrations to the watertight bulkheads on the vessel.  We have no choice but to find in State National's favor as to Count I of the complaint and enter judgment accordingly.

### B.   *Breach of Navigational Warranty*

Having found in State National's favor on Count I that voids the policy ab initio, we need not go further, at least as to the other liability issues in the case.  But in the interest of completeness, and with the recognition that our dispositive conclusion could prove to be in error, we continue to analyze the remaining counts of the complaint and counterclaim.

Count IV of State National's complaint focuses specifically on the Anzhela's alleged breach of the express navigational warranty in the policy that the vessel would remain within the Gulf of Mexico and not to exceed 100 miles offshore.[9]  Because the vessel was lost in the Atlantic waters prior to its ever reaching the Gulf of Mexico, State National concludes that this too voided the policy and relieves State National from any obligation under the policy.  We find that State National has not met its burden of showing, by the greater weight of the evidence, that the navigational

---

[9]      We will jump forward to consider the issues in Count IV before tackling the more difficult and more involved issues in the case as to the seaworthiness of the vessel.

warranty was breached based upon the supplemental oral modification of the policy entered into between the parties, as well as the held coverage provision of the policy.

### 1.  *Oral Modification of the Navigational Warranty*

As the Court has found as a matter of fact, *supra* ¶¶24-40, on or around March 19, 2007, Anzhela's agents entered into oral agreement with underwriter Karyn Price, whereby Price agreed to provide specific coverage to the vessel for the March 24th trip from Fort Lauderdale, into the Gulf of Mexico and into Golden Meadow, Louisiana. Dorsey testified credibly that he signed the last page of the application even with reference to the navigational limits of the Gulf of Mexico because he had earlier received written and oral confirmation from his broker USI that the vessel had trip coverage.   The law of maritime contracts supports Anzhela's position.

Federal admiralty law, as recognized in the Eleventh Circuit and elsewhere, requires the strict construction of express warranties in maritime insurance contracts. *Lexington Ins. Co. v. Cooke's Seafood,* 835 F.2d 1364, 1366 (11th Cir. 1988).  That is why a breach of a navigational limitation warranty like the one at issue here may release an insurance company of liability on the policy even if compliance with the policy would not have avoided the loss.  *Id.* (affirming trial court's finding that an unexcused deviation from a navigational limitation voided the policy) (citing *Aguirre v. Citizens Cas. Co. of N.Y.,* 441 F.2d 141, 143 (5th Cir. 1971)); *see also United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832 (11th Cir. 1984) ("It is well established where a vessel ventures voluntarily outside of the navigational limits specified in a hull

policy, and sinks or is otherwise destroyed while outside the mentioned limits, the insurer is relieved from liability for the loss of the vessel.") ("*Cavanaugh*").

State National relies on these principles in arguing that the breach of the navigational warranty here similarly voids this policy, whether or not the navigation of the vessel in Atlantic Waters, rather than in Gulf of Mexico waters as provided for in the warranty, contributed in any way to the loss of the Anzhela.  State National's argument would have merit, but for two important considerations.

First, as Anzhela points out, the law of insurance contracts also recognizes oral insurance agreements.  *See, e.g., Nu-Air Mfg Co. v. Frank B. Hall & Co. of N.Y.,* 822 F. 2d 987, 990 (11th Cir. 1987) (citations omitted).  "To be enforceable, the agreement must encompass the following essential terms: subject-matter, risk, amount of insurance, premium, duration of risk and identity of parties."  *Id.*  "The terms and provisions which control in the construction of the coverage afforded by a binder are those contained in the ordinary form of policy usually issued by the company at the time upon similar risks."  *Great Am. Ins. Co. of N.Y. v. Maxey,* 193 F.2d 151, 152 (5th Cir. 1951) (where a policy had been limited to "inland waters only" until the owner obtained an oral agreement extending coverage to the Gulf of Mexico).  As the Supreme Court put it, one should construe a maritime insurance policy "in the light of the circumstances which surrounded the parties at the time of its execution."  *Merchants' Mut. Ins. Co. v. Allen,* 121 U.S. 67, 69 (1887).  Thus, the parties' intent and knowledge of the purpose of a voyage must be factored into a policy's coverage.  *See id.* (finding coverage where "all parties knew that the business in which she was engaged took her

in and out of the last named port . . . . To get to and from it ships must navigate the Gulf of Mexico."); *see, e.g., Lemar Towing Co., Inc. v. Fireman's Fund Ins. Co.,* 352 F. Supp. 652, 658-59 (E.D. La. 1972) (rejecting insurer's argument for strict application of navigational warranty where "[c]ommon sense would . . . dictate that the interpretation of the navigation limits proposed by the underwriter is unacceptable."), *aff'd,* 471 F.2d 609 (5th Cir. 1973).

Based upon the record presented at trial with respect to this issue, the Court finds by the greater weight of the evidence that Anzhela has demonstrated that the policy's navigational limitation *does not* apply to the maiden voyage of the Anzhela from Fort Lauderdale to Golden Meadow.  The Court finds the Anzhela's owner's and agent's testimony to be credible that they communicated to State National's underwriter their intent to obtain coverage for that specific voyage, and *thereafter* only within the Gulf of Mexico.  The Court finds that State National's underwriter factored in any risk and premium associated with this trip coverage into the overall policy premium.  Specifically, the Court finds that the underwriter's contrary testimony lacks credibility on this issue given the state of the documentary record submitted at trial that fully supports Anzhela's intentions.

In particular, numerous emails and communications between the parties evidenced the fact that the vessel was located in Fort Lauderdale when coverage attached.  (DX 1, 2, 11, 177, 212).  Indeed, a February 14, 2007, communication to the underwriter, which attached the survey report, specifically referenced the need to transport the vessel to Louisiana in the next few weeks.  (PX 63).  Abundant

compelling documentary evidence is in this record that supports the testimony of the Anzhela's owner and agents as to their intent and how they went about obtaining trip coverage for the vessel.

Therefore each of the elements necessary for an oral insurance agreement to supplement a written maritime insurance contract have been satisfied. The navigational warranty that State National relies upon applies for all vessel operations *after* the initial voyage to Louisiana. And because the vessel was lost on that maiden voyage, which was known to and considered by the underwriter before coverage attached, the navigational warranty was not breached in this case.

## 2. *Held Covered Clause Applies*

A second consideration relates to the policy's "held covered" clause. The Court concluded above that the navigational warranty does not apply, by agreement, to the initial voyage of the vessel during which the loss occurred. But even putting that finding aside, the navigational warranty also does not void coverage for this loss based upon the held covered clause included in the policy:

> The Vessel is held covered in case of any breach of conditions as to cargo, trade, *locality,* towage or salvage activities, or date of sailing, or loading or discharging cargo at sea, provided (a) notice is give to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b) any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured.

(PX 65) (emphasis added).

The held covered provisions of a policy are designed to protect the owner of a vessel from the harsh results of inadvertent failure to comply with specified warranties

of the policy.  "By including the clause the insurer accepts the greater risk occasioned by a possible failure to comply with those warranties, on condition that the breach is not wilful. . . ."  *Campbell v. Hartford Fire Ins. Co.,* 533 F.2d 496, 497 (9th Cir. 1976), *quoted in Hilton Oil Transport v. Jonas,* 75 F.3d 627, 630 (11th Cir. 1996) ("The admiralty cases that support this principle are legion and form a judicially established and entrenched federal admiralty rule.").

In particular, a "held covered" clause can provide coverage when a breach of a navigational warranty occurs, "but only if the breach was not willful."  *Fenby v. M/V Three D of Guernsey,* 217 Fed.Appx. 846,849, 2007 WL 328810, at *1 (11th Cir. Feb. 2, 2007).  That is the case here, where the held covered provision applies to a breach of a condition of locality.  *See, e.g., Campbell,* 533 F.2d at 498.  A held covered clause can also be written in even broader language, where the provision is intended to address a breach of any condition of the policy.  *See, e.g., International Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co.,* 944 F. Supp 886, 894 (M.D. Fla 1996) (applying held covered clause to seaworthiness warranty where the provisions covered "any breach of warranty or deviation from the conditions of this policy, . . .").

We find, based upon the greater weight of the evidence, that even if the navigational warranty was not excluded for the initial trip to Louisiana, the held covered clause applies.  The "breach" of the warranty here was occasioned only by the owner's attempt to transport the vessel to the location where the coverage was intended.  It was thus an inadvertent violation, in so far as there was no willful or intentional effort made to violate the policy's conditions for any other purpose or

motivation.  Clearly, the insurer here had to expect the vessel to get to its original destination, thus the Anzhela's owner credibly testified that he did not believe there was any violation in transporting the vessel to the Gulf of Mexico.  The held covered clause is thus triggered to excuse technical and non-willful violations of the warranty and to avoid a harsh result from technical non-compliance.

Under either analysis, the Court finds that State National has not met its burden of proof as to Count IV of the Complaint because Anzhela did not breach the express navigational warranty in the policy.

### C.    _Unseaworthiness_

We turn then to the more difficult aspect of the case relating to State National's arguments on Counts II and III that the Anzhela Explorer was not seaworthy at the time the policy issued and when she sailed and was lost on March 24-25, 2007.  We say it is more difficult because, frankly, we have taken much time looking at this issue from all sides and conclude that reasonable people looking at these facts may draw different conclusions.[10]  Indeed, we have done so ourselves repeatedly and taken time to write these findings and conclusions accordingly.  After much deliberation, multiple reviews of the transcript and all the evidence, and unfortunately multiple drafts, we have settled on the following as being the more persuasive analysis of the competent evidence in the record presented.  And we do so mindful of what a young legal scholar once said; "it is better to have a line drawn somewhere in the penumbra between

---

[10]    We note here that this is in contrast to the Court's analysis of Count I and Anzhela's breach of its duty of good faith, which in our view does not present a close question and is fully dispositive of the case.

darkness and light, than to remain in uncertainty."[11]  As I am sure the parties would attest, we have remained in uncertainty long enough.

### 1.  *Seaworthiness Defined*

The presumption of law is that "every vessel is seaworthy until the contrary is proved, and the burden of proving that a vessel is unseaworthy lies upon the insurance company."  *Hanover Fire Ins. Co. v. Holcombe,* 223 F.2d 844, 846 (5th Cir. 1955). Seaworthiness has been defined in different ways, but undoubtedly it means "that the vessel is reasonably fit for the intended use."  *Aguirre v. Citizens Casualty Co.,* 441 F.2d 141, 144 (5th Cir. 1971); *see also  Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 103 (1944) (vessel is unseaworthy if it or its appurtenances are inadequate for the purposes they are ordinarily used); *Mills v. Mitsubishi Shipping Co.,* 358 F.2d 609, 613 (5th Cir. 1966) (the "classic" definition in the marine insurance context is whether vessel is reasonably suitable for the purposes intended).

There are three basic components to the determination of seaworthiness: the maintenance of the vessel itself; the competence of its crew; and the furnishing and maintenance of appurtenances and equipment onboard the vessel.  *See In re Hercules Carrier, Inc.,* 768 F.2d 1558, 1565-66 (11th Cir. 1985) (citing *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1155 (2d Cir. 1979) (a vessel "must be staunch, strong, well-equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion.")).

---

[11]    O. W. Holmes, *The Theory of Torts,* 7 Am. L. Rev. 652 (1873) (as collected in F. Kellogg, *The Formative Essays of Justice Holmes* 119 (1984)).

We will address the particular issues for each of these components in detail below.  But as a general matter it is well understood that seaworthiness is not an absolute standard.  The law of seaworthiness, which has evolved over considerable time in various maritime contexts, requires precisely the opposite:

> the owner is [not] obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.

*Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550 (1960).

That is why the scope of seaworthiness is not limited to defective conditions on the vessel itself and "might arise from any number of circumstances."   *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 499 (1971).  Seaworthiness is not an absolute standard and its scope is not definable in absolute terms:

> Seaworthiness is a comprehensive term, and a relative one. The requirement is that the vessel not only be staunch and strong, but also that she be fitted out with all proper equipment in good order, and with a sufficient and competent crew and compliment of officers.  But these requirements are relative to the voyage or service proposed. A ship that is in one or another of these respects unseaworthy for an Atlantic crossing in December may nevertheless be seaworthy for a coasting run to the south in the same season.

G. Gilmore & C. Black, *The Law of Admiralty* §2-6, at 65 (2d ed. 1975), *quoted in Acadia Ins. Co. v. Allied Marine Transp. LLC,* 151 F. Supp. 2d 107, 118 (D. Me. 2001); *see also Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422, 431 (5th Cir. 1968)

(seaworthiness is a relative term depending upon "the type of vessel and the character of the voyage") (citations omitted).

It is also important to remember that the Supreme Court has repeatedly taken pains to distinguish and contrast the *condition* of seaworthiness from *acts* of negligence of a shipowner or crewmember:

> A major burden of the Court's decisions spelling out the nature and scope of the cause of action for unseaworthiness has been insistence upon the point that it is a remedy separate from, independent of, and additional to other claims against the shipowner, whether created by statute or under general maritime law. More specifically, the Court has repeatedly taken pains to point out that liability based upon unseaworthiness is wholly distinct from liability based upon negligence. The reason, of course, is that unseaworthiness is a condition, and how that condition came into being – whether by negligence or otherwise – is quite irrelevant to the owner's liability . . . .

*Usner,* 400 U.S. at 498 ("What has evolved in our case law . . . is the 'complete divorcement of unseaworthiness liability from concepts of negligence.' To hold otherwise now would be to erase more than just a page of history.") (quoting *Mitchell,* 362 U.S. at 550); *see, e.g., Domingue v. Offshore Service Vessels, LLC,* 2009 WL 3254147, at *4 (E.D. La. Oct. 7, 2009) ("A vessel's condition of unseaworthiness might arise from circumstances such as defective gear, appurtenances in disrepair, or an unfit crew. . . . An isolated act of negligence does not establish unseaworthiness."); *Dover Barge Co. v. Tug Crow,* 642 F. Supp. 2d 266, 275 (S.D.N.Y. 2009) ("A single act of operational negligence, however, will not suffice to create an unseaworthy condition. Operational negligence must be 'pervasive or repeated frequently for it to rise to the level of an unseaworthy condition.'") (quoting *Federal Ins.,* 538 F. Supp. 2d at 697).

For these reasons, and because a finding of unseaworthiness is so fact and context intensive, which does not allow for the strict application of concrete and inflexible rules or postulates, the trier of fact must consider all the competing evidence and render a judgment based on an objective standard.  *See Kilpatrick,* 795 F.2d at 944-45 (citing *Aguirre,* 441 F.2d at 144 (determining seaworthiness of a vessel at a particular moment in time is the responsibility of the trier of fact)); *Gulfstream,* 409 F.2d at 980; *see also Waldron v. Moore-McCormack Lines, Inc.,* 386 U.S. 724, 727-28 (1967) (reversing lower courts' judgments setting aside jury verdict of unseaworthiness and rejecting strict lines being drawn between or among different components of seaworthiness).

### 2.  *Absolute Warranties of Seaworthiness*

 State National's strongest and most persuasive case for unseaworthiness arises in the context of the absolute warranties of seaworthiness owed by Anzhela in this case.  Under the American rules of admiralty law, an insured impliedly warrants to the insurer the seaworthiness of the vessel at the inception or attachment of a time policy like this one.  *E.g., Kilpatrick,* 795 F.2d at 945 (citing *Saskatchewan Government Ins. Office v. Spot Pack,* 242 F.2d 385 (5th Cir. 1975) ("*Spot Pack*"); *Gulfstream,* 409 F.2d at 974; *Aguirre,* 441 F.2d at 143-44.

This implied warranty, in contrast to the negative implied warranty of continuing seaworthiness discussed *infra,* is an "absolute" duty, which means that it is imposed regardless of fault, regardless of the owner's knowledge of the unseaworthy condition, and regardless of whether the unseaworthy condition was a proximate cause

of the loss of the vessel. *See Aguirre,* 441 F.2d at 144-46; *Spot Pack,* 242 F.2d at 388; *Employers Ins. of Wausau v. Occidental Petroleum Corp.,* 978 F.2d 1422, 1431-1440 (5th Cir. 1991) (continuing to follow former Fifth Circuit precedent in *Spot Pack* given its long-established precedence); *Underwriters at Lloyd's v. Labarca,* 260 F.3d 3, 8 (1st Cir. 2001) ("a finding of unseaworthiness is not affected by whether the owner was or was not negligent or at fault"); *Commercial Union Ins. Co. v. Flagship Marine Services, Inc.,* 190 F.3d 26, 32 (2d Cir. 1999)("[C]ompliance with the warranty was a condition precedent to liability [under the contract of marine insurance] and afforded a complete defense irrespective of any question of causation") (quotation omitted); *see also The Caledonia,* 157 U.S. 124, 131 (1895) ("This warranty is strictly a condition precedent to the obligation of insurance; if it be not performed, the policy does not attach; and, if this condition be broken, at the inception of the risk in any way whatever and from any cause whatever, there is no contract of insurance, the policy being wholly void.") (defining the traditional warranty in voyage policies that was the genesis for the implied warranty in time policies under the American rule as per *Spot Pack*); *The Law of Admiralty, supra,* §2-6 at 63 (if the vessel is not in fact seaworthy at the beginning of the voyage or at the inception of the risk then no recovery can be had on the policy; this result does not depend on the knowledge or fault of the assured nor on the subsequent loss being directly attributable to the lack of seaworthiness).

Hence a breach of the absolute duty of seaworthiness at the inception of a policy voids the policy altogether regardless of fault and regardless of whether the unseaworthiness contributed to the loss. *See Federal Ins.,* 538 F. Supp. 2d at 693-94

(citing 8-XII *Benedict on Admiralty* § 12.10, at 12-22 (7th ed. 2007) (the warranty "is absolute, and its violation voids the policy altogether, regardless of whether unseaworthiness at inception contributed to the loss."); 2 T. Schoenbaum, *Admiralty and Maritime Law* § 19-16, at 337 (4th ed. 2004)).

This absolute duty is implied under admiralty law.  The parties can also be bound by express warranties of seaworthiness in the policy itself, a violation of which also voids the policy in its entirety.  *See Aguirre,* 441 F.2d at 143; *Spot Pack,* 242 F.2d at 388.  Like the implied absolute duty of seaworthiness, a breach of an express warranty under the policy relieves the insurer of any obligation under the policy even if the breach did not cause the loss.  *Aguirre,* 441 F.2d at 143; *see, e.g., Lexington,* 835 F.2d at 1364 ("admiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss."), *cited in Port Lynch, Inc. v. New England Int'l. Assurety of Am., Inc.,* 754 F. Supp. 816, 819 (W.D. Wash. 1991) ("with respect to breaches of express warranties in a marine insurance contract, there is federal case law which calls for strict construction and renders policies void where such warranties are violated, even if there is no causal connection between the breach and the loss which has occurred").

State National here points to the seaworthiness clause in the Anzhela policy, which provides: "Warranted that at the inception of this Policy the Vessel(s) shall be in a seaworthy condition and, thereafter, during the currency of the Policy, the Assured shall exercise due diligence to keep the Vessel(s) seaworthy, and in all regards, fit,

tight, and properly manned, equipped and supplied." (PX 65 at 1020). State National alleges that this provision was breached by various deficiencies in the competency of the crew, the furnishing of equipment on board the vessel, and the maintenance of the vessel itself. We will address each issue in turn, focusing again for now only on the analysis under the more stringent absolute warranties of seaworthiness.

   (a)   *Competency of the Crew*

   State National argues that Anzhela's absolute duty of seaworthiness were breached based on the lack of a competent crew. Specifically, State National maintains that the crew was not competent to handle the emergency situation confronting them. Their failure to appreciate the situation and take corrective measures was the direct cause of the sinking. Though we agree with that latter point, we disagree with the premise that the crew's negligence during the sailing breached the absolute duty of seaworthiness.[12]

   There is no doubt, as cited earlier, that one of the components of seaworthiness involves the crew. *See Waldron,* 386 U.S. at 724; *Hercules,* 768 F.2d at 1565-66 ("Because the shipowner has a non-delegable duty to provide a competent master and

---

   [12]   We note that crew competency is usually not an issue for purposes of the absolute warranties of seaworthiness at inception of a policy. Indeed, the bulk of the cases cited by the parties and identified by the Court that address crew competency as evidence of unseaworthiness do so in the context of the warranties for continued seaworthiness after the inception of the policy (or other non-insurance contexts), for that is normally the point when a crew is assembled for a particular voyage. *See, e.g., Lemar,* 352 F. Supp. at 660-61 (analyzing crew competency under warranty of continuing seaworthiness as no argument was raised that the vessel was unseaworthy at the inception of the policy). See *infra* Sec. II.C.3. This case is unique in the sense that the inception of the policy and the first voyage were simultaneous. Indeed, the underwriter was made aware of the intended crew prior to coverage attaching. Therefore, we have addressed crew competency as part of both claims.

crew, unseaworthiness can be caused by insufficient manning of the vessel or an incompetent crew.") (citing *Tug Ocean,* 584 F.2d at 1155). A vessel is unseaworthy if its crew members are not reasonably fit for their intended use or service. *Mitchell,* 362 U.S. at 549; *Empire Seafoods, Inc. v. Anderson,* 398 F.2d 204, 210 (5th Cir. 1968) (crew was incompetent and rendered vessel unseaworthy because captain was inexperienced in intra-coastal waters and a qualified lookout was not onboard). "It is clearly the duty of a shipowner to not only provide a crew sufficient in number, . . . but also a crew competent for the duties it may be called upon to perform, including provision for any exigency which is likely to be encountered." *Lemar,* 352 F. Supp. at 661 (finding crew incompetent for the intended purposes of a vessel's voyage given the minimal experience a 21-year old unlicensed captain had on a tug boat and in the intended waterway) (citations omitted).

The critical factor in the analysis is whether or not the crew is competent based on the crew's sea experience and their experience in handling the type of vessel involved. *See, e.g., Horn,* 404 F. 2d at 431 (holding that the amount of sea and cargo experience of the crew was insufficient to render the vessel seaworthy; "she must also be provided with a crew, adequate in number and competent for the voyage with reference to its length and other particulars, and have a competent and skilled master of sound judgment and discretion"); *Empire Seafoods,* 398 F.2d at 210 (evaluating seaworthiness based on the captain's experience and availability of qualified lookout); *Acadia,* 151 F. Supp. 2d at 118 (considering the crew's experience in handling a vessel

of the type and size involved, court found vessel unseaworthy because its crew lacked experience in handling a vessel of the same type and size).

"The determination whether a shipowner has furnished a competent crew depends upon several factors, including whether the captain, pilot, and navigator are licensed; whether they have satisfactory safety records; whether they are familiar with the vessel and the waters on which it travels; and whether they are adequately trained. Although a pattern of safety violations certainly would be evidence of incompetence, a single accident does not render a pilot or navigator incompetent, for even competent pilots occasionally experience groundings and allisions." *Illinois Constructors Corp. v. Logan Transp.,* 715 F. Supp. 872, 886 (N.D. Ill. 1989).

Especially as it relates to the absolute duty of seaworthiness at the inception of the policy, we readily conclude that the crew was competent for the vessel's intended use. See *supra* ¶¶54-55. The crew had many years of experience in the operation of commercial vessels. Captain Eymard was fully and repeatedly licensed with the Coast Guard as a vessel captain. Although certainly not dispositive, the appropriate licensing of a vessel's crew is highly relevant. *See Hercules,* 768 F.2d at 1574 ("The courts have noted that it is possible to estimate the competency of a vessel's crew by examining their licenses."; finding unseaworthiness in part based upon unlicensed status of vessel's officers) (citing *In re Ta Chi Navigation (Panama) Corp., S.A.,* 513 F. Supp. 148, 159 (E.D. La. 1981), *aff'd,* 728 F.2d 699 (5th Cir. 1984)). Eymard's licensing for the type of vessel and voyage involved here is certainly competent evidence that supports the competency of the crew onboard the Anzhela.

Moreover, the deckhand, Steve Scibetta, had seamanship experience in various capacities since 1981.  Eymard credibly testified that he was familiar with the coastal waters of South Florida prior to taking command of the Anzhela, in part based upon his operation experience of commercial vessels off the Florida coast as a Captain for over six years.  The Anzhela owner credibly testified that the engineer was a hard worker and appeared to him to be competent and skilled prior to departure. Admittedly, Rosandich grew to be alarmed by the engineer's temperament and skill. But State National has not proven that, by the greater weight of the evidence, the engineer's experience and tangible seaman skills were so deficient or inadequate that they rendered the vessel unseaworthy.  Nor did State National argue that the number or type of crew members onboard the Anzhela were per se deficient in any way as to render the vessel unseaworthy.

It is also significant that all the crew members were employed and assigned by a respected entity that was familiar to and approved by State National's underwriter. Ms. Price testified that she insured the vessel based on her understanding that the transportation crew was a Fish Offshore crew.  The underwriter then approved the crew that was on the vessel at the time of loss.  All these factors in the record demonstrate that the greater weight of the evidence supports the competence of the crew for purposes of the absolute duty of seaworthiness.

State National's focus lies instead on how poorly the crew performed when the vessel encountered an emergency in rough seas and just yards offshore.  As the Court found, the primary cause of the loss of the vessel rests with the crew, and especially the engineer who more likely than not fell asleep while the starboard hull was filling with

seawater.  Obviously, the Anzhela's owner had no basis to believe that the crew or the engineer in particular would react in this negligent manner when the policy was issued.  His reliance on the competence of the Fish Offshore crew was reasonable under the circumstances and did not render the vessel unseaworthy at policy inception.

And, again, there is a material difference between acts of negligence and the failure to exercise due care under the circumstances and the condition of seaworthiness that results from a grossly deficient or incompetent crew.  *See Usner,* 400 U.S. at 498; *Mitchell,* 362 U.S. at 550; *see, e.g., Domingue,* 2009 WL 3254147, at *4 ("An isolated act of negligence does not establish unseaworthiness."); *Dover Barge,* 642 F. Supp. 2d at 275 ("Operational negligence must be 'pervasive or repeated frequently for it to rise to the level of an unseaworthy condition.'") (quotation omitted).  As one court put it in a seaworthiness case that also involved an allegedly incompetent crew, "[t]he vessel owner is not required to provide an accident free vessel or a perfect crew."  *Pettis v. Bosarge Diving, Inc.,* 751 F. Supp. 2d 1222, 1244 (S.D. Ala. 2010) (citing *Mitchell,* 362 U.S. at 550 (the standard is "not perfection, but reasonable fitness")).  In that case, the court found that the crew (commercial divers) were reasonably believed to be skilled, experienced and fit for their work aboard the vessel, even though they proved to be negligent in conducting the specific dives at issue; unseaworthiness had thus not been established.

Similarly, in *Illinois Constructors,* the court rejected a claim that an incompetent crew rendered a vessel unseaworthy, where the owners were found to have hired and trained experienced crew members and adequately manned the vessel with a sufficient

number of crew members prior to the loss.  "Thus, at most one of the crew members, . . . was negligent in navigating the vessel; this act of negligence, though, does not render him incompetent . . . ."  715 F. Supp. at 886-87.

We are presented with a similar record here, where the objective evidence of seamanship, skill and experience known or available to the Anzhela owner supported the competency of the crew at the inception of the policy.  The crew was reasonably fit for the intended purpose of the voyage to Louisiana.  We know now that the crew acted negligently and proximately caused the loss of the vessel.  But that fact does not render the vessel unseaworthy, either at the inception of the policy or even thereafter.  We reject State National's argument on this question.

(b)    *Inadequate Bilge Pumping Capacity*

State National then argues that Anzhela's owner and agents breached the absolute duty of seaworthiness based upon their failure to install the main fixed bilge pump located on the bilge manifold of the starboard hull.  Had that pump been operative, State National concludes, it would have been capable of handling the inflow of water from the hole in the exhaust.  Moreover, it would not have been necessary to keep the watertight hatches to the port and starboard engine rooms open. The use of portable pumps required open hatches to allow the discharge hoses and electrical connections to exit the respective engine rooms.

A vessel is unseaworthy if its appurtenances are inadequate for the purposes for which they are ordinarily used.  *E.g., Mahnich,* 321 U.S. at 103; *Mitchell,* 362 U.S. at 549.  The use of defective or inadequate equipment or gear not reasonably suited for

the purposes for which it is used may render a vessel unseaworthy. *Usner,* 400 U.S. at 499. The same holds true for improper maintenance of that equipment. *See, e.g., Hercules,* 768 F.2d at 1566.

There is no dispute that for COI certification the Coast Guard required the Anzhela to have two 50-gallon per minute fixed bilge pumps in each hull, each powered by an independent source. The Anzhela was equipped with a bilge manifold that permits the de-watering of the individual watertight compartments through the use of a single pump. The manifold permits the suction of the main bilge pump to be diverted to the various watertight compartments. Yet, it is undisputed that the Anzhela departed on the March 24th trip without her starboard hull fixed bilge pump. That pump had been removed because it was inoperable. It was not repaired or replaced prior to the first voyage. See *supra* ¶¶ 83-84.

Rosandich acknowledged as much and claimed that the plan was for the repaired pump to be installed at Fort Myers before the vessel completed the voyage to Louisiana. Rosandich credibly testified, however, that when the vessel departed it had nine pumps that could have been used to pump water out of the vessel. Out of the nine pumps, seven could have been used in the starboard hull. This included the mechanical bilge pump attached to the engine, a trash pump, and four submersible pumps.

As a result, and given the credible testimony of multiple experts who testified at trial, even without the main electrical bilge pump in place the vessel had more than adequate pumping capacity onboard at the inception of the policy. See *supra* ¶¶ 50,

84-85.  We know, in fact, that the bilge pump capacity that was onboard successfully

de-watered the hull and stabilized the vessel after the exhaust hose failed.  See *supra*

¶¶ 101-104.  This apparently was the case even though the crew did not or could not

use the main engine pump to de-water the vessel.

Again, the standard does not require perfection; reasonable fitness under the

circumstances is sufficient to render the vessel seaworthy.  *Mitchell,* 362 U.S. at 550.

Obviously, had the hull lacked the supplemental portable bilge pumps that were

purchased for this voyage, the vessel would clearly have been unseaworthy without the

fixed main pump installed.  *See, e.g., Nelsen v. Research Corp. of Univ. of Haw.,* 805 F.

Supp. 837, 851 (D. Haw. 1992) (vessel unseaworthy in part due to inadequate and

defective bilge pumps and lack of bilge alarm).

But with that supplemental pumping capacity onboard and available to the

crew, the overall pumping capacity available cuts against a finding that the vessel was

unseaworthy solely due to the absence of one particular pumping system.  *See, e.g.,*

*U.S. Fire Ins. Co. v. Riverside Ventures, Inc.,* 1990 WL 6036, at *5 (E.D. La. Jan. 17,

1990) (vessel may be seaworthy by use of a portable bilge pump, even in the absence

of a permanent bilge pump), *aff'd,* 915 F.2d 692 (5th Cir. 1990); *Federal Ins.,* 538 F.

Supp. 2d at 696 (vessel may be seaworthy without an automatic bilge pump if it has

an AC pump and engine-powered pump that can remove water adequately from the

vessel).  The competent evidence in the record fully supports this conclusion.

That is indeed evidenced in this case by the fact the portable pumps, by all

accounts presented at trial, successfully de-watered the pumps and stabilized the

situation long before the vessel was lost.  That alone constitutes competent evidence that the bilge pumping capacity onboard was sufficient for the types of exigencies one could expect on this voyage and the nature of this vessel.  As one court experienced in admiralty and maritime matters put it in a similar case:

> The simple fact that the [vessel] had no permanent bilge pump for the bow void, however, does not make the vessel unseaworthy.  The evidence in this case indicates that the three inch pump used . . . was adequate for the task of clearing the void of water that collected there.  Until the voyage during which the [vessel] sank, the crew had successfully used the pump to remove accumulated water for months without incident.  While the routine nature of the flooding might have made a permanent bilge pump a desirable feature for the [vessel], the warranty of seaworthiness does not require that the vessel owner keep the ship in perfect condition; the vessel must only be maintained in a condition reasonably suited for its intended purpose.  *P.T. Tugs, Inc. v. United States Fire Insurance Company,* 796 F.2d 125, 127 (5th Cir.1986); *Spot Pack,* 242 F.2d at 388.  Based on the evidence adduced at trial, regular use of the three inch portable pump used on the [vessel], and the lack of a permanent bilge pump on this vessel, did not render it unseaworthy.

*U.S. Fire,* 1990 WL 6036, at *5.

State National nevertheless makes a compelling case that the reliance on the portable bilge pumps created complications that contributed to the loss of the vessel; namely, the fact that the hatches on both hulls had to be opened and remain open for the portable pumps to dewater the vessel, thereby increasing the risk of water ingress into the hulls through those hatches.  It is certainly true that the use of the portable pumps increased the burden on the crew to adequately supervise the de-watering process. The fixed bilge pump would undeniably have helped matters.  But, again, that

does not mean the vessel was per se unseaworthy.  The vessel owner is entitled to assume reasonable care on the part of the crew in handling a water ingress issue and remaining alert and on watch when the pumps are required.  Moreover, no bilge pump system is a guarantee against water ingress overwhelming the vessel.  After all, if the vessel's electrical system malfunctions while on the voyage, the electrical main bilge pump would be of little use.   Portable gasoline-powered pumps may, in those circumstances, be the only pumps capable of de-watering a vessel.

The question for seaworthiness is whether, at the time of inception of the policy or the commencement of the voyage, it was reasonable to conclude that the vessel was fit and adequately equipped under the circumstances.  We conclude that it was, like the Eastern District of Louisiana in *U.S. Fire,* as well as the Southern District of New York's conclusion in *Federal Ins.* where a similar issue was raised.  In that recent case a vessel sank due to bad weather and loss of power rendering the steering and AC bilge pump inoperable.  The court found that the lack of an automatic bilge pump or automatic float switches on the bilge pumps did not render a vessel unseaworthy.  538 F. Supp. 2d at 696.  The vessel had an AC bilge pump, engine powered pumps, and a portable gasoline-powered pump that could have been used without power, but they were stored in the garage and the crew was unable to reach it under the unforeseen situation confronting the vessel.  *Id.*   Nonetheless, this did not render the vessel unseaworthy. *Id.*

We are presented here with a less compelling case for unseaworthiness where (1) the portable pumps were in fact in use and available to the crew, (2) the vessel had

onboard an engine bilge pump in the starboard hull that should have been available to substitute for the missing fixed pump, and (3) the crew successfully de-watered the vessel for several hours using the pumps available. Were these circumstances optimal? Clearly not. Did they heighten the burden placed on the crew and increase the risk to the vessel? Maybe. But were they evidence of a condition of seaworthiness? No. The Court credits the testimony of Anzhela's experts who explained why these factors demonstrated that the vessel was seaworthy in relation to the bilge pump capacity available at the inception of the policy and the time of the loss. State National has not proven otherwise by the greater weight of the evidence.

(c)    *Lack of Watertight Integrity*

We turn then to the most persuasive argument made as to the unseaworthiness of the vessel. Because each hull had five watertight compartments, State National presented evidence that the flooding of any one compartment could not result in the vessel sinking. The aft compartment where the exhaust hose was located comprised only one watertight compartment. Even if this compartment completely filled with water, it should not have caused the remaining compartments to fill with water and submerge the hull. Thus, water communicated through the watertight bulkheads causing all of the five watertight compartments to flood. The reason why, State National concludes, is that the repairs required to seal the penetrations in the watertight bulkheads, as identified by the Coast Guard, were not made prior to the sailing.

The Court's analysis begins with the agreement that watertight integrity of the bulkheads in the hull compartments of the vessel is essential. Specifically, Rosandich agreed without reservation at trial that keeping watertight bulkheads watertight is a "significant component of keeping a boat seaworthy." See *supra* n.5. Anzhela's seaworthiness expert agreed with that general principle, and none of Anzhela's other experts disputed it. State National's experts all testified that watertight bulkheads are a material part of a seaworthy vessel. Consequently, the uncontroverted evidence in the record requires the Court to accept the premise that watertight bulkheads are material to the seaworthiness of the vessel.

Moreover, this principle has been widely accepted in seaworthiness cases that the parties cited or the Court identified, including a former Fifth Circuit case that is relevant precedent here. *See D. J. McDuffie, Inc. v. Old Reliable Fire Ins. Co.,* 608 F.2d 145, 147 (5th Cir. 1979) (affirming finding that vessel was unseaworthy and breached absolute warranty at inception of policy in part because vessel lacked watertight compartments); *see also Nelsen,* 805 F. Supp. at 851 (vessel unseaworthy in part based upon lack of watertight integrity shaft alleys and engine room); *Ohio River Co. v. M/V Irene Chotin,* 238 F. Supp. 114, 117-18 (E.D. La. 1965) ("lack of watertight integrity" of a vessel's "hull and transverse bulkheads and compartments" rendered a vessel unseaworthy); *cf. Steel Coils, Inc. v. M/V Lake Marion,* 2001 WL 1518302, at *12 (E.D. La. Nov. 29, 2001) (vessel was unseaworthy in part because deficient hatch covers on cargo ship undermined their watertight integrity).

Significantly, no case was found where deficient watertight compartments were found to be immaterial to a seaworthiness determination.  In fact cases where the integrity of watertight bulkheads were unsuccessfully challenged never held, or even suggested in dicta, that their watertight integrity could simply be excused or overlooked.  Instead, courts found that there was a lack of evidence that watertight integrity was left compromised, as illustrated by the now-familiar *Federal Ins.* decision.

One of the issues in that multi-issue case, like ours, was whether the vessel was seaworthy even though its watertight bulkheads were compromised by plumbing penetrations and unfilled cut-throughs.  538 F. Supp. 2d at 695.  The district court ultimately found that coverage existed and that the vessel was seaworthy.  But with regard to this specific issue, the court did not suggest that the vessel could be deemed seaworthy even if the watertight bulkheads were not in fact watertight.  Instead the court reviewed the evidence and found as a factual matter that almost all penetrations were sealed prior to the voyage at issue. *Id.* Thus, the court found that any penetrations in the watertight aft engineroom bulkhead that remained at the time coverage was bound were trivial and did not render the vessel unseaworthy. *Id.*

Having settled on the material importance that watertight bulkheads have on the seaworthiness analysis, Anzhela's first argument in opposition rings hollow. Anzhela argues that watertight integrity of the bulkheads is not required for the type of voyage that the Anzhela was taking.  Specifically, the vessel was merely being transported to Louisiana to complete the COI process and was not engaged in

commercial activities at the time. It was, in other words, operating like a recreational vessel when it left port at Fort Lauderdale, which the Coast Guard approved when it transferred its inspection file to Louisiana in anticipation of the vessel's arrival in that district.

Anzhela is obviously correct that many, if not most, vessels navigating in our jurisdiction are not commercially certified vessels. They thus do not have the same safety protocols. Indeed, many of those vessels may not even be designed with watertight bulkheads and may simply be single-hulled vessels that have nothing more than bilge pumping capability to maintain seaworthiness. But the fact that this is undoubtedly true does not mean that this vessel, having been constructed with watertight compartments (and represented as such to the underwriter), should not reasonably be expected to maintain internal watertight integrity to be seaworthy. After all, this million dollar policy would not have been required or issued for a single hull recreational vehicle. The risk involved is far more significant, and thus with good reason the expectation for seaworthiness would also be more exacting.

As discussed in the preceding discussion, we agree with Anzhela that the absence of a current Coast Guard certification does not per se render the vessel unseaworthy at least for purposes of this initial intended use. *See, e.g., Mitchell,* 362 U.S. at 550 (seaworthiness only requires "a vessel reasonably suitable for her intended service"); *Horn,* 404 F.2d at 431 (seaworthiness depends on "the type of vessel and the character of the voyage"). And that is because many requirements necessary for COI certification do not implicate an integral component of seaworthiness. The policy was

issued, in fact, with the underwriter's knowledge that a COI had not yet been obtained and was still in process.

Yet, Anzhela has not provided us with any persuasive evidence or authority for the proposition that a modern commercially insured vessel may lack watertight integrity in its hull's compartments for any period of time, temporary or otherwise. That is because watertight bulkheads are universally recognized to be essential and integral for seaworthiness.  Though Anzhela's experts suggested that watertight bulkheads were not necessary for all vessels, they did not make that claim for commercial vessels.  They were instead referring to recreational vessels or other non-commercial marine craft.  The requirement of watertight bulkheads for any modern commercial vessel is really beyond much dispute, as illustrated by the fact we have found *no* case which excused a failure to maintain watertight bulkheads for a commercial vessel, despite the countless number of published maritime cases that exist.

Anzhela's other, and more persuasive, argument in response to this issue is that the watertight integrity of the bulkheads on the vessel was never compromised, or at least that State National has not proven to the contrary.  Anzhela relies on Rosandich's explanation at trial for what the Coast Guard was referring to when it noted a deficiency due to penetrations in the watertight bulkheads.  Specifically, Rosandich claimed that the watertight integrity of the bulkheads was not at issue.  The cause of the dispute related only to the removal of a locking door in one compartment due to changes in subchapter T regulations, as well as the type of sealing materials used in

the bulkhead penetrations. Thus, Rosandich maintains that, even if these two items were not resolved to the Coast Guard's satisfaction, the watertight integrity of the bulkheads remained.

Though Rosandich credibly testified to many other issues during his testimony, the Court took note that his testimony with respect to the watertight bulkheads was far less convincing. Rosandich's explanation fell flat, in part because the Coast Guard's summary and notations in the activity report do not appear to corroborate his version of the events. Despite the specificity with which other issues are discussed (PX 176), the Coast Guard inspector identified the problem only as "Transverse Bulkhead – Make all penetrations through water tight bulkheads watertight." The inference drawn from this is that there were material problems with penetrations in the bulkheads that needed to be addressed, rather than technical compliance issues as alleged by Rosandich. Moreover, none of Anzhela's experts supported this interpretation or explained away what was referenced in the activity report. Expert Samuel Windsor, for instance, conceded that he was not at all sure what penetration issues the Coast Guard was referring to.

Apart from the less-than-credible explanation that Rosandich provided, the Court also considered that neither Rosandich nor any other Anzhela witness credibly challenged State National's evidence that one of the deficiencies was the presence of open, uncapped pipes that penetrated the watertight bulkheads, which would have permitted water to travel from one compartment to another. These openings were found in the forward and aft engine room bulkheads. These penetrations permitted water entering the engine room to invade the watertight compartments forward and

aft of the engine room.  Anzhela's expert Ian Cairns credibly testified that he was able to observe evidence of those uncapped penetrations on his inspection of the vessel after being salvaged.

Moreover, Naval Architect Drew Hains credibly reenforced that testimony and confirmed that the penetrations likely referred to by the Coast Guard inspector were open pipes and unsealed wire and cable chases that pierced the bulkheads, which compromised the watertight integrity of the bulkheads.  This witness then credibly demonstrated the effects that a lack of watertight integrity would have on the vessel's ability to remain afloat upon the ingress of water.  Indeed, circumstantial evidence of the lack of watertight integrity exists in the form of the sunken vessel itself. Watertight compartments in the starboard hull, more likely than not, would not have permitted a total submersion of the hull and the resulting loss of the vessel.

Though Anzhela tried to deflect the strength of this testimony with its own expert, Windsor, who was not a naval architect but was a marine mechanical engineer familiar with the process, that expert's testimony lacked the weight and persuasiveness of State National's experts on the issue.  More particularly, Anzhela's expert did not try to rebut Cairns's testimony that he observed the open penetrations in the bulkheads.  Instead, Anzhela's expert maintained that it would not matter because it may not have taken flooded compartments in the entire hull to cause the boat to sink.

But that latter testimony goes more to the cause of the sinking than the underlying seaworthiness of the watertight bulkheads.  As we described earlier, we agree that the proximate cause of the loss of the vessel was not directly related to the

watertight integrity of the bulkheads.  The efficient cause of the loss was the crew's response to the ingress of water from the failed exhaust hose.  For purposes of the absolute warranties of seaworthiness, however, that finding does not help Anzhela's cause.  Contrary to what Anzhela argued in its post-trial submissions, at least with respect to the absolute warranties of seaworthiness implied by law and expressly required by the policy, an unseaworthy vessel voids the policy regardless of the owner's intent and regardless of the role that the unseaworthy condition had on the cause of the loss of the vessel.  *See Aguirre,* 441 F.2d at 145 ("If breach of the express warranty automatically suspended coverage under the policy, the question whether unseaworthiness proximately caused or contributed to the grounding becomes irrelevant.") (rejecting, per *Spot Pack,* the owners' contention that "in spite of the express warranty, coverage under the policy may be suspended or avoided only when unseaworthiness is a proximate cause of personal injury aboard the vessel."); *Gulfstream,* 409 F.2d at 983 n.28 ("if the vessel is unseaworthy . . . at the time the insurance attaches, the breach absolutely avoids the policy" and "'the underwriters are relieved of their liability notwithstanding the loss is not connected with the breach or the breach is cured prior to the loss.'") (quoting in part 45 C.J.S. *Insurance* § 650, at 555); *Lexington,* 835 F.2d at 1364.[13]

_____

[13]     Anzhela mis-cited the cases it relied upon for the proposition that causation is an element for a breach of an absolute warranty.  First, Anzhela quoted from *Lloyd's U.S. Corp. v. Smallwood,* 719 F. Supp. 1540, 1549 (M.D. Fla. 1989) ("Plaintiff/insurer had the dual burdens of proving that the vessel was unseaworthy and that the cause of the unseaworthiness was the proximate cause of the loss."), *aff'd,* 903 F.2d 828 (11th Cir. 1990).  *Lloyd's* pointed out in that same paragraph, however, that there was "no question" that the vessel involved "was seaworthy at the inception of the subject policy." *Id.*  Here, there is very much a question as to whether the vessel

In sum, the evidence supporting the Court's finding of unseaworthiness is greater and more compelling than the evidence submitted by Anzhela in defense of the watertight integrity of the bulkheads. Therefore, given the importance that watertight compartments have in maintaining a seaworthy vessel of this type, and the Court's finding that that the watertight bulkheads lacked the watertight integrity they were designed to have, we find that based on the greater weight of the evidence the Anzhela was not seaworthy when coverage was bound.  As a result, Anzhela breached its absolute warranties of seaworthiness at policy inception that are implied as a matter of law and expressly provided for in the special conditions of the policy.[14]

was seaworthy at the inception of the policy; thus, causation is not required.  Second, Anzhela cited *Spot Pack* for the same proposition, 242 F.2d at 389, even though the Fifth Circuit was faced with a policy that lacked an express warranty of seaworthiness, *id.* at 388 (the policy "was completely silent on warranties of seaworthiness.").  And the claim at issue only related to the owner's due diligence in maintaining the vessel in seaworthy condition after the policy issued (i.e. an implied warranty of continuing seaworthiness) which is not an absolute warranty.  *Id.* at 386, 391.  Given how well Anzhela's counsel litigated the case, it is not surprising that counsel has tried to blur the lines between the claims for breach of the absolute warranties from the breach of the implied continuing warranties.  Def. Prop. Findings at 70-74.  Counsel obviously recognizes as we do that, if the Court does not also blur those lines, Anzhela's defense to the absolute warranty claims will fail.

[14]    We note here as well that Anzhela claimed in its post-trial submissions that the policy's "held covered" clause, which we addressed earlier in Section II.B.2, also "cures" any breach of the warranties of seaworthiness.  Anzhela is wrong in this respect, primarily because the held covered provision in this policy does not refer or encompass in any way the insured's breach of a warranty of seaworthiness.  Instead, the provision only relates to "cargo, trade, locality, towage or salvage activities, or date of sailing, or loading or discharging cargo at sea, . . . ." (PX 65).  This is an explicitly narrower provision than the one addressed in *International Ship*, 944 F. Supp. at 894 that Anzhela relies upon for this issue.  That provision applied to "any breach of warranty or deviation from the conditions of this policy, . . . ."  That language is missing from the held covered clause at issue here.  Consequently, the held covered clause can save only a breach of the navigational warranty, as discussed earlier, but not a breach of a warranty of seaworthiness.  None of the cases Anzhela cites support

Accordingly, we regretfully must find in favor of State National on Count II of the complaint on this basis.  That regret is based on the recognition that Anzhela likely did not intend to pull a fast one, and instead believed in good faith that it could obtain insurance to cover the voyage to Louisiana to finish the work on the vessel.  Plus, the primary cause of the loss of the vessel focused on the negligence of the crew, which is precisely the type of peril that compels one to buy marine insurance coverage in the first place.

But Anzhela's good faith faltered when Anzhela failed to disclose to the underwriter the deficiencies that the Coast Guard identified with the watertight bulkheads.  And ultimately any subjective good faith Anzhela had is not enough to defeat State National's claim, which requires no showing of willfulness or causation.  Hence, the harsh result that will ensue from the Court's judgment is precisely what the originators of the absolute warranty of seaworthiness contemplated as being necessary to ensure that owners take all reasonable measures to assure that the vessel is adequately prepared for its intended use:

> It is not necessary to inquire, whether the owners acted honestly and fairly in the transaction; for it is clear law that, however just and honest the intentions and conduct of

---

Anzhela's position, and they instead reenforce the Court's interpretation.  *Compare Campbell,* 553 F.2d at 498-99 (held covered clause substantially identical to the Anzhela clause did not apply to a breach of layup warranty claim that was not encompassed by the perils identified in the clause), *with Kalmbach, Inc. v. Insurance Co. of State of Pa., Inc.,* 529 F.2d 552, 555-56 (9th Cir. 1976) (held covered clause that "held covered in the event of *any breach of warranty*, or deviation from the conditions of this policy" applied to negate effect of a breach of layup warranty) (citing *Greenock Steamship Co. v. Maritime Ins. Co.,* 1 K.B. 367 (1902) (similar unlimited held covered clause excused an underwriter's claim for breach of warranty of seaworthiness)).

> the owner may be, if he is mistaken in the fact, and the
> vessel is in fact not seaworthy, the underwriter is not liable.

*The Caledonia,* 157 U.S. at 133-34 (quoting *Douglas v. Scougall,* 4 Dow. 269, 270, 1816

WL 3721 (HL 1816)).

### 3. *Warranties of Continuing Seaworthiness*

Again, we will address the merits of Count III even though the Court's findings

and conclusion as to Counts I and II are dispositive and require the policy to be voided

ab initio.  Count III relates to State National's alternative argument that Anzhela

breached the continuing duty of seaworthiness that is also implied by law, as well as

by the due diligence provision of the policy, based on the same deficiencies as those

already discussed above.

The "negative, modified warranty of seaworthiness" establishes that "the Owner,

from bad faith or neglect, will not knowingly permit the vessel to break ground in an

unseaworthy condition." *Spot Pack,* 242 F.2d at 388.  The implied negative warranty

of seaworthiness is an ongoing promise that the insured will not "knowingly send a

vessel to sea in an unseaworthy condition." *Employers Ins.,* 978 F.2d at 1432.

Moreover, this warranty can also arise as a matter of contract, which is the case here

based upon Anzhela's agreement to "exercise due diligence to keep the Vessel(s)

seaworthy." (PX 65 at 1020).

Often referred to as the warranty of continuing seaworthiness, this warranty

differs in two material ways from the absolute warranties addressed above.  First, this

warranty is not that the vessel shall continue absolutely to be seaworthy after the

policy attaches or at each departure from port; simply, that the vessel's owners do not

actually know that the vessel was unseaworthy when it left port. *Lloyd's,* 719 F. Supp. at 1549; *Spot Pack,* 242 F.2d at 388. Second, unlike the absolute warranties, this implied warranty requires a showing that the unseaworthy condition proximately caused the loss. *Spot Pack,* 242 F.2d at 388.

To establish a breach of this warranty, and absent specific language in a policy that alters the traditional implied warranty, State National must prove that (1) an unseaworthy condition existed at the commencement of the voyage; (2) the vessel's owners knew of that unseaworthy condition and allowed the vessel to sail anyway; and (3) that unseaworthy condition proximately caused the claimed loss. *E.g., Federal Ins.,* 538 F. Supp. 2d at 696; *Lloyd's,* 719 F. Supp. at 1549.

Given what we have already discussed at length regarding the seaworthiness of the vessel, we find that State National has not met its burden of proof to establish a breach of the implied warranty of continuing seaworthiness. As to crew competence, we reincorporate the analysis in the preceding subsection that explained why the crew was not per se unseaworthy and that owners did not knowingly use an incompetent crew. Because these conclusions undermine the first and second elements of the claim for warranty of continuing seaworthiness, State National's claim fails.

We did find, however, that the crew was negligence, and indeed incompetent, in the manner by which they responded to the ingress of water. We need not review that again here and reincorporate those findings and conclusions. That finding, we conclude, would satisfy the third element of this breach of warranty claim. Under federal maritime law, "the proximate cause is the efficient cause and not a merely

incidental cause which may be nearer in time to the result." *Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co.,* 302 U.S. 556, 562 (1938), *quoted and followed in Cavanaugh,* 732 F.2d at 835 ("In admiralty cases the 'cause which is truly proximate is that which is proximate in efficiency.'").

Consequently, this latter finding with respect to the incompetent performance of the crew dooms all the other deficiencies cited by State National to support its continuing seaworthiness claim. Because the predominant cause and most efficient cause of the sinking of the vessel was the crew's failure to properly deal with the ingress of water and their failure to remain on watch while the vessel was in peril, even if other deficiencies cited rose to the level of unseaworthiness, they did not breach this non-absolute warranty.[15]

With respect to the deficiency in the watertight bulkheads in particular, we found earlier that the watertight integrity of the hull was compromised, thus the vessel was not seaworthy at inception. We also found that the owners knew of this condition prior to the voyage. Hence, the first two elements of the cause of action in Count III have been satisfied. But for purposes of the warranty of continuing seaworthiness, the compromised watertight integrity of the bulkheads does not support the claim because the third element fails: the unseaworthy watertight compartments did not proximately cause the loss.

---

[15]    We further agree with Anzhela that the inchmaree clause in this policy would extend coverage for the loss of the vessel based upon the negligence of the crew, because that negligence would have been a latent defect to the owner. *See, e.g., Spot Pack,* 242 F.2d at 391; *Tropical Marine Products, Inc. v. Birmingham Fire Ins.,* 247 F.2d 116, 122 (5th Cir. 1957)

In sum, the Court finds that, by the greater weight of the evidence, State National has not met its burden of showing that the Anzhela's owners breached the implied warranty of continuing seaworthiness or the policy provisions requiring the owners to exercise due diligence in that respect. We find in Anzhela's favor as to Count III of the complaint and enter judgment accordingly.

### D.   *Counts V and VI are Mooted*

Though we have addressed many of the issues in the case that are really moot in light of the Court's judgment as to Counts I and II, we will not further do so as to Counts V and VI. These counts relate to specific coverage exclusions that State National relies upon to reduce the extent of any covered losses, assuming the policy is not void, regarding environmental damage or regulatory fines and penalties that are charged against the Anzhela and its owner. Because the Court has found that the policy is indeed void, Counts V and VI are now moot.

### E.   *Count VII - Reimbursement of Costs*

Count VII of the complaint sought recovery of $612,421.50 for the salvage and other costs (not including litigation costs) incurred by State National following the loss of the vessel. State National advanced payment of the salvage expenses and wreckage removal costs under a reservation of rights to reduce Anzhela's exposure to environmental damages and to prevent the government from federalizing the wreck removal. This reduced the Anzhela's exposure to additional expense.

No viable defense has been raised to State National's recovery of these costs other than those raised in defense to Counts I and II that the Court has now rejected.

Because judgment should be entered in State National's favor on those Counts, and because the Court has declared the policy in question to be void ab initio, State National has established that it is lawfully entitled to judgment under Count VII.

There has also been no defense or challenge raised to the reasonableness of the salvage costs sought in Count VII.  In any event, the Court finds that the original Sea Tow invoice was on a time and material basis agreed in advance by Anzhela's agent, Rosandich, and is therefore recoverable.  The second Sea Tow invoice was the low bid.  Thus both were reasonable and necessary for State National to pay under the circumstances under a reservation of rights.

Accordingly, State National is entitled to reimbursement of the $613,421.50 advanced on behalf of Anzhela, less all premiums paid to date by Anzhela on the policy. *See, e.g., American Home,* 423 F. Supp. 2d at 197.

### F.    *Counterclaims*

Count I of the Amended Counterclaim stated a breach of contract claim and sought payment under the policy for the loss of the vessel due to a covered peril.  The Court has now found that the policy at issue is void ab initio under federal admiralty law.  That finding is also a complete affirmative defense to Anzhela's breach of contract claim.  Accordingly, judgment must be entered in Counter-defendant State National's favor on Count I.

Count II stated a claim for conversion under state law based upon State National's alleged conversion and usurpation of the salvaged property belonging to Anzhela.  The essential elements for a claim of conversion under state law require that

a defendant knowingly obtained or used property belonging to another. *See, e.g.,*
*Swedish Telecom Radio v. M/V Discovery I,* 712 F. Supp. 1542, 1547 (S.D. Fla. 1988).
The Court has found that no salvage property belonging to or otherwise claimed by
Anzhela was wrongly obtained or usurped by State National or its agents. Therefore,
the Court finds that, by the greater weight of the evidence, Counter-claimant Anzhela's
claim of conversion has not been proven. Accordingly, judgment must be entered in
State National's favor on Count II of Anzhela's pending counterclaim.

### III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED** that
judgment shall be entered by separate Order in favor of State National on Counts I,
II and VII of the complaint, and in favor of Anzhela on Counts III and IV. Counts V
and VI shall be dismissed as moot (with all other claims in the complaint having been
previously dismissed).

It shall be furthered **ORDERED** and **ADJUDGED** that judgment shall be
entered in favor of State National on Counts I and II of the amended counterclaim.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 23rd day of
August, 2011.

EDWIN G. TORRES
United States Magistrate Judge